# EXHIBIT A

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

Patrick R. Kitchin, Esq. (SBN 162965)
1999 Harrison Street, 18th Floor, #3535, Oakland, CA 94612

| | |
|---|---|
| TELEPHONE NO.: 415-677-9058 | FAX NO. *(Optional):* |
| E-MAIL ADDRESS: prk@kitchinlegal.com | |
| ATTORNEY FOR *(Name):* Plaintiff Rahul Mewawalla | |

**FOR COURT USE ONLY**

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 9/3/2021 12:45 PM
Reviewed By: Victoria Castaneda
Case #21CV388444
Envelope: 7202782

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
STREET ADDRESS: 191 N. First St.
MAILING ADDRESS: 191 N. First St.
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

CASE NAME:
Rahul Mewawalla v. Stanley C. Middleman, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) | [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 21CV388444 |
| | | | JUDGE: |
| | | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[x] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 19
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 2, 2021

Patrick R. Kitchin
_____
(TYPE OR PRINT NAME)

▶ *(signature)*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or
    toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-
      domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
      harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| |
|---|
| FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)*<br>E-FILED<br>9/3/2021 12:45 PM<br>Clerk of Court<br>Superior Court of CA,<br>County of Santa Clara<br>21CV388444<br>Reviewed By: Victoria Castaneda<br>Envelope: 7202782 |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Stanley C. Middleman, an individual; Michael B. Middleman, an individual; Gregory E. Middleman, an individual; Erik L. Anderson, an individual; [Additional Parties Attachment form is attached]

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Rahul Mewawalla, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es:)*  Santa Clara County Superior Court<br>191 N. First Street, San Jose, CA 95113 | CASE NUMBER: *(Número del Caso):*<br>**21CV388444** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*:
Patrick R. Kitchin, Esq. 1999 Harrison Street, 18th Floor, #3535, Oakland, CA 94612 415-677-9058

| | | | | |
|---|---|---|---|---|
| DATE:<br>*(Fecha)*  9/3/2021 12:45 PM | Clerk of Court | Clerk, by<br>*(Secretario)*  Victoria Castaneda | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

 under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
    ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
    ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
    ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Rahul Mewawalla v. Stanley C. Middleman, et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

FREEDOM MORTGAGE CORPORATION; a New Jersey corporation; XPANSE, LLC, a Delaware limited liability company; ARCHWELL HOLDINGS LLC, a Florida limited liability company; ARCHWELL SOLUTIONS LLC, a Florida limited liability company; ARCHWELL MANAGEMENT, LLC, a Florida limited liability company; KEYSTONE B2B LLC, a Florida limited liability company; and DOES 1-50, inclusive

Page _____ of _____

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

E-FILED
9/3/2021 12:45 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV388444
Reviewed By: A. Rodriguez

1  Patrick R. Kitchin, Esq. (State Bar No. 162965)
   **KITCHIN LEGAL, APC**
2  1999 Harrison Street, 18th Floor #3535
   Oakland, CA 94612
3  Telephone: (415) 677-9058
   Email:  prk@kitchinlegal.com

4  Counsel to Plaintiff Rahul Mewawalla

5

6       SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF SANTA CLARA

7

8  RAHUL MEWAWALLA, an individual;          Case No.:      21CV388444

9          Plaintiff,                        **COMPLAINT FOR DAMAGES**

10     vs.
                                             1.  **Fraud-False Promise;**
11 STANLEY C. MIDDLEMAN, an individual;      2.  **Fraud-Concealment;**
   MICHAEL B. MIDDLEMAN, an individual;      3.  **Fraud-Misrepresentation;**
12 GREGORY E. MIDDLEMAN, an individual;      4.  **Negligent Misrepresentation;**
   ERIK L. ANDERSON, an individual;          5.  **Breach of Contract;**
13 FREEDOM MORTGAGE CORPORATION;             6.  **Breach of Covenant of Good Faith**
   a New Jersey corporation; XPANSE, LLC, a      **and Fair Dealing;**
14 Delaware limited liability company;       7.  **Retaliation-Labor Code § 1102.5;**
   ARCHWELL HOLDINGS LLC, a Florida          8.  **Retaliation-Labor Code § 98.6;**
15 limited liability company; ARCHWELL       9.  **Wrongful Discharge in Violation of**
   SOLUTIONS LLC, a Florida limited liability    **Public Policy;**
16 company; ARCHWELL MANAGEMENT,             10. **Intentional Interference with**
   LLC, a Florida limited liability company;     **Economic Relations;**
17 KEYSTONE B2B LLC, a Florida limited       11. **Intentional Inducement of Breach of**
   liability company; and DOES 1-50, inclusive   **Contract;**
18                                           12. **Negligent Interference with Economic**
19         Defendants.                           **Relations;**
                                             13. **Violations of Labor Code § 210;**
20                                           14. **Violation of Labor Code § 970, et seq.;**
                                             15. **Violations of Labor Code §§ 201, et**
21                                               **seq.;**
                                             16. **Violations of Business and Professions**
22                                               **Code §§ 17200, et seq.;**
23                                           17. **Constructive Trust;**
                                             18. **Equitable Accounting; and**
24                                           19. **Declaratory Relief**
25

26                                           **JURY TRIAL DEMAND**

1  Plaintiff, individually for his complaint against Defendants Stanley Middleman,

2  Michael Middleman, Gregory Middleman, Erik Anderson, Freedom Mortgage Corporation,

3  Xpanse, LLC, Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management,

4  LLC, Keystone B2B, LLC, and Does 1-50, inclusive, alleges upon information and belief, as

5  follows:

6  **JURISDICTION AND VENUE**

7  1.      Plaintiff is a citizen of the State of Washington who was employed in Santa Clara

8  County, California and subsequently in Washington State by Defendant Freedom Mortgage

9  Corporation as Executive Vice President, Platforms and Technology Businesses and Chief

10  Digital Officer between March 30, 2020 and January 22, 2021. Plaintiff was jointly employed

11  by Archwell Technology Corporation, referred to as Freedom Technology Corporation ("FTC")

12  in Plaintiff's employment contract, which was subsequently renamed Xpanse, Inc, and now

13  called Xpanse, LLC, from May 27, 2020 through January 22, 2021 as Chief Executive

14  Officer/President and Co-Founder.

15  2.      Defendant Stanley Middleman is the CEO and principal owner, shareholder and

16  beneficiary of Freedom Mortgage Corporation and is a resident of New Jersey and/or Florida.

17  Stanley Middleman has also been Chairman of a Mortgage Investment Corporation, which is a

18  NYSE listed publicly-traded company, and he also retains control and/or owns interests in

19  several other companies and businesses.

20  3.      Defendant Michael Middleman, son of Defendant Stanley Middleman and brother of

21  Defendant Gregory Middleman, is executive vice president of Freedom Mortgage Corporation

22  and is a principal owner of Archwell Holdings LLC, Archwell Solutions LLC, Archwell

23  Management LLC and Keystone B2B, LLC.  Michael Middleman is a resident of Pennsylvania.

24  4.      Gregory Middleman, son of Defendant Stanley Middleman and brother of Defendant

25  Michael Middleman, is Chief Operating Officer of Xpanse, LLC, vice president at Freedom

26  Mortgage Corporation and a principal owner of Archwell Holdings LLC, Archwell Solutions

Kitchin Legal, APC
Oakland

1  LLC, Archwell Management, LLC and Keystone B2B, LLC.  Gregory Middleman is a resident
2  of Pennsylvania.

3  5.      Erik Anderson is president and CEO of Defendant Archwell Holdings, LLC and
4  Defendant Archwell Solutions, LLC, and is a resident of Georgia.

5  6.      Defendant Freedom Mortgage Corporation is a corporation formed, organized and
6  existing under the laws of the State of New Jersey, and headquartered in Mount Laurel, New
7  Jersey. It is one of the largest financial services, mortgage and lending companies in the nation
8  and describes itself publicly as "the #1 FHA (government-insured) and VA Lender in the U.S.",
9  "one of the nation's largest full-service mortgage lenders" and "licensed in all 50 states, the
10 District of Columbia, Puerto Rico and the U.S. Virgin Islands."  Freedom Mortgage is a multi-
11 billion-dollar company that has multi-billion-dollar arrangements with numerous publicly-
12 traded banks and has also issued several large bond and other offerings in excess of several
13 hundreds of millions of dollars to investors in recent years subject to securities law, tax law,
14 corporate law, and other applicable laws. According to a 2021 news release from Freedom
15 Mortgage Corporation, the company had a well over $300 billion dollars mortgage portfolio
16 and had annual mortgage origination of $134 billion dollars in 2020. In addition, according to
17 public credit rating agency reports, the company has $9.5 billion of borrowing capacity across
18 committed and uncommitted warehouse facilities.

19 7.      Defendant Xpanse, LLC is a limited liability company organized and existing under the
20 laws of the State of Delaware.  It describes itself publicly as a FinTech (financial technology)
21 company "building the modern OS (operating system) for the greater mortgage industry,"
22 Xpanse, LLC is a wholly-owned subsidiary of Archwell Holdings, LLC, with Archwell
23 Holdings, LLC as the member and Archwell Management, LLC as the manager.  Xpanse,
24 LLC's corporate headquarters and principal place of business is in Bellevue, Washington.

25 8.      Defendant Archwell Holdings LLC is a limited liability company organized and
26 existing under the laws of the State of Florida. Archwell Holdings LLC as Defendant includes

Kitchin Legal, APC
Oakland

itself and all its various subsidiaries, affiliates, related entities, and interests. It owns, controls and retains interest in several entities and businesses, including Defendants Archwell Solutions, LLC, Archwell Management, LLC and Keystone B2B, LLC.

9.      Defendant Archwell Solutions, LLC is a limited liability company organized and existing under the laws of the State of Florida. It is a wholly-owned subsidiary of Archwell Holdings, LLC.

10.     Defendant Archwell Management, LLC, is a limited liability company and existing under the laws of the state of Florida.  It is a wholly-owned subsidiary of Archwell Holdings, LLC.

11.     Defendant Keystone B2B, LLC is a limited liability company and existing under the laws of the state of Florida. It is a wholly-owned subsidiary of Archwell Holdings, LLC.

12.     Plaintiff lacks sufficient information and belief to allege the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, pursuant to Code of Civil Procedure § 474.  For that reason, Plaintiff sues said fictitiously named Defendants by such fictitious names. When the true names, nature and capacity of said fictitiously named Defendants are ascertained, Plaintiff shall amend this Complaint accordingly.  At all times herein mentioned, all Defendants herein, whether named or unnamed were and are responsible and liable to Plaintiff for all of Plaintiff's damages and other relief prayed for herein.  Plaintiff alleges on information and belief that at all times herein mentioned, each of the Defendants herein, whether named or unnamed, was the agent, servant, employee, co-conspirator, co-adventurer, and employee of each other Defendant herein, whether named or unnamed. With respect to each action and inaction pled in the following paragraphs, each of the Defendants, whether named or unnamed, was acting within the full course and scope of their agency and employment and was acting with the full knowledge, consent, ratification and approval of each other Defendant herein, whether named or unnamed.

13.     The value of the damages, penalties and interest sought in this action exceed the

1    minimum jurisdictional requirements of the Court. Venue in the Court is proper because: (1)

2    Plaintiff entered into and executed the employment contract in Santa Clara County, California

3    (2) Plaintiff lived in and worked for Defendants in Santa Clara County, California; and (3)

4    Plaintiff and Defendants entered into a binding employment contract that selected California

5    law and Santa Clara County Superior Court as the venue for the resolution of all claims arising

6    out of Plaintiff's employment. (Exhibit A).

7    **BACKGROUND**

8     A.   <u>Plaintiff Negotiates an Agreement to Become the Founding President of the Company</u>

9       <u>that is Now Known as Xpanse, LLC</u>

10    14.    Plaintiff is an accomplished business, digital and technology leader. He earned an MBA

11    from the Kellogg School of Management, Northwestern University, and has numerous years of

12    executive management and leadership experience. Plaintiff has held leadership, executive and

13    entrepreneurial roles at a number of major business, digital and technology companies such as

14    Nokia, General Electric/NBCUniversal, Yahoo and has been featured in major publications

15    such as the Wall Street Journal, CNBC, Harvard Business Review and has also been involved

16    with philanthropic organizations such as SOS Children's Villages USA, one of the largest non-

17    profit organizations serving children in need.

18    15.    In 2019, Plaintiff entered into discussions with Defendant Stanley Middleman. Over the

19    course of the following several months, Plaintiff spoke with and met personally with Stanley

20    Middleman numerous times in both New York City, including on November 6, 2019 and

21    November 7, 2019, and at and near Freedom Mortgage's headquarters in Mount Laurel, New

22    Jersey on October 11, 2019 and on December 20, 2019, in addition to more discussions over

23    the phone, including on September 19, 2019 and October 17, 2019 about the Middleman

24    family's desire to create a technology company that would develop and market technologies to

25    revolutionize the tools and processes used by lenders and service providers in the mortgage

26    industry.   Stanley Middleman described the technology company as a multi-billion-dollar

Kitchin Legal, APC
Oakland

opportunity, and informed Plaintiff that the goal of the technology company is to take it public through an IPO. Stanley Middleman described to Plaintiff the substantial projected valuation of the technology company and how although he had already amassed substantial wealth, he saw this as an opportunity to further grow his and his family's coffers by several billion dollars. Plaintiff informed Stanley Middleman that for Plaintiff to consider this opportunity and partner with the Defendants, Defendants would have to provide Plaintiff with meaningful equity ownership as a central component of his employment compensation and the Defendants would have to commit that Plaintiff and Xpanse's employees get value and participate through equity ownership in the company.

16.     Plaintiff and Stanley Middleman discussed and agreed that the technology company would be incorporated, run and operated as an independent corporation, similar to how the NYSE listed publicly-traded Mortgage Investment Corporation that Stanley Middleman was involved with was operated, and that it would not be like Archwell Holdings or Freedom Mortgage Corporation, which were closely held and operated by the Middleman's. Stanley Middleman said to Plaintiff that he and the Mortgage Investment Corporation CEO would meet occasionally for lunch about once a month and the CEO of the Mortgage Investment Corporation ran the company independently. Stanley Middleman discussed with Plaintiff that the Middleman's had previously tried to generate substantial gain through technology related ventures. However, they had failed, and that it would key for them have a leader like Plaintiff to partner with to form, launch and lead the technology company, and to attract and recruit the caliber of talent needed.

17.     Defendant Stanley Middleman promised Plaintiff that Freedom Mortgage Corporation would contribute about $140-$150 million in annual revenue recurring run rate to the new technology company.  Stanley Middleman also promised Plaintiff that Freedom Mortgage Corporation would transfer substantial valuable intellectual property, transfer all the significant technology assets owned by Freedom Mortgage Corporation and Archwell Holdings, and

transfer large numbers of valuable technologists from Freedom Mortgage Corporation and Archwell Holdings related to the development of technology (including engineers and developers), to the new company.

18.　　Defendant Stanley Middleman also promised Plaintiff that he would get other major U.S. mortgage companies, including a specific NASDAQ listed publicly-traded company, to contribute and work with the new technology company. He described how his plans would further enhance the opportunity and value of the technology company, which would have about $200 million in annual recurring revenue. Stanley Middleman informed Plaintiff that in addition to getting the Chairman and CEO of the specific NASDAQ listed publicly-traded major U.S. mortgage company involved, he would get several other major mortgage companies, servicers and others operating in the industry to support the growth and success of the technology company.

19.　　Defendant Stanley Middleman informed Plaintiff that Freedom Mortgage Corporation and Archwell Holdings had significant existing technology assets and owned substantial valuable intellectual property. He promised those assets would be transferred to the technology company, which would enable the technology company to have a substantial base of assets, revenue, resources and technologists immediately and accelerate its success.

20.　　Defendant Stanley Middleman informed Plaintiff that he and his team of advisors had projected the technology company's valuation to be in the tens of billions of dollars. Defendant Stanley Middleman also informed Plaintiff that he intended to obtain a number of additional multi-million-dollar recurring revenue contracts from companies, including from the specific NASDAQ listed publicly-traded major U.S. mortgage company and others, to contribute additional revenue to the new technology company in addition to the $140-$150 million recurring annual revenue from Freedom Mortgage Corporation. This revenue would further support the technology company's aggressive growth plans and even further enhance the technology company's valuation and the value of the equity compensation.

Kitchin Legal, APC
Oakland

21.     Defendant Stanley Middleman informed Plaintiff that he planned for Plaintiff to lead the technology company over the next several years, that he viewed Plaintiff as a business partner, in addition to being leader of the technology company, and that Plaintiff would have a long-term employment and business relationship with the company as the company went public through an IPO, and post-IPO as the company continues to operate and expand.

22.     On about November 7, 2019, after discussions and meetings between Plaintiff and Defendants Stanley Middleman, Michael Middleman, and others, Defendant Stanley Middleman negotiated terms of employment with Plaintiff and told Plaintiff that he intended to send Plaintiff a formal employment offer.  Defendants wanted to hire Plaintiff to form, lead and build a spin-off technology company, which initially was to be called Freedom Technology Corporation ("FTC"), and to serve as its Founding President.

23.     Over the course of the following several weeks, Plaintiff engaged in contract negotiations with Robert King, Special Advisor to Defendant Stanley Middleman and Executive Vice President for Freedom Mortgage Corporation, who is a lawyer, and Christopher Staub, friend of Defendant Michael Middleman and Senior Vice President of Finance for Freedom Mortgage Corporation.

24.     During this time, Plaintiff was also in discussions with another company in the European Union to serve as its Managing Director and to take the role of CEO.  That company had offered Plaintiff at least $19,200,000.00 cash compensation over 3 years, with at least $7,200,000.00 cash compensation in the first year, for an initial 3-year fixed commitment, with expected 3-year recurring extensions henceforth.  That company also offered double-digit percentage equity that based on overall financial projections by the company would equal or exceed $200 million.

25.     Based on representations made to him by Defendants about the multi-billion-dollar opportunity for the new technology company, the value of the equity, the specific structure, form, and manner of the equity, their contributions, the independent nature and operation of the

1   technology company, C-Corp structure of the company, and long-term employment and

2   partnership, Plaintiff eventually elected to proceed forward with Freedom Mortgage

3   Corporation's more valuable offer.

4   26.     During a breakfast meeting with Stanley Middleman at 80 Columbus Circle in New

5   York City on about November 7, 2019, as Stanley Middleman and Plaintiff were negotiating

6   Plaintiff's employment terms including equity ownership and signing bonus, Plaintiff disclosed

7   that he was in discussions with another company. In response, Stanley Middleman promised

8   that the value of Plaintiff's ownership interests and the value of the new technology company

9   would be significant.  He promised he was committed to a long-term relationship with Plaintiff,

10  who would for several years to come serve as the leader of a multi-billion-dollar technology

11  venture.  Stanley Middleman said that he expected Plaintiff to take the company public and lead

12  it through to an IPO in four to five years, and to serve beyond.

13  27.     During this meeting Stanley Middleman described the plan to Plaintiff.  Plaintiff would

14  first join Freedom Mortgage Corporation.   When the technology company was formed,

15  Plaintiff's employment would be transferred there as its leader.  The Middleman's companies,

16  including Freedom Mortgage Corporation, Archwell Holdings, KeystoneB2B and other

17  entities, would transfer and fulfill their technology assets, revenue, technologists, intellectual

18  property and other contributions to the technology company.  Stanley Middleman would work

19  to secure revenue and other contributions from the specific NASDAQ listed publicly-traded

20  major U.S. mortgage company and others, and to obtain other parties to purchase equity stakes

21  in the technology company in order to establish attractive valuation benchmarks so that Plaintiff

22  could take the company public through an IPO. Stanley Middleman assured Plaintiff he would

23  be the leader of the company through the IPO and henceforth.  Stanley Middleman discussed

24  the timeline to take the company public within four to five years given his overall projections

25  and plans.

26  28.     Plaintiff discussed all of this with Stanley Middleman who re-emphasized his

Kitchin Legal, APC
Oakland

representations about the multi-billion-dollar opportunity for the new technology company, the magnitude of his revenue run rate, assets, intellectual property, technology, technologists and staff contributions, the value of Plaintiff's equity ownership, IPO plans for the technology company, Plaintiff being the technology company's founding President and leading the company long-term, and the technology company's independence and focus on external customers and markets. Based on Defendant Stanley Middleman's statements and explicit promises, Stanley Middleman suggested he would offer Plaintiff a 5% stake in the new company instead of the double-digit percentage equity stake in the new company that Plaintiff had requested during prior negotiations with Stanley Middleman. Stanley Middleman also negotiated down the terms of Plaintiff's signing bonus so that instead of receiving the signing bonus as a single lumpsum, only half of the signing bonus would be paid on the first company pay date following Plaintiff's start date and the second half of the signing bonus would be paid on the first pay date following Plaintiff's six-month work anniversary.

29.    On December 10, 2019, Robert King sent Plaintiff an offer letter for his consideration, copying Stanley Middleman and Christopher Staub. The offer letter contained terms that were inconsistent with terms discussed during direct negotiations with Stanley Middleman, however, and missed terms such as the signing bonus that Stanley Middleman had already agreed to and negotiated with Plaintiff.  Later that same day, Plaintiff returned a redline of the offer letter that reinserted the missing terms and added other customary terms.  In response, Robert King agreed to revise and subsequently, the parties agreed to put together a definitive employment agreement and contract.

30.    In January 2020, when the Defendants sent the employment agreement to Plaintiff, it contained provisions that are unlawful in California, where Plaintiff resided and was expected to work. Defendants had at least two seasoned lawyers involved in the contract negotiations: Robert King and Freedom Mortgage Corporation's Chief Legal Officer Steven Molitor. As negotiations stalled, Plaintiff retained and involved his personal attorney directly in the contract

Kitchin Legal, APC
Oakland

1  negotiations. Defendants and their employment attorneys suggested that the employment

2  agreement for Plaintiff's employment with Freedom Mortgage Corporation and the agreement

3  for Plaintiff's employment with the technology company (referred to as "Freedom Technology

4  Corporation" (FTC) in the Agreement) should use the same form of agreement for Plaintiff's

5  employment and both were attached together by the Defendants. During legal negotiations,

6  Defendants and their attorneys were especially focused on certain aspects of the contract, such

7  as the Termination for Cause definition and the Equity Agreement, and pushed hard for

8  acceptance on those terms. Eventually the parties reached agreement on all material terms of

9  Plaintiff's employment and compensation package, and entered into a for-cause executive

10  employment binding contract (Exhibit A).

11  31.    As per the negotiations and discussions, (i) the employment agreement with Freedom

12  Mortgage Corporation, (ii) the employment agreement with the technology company, referred

13  to as Freedom Technology Corporation ("FTC"), now known as Xpanse (See "Employment

14  Agreement between Freedom Technology Corporation" and Plaintiff, (included in Exhibit A

15  attached hereto), and (iii) the equity agreement including as early-exercise stock, form and

16  manner of equity structured as incentive stock options (ISO), non-statutory stock options (NSO)

17  or combination thereof (included in Exhibit A, attached hereto), and provisions around equity

18  acceleration, were all contemporaneously agreed to by all the parties, and incorporated into and

19  combined together in one overall binding employment agreement.

20  32.    The representations and promises made by the Defendants, including the substantial

21  contributions, revenue, assets, intellectual property, technologists transfers to the technology

22  company from the Middleman's and Freedom Mortgage Corporation were material

23  representations and were relied upon by Plaintiff.  Both parties agreed that Freedom Mortgage

24  Corporation would be the guarantor of the payments and benefits promised to Plaintiff in the

25  event that the technology company (referred to as Freedom Technology Corporation, thereafter

26  named as Xpanse) does not or is unable to meet its obligations to Plaintiff under Plaintiff's

Kitchin Legal, APC
Oakland

1  employment agreement (Exhibit A).

2  33.     Plaintiff accepted Defendants' employment offer based on statements and explicit

3  promises made by Defendants Stanley Middleman and Michael Middleman, and their company

4  representatives.  In lieu of the double-digit percentage equity stake in the new company Plaintiff

5  had requested during negotiations with Stanley Middleman, he accepted a reduced 5% equity

6  stake in the company as a material and central component of his compensation package.

7  Plaintiff expressed his desire to have key employees participate in the value of the technology

8  company and have ownership, and specifically agreed with the Defendants on the structure,

9  form and manner of equity ownership.

10  34.     Defendant Stanley Middleman, to Plaintiff's knowledge, had not provided nor

11  currently provides equity ownership to employees at Freedom Mortgage Corporation or

12  Archwell Holdings, and was hesitant to share equity with key employees. Stanley Middleman

13  expressed great pride to Plaintiff that he fully controlled and fully owned Freedom Mortgage

14  Corporation and Archwell Holdings and that he and his family had all the equity.  However,

15  Plaintiff expressed his preference to having employees participate in equity ownership and

16  negotiated with the Defendants to agree to have an additional 2.5% equity to offer the

17  technology company's key employees.

18  35.     Defendants also agreed with Plaintiff that the technology company's structure would

19  be a C-Corporation ("C-Corp"), which is also known as a Stock Corporation, to enable the

20  technology company to be structured and operated as an independent company, to provide

21  transparent ownership participation for employees, with the shareholder rights and protections

22  provided by a C-Corp, to gain the full value of the equity per a C-Corp entity structure and to

23  ensure the company could provide the form, manner and structure of equity to Plaintiff as

24  negotiated and agreed upon. The technology company was specifically referred to as Freedom

25  Technology Corporation in the executed employment agreement; i.e., it specifically used

26  "Corporation" affirming the agreement between Plaintiff and Defendants regarding the entity

Kitchin Legal, APC
Oakland

being structured and operated as a C-Corp.

36.     For equity ownership as negotiated and agreed upon, Defendants agreed for Plaintiff to be granted an early-exercise stock option and specifically, as incentive stock options (ISOs), non-statutory stock options (NSOs) or combination thereof, as determined by Plaintiff. This specific structure, form and manner of the equity was material to Plaintiff's employment terms, and substantially contributed to the value of the equity compensation of Plaintiff, and, therefore, was specified and included in the employment agreement (Exhibit A).

37.     Plaintiff's decision to accept the Defendants' employment offer and to not take another employment offer was based on the representations of Defendant Stanley Middleman, and others, that the company would be valued at tens of billions of dollars based on Freedom Mortgage Corporation's immediate contribution of $140-$150M of annual revenue rate, additional contributions secured from others such as the specific NASDAQ listed publicly-traded major U.S. mortgage company for recurring annual revenue to be at least $200 million, substantial valuable intellectual property and significant technology assets contributions, the transfer of Freedom Mortgage's technology divisions and staff, including a large number of technologists, the company structured as a C-Corp, the company operated independently with its own market-facing priorities and roadmaps, the equity as early-exercise, and specifically as incentive stock options (ISOs),  non-statutory stock options (NSOs) or combination thereof as determined by Plaintiff, and the Plaintiff's employment being immediately transferred to the technology company upon its formation and incorporation.

38.     Stanley Middleman represented that he would obtain significant contributions and multi-million dollars of annual recurring revenue from other major mortgage industry players such as the specific NASDAQ listed publicly-traded major U.S. mortgage company and others. According to the recurring revenue, assets, intellectual property, staffing, and other contributions' representations made by Defendant Stanley Middleman, and others, Plaintiff's 5% equity interest in the new company would be worth at least $400 million.

Kitchin Legal, APC
Oakland

39.     On February 7, 2020, Freedom Mortgage Corporation informed Plaintiff that they plan to have Plaintiff speak at their upcoming annual leadership conference. On February 18, 2020, Plaintiff signed and returned the employment agreement to Freedom Mortgage Corporation. Defendant Stanley Middleman informed Plaintiff on February 19, 2020 that he was very pleased that Plaintiff had signed the agreement; Stanley Middleman signed the Agreement on behalf of Freedom Mortgage Corporation on February 26, 2020 (Exhibit A).

40.     The 2020 employment agreement grew out of extensive negotiations, including numerous in-person meetings, breakfast, lunch and dinner meetings, in both New York City and at and near Freedom Mortgage Corporation's headquarters in Mount Laurel, New Jersey, and phone discussions.  During these meetings and discussions, the most senior executives and the owners of Freedom Mortgage Corporation, Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management, LLC, and Keystone B2B, LLC, including Defendants Stanley Middleman, Michael Middleman, and others, spelled out their aggressive enterprise value creation plans for the new independent technology company that would be worth tens of billions of dollars.   Defendants promised that Plaintiff would play the leading role as the founding president and leader of the independent technology company for many years to come.

B. Summary of Key Terms of the February 2020 Employment Agreement (Exhibit A)

41.     Key terms of the employment agreement include:

i.       Until the technology company was formed as a C-Corp, Plaintiff would be designated an employee of Freedom Mortgage Corporation as its Executive Vice President, Platforms and Technology Businesses and Chief Digital Officer, but his work would be focused entirely on the technology company.

ii.      Immediately after the technology company was created and incorporated, Plaintiff's employment would be transferred to the new company where he would assume the title and position of the company's founding President.

iii.     On the date the technology company was formed, Defendants would adopt and

Kitchin Legal, APC
Oakland

1 establish an equity incentive plan with a share reserve equal to at least 7.5% of the company's
2 total share capital.

3     iv.    As soon as Plaintiff's employment transferred to the technology company, it
4 would grant him an early-exercise stock option to purchase a number of shares of the company
5 equal to at least 5% of the company's share capital on a fully diluted basis as of the date of the
6 adoption of the technology company's stock plan. Options would be early-exercise and
7 incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof.
8 Plaintiff's equity would be immediately vested and accelerated given a number of
9 circumstances;

10     v.    As soon as Plaintiff's employment transferred to the technology company,
11 Plaintiff and that company would execute the included and already agreed to employment
12 agreement with the technology company (referred to as "Freedom Technology Corporation")
13 attached to and incorporated within the parties' original employment agreement. (Exhibit A)

14     vi.    Plaintiff would be paid a signing bonus of $1,000,000.00. Fifty percent of the
15 signing bonus ($500,000.00) would be paid on the first company pay date following Plaintiff's
16 start date (March 30, 2020). The Agreement required Defendant Freedom Mortgage
17 Corporation to pay the second half of the signing bonus ($500,000.00) on the first pay date
18 following Plaintiff's six-month work anniversary (September 30, 2020).

19     vii.    Plaintiff would be paid a beginning annual base salary of $1,500,000.00.

20     viii.    Plaintiff would receive performance bonuses, including but not limited to, a
21 guaranteed bonus at the end of his first year of employment in an amount equal to his annual
22 salary, at a minimum of $1,500,000.00.

23     ix.    Plaintiff would receive at least 20 calendar days' paid time off each calendar
24 year.

25     x.    Plaintiff's and the technology company's employee bonus plan, as subsequently
26 discussed and agreed upon, was determined to be increased to up to 150% of base salary i.e.

Kitchin Legal, APC
Oakland

1    $2,250,000.00.

2          xi.     Plaintiff was entitled to the enhanced employment benefits of the technology

3    company, including but not limited to, 100% matching and fully-vested 401K contributions,

4    no-cost health insurance coverage for him and his family, annual inflation (at least 3%) and

5    other base salary increases, annual wellness bonuses, and additional bonuses and benefits.

6          xii.    Plaintiff's employment would be subject to a good-cause termination provision

7    pursuant to 8(f)(i) of Exhibit A, and not to be deemed "at will." If Plaintiff were terminated

8    without "good cause," as defined within the employment agreement, he would be entitled to a

9    number of substantial benefits, including:

10               a.   A single severance lump sum payment in an amount equal to one full year of

11                    cash compensation, defined as (a) the Executive's Base Salary plus (b) the

12                    Executive's annual Performance Discretionary Bonus calculated at 100% of

13                    Base Salary (payable regardless of the Executive's satisfaction of the

14                    performance metrics for such Performance Discretionary Bonus);

15               b.   A single lump sum payment of the Performance Discretionary Bonus to be

16                    payable to the Executive for the immediately preceding Performance Year that

17                    has not yet been paid to the Executive as of the date of the Executive's

18                    termination calculated at 100% of target.

19               c.   Twelve months equivalent company-paid COBRA benefits for Plaintiff and his

20                    family.

21               d.   A pro rata amount (calculated pursuant to the Employment Agreement) of the

22                    current year's target Discretionary Performance Bonus amount, irrespective of

23                    whether the performance goals applicable have been established or satisfied,

24                    which is calculated pro rata of 100% of Base Salary, however as subsequently

25                    discussed and agreed upon, the Discretionary Performance bonus plan for the

26                    Plaintiff and the technology company was determined to be increased to up to

Kitchin Legal, APC
Oakland

1 | 150% of Base Salary.

2

3 | C. <u>On May 27, 2020, Xpanse is Established, Formed, Incorporated and Registered as a</u>

4 | <u>Delaware C-Corp.</u>

5 | 42.    Defendants Stanley Middleman, Gregory Middleman and Michael Middleman initially

6 | named the technology company, erstwhile referred to as Freedom Technology Corporation

7 | ("FTC"), as Archwell Technology Corporation. Approximately two months after Plaintiff

8 | began working for Defendants, they incorporated FTC in the State of Delaware on May 27,

9 | 2020, as a C-Corp. The Middleman's subsequently renamed the company, Xpanse, Inc. Based

10 | on public filings made under penalty of perjury by Gregory Middleman in Arizona on August

11 | 17, 2020, Xpanse, Inc. authorized 10,000 shares and issued 1,000 shares. Defendants failed to

12 | disclose this activity to Plaintiff.

13 | D. <u>Plaintiff Became a Joint Employee of Freedom Mortgage Corporation and Xpanse</u>

14 | 43.    Over the course of the following months, Defendant Gregory Middleman registered

15 | Xpanse, Inc. in several states, including California, Washington, Arizona, New Jersey, Florida,

16 | Pennsylvania, Michigan, Virginia, Texas among others. In these filings, Defendant Gregory

17 | Middleman declared under penalty of perjury that Plaintiff was the Chief Executive Officer of

18 | Xpanse, as filed with the Secretary of State of California (See Exhibit B), with similar filings

19 | per declaration by Defendant Gregory Middleman under penalty of perjury across several states

20 | that Plaintiff was the Chief Executive Officer/President/Governor of Xpanse.

21 | 44.    Xpanse's public website also stated that Plaintiff was "CEO & Co-Founder" of the

22 | company, and in external and internal meetings, the company referred to Plaintiff as the Chief

23 | Executive Officer and Co-Founder of the company. Defendants used Freedom Mortgage

24 | Corporation as a temporary platform to house Plaintiff until Xpanse, Inc. was formed and

25 | legally capable of hiring employees.

26 | 45.    From the beginning of his engagement by Defendants, Plaintiff's work was focused on

Kitchin Legal, APC
Oakland

creating and building Xpanse as a technology company. Although Plaintiff reported directly to Defendant Stanley Middleman of Freedom Mortgage Corporation, his role was to lead the independently-formed technology company.

46.     Soon after Xpanse's incorporation, the company started bringing onboard and hiring employees of Xpanse, but did not bring onboard and immediately transfer Plaintiff to Xpanse, which was required by Plaintiff's employment contract.

47.     Given Defendant Stanley Middleman's promises and commitments around aggressive growth plans, Plaintiff recruited, attracted and brought on leadership, engineering, product, design, technology and other talent into the company with experience from multi-billion dollar and high growth companies such as Amazon, Facebook, Microsoft, Zillow among others. Based on promises Defendants made and upon authority granted to him, Plaintiff offered stock options in Xpanse, Inc. to key employees as an incentive for joining the new technology company.

48.     Defendant Gregory Middleman remarked to his father Stanley Middleman and brother Michael Middleman how amazed he was with the caliber, experience and expertise of talent Plaintiff and the company were in discussions with, and with the caliber and level of talent that was coming onboard.

49.     Plaintiff kept Defendant Gregory Middleman involved in these discussions and decisions, and Defendants Stanley Middleman and Michael Middleman were regularly kept abreast and apprised. Defendant Gregory Middleman controlled employment terms offered to employees, including equity ownership and stock options, by keeping himself as the signatory for Xpanse employment letters.

50.     The Xpanse leadership and executive team reported to Plaintiff on a daily basis, including the senior most product, engineering, design, technology, business executives, and he was fully focused on leading the company and driving the company's growth in his role as CEO and Co-Founder of Xpanse.

Kitchin Legal, APC
Oakland

E. <u>In Malicious Breach of Plaintiff's Employment Agreement, Defendants Failed to Transfer Plaintiff's Employment to Xpanse</u>

51.    Soon after the incorporation of Xpanse in May 2020 and for several months following, Plaintiff engaged in multiple discussions with Defendants Gregory Middleman, Michael Middleman and Stanley Middleman, among others, requesting transfer of his employment to Xpanse, Inc as had been promised in the employment agreement. Plaintiff was functioning in all respects as the CEO and Co-Founder of Xpanse and was referred to by the Defendants and others in external and internal meetings as the leader of the technology company and was declared as such by Defendant Gregory Middleman across numerous state filings under penalty of perjury.  Yet for undisclosed reasons, Defendants refused to transfer his employment there.

52.    Defendant Gregory Middleman, who was an executive and vice president of Freedom Mortgage Corporation, transferred his own employment to Xpanse as the company's chief operating officer, and also promptly availed himself of the company's superior benefits and other employment entitlements, all of which were denied and not made available to Plaintiff.

53.    In about September 2020, in a meeting with Plaintiff, Defendant Gregory Middleman, Robert King and Christopher Staub asked Plaintiff if he would consider delaying the transfer of his employment to Xpanse until sometime after the beginning of 2021.  In response, Plaintiff reminded them that the transfer had already been delayed well beyond the incorporation of the technology company, which was completed back in May 2020, and Plaintiff requested to be transferred immediately in compliance with the employment agreement.

54.    For reasons that only became clear to Plaintiff later, Defendants continued to promise transferring his employment to Xpanse, yet refused to do so.

F. <u>Defendants Made Material Misrepresentations to Plaintiff Regarding Their Contributions, Structure and Plans for the Technology Company, Concealed Material Information, and Made False and Fraudulent Promises to Plaintiff.</u>

55.    Defendants Stanley Middleman, Michael Middleman and others represented to Plaintiff

Kitchin Legal, APC
Oakland

that they and Freedom Mortgage Corporation, Archwell Holdings LLC, Keystone B2B LLC and others would transfer all the significant technology assets, substantial valuable intellectual property, technology related platforms and assets, and large numbers of technologists from Freedom Mortgage Corporation, Archwell Holdings LLC and Keystone B2B LLC to the technology company.

56.     However, Freedom Mortgage Corporation did not have full lien-free rights and transfer privileges for all its intellectual property and significant technology assets upon Plaintiff's commencement of employment. Defendants Stanley Middleman and Michael Middleman were fully aware of this during negotiations and discussions with Plaintiff; however, all of them concealed these material facts from Plaintiff.

57.     Defendant Stanley Middleman, Michael Middleman and others represented to Plaintiff that Defendants Freedom Technology Corporation, Archwell Holdings and Keystone B2B LLC had existing valuable technology platforms, substantial intellectual property and would transfer a large number of skilled technologists that the technology company would build upon and accelerate its success with customers and with the broader industry. However, much of Freedom Technology Corporation's core code was outdated, legacy and inflexible in nature, and was not particularly useful for external customers.  Keystone B2B LLC had no valuable internal technology development talent and it did not have ownership of technology nor intellectual property nor the data models and architecture. Defendants were fully aware of these facts and concealed all this material information from Plaintiff during negotiations and discussions. The truth of these facts remained concealed from Plaintiff until the true state of affairs was uncovered after having direct discussions with the respective tech and other teams.

58.     Furthermore, the technology and platform used by Archwell Holdings and its subsidiary Keystone B2B, LLC was not even owned by the Middleman's but was commercially licensed from a third-party company, and there was no available access to the architecture or data models and no ownership of the intellectual property and technology platform. Defendants were fully

1  aware of the inflexible and outdated nature of the code at Freedom Mortgage Corporation, the

2  third-party licensing arrangement, its restrictions, the absence of owned intellectual property,

3  lack of technology development talent, and/or absence of access to the architecture or data

4  models at Archwell Holding's subsidiary Keystone B2B LLC; however, they had

5  misrepresented and concealed this from Plaintiff.

6  59.    During the course of the entire calendar year 2020, and early 2021, Freedom Mortgage

7  Corporation, Archwell Holdings, Archwell Management, Archwell Solutions, and Keystone

8  B2B did not transfer any significant intellectual property, technology platforms, or substantial

9  assets to the technology company, despite promises and representations that were made to

10  Plaintiff during negotiations and discussions.

11  60.    Defendants Stanley Middleman, Michael Middleman and others represented to Plaintiff

12  that they would transfer a large number of technologists, staff and assets from Freedom

13  Mortgage Corporation to the technology company. Freedom Mortgage Corporation did not

14  transfer a large number of technologists, staff, resources and assets to the technology company.

15  Defendants did not even prepare a transition plan for such transfer to the technology company,

16  again misrepresenting their intentions to Plaintiff. Plaintiff also asked Defendants for approval

17  to prepare such a plan; however, Defendants delayed and evaded having any plans for

18  transferring substantial technologists and assets from Freedom Mortgage Corporation,

19  Archwell Holdings and its entities to Xpanse upon Plaintiff's commencement of employment

20  and during his employment. Plaintiff also asked Defendants Stanley Middleman and Michael

21  Middleman about resourcing the technology company with the significant revenue, intellectual

22  property and substantial staffing transfers as they had represented to Plaintiff; however, they

23  repeatedly evaded and delayed on their promises and commitments to Plaintiff.

24  61.    Defendants had represented to Plaintiff that Archwell Holding's technology

25  subsidiaries, affiliates and related platforms, staff, and assets would be transferred to the

26  technology company, which also included transferring Defendant Keystone B2B LLC to

1    Xpanse. While Defendants represented this to Plaintiff both before and after his commencement
2    of employment, Defendants, including Defendant Michael Middleman's friend and Freedom
3    Mortgage Corporation's Senior Vice President Christopher Staub, Defendant Erik Anderson,
4    Defendant Gregory Middleman and others, were concurrently providing employees of
5    Keystone B2B LLC with contrary information and representations.

6    62.     Defendant Stanley Middleman represented that Freedom Mortgage Corporation would
7    contribute $140-$150 million of annual recurring revenue run rate. However, Defendants did
8    not contribute the $140-$150 million of annual recurring revenue run rate from Freedom
9    Mortgage Corporation to the technology company that the Defendant Stanley Middleman had
10   promised and misrepresented to Plaintiff.

11   63.     Defendants did not execute any revenue contracts between the technology company and
12   Freedom Mortgage Corporation during the entire calendar year 2020, and through 2021 during
13   Plaintiff's employment, even though several revenue terms sheets and contracts were prepared
14   and discussed by Plaintiff and Timothy M. Beard, Chief Financial Officer (CFO) of Xpanse,
15   with Defendants Michael Middleman, Gregory Middleman and Stanley Middleman.
16   Defendants Michael Middleman, Gregory Middleman and Stanley Middleman made repeated
17   representations to Plaintiff that they would execute independent and market-standard revenue
18   agreements with Xpanse, however, they did not do so through the entire 2020 calendar year and
19   through 2021 during Plaintiff's employment even though the Defendants had Xpanse develop
20   and build technology and develop intellectual property development for the benefit of Freedom
21   Mortgage Corporation, Keystone B2B LLC, Archwell Holdings LLC, its subsidiaries and
22   affiliates. In addition, revenue and pricing model proposals made by Plaintiff that would
23   significantly increase revenue and value of Xpanse were not made effective by Defendants
24   because they wanted to capture and retain that revenue and value in other Archwell-affiliated
25   entities which were 100% owned by the Middleman's, to the detriment of Xpanse, it's revenue,
26   scale, valuation and economic growth, and damaging Plaintiff and Xpanse's employees.

64.      Defendant Stanley Middleman made representations regarding additional multi-millions of annual recurring revenue run rate from the specific NASDAQ listed publicly-traded major U.S. mortgage company and others; however, Defendants did not allow Plaintiff nor CFO Timothy Beard to discuss or even communicate with the specific NASDAQ listed publicly-traded major U.S. mortgage company regarding the additional multi-million annual recurring revenue run rate that the Defendants had represented to Plaintiff.

65.      Defendant Stanley Middleman, Michael Middleman and Gregory Middleman made representations to Plaintiff that the technology company would be an independent market-facing company to enable management to be focused on serving the best interests of the technology company, external customers and its employees. However, Defendants refused Plaintiff from having an independent and external market-facing product and market roadmap. Instead, Defendant Michael Middleman coerced Plaintiff to have a roadmap serving the needs and priorities of Freedom Technology Corporation and the Archwell entities. Funding and financing were being conditioned by the Defendants as such and based on the self-serving near-term interests of the Middleman's instead of the technology company advancing its own independent market-facing roadmap and priorities focused on the long-term best interests of the technology company, external customers and its employees. Defendant Gregory Middleman used the payroll of the technology company to hire his own friends, and Defendant Michael Middleman and his staff hired people on the payroll of the technology company with the intent and with instructions to serve the self-serving interests of Freedom Mortgage Corporation instead of serving the independent technology company, its commercialization activities and external customers. In addition, instead of having the technology company as an independent company, Defendants in December 2020 even referred to the technology company as a member of the "Freedom Family of Companies."

66.      Defendant Stanley Middleman and Gregory Middleman represented to Plaintiff that Xpanse would provide employee ownership through grants of employee stock options for

1    Plaintiff's co-workers, staff and employees, but refused Plaintiff to take actions to enable that
2    and Defendants did not provide an equity plan nor equity grant documents to any of the other
3    key employees promised equity, even though Defendants had represented that Plaintiff as the
4    leader of the technology company could make these decisions to serve the best interests of the
5    technology company and its employees.

6    67.    Plaintiff was fraudulently misled to act in reliance on the Middleman's
7    misrepresentations. Based on their representations and promises, Plaintiff made similar
8    representations and promises to executives and employees that were recruited and brought
9    aboard the technology company. These executives and employees relied upon these material
10   representations. Defendants Stanley Middleman, Michael Middleman and Gregory Middleman
11   were aware that their misrepresentations, false promises and concealments would cause both
12   personal and economic harm to Plaintiff and his co-employees at Xpanse.

13   68.    Defendants and Plaintiff negotiated and agreed in the employment contract (pursuant to
14   Exhibit B of the employment contract), and Defendants represented that they would adopt
15   comments provided by Plaintiff to ensure commercially reasonable terms and conditions in the
16   technology company's equity plans upon Plaintiff's commencement (see Exhibit A); however,
17   the Defendants did not intend to and did not do so, and instead, slipped in highly unusual and
18   unreasonable material terms and provisions without advance discussion or agreement with
19   Plaintiff, such as but not limited to, a vested share repurchase provision and a five-year purchase
20   note provision, and the Defendant's scheme was caught by and objected to by Plaintiff and his
21   counsel.

22   69.    The vested share repurchase provision Defendants slipped into the equity plan, without
23   any advance discussion with Plaintiff, would egregiously enable Defendants to repurchase
24   Plaintiff and his co-employees' vested equity with no increase in price or at unfavorable prices,
25   resulting in no or marginal economic net benefit to Plaintiff and his co-workers. Defendants
26   attempted to deprive Plaintiff and other equity-entitled employees of the most valuable and

Kitchin Legal, APC
Oakland

central part of their compensation and the promised value of their equity ownership. This would severely negate or reduce the value of their equity ownership and the material compensation represented by the Defendants to Plaintiff and his co-employees.

70.     Defendants also slipped in a provision to avoid paying Plaintiff and his co-employees upon purchase of their equity, and instead use a five year note which would deprive Plaintiff and his co-employees of due compensation for several years, and with the risk of not receiving any payments if the Defendants did not sustain the company or fulfill their obligations.

71.     Plaintiff and his counsel expressed repeated material concerns about these slipped in provisions and the egregiously behavior of the Defendants and its legal counsel, Blank Rome, which was contrary to the Defendants obligations and representations to Plaintiff. Even though Defendants specifically represented in the Employment Agreement that they "shall adopt the reasonable comments provided" by Plaintiff "to ensure commercially reasonable terms and conditions" in the technology company's equity plans, the Defendants did not adopt the comments provided by Plaintiff and his counsel and neither addressed nor resolved Plaintiff's and his counsel's concerns and objections about the Defendants having slipped in highly unusual and unreasonable material terms and provisions without advance discussion or agreement with Plaintiff, that the Defendants were aware would deprive Plaintiff of the value, form, manner and structure of equity which was the central component of Plaintiff's compensation.

72.     Defendants Stanley Middleman and Michael Middleman made representations that Plaintiff would be the long-term leader of the technology company and would have a long-term employment relationship over several years. Defendant Stanley Middleman informed Plaintiff that Gregory Middleman would assist him.  Stanley Middleman assured Plaintiff that Gregory Middleman's proximity to and relationship with his father Stanley Middleman and brother Michael Middleman, would be beneficial to Plaintiff.  In fact, however, Defendants Stanley Middleman and Michael Middleman intended for Defendant Gregory Middleman, who had

Kitchin Legal, APC
Oakland

only recently graduated from business school, to learn from Plaintiff, draw and benefit from his expertise, have Plaintiff attract, recruit and onboard an experienced leadership team, to setup, create and operationalize the company, and instead of Plaintiff, for Gregory Middleman to become leader of and be heir to the technology company, much like Defendant Stanley Middleman was making his other son Michael Middleman heir to Freedom Mortgage Corporation.

73.     Defendants misrepresented that Plaintiff and employees would have equity in the technology company and had falsely promised Plaintiff that he and other employees would be provided due and full shareholder rights and protections. After almost a full year of Plaintiff joining, and after Defendants had already authorized 10,000 shares and issued shares 1,000 shares of Xpanse, Inc., they had not provided any equity stock options or equity ownership rights and protections to Plaintiff or any of the other employees as they had repeatedly promised.

74.     Defendants misrepresented that the technology company would be a C-Corp, have C-Corp shareholders' rights and protections, be formed to be taken public through an IPO, and that Plaintiff and other key employees would participate through equity ownership in the C-Corp, as early-exercise incentive stock options, non-statutory stock options and/or combination thereof for Plaintiff.  Without disclosing their true plans to Plaintiff, however, Defendants actually intended to develop the technology company into a closely-held, Middleman-family, limited liability company, and be a subsidiary closely controlled by Archwell Holdings LLC, and to serve the self-serving interests of the Middleman's and their other entities.

75.     Defendants Stanley Middleman, Michael Middleman, Gregory Middleman and Erik Anderson deliberately concealed structural, legal and other plans and actions from Plaintiff and deliberately excluded Plaintiff from such discussions related to the technology company where it would have been evident to Plaintiff that the Defendants had made misrepresentations to and had concealed information from Plaintiff.

76.     In May 2020, around the time the technology company was established and incorporated as a Delaware C-Corp, Defendants Stanley Middleman, Michael Middleman, Gregory Middleman misrepresented to Plaintiff that if the technology company was based in Bellevue, Washington, his employment would continue, along with the terms of and his benefits of that employment, in accordance with his contract and in accordance with the representations made by the Defendants. In June 2020, Defendants confirmed to Plaintiff that Plaintiff's position and base location, pursuant to paragraph 2 of the employment agreement, would be updated to include Greater Seattle area, which includes Bellevue, Washington with Special Advisor to Defendant Stanley Middleman and Executive Vice President for Freedom Mortgage Corporation Robert King, Freedom Mortgage Corporation's Chief Legal Officer Steven Molitor, Defendant Gregory Middleman and others involved. In reliance on those discussions and representations, Plaintiff moved from Santa Clara County, California to Bellevue, Washington along with his family within weeks to establish leadership presence in Bellevue and progress recruiting activities for the company. In reliance on the Defendant's representations, Plaintiff, his family and kids uprooted their life and school in California and moved to Bellevue, Washington believing Defendant's representations that they would transfer Plaintiff's employment to Xpanse and that Plaintiff would continue his career at Xpanse for years to come.  Defendants however did not intend to transfer Plaintiff to Xpanse, be in the long-term employment of either Freedom Mortgage Corporation or Xpanse and/or to pay him compensation, equity, equity as early-exercise incentive stock options, non-statutory stock options and/or combination thereof, and the benefits of Xpanse they had promised to provide to Plaintiff. Defendants did not intend for the technology company to operate as an independent company and as a C-Corp.

///

///

///

Kitchin Legal, APC
Oakland

G. In Malicious Breach of Plaintiff's Employment Agreement, Defendants Failed to Issue Equity in Xpanse to Plaintiff

77.     Plaintiff's employment agreement required Xpanse to issue its stock option plan on May 27, 2020, when the company was incorporated, and to immediately provide Plaintiff with a stock option agreement pursuant to the employment agreement.  (See, Exhibit A.)

78.     Now that the technology company, Xpanse, was already incorporated, Defendants were required to immediately adopt the equity plan. Pursuant to the employment agreement (see ¶ Exhibit B of the employment contract), "On the date that Freedom Technology Corporation is incorporated, Freedom Technology Corporation shall adopt and establish an equity incentive plan." Defendants were required immediately grant Plaintiff his early-exercise stock option. Pursuant to the employment agreement (see ¶ Exhibit B of the employment contract hereto), " In conjunction with the adoption of the FTC Equity Plan, the Executive shall be granted an "early exercise" stock option which is an "incentive stock option", a "non-statutory stock option" or combination thereof at the Executive's election, to purchase a number of shares in Freedom Technology Corporation that is equal to at least 5% of Freedom Technology Corporation's share capital on a fully diluted basis…" Plaintiff engaged in extensive discussions with Defendants Stanley Middleman, Michael Middleman and Gregory Middleman regarding the equity component of his compensation package, which was the most valuable and central component of his compensation as represented by the Defendants.  During these discussions, Defendants repeatedly assured Plaintiff that his equity interest would be issued and, in the structure, form and manner consistent with his employment agreement and that Plaintiff would be transferred over to the technology company, Xpanse, as required by the employment agreement.

79.     In June 2020, after the equity plan was already overdue under the employment agreement, Defendants finally engaged the law firm of Blank Rome to work with Robert King, Christopher Staub and Steven Molitor of Freedom Mortgage Corporation to prepare the equity

documents for Plaintiff. Plaintiff relied on his own counsel to review and advise him with respect to the equity discussions.

80.     In July 2020, during a discussion with Defendant Gregory Middleman, Robert King, Special Advisor to Defendant Stanley Middleman and Executive Vice President of Freedom Mortgage Corporation, and Christopher Staub, friend of Defendant Michael Middleman and Senior Vice President of Freedom Mortgage Corporation, Plaintiff learned the Defendants were planning to change, convert and/or succeed the company from a C-Corp to a Limited Liability Company.  This restructuring would willfully and materially breach Plaintiff's employment agreement, and was contrary to the representations and promises Defendants made to Plaintiff. The restructuring would severely and detrimentally impact the value, form, manner and structure of Plaintiff's equity. It would have the same detrimental impact on the equity compensation of other executives and employees Plaintiff was planning to recruit and bring onboard over the coming months. Unlike a C-Corp, limited liability companies (LLCs) cannot and are unable to provide, issue and/or retain the value, form, manner and structure of equity as incentive stock options (ISOs), non-statutory options (NSOs) and early-exercise stock options pursuant to applicable legal and tax regulations and laws. Defendants said that their plan was driven by tax benefits that would benefit the Middleman's. Plaintiff expressed his concern that tax benefits, if any, would accrue to Archwell Holdings and/or Freedom Mortgage Corporation and not Xpanse, and would be self-serving to the Middleman's to the detriment of Xpanse, its value and tax credits, and the value, form and manner of the equity compensation promised to Plaintiff and his coworkers. In addition, it would be in violation of representations made by the Defendants that Xpanse would be a C-Corp and injure employees whose compensation included stock including Plaintiff. Plaintiff also explained to the Defendants that there were other approaches to have tax benefits if that was their objective, which would not be to the detriment of Plaintiff and future employees, and would not in be violation of the representations made by the Defendants to Plaintiff.

81.     During this July 2020 meeting, Plaintiff also expressed his concerns on how this change would severely harm the value, form, manner and structure of the represented equity compensation, and the consequential adverse impact on upcoming recruiting efforts which was considered a priority by the Defendants and the company. Defendant Gregory Middleman reaffirmed to Plaintiff that they had discussed and already agreed to a C-Corp. Defendants assured Plaintiff that they would abide by their agreement with and their representations to him including the C-Corp structure of the company and the structure, form and manner of equity compensation as early exercise and incentive stock options, non-statutory stock options or combination thereof as determined by Plaintiff, and that Plaintiff should continue to attract, recruit and bring employees on board.  Defendants assured Plaintiff that they would abide by their promises and told him not to be concerned. Plaintiff relied on the Defendants' representations to his detriment, as he discovered in time to come.

82.     In or about August 2020, several months after Xpanse was already incorporated, Freedom Mortgage Corporation finally sent Plaintiff and his counsel the first draft of the proposed equity plan.  The proposed plan, however, was incomplete, and still did not include Plaintiff's individual equity award agreement. Plaintiff asked for his individual equity award agreement which had already been delayed and evaded by the Defendants for several months and was long overdue from the Defendants.

83.     The proposed equity plan and equity award agreement, prepared for Defendants by their lawyers at Blank Rome did not include terms in accordance with the terms Plaintiff had negotiated with the Middleman's, which had been expressly discussed and/or incorporated into his employment agreement. It was filled with provisions that appeared to have been intentionally inserted to delay or evade the issuance of the equity plan and option agreement, or to coerce Plaintiff to succumb to a plan that was prepared by the Defendants in bad faith, self-serving to the Defendants, and to the severe detriment of Plaintiff and his co-workers. The draft plan deflated the terms and value of the equity promised to Plaintiff in favor of the

Kitchin Legal, APC
Oakland

1  Middleman's and included terms that were highly unusual and unreasonable.

2  84.     Over the course of several months, Defendants used their attorneys at Blank Rome to

3  intentionally delay or evade completing the equity plan and to preclude Plaintiff from his early-

4  exercise equity rights and equity terms in the form, manner and structure as provided by his

5  employment agreement and to deprive Plaintiff from realizing the value of his equity.

6  85.     On repeated occasions in or about November 2020, Plaintiff strenuously objected

7  directly to Defendants Stanley Middleman, Michael Middleman and Gregory Middleman about

8  these delay tactics, misrepresentation, bad faith, and violation of his and others' equity rights.

9      H.  Freedom Mortgage Corporation Repeatedly Failed to Pay Plaintiff's Wages Fully and

10         Timely

11  86.     Defendants Freedom Mortgage Corporation and Xpanse failed to properly credit and

12  compensate Plaintiff with PTO pay between June 2020 and January 2021.  On those occasions,

13  Freedom Mortgage Corporation paid PTO based on an incorrect calculation of Plaintiff's

14  regular rate of pay, which resulted in a significant underpayment of Plaintiff's wages that

15  remain unpaid.

16  87.     Defendants also failed to make matching contributions to his 401k plan in July, August,

17  November and December of 2020, and in January of 2021 in accordance with their contractual

18  requirements.

19  88.     In addition, Freedom Mortgage Corporation was required to pay Plaintiff $500,000.00

20  on October 2, 2020, but it failed to do so until October 30, 2020.

21      I.  Plaintiff Refused to Support a Secret, Illegal Share Valuation Scheme.

22  89.     While engaged in discussions between Blank Rome and Plaintiff's personal counsel,

23  Xpanse and Freedom Mortgage Corporation confirmed to Plaintiff and his personal counsel

24  that all Xpanse shareholders would be issued the same class of stock.  The company would not

25  issue any preferred stock.

26  90.     During a meeting in September 2020, however, Defendant Gregory Middleman, Robert

1   King and Christopher Staub explained that the Middleman family wanted to be able to
2   demonstrate externally during future fundraising events, including anticipated investment
3   rounds, strategic partnerships, M&A events and transactions, and future IPO, that the share
4   value for all equity holders was equal.

5   91.   However, Gregory Middleman stated that internally at Xpanse, the Middleman family
6   wanted to calculate share value differently by crediting their own share value with an additional
7   several millions in revenue through and related to affiliated entities, such as Defendant
8   Keystone B2B, LLC, which is owned by Archwell Holding LLC and other Archwell Holding
9   LLC's affiliated entities. The Middleman's wanted to create a secret share valuation that
10  benefitted them personally at the expense of Plaintiff, other equity holders, future investors,
11  strategic partners and shareholders.

12  92.   Defendants wanted to have two sets of valuation books and calculations, one to show
13  and use externally and another to use internally. The external calculation would show the same
14  share valuation numbers for the Middleman's, their affiliates, Plaintiff and his co-workers
15  however the internal calculation as proposed by the Middleman's would benefit the
16  Middleman's and deprive Plaintiff and his co-workers of value, even though everyone would
17  own the same class of shares.

18  93.   During this September 2020 meeting and during subsequent meetings with Defendants
19  Gregory Middleman, Michael Middleman and Stanley Middleman, each specifically threatened
20  Plaintiff would suffer adverse consequences if he did not endorse their schemes.

21  94.   In separate meetings, Defendants Stanley Middleman, Michael Middleman and Gregory
22  Middleman specifically informed Plaintiff that they expected him to support their share
23  valuation scheme and to support the scheme over anticipated protests from Xpanse co-workers
24  entitled to equity in Xpanse, Inc.

25  95.   Plaintiff explained to Defendant Gregory Middleman and Michael Middleman in
26  discussions with each of them that the scheme likely violated securities, tax, corporate and other

Kitchin Legal, APC
Oakland

1  laws. He also explained to Gregory Middleman and Michael Middleman that this plan would
2  inflate the value of Middleman's ownership interest in Xpanse when compared with the value
3  assigned to shares promised to Xpanse employees as incentive for joining and staying with
4  Xpanse, including Plaintiff, CFO Timothy Beard and his other co-workers.

5  96.   Plaintiff also raised the issue of misrepresentation to future employees, co-workers,
6  investors, and strategic partners and issues regarding legality of having a secret share valuation
7  scheme. Defendant Gregory Middleman said that he will follow up on these concerns with
8  Robert King and Christopher Staub, and also with his brother Michael Middleman and father
9  Stanley Middleman. However, Defendant Stanley Middleman made it evident to Plaintiff in his
10 subsequent discussion with him that refusal to adhere to the Middleman's scheme would result
11 in adverse consequences to Plaintiff.

12 97.   CFO Timothy Beard, upon learning about the Middleman's proposed schemes, also
13 expressed his concerns about the Middleman's' share valuation schemes. Mr. Beard was
14 alarmed that the Defendants would attempt to manipulate a company's valuation and by the
15 Defendant's proposed plan to have a differential price for the same class of shares given that
16 would run afoul of and be in violation of federal tax, securities and corporate law, and in
17 addition, the Middleman's self-dealing act would violate the promised compensation and rights
18 of Plaintiff, CFO Timothy Beard and their co-workers.

19     J.   Defendants Threatened Plaintiff for Refusing to Participate in their Equity Scheme

20 98.   During discussions with Defendants Stanley Middleman, Gregory Middleman, and
21 Michael Middleman, Plaintiff was threatened for refusing to participate in their equity scheme.
22 99.   In November and December 2020, Defendant Michael Middleman informed Plaintiff
23 that he did not want the company share valuation issue to be discussed with outside individuals,
24 including with Plaintiff's attorney. Michael Middleman ordered the abrupt cancellation of a call
25 scheduled for December 2, 2020 with Plaintiff's legal counsel and CFO Timothy Beard, which
26 had been called to further discuss Plaintiff's concerns. Michael Middleman refused to permit

Kitchin Legal, APC
Oakland

1  Plaintiff's legal counsel to join in a call to address Plaintiff's concerns and he told Plaintiff that

2  he did not want Plaintiff to have his counsel involved in these discussions.

3  100.   Plaintiff expected Defendants would abandon their illegal and self-serving schemes as

4  a result of the concerns he and CFO Timothy Beard expressed to them. In addition to his

5  previous efforts to convince Defendants Stanley Middleman and Gregory Middleman to course

6  correct, Plaintiff spoke with Defendant Michael Middleman in November 2020. Instead of

7  working with Plaintiff to create a legal share valuation model, however, Defendant Michael

8  Middleman advanced other schemes that would cause harm to Plaintiff and others who had

9  been promised equity.

10  101.   During his discussion with Defendant Michael Middleman, Plaintiff reminded him that

11  Plaintiff had foregone other opportunities to work for and partner with the Defendants, and had

12  relocated his family to Washington state.  He also reminded Michael Middleman that he had

13  made a long-term employment commitment to Defendants based on the representations and

14  promises they each had made to him and to his co-workers.

15  102.   In an effort to help Defendants avoid violations of tax and security laws and to protect

16  his own contractual interests, Plaintiff scheduled a call with the Defendants, together with

17  Plaintiff's legal counsel and Xpanse's CFO Timothy Beard.

18  103.   On or about December 2, 2020, Defendant Michael Middleman canceled this scheduled

19  call. Instead, Defendant Michael Middleman separately spoke with Plaintiff. In response to

20  Plaintiff's expression of concern about the legality of the stock valuation scheme, Michael

21  Middleman pointedly asked Plaintiff when his own equity interest vests, and if he knew what

22  would happen to his equity interest if Plaintiff were fired "for cause" before the stock options

23  vest.

24  104.   Michael Middleman made it clear to Plaintiff that the Defendants did not want to fulfill

25  Plaintiff's equity compensation pursuant to the terms of the Employment Agreement.  Michael

26  Middleman insisted Defendants had the right to determine at their sole discretion if or when

Kitchin Legal, APC
Oakland

1  Plaintiff received equity, bonuses or other compensation even thought he was fully aware that

2  the Defendants and the Plaintiff had negotiated and executed a binding employment agreement

3  which specified these terms. Michael Middleman also asked Plaintiff about equity promised to

4  his co-workers and what Plaintiff had communicated to them.

5  105.    In response to Plaintiff's request to discuss the Defendant's proposed valuation scheme

6  with members of his leadership team who had been promised equity, Michael Middleman

7  threatened Plaintiff with adverse consequences if he did so. Michael Middleman also told

8  Plaintiff that he had spoken with his father Stanley Middleman, brother Gregory Middleman,

9  Robert King and Christopher Staub. He informed Plaintiff he must support Defendants'

10 proposals and illegal schemes or suffer the adverse consequences. Plaintiff understood the

11 statement to be an explicit ultimatum to support the Middleman's' share value scheme or he

12 would be summarily and pretextually fired "for cause." A manufactured termination for cause

13 would provide Defendants a reason to deny all the benefits and substantial value of Plaintiff's

14 equity agreement, his share of ownership of the company, his guaranteed bonuses, the severance

15 and other benefits incorporated in the employment agreement (Exhibit A), his expected

16 compensation over the next several years, and his role as co-founder and leader of the company.

17 106.    On or about December 14, 2020 Michael Middleman scheduled another telephone call

18 with Plaintiff for the following day.  Michael Middleman informed Plaintiff that neither his

19 personal legal counsel nor Xpanse's chief financial officer, Timothy Beard, nor any of his

20 Xpanse co-workers entitled to equity ownership, would be permitted to join the call.  Michael

21 Middleman was joined on the call by his long-time business associate and family friend,

22 Defendant Erik Anderson, the recently-hired president and CEO of Defendant Archwell

23 Holdings, LLC and Defendant Archwell Solutions, LLC. When Plaintiff informed CFO

24 Timothy Beard of this call, CFO Timothy Beard was alarmed that Michael Middleman had

25 abruptly canceled the call with Plaintiff's counsel and had refused to let Plaintiff have his

26 counsel or CFO Timothy Beard join this call.

Kitchin Legal, APC
Oakland

107.    Michael Middleman used the pretext of stating that he would like to have a 1:1 discussion with Plaintiff. Without any notice to Plaintiff, Michael Middleman was joined in this 1:1 call by his close personal friend, former Skadden Arps attorney, Defendant Erik Anderson. Defendant Michael Middleman refused to permit Plaintiff's counsel to be present on the call. Despite Plaintiff's request, Defendant Michael Middleman also did not permit Xpanse CFO Timothy Beard to join the call either.

108.    During this call on December 15, 2020, Michael Middleman and Erik Anderson were oppressive in their insistence that Plaintiff accept the Middleman's schemes.  Plaintiff again expressed concern for other key employees who, like himself, had been promised equity. When he informed Defendants Michael Middleman and Erik Anderson of his desire to speak with his leadership team about the Middleman's valuation scheme, Michael Middleman again ordered Plaintiff not to do so.

109.    During this conversation, Defendant Michael Middleman and Erik Anderson also informed Plaintiff that the Middleman's have decided to have Xpanse, Inc. succeeded by a limited liability company called Xpanse, LLC.

110.    Plaintiff explained that changing Xpanse, Inc. from a C-Corp to a limited liability company would breach material terms of the compensation/equity agreements with himself and other Xpanse employees to whom he had been expressly authorized to offer stock options as part of their compensation packages. Defendants were aware that a limited liability company would violate and be detrimental to the structure, form and manner of equity as had been promised to Plaintiff. Defendants were also aware that they had made multiple representations to Plaintiff about the company being and remaining a C-Corp, both before his joining the company and again during the discussions back in July 2020 when Defendants had assured Plaintiff that the company would remain and operate as a C-Corp.

111.    During this conversation, Defendants Michael Middleman and Erik Anderson issued an ultimatum to Plaintiff to submit to the secret equity scheme and succumb to the succession to a

1   limited liability company immediately, or face serious and adverse consequences.

2   112.   In response to Defendants' aggressive threats, Plaintiff informed Defendants Michael

3   Middleman and Erik Anderson that he would not succumb to their threats on this call.  Plaintiff

4   reiterated his concerns around their share valuation scheme and about the changes planned by

5   Freedom Mortgage Corporation and Archwell, including the conversion and succession of

6   Xpanse, Inc. from a C-Corp to an LLC, breached material promises and terms of employee

7   contracts and representations. Defendants were aware that Xpanse, Inc. needed to remain a C-

8   Corp and preserve the structure, form and manner of equity or face exposure to liability for

9   fraud, material breach of contract, and other applicable laws, and at least five individuals had

10   been promised equity in Xpanse, Inc. Plaintiff also reminded them that Plaintiff had previously

11   expressed these concerns around conversion and succession of Xpanse, Inc. from a C-Corp to

12   an LLC back in July 2020 to Gregory Middleman, Robert King and Christopher Staub, and that

13   Plaintiff had been reassured by the Defendants at that time that the company would continue as

14   a C-Corp., and Plaintiff had relied on the Defendants' representations.

15   113.   Plaintiff informed Michael Middleman and Erik Anderson that he would at least like to

16   discuss his concerns and confer with Chief Financial Officer Timothy Beard, given the CFO's

17   financial and securities experience and law degree background. Defendants Michael

18   Middleman and Erik Anderson were displeased that Plaintiff asked again to confer with CFO

19   Timothy Beard. Plaintiff and CFO Timothy Beard further evaluated the differential share value

20   and other elements of the Middleman's scheme with Plaintiff, and again concluded that the

21   scheme likely ran afoul of tax, securities, corporate, and other laws, and would unquestionably

22   result in the breach of employment agreements already signed, including their own.

23   K.   Plaintiff and Xpanse CFO Timothy Beard Continue to Object to Defendants' Planned

24        Conversion of Xpanse from a C-Corp to a Limited Liability Company.

25   114.   On December 17, 2020, CFO Timothy Beard sent an email to Michael Middleman's

26   friend Defendant Erik Anderson, who was also President and CEO of Defendant Archwell

Holding and Archwell Solutions, LLC, (one of Defendant Archwell Holdings' subsidiaries) and Defendants Michael Middleman and Gregory Middleman, and struck out the change proposed by Freedom Mortgage Corporation and Archwell, for the conversion and succession of Xpanse, Inc. from a C-Corp to an LLC and reiterated that Xpanse has to remain a C-Corp as previously agreed. Plaintiff had previously informed Defendants during their discussions that Xpanse, Inc. needed to remain a C-Corp or face exposure to liability for fraud, material breach of contract and other applicable laws. Defendants were aware that at least five individuals had been promised equity in Xpanse, Inc., a C-Corp.

115.    Plaintiff and CFO Timothy Beard were concerned that if the Defendants unilaterally convert and succeed the technology company from a C-Corp to a Limited Liability Company that the Defendants: (1) would egregiously deprive Plaintiff and his co-workers of the form, manner and/or structure of the equity as early-exercise and as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof as promised by the Defendants to Plaintiff. Pursuant to tax laws, unlike a C-Corp, a limited liability company cannot issue early-exercise stock and as ISOs and NSOs and the Defendants were fully aware of this; (2) would deprive Plaintiff and his co-workers of the protections, rights and benefits available with a C-Corp structure; (3) would use the opaqueness of the LLC structure compared to the transparency and well-defined structure of the C-Corp to further deprive Plaintiff and his co-workers of their equity and equity rights and to deprive them of their promised compensation, and for the Defendants to engage in further self-dealing and for their self-interests at the detriment of Plaintiff and his co-workers; (4) would further their egregious schemes such as the share valuation scheme; (5) would unjustly enrich themselves by availing tax benefits and credits to their self-interests related to Archwell Holdings and/or Freedom Mortgage Corporation, and their subsidiaries and affiliates, and deprive the technology company of its self-held and carry-forward NOL and other tax credits; (6) would continue to further delay and evade their obligations and commitments to Plaintiff and his co-workers; and (7) would use the LLC

Kitchin Legal, APC
Oakland

1    structure to strip the technology company of its independence and make it a closely-knit and

2    fully controlled and self-serving subsidiary of Archwell Holdings.

3    116.   Plaintiff and CFO Timothy Beard also requested that Xpanse management

4    representatives including Plaintiff join the board of Xpanse based on their growing concerns

5    that Defendants who constituted the board were evading their fiduciary, legal and ethical

6    obligations.  Their request received no response from the Defendants.

7    117.   Defendants Stanley Middleman, Michael Middleman, Gregory Middleman and Erik

8    Anderson did not respond to these growing and consequential concerns, at least to Plaintiff.

9    118.   Throughout the rest of December 2020, Plaintiff assumed that Defendants were heeding

10   his advice and the advice of Xpanse's CFO.

11   119.   As of December 2020, Xpanse was making substantial progress toward hitting goals

12   established for Plaintiff and the company. Plaintiff was on track to hit the incentive

13   compensation milestones required to earn a bonus payout of between 100% and 150% of his

14   salary, and he was in the process of onboarding additional staff and further expanding and

15   growing the company.

16       L.   Plaintiff Refused to Engage in Deceptive and Unfair Business Practices.

17   120.   In or about December 2020 and January 2021, Defendant Gregory Middleman

18   instructed Plaintiff to participate with him in what Plaintiff believed to be a fraudulent scheme

19   during an upcoming meeting with representatives of a major mortgage enterprise software

20   company which is owned by a multi-billion-dollar NYSE listed publicly-traded company.

21   121.   Gregory Middleman informed Plaintiff that he intended to tell the major mortgage

22   enterprise software company that Xpanse would only be used as an internal resource to Freedom

23   Mortgage Corporation and Archwell Holdings, and that Xpanse was not planning to sell its

24   technologies to third parties.

25   122.   This contradicted everything Plaintiff had been told about Xpanse's plans and

26   everything Plaintiff had been working towards as Xpanse's founding president, CEO and co-

founder.   Gregory Middleman planned to misrepresent the fact that Xpanse was actually building technologies for the broader mortgage industry and, therefore, would be a direct competitor of the major mortgage enterprise software company.

123.   Defendant Gregory Middleman directed Plaintiff to engage in this fraudulent subterfuge in order to obtain access to valuable application programming interfaces and other proprietary information and access from the major mortgage enterprise software company, and to do so at favorable economic and commercial terms. Plaintiff refused to do so. Instead, Plaintiff complained to Gregory Middleman that the use of intentional misrepresentations with its competitors would expose Xpanse and all those involved to liability and other legal concerns, including himself.

   M. Plaintiff Began to Understand the Scope of Defendants' Misrepresentations and the
       Motivations Behind Their Misconduct and Misrepresentations.

124.   The ownership interest Defendants promised to Plaintiff, 5% of Xpanse's total share value, represents one of the largest, if not the largest, single ownership share the Middleman's have ever offered to an employee who was not a member of the Middleman family.

125.   In January 2021 Plaintiff came to the well-founded conclusion that Defendants did not intend to provide him with what they had promised, including a significant ownership interest in Xpanse.

126.   In January 2021, Xpanse's leadership team members informed Plaintiff that Defendants Stanley Middleman and Gregory Middleman had privately met with them, without notifying Plaintiff or CFO Timothy Beard.  These team members informed Plaintiff that they now believed the Middleman's did not truly intend to operate Xpanse as an independent technology company, enable its management team to independently run and operate the company, prioritize commercialization of its technologies and/or offer it at true standalone market and economic terms to Freedom Mortgage Corporation and Archwell Holdings, or to take it public with true equity participation and full rights for Xpanse's employees. They expressed their belief that the

1   representations made to them during their own recruitment and promises made to them with

2   respect to equity, its form and manner, and ownership were unlikely to be fulfilled, that the

3   Middleman's' instead had intended for Xpanse to become a closely-held subsidiary of Archwell

4   that would serve their own self-interests, and that the Middleman's' true plans were not what

5   had been represented during recruitment to Plaintiff or themselves. CFO Timothy Beard also

6   shared with Plaintiff that he realized from these team members who had discussions with

7   Stanley Middleman and from his own interactions with Stanley Middleman, Michael

8   Middleman, Gregory Middleman and others, that it was clear that the Defendants plans for

9   Xpanse were not as had been represented to him and Plaintiff. Plaintiff and CFO Timothy

10  Beard now realized that the representations and promises made by the Defendants were not

11  going to be fulfilled by the Defendants, and the Defendants had plans for Xpanse that they had

12  concealed from Plaintiff and CFO Timothy Beard.

13  127.    Representations Defendants Stanley Middleman and Michael Middleman made to

14  Plaintiff before he accepted the offer of employment and representations made by Defendants

15  Stanley Middleman, Michael Middleman and Gregory Middleman during his period of

16  employment were false. Plaintiff's equity interest in the new company and its structure, form

17  and manner, a central material term to his employment agreement and the most valuable

18  component of his salary package, was not what the Middleman's claimed it to be. Promises

19  Defendants made about the technology company, including its structure as a C-Corp, its

20  independence, its revenue, intellectual property, assets, transfer of technologists and staff,

21  and/or its priorities and objectives, were never meant to be and were not fulfilled.

22  128.    Defendants concealed from Plaintiff their plan to turn Xpanse, Inc. into a closely-

23  controlled subsidiary of Archwell Holdings, a member of the "Freedom Family of Companies",

24  and have the company serve the economic needs and self-serving priorities of Freedom

25  Mortgage Corporation and Archwell entities. In 2021, Archwell Holdings on its website

26  described Xpanse along with itself and other Defendants as "complementary entities working

Kitchin Legal, APC
Oakland

together" and "Together we are One Archwell."

129.    By mid-January 2021, it became clear to Plaintiff why Defendants had intentionally delayed transferring Plaintiff's employment from Freedom Mortgage Corporation to Xpanse. It had also become clear why Defendants Stanley Middleman, Michael Middleman, Gregory Middleman had intentionally delayed and evaded issuing the equity plan promised in Plaintiff's employment agreement.  Plaintiff understood that Defendants' hidden plans for Xpanse were inconsistent with material promises they had made to Plaintiff and other employees.

N.  Defendants Terminated Both Plaintiff and CFO Timothy Beard on January 21, 2021.

130.    On January 21, 2021, without advanced notice or discussion, Special Advisor to Defendant Stanley Middleman and Freedom Mortgage Corporation's Executive Vice President Robert King, informed Plaintiff that he was fired.  The notice of his termination said he was terminated for "cause," although Plaintiff's employment agreement requires both notice and an opportunity to cure if there is cause.  At no time did Freedom Mortgage Corporation or Xpanse provide any notice to Plaintiff of concerns with his performance, direction or accomplishments.

131.    CFO Timothy Beard, who also expressed concerns and challenged Defendants, including their share valuation scheme and planned conversion of Xpanse from a C-Corp to a limited liability company, was summarily fired the same day.

132.    Defendants fired Plaintiff because: (1) he refused to participate in activities and schemes that he believed were fraudulent and illegal; (2) he demanded to be paid wages and benefits due and to be issued stock options promised to him by Defendants; (3) he requested to be permitted by Defendants to coordinate with co-workers whose employment rights also were at stake; (4) he requested an opportunity to consult with his legal counsel regarding his rights and to have his counsel participate in discussions to assess the adverse effects of Defendants' share valuation scheme on his employment and contract rights; (5) Plaintiff refused to engage in deceptive and unfair business practices; (6) despite their contrary representations, Defendants Stanley Middleman, Michael Middleman and Gregory Middleman never intended to permit

1    Plaintiff to hold a 5% ownership stake in Xpanse, a Middleman family company; (7)
2    Defendants Stanley Middleman, Michael Middleman and Gregory Middleman wanted to evade
3    paying Plaintiff his guaranteed bonus, other payments and benefits, and wanted to avoid
4    fulfilling their legal obligations; (8) Defendants wanted Xpanse to facilitate and Plaintiff to
5    succumb to the self-serving interests and self-dealing of the Middleman's, Freedom
6    Technology Corporation and Archwell Holdings over the rights, protections and interests of all
7    others and employees including those had been promised equity ownership; (9) Plaintiff
8    requested to join the board of Xpanse to ensure that the Defendants fulfilled their fiduciary,
9    legal and ethical obligations and his co-workers rights were protected,  to ensure that employees
10   would be treated fairly, and that the Defendants were not self-dealing and unjustly benefiting
11   themselves; (10) Defendants realized that Plaintiff had begun to unwind the web of lies
12   Defendants had spun, making it impossible to continue to keep them concealed; and (11)
13   Defendants Stanley Middleman, Michael Middleman and Gregory Middleman wanted to seize
14   full control, ownership, credit and value for Xpanse.

15   133.    Operating according to a common scheme or plan, Defendants intended to interfere
16   with, and deprive Plaintiff of the benefits of his employment agreement.  Defendants conspired
17   to fabricate grounds to support "for cause" termination of Plaintiff's employment. They did so
18   to advance their own financial interest and to retaliate against Plaintiff for the concerns and
19   objections that he and CFO Timothy Beard had both raised with them. While Plaintiff certainly
20   had grounds to resign for "good reason" under the employment agreement, Freedom Mortgage
21   did not have good cause to fire him.

22   134.    On January 21, 2021, Defendant Gregory Middleman informed Xpanse's leadership
23   that Plaintiff was terminated and no longer CEO, and that Timothy Beard was no longer CFO.
24   Gregory Middleman indicated to the leadership team that he was now the senior most executive
25   of the company. Immediately seizing management control of the company, Gregory Middleman
26   later that day held a companywide conference with all Xpanse employees to tell them that

Kitchin Legal, APC
Oakland

1    Plaintiff had been terminated and was no longer the company's CEO. Defendant Freedom
2    Mortgage Corporation paid Plaintiff through January 22, 2021. With both Plaintiff and CFO
3    Timothy Beard simultaneously terminated, the Middleman's had concurrently eliminated the
4    only two individuals who had knowledge of and who had expressed concerns about their illegal,
5    fraudulent and self-serving schemes.

6    135.    In early 2021, Defendants removed Plaintiff and his title as "CEO & Co-Founder" from
7    the company's public website, and changed Gregory Middleman's title on the website to
8    "Founder" of the company, which the Defendants were fully aware was false and fabricated.
9    In doing so Defendants willfully and deliberately robbed Plaintiff of his Co-Founder status.

10    136.    After his termination, Plaintiff discovered that Xpanse, Inc. already had been succeeded
11    by Xpanse, LLC, despite objections from Plaintiff and CFO Timothy Beard. During or around
12    the end of 2020, Defendants Stanley Middleman, Michael Middleman and Gregory Middleman
13    were together in Palm Beach County, Florida. Michael Middleman quietly executed the
14    Delaware succession certificate on December 24, 2020, without informing either Xpanse's
15    Chief Executive Officer or its Chief Financial Officer. Xpanse's succession to a limited liability
16    company was made effective by the Defendants at 11:59 p.m. on December 31, 2020, and the
17    processing of the Delaware succession was completed by early January 2021. Defendants kept
18    this concealed and did not disclose this even after it was completed by them, neither to Plaintiff
19    who was the company's Chief Executive Officer (CEO)/President and Co-Founder, and nor to
20    the Chief Financial Officer of the company.

21    //
22    ///
23    ///
24    ///
25    ///
26    ///

Kitchin Legal, APC
Oakland

**FIRST CAUSE OF ACTION**

Fraud: False Promise

(Against Defendants Freedom Mortgage Corporation, Archwell Holdings LLC, Archwell Solutions, Archwell Management LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, and Does 1-50)

137.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

138.    As described herein, Defendants worked in concert to misrepresent material facts and make false promises to Plaintiff to persuade him to become the founding president of a technology company they had planned to form and develop. These misrepresentations involved the most fundamental material terms of Plaintiff's employment, including the revenue, assets, staff transfers, intellectual property and other contributions Defendants planned to make in the new company, the overall independent plans and goals for the company, the structure of the company, the value, form, terms and manner of the equity promised to Plaintiff, the immediate transfer of Plaintiff's employment to the new company, and the early-exercise issuance of ownership interest as incentive stock options, non-statutory options or combination thereof to Plaintiff.

139.    These representations, among others described herein, were false.

140.    Defendants Stanley Middleman and Michael Middleman made these misrepresentations for their own personal financial interest and on behalf of Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings LLC, Archwell Solutions, LLC, Archwell Management LLC and Keystone B2B, LLC.  Defendants Stanley Middleman and Michael Middleman knew that the statements described herein were false, or made the misrepresentations recklessly and without regard for the truth.

141.    Defendants intended Plaintiff to rely these representations and promises.

Kitchin Legal, APC
Oakland

1    142.    Plaintiff reasonably relied to his detriment on these representations as statements of fact.

2    Based on these representations, Plaintiff accepted the employment offer made by Defendants

3    Stanley Middleman and Michael Middleman and was precluded from another valuable

4    employment offer.  He spent several months in the negotiation process and then worked for

5    almost a full year in reliance on Defendants' misrepresentations.

6    143.    As a consequence of Defendants' misrepresentations and false promises, Plaintiff has

7    been damaged in several ways:

8        A.  By accepting employment by Defendants, Plaintiff was precluded from pursing an

9        alternative employment offer that was worth in excess of $19,200,000.00 cash

10       compensation, with at least $7,200,000.00 cash compensation in the first year, for an

11       initial 3-year fixed commitment, with expected recurring 3-year renewals at similar or

12       higher compensation.  The offer also offered double-digit percentage equity that based

13       on overall financial projections by company would equal or exceed $200 million.

14       B.  Plaintiff has lost the compensation and other benefits of long-term employment

15       promised him by Defendants, including but not limited to, an ownership interest of at

16       least 5% in Xpanse.

17       C.  As a result of his reasonable reliance on Defendants' misrepresentations, which

18       ultimately led to the wrongful termination of his employment "for cause" after less than

19       one year of employment, Plaintiff's accomplished career, professional standing and

20       reputation have been falsely and severely damaged by Defendants, and Plaintiff's future

21       employment opportunities are adversely affected by Defendants' tortious misconduct.

22       D.  Plaintiff has lost significant past income and will lose additional income into the

23       future until he is able to obtain long-term employment with similar position,

24       responsibility, compensation, benefits and equity ownership, promised him by the

25       Defendants, if ever, given the fabricated and false "for cause" characterization of his

26       termination, and has incurred other significant economic losses.

         E.  Plaintiff incurred substantial expenses and hardship moving himself, his family and

1   children to Washington State based on his reliance on Defendants' misrepresentations.

2   F.   Plaintiff has suffered severe emotional distress, mental anguish and suffering as a

3   result of Defendant's egregious misconduct.

4   144.   In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably,

5   with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of

6   Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's

7   rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to

8   compensatory damages for the injuries caused by Defendants.

9   145.   As a result of Defendants' Conspiracy to Commit Fraud by False Promise, Plaintiff has

10   sustained damages in excess of $100,000,000.00 plus at least a 5% ownership interest in

11   Xpanse, LLC, and is additionally entitled to sufficient punitive damages to punish Defendants

12   for their outrageous conduct and to set an example to others.

13                          **SECOND CAUSE OF ACTION**

14                             Fraud: Concealment

15   (Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings,

16   LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley

17   Middleman, Michael Middleman, Gregory Middleman and Does 1-50)

18   146.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

19   forth herein, with the exception of allegations that are inconsistent with this cause of action.

20   147.   Plaintiff and Defendants were in a confidential relationship with bilateral fiduciary

21   duties.   Defendants had a duty to the founding president and CEO of Xpanse to disclose

22   information to him that was material to the structure, operation and plans of the business- and

23   business-related filings.   Defendants also had a fiduciary duty to Plaintiff whose employment

24   contract promised significant ownership interest in Xpanse, making him into a significant

25   owner/investor and substantial shareholder of the company: an employee, co-founder, and

26   business partner.

Kitchin Legal, APC
Oakland

148.   Furthermore, Defendants gave Plaintiff the authority to act on behalf of Xpanse, including the authority to offer stock ownership interests to his leadership team as part of their compensation package, which in several instances Plaintiff did.  Defendants had the fiduciary duty to disclose to him material information about their plans and actions, but failed to do so. Unknown to Plaintiff, Defendants used him to make false promises to several key Xpanse employees.

149.   Defendants intentionally concealed from Plaintiff the truth about their plans, actions and activities relating to the Xpanse, LLC, as described herein.  Plaintiff did not know of the concealed facts until well after he was hired.  He only learned the truth about Defendants' illegal schemes because he observed the inconsistencies between what Defendants represented and promised, versus what they were doing and not doing.

150.   Had Plaintiff learned the full extent and truth of the concealed facts and/or plans earlier, he would have behaved differently to protect his interests.

151.   As a consequence of Defendants' fraudulent concealment of material facts and/or plans, Plaintiff has been damaged in several ways:

A. By accepting employment by Defendants, Plaintiff was precluded from pursing an alternative employment offer that was worth in excess of $19,200,000.00 cash compensation over the first 3 years, with at least $7,200,000.00 cash compensation in the first year, for an initial 3-year fixed commitment, with expected 3-year renewals. The offer also offered double-digit percentage equity that based on overall financial projections by company would equal or exceed $200 million.

B. Plaintiff has lost the compensation and other benefits of long-term employment promised him by Defendants, including an ownership interest of at least 5% in Xpanse.

C. As a result of his reasonable reliance on Defendants' misrepresentation, which ultimately led to the wrongful termination of his employment "for cause" after less than one year of employment, Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's

Kitchin Legal, APC
Oakland

future employment opportunities are adversely affected by Defendants' tortious misconduct.

D.  Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic losses.

E.  Plaintiff incurred substantial expenses and hardship moving himself, his family and children to Washington State based on his reliance on Defendants' misrepresentations.

F.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

152.   In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

153.   As a result of Defendants' Conspiracy to Commit Fraud by Concealment Plaintiff has sustained economic and general damages in excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC.  Plaintiff is also entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

///

///

///

///

///

///

Kitchin Legal, APC
Oakland

**THIRD CAUSE OF ACTION**

Fraud: Intentional Misrepresentation

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings,

LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley

Middleman, Michael Middleman, Gregory Middleman and Does 1-50)

154.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

155.    Once Plaintiff was hired, Defendants continued to use intentional misrepresentations of material facts about their plans, activities and actions for Xpanse, LLC and himself.

156.    As described herein, Defendants worked in concert to misrepresent material facts to Plaintiff to persuade him to become the founding president, CEO and co-founder of a technology company they hired him to form and develop.  Defendants' misrepresentations during the course of his employment involved Defendants' plans for Xpanse and Plaintiff. These misrepresentations involved the most fundamental material terms of Plaintiff's employment, including the significant revenue run rate contributions, substantial transfers of valuable intellectual property and assets, transfer of large numbers of technologists, Defendants planned to make into the new company, the structure and operations as a C-Corp, overall independent roadmap, priorities, plans and goals for the company, the value, terms and manner of the equity promised to Plaintiff, the immediate transfer of Plaintiff's employment to the new company, and the early-exercise issuance, structure, form, type and manner of stock options as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof to Plaintiff.

157.    These representations, among others described herein, were false.

158.    Defendants Stanley Middleman, Michael Middleman and Gregory Middleman made such misrepresentations for their own personal financial interest and on behalf of Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings LLC, Archwell Solutions,

1    LLC, Archwell Management LLC and Keystone B2B, LLC. Defendants Stanley Middleman,

2    Michael Middleman and Gregory Middleman knew that the statements described herein were

3    false, or made the misrepresentations recklessly and without regard for the truth.

4    159.   Defendants intended Plaintiff to rely these representations.

5    160.   Plaintiff reasonably relied to his detriment on these representations as statements of fact.

6    Based on these representations, Plaintiff accepted the employment offer made by Defendants

7    Stanley Middleman and Michael Middleman and was precluded from another valuable

8    employment offer. He spent several months in the negotiation process and then worked for

9    almost a full year in reliance on Defendants' misrepresentations.

10   161.   As a consequence of Defendants' misrepresentations, Plaintiff has been damaged in

11   several ways:

12           A. By accepting employment by Defendants, Plaintiff was precluded from pursing an

13           alternative employment offer that was worth in excess of $19,200,000.00 cash

14           compensation over the first 3 years, with at least $7,200,000.00 cash compensation in

15           the first year, for an initial 3-year fixed commitment, with expected 3-year renewals.

16           The offer also offered double-digit percentage equity that based on overall financial

17           projections by company would equal or exceed $200 million.

18           B. Plaintiff has lost the compensation benefits of long-term employment promised him

19           by Defendants, including an ownership interest of at least 5% in Xpanse.

20           C. As a result of his reasonable reliance on Defendants' misrepresentation, which

21           ultimately led to the wrongful termination of his employment "for cause" after less

22           than one year of employment, Plaintiff's accomplished career, professional standing

23           and reputation have been falsely and severely damaged by Defendants and Plaintiff's

24           future employment opportunities are adversely affected by Defendants' tortious

25           misconduct.

26           D. Plaintiff has lost significant past income and will lose additional income into the

             future until he is able to obtain long-term employment with similar position,

Kitchin Legal, APC
Oakland

1    responsibility, compensation, benefits and equity ownership, promised him by the

2    Defendants, if ever given the fabricated and false "for cause" characterization of his

3    termination, and has incurred other significant economic losses.

4    E.  Plaintiff incurred substantial expenses and hardship moving himself, his family and

5    children to Washington State based on his reliance on Defendants' misrepresentations.

6    F.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a

7    result of Defendant's egregious misconduct.

8    162.    In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably,

9    with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of

10   Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's

11   rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to

12   compensatory damages for the injuries caused by Defendants.

13   163.    As a result of Defendants' Conspiracy to Commit Fraud by Intentional

14   Misrepresentation, Plaintiff has sustained special and general damages in excess of

15   $100,000,000.00, and is currently owed at least a 5% ownership interest in Xpanse, LLC.

16   Plaintiff is also entitled to sufficient punitive damages to punish Defendants for their outrageous

17   conduct and to set an example to others.

18                              **FOURTH CAUSE OF ACTION**

19                                Negligent Misrepresentation

20   (Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings LLC,

21   Archwell Solutions, Archwell Management LLC, Keystone B2B, LLC, Stanley Middleman,

22            Michael Middleman, Gregory Middleman, and Does 1-50)

23   164.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

24   forth herein, with the exception of allegations that are inconsistent with this cause of action.

25   165.    As described herein, on behalf of themselves and on behalf of Defendants Freedom

26   Mortgage Corporation, Xpanse, LLC, Archwell Holdings LLC, Archwell Solutions, LLC,

Kitchin Legal, APC
Oakland

1   Archwell Management LLC, and Keystone B2B LLC, Defendants Stanley Middleman,

2   Michael Middleman and Gregory Middleman worked in concert to misrepresent material facts

3   to Plaintiff to persuade him to become the founding president, CEO and co-founder of a

4   technology company they hired him to form and develop. These misrepresentations involved

5   the most fundamental material terms of Plaintiff's employment, including the contributions

6   Defendants planned to make in the new company, the overall structure, plans and goals for the

7   company, the value, form and manner of the equity promised to Plaintiff, the transfer of

8   Plaintiff's employment to the new company, and the issuance of early-exercise stock options

9   and as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof

10  to Plaintiff.

11  166.    Once Plaintiff was hired, Stanley Middleman, Michael Middleman, Gregory

12  Middleman, Erik Anderson and others, including Freedom Mortgage Corporation senior

13  executive Christopher Staub and Freedom Mortgage Corporation senior executive Robert King

14  continued to use misrepresentations of material facts about their plans, activities and actions for

15  Xpanse, and concealed those plans from Plaintiff and the company's CFO as described herein.

16  167.    Defendants did not have reasonable grounds to believe the representations were true or

17  that their promises would be fulfilled when they made them.

18  168.    Defendants intended Plaintiff to rely upon these misrepresentations.

19  169.    Plaintiff reasonably relied to his detriment on these representations as statements of fact.

20  Based on these representations, Plaintiff accepted the employment offer made by Defendants

21  Stanley Middleman and Michael Middleman and was precluded from another valuable

22  employment offer.  He spent several months in the negotiation process and then worked for

23  almost a full year in reliance on Defendants' misrepresentations.

24  170.    As a consequence of Defendants' misrepresentations, Plaintiff has been damaged in

25  several ways:

26          A. By accepting employment by Defendants, Plaintiff was precluded from pursing an

1    alternative employment offer that was worth in excess of $19,200,000.00 cash

2    compensation over the first three years, with at least $7,200,000.00 cash compensation

3    in the first year, for an initial 3-year fixed commitment, with expected 3-year renewals.

4    The offer also offered double-digit percentage equity that based on overall financial

5    projections by company would equal or exceed $200 million.

6    B.  Plaintiff has lost the compensation and other benefits of long-term employment

7    promised him by Defendants, including an ownership interest of at least 5% in Xpanse.

8    C.  As a result of his reasonable reliance on Defendants' misrepresentation, which

9    ultimately led to the wrongful termination of his employment "for cause" after less

10    than one year of employment, Plaintiff's accomplished career, professional standing

11    and reputation have been falsely and severely damaged by Defendants and Plaintiff's

12    future employment opportunities are adversely affected by Defendants' tortious

13    misconduct.

14    D.  Plaintiff has lost significant past income and will lose additional income into the

15    future until he is able to obtain long-term employment with similar position,

16    responsibility, compensation, benefits and equity ownership, promised him by the

17    Defendants, if ever given the fabricated and false for cause nature of his termination,

18    and has incurred other significant economic and non-economic losses.

19    E.  Plaintiff incurred substantial expenses and hardship moving himself, his family and

20    children to Washington State based on his reliance on Defendants' misrepresentations.

21    F.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a

22    result of Defendant's egregious misconduct.

23   171.  As a result of Defendants' Negligent Misrepresentations, Plaintiff has sustained

24   economic and general damages in excess of $100,000,000.00, and he is owed at least a 5%

25   ownership interest in Xpanse, LLC.

26   ///

///

Kitchin Legal, APC
Oakland

## FIFTH CAUSE OF ACTION

### Breach of Contract

(Against Defendants Freedom Mortgage Corporation and Xpanse, LLC and Does 1-50)

172.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

173.    On or about February 26, 2020, Plaintiff entered into a binding employment contract with Defendant Freedom Mortgage Corporation to serve as the founding president of a technology company it hired Plaintiff to form and lead. At the time he was hired, the technology company did not exist. Once that company was formed by Freedom Mortgage Corporation, Plaintiff became its chief executive officer/president and co-founder. Once formed, the technology company, referred to as Freedom Technology Corporation in the contract, now known as Xpanse, LLC, assumed the duties and responsibilities as set out in the contract Defendant Stanley Middleman signed on February 26, 2020. (Exhibit A).

174.    This contract required Plaintiff to serve as the founding president of Xpanse. Plaintiff fulfilled all of his responsibilities under the contract and/or was excused from performing those duties and obligations that Defendants made impossible to perform as a consequence of their breach and wrongful termination of Plaintiff's employment.

175.    Pursuant to section 8(f)(ii)(2) of the employment agreement, Plaintiff's 5% ownership interest in Xpanse accelerated upon the assignment and/or disposition and/or lease and/or sale of substantially all of the talent and intellectual property from Xpanse to Freedom Mortgage Corporation and/or KeystoneB2B LLC and/or Archwell Solutions LLC and/or other entities. In late 2020 and January 2021, Xpanse's talent, technology and intellectual property development was assigned, subjugated and appropriated by the Middleman's to substantially serve the primary needs and priorities of and for the primary benefit of Freedom Mortgage Corporation, and/or KeystoneB2B LLC and/or Archwell Solutions LLC and/or other Middleman's entities, and not as an independent roadmap or market facing priorities or to maximize Xpanse's value

Kitchin Legal, APC
Oakland

1   and revenue.  In breach of their duties under the employment agreement, Defendants failed to

2   accelerate the 5% ownership interest in Xpanse, LLC to Plaintiff upon this occurrence.

3   176.   In addition, and/or in the alternative, when Defendants surreptitiously converted

4   Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January

5   2021, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately

6   and in its entirety pursuant to Exhibit B of the binding employment contract (see ¶ Exhibit B of

7   the employment contract). The successor and surviving LLC entity did not preserve the value,

8   form, manner and structure of the equity award required by the employment contract.

9   Defendants had agreed with Plaintiff for the technology company's structure to be a C-

10  Corporation ("C-Corp") to enable the full value, form, manner and structure of the equity as

11  such.  The technology company was specifically referred to as Freedom Technology

12  Corporation in the executed employment agreement; i.e., it specifically used "Corporation"

13  affirming the agreement between Plaintiff and Defendants regarding the entity being structured

14  and operated as a C-Corp. However, unlike a C-Corp, limited liability companies (LLCs) cannot

15  and are unable to provide, issue and/or retain the value, form, manner and structure of equity

16  as incentive stock options (ISOs), non-statutory options (NSOs) and early-exercise stock

17  options pursuant to applicable legal and tax regulations. Defendants' failure to accelerate

18  Plaintiff's 5% ownership interest in Xpanse upon this occurrence of this conversion constitutes

19  another breach of the contract.

20  177.   Also, in addition, and/or in the alternative, when Defendants surreptitiously converted

21  and succeeded Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability

22  company in January 2021 and/or made Archwell Management, LLC as the manager of the

23  company, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse

24  immediately and in its entirety pursuant to section 8(f)(ii)(1) of the employment agreement.

25  Defendants' failure to accelerate Plaintiff's 5% interest in Xpanse, LLC upon this

26  occurrence of this conversion constitutes another breach of the employment agreement.

Kitchin Legal, APC
Oakland

178.    Defendants breached the contract in multiple additional ways, as follows:

    A.  Defendants failed to formally and immediately transfer Plaintiff's employment from Freedom Mortgage Corporation to Xpanse as required under ¶ 3 of the contract;

    B.  Defendants failed to adopt and establish an equity incentive plan as required under ¶ 5(g) of the contract;

    C.  Defendants failed to issue equity grants to Plaintiff when and as required under ¶ 5(g) of the contract;

    D.  Defendants failed to provide or preserve the form, manner and structure of the equity as early-exercise and as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof as requited under Exhibit B of the employment contract;

    E.  Defendants failed to timely pay the second half of his signing bonus ($500,000.00) to Plaintiff;

    F.   Defendants failed to provide Plaintiff with vested 401k matching benefits in an amount, net of taxes, of at least $39,000.00;

    G.  Defendants failed to adopt the comments provided by Plaintiff to ensure commercially reasonable terms and conditions for Xpanse's equity plan in violation ¶ Exhibit B of the employment contract;

    H.  Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of ¶ 8(f) of the employment contract;

    I.   Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of Exhibit B of the employment contract;

    J.  Defendants failed to provide Plaintiff with health and other benefits through Xpanse;

    K.  Defendants failed to fully calculate and pay Plaintiff the value of PTO and

Kitchin Legal, APC
Oakland

holiday pay;

L.  Defendants terminated Plaintiff's employment without cause in violation of ¶ 8 of the contract, failed to provide notice or opportunity to cure in violation of the contract, and subsequently failed to provide Plaintiff with the severance benefits he is entitled to receive under the severance agreement provisions set out in the February 26, 2020 contract, including:

i.  A single severance lump sum payment in an amount equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus); which is calculated as at least $3,000,000.00;

ii.  A single lump sum payment of the of the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the Executive's termination calculated at 100% of target; which is calculated as at least $1,500,000.00.

iii.  Twelve months company-paid COBRA benefits for Plaintiff and his family; which is calculated per numbers provided by UMR on behalf of Freedom Mortgage Corporation as, net of taxes, $43,812.72.

iv.  A pro rata amount (calculated pursuant to the Employment Agreement) of the current year's target Discretionary Performance Bonus amount, irrespective of whether the performance goals applicable have been established or satisfied, which is calculated pro rata of 100% of Base Salary as at least $1,375,000.00, however as subsequently discussed and agreed upon, the Discretionary Performance bonus plan for the Plaintiff and the

Kitchin Legal, APC
Oakland

1               technology company was determined to be increased to up to 150% of Base

2               Salary, which is calculated pro rata as at least $2,062,500.00.

3   179.   As a result of Defendants' breaches of contract, as described herein, Plaintiff has

4 sustained damages in excess of $100,000,000.00, plus at least a 5% ownership interest in

5 Xpanse, LLC, the value of which is known to Defendants and to be proved at trial.

6 **SIXTH CAUSE OF ACTION**

7 Breach of the Covenant of Good Faith and Fair Dealing

8     (Against Defendants Freedom Mortgage Corporation and Xpanse, LLC and Does 1-50)

9   180.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

10 forth herein, with the exception of allegations that are inconsistent with this cause of action.

11   181.   On or about February 26, 2020, Plaintiff entered into a binding employment contract

12 with Defendant Freedom Mortgage Corporation to serve as the founding president of a

13 technology company it hired Plaintiff to form and lead. At the time he was hired, the technology

14 company did not exist. Once that company was formed by Freedom Mortgage Corporation,

15 Plaintiff became its chief executive officer/president and co-founder. Once formed, the

16 technology company, referred to as Freedom Technology Corporation in the contract, now

17 known as Xpanse, LLC, assumed the duties and responsibilities as set out in the contract

18 Defendant Stanley Middleman signed on February 26, 2020. (Exhibit A)

19   182.   This contract required Plaintiff to serve as the founding president of Xpanse. Plaintiff

20 fulfilled all of his responsibilities under the contract and/or was excused from performing those

21 duties and obligations that Defendants made impossible to perform as a consequence of their

22 breach and wrongful termination of Plaintiff's employment.

23   183.   As Plaintiff's employers, Defendants had substantial and superior power over Plaintiff,

24 and they used their power to prevent Plaintiff from receiving the benefits he had bargained for

25 under the contract. Defendants engaged in conduct specifically meant to mislead and take

26 advantage of Plaintiff in multiple unfair ways. As described herein, Defendants breached the

Kitchin Legal, APC
Oakland

1    covenant of good faith and fair dealing implied within the employment contract.

2    184.    Pursuant to section 8(f)(ii)(2) of the employment agreement, Plaintiff's 5% ownership

3    interest in Xpanse accelerated upon the assignment and/or disposition and/or lease and/or sale

4    of substantially all of the talent and intellectual property from Xpanse to Freedom Mortgage

5    Corporation and/or KeystoneB2B LLC and/or Archwell Solutions LLC and/or other entities. In

6    late 2020 and January 2021. Xpanse's talent, technology and intellectual property development

7    was assigned, subjugated and appropriated by the Middleman's to substantially serve, not an

8    independent roadmap or market facing priorities or to maximize Xpanse's value and revenue,

9    but instead the primary needs and priorities of and for the primary benefit of Freedom Mortgage

10   Corporation, and/or Keystone B2B LLC and/or Archwell Solutions LLC and/or other

11   Middleman's entities. In breach of their duties under the employment agreement and in breach

12   of the covenant of good faith and fair dealing, Defendants failed to accelerate the 5% ownership

13   interest in Xpanse, LLC to Plaintiff upon this occurrence.

14   185.    In addition, and/or in the alternative, when Defendants surreptitiously converted

15   Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January

16   2021, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately

17   and in its entirety pursuant to Exhibit B of the binding employment contract (see ¶ Exhibit B of

18   the employment contract). The successor and surviving LLC entity did not preserve the value,

19   form, manner and structure of the equity award required by the employment contract.

20   Defendants had agreed with Plaintiff for the technology company's structure to be a C-

21   Corporation ("C-Corp") to enable the full value, form, manner and structure of the equity as

22   such. The technology company was specifically referred to as Freedom Technology

23   Corporation in the executed employment agreement; i.e., it specifically used "Corporation"

24   affirming the agreement between Plaintiff and Defendants regarding the entity being structured

25   and operated as a C-Corp. However, unlike a C-Corp, limited liability companies (LLCs) cannot

26   and are unable to provide, issue and/or retain the value, form, manner and structure of equity

as incentive stock options (ISOs), non-statutory options (NSOs) and early-exercise stock options pursuant to applicable legal and tax regulations. Defendants' failure to accelerate Plaintiff's 5% ownership interest in Xpanse upon this occurrence of this conversion constitutes another breach of the contract and constitutes a breach of the covenant of good faith and fair dealing.

185.   Also, in addition, and/or in the alternative, when Defendants surreptitiously converted and succeeded Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January 2021 and/or made Archwell Management, LLC as the manager of the company, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately and in its entirety pursuant to section 8(f)(ii)(1) of the employment agreement. Defendants' failure to accelerate Plaintiff's 5% ownership interest in Xpanse, LLC upon this occurrence of this conversion constitutes another breach of the employment agreement and breach of the covenant of good faith and fair dealing.

186.   Defendants breached the covenant of good faith and fair dealing in the employment contract in multiple additional ways, as follows:

A.  Defendants failed to formally and immediately transfer Plaintiff's employment from Freedom Mortgage Corporation to Xpanse as required under ¶ 3 of the contract;

B.  Defendants failed to adopt and establish an equity incentive plan as required under ¶ 5(g) of the contract;

C.  Defendants failed to issue equity grants to Plaintiff when and as required under ¶ 5(g) of the contract;

D.  Defendants failed to provide or preserve the form, manner and structure of the equity as early-exercise and as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof as requited under ¶ Exhibit B of the employment contract;

E.  Defendants failed to timely pay the second half of his signing bonus ($500,000.00) to Plaintiff;

F.   Defendants failed to provide Plaintiff with vested 401k matching benefits in an amount, net of taxes, of at least $39,000.00;

G. Defendants failed to adopt the comments provided by Plaintiff to ensure commercially reasonable terms and conditions for Xpanse's equity plan in violation ¶ Exhibit B of the employment contract;

H. Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of ¶ 8(f) of the contract;

I.   Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of Exhibit B of the employment contract;

J.   Defendants failed to provide Plaintiff with health and other benefits through Xpanse;

K. Defendants failed to fully calculate and pay Plaintiff the value of PTO and holiday pay;

L. Defendants terminated Plaintiff's employment without cause in violation of ¶ 8 of the contract, failed to provide notice or opportunity to cure in violation of the contract, and subsequently failed to provide Plaintiff with the severance benefits he is entitled to receive under the severance agreement provisions set out in the February 26, 2020 contract, including:

     a.   A single severance lump sum payment in an amount equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus); which is calculated as at least $3,000,000.00;

     b.   A single lump sum payment of the of the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the

1          Executive's termination calculated at 100% of target; which is calculated as

2          at least $1,500,000.00.

3    c.  Twelve months company-paid COBRA benefits for Plaintiff and his family;

4       which is calculated per numbers provided by UMR on behalf of Freedom

5       Mortgage Corporation as, net of taxes, $43,812.72.

6    d.  A pro rata amount (calculated pursuant to the Employment Agreement) of

7       the current year's target Discretionary Performance Bonus amount,

8       irrespective of whether the performance goals applicable have been

9       established or satisfied, which is calculated pro rata of 100% of Base Salary

10      as at least $1,375,000.00, however as subsequently discussed and agreed

11      upon, the Discretionary Performance for the Plaintiff and the technology

12      company was determined to be increased to up to 150% of Base Salary,

13      which is calculated pro rata as at least $2,062,500.00.

14  187.    All of these actions and deliberate inactions resulted in the breach of the covenant of

15  good faith and fair dealing, as described herein.  As a result of Defendants' breaches of the

16  covenant of good faith and fair dealing Plaintiff sustained damages in excess of

17  $100,000,000.00, plus at least a 5% ownership interest in Xpanse, LLC, the value of which is

18  known to Defendants and to be proved at trial.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

Kitchin Legal, APC
Oakland

1

## SEVENTH CAUSE OF ACTION

2

Retaliation Against Plaintiff for Refusing to Participate in Illegal Activities

3

(Labor Code § 1102.5)

4      (Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings,

5      LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley

6      Middleman, Michael Middleman, Gregory Middleman, Erik Anderson and Does 1-50)

7      188.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

8      forth herein, with the exception of allegations that are inconsistent with this cause of action.

9      189.    Labor Code § 1102.5(c) provides:

10              An employer, or any person acting on behalf of the employer, shall not retaliate

11              against an employee for refusing to participate in an activity that would result in

12              a violation of state or federal statute, or a violation of or noncompliance with a

13              local, state, or federal rule or regulation.

14      190.    Plaintiff's employers, Defendants Freedom Mortgage Corporation and Xpanse

15      conspired with Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management

16      LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman,

17      Erik Anderson and others to retaliate against Plaintiff because he refused to participate in

18      activities that Plaintiff had reasonable cause to believe would violate state, federal and other

19      laws:

20              A. Plaintiff refused to participate in, endorse and sign-off on the creation of a secret

21              share valuation scheme that would have required him to engage in business practices

22              that would have violated the tax, securities, corporate and other laws of the United

23              States, and that would have violated the employment rights of employees, including

24              their right to receive the compensation promised to Plaintiff pursuant to Labor Code §§

25              201, *et seq.*;

26              B. Plaintiff refused to agree to the conversion and succession to a limited liability

Kitchin Legal, APC
Oakland

1    company, which could have subjected him (and the company) to significant civil, fraud
2    and misrepresentation exposure/liability and would have been to the detriment of his
3    and his co-workers' compensation/equity and rights.

4    C.  Plaintiff contested Defendants' refusal to permit his attorney to be involved in
5    discussions about his concerns, and their refusal for him to have his co-workers involved
6    and to confer with others, including co-workers such as CFO Timothy Beard and other
7    co-workers promised equity compensation; pursuant to Labor Code §§ 923, *et seq.*

8    D.  Plaintiff refused to participate in anticompetitive conduct and unfair business
9    practices that would have involved him in the violation of Civil Code §§ 1572 and 1710,
10   and Business and Professions Code § 17200, et seq., as well as state, federal and other
11   laws, which could have subjected him (and the company) to significant civil and
12   criminal liability.

13   191.  Defendants terminated Plaintiff's employment because he refused to participate in these
14   activities.   Defendants worked together in furtherance of the common plan to fabricate
15   pretextual causes and complaints against Plaintiff to support the termination of his employment
16   and deny him his wage rights and his contractual rights.

17   192.  As a result of Defendants' wrongful conduct, Plaintiff has been damaged in numerous
18   ways.

19   193.  The wrongful conduct of Defendants Freedom Mortgage Corporation, Xpanse,
20   Archwell Holdings LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone
21   B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman, Erik Anderson and
22   others was a substantial factor in causing Plaintiff's harm, including:

23   A.  Plaintiff has lost the compensation and other benefits of long-term employment
24   promised him by Defendants.

25   B.  Plaintiff has been denied an ownership interest of at least 5% in Xpanse he was
26   entitled to and would have earned absent Defendants' wrongful conduct.

Kitchin Legal, APC
Oakland

C.  Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to receive.

D.  Plaintiff has suffered undue hardship given his uprooting his family and children across states from California to Washington state to serve the best interests of the company and its employees.

E.  As a result of Defendants' wrongful termination of his employment after less than one year of employment, including but not limited to the mischaracterization of the termination as one "for cause," Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious termination of his employment by pretextual and fabricated means.

F.  Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic and non-economic losses.

G.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

194.   In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants. Defendants' decision to terminate Plaintiff's employment was authorized and ratified by Defendants' senior-most executives as described herein above.

Kitchin Legal, APC
Oakland

1    195.    To date, as a result of Defendants' Conspiracy to Retaliate Against Plaintiff for Refusing

2    to Participate in Illegal Activities, Plaintiff has sustained economic and general damages in

3    excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC.

4    Plaintiff is entitled to sufficient punitive damages to punish Defendants for their outrageous

5    conduct and to set an example to others.

6    196.    Plaintiff has incurred attorneys' fees and will continue to incur them, and he is entitled

7    to recover attorneys' fees and costs pursuant to Labor Code § 1102.5.

8                                    **EIGHTH CAUSE OF ACTION**

9                            Retaliation for Requesting Unpaid Wages

10                               (California Labor Code § 98.6)

11          (Against Defendants Freedom Mortgage Corporation and Xpanse, LLC and Does 1-50)

12    197.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

13    forth herein, with the exception of allegations that are inconsistent with this cause of action.

14    198.    Labor Code § 98.6 provides in relevant part,

15          (a) A person shall not discharge an employee or in any manner discriminate,

16          retaliate, or take any adverse action against any employee or applicant for

17          employment because the employee […] made a written or oral complaint that he

18          or she is owed unpaid wages…

19    199.    Defendants Freedom Mortgage Corporation and Xpanse, LLC served as joint employers

20    of Plaintiff as described herein.

21    200.    Defendants Freedom Mortgage Corporation, Xpanse, LLC retaliated against Plaintiff

22    because he demanded the payment of unpaid wages, compensation and benefits to which he

23    was entitled under his employment agreement.

24    201.    Defendants terminated Plaintiff's employment because he demanded the payment of

25    wages, compensation and benefits of employment.

26    202.    As a result of Defendants' wrongful conduct, Plaintiff has been damaged in several

ways.

203.    The wrongful conduct of Defendants was a substantial factor in causing Plaintiff's harm, including:

    A.  Plaintiff has lost the compensation and other benefits of employment promised him under his contract with Defendants.

    B.  Plaintiff has been denied an ownership interest of at least 5% in Xpanse that he was entitled to receive.

    C.  Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to receive.

    D.  Plaintiff has suffered undue hardship given his uprooting his family and children across states from California to Washington state to serve the best interests of the company and its employees.

    E.  As a result of Defendants' wrongful termination of his employment after less than one year of employment, including but not limited to the mischaracterization of the termination as one "for cause," Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious termination of his employment by pretextual and fabricated means.

    F.  Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic and non-economic losses.

    G.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

204.   In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

205.   To date, as a result of Defendants' Retaliation for Requesting Unpaid Wages, Plaintiff has sustained economic and general damages in excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC. Plaintiff is entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

206.   Plaintiff has incurred attorneys' fees and will continue to incur them, and he is entitled to recover attorneys' fees and costs pursuant to Labor Code § 1102.5.

## NINTH CAUSE OF ACTION

### Wrongful Discharge in Violation of California Public Policy

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, and Does 1-50)

207.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

208.   Defendants Freedom Mortgage Corporation and Xpanse jointly employed Plaintiff.

209.   While employed by Defendants, Plaintiff refused to engage in conduct that violated the laws and the public policy of California and the United States.

A. Plaintiff refused to participate and sign-off on the creation, endorsement and/or implementation of a secret share valuation scheme that would have required him to engage in business practices that he believed would have violated the tax, securities, corporate and other laws of the United States, and that would have violated the employment rights of his co-employees, and his own, and their right to receive the compensation promised to them, including to Plaintiff pursuant to Labor Code §§ 201, *et seq.*;

Kitchin Legal, APC
Oakland

B. Plaintiff refused to participate and agree to the restructuring and reorganization of the company from a C-Corp to a limited liability company (LLC) that would have required him to engage in business practices he believed would make him party to the intentional and knowing violation of the employment rights of his co-employees, and which also would result in a violation of his own legal rights, including those guaranteed to Plaintiff under Labor Code §§ 201, *et seq.*;

C. Plaintiff refused to participate and engage in anticompetitive conduct and unfair business practices that would have involved him in the violation of Civil Code §§ 1572 and 1710, and Business and Professions Code § 17200, et seq., as well as state and federal laws, which could have subjected him (and the company) to significant liability.

210.   Plaintiff's refusal to engage in this illegal misconduct was a substantial motivating reason for Defendants' termination of Plaintiff's employment.

211.   Defendants retaliated against and discharged Plaintiff's employment in violation of Labor Code §§ 98.6 and 1102.5.

212.   In violation of Labor Code § 232.5, Defendants also retaliated against and discharged Plaintiff because he sought to disclose and discuss illegal employment practices and conditions with Xpanse CFO Timothy Beard and with Plaintiff's attorney in violation of the polices set forth in Labor Code § 923. Defendants had knowledge of these efforts and threatened Plaintiff with termination for his efforts to do so.

213.   As a result of the wrongful discharge of his employment, Plaintiff has been damaged in numerous ways.

A. Plaintiff has lost the compensation and other benefits of long-term employment promised him by Defendants.

B. Plaintiff has been denied an ownership interest of at least 5% in Xpanse.

C. Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to

Kitchin Legal, APC
Oakland

1    receive.

2    D.  Plaintiff has suffered undue hardship given his uprooting his family and children

3    across states from California to Washington state to serve the best interests of the

4    company and its employees.

5    E.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a

6    result of Defendant's egregious misconduct.

7    F.  As a result of Defendants' wrongful termination of his employment after less than

8    one year of employment, including but not limited to the mischaracterization of the

9    termination as one "for cause," Plaintiff's accomplished career, professional standing

10   and reputation have been falsely portrayed and severely damaged by Defendants.

11   Plaintiff's future employment opportunities are adversely affected by Defendants'

12   tortious termination of his employment by pretextual and fabricated means.

13   G.  Plaintiff has lost significant past income and will lose additional income into the

14   future until he is able to obtain long-term employment with similar position,

15   responsibility, compensation, benefits and equity ownership, promised him by the

16   Defendants, if ever given the fabricated and false "for cause" characterization of his

17   termination, and Plaintiff has incurred other significant economic and non-economic

18   losses.

19   H.  Defendants' discharge of Plaintiff's employment was a substantial factor in causing

20   Plaintiff's harm. Knowing that their actions would cause this, Defendants acted

21   despicably and with malice.

22   214.    In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably,

23   with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of

24   Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's

25   rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to

26   compensatory damages for the injuries caused by Defendants. Defendants' decision to

Kitchin Legal, APC
Oakland

1  terminate Plaintiff's employment was made by Defendants' senior-most executives as
2  described herein above.

3  215.   To date, as a result of Defendants' Wrongful Discharge in Violation of California Public
4  Policy, Plaintiff has sustained economic and general damages in excess of $100,000,000.00,
5  and is owed at least a 5% ownership interest in Xpanse, LLC.

6  216.   Plaintiff also is entitled to sufficient punitive damages to punish Defendants for their
7  outrageous conduct and to set an example to others.

8                          **TENTH CAUSE OF ACTION**

9                  Intentional Interference with Economic Relations

10      (Against Defendants Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell
11  Management LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory
12                  Middleman, Erik Anderson and Does 1-50)

13  217.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set
14  forth herein, with the exception of allegations that are inconsistent with this cause of action.

15  218.   Defendants Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management
16  LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman,
17  Erik Anderson were not parties to the employment contract between Plaintiff and Defendants
18  Freedom Mortgage Corporation and Xpanse, but they were aware of the agreement.

19  219.   Despite their knowledge of the contract, each of them worked together to engage in the
20  conduct described herein in accordance with an objective and plan to make Plaintiff's
21  performance of his contractual obligations more difficult.

22  220.   Defendants intended to disrupt the contract between Plaintiff and Defendants Freedom
23  Mortgage Corporation and Xpanse, and/or knew that disruption of performance was certain or
24  substantially certain to occur as a result of their interference. As senior officers and owners of
25  the corporate defendants, Stanley Middleman, Michael Middleman, Gregory Middleman,
26  controlled all aspects of the plan to disrupt the relationship between Plaintiff and his employers.

Kitchin Legal, APC
Oakland

They enlisted and encouraged their long-time business associate and family friend Defendant Erik Anderson, President and CEO of Archwell Holdings LLC and Archwell Solutions LLC and a former lawyer, Michael Middleman's friend and Freedom Mortgage executive Christopher Staub, and Special Advisor to Defendant Stanley Middleman and Freedom Mortgage executive Robert King who is also a lawyer among others, in effectuating their tortious plans.

221.    Plaintiff sustained damages as a result of Defendants' conduct, including the following:

A. Plaintiff lost the compensation and other benefits of employment promised him under his contract with Defendants, including an ownership interest of at least 5% in Xpanse.

B. Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to receive.

C. As a result of Defendants' wrongful termination of his employment after less than one year of employment, including but not limited to the mischaracterization of the termination as one" for cause," Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious termination of his employment by pretextual and fabricated means.

D. Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic and non-economic losses.

E. Plaintiff incurred substantial expenses and hardship moving to Washington State based on his reliance on Defendants' misrepresentations.

F.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

222.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

223.   In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

224.   As a result of Defendants' Intentional Interference with Economic Relations Plaintiff has sustained economic and general damages in excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC.  Plaintiff is also entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

## ELEVENTH CAUSE OF ACTION

### Intentional Inducement of Breach of Contract

(Against Defendants Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman, Erik Anderson and Does 1-50)

225.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

226.   Defendants Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman, Erik Anderson were not parties to the employment contract between Plaintiff and Defendants Freedom Mortgage Corporation and Xpanse, but they were aware of the contract.

227.   Despite their knowledge of the contract, each of them worked together to engage in the conduct described herein in accordance with an objective and plan to cause Defendants Freedom Mortgage Corporation and Xpanse to breach the agreement, the result they intended.

Kitchin Legal, APC
Oakland

228.   Defendants intended to disrupt or cause a breach of the contract between Plaintiff and Defendants Freedom Mortgage Corporation and Xpanse, and/or knew that disruption of performance was certain or substantially certain to occur.

229.   Plaintiff sustained damages as a result of Defendants' conduct, including the following:

A.  Plaintiff lost the compensation and other benefits of employment promised him under his contract with Defendants, including an ownership interest of at least 5% in Xpanse.

B.  Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to receive.

C.  As a result of Defendants' wrongful termination of his employment after less than one year of employment, including but not limited to the mischaracterization of the termination as one "for cause," Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious termination of his employment by pretextual and fabricated means.

D.  Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic and non-economic losses.

E.  Plaintiff incurred substantial expenses and hardship moving to Washington State based on his reliance on Defendants' misrepresentations.

F.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

230.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

Kitchin Legal, APC
Oakland

231.    In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

232.    As a result of Defendants' Intentional Inducement of Breach of Contract, Plaintiff has sustained economic and general damages in excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC.  Plaintiff is also entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

## TWELFTH CAUSE OF ACTION

### Negligent Interference with Economic Relations

(Against Defendants Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman, Erik Anderson and Does 1-50)

233.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

234.    Defendants Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, Stanley Middleman, Michael Middleman, Gregory Middleman, Erik Anderson were not parties to the employment agreement between Plaintiff and Defendants Freedom Mortgage Corporation and Xpanse, LLC, but they were aware of the agreement.

235.    Despite their knowledge of the agreement, each of them worked together to engage in the conduct described herein despite the fact that they should have known that engaging in the conduct described herein would result in a disruption of the employment agreement.

236.    Defendants failed to act with reasonable care.  Instead, they conspired to conceal material information from Plaintiff, misrepresent material facts to Plaintiff, and attempted to involve Plaintiff in illegal and/or fraudulent activities.  When misrepresentations, coercion, and

Kitchin Legal, APC
Oakland

threats did not succeed, Defendants encouraged and directed Freedom Mortgage Corporation and Xpanse to terminate Plaintiff's employment.

237.   Plaintiff sustained damages as a result of Defendant' conduct, including the following:

A. Plaintiff lost the compensation and other benefits of long-term employment promised him under his contract with Defendants, including an ownership interest of at least 5% in Xpanse.

B.  Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to receive.

C. As a result of Defendants' wrongful termination of his employment after less than one year of employment, including but not limited to the mischaracterization of the termination as one "for cause," Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious termination of his employment by pretextual and fabricated means.

D. Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic and non-economic losses.

E.  Plaintiff incurred substantial expenses and hardship moving to Washington State based on his reliance on Defendants' misrepresentations.

F.  Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

238.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

239.   As a result of Defendants' Negligent Interference with Economic Relations Plaintiff has

sustained economic and general damages in excess of $100,000,000.00, plus at least a 5% ownership interest in Xpanse, LLC.

## THIRTEENTH CAUSE OF ACTION

### Violation of Labor Code § 210

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, and Does 1-50)

240.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

241.   Labor Code § 210 states in relevant part:

(a) In addition to, and entirely independent and apart from, any other penalty provided in this article, every person who fails to pay the wages of each employee as provided in Sections 201.3, 204, 204b, 204.1, 204.2, 204.11, 205, 205.5, and 1197.5, shall be subject to a penalty as follows:

(1) For any initial violation, one hundred dollars ($100) for each failure to pay each employee.

(2) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld.

242.   Defendants failed to pay Plaintiff his wages as required under California law, including under as required by Labor Code § 204.

243.   On July 10, 2020, Plaintiff made a contribution to his 401k plan in the total amount of $4,326.92. Defendants failed make a timely matching contribution at that time as required by their contract with Plaintiff.  The payment of this part of Plaintiff's promised wages remains due. Plaintiff is entitled to a statutory penalty in the amount of $100 for this late payment.

244.   On July 24, 2020, Plaintiff made another contribution to his 401k plan in the total amount of $4,326.92. Defendants failed make a timely matching contribution at that time as required by their contract with Plaintiff. The payment of this part of Plaintiff's promised wages

Kitchin Legal, APC
Oakland

1  remains due.  Plaintiff is entitled to $200, plus 25% of the amount Defendants failed to pay:

2  $1,081.73.

3  245.   On August 7, 2020, Plaintiff made another contribution to his 401k plan in the total

4  amount of $4,326.92.  Defendants failed make a timely matching contribution at that time as

5  required by their agreement with Plaintiff.  The payment of this part of Plaintiff's promised

6  wages remains due Plaintiff is entitled to $200, plus 25% of the amount Defendants failed to

7  pay:  $1,081.73.

8  246.   On October 2, 2020, Defendants were required under their employment contract with

9  Plaintiff to pay him the second half of the signing bonus promised to him in the total amount of

10  $500,000.00.  Defendants failed to pay these wages to Plaintiff until October 30, 2020.  Plaintiff

11  is entitled to $200, plus 25% of the amount Defendants failed to timely pay: $125,000.00.

12  247.   On October 16, 2020, Defendants paid Plaintiff a total of 82 PTO hours at the incorrect

13  rate of $721.15 per hour resulting in a failure to pay $39,423.14.  Plaintiff is entitled to $200,

14  plus 25% of the amount Defendants failed to timely pay:  $9,855.79.

15  248.   On January 8, 2021, Freedom Mortgage Corporation paid Plaintiff 16 hours of PTO at

16  the incorrect rate, resulting in an underpayment of $12,104.10.  Plaintiff is entitled to $200,

17  plus 25% of the amount Defendants failed to timely pay: $3,026.03.

18  249.   On January 22, 2021, Freedom Mortgage Corporation paid Plaintiff 22 hours of PTO

19  at the incorrect rate, resulting in an underpayment of $16,632.52.  Plaintiff is entitled to $200,

20  plus 25% of the amount Defendants failed to timely pay: $4,158.13.

21  250.   On November 27, 2020, Plaintiff made another contribution to his 401k plan in the total

22  amount of $4,326.92.  Defendants failed make a timely matching contribution at that time.  The

23  payment of this part of Plaintiff's promised wages remains due. Plaintiff is entitled to $200,

24  plus 25% of the amount Defendants failed to pay:  $1,081.73.

25  251.   On December 11, 2020 made another contribution to his 401k plan in the total amount

26  of $2,192.32. Defendants failed make a timely matching contribution at that time.  The payment

1  of this part of Plaintiff's promised wages remains due. Plaintiff is entitled to $200, plus 25% of

2  the amount Defendants failed to pay, or $548.08.

3  252.  On December 24, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 42

4  PTO hours at the rate of $721.15 per hour, resulting in a failure to pay $20,192.34. Plaintiff is

5  entitled to $200, plus 25% of the amount Defendants failed to pay, or $5,048.08.

6  253.  On January 22, 2021, Plaintiff made another contribution to his 401k plan in the total

7  amount of $19,500.00. Defendants failed to make a timely matching contribution at that time.

8  The payment of this part of Plaintiff's promised wages remains due. Plaintiff is entitled to $200,

9  plus 25% of the amount Defendants failed to pay, or $5,075.00.

10  254.  On January 22, 2021, Freedom Mortgage Corporation paid Plaintiff a total of 22 PTO

11  hours at the rate of $721.15 per hour, resulting in a failure to pay $16,632.22. Plaintiff is entitled

12  to $200, plus 25% of the amount Defendants failed to pay:  $4,158.06.

13  255.  On February 17, 2021, Plaintiff executed the severance agreement provided for in the

14  employment agreement (Exhibit D to Exhibit A hereto), and returned it to Freedom Mortgage

15  Corporation for its acceptance. Freedom Mortgage Corporation indicated that it had not invited

16  the submission of the severance agreement and that it would not sign it.  Pursuant to the

17  employment agreement, payment of severance benefits was due March 22, 2021.  Defendants

18  failed to make the required severance payment in the total amount of at least $6,650,125.44.

19  Plaintiff is entitled to $200, plus 25% of the amount Defendants failed to timely pay:

20  $1,662,731.36.

21  256.  In total, Plaintiff is entitled to an amount of at least $1,825,345.60 based on Defendants'

22  violation of Labor Code § 210.

23  257.  In addition to these amounts, Plaintiff is also entitled to his attorneys' fees and costs

24  pursuant to Labor Code § 218.5

25

26

Kitchin Legal, APC
Oakland

**FOURTEENTH CAUSE OF ACTION**

Violation of Labor Code §§ 970, et seq.

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Stanley Middleman,

Michael Middleman, Gregory Middleman, and Does 1-50)

258.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

forth herein, with the exception of allegations that are inconsistent with this cause of action.

259.   Labor Code § 970 provides in relevant part that,

No person, or agent or officer thereof, directly or indirectly, shall influence,

persuade, or engage any person to change from one place to another in this

State or from any place outside to any place within the State, or from any

place within the State to any place outside, for the purpose of working in

any branch of labor, through or by means of knowingly false

representations, whether spoken, written, or advertised in printed form,

concerning either:

(a) The kind, character, or existence of such work;

(b) The length of time such work will last, or the compensation therefor.

260.   Labor Code § 971 provides,

Any person, or agent or officer thereof, who violates Section 970 is guilty

of a misdemeanor punishable by a fine of not less than fifty dollars ($50)

nor more than one thousand dollars ($1,000) or imprisonment for not more

than six months or both.

261.   Labor Code § 972 provides,

In addition to such criminal penalty, any person, or agent or officer thereof

who violates any provision of Section 970 is liable to the party aggrieved,

in a civil action, for double damages resulting from such misrepresentations.

Kitchin Legal, APC
Oakland

1      Such civil action may be brought by an aggrieved person or his assigns or

2      successors in interest, without first establishing any criminal liability.

3  262.  Labor Code § 974 provides in full,

4      In addition to such criminal penalty, any person, or agent or officer thereof

5      who violates any provision of Section 970 is liable to the party aggrieved,

6      in a civil action, for double damages resulting from such misrepresentations.

7      Such civil action may be brought by an aggrieved person or his assigns or

8      successors in interest, without first establishing any criminal liability.

9  263.  Defendants intentionally misrepresented the kind, nature, character, compensation,

10  terms including equity, existence and duration of such work, including their intent to timely

11  transfer Plaintiff's employment to Xpanse as represented, to provide him with the benefits of

12  Xpanse, to provide the second payment of his signing bonus in a timely manner, provide

13  Plaintiff with equity ownership in Xpanse and in the form, manner and structure as promised

14  as early-exercise and as incentive stock options (ISO), non-statutory stock options (NSO) or

15  combination thereof, their numerous and substantial contributions to the technology company,

16  the continued C-Corp structure of the company, the independence of the technology company

17  and management, plans for the company, his guaranteed bonus, annual bonus and other

18  compensation as represented, his role as Co-Founder and CEO/President, and that Plaintiff

19  would continue to be employed by them for years to come with the specific intent to directly

20  and/or indirectly influence, persuade or engage Plaintiff to move from his longtime home in

21  California to the City of Bellevue in the Seattle, Washington area where Xpanse was to be

22  headquartered. Defendants knew that Plaintiff's presence and move to Bellevue, Washington

23  would facilitate and be helpful to the company's recruiting activities and in attracting talent

24  including from technology companies such as Amazon, Microsoft, Zillow and others, with

25  these companies being located in and around the same area – companies from where Plaintiff

26  after moving to Bellevue, Washington state successfully attracted and brought onboard talent

Kitchin Legal, APC
Oakland

to Xpanse. In fact, Defendants did not intend that Plaintiff be employed in Bellevue, Washington for many additional years on the terms they had promised, nor to formally transfer Plaintiff's employment to Xpanse, nor to provide him with the benefits of Xpanse, nor to provide the second payment of his signing bonus in a timely manner, nor to provide Plaintiff with early-exercise equity ownership in Xpanse and in the form, manner and structure as promised, nor to fulfill their contributions to the technology company, nor to continue the C-Corp structure of the company, nor to enable the independence of the technology company, nor for him to have his long-term role as CEO/founding President and title as Co-Founder and or nor to provide Plaintiff with his guaranteed bonus, annual bonus and other compensation represented.

264. Defendants' plan was only to retain Plaintiff until he no longer served Defendants' undisclosed purposes.

265. Defendants also intentionally misrepresented the compensation and benefits Plaintiff would receive from Freedom Mortgage Corporation and/or Xpanse, his timely transfer to Xpanse, Xpanse operating and continuing as a C-Corp, as an independent company, Xpanse providing early-exercise equity ownership with terms and in the form, manner and structure as promised to Plaintiff, and Defendants fulfilling their material representations regarding revenue run rate contributions, substantial intellectual property transfers, assets transfers and large numbers of technologists transfers from Freedom Mortgage Corporation and Archwell Holdings entities to Xpanse with the specific intent to influence, persuade or engage Plaintiff to move from his long-time home and residence in Santa Clara County, California to Bellevue, Washington, to have Plaintiff establish leadership presence in the Bellevue, Washington state area and further Xpanse's recruiting activities and presence. Defendants made their representations to Plaintiff, repeatedly and falsely promised, without the intent to perform them.

Kitchin Legal, APC
Oakland

266.   Plaintiff relied to his detriment on these misrepresentations from the Defendants and moved and uprooted himself, his family and children from California to Bellevue, Washington, where he was wrongfully terminated a brief seven months later.

267.   As a result of those misrepresentations, Plaintiff has sustained damages, including but not limited to, the cost of the move and relocation, the cost and hardship of securing new housing and new schools in Washington, loss of compensation and benefits, past and future income and benefits, loss of equity and stock, and in the form, manner and structure of early-exercise incentive stock options, non-statutory stock options or combination thereof, the loss of alternative employment opportunities, severe emotional distress, mental anguish and suffering, and severe hardship for Plaintiff.

268.   Plaintiff seeks all damages resulting from these misrepresentations according to proof at trial.  Plaintiff also seeks double these damages under Labor Code § 972 and § 974.

269.   In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

## FIFTEENTH CAUSE OF ACTION

### Failure to Pay Wages Timely, Including Upon Termination

Labor Code §§ 201 et seq.

(Against Defendants Freedom Mortgage Corporation and Xpanse, LLC, and Does 1-50)

270.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

271.   Pursuant to his employment agreement with Defendants, Plaintiff was entitled to at least 20 calendar days paid time off per calendar year.

Kitchin Legal, APC
Oakland

272.    Pursuant to Defendant Freedom Mortgage Corporation's PTO policy, Plaintiff earned 14 hours of PTO per pay period.  At the end of every quarter, Freedom Mortgage Corporation paid out Plaintiff's earned PTO wages.  On October 16, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 82 PTO hours at the rate of $721.15 per hour.  Subsequently, on December 24, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 42 PTO hours at the rate of $721.15 per hour.

273.    Defendant Freedom Mortgage Corporation failed to pay out Plaintiff's PTO at his regular rate of pay for 2020, however, which was $1,201.92 per hour based on Plaintiff's base salary plus his contractually-guaranteed non-discretionary $1,000,000 signing bonus.  For 2020, therefore, Defendant Freedom Mortgage Corporation under paid Plaintiff by a total of at least $59,615.48 in PTO payments, an amount that remained due upon and after the termination of Plaintiff's employment in January 2021.

274.    Defendant Freedom Mortgage Corporation failed to pay Plaintiff's PTO at his regular rate of pay for 2021, which was $1,477.16, based on Plaintiff's base salary plus his contractually-guaranteed, 2021 non-discretionary performance bonus of at least $1.5 million, plus Xpanse's 3% annual inflation increase (applied effective March and through the following year, and recurring annual inflation increases thereafter) and the guaranteed $5,000 wellness bonus.

275.    During 2021 Plaintiff earned at least 38 hours of PTO.  All of these PTO hours were paid at the rate of $721.15 per hour resulting in a failure to pay at least $28,728.24 in PTO wages that were earned and due upon Plaintiff's termination.

276.    In total, Defendant Freedom Mortgage Corporation failed to pay Plaintiff at least $88,343.72 in PTO wages upon the date of his termination.

277.    In addition, Defendants Freedom Mortgage Corporation and Xpanse, LLC failed to pay severance wages and benefits to Plaintiff on March 22, 2021 as required under the terms of his employment contract.

Kitchin Legal, APC
Oakland

278.   Defendant Xpanse, LLC also failed to make matching contributions to Plaintiff's 401k plan as required under Xpanse's executive compensation plan and 5(e) of Exhibit A to the employment contract between Plaintiff and Defendants.

279.   As of the date they paid Plaintiff, January 22, 2021, Defendants also owed Plaintiff a total of $39,000.00, net of taxes, in matching 401k contributions with $19,500.00, net of taxes, during calendar year 2020, and $19,500.00, net of taxes, in January 2021.

280.   Defendants willfully failed to pay all of these wages due to Plaintiff upon his termination.

281.   California Labor Code §§ 201 and 202 require Defendants to pay Plaintiff immediately upon his termination.  California Labor Code § 203 provides that if an employer willfully fails to timely pay such wages the employer must, as a penalty, continue to pay the subject employees' wages until the back wages are paid in full or an action is commenced.  The penalty cannot exceed 30 days of wages per violation.  A worker need not prove malice or intentional conduct in establishing their claim for waiting time penalties, but merely establish the employer did not do something it was obligated to do.  (See *Mamika v. Barca* (1998) 68 Cal. App. 4th 487; *Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1.)

282.   Due to Defendants' willful conduct in not paying all compensation due Plaintiff, Plaintiff is entitled to up to 30 days' wages as penalty under Labor Code § 203 in excess of $477,691.

283.   Plaintiff has incurred and will continue to incur attorneys' fees in the prosecution of this action.  Plaintiff seeks his attorneys' fees and costs of suit under Labor Code § 218.5.

///

///

///

///

///

Kitchin Legal, APC
Oakland

1

## SIXTEENTH CAUSE OF ACTION

2

Unfair Competition

3

(California Business and Professions Code §§ 17200, et seq.)

4

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings,

5

LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC Stanley

6

Middleman, Michael Middleman, Gregory Middleman, Erik Anderson and Does 1-50)

7   284.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set

8   forth herein, with the exception of allegations that are inconsistent with this cause of action.

9   285.   Plaintiff further brings this action pursuant to Business and Professions Code §§ 17200,

10  *et seq.*, seeking restitution of monies owed to Plaintiff as described herein above and for

11  equitable relief.

12  286.   The unfair competition law prohibits all unfair competition, which is defined as "any

13  unlawful, unfair or fraudulent business act or practice." Plaintiff has standing to bring this claim

14  because while he was employed by Defendants Freedom Mortgage Corporation and Xpanse,

15  he was the direct victim of Defendants' illegal and unfair business practices, which Defendants

16  engaged in for their financial benefit.

17  287.   Defendants, and each of them, are "persons" as defined under Business and Professions

18  Code § 17201.  Each of the directors, officers, and/or agents of Defendants, and each of them,

19  are equally responsible for the acts of the other directors, officers, employees and/or agents as

20  set forth in the Business and Professions Code § 17095.

21  288.   Plaintiff also seeks injunctive relief under Business and Professions Code § 17203 to

22  require Defendants to restore to Plaintiff his rightful at least 5% ownership interest in Xpanse,

23  LLC.

24  289.   The following practices of Defendants, and each of them, are unlawful and unfair

25  business practices under California Business and Professions Code §§ 17200 *et seq.*:

26      A.  Making false promises to Plaintiff to accept employment;

**Kitchin Legal, APC**
Oakland

B. Inducing Plaintiff to move residence from California to Washington State based on misrepresentations;

C. Retaliating against Plaintiff for exercising rights guaranteed under California law;

D. Failing to pay Plaintiff wages when due;

E. Failing to transfer Plaintiff's employment to Xpanse as entitled by contract;

F. Failing to pay Plaintiff severance and other benefits guaranteed to him by contract;

G. Delaying and evading providing Plaintiff with equity and in the form, manner and structure that was entitled to him by contract;

H. Failing to immediately transfer at least 5% ownership interest in Xpanse to Plaintiff upon the occurrence of conditions specified in ¶ 8(f) and/or Exhibit B of the employment agreement;

I. Engaging in conduct meant to punish Plaintiff for refusing to engage in illegal and/or fraudulent conduct;

J. Terminating Plaintiff's employment in retaliation for engaging in protected activities;

K. Concealing material information and making misrepresentations and false promises to Plaintiff;

L. Using staff, technologies and intellectual property developed by Xpanse to benefit and enrich the Defendants without sufficient and market-based revenue payments to Xpanse, which in turn reduced the value of Plaintiff's 5% ownership interest in Xpanse;

M. Self-serving changes directed and made by the Defendants, including but not limited to succeeding and converting Xpanse from C-Corp to a limited liability company, directing its intellectual property development and assignment, and

Kitchin Legal, APC
Oakland

1    assigning its resources and staff to serve the objectives of Freedom Mortgage

2    Corporation, Archwell Holdings, LLC, Keystone B2B LLC, and other

3    Middleman affiliated entities, for the benefit and enrichment of the Defendants,

4    including significant tax benefits for the Defendants, which in turn violated the

5    representations and promises made to Plaintiff;

6    N.  Removing Plaintiff as Co-Founder of Xpanse and solely titling the Defendant

7    Gregory Middleman as Founder; and

8    O.  Being unjustly enriched by their unfair business practices.

9    290.    At all times relevant, Defendants' conduct described above constituted an unfair,

10   unlawful, and/or fraudulent business practice in violation of Business & Professions Code §§

11   17200, *et seq*.

12   291.    Defendants have inequitably and unlawfully conspired, agreed, arranged and combined

13   to violate California labor laws, as alleged herein.

14   292.    As a direct and proximate result of the unfair, unlawful, and/or fraudulent business

15   practices alleged herein, Plaintiff has been denied due wages, all to his detriment and all to

16   Defendants' illegal economic advantage.

17   293.    The unfair competition law provides that the Court may restore to an aggrieved party

18   any money or property acquired or any other economics benefits, including tax benefits, by

19   means of unlawful and unfair business practices.  Plaintiff seeks the restitution of his wages and

20   other benefits Defendants denied to him through their unfair business practices.

21   294.    In addition, pursuant to Business and Professions Code § 17203, Plaintiff is entitled to

22   injunctive relief to require Defendants to transfer at least 5% ownership interest in Xpanse, LLC

23   to him.

24   295.    Attorneys' fees are appropriate and sought pursuant to all applicable laws, including but

25   not limited to Code of Civil Procedure § 1021.5.

26

Kitchin Legal, APC
Oakland

## SEVENTEENTH CAUSE OF ACTION

### Constructive Trust

Civil Code §§ 2223 and 2224

(Against Defendants Xpanse, LLC, Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, and Does 1-50)

296.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

297.    Pursuant to California Civil Code § 2223, "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner."

298.    Plaintiff seeks a constructive trust over the Defendants to the extent necessary to protect Plaintiff's ownership interest in the profits and operation of Xpanse, LLC.

299.    As alleged herein, Defendants wrongfully withheld from Plaintiff his accelerated 5% ownership interest in Xpanse, LLC, and denied him the right to exercise an early option to obtain that ownership.

300.    Defendants conspired to deprive Plaintiff of his ownership interest in Xpanse, LLC through fraud and deception, as described herein, thereby depriving Plaintiff of the rights and benefits of his ownership interest in Xpanse, LLC.

301.    Plaintiff seeks a preliminary injunction pursuant to Civil Code § 2225 (f)(1)  to prevent any waste of proceeds or profits while this action to recover that interest proceeds.

## EIGHTEENTH CAUSE OF ACTION

### Equitable Accounting

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management LLC, Keystone B2B, LLC, and Does 1-50)

302.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

303.    In or around December 2020 or earlier, Plaintiff became entitled to an accelerated 5% ownership interest in the company now known as Xpanse, LLC.

304.    Plaintiff's ownership interest in Xpanse entitles Plaintiff to benefits of that ownership and the value of that ownership, including but not limited to intellectual property, revenues, profits, retained earnings, and accrued tax benefits/credits, and other owner benefits and distributions.

305.    Defendants have appropriated and assigned Xpanse's intellectual property, development, technologists, staff, other resources, R&D and tax credits and benefits to enrich Defendants Freedom Mortgage Corporation, Keystone B2B, LLC, Archwell Solutions, LLC, Archwell Management, LLC, Archwell Holdings, LLC and its several other subsidiaries and affiliated entities, at the expense of Xpanse and causing economic harm to Plaintiff and his ownership interest.

306.    Information memorializing these monetary values and the transfer of intellectual property is in the exclusive control of Defendants.  Consequently, the amount of money due Plaintiff now and into the future cannot be ascertained without an accounting.

307.    Plaintiff therefore seeks an equitable accounting so he can ascertain the value of his rights.

### NINETEENTH CAUSE OF ACTION

#### Declaratory Relief

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, and Does 1-50)

308.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

309.    Plaintiff is a party to a contract between himself, Freedom Mortgage Corporation and the company now known as Xpanse, LLC with duties and obligations between the parties. (Exhibit A)

Kitchin Legal, APC
Oakland

310.    Plaintiff seeks a declaration of his rights under this contract, including but not limited to his right to severance, benefits, and his ownership interest in Xpanse, LLC.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1)    For past and future general and special damages according to proof;

2)    For punitive and exemplary damages;

3)    For statutory penalties;

4)    For double the value of all damages awarded pursuant to Labor Code § 972 and § 974.;

5)    For restitution and equitable relief under Business & Professions Code §§ 17200, et seq.;

6)    For declaratory relief;

7)    For a constructive trust;

8)    For specific performance;

9)    For an equitable accounting;

10)    For prejudgment and postjudgment interest, at the legal rate;

11)    For increased payment to offset any additional income or other taxes;

12)    For costs of suit incurred herein, including reasonable attorney's fees and costs; and

13)    For such other and further relief as the court may deem just and proper.


DATED: September 2, 2021          **KITCHIN LEGAL, APC**


By: _____
     Patrick R. Kitchin, Esq.
     Attorneys for Plaintiff

1

## DEMAND FOR TRIAL BY JURY

2
To the fullest extent permitted by law, Plaintiff demands a trial by jury.

3

4
DATED:  September 2, 2021          **KITCHIN LEGAL, APC**

5
By: _____

6
Patrick R. Kitchin, Esq.
Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Kitchin Legal, APC**
Oakland

---

**EXHIBIT A**

Execution Copy

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of March 30, 2020, by and between Freedom Mortgage Corporation (the "Company"), and Rahul Mewawalla (the "Executive") (together, the "Parties").

## RECITALS

WHEREAS, the Company desires to employ the Executive as its Executive Vice President, Platforms and Technology Businesses and Chief Digital Officer until the establishment of a new technology affiliate referred to as Freedom Technology Corporation (as explained more fully below), of which the Executive will become the President; and

WHEREAS, the Executive has agreed to accept such employment on the terms and conditions set forth in this Agreement effective as of the date first set forth above (the "Effective Date" or "the Start Date").

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements of the Parties herein contained, the Parties hereto agree as follows:

1.      **Term of Employment.** The term of this Agreement shall commence on the Effective Date and continue until terminated or until such time as the Executive enters into an employment agreement with FTC (as defined below) in a form that is mutually agreeable to the Parties (the "Term of Employment"). During the Term of Employment, the Executive shall be an at-will employee of the Company and the Executive's employment and the Term of Employment shall be freely terminable by either Party, for any reason, at any time, with or without Cause (as defined below) or notice (except as set forth herein).

2.      **Position.** During the Term of Employment, the Executive shall serve as the Company's Executive Vice President, Platforms and Technology Businesses and Chief Digital Officer, based in and working in the San Francisco Bay Area in California, with travel as needed to other locations, including New Jersey, as required by the Executive's job duties, or in such other location as may be mutually agreed to in writing by the Executive and Company. The Executive's position is an exempt position. The Executive is expected to work a minimum of forty (40) hours per week. The Executive's Start Date will be determined by the Executive and will be within no later than [30] days of both parties signing and executing this agreement.

3.      **Scope of Employment.** During the Term of Employment, the Executive shall be responsible for the performance of those duties consistent with the Executive's position as Executive Vice President, Platforms and Technology Businesses and Chief Digital Officer and such other duties and responsibilities as may be assigned by the Chief Executive Officer of the Company (the "CEO"), including setting up, creating, and running a new affiliate of the Company, which will be known as Freedom Technology Corporation ("FTC") or another name agreed to between the Company and the Executive. The Executive will be responsible for developing a detailed business plan for FTC, which lays out hiring goals and an operational approach to development and rollout of a series of products that will improve the speed, efficiency, and cost of

1

mortgage origination and servicing. The Executive, among other things, will also be responsible for overall strategy for FTC, including setting forth priorities, roadmaps, KPIs, operational plans. The Executive will be employed by the Company until such time as FTC is created and operational and at which time the Executive will become the President of FTC following mutual agreement between the Executive and FTC on a new employment agreement in the form attached as Exhibit A. Termination of the Executive's employment with the Company in order for the Executive to begin employment with FTC will not trigger any of the provisions of Section 8 of this Agreement, except if the employment terms with FTC are not substantially similar with terms agreed upon in this agreement with Freedom Mortgage Corporation, and where otherwise required by law. The Executive shall report to the CEO of the Company until he becomes the President of FTC, at which time he will report to the CEO of FTC. At that time, the Executive and FTC will execute an employment agreement in a form that is mutually agreeable to the Parties. At all times, the Executive shall perform and discharge faithfully, diligently, and to the best of the Executive's ability, the Executive's duties and responsibilities hereunder. While employed by the Company, the Executive shall devote the Executive's entire business time, loyalty, attention and efforts to the business and affairs of the Company and its affiliates, except as provided in Section 4. The Executive agrees to abide by the rules, regulations, instructions, personnel practices and policies of the Company and any changes therein that may be adopted from time to time by the Company.

4.     **Outside Activities.** Subject to the prior written approval of the Company, which the Company shall not withhold unless a material and adverse conflict of interest would otherwise exist, the Executive may serve on the board of directors, advisory board, or similar body of up to two (2) other organizations, including publicly owned corporations or other entities, philanthropic organizations and organizations in which the Executive has made an investment, provided that the Executive's activities with respect to the foregoing do not, individually or in the aggregate, materially affect the performance of the Executive's duties to the Company, or violate the provisions of this Agreement or any other agreement between the Executive and the Company. If the Executive is appointed or elected to additional boards, the Executive may continue to serve on all boards for a limited transaction period, provided that, within four (4) months of the date on which the Executive becomes a member of such additional boards, the Executive must resign from or otherwise cease to serve on one of the other boards on which the Executive serves to keep the total number of boards to no more than two (2) in total at any given time.

5.     **Compensation.** As full compensation for all services rendered by the Executive during the Term of Employment, the Company will provide to the Executive the following:

(a)     Base Salary. The Executive shall receive a base salary of $1,500,000.00 annually, which will be paid in bi-weekly installments (the "Base Salary"). Base Salary shall be paid in accordance with the Company's regularly established payroll procedure and may be increased periodically (but shall not be subject to decrease below $1,500,000), as determined by the CEO of the Company in his sole discretion.

(b)     Signing Bonus. Following the Effective Date hereof, the Executive shall be entitled to receive a one-time bonus in the amount of $1,000,000.00, which will be payable in two lump sum payments (the "Signing Bonus"). The first payment will be in the gross amount of $500,000.00 and will be paid on the first pay date following the Executive's Start Date with the

2

Company. The second payment will be in the gross amount of $500,000.00 and will be made by the Company on the first pay date following the six (6) month anniversary of the Start Date, provided that the Executive has not been terminated for Cause or resigned without Good Reason by either the Company or FTC (or any of their wholly-owned subsidiaries). If the Executive leaves employment with the Company or FTC voluntarily without Good Reason or is terminated by the Company or FTC for Cause, as those terms are defined below, in each case before the first anniversary of the Start Date, the Executive shall be required to repay to the Company a pro rata of the Signing Bonus that has been paid to Executive. If the Executive must repay any portion of the Signing Bonus to the Company pursuant to the preceding sentence, it shall be paid (i) without regard to any taxes withheld by the Company upon payment of the Signing Bonus to the Executive (i.e., on a gross basis and with the Company making the necessary adjustments to the W-2 form issued at the end of the year to account for the return of the Signing Bonus) and (ii) in a single lump sum, promptly, but no later than thirty (30) days following, such separation of employment from either the Company or FTC.

(c)     Performance Discretionary Bonus. The Executive shall be subject to an annual performance evaluation by the CEO or Board of the Company to assess achievement of performance goals as discussed and mutually agreed in advance between the CEO or Board of the Company and the Executive. Following the anniversary of the Executive's Start Date each year ("Performance Year"), the Executive shall be eligible to receive a performance bonus with a target of 100% of Executive's Base Salary. This Performance Bonus will be based on the Executive's performance and the Company's performance during the Performance Year, which performance will be measured against the annual goals as discussed and mutually agreed between the CEO or Board of the Company and the Executive in advance of that Performance Year. The determination of whether any such bonus has been earned by the Executive in a particular Performance Year and the amount of such bonus shall in each case be reasonably determined by the CEO or the Board of the Company based upon goals accomplished (the "Performance Discretionary Bonus"). The Executive must be an active employee of the Company on the last day of the Performance Year in order to be eligible for and to earn any Performance Discretionary Bonus. The Performance Discretionary Bonus, as determined, will be payable within sixty (60) days of the anniversary of the Executive's Start Date. For the first Performance Year, the Executive will be guaranteed to receive a minimum discretionary performance bonus of 100% of the Executive's Base Salary.

(d)     Income Tax Withholding. The Company may withhold from any compensation (including salary and/or bonuses) or benefits payable to the Executive all Federal, State, City or other taxes as shall be required pursuant to any applicable law or governmental regulation or ruling.

(e)     Paid Time Off. Subject to the terms hereof, the Executive shall receive twenty (20) days of paid time off per calendar year.

(f)     Benefits. The Executive may participate in any and all benefit programs that the Company establishes and makes available to its senior executives from time to time, provided that the Executive is eligible under (and subject to all provisions of) the plan documents governing those programs. These benefits include Medical, Dental, Vision, Life Insurance, Long Term and Short-Term Disability Options, Flexible Spending Accounts (FSA), Health Savings Account (HSA), Employee Assistance Plan, 401(k) with company match, Tuition

3

Execution Copy

Reimbursement, Legal and Pet Insurance plans. Benefits are subject to change at any time in the Company's sole discretion.

(g)     Equity. Upon employment with Freedom Technology Corporation, the Parties agree that the Executive will be eligible to receive equity grants as set forth in Exhibit B and at least the same Base Salary, Performance Bonus and all other terms as with Freedom Mortgage Corporation.

(h)     Directors and Officers Insurance. The Company agrees to continue and maintain a directors' and officers' liability insurance policy covering the Executive to the same extent the Company provides such coverage for its other executive officers. The Executive shall be entitled to such rights regarding indemnification as are provided in the Company's Charter and Bylaws, as they may be amended from time to time.

6.     **Expenses.** The Executive shall be entitled to reimbursement by the Company for all reasonable business and travel expenses (in-line with the customary travel expense practices of the Company with other senior executives) incurred by the Executive on the Company's behalf during the course of the Executive's employment with the Company, upon the presentation by the Executive of documentation itemizing such expenditures and attaching all supporting vouchers and receipts in accordance with the Company's policies. Reimbursement will be made no later than thirty (30) calendar days after the expense is substantiated (which must occur within thirty (30) calendar days after the expense is incurred). The expenses eligible for reimbursement under this provision may not affect the amount of such expenses eligible for reimbursement in any other taxable year, and the right to reimbursement is not subject to liquidation or exchange for another benefit.

7.     **Confidentiality Agreement.** As a condition to the commencement of the Executive's employment with the Company, the Executive is required to execute the Confidentiality, Proprietary Rights, Non-Solicitation and Assignment of Inventions Agreement, attached hereto as Exhibit C (the "Confidentiality Agreement").

8.     **Termination and the Effect of Termination.**

(a)     General. Subject in each case to the provisions of this Section 8 and the other provisions of this Agreement relating to the Parties' respective rights and obligations upon termination of the Executive's employment, nothing in this Agreement interferes with or limits in any way the Company's or the Executive's right to terminate the Executive's employment at any time, for any reason or no reason, with or without notice (except as provided further below), subject to any payment obligations that the Company may have, and nothing in this Agreement confers on the Executive any right to continue in the Company's employ. If the Executive's employment ceases for any reason, the Executive (or the Executive's estate, as applicable) will be entitled to receive: (i) any earned but unpaid compensation  to be paid in accordance with the Company's regular payroll practices and with applicable law; (ii) unreimbursed business expenses for which expenses the Executive has provided appropriate documentation in accordance with the Company's policies, to be paid in accordance with Section 6; and (iii) any amounts or benefits to which the Executive is then entitled under the terms of the benefit plans then sponsored by the

4

Company in accordance with their terms (and not accelerated to the extent acceleration does not satisfy Section 409A of the Code).

(b)     Death or Disability. The Executive's employment shall terminate automatically upon his death. The Company may terminate the Executive's employment immediately upon the occurrence of a Disability (as defined below), such termination to be effective upon the Executive's receipt of written notice of such termination. In the event the Executive's employment is terminated due to his death or Disability, the Executive or his estate or his beneficiaries, as the case may be, shall be entitled to all compensation and benefits set forth in Section 8(a) which have been accrued as of the date of the Executive's death or Disability.

(c)     Termination by the Company for Cause or by the Executive without Good Reason. This Agreement and the employment of the Executive shall terminate, (i) at the election of the Company for Cause (as defined below) immediately upon written notice by the Company to the Executive, or (ii) at the election of the Executive, other than for Good Reason (as defined below) upon thirty (30) days' prior written notice by the Executive to the Company (each thirty-day period, the "Notice Period"), provided that, the Company may choose to end the Executive's employment at any time during the Notice Period, subject to the Company paying the Executive his Base Salary and permitting the Executive to continue to accrue paid time off and participate in the Company's benefit plans for any remaining portion of the Notice Period. If the Executive's employment is terminated in accordance with this Section 8(c), the Company's obligations under this Agreement shall immediately cease and the Executive shall be entitled only to the benefits set forth in Section 8(a)(i)-(iii), provided that, the Company shall pay the Executive in lieu of notice and the Executive shall be deemed to have remained an employee for the Notice Period for purposes of accruing paid time off, as described above. For the avoidance of doubt, if the Executive's employment is terminated for Cause or if the Executive terminates his employment with the Company without Good Reason, the Executive shall not be entitled to receive any portion of the Discretionary Bonus otherwise payable to the Executive for the immediately preceding Performance Year.

(d)     Termination by the Company without Cause or by the Executive with Good Reason. In the event the employment of the Executive is terminated by the Company without Cause or by the Executive with Good Reason, the Company shall pay the Executive the benefits described in Section 8(a)(i)-(iii). In addition, subject to the conditions of Sections 8(e) and 14, the Company shall:

(i)     pay to the Executive, in a single severance lump sum payment on the Payment Date (as defined below), equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus);

(ii)     in addition, pay to the Executive, in a single lump sum payment on the Payment Date, the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the Executive's termination calculated at 100% of target.

5

(iii)    in addition, for a period of twelve (12) months following the Executive's termination date, and provided the Executive is eligible for and timely elects to continue receiving group medical insurance pursuant to COBRA (Consolidated Omnibus Budget Reconciliation Act), continue to pay the share of the premium for health coverage that is paid by the Company for active and similarly-situated employees who receive the same type of coverage ("COBRA Continuation"). Notwithstanding the foregoing, if for any reason such benefits cannot be provided through the Company's group or other plans, the Company shall reimburse the Executive for the Executive's reasonable cost of obtaining equivalent benefits, such reimbursements to be made on the same schedule as otherwise would have been paid. At the end of such twelve (12) month period, the Executive shall be entitled to such rights as the Executive may have to continue health insurance coverage at the Executive's sole expense as are then accorded under COBRA, for the remainder of the COBRA coverage period.

(iv)    notwithstanding the requirement that the Executive be an active employee of the Company on the last day of the Performance Year, pay to the Executive, in a single lump sum payment on the Payment Date, a prorated portion of the Executive's target Discretionary Bonus for the Performance Year in which the separation occurs under this subsection, irrespective of whether the performance goals applicable to such Discretionary Bonus have been established or satisfied, such prorated portion to be calculated by multiplying the target Discretionary Bonus for such Performance Year by the quotient obtained by dividing the number of months of the Performance Year during which the Executive has provided services to the Company by twelve (12).

(e)    Release. As a condition of the Executive's receipt of the benefits described under Section 8(d)(i-iv) (such benefits, the "Severance Benefits"), the Executive must execute and deliver to the Company a severance agreement and general release of claims substantially in the form set forth in Exhibit D hereof (the "Severance Agreement"), which must become irrevocable within sixty (60) days following the date of the Executive's termination of employment (or such shorter period as may be directed by the Company and as permitted by law) (the sixty (60)-day anniversary of the Executive's termination of employment shall be the "Payment Date"). Severance Benefits will be paid on the Payment Date. The Executive must continue to comply with the Confidentiality Agreement and any other Agreements to which he is bound in order to be eligible to receive the Severance Benefits.

(f)    Definitions. As used in this Agreement:

(i)    "Cause" shall mean a finding by the CEO that the Executive: (1) materially breached this Agreement, provided that, if such breach is curable, the Executive was given prior written notice of such breach and was granted a reasonable opportunity of not less than fifteen (15) days to cure any such breach; (2) breached a material term or condition of the Confidentiality Agreement or any other Agreements to which he is bound as per this agreement; (3) engaged in gross negligence or misconduct, fraud or embezzlement in his job duties; (4) engaged in any conduct that is, or is reasonably likely to be,  materially harmful to the business, interests or reputation of the Company, provided that, if such conduct is, in the reasonable judgment of the Company, curable, the Executive was given prior written notice of such conduct and was granted a reasonable opportunity of not less than fifteen (15) days to cure any such conduct; or (5) was convicted of, or pleaded guilty or nolo contendere to, a misdemeanor, or

6

charged with any felony crime (other than a traffic offense that does not cause serious bodily injury to another person).

(ii)   "Change in Control" shall mean (1) any merger, reorganization, consolidation, recapitalization or other transaction or series of related transactions, whether or not the Company is the surviving or continuing entity in such transaction or transactions, and whether or not the Company is a party thereto, that results in the holders of equity interests in the Company immediately prior to such transaction or transactions holding, immediately after such transaction or transactions (whether by virtue of securities issued as consideration for the transaction(s) or otherwise), less than 50% of the voting power of the surviving, continuing or purchasing entity; or (2) any sale, lease or other disposition of all or substantially all of the assets (tangible or intangible) of the Company and its subsidiaries, if any, taken as a whole.

(iii)   "Disability" shall mean a physical or mental illness or disability that prevents the Executive from performing the essential functions of the Executive's position with or without reasonable accommodations for a period of more than any three (3) consecutive months or for periods aggregating more than twenty-six (26) weeks in any year. The Company shall determine in good faith whether the Executive is unable to perform the duties provided for herein.

(iv)   "Good Reason" shall mean the occurrence, without the Executive's prior written consent, of any of the following events: (1) a change in the Executive's reporting relationship such that the Executive no longer reports directly to the CEO or the Board; (2) a diminution in any of the Executive's titles or a material reduction in the authority, duties, or responsibilities of the Executive or the assignment to the Executive of duties or responsibilities inconsistent with the Executive's position; (3) a reduction of the Executive's Base Salary; (4) a reduction of the Executive's target bonus opportunity; (5) a reduction in the equity grants, terms or rights per Exhibit B; (6) any change in home base outside of the San Francisco Bay Area, California without the Executive's written consent; (7) any Change of Control; (8) if the Company does not establish Freedom Technology Corporation and transfer the Executive's employment to Freedom Technology Corporation in the position of President of Freedom Technology Corporation within one year of the Executive's start date with the Company; or (9) any action or inaction of the Company that constitutes a material breach by the Company of its obligations to the Executive under this Agreement. No resignation will be treated as a resignation for Good Reason unless (A) the Executive provides written notice to the Company of the Executive's intention to terminate employment for Good Reason, describing the grounds for such action, no later than fifteen (15) days after the first occurrence of such circumstances, (B) the Executive provides the Company with at least thirty (30) days to cure the circumstances, and (C) if the Company is not successful in curing the circumstances, the Executive ends the Executive's employment within ninety (90) days following the cure period in (B).

9.   **Absence of Restrictions.** The Executive represents and warrants that, except as disclosed to the Company in writing, the Executive is not bound by any employment contracts, restrictive covenants or other restrictions that prevent the Executive from entering into employment with, or carrying out the Executive's responsibilities for, the Company, or which are in any way inconsistent with any of the terms of this Agreement. On an annual basis, or as the

7

Company otherwise directs, the Executive will disclose to the Company the Executive's investments in business interests or other potential or actual conflicts of interest.

        10.    **Amendments.** Any amendment to this Agreement shall be made in writing and signed by the Parties hereto.

        11.    **Notice.** Any notice delivered under this Agreement shall be deemed duly delivered three (3) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, one (1) business day after it is sent for next-business day delivery via a reputable nationwide overnight courier service, or immediately upon hand delivery, in each case to the address of the recipient set forth below.

> To Executive:
>
> Rahul Mewawalla
>
> █████████
>
> Along with an electronic copy
> to ████████
>
> With a separate copy to:
> DLA Piper LLP (US)
> ATTN: Cisco Palao-Ricketts
> 2000 University Ave.
> East Palo Alto, CA 94303
>
> Along with an electronic copy
> to ████████
>
> To Company:
>
> Freedom Mortgage Corporation
> ATTN: Stanley Middleman
> 40 Lake Center Drive
> Marlton, NJ 08053
>
> With a separate copy to:
> Freedom Mortgage Corporation
> ATTN: Chief Legal Officer
> 40 Lake Center Drive
> Marlton, NJ 08053

Either Party may change the address to which notices are to be delivered by giving notice of such change to the other Party in the manner set forth in this Section 11.

        12.    **Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California (without reference to the conflict of laws provisions thereof). Any action, suit or other legal proceeding arising under or relating to any provision of this Agreement shall be commenced in the Santa Clara County Superior Court in the State of California (or, if appropriate, a federal court located within the Northern District of the

State of California), and the Company and the Executive each consents to the jurisdiction of such a court.

13.     **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business; provided, however, that the obligations of the Executive are personal and shall not be assigned by the Executive.

14.     **Effect of Section 409A of the Code.**

(a)     General 409A Principles. For purposes of this Agreement, a termination of employment will mean a "separation from service" as defined in Section 409A of the Code, each amount to be paid or benefit to be provided will be construed as a separate identified payment for purposes of Section 409A of the Code. The determination of whether and when the Executive's separation from service from the Company has occurred shall be made in a manner consistent with, and based on the presumptions set forth in, Treasury Regulation Section 1.409A-1(h). Solely for purposes of this determination, "Company" shall include all persons with whom the Company would be considered a single employer under Section 414(b) and 414(c) of the Code. Neither the Company nor the Executive will have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A of the Code. This Agreement is intended to comply with the provisions of Section 409A of the Code and this Agreement shall, to the extent practicable, be construed in accordance therewith. Terms defined in this Agreement will have the meanings given such terms under Section 409A of the Code if and to the extent required to comply with Section 409A of the Code. *In any event, the Company makes no representations or warranties and will have no liability to the Executive or any other person if any provisions of or payments made in accordance with the terms of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but not to satisfy the conditions of that section.*

15.     **Acknowledgment.** The Executive states and represents that the Executive has had an opportunity to fully discuss and review the terms of this Agreement with an attorney. If the Executive accepts this offer, Company will pay the reasonable legal fees and disbursements relating to the documentation and negotiation of your employment agreement with the Company in an amount not to exceed $5,000.

16.     The Executive further states and represents that the Executive has carefully read this Agreement, understands the contents herein, freely and voluntarily assents to all of the terms and conditions hereof, and signs the Executive's name of the Executive's own free act.

17.     **No Expectation of Privacy.** The Company's premises, including all workspaces, furniture, documents, and other tangible materials, and all information technology resources of the Company (including computers, data and other electronic files, and all internet and email) are subject to oversight and inspection by the Company at any time. Company employees should have no expectation of privacy with regard to any Company premises, materials, resources or information.

9

18.    **Waiver, Cancellation or Discharge.** No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

19.    **Captions and Pronouns.** The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement. Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns and pronouns shall include the plural, and vice versa.

20.    **Interpretation.** The Parties agree that this Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the drafting Party. References in this Agreement to "include" or "including" should be read as though they said "without limitation" or equivalent forms.

21.    **Severability.** Each provision of this Agreement must be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Moreover, if a court of competent jurisdiction determines any of the provisions contained in this Agreement to be unenforceable because the provision is excessively broad in scope, whether as to duration, activity, geographic application, subject or otherwise, it will be construed, by limiting or reducing it to the extent legally permitted, so as to be enforceable to the extent compatible with then applicable law to achieve the intent of the Parties.

22.    **Entire Agreement and Survival.** This Agreement, and its Appendixes and Exhibits, constitute the entire agreement between the Parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement.

*[Signatures on Page Following]*

10

*Execution Copy*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first set forth above.

**FREEDOM MORTGAGE CORPORATION**

By: _____      Date: _2/20/20_
  Name: Stanley Middleman
  Title: Chief Executive Officer


**EXECUTIVE:**

_____      Date: _2/18/20_
Name: Rahul Mewawalla

*[Signature Page to Employment Agreement]*

11

LEGAL02/39609528v1

**EXHIBIT A**
**[FTC EMPLOYMENT AGREEMENT]**

## EXHIBIT B

## EQUITY TO BE PROVIDED TO EXECUTIVE UPON TRANSFER OF EMPLOYMENT TO FREEDOM TECHNOLOGY CORPORATION ("FTC")

- On the date that Freedom Technology Corporation is incorporated, Freedom Technology Corporation shall adopt and establish an equity incentive plan with a share reserve equal to at least 7.5% of Freedom Technology Corporation's share capital on a fully diluted basis as of such date (the "FTC Equity Plan"), with the balance of all other equity in Freedom Technology Corporation to be owned by Freedom Mortgage Corporation or the Middleman family.

- Prior to such adoption, the FTC Equity Plan shall be subject to the advance review by the Executive and Freedom Technology Corporation shall adopt the reasonable comments provided by the Executive to ensure commercially reasonable terms and conditions are set forth therein.

  In conjunction with the adoption of the FTC Equity Plan, the Executive shall be granted an "early exercise" stock option (which may, at the Executive's election, be as an incentive stock option, a non-statutory stock option or combination thereof) to purchase a number of shares in Freedom Technology Corporation that is equal to at least 5% of Freedom Technology Corporation's share capital on a fully diluted basis as of the date of the FTC Equity Plan adoption (the "Option"). The Corporation may, in response to a request by the executive, in its discretion, provide the Executive a loan, on a 50.1% recourse basis, to enable the Executive to exercise the Option. The Option shall have an exercise price that is no more than the fair market value of Freedom Technology Corporation's common stock on the Option's date of grant, as determined mutually by the Executive and the board of directors of Freedom Technology Corporation pursuant to an independent third-party valuation report that is entitled a presumption of reasonableness under Section 409A of the Internal Revenue Code.

- The Option shall vest over a four (4)-year period from the Start Date with 25% of the shares subject to the Option vesting on the one (1)-year anniversary of the Start Date, and with the remainder of the shares subject to the Option vesting in substantially equal installments over the following thirty-six (36) months.

- Any unvested equity awards granted to the Executive, including the Option, shall vest in their entirety and immediately in the event that the surviving entity in a merger or other change of control does not assume such equity awards either outright or in a manner that preserves the value of such award and provides for its continued payout over the vesting period.  In addition, in the event the Executive's employment is terminated without Cause or the Executive terminates for Good Reason, following or in connection with a change of control of FTC or an initial public offering of FTC, then such equity awards granted to the Executive shall also accelerate in full.

- The Option will have a standard ten (10)-year term and if the Executive is terminated or ends employment, the Executive will have a standard 90-day exercise period post termination and, if the Executive does not exercise the vested portion of the Option

within 90 days after the cessation of employment, any portion of the  Option that is an incentive stock option will convert to a non-statutory stock option and the Executive may exercise the vested portion of the Option at any time prior to the expiration of the Option's 10-year term.

2

**EXHIBIT C**

**CONFIDENTIALITY, PROPRIETARY RIGHTS, NON-SOLICITATION AND ASSIGNMENT OF INVENTIONS AGREEMENT**

This Confidentiality, Proprietary Rights, Non-Solicitation and Assignment of Inventions Agreement (this "Agreement") is made between Freedom Mortgage Corporation (the "Company"), and Rahul Mewawalla (the "Executive") (together, the "Parties").

For good consideration and in consideration of the employment or continued employment of the Executive by the Company, the Executive and the Company, intending to be legally bound, agree as follows:

1.      Condition of Employment.  The Executive acknowledges that his employment with the Company is contingent upon his agreement to sign and adhere to the provisions of this Agreement. The Executive further acknowledges that the nature of the Company's business is such that protection of its proprietary and confidential information is critical to the survival and success of the Company's business.

2.      Proprietary and Confidential Information.

(a)      The Executive agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, ideas, inventions, algorithms, products, product improvements, product enhancements, processes, methods, techniques, formulas, compositions, compounds, negotiation strategies and positions, projects, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant to a license agreement), and all in-house built technology and software, customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. Unless required by law, the Executive will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company).  Nothing in this Agreement prohibits Executive from disclosing Proprietary Information pursuant to subpoena or other lawful process, provided that, if he is served with a subpoena or process, he will notify the Company promptly so that Company can decide whether it wishes to seek a protective order or other appropriate relief.

(b)      Nothing in this Agreement is intended to or shall prevent, impede or interfere with Executive's right, without prior notice to the Company, to provide information to the government, participate in investigations, file a complaint, testify in proceedings regarding the Company's past or future conduct, or engage in any activities protected under any whistleblower statutes.

1

(c)     While employed by the Company, the Executive will use the Executive's best efforts to prevent unauthorized publication or disclosure of any of the Company's Proprietary Information. Notwithstanding the foregoing, the following will not be considered Proprietary Information: information that was already in the public domain at the time of receipt or that came into the public domain thereafter, in each case, through no act by the Executive or any other third party in breach of any confidentiality obligation.

(d)     The Executive agrees that all files, documents, letters, memoranda, reports, records, data, sketches, drawings, models, laboratory notebooks, program listings, computer equipment or devices, computer programs or other written, photographic, or other tangible or intangible material containing Proprietary Information, whether created by the Executive or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Executive only in the performance of his duties for the Company and shall not be copied or removed from the Company premises except in the pursuit of the business of the Company. All such materials or copies thereof and all tangible property of the Company in the custody or possession of the Executive shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of his employment for any reason. After such delivery, the Executive shall not retain any such materials or copies thereof or any such tangible property.

(e)     The Executive agrees that his obligation not to disclose or to use information and materials of the types set forth above, and his obligation to return materials and tangible property, set forth above, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Executive in the course of the Company's business.

3.     The Defend Trade Secrets Act. Executive understands that notwithstanding Executive's obligations to protect Proprietary Information, Executive may disclose Proprietary Information or trade secrets in confidence to a federal, state, or local government official, directly or indirectly, or to an attorney advising Executive about such disclosures, provided that the disclosure is made solely for the purpose of reporting or investigating a suspected violation of law. Executive also understands that should Executive ever file a lawsuit against Company claiming retaliation, or if Executive is involved in any other lawsuit or proceeding, Executive may disclose Proprietary Information or trade secrets to Executive's attorney and use it in a court proceeding if Executive: (a) files under seal any document containing the Proprietary Information, and (b) does not disclose the Proprietary Information except pursuant to a court order. "Trade Secrets" mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

4.     Inventions, Developments, and Works.

(a)     Executive acknowledges and agrees that all drafts, records, memoranda, notes, compositions, writings, diaries, drawings, photographs, graphics, logos,

2

sketches, audio-visual material, films, pictures, sound recordings, charts, software, algorithms, code, and any other materials, including but not limited to any invention that is or contains copyrightable material and the technology, mobile applications and algorithms and all in-house built technology and software, and all derivatives and updates thereto, authored or prepared by Executive, in whole or in part, or that Executive authors, creates, prepares, in whole or part, during Executive's engagement with the Company and within the scope of his or her engagement as an Executive, but excluding Excluded Works (defined below) ("Works"), are deemed works made for hire, owned and authored by the Company, as that term is defined in the Copyright Laws of the United States of America. To the extent that any such Works are deemed not to be works made for hire, Executive irrevocably and without limit hereby assigns all current and future right, title, and interest and all copyright in the Works throughout the world to the Company (or its designee) as set forth above. Executive expressly waives any ownership claim, now or in the future, in the Works; any right or claim of any right to create new derivative works or adaptations based on the Works in the future; and the right to apply for or file any copyright registrations for the Works or any part of them. Executive acknowledges that the Company has the sole right to apply for, obtain, and own copyright registrations and use the copyright notices to the Works. Executive now and forever expressly waives any right of publicity, attribution, and integrity, including any so-called moral rights or equivalents thereof, arising under U.S. federal law and under any state law and under the laws of any other country that conveys rights of the same nature.

(b)     Executive acknowledges and agrees that any and all Inventions (defined below), made, conceived, discovered, reduced to practice or developed, by Executive alone or with others, during Executive's engagement with the Company belong to the Company. Executive will promptly and fully disclose to the Company all such Inventions. Executive hereby irrevocably transfers and assigns to the Company or its designee (if not otherwise transferred by law), as its exclusive property, the entire worldwide and perpetual right, title and interest in all Inventions, including (but not limited to) any patent applications, patents, trade secrets, or confidential information. Executive agrees that these obligations bind Executive's assigns, executors, administrators, and other legal representatives. "Inventions" means any and all discoveries, ideas, improvements, innovations, inventions, information, know-how, processes, or techniques, in whole or in part, whether patentable or not, which generally relate to or are useful to the Company's current or future business.

(c)     Executive will cooperate fully with the Company, during and after his engagement as an Executive for the Company, with respect to the protection of the Company's intellectual property rights in the Works and Inventions anywhere in the world, including signing all papers that the Company requests that Executive sign to perfect or protect those rights (at the Company's expense). Executive agrees that these obligations are binding on Executive's assigns, executors, administrators, heirs and other legal representatives. Executive further agrees that if the Company is unable, after reasonable effort, to obtain Executive's signature on any such papers, any executive officer of the Company may sign such papers as Executive's agent and the attorney-in-fact, and Executive hereby irrevocably designates and appoints each executive officer of the Company as Executive's agent and attorney-in-fact to execute any such papers on Executive's behalf, and to take any action the Company deems necessary or desirable to protect its rights and interests in and to the Works and Inventions.

3

(d)     Executive acknowledges and agrees that Executive has no right to use or seek registration for any Work, Invention, trade name, trademark, service mark, trade dress, logo, or other source identifying designation owned or used by or licensed to the Company ("Company Intellectual Property") and shall not challenge or assist another party in challenging Company's ownership in or the validity of Company Intellectual Property.

(e)     "Excluded Works" means any work or invention created by Executive entirely on Executive's own time, for which no equipment, supplies, facilities, or Proprietary Information of the Company was used, which does not relate to any of the services set forth in this Agreement or Executive's Employment Agreement which did not result from Executive's relationship with the Company or its processor, and which does not relate to the Company's current or demonstrably anticipated future business at the time of work or invention or to the Company's actual or demonstrably anticipated research or development.   Further, Executive acknowledges that he is aware of the provisions of Sections 2870 through 2872 of the California Labor Code, which are set forth on **Exhibit "C(1)"**, attached hereto and made a part hereof.  Nothing in this Agreement is intended to grant to the Company rights other than those that may be assigned by employees under Section 2870.  Executive confirms that he has fully listed any prior inventions or works of authorship that he believes are outside the scope of this Agreement on **Exhibit "C(2)"** attached hereto and made a part hereof and that such prior inventions are included within the definition of "Excluded Works."  Excluded Works shall be excluded from the definitions of Works and Inventions herein, and the ownership shall remain the sole property of Executive and/or Executive's assigns and not owned by the Company.

(f)     Executive hereby represents and warrants that (i) Company shall not be required to make any payment of any nature for, or in connection with the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement except those expressly set forth in this Agreement; (ii) at the time of execution of this Agreement there are no liens, encumbrances or other charges against Works, Inventions or intellectual property rights furnished by Executive herein; and (iii) all Works, Inventions or intellectual property rights furnished by Executive herein shall be original to Executive and not infringe upon or violate the rights of any third parties.

5.     Obligations to Third Parties. The Executive represents that, except as the Executive has disclosed in writing to the Company, the Executive is not bound by the terms of any agreement with any previous employer or other party that are in conflict with the Agreement and the Executive will abide with any requirements to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of his employment with the Company, to refrain from competing, directly or indirectly, with the business of such previous employer or any other party or to refrain from soliciting employees, customers or suppliers of such previous employer or other party. The Executive further represents that his performance of all the terms of this Agreement and the performance of his duties as an employee of the Company do not and will not conflict with or breach any agreement with any prior employer or other party (including, without limitation, any nondisclosure or non-competition agreement), and that the Executive will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

6.     Non-Competition. While the Executive is employed by the Company, the Executive will not, directly or indirectly, within the United States of America, engage or assist

4

LEGAL02/39609528v1

others in engaging in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise, except as the holder of not more than 3% of the outstanding stock of a publicly-held company) that is competitive with the business of the Company, and about which the Executive has Proprietary Information, including but not limited to any business or enterprise that develops, manufactures, markets, licenses, sells or provides any service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Executive was employed by the Company.

      7.    <u>Non-Solicitation of Customers and Suppliers</u>. While the Executive is employed by the Company, the Executive will not directly or indirectly, either alone or in association with others, solicit, divert or take away, or attempt to divert or take away, the business or patronage of any of the actual or prospective clients, customers, accounts or business partners of the Company for the purposes of providing products or services that are competitive with those provided by the Company.

      8.    <u>Non-Solicitation of Employees</u>. While the Executive is employed by the Company and for a period of one (1) year after the termination or cessation of such employment for any reason, the Executive will not directly or indirectly, either alone or in association with others: (i) solicit, induce or attempt to induce, any employee or independent contractor of the Company to terminate his or her employment or other engagement with the Company, or (ii) recruit, or attempt to recruit, or engage or attempt to engage as an independent contractor, any person who was employed or otherwise engaged by the Company at any time during the term of the Executive's employment with the Company; provided, that this clause shall not apply to the recruitment or other engagement of any individual whose employment or other engagement with the Company has been terminated for a period of six months or longer.

      9.    <u>Extension</u>.  If the Executive violates the provisions of Paragraph 8, the Executive shall continue to be bound by the restrictions set forth in such paragraph until a period of one (1) year has expired without any violation of such provisions.

      10.    <u>Acknowledgment and Equitable Remedies</u>. The Executive acknowledges that the restrictions contained in this Agreement are necessary for the protection of the business, the Company's Proprietary Information, and goodwill of the Company and are considered by the Executive to be reasonable for such purpose. The Executive agrees that any breach or threatened breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is impossible to measure. Therefore, in the event of any such breach or threatened breach, the Executive agrees that the Company, in addition to such other remedies which may be available, shall have the right to obtain an injunction from a court restraining such a breach or threatened breach without posting a bond and the right to specific performance of the provisions of this Agreement and the Executive hereby waives the adequacy of a remedy at law as a defense to such relief.

      11.    <u>Disclosure of this Agreement</u>. For a period of one (1) year after the termination or cessation of the Executive's employment for any reason, the Executive agrees to notify any potential, prospective employer or prospective business associate, of the relevant terms

5

and existence of this Agreement and the Executive's continuing obligations to the Company hereunder.

12.  Not Employment Contract. The Executive acknowledges that this Agreement does not constitute a contract of employment, and does not imply that the Company will continue his employment for any period of time.

13.  Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which, or into which, the Company may be merged or which may succeed to the Company's assets or business, provided, however, that the obligations of the Executive are personal and shall not be assigned by him or her. The Executive expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate thereof to whose employ the Executive may be transferred without the necessity that this Agreement be re-signed at the time of such transfer.

14.  Severability. In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

15.  Waivers. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

16.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California in the United States of America (without reference to the conflicts of laws provisions thereof). Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in the Santa Clara County Superior Court in the State of California (or, if appropriate, a federal court located within the Northern District State of California), and the Company and the Executive each consents to the jurisdiction of such a court.

17.  Entire Agreement; Amendment. This Agreement supersedes all prior agreements, written or oral, between the Executive and the Company relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Executive and the Company. The Executive agrees that any change or changes in his duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement.

18.  Captions. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

19.  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement, by

6

facsimile, electronic mail, PDF, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.


THE EXECUTIVE ACKNOWLEDGES THAT HE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

**FREEDOM MORTGAGE CORPORATION**

2/26/20
_____
Date

By _____

Stanley Middleman
_____
Name

CEO
_____
Title

**EXECUTIVE**

2/18/20
_____
Date

_____

Rahul Mewawalla
_____
Name


*[Signature Page to Confidentiality Agreement]*

7

**Exhibit "C(1)"**
**"Labor Code, State of California, Div. 3, Ch. 2, Article 3.5**

2870.   Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer.  Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

2871.   No employer shall require a provision made void and unenforceable by Section 2870 as a condition of employment or continued employment.  Nothing in this article shall be construed to forbid or restrict the right of an employer to provide in contracts of employment for disclosure, provided that any such disclosures be received in confidence, of all of the employee's inventions made solely or jointly with others during the term of his or her employment, a review process by the employer to determine such issues as may arise, and for full title to certain patents and inventions to be in the United States, as required by contracts between the employer and the United States or any of its agencies.

2872.  If an employment agreement entered into after January 1, 1980, contains a provision requiring the employee to assign or offer to assign any of his or her rights in any invention to his or her employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention which qualifies fully under the provisions of Section 2870.  In any suit or action arising thereunder, the burden of proof shall be on the employee claiming the benefits of its provisions."

8

**Exhibit "C(2)"**
**Disclosure of other inventions**

The following is a complete list of all inventions or improvements or works of authorship relevant to the subject matter of Executive's employment by the Company that have been made or conceived or first reduced to practice by him alone or jointly with others prior to his employment by the Company.  Executive desires to remove those inventions and improvements listed below from the operation of the Confidentiality, Proprietary Rights, Non-Solicitation and Assignment of Inventions Agreement he has executed for the benefit of the Company.

_____   No inventions or improvements.

_____   See below (list specific inventions, improvements or works).

_____   Additional sheets attached.


Date:   _____


_____
*Signature*

_____
*Print Name*

_____
*Address*

_____
*City, State Postal Code*

9

**EXHIBIT D**

## CONFIDENTIAL SEPARATION AGREEMENT AND
## GENERAL RELEASE OF CLAIMS

THIS AGREEMENT (the "Agreement") is entered into as of the Effective Date, as defined in Paragraph 7 hereof, by and between **Freedom Mortgage Corporation and Freedom Technology Corporation** (collectively, the "Company") and **Rahul Mewawalla** (the "Executive"). Together, the Company and Executive may be referred to hereinafter as the "Parties." Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Employment Agreement between the Company and Executive, dated _____ (the "Employment Agreement") and the Confidentiality, Proprietary Rights, Non-Solicitation, and Assignment of Inventions Agreement between the Company and Executive dated _____ (the "Confidentiality Agreement"). Freedom Mortgage Corporation shall be the guarantor of the payments and benefits promised and agreed hereunder in the event that Freedom Technology Corporation does not or is unable to meet its obligations under the Employment Agreement and this Agreement.

In consideration of the payments, covenants and releases described below, and in consideration of other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, the Company and Executive agree as follows:

1.      Separation from Employment.  The Executive's employment with the Company ended on _____ (the "Termination Date"). As of the Termination Date, the Company has paid to Executive any earned but unpaid compensation through the Termination Date. Upon proper submission of receipts and required documentation as provided in Section 6 of the Employment Agreement, the Company shall, within thirty (30) days of the Termination Date, reimburse Executive for expenses incurred and unpaid through the Termination Date. Additionally, Executive shall have such rights under the employee benefits plans as shall be determined under the provisions of such plans. The Executive will receive by separate letter information regarding his rights regarding continuation of health insurance under Section 4980B of the Internal Revenue Code and any similar state law ("COBRA"), and to the extent that Executive has such rights, nothing in this Agreement will change or impair those rights.

2.      Separation Obligations of the Company.  In consideration of Executive's promises contained in this Agreement, the Company agrees it shall pay on the Payment Date:

a.      pay to Executive, in a single severance lump sum payment on the Payment Date, equal to one full year of cash compensation, defined as (a) Executive's Base Salary plus (b) Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus);

b.      pay to Executive, in a single lump sum payment on the Payment Date, the Performance Discretionary Bonus to be payable to Executive for the immediately preceding Performance Year that has not yet been paid to Executive as of the date of Executive's termination

1

calculated at 100% of target.

    c.  for a period of twelve (12) months following Executive's termination date, and provided Executive is eligible for and timely elects to continue receiving group medical insurance pursuant to COBRA (Consolidated Omnibus Budget Reconciliation Act), continue to pay the share of the premium for health coverage that is paid by the Company for active and similarly-situated employees who receive the same type of coverage ("COBRA Continuation"). Notwithstanding the foregoing, if for any reason such benefits cannot be provided through the Company's group or other plans, the Company shall reimburse Executive for Executive's reasonable cost of obtaining equivalent benefits, such reimbursements to be made on the same schedule as otherwise would have been paid Executive. At the end of such twelve (12) month period, Executive shall be entitled to such rights as Executive may have to continue health insurance coverage at Executive's sole expense as are then accorded under COBRA, for the remainder of the COBRA coverage period; and

    d.  notwithstanding the requirement that the Executive be an active employee of the Company on the last day of the Performance Year, pay to the Executive, in a single lump sum payment on the Payment Date, a prorated portion of the Executive's target Discretionary Bonus for the Performance Year in which the separation occurs under this subsection, irrespective of whether the performance goals applicable to such Discretionary Bonus have been established or satisfied, such prorated portion to be calculated by multiplying the target Discretionary Bonus for such Performance Year by the quotient obtained by dividing the number of months of the Performance Year during which the Executive has provided services to the Company by twelve (12).

The benefits in Sections 2(a)-(d) shall hereafter be collectively referred to as the "Severance Benefits."

  3.  <u>Separation Obligations of the Executive.</u>

    a.  Payment of the Severance Benefits shall be subject to Executive's continued compliance in all material respects with each and every requirement of Sections __ and __ of Executive's Confidentiality Agreement, [IDENTIFY ANY OTHER AGREEMENTS], and the execution and delivery of this Confidential Separation Agreement and General Release of Claims. Executive expressly affirms and acknowledges his obligations contained in Sections __ and __ of the Confidentiality Agreement. (A true and correct copy of Executive's Confidentiality Agreement is attached hereto as **Exhibit A**.) For the avoidance of doubt, Executive is bound by the above-referenced provisions regardless of whether he receives the Severance; however, should Executive violate any of the referenced provisions during the period described in Paragraphs 2(a)-(d) for the payment of the Severance Benefits and/or if the Company discovers at any time after the Termination Date that Executive violated the provisions of Sections __ or __ of the Confidentiality Agreement at any time, the Company shall be relieved of its obligation to pay any remaining Severance Benefits and no further payments will be owed or made to Executive.

    b.  Prior to and after the Termination Date and in consideration of the Severance Benefits, Executive agrees that he will reasonably cooperate with the Company, its

2

affiliates and its subsidiaries, as well as any of their officers, directors, shareholders, or employees: (A) concerning requests for information about the business of the Company or its subsidiaries or affiliates or Executive's involvement and participation therein; (B) with respect to transition matters of any nature; and (C) in connection with any future litigation arising out of or related to events occurring during Executive's tenure with the Company in any manner. Executive's cooperation shall include, but not be limited to (taking into account Executive's personal and professional obligations, including those to any new employer or entity to which Executive provides services), being available to meet and speak with officers or employees of the Company and/or the Company's counsel at mutually convenient, reasonable times and locations, testifying truthfully at deposition or trial, executing accurate and truthful documents, and taking such other actions as may reasonably be requested by the company and/or the Company's counsel in good faith and in the best interests of the defense to effectuate the foregoing. Upon request and reasonable notice from the Company, Executive will voluntarily, and without additional payment or requiring a subpoena or other process, meet with the Company's attorneys and other representatives, appear at hearings, depositions, trials, and other proceedings relating to such matters, and provide truthful written statements and testimony relating to such matters. The Company shall reimburse Executive for his time for all reasonable and necessary out-of-pocket expenses necessitated by Executive's cooperation under this Paragraph. Executive further agrees not to assist any party in maintaining any lawsuit against any of the Releasees, and will not provide any information to anyone concerning any of the Releasees, unless compelled to do so by valid subpoena or other court order, and in such case only after first notifying Company sufficiently in advance of such subpoena or court order to reasonably allow Company an opportunity to object to same.

        c.    Executive acknowledges and agrees that the payments and benefits set forth in Paragraph 2 are consistent with prior agreements executed by the parties and exceed any and all actions, pay, and benefits that the Company might otherwise have owed to Executive by contract or law, and that the payments and benefits set forth in Paragraph 2 constitute good, valuable, and sufficient consideration for Executive's release and agreements herein. The Company's obligation to provide the payments and benefits set forth in Paragraph 2 is expressly contingent on Executive **executing and returning this Agreement to**                 and not revoking this Agreement pursuant to Paragraph 8 below. The Company's obligation to make the payments set forth herein shall cease upon Executive's breach of any of his continuing contractual obligations to the Company.

        4.    <u>General Release of Claims and Covenant Not to Sue.</u>

        a.    <u>General Release of Claims</u>. In consideration of the payments made to him by the Company and the promises contained in this Agreement, Executive on behalf of himself and his agents and successors in interest, hereby UNCONDITIONALLY RELEASES AND DISCHARGES the Company, its successors, subsidiaries, parent companies, assigns, joint ventures, and affiliated companies and their respective agents, legal representatives, shareholders, attorneys, employees, members, managers, officers and directors (collectively, the "<u>Releasees</u>") from ALL CLAIMS, LIABILITIES, DEMANDS AND CAUSES OF ACTION which he may by law release, as well as all contractual obligations not expressly set forth in this Agreement, whether known or unknown, fixed or contingent, that he may have or claim to have against any

3

Releasee for any reason as of the date of execution of this Agreement. This Release and Covenant Not to Sue includes, but is not limited to, claims arising under federal, state or local laws prohibiting employment discrimination; claims arising under severance plans and contracts; and claims growing out of any legal restrictions on the Company's rights to terminate its employees or to take any other employment action, whether statutory, contractual or arising under common law or case law. The Executive specifically acknowledges and agrees that he is releasing any and all rights under federal, state and local employment laws including without limitation the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans With Disabilities Act, the Family and Medical Leave Act, the Genetic Information Nondiscrimination Act, the anti-retaliation provisions of the Fair Labor Standards Act, the Employee Retirement Income Security Act, the Equal Pay Act, the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the Employee Polygraph Protection Act, the Fair Credit Reporting Act, the California Fair Employment and Housing Act (Cal. Gov't Code §12900 et seq.); California Family Rights Act (Cal. Gov't Code §12945.2); California WARN Act (Cal. Lab. Code §1400 et seq.) as amended; all tort claims, including without limitation, claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing, including claims arising out of an Employment Agreement, sales commission plan or incentive compensation plan applicable to Executive's employment with the Company; and any and all other local, state, and federal law claims arising under statute or common law (collectively, the "Released Claims"). To the extent permitted by law, Executive also promises never directly or indirectly to bring or participate in an action against any Releasees under California Business & Professions Code Section 17200 or any unfair competition law of any jurisdiction. It is agreed that this is a general release and it is to be broadly construed as a release of all claims, provided, however, that Executive is not releasing (i) any claims that cannot be released by law, (ii) Executive's rights as a stockholder of the Company or any of its affiliates, (iii) Executive's rights to the vested benefits (including reimbursement of business expenses) he may have under any employee compensation or benefit plan or program maintained by the Company or any of its affiliates, (iv) any claim arising after the date of execution of this Agreement or (v) any rights for indemnification or contribution under the certificate of incorporation, by-laws or equivalent governing documents of the Company or its any of affiliates, the law of the State of California, any indemnification agreement between Executive and the Company or its any of affiliates or any rights to insurance coverage under any directors' and officers' liability insurance or fiduciary insurance policy.

b.    Section 1542 Waiver. The Executive understands and agrees that the claims released in this Agreement include not only claims presently known to Executive, but also include all unknown or unanticipated claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character that would otherwise come within the scope of the released claims. The Executive understands that he may hereafter discover facts different from what he now believes to be true, which if known, could have materially affected this Agreement, but Executive nevertheless waives any claims or rights based on different or additional facts. Executive knowingly and voluntarily waives any and all rights or benefits that he may now have, or in the future may have, under the terms of Section 1542 of the Civil Code of the State of California, which provides as follows:

4

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

        c.      <u>Covenant Not to Sue</u>. Except as expressly set forth in Paragraph 4 below, Executive further hereby AGREES NOT TO FILE A LAWSUIT or other legal claim or charge to assert against any of the Releasees any claim released by this Agreement.

        d.      <u>Acknowledgement Regarding Payments and Benefits</u>. Executive acknowledges and agrees that he has been paid all wages and accrued benefits to which he is entitled through the date of execution of this Agreement. Other than the payments set forth in this Agreement, the Parties agree that the Company owes no additional amounts to Executive for wages, back pay, severance pay, bonuses, damages, accrued vacation, benefits, insurance, sick leave, other leave, or any other reason.

        e.      <u>Other Representations and Acknowledgements</u>. This Agreement is intended to and does settle and resolve all claims of any nature that Executive might have against the Company, arising out of their employment relationship or the termination of employment or relating to any other matter, except those that cannot be released by law. By signing this Agreement, Executive acknowledges that he is doing so knowingly and voluntarily, that he understands that he may be releasing claims he may not know about, and that he is waiving all rights he may have had under any law that is intended to protect him from waiving unknown claims. Executive warrants that he has not filed any notices, claims, complaints, charges, or lawsuits of any kind whatsoever against the Company or any of the Releasees as of the date of execution of this Agreement. This Agreement shall not in any way be construed as an admission by the Company or any of the Releasees of wrongdoing or liability or that Executive has any rights against the Company or any of the Releasees. Executive represents and agrees that he has not transferred or assigned, to any person or entity, any claim that he is releasing in this Paragraph 4.

      5.      <u>Protected Rights</u>. Executive understands that nothing contained in this Agreement limits his ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, or any other federal, state or local governmental agency or commission ("<u>Government Agencies</u>"). Executive further understands that this Agreement does not limit his ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agencies in connection with any charge or complaint, whether filed by Executive, on his behalf, or by any other individual. However, based on Executive's release of claims set forth in Paragraph 4 of this Agreement, Executive understands that he is releasing all claims that he may have, as well as, to the extent permitted by applicable law, his right to recover monetary damages or obtain other relief that is personal to Executive in connection with any claim he is releasing under this Agreement.

      6.      <u>Acknowledgment</u>. **The Company hereby advises Executive to consult with an attorney prior to executing this Agreement and Executive acknowledges and agrees that the Company has advised, and hereby does advise, him or her of his opportunity to consult an**

5

attorney or other advisor and has not in any way discouraged him or her from doing so. Executive expressly acknowledges and agrees that he has been offered at least [twenty-one (21) days] to consider this Agreement before signing it, that he has read this Agreement and Release carefully, that he has had sufficient time and opportunity to consult with an attorney or other advisor of his choosing concerning the execution of this Agreement. Executive acknowledges and agrees that he fully understands that the Agreement is final and binding, that it contains a full release of all claims and potential claims, and that the only promises or representations he has relied upon in signing this Agreement are those specifically contained in the Agreement itself. Executive acknowledges and agrees that he is signing this Agreement voluntarily, with the full intent of releasing the Company from all claims covered by Paragraph 4.

7.  Revocation and Effective Date. The Parties agree Executive may revoke the Agreement at will within seven (7) days after he executes the Agreement by giving written notice of revocation to Company. Such notice must be delivered to _____, and must actually be received by him or her at or before the above-referenced seven-day deadline. The Agreement may not be revoked after the expiration of the seven-day deadline. In the event that Executive revokes the Agreement within the revocation period described in this Paragraph, this Agreement shall not be effective or enforceable, and all rights and obligations hereunder shall be void and of no effect. Assuming that Executive does not revoke this Agreement within the revocation period described above, the effective date of this Agreement (the "Effective Date") shall be the eighth (8th) day after the day on which Executive executes this Agreement.

8.  Termination of Employment Agreement; Survival of Continuing Obligations. Executive acknowledges and agrees that the Employment Agreement is hereby terminated, without further action by the Parties, as of the Termination Date and shall be of no further force and effect, and that, except as expressly set forth in this Agreement, the Company shall have no continuing obligations to Executive under the Employment Agreement; provided, however, that Sections __ and __ of the Employment Agreement and Sections __ and __ of the Confidentiality Agreement shall survive and remain in full force and effect in accordance with their terms.

9.  Confidentiality of Agreement; Nondisparagement. Executive agrees not to disclose the underlying facts that led up to this Agreement or the terms, amount, or existence of this Agreement or the benefits Executive is receiving under this Agreement to anyone other than a member of his immediate family, attorney, or other professional advisor and, even as to such a person, only if the person agrees to honor this confidentiality requirement. Such a person's violation of this confidentiality requirement will be treated as a violation of this Agreement by Executive. This Paragraph 10 does not prohibit Executive from disclosing the terms, amount, or existence of this Agreement to the extent necessary legally to enforce this Agreement. Executive agrees not to disparage the Company (and for this purposes, the Company shall be inclusive of the Company, its parent and subsidiaries, and each of their officers, directors, employees, or agents), in any manner likely to be harmful to them or their business, business reputation or personal reputation. Anything herein to the contrary notwithstanding, Executive shall not be restricted from disclosing information that is required to be disclosed by law, court order, other valid and appropriate legal process, or a valid request by a Government Agency. In response to inquiries from prospective employers, the Company agrees to provide only dates of employment, job title

6

and function, and, if authorized by Executive to do so, final salary.

10.   Final Agreement.  This Agreement contains the entire agreement between the Company and Executive with respect to the subject matter hereof, and supersedes all prior agreements between the Parties, except as set forth in Paragraph 7 above. The Parties agree that this Agreement may not be modified except by a written document signed by both Parties.  The Parties agree that this Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the state of California without giving effect to its conflict of law principles. Any action, suit or other legal proceeding arising under or relating to any provision of this Agreement shall be commenced in the Santa Clara County Superior Court in the State of California (or, if appropriate, a federal court located within the Northern District of the State of California), and the Company and the Executive each consents to the jurisdiction of such a court.

12.   Waiver.  The failure of either party to enforce any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision.  Any waiver of any provision of this Agreement must be in a writing signed by the party making such waiver.  No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

13.   Code Section 409A.  This Agreement shall be interpreted and administered in a manner so that any amount or benefit payable hereunder shall be paid or provided in a manner that is either exempt from or compliant with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and applicable Internal Revenue Service guidance and Treasury Regulations issued thereunder.  The tax treatment of the benefits provided under the Agreement is not warranted or guaranteed to Executive, who is responsible for all taxes assessed on any payments made pursuant to this Agreement, whether under Section 409A of the Code or otherwise.  Neither the Company Group nor its directors, officers, employees or advisers shall be held liable for any taxes, interest, penalties or other monetary amounts owed by Executive as a result of the application of Section 409A of the Code. Executive's right to receive any installment payments hereunder shall be treated as a right to receive separate and distinct payments for purposes of Section 409A of the Code. Notwithstanding anything to the contrary, the severance pay and benefits payable under this Agreement shall be subject, if required to avoid an imposition of penalty taxes on the Executive under Section 409A of the Code or any similar state law, to a delay under Section 409A(a)(2)(B).

[Signatures on next page]

7

**FREEDOM MORTGAGE CORPORATION**

By: _____          Date: _____

   Name: Stanley Middleman
   Title: Chief Executive Officer


**EXECUTIVE:**


_____          Date: _____

Name: Rahul Mewawalla

8

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of _____, by and between Freedom Technology Corporation (the "Company" or "FTC"), and Rahul Mewawalla (the "Executive") (together, the "Parties").  Freedom Mortgage Corporation shall be the guarantor of the payments and benefits promised and agreed hereunder in the event that Freedom Technology Corporation does not or is unable to meet its obligations under this Agreement.

## RECITALS

WHEREAS, the Company desires to employ the Executive as its President; and

WHEREAS, the Executive has agreed to accept such employment on the terms and conditions set forth in this Agreement effective as of the date first set forth above (the "Effective Date" or "the Start Date").

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements of the Parties herein contained, the Parties hereto agree as follows:

1.  **Term of Employment.** The term of this Agreement shall commence on the Effective Date and continue until terminated in a form that is mutually agreeable to the Parties (the "Term of Employment"). During the Term of Employment, the Executive shall be an at-will employee of the Company and the Executive's employment and the Term of Employment shall be freely terminable by either Party, for any reason, at any time, with or without Cause (as defined below) or notice (except as set forth herein).

2.  **Position.** During the Term of Employment, the Executive shall serve as the Company's President, based in and working in the San Francisco Bay Area in California, with travel as needed to other locations, including New Jersey, as required by the Executive's job duties, or in such other location as may be mutually agreed to in writing by the Executive and Company. The Executive's position is an exempt position. The Executive is expected to work a minimum of forty (40) hours per week. The Executive's Start Date will be determined by the Executive and will be within no later than thirty [30] days of both parties signing and executing this agreement.

3.  **Scope of Employment.** During the Term of Employment, the Executive shall be responsible for the performance of those duties consistent with the Executive's position as President and such other duties and responsibilities as may be assigned by the Chief Executive Officer of the Company (the "CEO"). The Executive will be responsible for developing a detailed business plan for FTC, which lays out hiring goals and an operational approach to development and rollout of a series of products that will improve the speed, efficiency, and cost of mortgage origination and servicing. The Executive, among other things, will also be responsible for overall strategy for FTC, including setting forth priorities, roadmaps, KPIs, operational plans. The Executive shall report to the CEO of FTC. At all times, the Executive shall perform and discharge faithfully, diligently, and to the best of the Executive's ability, the Executive's duties and responsibilities hereunder. While employed by the Company, the Executive shall devote the

1

Executive's entire business time, loyalty, attention and efforts to the business and affairs of the Company and its affiliates, except as provided in Section 4. The Executive agrees to abide by the rules, regulations, instructions, personnel practices and policies of the Company and any changes therein that may be adopted from time to time by the Company.

4.    **Outside Activities.** Subject to the prior written approval of the Company, which the Company shall not withhold unless a material and adverse conflict of interest would otherwise exist, the Executive may serve on the board of directors, advisory board, or similar body of up to two (2) other organizations, including publicly owned corporations or other entities, philanthropic organizations and organizations in which the Executive has made an investment, provided that the Executive's activities with respect to the foregoing do not, individually or in the aggregate, materially affect the performance of the Executive's duties to the Company, or violate the provisions of this Agreement or any other agreement between the Executive and the Company. If the Executive is appointed or elected to additional boards, the Executive may continue to serve on all boards for a limited transaction period, provided that, within four (4) months of the date on which the Executive becomes a member of such additional boards, the Executive must resign from or otherwise cease to serve on one of the other boards on which the Executive serves to keep the total number of boards to no more than two (2) in total at any given time.

5.    **Compensation.** As full compensation for all services rendered by the Executive during the Term of Employment, the Company will provide to the Executive the following:

(a)    Base Salary. The Executive shall receive a base salary of $1,500,000.00 annually, which will be paid in bi-weekly installments (the "Base Salary"). Base Salary shall be paid in accordance with the Company's regularly established payroll procedure and may be increased periodically (but shall not be subject to decrease below $1,500,000), as determined by the CEO of the Company in his sole discretion.

(b)    Performance Discretionary Bonus. The Executive shall be subject to an annual performance evaluation by the CEO or Board of the Company to assess achievement of performance goals as discussed and mutually agreed in advance between the CEO or Board of the Company and the Executive. Following the anniversary of the Executive's Start Date each year ("Performance Year"), the Executive shall be eligible to receive a performance bonus with a target of 100% of Executive's Base Salary. This Performance Bonus will be based on the Executive's performance and the Company's performance during the Performance Year, which performance will be measured against the annual goals as discussed and mutually agreed between the CEO or Board of the Company and the Executive in advance of that Performance Year. The determination of whether any such bonus has been earned by the Executive in a particular Performance Year and the amount of such bonus shall in each case be reasonably determined by the CEO or the Board of the Company based upon goals accomplished (the "Performance Discretionary Bonus"). The Executive must be an active employee of the Company on the last day of the Performance Year in order to be eligible for and to earn any Performance Discretionary Bonus. The Performance Discretionary Bonus, as determined, will be payable within sixty (60) days of the anniversary of the Executive's Start Date. For the first Performance Year, the Executive will be guaranteed to receive a minimum discretionary performance bonus of 100% of the Executive's Base Salary.

2

(c)     Income Tax Withholding. The Company may withhold from any compensation (including salary and/or bonuses) or benefits payable to the Executive all Federal, State, City or other taxes as shall be required pursuant to any applicable law or governmental regulation or ruling.

(d)     Paid Time Off. Subject to the terms hereof, the Executive shall receive twenty (20) days of paid time off per calendar year.

(e)     Benefits. The Executive may participate in any and all benefit programs that the Company establishes and makes available to its senior executives from time to time, provided that the Executive is eligible under (and subject to all provisions of) the plan documents governing those programs.  These benefits include Medical, Dental, Vision, Life Insurance, Long Term and Short-Term Disability Options, Flexible Spending Accounts (FSA), Health Savings Account (HSA), Employee Assistance Plan, 401(k) with company match, Tuition Reimbursement, Legal and Pet Insurance plans. Benefits are subject to change at any time in the Company's sole discretion.

(f)     Equity. Upon employment with Freedom Technology Corporation, the Parties agree that the Executive will be eligible to receive equity grants as set forth in Exhibit A and at least the same Base Salary, Performance Bonus and all other terms as with Freedom Mortgage Corporation.

(g)     Directors and Officers Insurance. The Company agrees to continue and maintain a directors' and officers' liability insurance policy covering the Executive to the same extent the Company provides such coverage for its other executive officers. The Executive shall be entitled to such rights regarding indemnification as are provided in the Company's Charter and Bylaws, as they may be amended from time to time.

6.     **Expenses.** The Executive shall be entitled to reimbursement by the Company for all reasonable business and travel expenses (in-line with the customary travel expense practices of the Company with other senior executives) incurred by the Executive on the Company's behalf during the course of the Executive's employment with the Company, upon the presentation by the Executive of documentation itemizing such expenditures and attaching all supporting vouchers and receipts in accordance with the Company's policies.  Reimbursement will be made no later than thirty (30) calendar days after the expense is substantiated (which must occur within thirty (30) calendar days after the expense is incurred). The expenses eligible for reimbursement under this provision may not affect the amount of such expenses eligible for reimbursement in any other taxable year, and the right to reimbursement is not subject to liquidation or exchange for another benefit.

7.     **Confidentiality Agreement.** As a condition to the commencement of the Executive's employment with the Company, the Executive is required to execute the Confidentiality, Proprietary Rights, Non-Solicitation and Assignment of Inventions Agreement, attached hereto as Exhibit B (the "Confidentiality Agreement").

3

8.    **Termination and the Effect of Termination.**

(a)    General. Subject in each case to the provisions of this Section 8 and the other provisions of this Agreement relating to the Parties' respective rights and obligations upon termination of the Executive's employment, nothing in this Agreement interferes with or limits in any way the Company's or the Executive's right to terminate the Executive's employment at any time, for any reason or no reason, with or without notice (except as provided further below), subject to any payment obligations that the Company may have, and nothing in this Agreement confers on the Executive any right to continue in the Company's employ. If the Executive's employment ceases for any reason, the Executive (or the Executive's estate, as applicable) will be entitled to receive: (i) any earned but unpaid compensation to be paid in accordance with the Company's regular payroll practices and with applicable law; (ii) unreimbursed business expenses for which expenses the Executive has provided appropriate documentation in accordance with the Company's policies, to be paid in accordance with Section 6; and (iii) any amounts or benefits to which the Executive is then entitled under the terms of the benefit plans then sponsored by the Company in accordance with their terms (and not accelerated to the extent acceleration does not satisfy Section 409A of the Code).

(b)    Death or Disability. The Executive's employment shall terminate automatically upon his death. The Company may terminate the Executive's employment immediately upon the occurrence of a Disability (as defined below), such termination to be effective upon the Executive's receipt of written notice of such termination. In the event the Executive's employment is terminated due to his death or Disability, the Executive or his estate or his beneficiaries, as the case may be, shall be entitled to all compensation and benefits set forth in Section 8(a) which have been accrued as of the date of the Executive's death or Disability.

(c)    Termination by the Company for Cause or by the Executive without Good Reason. This Agreement and the employment of the Executive shall terminate, (i) at the election of the Company for Cause (as defined below) immediately upon written notice by the Company to the Executive, or (ii) at the election of the Executive, other than for Good Reason (as defined below) upon thirty (30) days' prior written notice by the Executive to the Company (each thirty-day period, the "Notice Period"), provided that, the Company may choose to end the Executive's employment at any time during the Notice Period, subject to the Company paying the Executive his Base Salary and permitting the Executive to continue to accrue paid time off and participate in the Company's benefit plans for any remaining portion of the Notice Period. If the Executive's employment is terminated in accordance with this Section 8(c), the Company's obligations under this Agreement shall immediately cease and the Executive shall be entitled only to the benefits set forth in Section 8(a)(i)-(iii), provided that, the Company shall pay the Executive in lieu of notice and the Executive shall be deemed to have remained an employee for the Notice Period for purposes of accruing paid time off, as described above. For the avoidance of doubt, if the Executive's employment is terminated for Cause or if the Executive terminates his employment with the Company without Good Reason, the Executive shall not be entitled to receive any portion of the Discretionary Bonus otherwise payable to the Executive for the immediately preceding Performance Year.

4

(d)     Termination by the Company without Cause or by the Executive with Good Reason. In the event the employment of the Executive is terminated by the Company without Cause or by the Executive with Good Reason, the Company shall pay the Executive the benefits described in Section 8(a)(i)-(iii).  In addition, subject to the conditions of Sections 8(e) and 14, the Company shall:

(i)     pay to the Executive, in a single severance lump sum payment on the Payment Date (as defined below), equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus);

(ii)    in addition, pay to the Executive, in a single lump sum payment on the Payment Date, the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the Executive's termination calculated at 100% of target.

(iii)   in addition, for a period of twelve (12) months following the Executive's termination date, and provided the Executive is eligible for and timely elects to continue receiving group medical insurance pursuant to COBRA (Consolidated Omnibus Budget Reconciliation Act), continue to pay the share of the premium for health coverage that is paid by the Company for active and similarly-situated employees who receive the same type of coverage ("COBRA Continuation"). Notwithstanding the foregoing, if for any reason such benefits cannot be provided through the Company's group or other plans, the Company shall reimburse the Executive for the Executive's reasonable cost of obtaining equivalent benefits, such reimbursements to be made on the same schedule as otherwise would have been paid. At the end of such twelve (12) month period, the Executive shall be entitled to such rights as the Executive may have to continue health insurance coverage at the Executive's sole expense as are then accorded under COBRA, for the remainder of the COBRA coverage period.

(iv)    notwithstanding the requirement that the Executive be an active employee of the Company on the last day of the Performance Year, pay to the Executive, in a single lump sum payment on the Payment Date, a prorated portion of the Executive's target Discretionary Bonus for the Performance Year in which the separation occurs under this subsection, irrespective of whether the performance goals applicable to such Discretionary Bonus have been established or satisfied, such prorated portion to be calculated by multiplying the target Discretionary Bonus for such Performance Year by the quotient obtained by dividing the number of months of the Performance Year during which the Executive has provided services to the Company by twelve (12);

(e)     Release. As a condition of the Executive's receipt of the benefits described under Section 8(d)(i-iv) (such benefits, the "Severance Benefits"), the Executive must execute and deliver to the Company a severance agreement and general release of claims substantially in the form set forth in Exhibit C hereof (the "Severance Agreement"), which must become irrevocable within sixty (60) days following the date of the Executive's termination of employment (or such shorter period as may be directed by the Company and as permitted by law) (the sixty (60)-day anniversary of the Executive's termination of employment shall be the

5

"Payment Date"). Severance Benefits will be paid on the Payment Date. The Executive must continue to comply with the Confidentiality Agreement and any other Agreements to which he is bound in order to be eligible to receive the Severance Benefits.

      (f)   Definitions. As used in this Agreement:

      (i)   "Cause" shall mean a finding by the CEO that the Executive: (1) materially breached this Agreement, provided that, if such breach is curable, the Executive was given prior written notice of such breach and was granted a reasonable opportunity of not less than fifteen (15) days to cure any such breach; (2) breached a material term or condition of the Confidentiality Agreement or any other Agreements to which he is bound as per this agreement; (3) engaged in gross negligence or misconduct, fraud or embezzlement in his job duties; (4) engaged in any conduct that is, or is reasonably likely to be, materially harmful to the business, interests or reputation of the Company, provided that, if such conduct is, in the reasonable judgment of the Company, curable, the Executive was given prior written notice of such conduct and was granted a reasonable opportunity of not less than fifteen (15) days to cure any such conduct; or (5) was convicted of, or pleaded guilty or nolo contendere to, a misdemeanor, or charged with any felony crime (other than a traffic offense that does not cause serious bodily injury to another person).

      (ii)   "Change in Control" shall mean (1) any merger, reorganization, consolidation, recapitalization or other transaction or series of related transactions, whether or not the Company or Freedom Mortgage Corporation is the surviving or continuing entity in such transaction or transactions, and whether or not the Company or Freedom Mortgage Corporation is a party thereto, that results in the holders of equity interests in the Company or Freedom Mortgage Corporation immediately prior to such transaction or transactions holding, immediately after such transaction or transactions (whether by virtue of securities issued as consideration for the transaction(s) or otherwise), less than 50% of the voting power of the surviving, continuing or purchasing entity; or (2) any sale, lease or other disposition of all or substantially all of the assets (tangible or intangible) of the Company and its subsidiaries, if any, taken as a whole or of Freedom Mortgage Corporation.

      (iii)   "Disability" shall mean a physical or mental illness or disability that prevents the Executive from performing the essential functions of the Executive's position with or without reasonable accommodations for a period of more than any three (3) consecutive months or for periods aggregating more than twenty-six (26) weeks in any year. The Company shall determine in good faith whether the Executive is unable to perform the duties provided for herein.

      (iv)   "Good Reason" shall mean the occurrence, without the Executive's prior written consent, of any of the following events: (1) a change in the Executive's reporting relationship such that the Executive no longer reports directly to the CEO or the Board; (2) a diminution in any of the Executive's titles or a material reduction in the authority, duties, or responsibilities of the Executive or the assignment to the Executive of duties or responsibilities inconsistent with the Executive's position; (3) a reduction of the Executive's Base Salary; (4) a reduction of the Executive's target bonus opportunity; (5) a reduction in the equity grants, terms or rights per Exhibit B; (6) any change in home base outside of the San Francisco Bay Area,

6

California without the Executive's written consent; (7) any Change of Control; or (8) any action or inaction of the Company that constitutes a material breach by the Company of its obligations to the Executive under this Agreement. No resignation will be treated as a resignation for Good Reason unless (A) the Executive provides written notice to the Company of the Executive's intention to terminate employment for Good Reason, describing the grounds for such action, no later than fifteen (15) days after the first occurrence of such circumstances, (B) the Executive provides the Company with at least thirty (30) days to cure the circumstances, and (C) if the Company is not successful in curing the circumstances, the Executive ends the Executive's employment within ninety (90) days following the cure period in (B).

9.    **Absence of Restrictions.** The Executive represents and warrants that, except as disclosed to the Company in writing, the Executive is not bound by any employment contracts, restrictive covenants or other restrictions that prevent the Executive from entering into employment with, or carrying out the Executive's responsibilities for, the Company, or which are in any way inconsistent with any of the terms of this Agreement. On an annual basis, or as the Company otherwise directs, the Executive will disclose to the Company the Executive's investments in business interests or other potential or actual conflicts of interest.

10.    **Amendments.** Any amendment to this Agreement shall be made in writing and signed by the Parties hereto.

11.    **Notice.** Any notice delivered under this Agreement shall be deemed duly delivered three (3) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, one (1) business day after it is sent for next-business day delivery via a reputable nationwide overnight courier service, or immediately upon hand delivery, in each case to the address of the recipient set forth below.

To Executive:

Rahul Mewawalla

███████████████

Along with an electronic copy
to ███████████████

With a separate copy to:
DLA Piper LLP (US)
ATTN: Cisco Palao-Ricketts
2000 University Ave.
East Palo Alto, CA 94303

Along with an electronic copy
to ███████████████

7

To Company:

Freedom Technology Corporation
ATTN: Stanley Middleman
40 Lake Center Drive
Marlton, NJ 08053

With a separate copy to:
Freedom Mortgage Corporation
ATTN: Chief Legal Officer
40 Lake Center Drive
Marlton, NJ 08053

Either Party may change the address to which notices are to be delivered by giving notice of such change to the other Party in the manner set forth in this Section 11.

12. **Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California (without reference to the conflict of laws provisions thereof). Any action, suit or other legal proceeding arising under or relating to any provision of this Agreement shall be commenced in the Santa Clara County Superior Court in the State of California (or, if appropriate, a federal court located within the Northern District of the State of California), and the Company and the Executive each consents to the jurisdiction of such a court.

13. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of both Parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business; provided, however, that the obligations of the Executive are personal and shall not be assigned by the Executive.

14. **Effect of Section 409A of the Code.**

(a) General 409A Principles. For purposes of this Agreement, a termination of employment will mean a "separation from service" as defined in Section 409A of the Code, each amount to be paid or benefit to be provided will be construed as a separate identified payment for purposes of Section 409A of the Code. The determination of whether and when the Executive's separation from service from the Company has occurred shall be made in a manner consistent with, and based on the presumptions set forth in, Treasury Regulation Section 1.409A-1(h). Solely for purposes of this determination, "Company" shall include all persons with whom the Company would be considered a single employer under Section 414(b) and 414(c) of the Code. Neither the Company nor the Executive will have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A of the Code. This Agreement is intended to comply with the provisions of Section 409A of the Code and this Agreement shall, to the extent practicable, be construed in accordance therewith. Terms defined in this Agreement will have the meanings given such terms under Section 409A of the Code if and to the extent required to comply with Section 409A of the Code. *In any event, the Company makes no representations or warranties and will have no liability to the Executive or*

8

*any other person if any provisions of or payments made in accordance with the terms of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but not to satisfy the conditions of that section.*

15.     **Acknowledgment.** The Executive states and represents that the Executive has had an opportunity to fully discuss and review the terms of this Agreement with an attorney.

16.     The Executive further states and represents that the Executive has carefully read this Agreement, understands the contents herein, freely and voluntarily assents to all of the terms and conditions hereof, and signs the Executive's name of the Executive's own free act.

17.     **No Expectation of Privacy.** The Company's premises, including all workspaces, furniture, documents, and other tangible materials, and all information technology resources of the Company (including computers, data and other electronic files, and all internet and email) are subject to oversight and inspection by the Company at any time. Company employees should have no expectation of privacy with regard to any Company premises, materials, resources or information.

18.     **Waiver, Cancellation or Discharge.** No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar to or waiver of any right on any other occasion.

19.     **Captions and Pronouns.** The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement. Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns and pronouns shall include the plural, and vice versa.

20.     **Interpretation.** The Parties agree that this Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the drafting Party. References in this Agreement to "include" or "including" should be read as though they said "without limitation" or equivalent forms.

21.     **Severability.** Each provision of this Agreement must be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Moreover, if a court of competent jurisdiction determines any of the provisions contained in this Agreement to be unenforceable because the provision is excessively broad in scope, whether as to duration, activity, geographic application, subject or otherwise, it will be construed, by limiting or reducing it to the extent legally permitted, so as to be enforceable to the extent compatible with then applicable law to achieve the intent of the Parties.

LEGAL02/39609532v1

22.     **Entire Agreement and Survival.** This Agreement, and its Appendixes and Exhibits, constitute the entire agreement between the Parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement.

*[Signatures on Page Following]*

10

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the day and year first set forth above.

**FREEDOM TECHNOLOGY CORPORATION**

By: _____     Date: _____
   Name: Stanley Middleman
   Title: Chief Executive Officer


**EXECUTIVE:**

_____     Date: _____
Name: Rahul Mewawalla


*[Signature Page to Employment Agreement]*

11

**EXHIBIT A**
**EQUITY TO BE PROVIDED TO EXECUTIVE UPON TRANSFER OF EMPLOYMENT TO FREEDOM TECHNOLOGY CORPORATION ("FTC")**

- On the date that Freedom Technology Corporation is incorporated, Freedom Technology Corporation shall adopt and establish an equity incentive plan with a share reserve equal to at least 7.5% of Freedom Technology Corporation's share capital on a fully diluted basis as of such date (the "FTC Equity Plan"), with the balance of all other equity in Freedom Technology Corporation to be owned by Freedom Mortgage Corporation or the Middleman family.

- Prior to such adoption, the FTC Equity Plan shall be subject to the advance review by the Executive and Freedom Technology Corporation shall adopt the reasonable comments provided by the Executive to ensure commercially reasonable terms and conditions are set forth therein.

  In conjunction with the adoption of the FTC Equity Plan, the Executive shall be granted an "early exercise" stock option (which may, at the Executive's election, be as an incentive stock option, a non-statutory stock option or combination thereof) to purchase a number of shares in Freedom Technology Corporation that is equal to at least 5% of Freedom Technology Corporation's share capital on a fully diluted basis as of the date of the FTC Equity Plan adoption (the "Option"). The Corporation may, in response to a request by the executive, in its discretion, provide the Executive a loan, on a 50.1% recourse basis, to enable the Executive to exercise the Option. The Option shall have an exercise price that is no more than the fair market value of Freedom Technology Corporation's common stock on the Option's date of grant, as determined mutually by the Executive and the board of directors of Freedom Technology Corporation pursuant to an independent third-party valuation report that is entitled a presumption of reasonableness under Section 409A of the Internal Revenue Code.

- The Option shall vest over a four (4)-year period from the Start Date with 25% of the shares subject to the Option vesting on the one (1)-year anniversary of the Start Date, and with the remainder of the shares subject to the Option vesting in substantially equal installments over the following thirty-six (36) months.

- Any unvested equity awards granted to the Executive, including the Option, shall vest in their entirety and immediately in the event that the surviving entity in a merger or other change of control does not assume such equity awards either outright or in a manner that preserves the value of such award and provides for its continued payout over the vesting period. In addition, in the event the Executive's employment is terminated without Cause or the Executive terminates for Good Reason, following or in connection with a change of control of FTC or an initial public offering of FTC, then such equity awards granted to the Executive shall also accelerate in full.

- The Option will have a standard ten (10)-year term and if the Executive is terminated or ends employment, the Executive will have a standard 90-day exercise period post termination and, if the Executive does not exercise the vested portion of the Option within 90 days after the cessation of employment, any portion of the Option that is

1

an incentive stock option will convert to a non-statutory stock option and the Executive may exercise the vested portion of the Option at any time prior to the expiration of the Option's 10-year term.

LEGAL02/39609532v1

**EXHIBIT B**

## CONFIDENTIALITY, PROPRIETARY RIGHTS, NON-SOLICITATION AND ASSIGNMENT OF INVENTIONS AGREEMENT

This Confidentiality, Proprietary Rights, Non-Solicitation and Assignment of Inventions Agreement (this "Agreement") is made between Freedom Technology Corporation (the "Company"), and Rahul Mewawalla (the "Executive") (together, the "Parties").

For good consideration and in consideration of the employment or continued employment of the Executive by the Company, the Executive and the Company, intending to be legally bound, agree as follows:

1. <u>Condition of Employment.</u> The Executive acknowledges that his employment with the Company is contingent upon his agreement to sign and adhere to the provisions of this Agreement. The Executive further acknowledges that the nature of the Company's business is such that protection of its proprietary and confidential information is critical to the survival and success of the Company's business.

2. <u>Proprietary and Confidential Information.</u>

(a) The Executive agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, ideas, inventions, algorithms, products, product improvements, product enhancements, processes, methods, techniques, formulas, compositions, compounds, negotiation strategies and positions, projects, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant to a license agreement), and all in-house built technology and software, customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. Unless required by law, the Executive will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company). Nothing in this Agreement prohibits Executive from disclosing Proprietary Information pursuant to subpoena or other lawful process, provided that, if he is served with a subpoena or process, he will notify the Company promptly so that Company can decide whether it wishes to seek a protective order or other appropriate relief.

(b) Nothing in this Agreement is intended to or shall prevent, impede or interfere with Executive's right, without prior notice to the Company, to provide information to the government, participate in investigations, file a complaint, testify in proceedings regarding the Company's past or future conduct, or engage in any activities protected under any whistleblower statutes.

(c) While employed by the Company, the Executive will use the Executive's best efforts to prevent unauthorized publication or disclosure of any of the Company's Proprietary Information. Notwithstanding the foregoing, the following will not be considered

1

Proprietary Information: information that was already in the public domain at the time of receipt or that came into the public domain thereafter, in each case, through no act by the Executive or any other third party in breach of any confidentiality obligation.

(d)     The Executive agrees that all files, documents, letters, memoranda, reports, records, data, sketches, drawings, models, laboratory notebooks, program listings, computer equipment or devices, computer programs or other written, photographic, or other tangible or intangible material containing Proprietary Information, whether created by the Executive or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Executive only in the performance of his duties for the Company and shall not be copied or removed from the Company premises except in the pursuit of the business of the Company. All such materials or copies thereof and all tangible property of the Company in the custody or possession of the Executive shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of his employment for any reason. After such delivery, the Executive shall not retain any such materials or copies thereof or any such tangible property.

(e)     The Executive agrees that his obligation not to disclose or to use information and materials of the types set forth above, and his obligation to return materials and tangible property, set forth above, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Executive in the course of the Company's business.

3.     The Defend Trade Secrets Act. Executive understands that notwithstanding Executive's obligations to protect Proprietary Information, Executive may disclose Proprietary Information or trade secrets in confidence to a federal, state, or local government official, directly or indirectly, or to an attorney advising Executive about such disclosures, provided that the disclosure is made solely for the purpose of reporting or investigating a suspected violation of law. Executive also understands that should Executive ever file a lawsuit against Company claiming retaliation, or if Executive is involved in any other lawsuit or proceeding, Executive may disclose Proprietary Information or trade secrets to Executive's attorney and use it in a court proceeding if Executive: (a) files under seal any document containing the Proprietary Information, and (b) does not disclose the Proprietary Information except pursuant to a court order. "Trade Secrets" mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

4.     Inventions, Developments, and Works.

(a)     Executive acknowledges and agrees that all drafts, records, memoranda, notes, compositions, writings, diaries, drawings, photographs, graphics, logos, sketches, audio-visual material, films, pictures, sound recordings, charts, software, algorithms, code, and any other materials, including but not limited to any invention that is or contains copyrightable material and the technology, mobile applications and algorithms and all in-house

2

built technology and software, and all derivatives and updates thereto, authored or prepared by Executive, in whole or in part, or that Executive authors, creates, prepares, in whole or part, during Executive's engagement with the Company and within the scope of his or her engagement as an Executive, but excluding Excluded Works (defined below) ("Works"), are deemed works made for hire, owned and authored by the Company, as that term is defined in the Copyright Laws of the United States of America.  To the extent that any such Works are deemed not to be works made for hire, Executive irrevocably and without limit hereby assigns all current and future right, title, and interest and all copyright in the Works throughout the world to the Company (or its designee) as set forth above. Executive expressly waives any ownership claim, now or in the future, in the Works; any right or claim of any right to create new derivative works or adaptations based on the Works in the future; and the right to apply for or file any copyright registrations for the Works or any part of them.  Executive acknowledges that the Company has the sole right to apply for, obtain, and own copyright registrations and use the copyright notices to the Works.  Executive now and forever expressly waives any right of publicity, attribution, and integrity, including any so-called moral rights or equivalents thereof, arising under U.S. federal law and under any state law and under the laws of any other country that conveys rights of the same nature.

(b)     Executive acknowledges and agrees that any and all Inventions (defined below), made, conceived, discovered, reduced to practice or developed, by Executive alone or with others, during Executive's engagement with the Company belong to the Company. Executive will promptly and fully disclose to the Company all such Inventions. Executive hereby irrevocably transfers and assigns to the Company or its designee (if not otherwise transferred by law), as its exclusive property, the entire worldwide and perpetual right, title and interest in all Inventions, including (but not limited to) any patent applications, patents, trade secrets, or confidential information.   Executive agrees that these obligations bind Executive's assigns, executors, administrators, and other legal representatives.  "Inventions" means any and all discoveries, ideas, improvements, innovations, inventions, information, know-how, processes, or techniques, in whole or in part, whether patentable or not, which generally relate to or are useful to the Company's current or future business.

(c)     Executive will cooperate fully with the Company, during and after his engagement as an Executive for the Company, with respect to the protection of the Company's intellectual property rights in the Works and Inventions anywhere in the world, including signing all papers that the Company requests that Executive sign to perfect or protect those rights (at the Company's expense). Executive agrees that these obligations are binding on Executive's assigns, executors, administrators, heirs and other legal representatives. Executive further agrees that if the Company is unable, after reasonable effort, to obtain Executive's signature on any such papers, any executive officer of the Company may sign such papers as Executive's agent and the attorney-in-fact, and Executive hereby irrevocably designates and appoints each executive officer of the Company as Executive's agent and attorney-in-fact to execute any such papers on Executive's behalf, and to take any action the Company deems necessary or desirable to protect its rights and interests in and to the Works and Inventions.

(d)     Executive acknowledges and agrees that Executive has no right to use or seek registration for any Work, Invention, trade name, trademark, service mark, trade dress, logo, or other source identifying designation owned or used by or licensed to the Company

3

("Company Intellectual Property") and shall not challenge or assist another party in challenging Company's ownership in or the validity of Company Intellectual Property.

(e)     "Excluded Works" means any work or invention created by Executive entirely on Executive's own time, for which no equipment, supplies, facilities, or Proprietary Information of the Company was used, which does not relate to any of the services set forth in this Agreement or Executive's Employment Agreement which did not result from Executive's relationship with the Company or its processor, and which does not relate to the Company's current or demonstrably anticipated future business at the time of work or invention or to the Company's actual or demonstrably anticipated research or development. Further, Executive acknowledges that he is aware of the provisions of Sections 2870 through 2872 of the California Labor Code, which are set forth on **Exhibit "B(1)"**, attached hereto and made a part hereof. Nothing in this Agreement is intended to grant to the Company rights other than those that may be assigned by employees under Section 2870. Executive confirms that he has fully listed any prior inventions or works of authorship that he believes are outside the scope of this Agreement on **Exhibit "B(2)"** attached hereto and made a part hereof and that such prior inventions are included within the definition of "Excluded Works." Excluded Works shall be excluded from the definitions of Works and Inventions herein, and the ownership shall remain the sole property of Executive and/or Executive's assigns and not owned by the Company.

(f)     Executive hereby represents and warrants that (i) Company shall not be required to make any payment of any nature for, or in connection with the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement except those expressly set forth in this Agreement; (ii) at the time of execution of this Agreement there are no liens, encumbrances or other charges against Works, Inventions or intellectual property rights furnished by Executive herein; and (iii) all Works, Inventions or intellectual property rights furnished by Executive herein shall be original to Executive and not infringe upon or violate the rights of any third parties.

5.     Obligations to Third Parties. The Executive represents that, except as the Executive has disclosed in writing to the Company, the Executive is not bound by the terms of any agreement with any previous employer or other party that are in conflict with the Agreement and the Executive will abide with any requirements to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of his employment with the Company, to refrain from competing, directly or indirectly, with the business of such previous employer or any other party or to refrain from soliciting employees, customers or suppliers of such previous employer or other party. The Executive further represents that his performance of all the terms of this Agreement and the performance of his duties as an employee of the Company do not and will not conflict with or breach any agreement with any prior employer or other party (including, without limitation, any nondisclosure or non-competition agreement), and that the Executive will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

6.     Non-Competition. While the Executive is employed by the Company, the Executive will not, directly or indirectly, within the United States of America, engage or assist others in engaging in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise, except as the holder of not more than 3% of the outstanding stock of a publicly-held company) that is competitive with the business of the

4

Company, and about which the Executive has Proprietary Information, including but not limited to any business or enterprise that develops, manufactures, markets, licenses, sells or provides any service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Executive was employed by the Company.

7.     Non-Solicitation of Customers and Suppliers. While the Executive is employed by the Company, the Executive will not directly or indirectly, either alone or in association with others, solicit, divert or take away, or attempt to divert or take away, the business or patronage of any of the actual or prospective clients, customers, accounts or business partners of the Company for the purposes of providing products or services that are competitive with those provided by the Company.

8.     Non-Solicitation of Employees. While the Executive is employed by the Company and for a period of one (1) year after the termination or cessation of such employment for any reason, the Executive will not directly or indirectly, either alone or in association with others: (i) solicit, induce or attempt to induce, any employee or independent contractor of the Company to terminate his or her employment or other engagement with the Company, or (ii) recruit, or attempt to recruit, or engage or attempt to engage as an independent contractor, any person who was employed or otherwise engaged by the Company at any time during the term of the Executive's employment with the Company; provided, that this clause shall not apply to the recruitment or other engagement of any individual whose employment or other engagement with the Company has been terminated for a period of six months or longer.

9.     Extension.   If the Executive violates the provisions of Paragraph 8, the Executive shall continue to be bound by the restrictions set forth in such paragraph until a period of one (1) year has expired without any violation of such provisions.

10.     Acknowledgment and Equitable Remedies. The Executive acknowledges that the restrictions contained in this Agreement are necessary for the protection of the business, the Company's Proprietary Information, and goodwill of the Company and are considered by the Executive to be reasonable for such purpose. The Executive agrees that any breach or threatened breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is impossible to measure. Therefore, in the event of any such breach or threatened breach, the Executive agrees that the Company, in addition to such other remedies which may be available, shall have the right to obtain an injunction from a court restraining such a breach or threatened breach without posting a bond and the right to specific performance of the provisions of this Agreement and the Executive hereby waives the adequacy of a remedy at law as a defense to such relief.

11.     Disclosure of this Agreement. For a period of one (1) year after the termination or cessation of the Executive's employment for any reason, the Executive agrees to notify any potential, prospective employer or prospective business associate, of the relevant terms and existence of this Agreement and the Executive's continuing obligations to the Company hereunder.

5

12.     Not Employment Contract. The Executive acknowledges that this Agreement does not constitute a contract of employment, and does not imply that the Company will continue his employment for any period of time.

13.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which, or into which, the Company may be merged or which may succeed to the Company's assets or business, provided, however, that the obligations of the Executive are personal and shall not be assigned by him or her. The Executive expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate thereof to whose employ the Executive may be transferred without the necessity that this Agreement be re-signed at the time of such transfer.

14.     Severability. In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

15.     Waivers. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

16.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California in the United States of America (without reference to the conflicts of laws provisions thereof). Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in the Santa Clara County Superior Court in the State of California (or, if appropriate, a federal court located within the Northern District State of California), and the Company and the Executive each consents to the jurisdiction of such a court.

17.     Entire Agreement; Amendment. This Agreement supersedes all prior agreements, written or oral, between the Executive and the Company relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Executive and the Company. The Executive agrees that any change or changes in his duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement.

18.     Captions. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

19.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement, by facsimile, electronic mail, PDF, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

6

THE EXECUTIVE ACKNOWLEDGES THAT HE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

**FREEDOM TECHNOLOGY CORPORATION**

_____

Date

By _____

Name _____

Title _____

**EXECUTIVE**

_____

Date

_____

Name _____

7

## Exhibit "B(1)"
## "Labor Code, State of California, Div. 3, Ch. 2, Article 3.5

2870.  Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of his or her rights in an invention to his or her employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (a) which does not relate (1) to the business of the employer or (2) to the employer's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by the employee for the employer.  Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

2871.  No employer shall require a provision made void and unenforceable by Section 2870 as a condition of employment or continued employment.  Nothing in this article shall be construed to forbid or restrict the right of an employer to provide in contracts of employment for disclosure, provided that any such disclosures be received in confidence, of all of the employee's inventions made solely or jointly with others during the term of his or her employment, a review process by the employer to determine such issues as may arise, and for full title to certain patents and inventions to be in the United States, as required by contracts between the employer and the United States or any of its agencies.

2872.  If an employment agreement entered into after January 1, 1980, contains a provision requiring the employee to assign or offer to assign any of his or her rights in any invention to his or her employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention which qualifies fully under the provisions of Section 2870.  In any suit or action arising thereunder, the burden of proof shall be on the employee claiming the benefits of its provisions."

8

**Exhibit "B(2)"**
**Disclosure of other inventions**

     The following is a complete list of all inventions or improvements or works of authorship relevant to the subject matter of Executive's employment by the Company that have been made or conceived or first reduced to practice by him alone or jointly with others prior to his employment by the Company.  Executive desires to remove those inventions and improvements listed below from the operation of the Confidentiality, Proprietary Rights, Non-Solicitation and Assignment of Inventions Agreement he has executed for the benefit of the Company.

     _____    No inventions or improvements.

     _____    See below (list specific inventions, improvements or works).

     _____    Additional sheets attached.

Date: _____

_____
*Signature*

_____
*Print Name*

_____
*Address*

_____
*City, State Postal Code*

LEGAL02/39609532v1

**EXHIBIT C**

**CONFIDENTIAL SEPARATION AGREEMENT AND
GENERAL RELEASE OF CLAIMS**

THIS AGREEMENT (the "Agreement") is entered into as of the Effective Date, as defined in Paragraph 7 hereof, by and between **Freedom Mortgage Corporation and Freedom Technology Corporation** (collectively, the "Company") and **Rahul Mewawalla** (the "Executive"). Together, the Company and Executive may be referred to hereinafter as the "Parties." Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Employment Agreement between the Company and Executive, dated _____ (the "Employment Agreement") and the Confidentiality, Proprietary Rights, Non-Solicitation, and Assignment of Inventions Agreement between the Company and Executive dated _____ (the "Confidentiality Agreement"). Freedom Mortgage Corporation shall be the guarantor of the payments and benefits promised and agreed hereunder in the event that Freedom Technology Corporation does not or is unable to meet its obligations under the Employment Agreement and this Agreement.

In consideration of the payments, covenants and releases described below, and in consideration of other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, the Company and Executive agree as follows:

1.      Separation from Employment.  The Executive's employment with the Company ended on _____ (the "Termination Date").  As of the Termination Date, the Company has paid to Executive any earned but unpaid compensation through the Termination Date.  Upon proper submission of receipts and required documentation as provided in Section 6 of the Employment Agreement, the Company shall, within thirty (30) days of the Termination Date, reimburse Executive for expenses incurred and unpaid through the Termination Date. Additionally, Executive shall have such rights under the employee benefits plans as shall be determined under the provisions of such plans.  The Executive will receive by separate letter information regarding his rights regarding continuation of health insurance under Section 4980B of the Internal Revenue Code and any similar state law ("COBRA"), and to the extent that Executive has such rights, nothing in this Agreement will change or impair those rights.

2.      Separation Obligations of the Company.  In consideration of Executive's promises contained in this Agreement, the Company agrees it shall pay on the Payment Date:

        a.      pay to Executive, in a single severance lump sum payment on the Payment Date, equal to one full year of cash compensation, defined as (a) Executive's Base Salary plus (b) Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus);

        b.      pay to Executive, in a single lump sum payment on the Payment Date, the Performance Discretionary Bonus to be payable to Executive for the immediately preceding Performance Year that has not yet been paid to Executive as of the date of Executive's termination calculated at 100% of target.

1

        c.     for a period of twelve (12) months following Executive's termination date, and provided Executive is eligible for and timely elects to continue receiving group medical insurance pursuant to COBRA (Consolidated Omnibus Budget Reconciliation Act), continue to pay the share of the premium for health coverage that is paid by the Company for active and similarly-situated employees who receive the same type of coverage ("COBRA Continuation"). Notwithstanding the foregoing, if for any reason such benefits cannot be provided through the Company's group or other plans, the Company shall reimburse Executive for Executive's reasonable cost of obtaining equivalent benefits, such reimbursements to be made on the same schedule as otherwise would have been paid Executive. At the end of such twelve (12) month period, Executive shall be entitled to such rights as Executive may have to continue health insurance coverage at Executive's sole expense as are then accorded under COBRA, for the remainder of the COBRA coverage period; and

        d.     notwithstanding the requirement that the Executive be an active employee of the Company on the last day of the Performance Year, pay to the Executive, in a single lump sum payment on the Payment Date, a prorated portion of the Executive's target Discretionary Bonus for the Performance Year in which the separation occurs under this subsection, irrespective of whether the performance goals applicable to such Discretionary Bonus have been established or satisfied, such prorated portion to be calculated by multiplying the target Discretionary Bonus for such Performance Year by the quotient obtained by dividing the number of months of the Performance Year during which the Executive has provided services to the Company by twelve (12).

The benefits in Sections 2(a)-(d) shall hereafter be collectively referred to as the "Severance Benefits."

     3.    <u>Separation Obligations of the Executive.</u>

        a.     Payment of the Severance Benefits shall be subject to Executive's continued compliance in all material respects with each and every requirement of Sections __ and __ of Executive's Confidentiality Agreement, [IDENTIFY ANY OTHER AGREEMENTS], and the execution and delivery of this Confidential Separation Agreement and General Release of Claims. Executive expressly affirms and acknowledges his obligations contained in Sections __ and __ of the Confidentiality Agreement. (A true and correct copy of Executive's Confidentiality Agreement is attached hereto as **Exhibit A**.) For the avoidance of doubt, Executive is bound by the above-referenced provisions regardless of whether he receives the Severance; however, should Executive violate any of the referenced provisions during the period described in Paragraphs 2(a)-(d) for the payment of the Severance Benefits and/or if the Company discovers at any time after the Termination Date that Executive violated the provisions of Sections __ or __ of the Confidentiality Agreement at any time, the Company shall be relieved of its obligation to pay any remaining Severance Benefits and no further payments will be owed or made to Executive.

        b.     Prior to and after the Termination Date and in consideration of the Severance Benefits, Executive agrees that he will reasonably cooperate with the Company, its affiliates and its subsidiaries, as well as any of their officers, directors, shareholders, or employees: (A) concerning requests for information about the business of the Company or its subsidiaries or

2

affiliates or Executive's involvement and participation therein; (B) with respect to transition matters of any nature; and (C) in connection with any future litigation arising out of or related to events occurring during Executive's tenure with the Company in any manner.  Executive's cooperation shall include, but not be limited to (taking into account Executive's personal and professional obligations, including those to any new employer or entity to which Executive provides services), being available to meet and speak with officers or employees of the Company and/or the Company's counsel at mutually convenient, reasonable times and locations, testifying truthfully at deposition or trial, executing accurate and truthful documents, and taking such other actions as may reasonably be requested by the company and/or the Company's counsel in good faith and in the best interests of the defense to effectuate the foregoing. Upon request and reasonable notice from the Company, Executive will voluntarily, and without additional payment or requiring a subpoena or other process, meet with the Company's attorneys and other representatives, appear at hearings, depositions, trials, and other proceedings relating to such matters, and provide truthful written statements and testimony relating to such matters. The Company shall reimburse Executive for his time for all reasonable and necessary out-of-pocket expenses necessitated by Executive's cooperation under this Paragraph.  Executive further agrees not to assist any party in maintaining any lawsuit against any of the Releasees, and will not provide any information to anyone concerning any of the Releasees, unless compelled to do so by valid subpoena or other court order, and in such case only after first notifying Company sufficiently in advance of such subpoena or court order to reasonably allow Company an opportunity to object to same.

c.       Executive acknowledges and agrees that the payments and benefits set forth in Paragraph 2 are consistent with prior agreements executed by the parties and exceed any and all actions, pay, and benefits that the Company might otherwise have owed to Executive by contract or law, and that the payments and benefits set forth in Paragraph 2 constitute good, valuable, and sufficient consideration for Executive's release and agreements herein.  The Company's obligation to provide the payments and benefits set forth in Paragraph 2 is expressly contingent on Executive **executing and returning this Agreement to** _____ and not revoking this Agreement pursuant to Paragraph 8 below.  The Company's obligation to make the payments set forth herein shall cease upon Executive's breach of any of his continuing contractual obligations to the Company.

4.       General Release of Claims and Covenant Not to Sue.

a.       General Release of Claims.  In consideration of the payments made to him by the Company and the promises contained in this Agreement, Executive on behalf of himself and his agents and successors in interest, hereby UNCONDITIONALLY RELEASES AND DISCHARGES the Company, its successors, subsidiaries, parent companies, assigns, joint ventures, and affiliated companies and their respective agents, legal representatives, shareholders, attorneys, employees, members, managers, officers and directors (collectively, the "Releasees") from ALL CLAIMS, LIABILITIES, DEMANDS AND CAUSES OF ACTION which he may by law release, as well as all contractual obligations not expressly set forth in this Agreement, whether known or unknown, fixed or contingent, that he may have or claim to have against any Releasee for any reason as of the date of execution of this Agreement. This Release and Covenant Not to Sue includes, but is not limited to, claims arising under federal, state or local laws prohibiting employment discrimination; claims arising under severance plans and contracts; and

3

claims growing out of any legal restrictions on the Company's rights to terminate its employees or to take any other employment action, whether statutory, contractual or arising under common law or case law. The Executive specifically acknowledges and agrees that he is releasing any and all rights under federal, state and local employment laws including without limitation the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans With Disabilities Act, the Family and Medical Leave Act, the Genetic Information Nondiscrimination Act, the anti-retaliation provisions of the Fair Labor Standards Act, the Employee Retirement Income Security Act, the Equal Pay Act, the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the Employee Polygraph Protection Act, the Fair Credit Reporting Act, the California Fair Employment and Housing Act (Cal. Gov't Code §12900 et seq.); California Family Rights Act (Cal. Gov't Code §12945.2); California WARN Act (Cal. Lab. Code §1400 et seq.) as amended; all tort claims, including without limitation, claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing, including claims arising out of an Employment Agreement, sales commission plan or incentive compensation plan applicable to Executive's employment with the Company; and any and all other local, state, and federal law claims arising under statute or common law (collectively, the "Released Claims"). To the extent permitted by law, Executive also promises never directly or indirectly to bring or participate in an action against any Releasees under California Business & Professions Code Section 17200 or any unfair competition law of any jurisdiction. It is agreed that this is a general release and it is to be broadly construed as a release of all claims, provided, however, that Executive is not releasing (i) any claims that cannot be released by law, (ii) Executive's rights as a stockholder of the Company or any of its affiliates, (iii) Executive's rights to the vested benefits (including reimbursement of business expenses) he may have under any employee compensation or benefit plan or program maintained by the Company or any of its affiliates, (iv) any claim arising after the date of execution of this Agreement or (v) any rights for indemnification or contribution under the certificate of incorporation, by-laws or equivalent governing documents of the Company or its any of affiliates, the law of the State of California, any indemnification agreement between Executive and the Company or its any of affiliates or any rights to insurance coverage under any directors' and officers' liability insurance or fiduciary insurance policy.

    b.  Section 1542 Waiver. The Executive understands and agrees that the claims released in this Agreement include not only claims presently known to Executive, but also include all unknown or unanticipated claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character that would otherwise come within the scope of the released claims. The Executive understands that he may hereafter discover facts different from what he now believes to be true, which if known, could have materially affected this Agreement, but Executive nevertheless waives any claims or rights based on different or additional facts. Executive knowingly and voluntarily waives any and all rights or benefits that he may now have, or in the future may have, under the terms of Section 1542 of the Civil Code of the State of California, which provides as follows:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing**

4

**the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

        c.    <u>Covenant Not to Sue</u>. Except as expressly set forth in Paragraph 4 below, Executive further hereby AGREES NOT TO FILE A LAWSUIT or other legal claim or charge to assert against any of the Releasees any claim released by this Agreement.

        d.    <u>Acknowledgement Regarding Payments and Benefits</u>. Executive acknowledges and agrees that he has been paid all wages and accrued benefits to which he is entitled through the date of execution of this Agreement. Other than the payments set forth in this Agreement, the Parties agree that the Company owes no additional amounts to Executive for wages, back pay, severance pay, bonuses, damages, accrued vacation, benefits, insurance, sick leave, other leave, or any other reason.

        e.    <u>Other Representations and Acknowledgements</u>. This Agreement is intended to and does settle and resolve all claims of any nature that Executive might have against the Company, arising out of their employment relationship or the termination of employment or relating to any other matter, except those that cannot be released by law. By signing this Agreement, Executive acknowledges that he is doing so knowingly and voluntarily, that he understands that he may be releasing claims he may not know about, and that he is waiving all rights he may have had under any law that is intended to protect him from waiving unknown claims. Executive warrants that he has not filed any notices, claims, complaints, charges, or lawsuits of any kind whatsoever against the Company or any of the Releasees as of the date of execution of this Agreement. This Agreement shall not in any way be construed as an admission by the Company or any of the Releasees of wrongdoing or liability or that Executive has any rights against the Company or any of the Releasees. Executive represents and agrees that he has not transferred or assigned, to any person or entity, any claim that he is releasing in this Paragraph 4.

    5.    <u>Protected Rights</u>. Executive understands that nothing contained in this Agreement limits his ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, or any other federal, state or local governmental agency or commission ("Government Agencies"). Executive further understands that this Agreement does not limit his ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agencies in connection with any charge or complaint, whether filed by Executive, on his behalf, or by any other individual. However, based on Executive's release of claims set forth in Paragraph 4 of this Agreement, Executive understands that he is releasing all claims that he may have, as well as, to the extent permitted by applicable law, his right to recover monetary damages or obtain other relief that is personal to Executive in connection with any claim he is releasing under this Agreement.

    6.    <u>Acknowledgment</u>. **The Company hereby advises Executive to consult with an attorney prior to executing this Agreement and Executive acknowledges and agrees that the Company has advised, and hereby does advise, him or her of his opportunity to consult an attorney or other advisor and has not in any way discouraged him or her from doing so. Executive expressly acknowledges and agrees that he has been offered at least [twenty-one (21) days] to consider this Agreement before signing it, that he has read this Agreement and**

**Release carefully, that he has had sufficient time and opportunity to consult with an attorney or other advisor of his choosing concerning the execution of this Agreement. Executive acknowledges and agrees that he fully understands that the Agreement is final and binding, that it contains a full release of all claims and potential claims, and that the only promises or representations he has relied upon in signing this Agreement are those specifically contained in the Agreement itself. Executive acknowledges and agrees that he is signing this Agreement voluntarily, with the full intent of releasing the Company from all claims covered by Paragraph 4.**

7. <u>Revocation and Effective Date</u>. The Parties agree Executive may revoke the Agreement at will within seven (7) days after he executes the Agreement by giving written notice of revocation to Company. Such notice must be delivered to _____, and must actually be received by him or her at or before the above-referenced seven-day deadline. The Agreement may not be revoked after the expiration of the seven-day deadline. In the event that Executive revokes the Agreement within the revocation period described in this Paragraph, this Agreement shall not be effective or enforceable, and all rights and obligations hereunder shall be void and of no effect. Assuming that Executive does not revoke this Agreement within the revocation period described above, the effective date of this Agreement (the "<u>Effective Date</u>") shall be the eighth (8th) day after the day on which Executive executes this Agreement.

8. <u>Termination of Employment Agreement; Survival of Continuing Obligations</u>. Executive acknowledges and agrees that the Employment Agreement is hereby terminated, without further action by the Parties, as of the Termination Date and shall be of no further force and effect, and that, except as expressly set forth in this Agreement, the Company shall have no continuing obligations to Executive under the Employment Agreement; provided, however, that Sections __ and __ of the Employment Agreement and Sections __ and __ of the Confidentiality Agreement shall survive and remain in full force and effect in accordance with their terms.

9. <u>Confidentiality of Agreement; Nondisparagement</u>. Executive agrees not to disclose the underlying facts that led up to this Agreement or the terms, amount, or existence of this Agreement or the benefits Executive is receiving under this Agreement to anyone other than a member of his immediate family, attorney, or other professional advisor and, even as to such a person, only if the person agrees to honor this confidentiality requirement. Such a person's violation of this confidentiality requirement will be treated as a violation of this Agreement by Executive. This Paragraph 10 does not prohibit Executive from disclosing the terms, amount, or existence of this Agreement to the extent necessary legally to enforce this Agreement. Executive agrees not to disparage the Company (and for this purposes, the Company shall be inclusive of the Company, its parent and subsidiaries, and each of their officers, directors, employees, or agents), in any manner likely to be harmful to them or their business, business reputation or personal reputation. Anything herein to the contrary notwithstanding, Executive shall not be restricted from disclosing information that is required to be disclosed by law, court order, other valid and appropriate legal process, or a valid request by a Government Agency. In response to inquiries from prospective employers, the Company agrees to provide only dates of employment, job title and function, and, if authorized by Executive to do so, final salary.

10. <u>Final Agreement</u>. This Agreement contains the entire agreement between the Company and Executive with respect to the subject matter hereof, and supersedes all prior

6

agreements between the Parties, except as set forth in Paragraph 7 above. The Parties agree that this Agreement may not be modified except by a written document signed by both Parties. The Parties agree that this Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the state of California without giving effect to its conflict of law principles. Any action, suit or other legal proceeding arising under or relating to any provision of this Agreement shall be commenced in the Santa Clara County Superior Court in the State of California (or, if appropriate, a federal court located within the Northern District of the State of California), and the Company and the Executive each consents to the jurisdiction of such a court.

12.     Waiver.  The failure of either party to enforce any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision. Any waiver of any provision of this Agreement must be in a writing signed by the party making such waiver. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

13.     Code Section 409A.  This Agreement shall be interpreted and administered in a manner so that any amount or benefit payable hereunder shall be paid or provided in a manner that is either exempt from or compliant with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and applicable Internal Revenue Service guidance and Treasury Regulations issued thereunder. The tax treatment of the benefits provided under the Agreement is not warranted or guaranteed to Executive, who is responsible for all taxes assessed on any payments made pursuant to this Agreement, whether under Section 409A of the Code or otherwise. Neither the Company Group nor its directors, officers, employees or advisers shall be held liable for any taxes, interest, penalties or other monetary amounts owed by Executive as a result of the application of Section 409A of the Code. Executive's right to receive any installment payments hereunder shall be treated as a right to receive separate and distinct payments for purposes of Section 409A of the Code. Notwithstanding anything to the contrary, the severance pay and benefits payable under this Agreement shall be subject, if required to avoid an imposition of penalty taxes on the Executive under Section 409A of the Code or any similar state law, to a delay under Section 409A(a)(2)(B).

[Signatures on next page]

LEGAL02/39609532v1

**FREEDOM MORTGAGE CORPORATION**

By: _____     Date: _____
    Name: Stanley Middleman
    Title: Chief Executive Officer


**EXECUTIVE:**


_____     Date: _____
Name: Rahul Mewawalla

# EXHIBIT B



**California Secretary of State**
Electronic Filing

FILED
Secretary of State
State of California

# Corporation - Statement of Information

| | |
|---|---|
| Entity Name: | XPANSE, INC. WHICH WILL DO BUSINESS IN CALIFORNIA AS XPANSE TECHNOLOGIES CORPORATION |
| Entity (File) Number: | C4632351 |
| File Date: | 09/28/2020 |
| Entity Type: | Corporation |
| Jurisdiction: | DELAWARE |
| Document ID: | GJ78788 |

**Detailed Filing Information**

1. Entity Name:

   XPANSE, INC. WHICH WILL DO BUSINESS IN CALIFORNIA AS XPANSE TECHNOLOGIES CORPORATION

2. Business Addresses:

   a. Street Address of Principal Office in California:

   b. Mailing Address:

   14205 SE 36th Street
   Bellevue, Washington 98006
   United States of America

   c. Street Address of Principal Executive Office:

   14205 SE 36th Street
   Bellevue, Washington 98006
   United States of America

3. Officers:

   a. Chief Executive Officer:

   Rahul Mewawalla
   14205 SE 36th Street
   Bellevue, Washington 98006
   United States of America

   b. Secretary:

   Gregory Middleman
   14205 SE 36th Street
   Bellevue, Washington 98006
   United States of America

Document ID: GJ78788

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

**California Secretary of State**
Electronic Filing

Officers (cont'd):

   c.  Chief Financial Officer:

Timothy  Beard
14205 SE 36th Street
Bellevue, Washington 98006
United States of America

4.  Director:

Not Applicable

Number of Vacancies on the Board of
Directors:

Not Applicable

5.  Agent for Service of Process:

C T CORPORATION SYSTEM
(C0168406)

6.  Type of Business:

Software development

By signing this document, I certify that the information is true and correct and that I am authorized by
California law to sign.

Electronic Signature:   Gregory Middleman

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GJ78788



Office of the Secretary of State
Corporations & Charities Division

> Filed
> Secretary of State
> State of Washington
> Date Filed: 08/12/2020
> Effective Date: 08/12/2020
> UBI #: 604 645 839

# FOREIGN REGISTRATION STATEMENT

## UBI NUMBER

UBI Number:
**604 645 839**

## BUSINESS NAME

Business Name
**XPANSE, INC.**

## JURISDICTION

Country:
**UNITED STATES**

State:
**DELAWARE**

## DOING BUSINESS AS (DBA) NAME     RCW 23.95.525

DBA Name:

## REGISTERED AGENT

| Registered Agent Name | Street Address | Mailing Address |
|---|---|---|
| C T CORPORATION SYSTEM | 711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501, UNITED STATES | 711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501, UNITED STATES |

## REGISTERED AGENT CONSENT

Customer provided Registered Agent consent? - **Yes**

## PRINCIPAL OFFICE

Phone:

Email:
**DAVID.CARBONI@FREEDOMMORTGAGE.COM**

Street Address:
**14205 SE 36TH ST, BELLEVUE, WA, 98006-1596, UNITED STATES**

Mailing Address:

---

This document is a public record. For more information visit www.sos.wa.gov/corps

14205 SE 36TH ST, BELLEVUE, WA, 98006-1596, UNITED STATES

## GOVERNORS

| Title | Governor Type | Entity Name | First Name | Last Name |
|-------|---------------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | MICHAEL | MIDDLEMAN |
| GOVERNOR | INDIVIDUAL | | GREGORY | MIDDLEMAN |
| GOVERNOR | INDIVIDUAL | | RAHUL | MEWAWALLA |

## DATE OF FORMATION IN HOME JURISDICTION

Date of formation in its Home Jurisdiction:
**05/27/2020**

## PERIOD OF DURATION IN HOME JURISDICTION

Duration:
**PERPETUAL**

## NATURE OF BUSINESS

Nature of Business:
**SOFTWARE DEVELOPMENT**

## DATE BEGAN DOING BUSINESS IN WASHINGTON

Date Began doing Business in WA:
**08/12/2020**

## EFFECTIVE DATE

Effective Date:
**08/12/2020**

## CERTIFICATE OF EXISTENCE

Certificate of Existence is included? - **Yes**

## RETURN ADDRESS FOR THIS FILING

Attention:

Email:

Address:

## UPLOAD ADDITIONAL DOCUMENTS

| Name | Document Type |
|------|---------------|
| No Value Found. | |

## UPLOADED DOCUMENTS

| Document Type | Source | Created By | Created Date |
|---------------|--------|------------|--------------|

This document is a public record. For more information visit www.sos.wa.gov/corps

CERTIFICATE OF EXISTENCE          ONLINE       JEFF MINER        08/11/2020

## EMAIL OPT-IN

☐  I hereby opt into receiving all notifications from the Secretary of State for this entity via email only. I acknowledge that I will no longer receive paper notifications.

## AUTHORIZED PERSON - STAFF CONSOLE

☑  Document is signed.

Person Type:
**ENTITY**

First Name:
**JEFF**

Last Name:
**MINER**

Entity Name:
**C T CORPORATION SYSTEM**

Title:
**REP**

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2020081100423947 - 1
Received Date: 08/11/2020
Amount Received: $200.00

1/29/21, 12:52 PM

# BUSINESS INFORMATION

Business Name:
**XPANSE, INC.**

UBI Number:
**604 645 839**

Business Type:
**FOREIGN PROFIT CORPORATION**

Business Status:
**ACTIVE**

Principal Office Street Address:
**14205 SE 36TH ST, BELLEVUE, WA, 98006-1596, UNITED STATES**

Principal Office Mailing Address:
**14205 SE 36TH ST, BELLEVUE, WA, 98006-1596, UNITED STATES**

Expiration Date:
**08/31/2021**

Jurisdiction:
**UNITED STATES, DELAWARE**

Formation/ Registration Date:
**08/12/2020**

Period of Duration:
**PERPETUAL**

Inactive Date:

Nature of Business:
**SOFTWARE DEVELOPMENT**

# REGISTERED AGENT INFORMATION

Registered Agent Name:
**C T CORPORATION SYSTEM**

Street Address:
**711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501, UNITED STATES**

Mailing Address:
**711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501, UNITED STATES**

# GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|---|---|---|---|---|
| GOVERNOR | INDIVIDUAL | | MICHAEL | MIDDLEMAN |

| GOVERNOR | INDIVIDUAL | | GREGORY | MIDDLEMAN |
| GOVERNOR | INDIVIDUAL | | RAHUL | MEWAWALLA |



ccfs.sos.wa.gov

Corporations and Charities System

## Corporations and Charities Filing System

## Business Information

### BUSINESS INFORMATION

Business Name: XPANSE, INC.

Business Type: FOREIGN PROFIT CORPORATION

Principal Office Street Address: 14205 SE 36TH ST, BELLEVUE, WA, 98006-1596, UNITED STATES

Expiration Date: 08/31/2021

Formation/ Registration Date: 08/12/2020

Inactive Date:

Nature of Business: SOFTWARE DEVELOPMENT

UBI Number: 604 645 839

Business Status: ACTIVE

Principal Office Mailing Address: 14205 SE 36TH ST, BELLEVUE, WA, 98006-1596, UNITED STATES

Jurisdiction: UNITED STATES, DELAWARE

Period of Duration: PERPETUAL

### REGISTERED AGENT INFORMATION

Registered Agent Name: C T CORPORATION SYSTEM

Street Address: 711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501, UNITED STATES

Mailing Address: 711 CAPITOL WAY S STE 204, OLYMPIA, WA, 98501, UNITED STATES

### GOVERNORS



| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | MICHAEL | MIDDLEMAN |
| GOVERNOR | INDIVIDUAL | | GREGORY | MIDDLEMAN |
| GOVERNOR | INDIVIDUAL | | RAHUL | MEWAWALLA |

Back

Filing History   Name History   Print   Return to Business Search

# APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA.*

1. Xpanse, Inc.

(Enter name of corporation; must include "INCORPORATED," "COMPANY," "CORPORATION," "Inc.," "Co.," "Corp." "Inc," "Co," or "Corp.")

(If name unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

2. Delaware
(State or country under the law of which it is incorporated)

3. 85-2073564
(FEI number, if applicable)

4. 05/27/2020
(Date of incorporation)

5. _____
(Date of duration, if other than perpetual)

6. _____
(Date first transacted business in Florida, if prior to registration)
(SEE SECTIONS 607.1501 & 607.1502, F.S., to determine penalty liability)

7. 14205 SE 36th Street, Bellevue, WA 98006
(Principal office address)

(Current mailing address, if different)

8. Name and street address of Florida registered agent: (P.O. Box NOT acceptable)

Name:  C T Corporation System

Office Address:  1200 South Pine Island Road

Plantation,
(City)
, Florida  33324
(Zip code)

9. Registered agent's acceptance:
*Having been named as registered agent and to accept service of process for the above stated corporation at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

C T Corporation System

By:   ROSE SONG, ASSISTANT SECRETARY
(Registered agent's signature)

10. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the law of which it is incorporated.

11. Names and business addresses of officers and/or directors:

## A. DIRECTORS

Chairman: _____

Address: _____

_____

Vice Chairman: _____

Address: _____

Director: Michael Middleman

Address: 14205 SE 36th Street

Bellevue, WA 98006

Director: Gregory Middleman

Address: 14205 SE 36th Street

Bellevue, WA 98006

## B. OFFICERS

President: Rahul Mewnwallu

Address: 14205 SE 36th Street

Bellevue, WA 98006

Vice President: Gregory Middleman

Address: 14205 SE 36th Street

Bellevue, WA 98006

Secretary: _____

Address: _____

Treasurer: _____

Address: _____

**NOTE:** If necessary, you may attach an addendum to the application listing additional officers and/or directors.

12. _____
### Signature of Director or Officer

The officer or director signing this document (and who is listed in number 11 above) affirms that the facts stated herein are true and that he or she is aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

Gregory Middleman, Vice President
13. _____
### (Typed or printed name and capacity of person signing application)



Page 1

The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "XPANSE, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FOURTEENTH DAY OF AUGUST, A.D. 2020.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL FRANCHISE TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

7990147  8300

SR# 20206753406

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203470871

Date: 08-14-20

Arizona Corporation Commission - RECEIVED: 8/21/2020          20082414454227
Arizona Corporation Commission - FILED: 8/21/2020

| Clear Form | | Print Form |

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# APPLICATION FOR AUTHORITY
## TO TRANSACT BUSINESS OR CONDUCT AFFAIRS IN ARIZONA
*Read the Instructions C018i*

1. **ENTITY TYPE – check only one** to indicate the type of entity applying for authority:

   [X] FOR-PROFIT CORPORATION          [ ] INSURER
   [ ] NONPROFIT CORPORATION           [ ] SAVINGS AND LOAN  ASSOCIATION
   [ ] PROFESSIONAL CORPORATION        [ ] CREDIT UNION
   [ ] CLOSE CORPORATION               [ ] COOPERATIVE MARKETING ASSOCIATION
   [ ] CORPORATION SOLE                [ ] ELECTRIC COOPERATIVE NON-PROFIT MEMBERSHIP ASSOC.
                                       [ ] NONPROFIT ELEC. GENERATION AND TRANSMISSION COOPERATIVE CORP.

2. **NAME IN STATE OR COUNTRY OF INCORPORATION (FOREIGN NAME)** – enter the exact, true name of the foreign corporation:

   Xpanse, Inc.

3. **NAME TO BE USED IN ARIZONA (ENTITY NAME)** – *see Instructions C018i* - identify the name the foreign corporation will use in Arizona by checking 3.1, 3.2, or 3.3 (check only one), and follow instructions

| 3.1 [X] | Name in state or country of incorporation, with no changes – Go to number 4. | 3.2 [ ] | Name in state or country of incorporation, *with a corporate identifier added* to it – Enter the name in number 3.4 below. | 3.3 [ ] | Fictitious name (check this *only if* the foreign corporation's name in its state or country of incorporation is not available for use in Arizona) – Enter the name in number 3.4 below. |

3.4  If you checked 3.2 or 3.3, enter or print the name to be used in Arizona:

4. **FOREIGN DOMICILE** – list the state or country in which the foreign corporation is incorporated: ___Delaware___

5. **DATE OF INCORPORATION IN FOREIGN DOMICILE:** ___05/27/2020___

6. **DURATION** – if the duration or life period of the foreign corporation is perpetual (forever), then skip this **section** and continue to number 7 or number 8. Otherwise, check the box below *and* fill in the date:

   [ ] The foreign corporation life period will end on this **date:** _____ (enter a date)

7. **PURPOSE** – the foreign corporation's purpose is to engage in any or all lawful business or affairs in which corporations may engage in the state or country under whose law the foreign corporation is incorporated, subject to the following **limitations**, if any (*leave this blank if there are no limitations on the corporation's purpose*):

   _____

20082414454227

8. **CHARACTER OF BUSINESS** – briefly describe the character of business or affairs the foreign corporation initially intends to conduct in Arizona.  NOTE that the character of business or affairs that the foreign corporation ultimately conducts is not limited by the description provided.

Software development

| 9.  **PRINCIPAL OFFICE ADDRESS - FOREIGN DOMICILE STREET ADDRESS** – *see Instructions C018i* – give the **physical or street address** (not a P. O. Box) of the foreign corporation required to be maintained in its state or country of incorporation, or, if not so required, of the foreign corporation's statutory agent in its state or country of incorporation: | 10. **ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:** Is the Arizona known place of business street address the same as the **street address** of the statutory agent? <br> ☒ Yes  - go to number 11 and continue. <br> ☐ No  - provide the Arizona physical or street address (not a P.O. Box) below: |
|---|---|
| Attention (optional) | Attention (optional) |
| 1209 Orange Street | |
| Address 1 | Address 1 |
| Address 2 (optional)    DE    Zip 19801 <br> City Wilmington    State | Address 2 (optional) <br> City    State    Zip |

| 11.  **STATUTORY AGENT IN ARIZONA** – *see Instructions C018i:* | |
|---|---|
| 11.1  *REQUIRED* – give the **name** (can be an individual or an entity) **and *physical or street address*** (not a P.O. Box) in Arizona of the statutory agent: | 11.2  *OPTIONAL* – mailing address in Arizona of statutory agent (can be a P.O. Box): |
| C T Corporation System | |
| Statutory Agent Name (required) | |
| Attention (optional) | Attention (optional) |
| 3800 North Central Avenue, Suite 460 | |
| Address 1 | Address 1 |
| Address 2 (optional) <br> City Phoenix    State AZ    Zip 85012 | Address 2 (optional) <br> City    State    Zip |
| 11.3  *REQUIRED* – the Statutory Agent Acceptance form M002 must be submitted along with this Application For Authority. | |

| 12.  **DIRECTORS** - list the **name and business address** of each and every Director of the corporation.  If more space is needed, check this box ☐ and complete and attach the Director Attachment form C082. | |
|---|---|
| Michael Middleman | Gregory Middleman |
| Director Name | Director Name |
| 14205 SE 36th Street | 14205 SE 36th Street |
| Address 1 | Address 1 |
| Address 2 (optional) <br> Bellevue    WA    98006 | Address 2 (optional) <br> Bellevue    WA    98006 |
| City   UNITED STATES    State or Province    Zip <br> Country | City   UNITED STATES    State or Province    Zip <br> Country |
| Date taking office (optional): | Date taking office (optional): |

20082414454227

| Director Name | | | Director Name | | |
|---|---|---|---|---|---|
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State or Province | Zip | City | State or Province | Zip |
| Country | | | Country | | |
| Date taking office (optional): | | | Date taking office (optional): | | |

| Director Name | | | Director Name | | |
|---|---|---|---|---|---|
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State or Province | Zip | City | State or Province | Zip |
| Country | | | Country | | |
| Date taking office (optional): | | | Date taking office (optional): | | |

**13. OFFICERS** - list the **name and business address** of all principal Officers of the corporation. If more space is needed, check this box ☐ and complete and attach the Officer Attachment form C085.

| Rahul Mewawalla | | | Gregory Middleman | | |
|---|---|---|---|---|---|
| Officer Name | | | Officer Name | | |
| 14205 SE 36th Street | | | 14205 SE 36th Street | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| Bellevue | WA | 98006 | Bellevue | WA | 98006 |
| City | State or Province | Zip | City | State or Province | Zip |
| UNITED STATES | | | UNITED STATES | | |
| Country | | | Country | | |
| Date taking office (optional): | Officer title: President | | Date taking office (optional): | Officer Title: VicePresident | |

| Officer Name | | | Officer Name | | |
|---|---|---|---|---|---|
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State or Province | Zip | City | State or Province | Zip |
| Country | | | Country | | |
| Date taking office (optional): | Officer Title: | | Date taking office (optional): | Officer Title: | |

| Officer Name | | | Officer Name | | |
|---|---|---|---|---|---|
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | | | Address 2 (optional) | | |
| City | State or Province | Zip | City | State or Province | Zip |
| Country | | | Country | | |
| Date taking office (optional): | Officer Title: | | Date taking office (optional): | Officer Title: | |

2008241454227

14. **FOR-PROFITS ONLY – SHARES AUTHORIZED –** *see Instructions C018I* – list the class (common, preferred, etc.) and total number of shares the foreign corporation is AUTHORIZED to issue. This information must match the original Articles of Incorporation plus any amendments thereto. If more space is needed, check this box ☐ and complete and attach the Shares Authorized Attachment form C087.

Class: Common stock          Series: _____          Total: 10,000

Class: _____          Series: _____          Total: _____

15. **FOR-PROFITS ONLY – SHARES ISSUED –** *see Instructions C018I* – list each class/series of authorized shares and give the total number and par value of shares of that class that have been ISSUED. If no shares of that class have been issued, put the number zero. If more space is needed, check this box ☐ and complete and attach the Shares Issued Attachment form C097.

Class: Common stock          Series: _____          Total: 1,000

Class: _____          Series: _____          Total: _____

16. **NONPROFITS ONLY – MEMBERS – check one box only:**

Does the foreign nonprofit corporation have members?          ☐ Yes          ☐ No

17. **PROFESSIONAL CORPORATIONS ONLY – PROFESSIONAL SERVICES –** if "professional corporation" is checked in number 1, briefly describe the type of professional services the corporation will render (examples: accounting, medical, law firm): _____

18. **PROFESSIONAL CORPORATIONS ONLY – PROFESSIONAL LICENSE:**

By the signature appearing on this document, the foreign professional corporation certifies under penalty of law that at least one-half of its shareholders who are entitled to vote for the election of directors, and at least one-half of its directors, and its president, are licensed in one or more states to render a professional service described in the foreign professional corporation's articles of incorporation.

NOTE:   **You must attach a statement from the licensing authority in Arizona for the profession showing that at least one of the professional corporation's shareholders or employees is licensed in Arizona to render that professional service.** (See A.R.S. § 10-2245.)

SIGNATURE:   By checking the box marked "I accept" below, I acknowledge *under penalty of law* that this document together with any attachments is submitted in compliance with Arizona law.

☒ I ACCEPT

*Greg Middleman*
Signature

Gregory Middleman
Printed Name

8/17/20
Date

**REQUIRED – check only one:**

| ☐ I am the **Chairman of the Board of Directors** of the corporation filing this document. | ☒ I am a duly-authorized **Officer** of the corporation filing this document. | ☐ I am a duly authorized **bankruptcy trustee**, receiver, or other court-appointed fiduciary for the corporation filing this document. |
|---|---|---|

| Filing Fee: $175.00 (regular processing)<br>Expedited processing – add $35.00 to filing fee.<br>All fees are nonrefundable – see Instructions. | Mail:   Arizona Corporation Commission - Corporate Filings Section<br>1300 W. Washington St., Phoenix, Arizona  85007<br>Fax:   602-542-4100 |
|---|---|

Please be advised that A.C.C. forms reflect only the minimum provisions required by statute. You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are public record and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

20082414454227

Clear Form                                                                    Print Form

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE
*Please read Instructions* <u>M002i</u>

1.  **ENTITY NAME** – give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Articles of Incorporation):

    Xpanse, Inc.

2.  **STATUTORY AGENT NAME** – give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

    C T Corporation System

3.  **STATUTORY AGENT SIGNATURE:**

    By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

    The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

    | | | |
    |---|---|---|
    | *Nichol McCroy* | Nichol McCroy, Assistant Secretary | 08/24/2020 |
    | Signature | Printed Name | Date |

**REQUIRED** – check only one:

| ☐ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☑ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |
|---|---|

Expedited or Same Day/Next Day services are available for an additional fee – see Instructions or Cover sheet for prices.

| Filing Fee: none (regular processing)<br>All fees are nonrefundable - see Instructions. | Mail: | Arizona Corporation Commission - Examination Section<br>1300 W. Washington St., Phoenix, Arizona 85007 |
|---|---|---|
| | Fax: | 602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

M002.005
Rev. 3/2020

Arizona Corporation Commission – Corporations Division
Page 1 of 1

AZ073 - 04/29/2020 Wolters Kluwer Online

20082414454227

 Clear Form

Print Form

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# CERTIFICATE OF DISCLOSURE

*Read the Instructions C003i*

1. **ENTITY NAME** – give the exact name of the corporation in Arizona:

   Xpanse, Inc.

---

2. **FELONY/JUDGMENT QUESTIONS:**

   Has any person (a) who is currently an officer, director, trustee, or incorporator, or (b) who controls or holds over ten percent of the issued and outstanding common shares or ten percent of any other proprietary, beneficial or membership interest in the corporation been:

   | 2.1 | Convicted of a felony involving a transaction in securities, consumer fraud or antitrust in any state or federal jurisdiction within the five year period immediately preceding the signing of this certificate? | ☐ Yes | ☒ No |
   |---|---|---|---|
   | 2.2 | Convicted of a felony, the essential elements of which consisted of fraud, misrepresentation, theft by false pretenses or restraint of trade or monopoly in any state or federal jurisdiction within the five-year period immediately preceding the signing of this certificate? | ☐ Yes | ☒ No |
   | 2.3 | Subject to an injunction, judgment, decree or permanent order of any state or federal court entered within the five-year period immediately preceding the signing of this certificate, involving any of the following:<br><br>a.  The violation of fraud or registration provisions of the securities laws of that jurisdiction;<br>b.  The violation of the consumer fraud laws of that jurisdiction;<br>c.  The violation of the antitrust or restraint of trade laws of that jurisdiction? | ☐ Yes | ☒ No |
   | 2.4 | If any of the answers to numbers 2.1, 2.2, or 2.3 are **YES**, you **MUST** complete and attach a Certificate of Disclosure Felony/Judgment Attachment form C004. | | |

---

3. **BANKRUPTCY QUESTION:**

   | 3.1 | Has any person (a) who is currently an officer, director, trustee, incorporator, or (b) who controls or holds over twenty percent of the issued and outstanding common shares or twenty percent of any other proprietary, beneficial or membership interest in the corporation, served in any such capacity or held a twenty percent interest in **any other corporation** (not the one filing this Certificate) on the bankruptcy or receivership **of the other corporation** ? | ☐ Yes | ☒ No |
   |---|---|---|---|
   | 3.2 | If the answer to number 3.1 is **YES**, you **MUST** complete and attach a Certificate of Disclosure Bankruptcy Attachment form C005. | | |

---

20082414454227

**IMPORTANT:** If within 60 days of the delivery of this Certificate to the A.C.C. any person not included in this Certificate becomes an officer, director, trustee or person controlling or holding over ten percent of the issued and outstanding shares or ten percent of any other proprietary, beneficial or membership interest in the corporation, the corporation must submit a SUPPLEMENTAL Certificate providing information about that person, signed by all incorporators or by a duly elected and authorized officer.

| SIGNATURE REQUIREMENTS: | |
|---|---|
| Initial Certificate of Disclosure: | This Certificate must be signed by all incorporators. If more space is needed, complete and attach an Incorporator Attachment form C084. |
| Foreign corporations: | This Certificate may be signed by a duly authorized officer or by the Chairman of the Board of Directors. |
| Credit Unions and Loan Companies: | This Certificate must be signed by any 2 officers or directors. |

Gregory Middleman
Name

14205 SE 36th Street
Address 1

Address 2

| Bellevue | WA | 98006 |
|---|---|---|
| City | State | Zip |
| UNITED STATES | | |
| Country | | |

Name

Address 1

Address 2

| | | |
|---|---|---|
| City | State | Zip |
| Country | | |

**SIGNATURE – see Instructions C003i:**

By typing or entering my name and checking the box marked "I accept" below, I acknowledge *under penalty of law* that this document together with any attachments is submitted in compliance with Arizona law.

[x] I ACCEPT

*Greg Middleman*
Signature

Gregory Middleman                    8/17/20
Printed Name                              Date

**SIGNATURE – see Instructions C003i:**

By typing or entering my name and checking the box marked "I accept" below, I acknowledge *under penalty of law* that this document together with any attachments is submitted in compliance with Arizona law.

[ ] I ACCEPT

Signature

Printed Name                              Date

**REQUIRED – check only one:**

[ ] **Incorporator -** I am an incorporator of the corporation submitting this Certificate.

[x] **Officer -** I am an officer of the corporation submitting this Certificate

[ ] **Chairman of the Board of Directors -** I am the Chairman of the Board of Directors of the corporation submitting this Certificate.

[ ] **Director –** I am a Director of the credit union or loan company submitting this Certificate.

**REQUIRED – check only one:**

[ ] **Incorporator -** I am an incorporator of the corporation submitting this Certificate.

[ ] **Officer -** I am an officer of the corporation submitting this Certificate.

[ ] **Chairman of the Board of Directors -** I am the Chairman of the Board of Directors of the corporation submitting this Certificate.

[ ] **Director –** I am a Director of the credit union or loan company submitting this Certificate.

**Expedited or Same Day/Next Day services are available for an additional fee – see Instructions or Cover sheet for prices.**

| Filing Fee: None | Mail: | Arizona Corporation Commission - Examination Section |
|---|---|---|
| All fees are nonrefundable - see Instructions. | | 1300 W. Washington St., Phoenix, Arizona 85007 |
| | Fax: | 602-542-4100 |

Please be advised that A.C.C. forms reflect only the minimum provisions required by statute. You should seek private legal counsel for those matters that may pertain to the individual needs of your business. All documents filed with the Arizona Corporation Commission are public record and are open for public inspection. If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

C003.004
Rev. 3/2020

Arizona Corporation Commission – Corporations Division
Page 2 of 2

AZ004 - 04/29/2020 Wolters Kluwer Online

20082414454227

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "XPANSE, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE ELEVENTH DAY OF AUGUST, A.D. 2020.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL FRANCHISE TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

7990147  8300

SR# 20206694473

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203450633

Date: 08-11-20

20082414454227

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "XPANSE, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-SEVENTH DAY OF MAY, A.D. 2020, AT 9:15 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "ARCHWELL TECHNOLOGY CORPORATION" TO "XPANSE, INC.", FILED THE SEVENTEENTH DAY OF JULY, A.D. 2020, AT 6:25 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "XPANSE, INC.".



Jeffrey W. Bullock, Secretary of State

7990147  8100H
SR# 20206893524

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203522828
Date: 08-24-20

20082414454227

Secretary of State
Division of Corporations
Delivered 09:15 PM 05/27/2020
FILED 09:15 PM 05/27/2020
SR 20204783848 - File Number 7990147

# STATE OF DELAWARE
# CERTIFICATE OF INCORPORATION
## OF
## ARCHWELL TECHNOLOGY CORPORATION
## A STOCK CORPORATION

**First:** The name of this Corporation is <u>Archwell Technology Corporation</u>.

**Second:** Its registered office in the State of Delaware is to be located at Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, 19801. The registered agent in charge thereof is: The Corporation Trust Company.

**Third:** The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

**Fourth:** The amount of the total stock of this corporation is authorized to issue is 10,000 shares with no par value.

**Fifth:** The name and mailing address of the incorporator are as follows:

Scott C. Mahoney, Esquire
Fineman Krekstein & Harris, P.C.
1801 Market Street, Suite 1100
Philadelphia, PA 19103

**Sixth:** No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Sixth shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment.

**Seventh:** Except as otherwise required by statute, the books and records of the corporation may be kept outside of the State of Delaware at such place or places as provided in the By-Laws of the corporation or from time to time designated by the Board of Directors.

Date: May 26, 2020

By: _____
Scott C. Mahoney, Incorporator

{01691140;v1}

DocuSign Envelope ID: 695CC6BE-308C-4593-8FB9-0FE2D38BD3DE

20082414454227

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:25 PM 07/17/2020
FILED 06:25 PM 07/17/2020
SR 20206288475 - File Number 7990147

# STATE OF DELAWARE
## CERTIFICATE OF AMENDMENT
## OF CERTIFICATE OF INCORPORATION

The corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware does hereby certify:

**FIRST:** That at a meeting of the Board of Directors of

Archwell Technology Corporation

resolutions were duly adopted setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

**RESOLVED,** that the Certificate of Incorporation of this corporation be amended by changing the Article thereof numbered "First_____" so that, as amended, said Article shall be and read as follows:

The name of this Corporation is Xpanse, Inc.

**SECOND:** That thereafter, pursuant to resolution of its Board of Directors, a special meeting of the stockholders of said corporation was duly called and held upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

**THIRD:** That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**IN WITNESS WHEREOF,** said corporation has caused this certificate to be signed this ___17___ day of ___July___, 20_20___.

By: _Greg Middleman_____
  Authorized Officer

Title: Vice President

Name: Greg Middleman

  Print or Type

DE011 - 05/26/2020 Wolters Kluwer Online



Form
**SCC759/
921**
(Rev. 08/20)
State Corporation Commission

# Application for Certificate of Authority to Transact Business in Virginia as a Foreign Corporation

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11100996
Filing Number: 2008271004687
Filing Date/Time: 08/27/2020 08:54 AM
Effective Date/Time: 08/27/2020 08:54 AM

**I**  The corporation's name: ___Xpanse, Inc.___

The designated name (if required): _____

The state or other jurisdiction of incorporation: ___Delaware___

The date of incorporation: ___05/27/2020___   The period of duration: ___Perpetual___

**(Mark box, if applicable.)** ☐ The corporation was previously authorized or registered to transact business in Virginia as a foreign business entity. **Provide additional information. (See Instructions.)**

**II**  The post office address, including the street and number, of the corporation's principal office is

| 14205 SE 36th Street | Bellevue | WA | 98006 |
|---|---|---|---|
| (number/street) | (city or town) | (state) | (zip) |

**III**  The name of the corporation's registered agent in VIRGINIA is   ___C T Corporation System___
The registered agent is: **(Mark appropriate box.)**
(1) an individual who is a resident of       (2) ☒  a Virginia or foreign stock or nonstock
Virginia **and**        **OR**        corporation, limited liability company
☐ an officer of the corporation.         or registered limited liability
☐ a director of the corporation.         partnership authorized to transact
☐ a member of the Virginia State Bar.        business in Virginia.

**IV**  A. The corporation's VIRGINIA registered office address, including the street and number, if any, which is identical to the business office of the registered agent, is

| 4701 Cox Road, Suite 285 | Glen Allen | , VA | 23060 |
|---|---|---|---|
| (number/street) | (city or town) | | (zip) |

B. The registered office is physically located in the ☒ county **or** ☐ city of ___Henrico___

**V**  The corporation's officers are:   **List additional officers on an attachment.**

| Name | Title | Business Address |
|---|---|---|
| Rahul Mewawalla | President | 14205 SE 36th Street, Bellevue, WA 98006 |
| Name | Title | Business Address |
| Gregory Middleman | Vice President | 14205 SE 36th Street, Bellevue, WA 98006 |

**VI**  The corporation's directors are:   **List additional directors on an attachment.**

| Name | Business Address |
|---|---|
| Michael Middleman | 14205 SE 36th Street, Bellevue, WA 98006 |
| Name | Business Address |
| Gregory Middleman | 14205 SE 36th Street, Bellevue, WA 98006 |

**VII**  The number of shares the corporation is authorized to issue is:   **List additional stock, itemized by class, on an attachment.**

| 10,000 | Common stock | | |
|---|---|---|---|
| Number | Class | Number | Class |

## Signature

Signed in the name of the foreign corporation by:

| _Greg Middleman_ | 8/25/2020 | |
|---|---|---|
| Signature | Date | Tel. # (optional) |
| Gregory Middleman | Vice President | |
| Printed Name | Title | Email Address (optional) |
| 856-626-2888 | Gregory.Middleman@freedommortgage.com | |
| Business Tel. # (optional) | Business Email Address (optional) | |

**Required Fees: See instructions for calculating**

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "XPANSE, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-SEVENTH DAY OF MAY, A.D. 2020, AT 9:15 O`CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "ARCHWELL TECHNOLOGY CORPORATION" TO "XPANSE, INC.", FILED THE SEVENTEENTH DAY OF JULY, A.D. 2020, AT 6:25 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "XPANSE, INC.".



Jeffrey W. Bullock, Secretary of State

7990147  8100H
SR# 20206941061

Authentication: 203538443
Date: 08-26-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:15 PM 05/27/2020
FILED 09:15 PM 05/27/2020
SR 20204783848 - File Number 7990147

# STATE OF DELAWARE
## CERTIFICATE OF INCORPORATION
### OF
## ARCHWELL TECHNOLOGY CORPORATION
## A STOCK CORPORATION

**First:** The name of this Corporation is Archwell Technology Corporation.

**Second:** Its registered office in the State of Delaware is to be located at Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, 19801. The registered agent in charge thereof is: The Corporation Trust Company.

**Third:** The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

**Fourth:** The amount of the total stock of this corporation is authorized to issue is 10,000 shares with no par value.

**Fifth:** The name and mailing address of the incorporator are as follows:

> Scott C. Mahoney, Esquire
> Fineman Krekstein & Harris, P.C.
> 1801 Market Street, Suite 1100
> Philadelphia, PA 19103

**Sixth:** No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Sixth shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment.

**Seventh:** Except as otherwise required by statute, the books and records of the corporation may be kept outside of the State of Delaware at such place or places as provided in the By-Laws of the corporation or from time to time designated by the Board of Directors.

Date: May 26, 2020

By: _____

Scott C. Mahoney, Incorporator

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:25 PM 07/17/2020
FILED 06:25 PM 07/17/2020
SR 20206288475 - File Number 7990147

# STATE OF DELAWARE
## CERTIFICATE OF AMENDMENT
## OF CERTIFICATE OF INCORPORATION

The corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware does hereby certify:

**FIRST**: That at a meeting of the Board of Directors of

Archwell Technology Corporation

resolutions were duly adopted setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended by changing the Article thereof numbered "First                    " so that, as amended, said Article shall be and read as follows:

The name of this Corporation is Xpanse, Inc.

**SECOND**: That thereafter, pursuant to resolution of its Board of Directors, a special meeting of the stockholders of said corporation was duly called and held upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

**THIRD**: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**IN WITNESS WHEREOF**, said corporation has caused this certificate to be signed this ____17____ day of ____July____, 20 _20_.

By: _____Greg Middleman_____
Authorized Officer

Title: Vice President

Name: Greg Middleman
Print or Type

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

AT RICHMOND, AUGUST 27, 2020

The State Corporation Commission has found the accompanying application for a certificate of authority to transact business in Virginia submitted on behalf of

Xpanse, Inc.

to comply with the requirements of law, and confirms payment of all required fees. Therefore, it is ORDERED that this

CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS IN VIRGINIA

be issued and admitted to record with the application in the Office of the Clerk of the Commission, effective August 27, 2020.

The corporation is authorized to transact business in Virginia, subject to all Virginia laws applicable to the corporation and its business.

STATE CORPORATION COMMISSION

By

Jehmal T. Hudson
Commissioner

05

CSCL/CD-560 (Rev. 10/17)

## MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU

| Date Received | (FOR BUREAU USE ONLY) | |
|---|---|---|
| 9/23/2020 | AC1 S60 MC CEPAS 20092305363267 | |
| | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document. | **FILED** SEP 28 2020 |
| Name | | ADMINISTRATOR CORPORATIONS DIVISION |
| Address | | |
| City | State        ZIP Code | EFFECTIVE DATE: |

Document will be returned to the name and address you enter above.
If left blank, document will be returned to the registered office.

## APPLICATION FOR CERTIFICATE OF AUTHORITY
## TO TRANSACT BUSINESS OR CONDUCT AFFAIRS IN MICHIGAN
### For use by Foreign Corporations
(Please read information and instructions on the last page)

*Pursuant to the provisions of Act 284, Public Acts of 1972 (profit corporations), or Act 162, Public Acts of 1982 (nonprofit corporations), the undersigned execute the following Application:*

1. The name of the corporation is:

   Xpanse, Inc.

2. (Complete this item only if the corporate name in item 1 is not available for use in Michigan.)
   The assumed name of the corporation to be used in all its dealings with the Bureau and in the transaction of its business or conducting of its affairs in Michigan is:

3. It is incorporated under the laws of __Delaware__ .

   The date of its incorporation is __5-27-20__ , and the term of existence

   if other than perpetual is _____ .

4. a. The address of the main business or headquarters office of the corporation is:

   | 14205 SE 36th Street | Bellevue | WA | 98006 |
   |---|---|---|---|
   | (Street Address) | (City) | (State) | (ZIP Code) |

   b. The mailing address if different than above:

   | | | | |
   |---|---|---|---|
   | (Street Address) | (City) | (State) | (ZIP Code) |

PC

MI029 - 08/31/2020 Wolters Kluwer Online

5. The street address of its registered office in Michigan is:

40600 ANN ARBOR RD E STE 201 PLYMOUTH MI _____ , Michigan __48170-4675__
(Street Address)                                          (City)                                          (ZIP Code)

The mailing address of the registered office in Michigan, if different than above:

_____ , Michigan _____
(Street Address or P.O. Box)                     (City)                                 (ZIP Code)

The name of the resident agent at the registered office is: __C T Corporation System__

The resident agent is an agent of the corporation upon whom process against the corporation may be served.

---

6. The specific business or affairs which the corporation is to transact or conduct in Michigan is as follows:

Creation of technology platform

The corporation is authorized to transact such business or conduct those affairs in the jurisdiction of its incorporation.

---

7. (To be completed by profit corporations only)

The total authorized shares of the corporation are: __10,000 common stock__

---

8. If the applicant is a trust, please specify any powers or privileges possessed by the trust that are not possessed by an individual or a partnership.

---

Signed this____21st____ day of ____September____ _____ , __2020__

By_____
Gregory Middleman (Sep 21, 2020 14:18 EDT)
(Signature of Authorized Officer or Agent)

Gregory Middleman, Vice President
(Type of Print Name)

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "XPANSE, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FIRST DAY OF SEPTEMBER, A.D. 2020.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL FRANCHISE TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

7990147  8300

SR# 20207387217

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203699458

Date: 09-21-20



## United States of America
## The State of Michigan

### Department of Licensing and Regulatory Affairs

Lansing, Michigan

This is to Certify That

*XPANSE, INC.*

a *FOREIGN PROFIT CORPORATION* existing under the laws of the state of Delaware

was validly authorized to transact business in Michigan on the 28 day of September , 2020 in conformity with 1972 PA 284.

Said corporation is authorized to transact in this state any business of the character set forth in its application which a domestic corporation formed under this act may lawfully conduct.  The authority shall continue as long as said corporation retains its authority to transact such business in the jurisdiction of its incorporation and its authority to transact business in this state has not been surrendered, suspended or revoked.

This certificate is in due form, made by me as the proper officer, and is entitled to have full faith and credit given it in every court and office within the United States.



*In testimony whereof, I have hereunto set my hand, in the City of Lansing, this 29th day of September , 2020.*

*Linda Clegg, Interim Director*

*Corporations, Securities & Commercial Licensing Bureau*

## APPLICATION BY FOREIGN LIMITED LIABILITY COMPANY FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 605.0902, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN LIMITED LIABILITY COMPANY TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1. Xpanse, LLC
   (Name of Foreign Limited Liability Company; must include "Limited Liability Company," " L.L.C.," or "LLC.")

(If name unavailable, enter alternate name adopted for the purpose of transacting business in Florida. The alternate name must include "Limited Liability Company," "L.L.C," or "LLC.")

2. Delaware
   (Jurisdiction under the law of which foreign limited liability company is organized)

3. 85-2073564
   (FEI number, if applicable)

4. _____
   (Date first transacted business in Florida, if prior to registration.)
   (See sections 605.0904 & 605.0905, F.S. to determine penalty liability.)

5. 14205 SE 36th Street
   (Street Address of Principal Office)

   Bellevue, WA 98006

6. 14205 SE 36th Street
   (Mailing Address)

   Bellevue, WA 98006

7. Name and street address of Florida registered agent: (P.O. Box NOT acceptable)

   Name:               C T Corporation System

   Office Address:     1200 South Pine Island Road

                       Plantation _____ , Florida    33324
                              (City)                      (Zip code)

Registered agent's acceptance:
*Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

                       C T Corporation System

   By: _____ _____    Kimberly Laughrey, Asst. Secretary
                              (Registered agent's signature)

8.  For initial indexing purposes, list names, title or capacity and addresses of the primary members/managers or persons authorized to manage [up to six (6) total]:

| Title or Capacity: | Name and Address: | Title or Capacity: | Name and Address: |
|---|---|---|---|
| ◉ Manager | Name: Archwell Management, LLC | ☐ Manager | Name: Archwell Holdings, LLC |
| ☐ Member | Address: 820 East Gate Drive | ◉ Member | Address: 820 East Gate Drive |
| ☐ Authorized | Suite 1 | ☐ Authorized | Suite 1 |
| Person | Mount Laurel, NJ 08054 | Person | Mount Laurel, NJ 08054 |
| ☐ Other_____ | ☐ Other_____ | ☐ Other_____ | ☐ Other_____ |
| ☐ Manager | Name: Gregory Middleman | ☐ Manager | Name: _____ |
| ☐ Member | Address: 14205 SE 36th Street | ☐ Member | Address: _____ |
| ◉ Authorized | Bellevue, WA 98006 | ☐ Authorized | _____ |
| Person | | Person | _____ |
| ☐ Other_____ | ☐ Other_____ | ☐ Other_____ | ☐ Other_____ |
| ☐ Manager | Name: _____ | ☐ Manager | Name: _____ |
| ☐ Member | Address: _____ | ☐ Member | Address: _____ |
| ☐ Authorized | _____ | ☐ Authorized | _____ |
| Person | | Person | _____ |
| ☐ Other_____ | ☐ Other_____ | ☐ Other_____ | ☐ Other_____ |

Important Notice: Use an attachment to report more than six (6). The attachment will be imaged for reporting purposes only. Non-indexed individuals may be added to the index when filing your Florida Department of State Annual Report form.

9. Attached is a certificate of existence, no more than 90 days old, duly authenticated by the official having custody of records in the jurisdiction under the law of which it is organized. (If the certificate is in a foreign language, a translation of the certificate under oath of the translator must be submitted.)

10. This document is executed in accordance with section 605.0203 (1) (b), Florida Statutes. I am aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

_____
Signature of an authorized person

Gregory Middleman
_____
Typed or printed name of signee

FL03T - 1/21/2020 Wolters Kluwer Online



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "XPANSE, LLC" IS DULY FORMED UNDER THE
LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A
LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF
THE FOURTH DAY OF FEBRUARY, A.D. 2021.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN
PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

7990147  8300
SR# 20210339913
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202445844
Date: 02-04-21

Arizona Corporation Commission - RECEIVED: 2/11/2021
Arizona Corporation Commission - FILED: 2/11/2021

21021110003955

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# FOREIGN REGISTRATION STATEMENT
*Please read Instructions L025i*

1. **ENTITY TYPE – check only one** to indicate the type of entity applying for registration:

   [X] LIMITED LIABILITY COMPANY   [ ] PROFESSIONAL LIMITED LIABILITY COMPANY   [ ] SERIES LLC

2. **NAME IN STATE OR COUNTRY OF FORMATION (FOREIGN NAME) –** enter the exact, true name of the foreign LLC:

   Xpanse, LLC

3. **NAME TO BE USED IN ARIZONA (ENTITY NAME) –** identify the name the foreign LLC will use in Arizona by checking 3.1 *or* 3.2 (check only one), and follow instructions:
   NOTE: For a foreign series LLC, "Series" must be included in the name.

   3.1   [X]   **Name in state or country of formation**, with no changes or additions – go to number 4 and continue.

   3.2   [ ]   **Fictitious name** – check this if the foreign LLC's name in its state or country of formation is not available for use in Arizona or if that name does not contain an LLC identifier, and enter the name in number 3.3 below. **NOTE –** a resolution of the company adopting the fictitious name must be attached to and submitted with this form.

   3.3   **If you checked 3.2**, enter or print the name to be used in Arizona:

4. **PROFESSIONAL LIMITED LIABILITY COMPANY SERVICES –** if professional LLC is checked in number 1 above, describe the professional services that the professional LLC will provide (examples: law firm, accounting, medical):

5. **FOREIGN DOMICILE –** list the state or country in which the foreign LLC was formed:   Delaware

6. **DATE OF FORMATION IN FOREIGN DOMICILE:** 05/27/2020

7. **PURPOSE OR GENERAL CHARACTER OF BUSINESS –** describe or state the purpose of the foreign LLC or the general character of the business it proposes to transact in Arizona:
   Software development

L025.004
Rev. 3/2020

Arizona Corporation Commission - Corporations Division
Page 1 of 4

AZ061 - 11/02/2020 Wolters Kluwer Online

## 8.  STATUTORY AGENT IN ARIZONA:

| 8.1  REQUIRED – give the **name** (can be an individual or an entity) **and physical or street address** (not a P.O. Box) in Arizona of the statutory agent: | | | 8.2  REQUIRED - mailing address in Arizona of statutory agent, if different from street address (can be a P.O. Box):  ☒  Check box if same as street address. | | |
|---|---|---|---|---|---|
| C T Corporation System | | | | | |
| Statutory Agent Name (required) | | | | | |
| Attention (optional) | | | Attention (optional) | | |
| 3800 North Central Avenue, Suite 460 | | | | | |
| Address 1 | | | Address 1 | | |
| Address 2 (optional) | AZ | 85012 | Address 2 (optional) | State | Zip |
| City   Phoenix | State | Zip | City | | |

**8.3**  REQUIRED – the Statutory Agent Acceptance form M002 must be submitted along with this Application For Registration.

## 9.  PRINCIPAL MAILING ADDRESS - FOREIGN LLC – see Instructions L025i

Give the **mailing address** of the foreign LLC (not required to, but can be in Arizona and may be a P.O. Box):

| Attention (optional) | | |
|---|---|---|
| 14205 SE 36th Street | | |
| Address 1 | | |
| Address 2 (optional) | WA | 98006 |
| Bellevue | | |
| City | State or Province | Zip |
| UNITED STATES | | |
| Country | | |

## 10.  JURISDICTION OF FORMATION:

**10.1**  Does the jurisdiction of formation require the LLC to maintain a street address in that jurisdiction?

☐ Yes  - complete number 10.2 and continue.
☒ No   - complete number 10.3 and continue.

**10.2**  If you answered "yes" to number 10.1, give the Foreign LLC street address in jurisdiction of formation.

| Attention (optional) | | |
|---|---|---|
| Address 1 | | |
| Address 2 (optional) | State or Province | Zip |
| City | | |
| Country | | |

L025.004
Rev. 3/2020

Arizona Corporation Commission - Corporations Division
Page 2 of 4

**10.3**  If you answered "no" to number 10.1, give the name and addresses of the statutory agent in jurisdiction of formation of Foreign LLC.

Statutory agent name:   C T Corporation System

Street address in jurisdiction of formation:

| | | |
|---|---|---|
| Attention (optional) | | |
| 1209 Orange Street | | |
| Address 1 | | |
| Corporation Trust Center | | |
| Address 2 (optional) | DE | 19801 |
| Wilmington | | |
| City | State or Province | Zip |
| UNITED STATES | | |
| Country | | |

Mailing address in jurisdiction of formation:

| | | |
|---|---|---|
| Attention (optional) | | |
| 1209 Orange Street | | |
| Address 1 | | |
| Corporation Trust Center | | |
| Address 2 (optional) | DE | 19801 |
| Wilmington | | |
| City | State or Province | Zip |
| UNITED STATES | | |
| Country | | |

**11.   INFORMATION REGARDING DESIGNATING FOREIGN COMPANY OF THE FOREIGN SERIES –** *see Instructions L025i*

**11.1   DESIGNATING FOREIGN COMPANY NAME IN JURISDICTION OF FORMATION (FOREIGN NAME)** - enter the exact, true name of the Designating Foreign Company:

_____

**11.2   FOREIGN DOMICILE** - list the jurisdiction in which the Designating Foreign Company was formed:

_____

**11.3   DATE OF FORMATION** - list the date on which the Designating Foreign Company was formed:   [                    ]

## COMPLETE NUMBER 12 OR NUMBER 13 – NOT BOTH.

**12.   MANAGER-MANAGED LLC –** *see Instructions L025i* **–** check this box [x] if management of the LLC is vested in a manager or managers, and complete and attach the Manager Structure Attachment form L040. *The filing will be rejected if it is submitted without the attachment.*

**13.   MEMBER-MANAGED LLC –** *see Instructions L025i* **–** check this box [ ] if management of the LLC is reserved to the members, and complete and attach the Member Structure Attachment form L041. *The filing will be rejected if it is submitted without the attachment.*

**14.   SIGNATURE:**   By checking the box marked "I accept" below, I acknowledge *under penalty of law* that this document together with any attachments is submitted in compliance with Arizona law.

☒ I ACCEPT

| | | |
|---|---|---|
| _Signature_ | Gregory Middleman<br>Printed Name | February 3, 2021<br>Date |

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| ☒ I am an **individual** authorized to sign this document. | ☐ I am signing on behalf of an **entity** that is authorized to sign this document. |
|---|---|

**Expedited or Same Day/Next Day services are available for an additional fee – see Instructions or Cover sheet for prices.**

| Filing Fee:  $150.00 (regular processing)<br>All fees are nonrefundable - see Instructions. | Mail: | Arizona Corporation Commission - Examination Section<br>1300 W. Washington St., Phoenix, Arizona  85007 |
|---|---|---|
| | Fax: | 602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.  All documents filed with the Arizona Corporation Commission are public record and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

L025.004
Rev. 9/2020
AZ063 - 11/02/2020 Wolters Kluwer Online

Arizona Corporation Commission - Corporations Division
Page 4 of 4

21021110003955

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# MANAGER STRUCTURE ATTACHMENT

1. **ENTITY NAME** – give the exact name of the LLC (foreign LLCs – give name in domicile state or country):

   Xpanse, LLC

2. **MANAGERS / MEMBERS** – give the name and address of each and every **manager** *and* list all **members who own 20% or more** of the profits or capital of the LLC. **Use one block per person**. Check the appropriate box or boxes below each person listed. If more space is needed, use another Manager Structure Attachment form.

| 1. Archwell Management, LLC | 2. Archwell Holdings, LLC |
|---|---|
| Name | Name |
| 820 East Gate Drive | 820 East Gate Drive |
| Address 1 | Address 1 |
| Suite 1 | Suite 1 |
| Address 2 (optional) | Address 2 (optional) |
| Mount Laurel   NJ   08054 | Mount Laurel   NJ   08054 |
| City   State or Province   Zip | City   State or Province   Zip |
| UNITED STATES | UNITED STATES |
| Country | Country |
| ☑ Manager   ☐ Member owning 20% or more | ☐ Manager   ☑ Member owning 20% or more |
| 3. | 4. |
| Name | Name |
| Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional) |
| City   ▼   State or Province   Zip | City   ▼   State or Province   Zip |
| Country | Country |
| ☐ Manager   ☐ Member owning 20% or more | ☐ Manager   ☐ Member owning 20% or more |
| 5. | 6. |
| Name | Name |
| Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional) |
| City   ▼   State or Province   Zip | City   ▼   State or Province   Zip |
| Country | Country |
| ☐ Manager   ☐ Member owning 20% or more | ☐ Manager   ☐ Member owning 20% or more |

21021110003955



DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE
*Please read Instructions M002i*

1. **ENTITY NAME –** give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Articles of Incorporation):

   Xpanse, LLC

2. **STATUTORY AGENT NAME –** give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

   C T Corporation System

3. **STATUTORY AGENT SIGNATURE:**

   By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

   The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

   | | | |
   |---|---|---|
   | *Nichol McCroy* | Nichol McCroy, C T Corporation System | 02/10/2021 |
   | Signature | Assistant Secretary    Printed Name | Date |

**REQUIRED** – check only one:

| ☐ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☒ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |
|---|---|

**Expedited or Same Day/Next Day services are available for an additional fee – see Instructions or Cover sheet for prices.**

| | | |
|---|---|---|
| Filing Fee:  none (regular processing)<br>All fees are nonrefundable - see Instructions. | Mail:<br><br>Fax: | Arizona Corporation Commission - Examination Section<br>1300 W. Washington St., Phoenix, Arizona 85007<br>602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

21021110003955



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "XPANSE, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FOURTH DAY OF FEBRUARY, A.D. 2021.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

7990147  8300
SR# 20210339913
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202445844

Date: 02-04-21

# Delaware

## The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "XPANSE, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "XPANSE, INC." TO "XPANSE, LLC", FILED IN THIS OFFICE ON THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2020, AT 6:28 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF CONVERSION IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2020 AT 11:59 O'CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

7990147 8100V
SR# 20210355108

Authentication: 202454074
Date: 02-05-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

21021110003955

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:28 PM 12/28/2020
FILED 06:28 PM 12/28/2020
SR 20208773902 - File Number 7990147

## STATE OF DELAWARE
## CERTIFICATE OF CONVERSION
## FROM A CORPORATION TO A
## LIMITED LIABILITY COMPANY PURSUANT TO
## SECTION 18-214 OF THE LIMITED LIABILITY
## COMPANY ACT

1.) The jurisdiction where the Corporation first formed is Delaware            .

2.) The jurisdiction immediately prior to filing this Certificate is Delaware      .

3.) The date the corporation first formed is May 27, 2020                  .

4.) The name of the Corporation immediately prior to filing this Certificate is
Xpanse, Inc.                                            .

5.) The name of the Limited Liability Company as set forth in the Certificate of
Formation is Xpanse, LLC                                      .

6.) The effective date of the conversion shall be 11:59 p.m. December 31, 2020.

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the
24th        day of December        , A.D. 2020            .

By: *Michael Middleman*
Authorized Person

Name: Michael Middleman
Print or Type

Xpanse, Inc.
File Number: 7990147

21021110003955



# Delaware

Page 1

The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "XPANSE, LLC", FILED IN

THIS OFFICE ON THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2020, AT

6:28 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF

THE AFORESAID CERTIFICATE OF FORMATION IS THE THIRTY-FIRST DAY

OF DECEMBER, A.D. 2020 AT 11:59 O'CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

7990147  8100
SR# 20210355108

Authentication: 202454075
Date: 02-05-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

21021110003955

# STATE OF DELAWARE
# CERTIFICATE OF FORMATION
# OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1.     The name of the limited liability company is Xpanse, LLC

2.     The Registered Office of the limited liability company in the State of Delaware is located at Corporation Trust Center, 1209 Orange St                    (street), in the City of Wilmington                    , Zip Code 19801                    . The name of the Registered Agent at such address upon whom process against this limited liability company may be served is The Corporation Trust Company

By: *Michael Middleman*

Authorized Person

Name: Michael Middleman

Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:28 PM 12/28/2020
FILED 06:28 PM 12/28/2020
SR 20208773902 - File Number 7990147

Xpanse

HOME     CAREERS     LEADERSHIP

**RAHUL MEWAWALLA**

CEO & CO-FOUNDER

Rahul is a technology, digital and business leader having built, grown and led a number of technology businesses, platforms and products across both Fortune 500 companies and Silicon Valley high growth companies.

Over the course of his career he has led revenue growth, built and led operating teams, developed, built and scaled industry-leading platforms and products, and drove large-scale market growth.

Rahul has received numerous awards and honors and has been featured in major publications for technology and business successes.

[ Connect with Rahul ]

in 🐦

©2020 XPANSE, INC.