1
2
3
4                   UNITED STATES DISTRICT COURT

5                 NORTHERN DISTRICT OF CALIFORNIA

6

7    RAHUL MEWAWALLA,                        Case No.  21-cv-09700-EMC

8                  Plaintiff,

9          v.                                ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANTS'
10   STANLEY C. MIDDLEMAN, et al.,           MOTION TO DISMISS

11                 Defendants.               Docket No. 12

12

13

14                  I.        **INTRODUCTION**

15         Plaintiff Rahul Mewawalla ("Plaintiff") brings this action against his former employers,

16   supervisors, and several of their associates for fraud, breach of contract, various California

17   statutory offenses, constructive trust, equitable accounting, and declaratory relief.  Defendants

18   include corporate entities Freedom Mortgage Corporation ("FMC"), Xpanse LLC ("Xpanse"),

19   Keystone B2B LLC ("Keystone"), Archwell Holdings LLC, Archwell Solutions LLC, and

20   Archwell Management LLC (collectively referred to as the "Archwell entities"), as well as the

21   corporations' directors, Stanley Middleman, Michael Middleman, Gregory Middleman, and Erik

22   Anderson.

23         Before the Court is defendants' motion to dismiss the complaint on the following grounds:

24   (i) lack of personal jurisdiction under Federal Rules of Civil Procedure 12(b)(2), and (ii) failure to

25   state a claim under Federal Rules of Civil Procedure 12(b)(6).  For the reasons set forth below, the

26   Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

27                  II.       **BACKGROUND**

28         In early 2019, Plaintiff began speaking with Stanley Middleman, CEO of FMC, about the

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1   Middleman family's desire to create a tech company that would develop and market technology

2   for lenders and service providers in the mortgage industry.  Complaint ¶ 15.  Stanley Middleman

3   and Michael Middleman wanted to hire Plaintiff to work at FMC and later lead the family's new

4   technology company.  *Id.* ¶¶ 21-22.

5          Stanley Middleman and Michael Middleman, who serves as FMC's Executive Vice

6   President, began negotiating Plaintiff's terms of employment and discussing plans for the new

7   technology company with Plaintiff in 2019.  *Id.* ¶ 15.  Plaintiff alleges that during these

8   discussions he made clear that receiving meaningful equity in the new technology company was

9   required for him to consider the position at FMC.  *Id.*

10         During these negotiations, Stanley Middleman detailed his plans for the new technology

11  company, describing it as a multi-billion-dollar opportunity.  *Id.* ¶ 20.  Plaintiff alleges that

12  Stanley Middleman assured Plaintiff that FMC would contribute 140 to 150 million in yearly

13  recurring revenue to the new technology company in order to help the technology company reach

14  multi-billion-dollar status.  *Id.* ¶ 17.  Plaintiff also alleges that Stanley Middleman promised that

15  FMC and Archwell Holdings would transfer substantial intellectual property to the new company

16  (*Id.* ¶¶ 19-20); that the new company would be an independent, public facing corporation unlike

17  the Middleman's other closely held companies (*Id.* ¶ 17); and that Stanley Middleman would

18  convince other leading U.S. mortgage companies to contribute and work with the new company.

19  *Id.* ¶ 18.

20         Negotiations continued, and on November 7, 2020, Plaintiff, Stanley Middleman, Michael

21  Middleman, and other executives met to finalize the employment contract's terms.  *Id.* ¶ 22.

22  During this conversation, Stanley Middleman reiterated many of the representation he had made

23  about the new technology company, promising that Plaintiff's equity in the company would be

24  significant and that Plaintiff's position at the new company would be long-term.  Complaint ¶¶ 26-

25  28.

26         During this conversation, Plaintiff allegedly warned Stanley Middleman that he had an

27  employment offer from another large company which included substantial equity.  *Id.* ¶ 26.  In

28  response, Stanley Middleman told Plaintiff that he expected Plaintiff to take the new technology

company public and lead it through an IPO. *Id.* Stanley Middleman also assured Plaintiff that Plaintiff's employment would transfer from FMC to the new technology company after the new technology company was incorporated. *Id.* ¶¶ 26-27.

Plaintiff and FMC finally reached an agreement on February 18, 2020 with Stanley Middleman signing the employment contract on behalf of FMC. *Id.* ¶ 39. The FMC contract specified that Plaintiff would serve as FMC's Chief Digital Officer, "based and working in San Francisco," until entering into an "employment agreement with [the new technology company] in a form that is mutually agreeable to the parties." *Id.* (Ex. A at 100). An unsigned employment contract for the new technology was attached as an exhibit to Plaintiff's contract with FMC. *Id.* (Ex. A at 132). The unsigned employment contract for the new technology company was substantially the same as the signed FMC contract.

The employment duties listed in Plaintiff's FMC contract included "creating, and running a new affiliate of the Company." *Id.* (Ex. A at 100). The FMC contract also specified that Plaintiff would be issued equity in the new technology company once his employment was transferred from FMC to the new company and an equity plan was created. *Id.* (Ex. A at 103). On May 27, 2020, a few months after Plaintiff began working for FMC, Defendants incorporated the new technology company, later naming it Xpanse. *Id.* ¶ 42.

Plaintiff does not allege that he or Xpanse ever signed the employment contract that was attached to Plaintiff's FMC contract. However, Plaintiff maintains that he began working for Xpanse after it was incorporated, hiring employees, creating a business strategy, and building out Xpanse's technology. *Id.* ¶ 43-47. Despite their alleged refusal to transfer Plaintiff's employment to Xpanse, the Middlemans required Plaintiff to move to Bellevue, Washington where Xpanse had decided to move headquarters. *Id.* ¶ 76. Plaintiff was also listed as Xpanse's CEO on its website. *Id.* ¶ 44.

Several months into his tenure at FMC and Xpanse, Plaintiff's relations with the Middleman's began to sour. Though Plaintiff believed that he would be made the leader of Xpanse and run it as a publicly facing company, the Middlemans allegedly failed to officially transfer Plaintiff's employment from FMC to Xpanse. Complaint ¶ 51. The Middlemans also did

not allow Plaintiff to run Xpanse as an independent company.  *Id.* ¶ 65.

Additionally, Plaintiff alleges that he and Defendants failed to agree on an equity plan for Xpanse, causing the equity which Plaintiff had been promised to never issue.  *Id.* ¶ 84.  In addition to failing to issue the equity, Defendants allegedly took actions which decreased the overall value of Xpanse's equity and were not in line with statements that had been made during Plaintiff's employment contract negotiations.  These actions included:

- Failing to transfer IP and technology staff from FMC to Xpanse.  *Id.* ¶ 59.

- Failing to transfer 140 to 150 million in annual revenue from FMC to Xpanse.  *Id.* ¶ 73.

- Prohibiting Plaintiff from discussing revenue agreements with other U.S. mortgage companies as Stanley Middleman had promised.  *Id.* ¶ 65.

- Converting Xpanse from a corporation to an LLC, so that it no longer operated as an independent corporation.  *Id.* ¶ 128.

In tandem with these failings, defendants Stanley Middleman, Gregory Middleman, Michael Middleman, and Erik Anderson pressured Plaintiff to participate in a plan which Plaintiff believed was illegal.  *Id.* ¶¶ 90-91.  In September 2020, during discussions surrounding Xpanse's equity plan, Gregory Middleman represented to Plaintiff that he wanted to "demonstrate externally during fundraising events. . . that the share value for all equity holders was equal," while internally calculating the share value for the Middleman family differently by crediting their "shares with additional several million in revenue through and related to their affiliated entities."  *Id.* ¶ 90.  After Gregory Middleman unveiled this plan, Stanley Middleman, Gregory Middleman, and Michael Middleman, all on separate occasions, threatened that "[Plaintiff] would suffer adverse consequences if he did not endorse their scheme."  Complaint ¶ 94.

Several months later, on December 15, 2020, Plaintiff met with Michael Middleman and Erik Anderson and discussed the share evaluation scheme.  *Id.* ¶ 105.  Plaintiff refused to go along with the plan and asked to reveal the scheme to his leadership team at Xpanse.  *Id.* ¶ 108.  In response, Michel Middleman and Erik Anderson "issued an ultimatum to Plaintiff to submit to the secret equity scheme . . . or face adverse consequences."  *Id.* ¶ 111.  Roughly a month later, on

1    January 21, 2021, Stanley Middleman informed Plaintiff that he was fired for cause.  *Id.* ¶ 134.

2    **III.    <u>MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION</u>**

3    A.    <u>Legal Standard</u>

4    Under Federal Rule of Civil Procedure 12(b)(2), a court must dismiss an action where it

5    does not have personal jurisdiction over the defendant.  Where, as here, no federal statute

6    authorizes personal jurisdiction, the court applies the law of the state in which the court sits.

7    *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir.1998).  California's long-arm

8    statute, Cal. Code Civ. P. § 410.10, extends to the limits of federal due process requirements, so

9    the Court need only conduct jurisdictional analysis under federal due process.  *Schwarzenegger v.*

10   *Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir.2004).

11   Personal jurisdiction may be either general or specific.  *Bancroft & Masters, Inc. v.*

12   *Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).  Additionally, the Supreme Court has

13   acknowledged that, because "the personal jurisdiction requirement is a waivable right, there are a

14   'variety of legal arrangements' by which a litigant may give 'express or implied consent to the

15   personal jurisdiction of the court.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14

16   (1985) (citation omitted).  This includes consenting to a court's jurisdiction by contract.  *See id.*

17   ("[P]arties frequently stipulate in advance to submit their controversies for resolution within a

18   particular jurisdiction."); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964)

19   ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court...").

20   B.    <u>Discussion</u>

21   Plaintiff does not contend that Defendants are subject to general personal jurisdiction.

22   Rather, he argues that this Court may exercise jurisdiction over FMC and Xpanse because they

23   have consented to jurisdiction per his employment contract.  Opposition at 19.  He further argues

24   that all Defendants have sufficient minimum contacts with California to justify the exercise of

25   specific personal jurisdiction.  Opposition at 16-19.

26   1.    <u>Forum Selection Clause</u>

27   Plaintiff contends that the following clause in his employment contract with FMC

28   constitutes consent to jurisdiction in California, at least as to FMC and Xpanse:

United States District Court
Northern District of California

5

> "This Agreement shall be governed by and construed in accordance with the laws of the state of California.  Any action, suit or other legal proceeding arising under or related to any provision of this Agreement shall be commenced. . . in California. . . and [FMC] and [Plaintiff] consents to jurisdiction of such court."

Complaint ¶ 173 (Ex. A at 107).  The contract was signed by Stanley Middleman, the CEO of FMC, on behalf of FMC.  *Id.* (Ex. A at 110).  Defendants concede that, as a signatory to the agreement, the clause subjects FMC to the jurisdiction of California courts.  Reply at 6.  However, Defendants argue that the clause cannot bind Xpanse because it did not sign the contract.  *Id.*

The general rule is "that a contract cannot bind a nonparty."  *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  However, as the Ninth Circuit noted in *Manetti-Farrow, Inc. v. Gucci America, Inc.*, "[a] forum-selection clause in an agreement extends to a range of transaction participants, parties and non-parties."  858 F.2d 509, 514 n.5 (1988) (internal quotations omitted).  There, the Court held that a forum selection clause in a contract between the plaintiff and one of the defendants required that the claims against all of the defendants be brought in Italy.  *Id.* at 515.  Though most of the defendants were not signatories to the contract that contained the clause, the court reasoned that non-signatory defendants can "benefit from and be subject to forum selection clauses" when the defendants are closely related parties.  *Id.*  In *Manetti-Farrow*, the defendants had a subsidiary-parent relationships and shared corporate directors.  *Id.* at 511.

Following *Manetti-Farrow*, the Ninth Circuit in *Holland America Line Inc. v. Wartsila North America, Inc.*, upheld the dismissal of two corporate defendants—who were not signatories to the contract at issue—and enforced that the forum selection clause requiring that the case be brought in France.  485 F.3d 450, 457 (9th Cir.2007).  The Court noted "any transactions between [the non-signatory corporate entities] and [the plaintiff] took place as part of the larger contractual relationship between [the plaintiff] and [the signatory defendant]."  *Id.* at 456.

Since *Manetti-Farrow* and *Holland America Line Inc.*, most courts that have dismissed a suit pursuant to a forum selection clause have only done so where the non-signatory *defendants* were seeking to avail themselves of the forum selection clause.  *See Sawyer v. Bill Me Later, Inc.*, No. CV 10-04461 SJO JCGX, 2011 WL 7718723, at *4 (C.D. Cal. Oct. 21, 2011); *Aspitz v. Witness Systems, Inc.*, No. C 07-02068 RS, 2007 WL 2318004, at *2 (N.D. Cal. Aug. 10, 2007);

United States District Court
Northern District of California

1  *Graham Tech. Sols., Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1434 (N.D. Cal. 1997);

2  *Universal Operations Risk Mgmt., LLC v. Glob. Rescue LLC*, No. C 11-5969 SBA, 2012 WL

3  2792444, at *5 (N.D. Cal. July 9, 2012); *cf. Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*,

4  108 F. Supp. 3d 816, 823 (N.D. Cal. 2015) (holding that a corporation's director who signed a

5  contract on behalf of that corporation was subject to the contract's forum selection clause for the

6  purposes of personal jurisdiction); *Prod. & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*, No.

7  16-CV-00669-YGR, 2017 WL 201703, at *7 (N.D. Cal. Jan. 18, 2017) (same).  In essence, a non-

8  signatory, closely-related defendant may enforce a forum selection clause against the plaintiff.

9        Here, it is the *plaintiff* which seeks to enforce the forum-selection clause against a non-

10  signatory defendant to confer jurisdiction over that defendant – the converse of the above

11  described cases.  Most district courts that have considered whether a plaintiff may enforce a forum

12  selection clause to establish personal jurisdiction over non-signatory defendants have rejected such

13  attempts because a non-signatory defendant to a contract has not consented to jurisdiction.  *See*

14  *Wescott v. Reisner*, No. 17-CV-06271-EMC, 2018 WL 2463614, at *3 (N.D. Cal. June 1, 2018)

15  (rejecting plaintiff's argument that a forum selection clause in a contract conferred jurisdiction

16  over a non-signatory); *FTC - Forward Threat Control, LLC v. Dominion Harbor Enterprises,*

17  *LLC*, No. 5:19-CV-06590-EJD, 2020 WL 5545156, at *4  (N.D. Cal. Sept. 16, 2020) (same);

18  *Pestmaster Franchise Network, Inc. v. Mata*, No. 16-CV-07268-EMC, 2017 WL 1956927, at *5

19  (N.D. Cal. May 11, 2017) (holding that a forum selection clause in a contract cannot establish

20  jurisdiction over non-signatories when they had no hand in drafting the contract); *Pinnacle Fitness*

21  *& Recreation Mgmt. LLC v. v. Jerry & Vickie Moyes Fam. Tr.*, No. 08-CV-1368 H BGS, 2010

22  WL 5141686, at *2 (S.D. Cal. Dec. 13, 2010) (same).  Unlike the situation where a non-signatory

23  defendant seeks to enforce a forum-selection clause (against a signatory plaintiff), and thus

24  consents to jurisdiction in the alternative forum, where the plaintiff seeks to enforce a clause

25  against a non-signatory defendant who did not consent to jurisdiction, there are due process

26  concerns.

27        As a non-signatory defendant that was not in existence when Plaintiff's employment

28  contract with FMC was executed, Xpanse did not consent to the jurisdiction of California courts.

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | Nor is there any evidence from which such consent may reasonably be inferred.  Accordingly, the

2 | forum selection clause in Plaintiff's contract does not extend jurisdiction over Xpanse.  Instead,

3 | analysis of specific personal jurisdiction is required.

4 |        2.    <u>Specific Personal Jurisdiction</u>

5 |      Plaintiff argues that the non-FMC defendants—Keystone, the Archwell entities, Erik

6 | Anderson, Stanley Middleman, Michael Middleman, Gregory Middleman, and Xpanse—are

7 | subject to the Court's specific personal jurisdiction.  "For a court to exercise personal jurisdiction

8 | over a nonresident defendant consistent with due process, that defendant must have 'certain

9 | minimum contacts' with the relevant forum 'such that the maintenance of the suit does not offend

10 | traditional notions of fair play and substantial justice.'"  *Mavrix Photo, Inc. v. Brand*

11 | *Technologies, Inc.*, 647 F.3d 1218, 1223 (9th Cir.2011) (quoting *International Shoe Co. v.*

12 | *Washington*, 326 U.S. 310, 316 (1945)).  The Ninth Circuit has established a three-prong test for

13 | analyzing a claim of specific jurisdiction:

14 |         "(1) The non-resident defendant must purposefully direct activities
15 |         or consummate some transaction with the forum or resident thereof;
        or perform some act which he purposefully avails himself of the
16 |         privilege of conducting activities in the forum, thereby invoking the
        benefits and protection of its laws;

17 |         (2) the claim must be one which arises out of or relates to the
18 |         defendant's forum-related activities; and

19 |         (3) the exercise of jurisdiction must comport with fair play and
        substantial justice. . ."

20 | *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  Plaintiff bears the

21 | burden of satisfying the first two prongs; if he does, the burden shifts to Defendant to present a

22 | "compelling case that the exercise of jurisdiction would not be reasonable."  *Mavrix*, 647 F.3d at

23 | 1228 (internal citations and quotation marks omitted).

24 |        a.    <u>Keystone B2B LLC and the Archwell Entities</u>

25 |      Plaintiff asserts claims for promissory fraud, fraudulent misrepresentation, and fraudulent

26 | concealment against Keystone and the Archwell entities.  All three of these claims seem to be

27 | premised on the theory that, during Plaintiff's employment contract negotiations, Keystone

28 | executives and Archwell executives represented that the companies would transfer valuable

United States District Court
Northern District of California

intellectual property to Xpanse, but the transfer was never made.  Complaint ¶ 137-41.  For claims sounding in tort, such as fraud, the Ninth Circuit employs a "purposeful direction" test to determine whether the defendant invoked the benefits and protections of the forum state. *Schwarzenegger*, 374 F.3d at 802.  The purposeful direction test derives from *Calder v. Jones* and requires that the defendant have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix,* 647 F.3d at 1228 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)) (internal quotation marks omitted).

Here, the parties' dispute concerns the second prong of this test, express aiming. According to Plaintiff, Keystone's and the Archwell entities' allegedly fraudulent statements regarding the transfer of intellectual property to Xpanse were expressly aimed at California because Plaintiff was living in California when the negotiations occurred.  Notably, none of the negotiations actually took place in California.  Complaint ¶ 15.  All the discussions took place over phone and email, or in-person on the East Coast.  *Id.*

The fact that Plaintiff was living in California when Keystone and the Archwell entities allegedly made fraudulent statements is not enough on its own to satisfy the express aiming requirement under recent Supreme Court and Ninth Circuit authority.  In *Axiom Foods, Inc. v. Acerchem International, Inc.*, the Ninth Circuit explained that, following the Supreme Court's decision in *Walden v. Fiore*, allegations that a defendant knew that a plaintiff resided in the forum and that it was foreseeable that plaintiff would suffer harm in the forum "will not, on its own, support the exercise of specific jurisdiction."  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069-70 (9th Cir. 2017).  Rather, express aiming requires that the defendant target the forum state—merely targeting an individual that happens to reside in the forum state will not satisfy the requirement.  *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1145 (9th Cir. 2017) ("to establish the basis for specific personal jurisdiction, a tort must involve the forum state itself, and not just have some effect on a party who resides there"); *San Diego Cty. Credit Union v. Citizens Equity First Credit Union*, 325 F. Supp. 3d 1088, 1099 (S.D. Cal. 2018) ("the express aiming inquiry requires something more than 'a foreign act with foreseeable effects in the forum state'").

1    Actions that may demonstrate targeting the forum state include "[t]he solicitation of

2    business in the forum state that results in business being transacted or contract negotiations."

3    *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988).  Similarly, taking actions to

4    exploit the California market for commercial gain may be sufficient to demonstrate targeting.  *See*

5    *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229-30 (9th 2011); *Keeton v. Hustler*

6    *Magazine, Inc.*, 465 U.S. 770, 772, 779-81, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (publisher was

7    subject to personal jurisdiction in New Hampshire based on its regular circulation of 10,000-

8    15,000 monthly copies of a magazine within the forum, indicating that the publisher "continuously

9    and deliberately" exploited the market).  However, "the plaintiff cannot be the only link between

10    the defendant and the forum."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

11    Here, Plaintiff's location is the only link between the Archwell entities and Keystone with

12    California.  There are no allegations that executives from Keystone and the Archwell entities

13    traveled to California to meet with Plaintiff or that Keystone and the Archwell entities had any

14    interest in entering the California market to further their own interest.  Furthermore, Plaintiff does

15    not allege that he entered into any contractual agreements with Keystone and the Archwell

16    entities.  Rather, the only specific allegation against Keystone and the Archwell entities is that

17    they promised to transfer intellectual property to Xpanse.  Mewawalla, however, does not allege

18    any facts which suggests that this action was focused on and expressly aimed at California.

19    Accordingly, the Court **GRANTS** Defendants' motion for lack of personal jurisdiction over the

20    claims against Keystone and the Archwell entities.

21    b.    Erik Anderson

22    Plaintiff asserts claims for wrongful retaliation under California Labor Code section

23    1102.5, inducement of breach of contract, intentional interference with economic relations, and

24    negligent interference with economic relations against Erik Anderson.  Complaint ¶¶ 190, 219.

25    The claims are all based on Anderson allegedly pressuring Plaintiff to acquiesce to the

26    Middleman's purportedly illegal "share evaluation scheme."  *Id.* ¶ 190(a).  Plaintiff claims that

27    Anderson, along with the Middlemans, fired Mewawalla in retaliation for his failure to go along

28    with their share evaluation scheme, thus interfering with Plaintiff's FMC and Xpanse employment

contracts.

Though not a tort per se, courts have employed the "purposeful direction" test when analyzing whether a defendant accused of violating a California labor code purposefully availed itself of California's protections and benefits. *See, e.g.*, *Mercado v. JMJ Assocs. LLC*, No. SACV142060JLSRNBX, 2015 WL 13783452, at *3-4 (C.D. Cal. Apr. 15, 2015); *Overholt v. Airista Flow Inc.*, No. 17CV1337-MMA (AGS), 2018 WL 355231, at *10 (S.D. Cal. Jan. 10, 2018); *Senne v. Kansas City Royals Baseball Corp.*, 105 F. Supp. 3d 981, 1022 (N.D. Cal. 2015). Similarly, courts have applied a purposeful direction test for claims involving interference with economic, or contractual relations. *See Picot v. Weston*, 780 F.3d 1206, 1213-14 (9th Cir. 2015) (applying purposeful direction test to allegations based on tortious inference of contract); *Safe N Sec Corp. v. SNS Holding LLC*, No. CV1706940RGKAGRX, 2018 WL 5264075, at *5 (C.D. Cal. July 10, 2018); *Park W. Galleries, Inc. v. Franks*, No. CV 12-3203-GHK (SHX), 2012 WL 12898001, at *4 (C.D. Cal. May 25, 2012). Accordingly, the Court applies the purposeful direction test in analyzing whether Anderson purposefully availed himself of California's protections and benefits.

Whether this Court has jurisdiction over Anderson again turns on the express aiming requirement of the purposeful direction test. To satisfy this element, Plaintiff must allege that Anderson's interference and retaliation was expressly aimed at California, rather than Plaintiff alone. *See Picot*, 780 F.3d at 1214 ("[Plaintiff] alleges intentional interference with a contract, so we must ask whether [defendant] expressly aimed such interference at California."). As the Ninth Circuit explained in *Picot v. Weston*, the defendant's actions which amounted to interference needed to be aimed at California to demonstrate express aiming. *Id.* at 1215. There, the Court noted that because the defendant allegedly interfered with the plaintiff's contractual relationship "from [defendant's] residence in Michigan, without entering California, contacting any person in California, or otherwise reaching out to California," he did not target the forum. *Id.*

Similarly, here, Anderson did not reach out to California when he allegedly interfered with Plaintiff's employment contracts. In fact, Plaintiff was not living in California when he and Anderson interacted. Plaintiff moved to Washington in June 2020 and met with Anderson to

United States District Court
Northern District of California

discuss the Middlemans' allegedly illegal scheme in December 2020.  *See* Complaint ¶¶ 76, 108.  Furthermore, there are no allegations in the complaint suggesting that Anderson contacted any person in California or reached out to California when he pressured Plaintiff to acquiesce to the Middleman's share evaluation scheme.  Rather, Plaintiff argues that Anderson's retaliatory actions were expressly aimed at California because Anderson allegedly knew that the terms in Plaintiff's employment contract were to be "construed in accordance with the law of the State of California."  Complaint ¶ 173 (Ex. A at 107).  In essence, Plaintiff contends that since Anderson was on notice that Plaintiff's employment contract had to be interpreted under California law, Anderson would have foreseen being subject to California jurisdiction if he violated any of Plaintiff's employment rights or interfered with Plaintiff's employment contract.

The fact that Anderson may have known about the choice of law clause in Plaintiff's contract is insufficient to satisfy the express aiming requirement for personal jurisdiction purposes.  Though a choice of law clause should be considered in the specific personal jurisdiction analysis, standing alone, it cannot establish specific personal jurisdiction over a defendant.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481-82 (1985).  The "choice-of-law *analysis* —which focuses on all elements of a transaction, and not simply on the defendant's conduct—is distinct from minimum-contacts jurisdictional analysis—which focuses at the threshold solely on the defendant's purposeful connection to the forum."  *Id.*  In other words, there needs to be more than just a choice of law clause to establish that the defendant directed his activity at the forum.  And notably, here, Anderson was not even a party to the contract that contained the choice of law clause.

Mere knowledge of Plaintiff's contract does not show that Anderson's actions were expressly aimed California.  As the Ninth Circuit emphasized in *Axiom Foods, Inc. v. Acerchem International, Inc.*, knowledge alone of a plaintiff's California affiliation is not sufficient to demonstrate express aiming.  874 F.3d at 1069-70.  Anderson did not participate in the negotiations surrounding Plaintiff's employment contract—in fact, he did not work for the Middlemans or any of the defendant companies when the negotiations took place.  Anderson Decl. ¶ 8.  Thus, even if those negotiations were driven by a California focus, Anderson was not part of

1    these negotiations.  Accordingly, this Court **GRANTS** defendants' motion for lack of personal

2    jurisdiction over the claims against Erik Anderson.

3              c.    Stanley Middleman, Michael Middleman, and Gregory Middleman

4         Plaintiff asserts several fraud claims, as well as an intentional interference with economic

5    relations claim, negligent interference with economic relations claim, intentional inducement of

6    breach of contract claim, and several labor code violations against Stanley Middleman, Michael

7    Middleman, and Gregory Middleman.  *Id.* ¶¶ 137-71.  All the claims are premised on similar

8    allegations.  Plaintiff alleges that Stanley Middleman and Michael Middleman made false

9    promises during Plaintiff's employment contract negotiations to induce Plaintiff to work at FMC

10   and Xpanse.  *Id.*  Similarly, Plaintiff alleges that Gregory Middleman made false representations

11   and concealed information from Plaintiff after Plaintiff began working at FMC.  *Id.* ¶¶ 144-71.

12        In contrast to the allegations against Keystone, the Archwell entities, and Erik Anderson,

13   Plaintiff has adequately alleged that Stanley Middleman, Michael Middleman, and Gregory

14   Middleman expressly aimed their actions at California.  Specifically, Plaintiff contends that

15   Stanley Middleman and Michael Middleman hired Plaintiff to capitalize on Plaintiff's Silicon

16   Valley connections, recruit Silicon Valley talent for their new technology company, and "develop

17   another family business in California to make billions of dollars."  Opposition at 17.  *See Berdux*

18   *v. Project Time & Cost, Inc.*, 669 F. Supp. 2d 1094, 1101 (N.D. Cal. 2009) (holding that corporate

19   directors' actions were expressly aimed at California when they induced an employee to open an

20   office in the forum).  Similarly, Plaintiff argues that Gregory Middleman expressly aimed his

21   actions at California by working with Plaintiff to hire California talent for Xpanse.  Mewawalla

22   Decl., ¶ 21-22.

23        The Middlemans' contacts with California are more significant than the Archwell entities,

24   Keystone's, and Anderson's connections with the forum.  The Archwell Entities, Keystone, and

25   Anderson were not alleged to have financially benefitted from Plaintiff's California connections or

26   to have accessed the California market through Plaintiff.  In contrast, Stanley Middleman, Michael

27   Middleman, and Gregory Middleman sought to hire Plaintiff in order to avail themselves of the

28   California market.  *See Mercado*, 2015 WL 13783452, at *4 (C.D. Cal. Apr. 15, 2015) (holding

United States District Court
Northern District of California

1    that hiring an employee who lived and worked in California partially so the employee could build

2    business relationships in California was sufficient to demonstrate express aiming); *McCard v.*

3    *Circor Int'l, Inc.*, No. 2:20-CV-00147-TLN-AC, 2021 WL 1212745, at *6 (E.D. Cal. Mar. 31,

4    2021) (holding that inducing a California resident to move out of California with the promise of

5    long-term employment satisfies the express aiming requirement).  Accordingly, the Court

6    **DENIES** Defendants' motion for lack of personal jurisdiction over the claims against the

7    Middlemans.[1]

              d.    Xpanse

8

9          Plaintiff asserts claims for breach of contract, and various other causes of action against

10   Xpanse.  For contract claims, courts apply a "purposeful availment" standard to determine whether

11   the defendant invoked the benefits and protections of the forum state.  *Boschetto v. Hansing*, 539

12   F.3d 1011, 1016 (9th Cir. 2008).  "To have purposefully availed itself of the privilege of doing

13   business in the forum, a defendant must have 'performed some type of affirmative conduct which

14   allows or promotes the transaction of business within the forum state.'"  *Id.* (quoting *Sher v.*

15   *Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)).  The court can "look to 'prior negotiations and

16   *contemplated* future consequences, along with the terms of the contract and the parties' actual

17   course of dealing' to determine if the defendant's contacts are '*substantial*' and not merely

18   'random, fortuitous, or attenuated.'"  *Sher*, 911 F.2d at 1362 (quoting *Burger King*, 471 U.S. at

19   479).

20         Courts have found that a defendant purposefully availed itself of the forum's protections

21   and benefits when a defendant opened offices and hired employees in the forum.  *San Diego Cty.*

22   *Credit Union*, 325 F. Supp. at 1100; *see also Senne*, 105 F. Supp. 3d at 1029-31 (N.D. Cal. 2015)

23

24   _____

[1] If the court has specific personal jurisdiction over a claim against one defendant, it can "assert
25   pendent personal jurisdiction over [that] defendant with respect to [another] claim for which there
     is no independent basis of personal jurisdiction [if] it arises out of a common nucleus of operative
26   facts with a claim in the same suit over which the court does have personal jurisdiction."  *Action*
     *Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  Since all of
27   Plaintiff's claims derive from the same common nucleus of facts, if this Court finds that it may
     exercise personal jurisdiction over one of the claims against a defendant, then it may assert
28   pendent personal jurisdiction over the remaining claims against that defendant.  *CE Distribution,*
     *LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004).

United States District Court
Northern District of California

1   (holding that several non-resident MLB teams where subject to California's jurisdiction by

2   recruiting California-based baseball players); *Alexis v. Rogers*, No. 15CV691-CAB-BLM, 2016

3   WL 11707630, at *7 (S.D. Cal. Feb. 26, 2016) (hiring a California resident, allowing her to work

4   from home, and communicating with her via email and text were sufficient to establish personal

5   jurisdiction).

6   Xpanse engaged in affirmative conduct which promoted the transaction of business within

7   California such that it purposefully availed itself of California's protections and benefits.  As

8   mentioned above, the Middlemans hired Plaintiff to work at FMC and Xpanse in large part

9   because of Plaintiff's California connections.  Mewawalla Decl. ¶ 8.  Additionally, Plaintiff's

10   contract with FMC contemplated that he would work for Xpanse in California and that Xpanse

11   would be based in California.  Complaint ¶ 30 (Ex. A at 100).   Finally, Plaintiff alleges that he

12   recruited "leaders and technological talent from Silicon Valley companies" for Xpanse.

13   Mewawalla Decl. ¶ 19.  In short, the focus of Xpanse and Plaintiff's involvement with Xpanse was

14   centered on the California market, thus demonstrating that Xpanse purposefully availed itself of

15   California's protections and benefits.  *Modius, Inc. v. Psinaptic, Inc.*, No. C 06-02074 SI, 2006

16   WL 1156390, at *3 (N.D. Cal. May 2, 2006).  Accordingly, this Court **DENIES** Defendants'

17   motion for lack of personal jurisdiction over the claims against Xpanse.

18   **IV.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

19   A.    Legal Standard

20   Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

21   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

22   complaint that fails to meet this standard must be dismissed pursuant to Rule 12(b)(6).  *See* Fed.

23   R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss the plaintiff's "factual

24   allegations 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v.*

25   *Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  "A claim has facial plausibility when the plaintiff

26   pleads factual content that allows the court to draw the reasonable inference that the Defendant is

27   liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

28   The Court "accept[s] factual allegations in the complaint as true and construe[s] the

pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135.

B.   Discussion

   1.   Fraud (Count 1, Count 2, Count 3, and Count 4)

   Plaintiff asserts four causes of action based on fraud: false promise (or promissory fraud), fraudulent concealment, fraudulent misrepresentation, and negligent misrepresentation. All four of the claims are premised on the theory that Stanley Middleman, Michael Middleman, and Gregory Middleman, in their individual capacities and as directors of FMC and Xpanse, made false promises and concealed information regarding their companies' plans for Xpanse. These promises led Plaintiff to believe that Xpanse would become a highly lucrative and independently run company, and that he would get to lead Xpanse for years to come. Complaint ¶ 40.

      a.   False Promise (Count 1)

   Plaintiff asserts a claim for false promise against Stanley Middleman, Michael Middleman, and FMC for the alleged false promises they made during Plaintiff's contract negotiations. Complaint ¶¶ 137-44. These promises allegedly induced Plaintiff to accept FMC's employment offer and forgo another lucrative employment opportunity. *Id.* ¶ 142. Plaintiff does not assert this claim against defendants Xpanse and Gregory Middleman.

   To assert a claim for false promise a plaintiff must plead that the defendant made a promise that it had no intention of performing. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). ("A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud."). Like all fraud claims, the plaintiff must also allege that he reasonably relied on that promise and that his reliance resulted in damage. *See Grant v. Aurora Loan Servs.*, Inc., 736 F. Supp. 2d 1257, 1272 (C.D. Cal. 2010) ("In the context of fraud or promissory fraud, reliance means that plaintiff acted or refrained from acting as a result of the promise.").

i.   FMC and Stanley Middleman

Defendants argue that Plaintiff's false promise claims fail for two reasons.  First, they

argue that Plaintiff has failed to plead his false promise claims against Stanley Middleman and

FMC with particularity pursuant to FRCP 9(b).  Motion to Dismiss at 21.  Second, they argue that

the false promise claims are barred by the economic loss doctrine.  *Id.*  The Court disagrees with

both of Defendants' arguments.

In order to satisfy FRCP 9(b), Plaintiff must allege with specificity the circumstances

which constitute the fraud.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Plaintiff can achieve the requisite level of specificity by alleging the "time, place, and specific

content" of the representations Defendants made, and providing sufficient facts to plausibly allege

that the representations were false.  *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp.

3d 1092, 1106 (C.D. Cal. 2015).

Plaintiff has alleged with sufficient specificity that Stanley Middleman[2] made false

promises on behalf of FMC during Plaintiff's employment contract negotiations.[3]  The false

promises included (1) the plan to grow Xpanse into an independent, publicly traded company

(Complaint ¶ 21), (2) promising to transfer substantial revenue and IP to Xpanse (*Id.* ¶¶ 17, 19,

27), (3) promising to contribute $140 million to $150 million of revenue from FMC to Xpanse,

---

[2] Stanley Middleman can be held liable for the statements he made on behalf FMC.  *See Frances T. v. Vill. Green Owners Assn.*, 42 Cal. 3d 490, 508 (1986) ("To maintain a tort claim against a director in his or her personal capacity, a plaintiff must first show that the director specifically authorized, directed or participated in the allegedly tortious conduct.").  "A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999).  Because Stanley Middleman directed FMC's fraud by making allegedly false promises during Plaintiff's contract negotiations, Stanley Middleman is personally liable for the false promises he made on behalf of FMC.

[3] FMC is liable for the false promises that Stanley Middleman, its CEO, made when hiring Plaintiff to work at FMC.  *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 296 (1995) ("An employer is vicariously liable for the torts of its employees committed within the scope of the employment."); *see also Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1168 (2005) (holding the employer liable when one of its directors fraudulently concealed information during contract negotiations); *Spahn v. Guild Indus. Corp.*, 94 Cal. App. 3d 143, 156-57 (Ct. App. 1979) (fraudulent acts of director could be imputed to employer because employer had authorized the directors to act on its behalf).

and (4) promising Plaintiff long-term employment at FMC and Xpanse.  *Id.*  ¶¶ 21, 26.   Plaintiff has alleged the dates that many of these statements were made, as well as the context of the conversation that they were made in.  *See, e.g., Id.* ¶ 15 ("Plaintiff spoke with and met personally with Stanley Middleman numerous times. . . including on November 6, 2019 and November 7, 2019. . .").

Additionally, Plaintiff has pled sufficient facts to allege that these promises were false when they were made.  When a defendant induces a plaintiff to enter into a contract—as was the case here—a plaintiff must allege that the defendant made an intentional misrepresentation or a promise that it did not intend to honor.  *Chelini v. Nieri*, 32 Cal. 2d 480, 487 (1948); *Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*, 2007 WL 2206946, at *6 (S.D. Cal. July 27, 2007).  False intent can be "inferred from such circumstances as defendant's. . . hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform."  *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30-31 (1985).

At the pleading stage, Plaintiff has alleged facts which permit the court to infer that the promises Stanley Middleman made on behalf of FMC during Plaintiff's contract negotiations were false.  First, Stanley Middleman promised to transfer IP, staff, and revenue to Xpanse even though he was allegedly aware that "FMC did not have full lien-free rights and transfer privileges for all of its intellectual property."  Complaint ¶ 56.  This suggests that Stanley Middleman made the promise, even though he knew that it could not be fulfilled.  Second, Plaintiff alleges that FMC did not even attempt to perform the promises they made during his contract negotiations.  Plaintiff drew up terms sheets and contracts to transfer revenue from FMC to Xpanse, but Stanley Middleman refused to approve the terms.  *Id.* ¶¶ 62-63.  And despite Plaintiff's insistence, FMC did not allow Plaintiff to develop market facing product.  *Id.*  ¶ 65.  Finally, after Plaintiff began working for FMC, Stanley Middleman continued to insist that the promises he made during contract negotiations would be fulfilled but failed to perform the promises.  *Id.* ¶¶ 26-28.  When considered in their totality, these facts are sufficient to allege that Stanley Middleman and FMC did not intend to keep the promises they made during Plaintiff's employment contract negotiations.

Plaintiff has also alleged with particularity that he reasonably relied on Stanley Middleman's promises, and that this reliance resulted in damage.  He alleges that he accepted FMC's employment offer *because* Stanley Middleman's promises led Plaintiff to believe that he would be given "long-term employment" and become the leader of a highly valuable and independent public company.  Complaint ¶ 37.  In reliance on these promises, he turned down another lucrative employment offer.  Complaint ¶ 33.  Accordingly, Plaintiff has pled sufficient facts to state a claim for false promise against FMC and Stanley Middleman.

Defendants also argue that Plaintiff's false promise claims are barred by the economic loss doctrine.  Motion to Dismiss at 23.  "The economic loss rule precludes tort claims. . . for purely economic damages that are recoverable under contract."  *Medawar v. Otis Elevator Co.*, No. CV 20-5155-DMG (EX), 2021 WL 1034840, at *2 (C.D. Cal. Feb. 9, 2021).  Tort damages, however, *may* exist between entities who are in a contractual relationship if "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm."  *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999) (emphasis added).  Importantly, "[t]ort damages have been permitted in contract cases . . . where the contract was fraudulently induced."  *Erlich*, 21 Cal. 4th at 551-52; *see also Harris v. Atl. Richfield Co.*, 14 Cal. App. 4th 70, 78 (1993) ("When one party commits fraud during the contract formation or performance, the injured party may recover in contract and tort."); *Jacobs v. Sustainability Partners LLC*, No. 20-CV-01981-PJH, 2020 WL 5593200, at *15 (N.D. Cal. Sept. 18, 2020) (recognizing that under California law, the economic loss rule does not bar a fraud claim when a contract was fraudulently induced); *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip.*, Inc., 868 F. Supp. 2d 983, 992 (E.D. Cal. 2012) (same).

For example, in *Lazar v. Superior Court*, the California Supreme Court recognized that a plaintiff could bring both a breach of contract claim and a fraud claim when the contract was fraudulently induced.  12 Cal. at 649.  There, the employer-defendants promised an employee that he would be entering into a "long-term relationship" with the defendants' company if he agreed to work for them.  *Id.* at 636.  In response to this representation, the employee accepted the offer, quit his job in New York, and moved to California with his family.  *Id*.  Several years later the

1    employee was fired, prompting him to sue the employer-defendants for breach of his employment

2    contract and fraudulent inducement.  *Id.*  The Court held that the employee had adequately stated a

3    claim for fraud and declined to apply the economic loss rule because:

> An action for promissory fraud may lie where defendant
> fraudulently induces the plaintiff to enter into a contract.  In such
> cases, the plaintiff's claim does not depend on whether the
> defendant's promise is ultimately enforceable as a contract.  If it is
> enforceable, the [plaintiff]...has a cause of action in tort as an
> alternative at least, and perhaps in some instances in addition to his
> cause of action on the contract.

8    *Id*. at 638.

9        Plaintiff similarly alleges that during contract negotiations, defendants Stanley Middleman

10   and FMC induced him to work for FMC by making false promises and concealing critical

11   information related to the future value of Xpanse, their plans for its corporate structure, and

12   Plaintiff's long-term role in the company.  Since these promises ultimately induced Plaintiff to

13   enter into a contract with FMC, and forgo another lucrative employment opportunity, Plaintiff's

14   false promise claims are not barred by the economic loss doctrine.  Accordingly, the Court

15   **DENIES** Defendants' motion as it pertains to the false promise claims against FMC and Stanley

16   Middleman.

                    ii.    Michael Middleman

18       Unlike his claims against FMC and Stanley Middleman, Plaintiff has failed to state a claim

19   for false promise against Michael Middleman with particularity.  Though Plaintiff alleges that

20   Michael Middleman participated in the employment contract negotiations, Plaintiff has not alleged

21   the "what, when, where, or how" of the circumstances which constituted the fraud.  *Vess*, 317 F.3d

22   at 1106.  Plaintiff does not allege any specific promises Michael Middleman made during the

23   negotiations, what role he played in the negotiations, or when he participated in the negotiations.

24   Complaint ¶¶ 22, 33, 40.

25       FRCP 9(b) requires "an account of the 'time, place, and specific content of the false

26   representations as well as the identities of the parties to the misrepresentations.'"  *Swartz v. KPMG*

27   *LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058,

28   1066 (9th Cir.2004)).  Though "there is no absolute requirement that where several defendants are

United States District Court
Northern District of California

United States District Court
Northern District of California

sued in connection with an alleged fraudulent scheme, the complaint must identify *false statements* made by each and every defendant," the complaint must at least "'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'" *Id.* at 764-65 (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.1989)).

Plaintiff has failed to do that here.  Simply stating that Michael Middleman induced Plaintiff to work for FMC by participating in the contract negotiations, without alleging what specific role he played in furthering the alleged fraudulent scheme, does not meet FRCP 9(b)'s heightened pleading standard.  Plaintiff's contract negotiations spanned multiple months and involved multiple meetings.  Complaint ¶ 15.  However, it is unclear from the face of the complaint what role Michael Middleman played throughout this process and how he acted fraudulently.  Accordingly, the Court **GRANTS** Defendants' motion as it pertains to the false promise claim against Michael Middleman.

> b.  Fraudulent Misrepresentation and Negligent Misrepresentation (Count 3 and Count 4)

Plaintiff asserts claims for fraudulent misrepresentation and negligent misrepresentation against FMC, Xpanse, Stanley Middleman, Gregory Middleman, and Michael Middleman. Complaint ¶¶ 156, 165.  To state a claim for fraudulent misrepresentation Plaintiff must allege with sufficient particularity that (1) defendants misrepresented a fact, knowing that the fact was false, and (2) that plaintiff reasonably relied on this fact to his detriment.  *Molko v. Holy Spirit Assn.*, 46 Cal.3d 1092, 1108, 252 Cal.Rptr. 122, 762 P.2d 46 (1988) (superseded on other grounds by Cal. C. Civ. P. § 437c(*o*)(2)).  "The elements for a claim for negligent misrepresentation are similar [to the elements for fraud]; the plaintiff must show that the defendant made a misrepresentation without reasonable grounds for believing it to be true and that the representation was intended to induce the plaintiff to take some action in reliance upon it."  *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1128 (N.D.Cal.2001).

Plaintiff's fraudulent misrepresentation and negligent misrepresentation claims concern actions taken by FMC, Xpanse, Stanley Middleman, Gregory Middleman, and Michael Middleman *after* Plaintiff began working for FMC.  *See* Complaint ¶ 155.  Specifically, Plaintiff

alleges that defendants misrepresented facts regarding their true plans for Xpanse while he was working for FMC and later Xpanse.  *Id.* ¶¶ 155-56.  Those misrepresentations concerned: (1) the amount of revenue that FMC would contribute to Xpanse, (2) the transfer of intellectual property from the Archwell Entities and Keystone to Xpanse, (3) the corporate structure of Xpanse, (4) the transfer of Mewawalla's employment to Xpanse, and (5) the structure of Xpanse's equity.  *Id.* Plaintiff alleges that these misrepresentations ultimately led to his termination, causing lost compensation, lost equity in Xpanse, reputational harm, and emotional distress.  *Id.* ¶ 161.

Plaintiff has failed to state a claim for false misrepresentation and negligent misrepresentation against all defendants for three reasons: (i) the complaint fails to meet FRCP 9(b)'s heightened pleading standard; (ii) the complaint fails to allege that Plaintiff reasonably relied on defendants' misrepresentations; and (iii) the economic loss doctrine bars the claims.

i.    <u>Rule 9(b)</u>

Plaintiff has failed to state his misrepresentation and negligent misrepresentation claims with sufficient particularity because the complaint does not identify what false representations were made by each defendant.  Instead, his allegations impermissibly lump defendants together. *Swartz*, 476 F.3d at 764-65.  For example, Plaintiff alleges that "Defendants continued to promise transferring his employment to Xpanse, but failed to do so" (Complaint ¶ 54), and "Defendants had represented to [Plaintiff] that Archwell Holdings'. . . assets. . . would be transferred to Xpanse." *Id.* ¶ 61.  These allegations do not identify which defendant actually made the representation.  In contrast, Plaintiff's false promise claims against Stanley Middleman and FMC clearly allege what Stanley Middleman promised to Plaintiff during the course of his employment contract negotiations.  The false promise claim also specifies when Stanley Middleman made these promises and the context in which they were made.

Unlike Plaintiff's false promise claims, his false misrepresentation and negligent misrepresentation claims fail to distinguish who made the false statements after Plaintiff began working for FMC, when the statements were made during the course of his employment, and in what context they were made.  The complaint must at least "'identif[y] the role of [each] defendant[] in the alleged fraudulent scheme'" and "inform each defendant separately of the

allegations surrounding his alleged participation in the fraud." *Swartz*, 476 F.3d at 764-65. Because Plaintiff's misrepresentation allegations are not differentiated between Defendants, and do not describe when the misrepresentations were made, the complaint fails to inform each defendant of the allegations against it.

### ii.   Reliance

Plaintiff's false and negligent misrepresentation claims also fail to allege that Plaintiff reasonably relied on defendants' misrepresentations. *See Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992) (noting that justifiable reliance is a necessary element of both fraudulent misrepresentation and negligent misrepresentation). "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995); *see also* Cal. Civ. Code § 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.").

Here, Plaintiff has not alleged that he made any choices or took any actions during the course of his employment *in response to* the defendants' alleged misrepresentations. In contrast, Plaintiff's alleges in his false promise claims that Stanley Middleman's promises led Plaintiff to take FMC's employment offer and forgo an alternate opportunity. Plaintiff's fraudulent misrepresentation and negligent misrepresentation claims at issue here include no such allegation. Based on the complaint it seems that Plaintiff would have continued to work at FMC and Xpanse irrespective of defendants' alleged misrepresentation. Because Plaintiff has not alleged that he made any decisions or altered his position based on defendants' representations, he has failed to allege reasonable reliance.

### iii.   Economic Loss Doctrine

Finally, Plaintiff's false and negligent misrepresentation claims are also barred by the economic loss doctrine. In California, breach of an employment contract "ordinarily does not give rise to a cause of action for fraud or deceit, even if some misrepresentation is made in the course of the employee's dismissal. Tort recovery is available only. . . when the plaintiff's fraud damages cannot be said to result from termination itself." *Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1178

(1993).  In other words, a terminated employee can maintain an action for fraud alongside a breach of contract claim only when "the plaintiff can establish all of the elements of fraud with respect to a misrepresentation that is separate from the termination of the employee contract, i.e., when the plaintiff's fraud damages cannot be said to result from the termination itself."  *Id.* at 1184.

All of the damages allegedly caused by the Defendants' misrepresentations were a direct result of Plaintiff's termination.  He alleges that Defendants' misrepresentations led to damages including the lost benefits of long-term employment, lost ownership interest in Xpanse, reputational harm caused by being fired, and lost past and future income.  Complaint ¶ 161.  All of these damages were caused by being fired and are recoverable under Plaintiff's wrongful termination and breach of contract claims—they are not "distinct from the termination itself." *Maffei v. Allstate California Ins. Co.*, 412 F. Supp. 2d 1049, 1055 (E.D. Cal. 2006).

However, as noted above, fraudulently inducing an individual to enter into an employment contract can be brought alongside a breach of contract claim.  *See Lazar*, 12 Cal.4th at 643.  The California Supreme Court explained in *Lazar* that when a defendant's fraudulent promise induces a plaintiff to enter into an employment contract, incurring damages that are distinct from the breach of contract claim, both the fraud claim and breach of contract claim may coexist.  *Id.* at 638.

The false promises that Stanley Middleman and FMC made induced Plaintiff to enter into a contract with FMC, resulting in damages that were independent of his termination—specifically, forgoing an alternate employment opportunity.  In contrast, all the damages which flowed from the alleged misrepresentations that Defendants made during the course of Plaintiff's employment were a direct result of Plaintiff's termination.  Accordingly, the Court **GRANTS** Defendants' motion as it pertains to Plaintiff's fraudulent misrepresentation claims and negligent misrepresentation claims.

       c.    <u>Fraudulent Concealment (Count 2)</u>

Plaintiff asserts his fraudulent concealment claim against FMC, Stanley Middleman, Michael Middleman, Gregory Middleman, and Xpanse.  Complaint ¶¶ 146-155.  To state claim for fraudulent concealment, the plaintiff must allege that: (1) defendant concealed a material fact it is

United States District Court
Northern District of California

1    was under a duty to disclose to the plaintiff, (2) the defendant intended to defraud the plaintiff, and

2    (3) the plaintiff sustained damage as a result of the concealment or suppression of the fact.

3    *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014).

4          Regarding the first element, a defendant is under a duty to disclose information when it has

5    "exclusive knowledge of material facts not known to the plaintiff" or "when [it] makes partial

6    representations but also suppresses some material facts."  *LiMandri v. Judkins*, 52 Cal.App.4th

7    326, 336 (1997) (internal quotations omitted).  A duty to disclose may occur in relationships

8    involving a "seller and buyer, employer and prospective employee, doctor and patient, or parties

9    entering into any kind of contractual agreement."  *Id.* at 337.

10                              i.    FMC and Stanley Middleman

11         Plaintiff's claims for fraudulent concealment against FMC and Stanley Middleman are

12   linked to Plaintiff's promissory fraud claims.  He alleges that during contract negotiations, Stanley

13   Middleman, on behalf of FMC, concealed their true plan to turn Xpanse into a closely controlled

14   subsidiary of Archwell Holdings, thus inducing Plaintiff to accept FMC's employment offer.

15   Complaint ¶ 128.

16         Defendants argue that Plaintiff's fraudulent concealment claims should be dismissed for

17   two reasons.  First, Plaintiff failed to allege that FMC and Stanley Middleman had a duty to

18   disclose the Middleman's true plans for Xpanse.  Motion to Dismiss at 25.  Second, Plaintiff failed

19   to allege the specific facts that Defendants concealed, and consequently has failed to state his

20   fraudulent concealment claims against Stanley Middleman and FMC with particularity.  *Id.* at 26.

21         Contrary to Defendant's contention, Plaintiff has alleged sufficient facts to show that FMC

22   had a duty to disclose its true plans for Xpanse.  In transactions which do not involve fiduciary or

23   confidential relations, a defendant may be under a duty to disclose information when it "had

24   exclusive knowledge of material facts not known to the plaintiff."  *LiMandri*, 52 Cal.App.4th at

25   336-37.  This duty may arise in an employer-employee relationship.  *Id.* at 337.  According to

26   Plaintiff, he and Stanley Middleman engaged in months long negotiations to finalize his

27   employment contract with FMC, during which time Stanley Middleman and Plaintiff discussed the

28   Middlemans' plans for Xpanse, including their desire to take Xpanse public and have Plaintiff lead

Xpanse through its IPO.  Complaint ¶¶ 15, 26.  Given that those plans were integral to Plaintiff's decision to accept FMC's employment offer, Stanley Middleman, acting on behalf of FMC, had a duty to disclose their true plans for Xpanse's corporate structure.  The information was material.

Furthermore, Plaintiff had no way of knowing that FMC's plans regarding Xpanse's corporate structure would be different than what Stanley Middleman represented during Plaintiff's contract negotiations.  *Cf. Magpali v. Farmers Grp., Inc.,* 48 Cal. App. 4th 471, 482 (1996) (allegedly concealed information were not in defendants' exclusive control, and defendants did not have a duty to disclose information that was already available to plaintiff).  As Plaintiff's future employers, FMC and Stanley Middleman had a duty to disclose information that would be material to Plaintiff's decision to accept their employment offer—specifically, their true plans for Xpanse.

Regarding Defendants' second argument, Plaintiff has pled what Stanley Middleman, on behalf of FMC, concealed with sufficient particularity.  Courts in this district have recognized that plaintiffs often cannot identify the contents and circumstances of an omission as specifically as they would an affirmative misrepresentation.  *See MacDonald v. Ford Motor Co*., 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014).  However, that does not excuse a plaintiff's obligation to plead with particularity the circumstances surrounding any representations that gave rise to a duty to disclose. *See Espineli v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:17-cv-00698-KJM-CKD, 2019 WL 2249605, at *4-5 (E.D. Cal. May 24, 2019).  Here, Plaintiff alleges that Stanley Middleman concealed the true plans for Xpanse when describing Xpanse as a "multi-billion" dollar, independent company that Plaintiff would eventually lead through the IPO process during Plaintiff's contract negotiations.  Complaint ¶¶ 18-20.  Plaintiff maintains that this was not Stanley Middleman's and FMC's true place for Xpanse.  *Id.* ¶ 149.  These allegations are sufficiently specific to put Stanley Middleman and FMC on notice of what they concealed from Plaintiff and when it occurred.

Furthermore, Plaintiff has alleged the remaining elements of fraudulent concealment—reliance and resulting damage—with sufficient particularity.  Plaintiff alleges that had he known about the true plan during his contract negotiations "he would have behaved differently to protect

26

his interests," and as a result he "was precluded from pursuing an alternative employment offer" worth millions of dollars in equity. *Id.* ¶ 150-51.  Given that Plaintiff has adequately alleged all the elements of fraudulent concealment, the Court **DENIES** Defendants' motion as it pertains to the fraudulent concealment claims against FMC and Stanley Middleman.

### ii.   Michael Middleman

Like his claim against Stanley Middleman and FMC, Plaintiff alleges that Michael Middleman concealed information regarding the Defendants' true plans for Xpanse during Plaintiff's employment contract negotiations.  Complaint ¶ 149.  However, unlike the fraudulent concealment claim against Stanley Middleman and FMC, Plaintiff has failed to allege his claim against Michael Middleman with sufficient particularity.

Whereas Plaintiff alleged the specific points during his contract negotiations where Stanley Middleman could have provided truthful statements regarding FMC's plans for Xpanse, it is unclear from the complaint what role Michael Middleman played in Plaintiff's contract negotiations, and by extension when Michael Middleman allegedly concealed material facts.  Details regarding Michael Middleman's role in the negotiations, along with the representations he made to Plaintiff during those negotiations, is critical to Plaintiff's claim because it informs whether and when Michael Middleman was under a duty to disclose information to Plaintiff.  Accordingly, Plaintiff has failed to state his fraudulent concealment claim against Michael Middleman with sufficient particularity and **GRANTS** Defendants' motion as it pertains to that claim.

### iii.   Xpanse and Gregory Middleman

Unlike the fraudulent concealment claims against Stanley Middleman, FMC, and Michael Middleman, Plaintiff's fraudulent concealment claims against Xpanse and Gregory Middleman are premised on events that occurred *after* Plaintiff began working for FMC.  Plaintiff alleges that once he began working for FMC and Xpanse, Gregory Middleman and Xpanse concealed information regarding their true plans for Xpanse—specifically, the plan to turn Xpanse into a closely held subsidiary of the Archwell entities.

The fraudulent concealment claims against Xpanse and Gregory Middleman fail for the

United States District Court
Northern District of California

same reason that Plaintiff's fraudulent misrepresentation and negligent misrepresentation claims

fail: (1) the claims fail to allege reasonable reliance, and (2) they are barred by the economic loss

doctrine.  Turning first to reliance, Plaintiff has not alleged that he altered his position or made any

decisions because Xpanse's and Gregory Middleman allegedly concealed information while

Plaintiff was working for FMC.  Second, all the damages that flowed from Xpanse and Gregory

Middleman's alleged concealment were a result of Plaintiff's termination from FMC.  A fraud

claim cannot survive when the Plaintiff's fraud damages are a direct result of the termination

itself, rather than distinct from the termination.  *Hunter*, 6 Cal. 4th at 1184.  Again, Plaintiff

alleges that Gregory Middleman and Xpanse's concealment led to losing "compensation and other

benefits of long-term employment," harmed his professional reputation, and led to lost income.

Complaint ¶ 151.  These damages are all a direct result of his termination, rather than any alleged

concealment which induced Plaintiff to take the job and forego other opportunities.  Accordingly,

the Court **GRANTS** Defendants' motion as it pertains to the fraudulent concealment claims

against Xpanse and Gregory Middleman.

       2.    Breach of Contract (Count 5)

Plaintiff asserts a breach of contract claim against Xpanse for its alleged failure to perform

several of the terms in Plaintiff's employment contract.  Plaintiff alleges that those terms include

(1) the duty to issue Plaintiff equity in Xpanse in the form he had been promised, (2) the duty to

pay certain salary bonuses and benefits, and (3) the duty to follow appropriate procedures when

firing Plaintiff.  Complaint ¶¶ 175-79.

To state a breach of contract claim, the plaintiff must allege (a) the existence of a contract

between the parties, (b) plaintiff's performance or excuse for nonperformance, (c) defendant's

breach, and (d) the resulting damages to plaintiff.  *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th

811, 821 (2011).  Whether Plaintiff and Xpanse were actually in a contract is at issue here.

"Contract formation requires mutual consent, which cannot exist unless the parties 'agree

upon the same thing in the same sense.'"  *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208

(2006) (quoting Cal. Civ. Code, §§ 1580, 1550, 1565).  Mutual assent is typically demonstrated by

an offer and acceptance communicated to the offeror.  *Donovan v. RRL Corp.*, 26 Cal.4th 261,

270-71 (2001).  "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.  Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved."  *Meyer v. Banko*, 55 Cal.App.3d 937, 942-43 (1976).

At the pleading stage, Plaintiff has stated enough facts to plausibly allege that Xpanse and Plaintiff entered into a mutual employment agreement.  *Eller v. City of Santa Rosa*, No. C09-01094 TEH, 2009 WL 3517610, at *5 (N.D. Cal. Oct. 23, 2009) ("Although mutual assent is a prerequisite for contract formation, an adequate pleading need only allege the contract's existence.").  Plaintiff's employment contract with FMC stated that his duties would include "setting up, creating, and running a new affiliate of [FMC]."  *Id.* (Ex. A at 100-101).  The FMC contract goes on to state that Plaintiff "will become President of [the new company] following mutual agreement between [Plaintiff] and [the new company] on a new employment agreement." *Id.*  There was also an unsigned form contract attached to Plaintiff's FMC contract that listed the new technology company as a party to the agreement.  *Id.* (Ex. A at 132).  Plaintiff alleges that he began working for the new technology company, Xpanse, hiring employees, creating a business strategy, and building out Xpanse's technology, as soon as it was incorporated in May 2020.  *Id.* ¶¶ 43-47.  Plaintiff also alleges that Defendants asked him to move from California to Bellevue, Washington where Xpanse had decided to move headquarters, so that he could continue working for Xpanse.  *Id.* ¶ 76.  Finally, Plaintiff was listed as Xpanse's CEO on the company's website.  *Id.* ¶ 44.  These facts allow for the plausible inference that Xpanse and Plaintiff mutually consented to enter into an employment agreement.  An employment relationship had begun, and it may reasonably be inferred that the parties had assumed that the terms of employment would be consistent with what Xpanse's founder, FMC, had promised to Plaintiff.

Defendants argue, however, that Xpanse never consented to enter into an employment agreement with Plaintiff because Xpanse did not sign a new employment agreement.  Motion to Dismiss at 28-29.  To support this contention, Defendants rely heavily on the following conditional language in Plaintiff and FMC's employment contract: Plaintiff "will become President of [the new technology] *following mutual agreement* between [Plaintiff] and [the new

29

technology company] on a *new employment agreement*."  Complaint ¶ 173 (Ex. A at 101).  Given this language, Defendants argue that Xpanse cannot have contracted with Plaintiff because Xpanse never signed a contract, demonstrating that it did not mutually agree to enter into a new employment agreement.  Motion to Dismiss at 28-29.

The fact that Xpanse did not sign the form employment contract attached to Plaintiff's contract with FMC does not preclude as a matter of law a contract.  A contract can be implied-in-fact, rather than in writing.  *Division of Labor Law Enforcement v. Transpacific Transportation Co.*, 69 Cal.App.3d 268, 275 (1977).  "An implied-in-fact contract is based on the conduct of the parties.  Like an express contract, an implied-in-fact contract requires an ascertained agreement of the parties."  *Unilab Corp. v. Angeles-IPA*, 244 Cal.App.4th 622, 636 (2016) (internal citation omitted).  As explained above, the fact that Plaintiff began working for Xpanse allows for the plausible inference that he and Xpanse were in a contract that was at the very least implied.  *See Diaz v. Tesla, Inc*., No. 3:17-CV-06748-WHO, 2021 WL 4595023 (N.D. Cal. Oct. 6, 2021) (holding that the jury had a legally sufficient basis to find that defendant and plaintiff had entered into an employment contract—even though defendant never signed a contract—because plaintiff completed work for defendant).

Furthermore, the Court cannot determine at the pleading stage that Xpanse needed to sign an employment contract in order to be bound.  Whether a signed agreement was indispensable to the formation of a contractual relationship is a factual question.  As the court in *Callie v. Near* held, "[w]hether the parties *intended* only to be bound upon the execution of a written, signed agreement is a factual issue."  829 F.2d 888, 890-91 (9th Cir. 1987).  Defendants do not point to any provisions in Plaintiff's employment contract with FMC which states that a contract with Xpanse needed to be *signed* in order to convey mutual agreement.  *See Angell v. Rowlands*, 85 Cal.App.3d 536, 542 (1978) ("a contract is invalid if not signed by all parties. . . [o]nly when it is shown, either by parol or express condition, that the contract was not intended to be complete until all parties had signed"); *Performance Plastering v. Richmond American Homes of California, Inc.*, 153 Cal.App.4th 659, 668 (2007) ("[T]he lack of a party's signature does not make a fully executed contract unenforceable.").  Accordingly, the fact that Xpanse did not sign the form

30

United States District Court
Northern District of California

1    contract attached to FMC's employment agreement does not defeat Plaintiff's claim at this

2    pleading stage.

3         Plaintiff has also adequately alleged the remaining elements of a breach of contract claim:

4    plaintiff's performance, defendant's breach, and the resulting damages to plaintiff.  *Richman v.*

5    *Hartley*, 224 Cal.App.4th 1182, 1186 (2014).  He alleges that he performed all of his duties under

6    the contract, specifically running Xpanse, and that Xpanse breached its duties under the contract

7    by failing to perform several of the terms listed in the unsigned form contract.  Complaint ¶¶ 174-

8    78.  Those terms are described above.  By allegedly breaching these terms, Xpanse damaged

9    Plaintiff in the form of lost compensation and employment benefits.  *Id.* ¶ 179.  Accordingly, the

10   Court **DENIES** Defendants' motion as it pertains to Plaintiff's breach of contract claim against

11   Xpanse.

12        3.        Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 6)

13        Plaintiff alleges that Xpanse and FMC breached the implied covenant of good faith and

14   fair dealing in performing their contractual obligations.  Complaint ¶¶ 180-87.  "There is an

15   implied covenant of good faith and fair dealing in every contract that neither party will do

16   anything which will injure the right of the other to receive the benefits of the agreement."

17   *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 658 (1958) (internal citation omitted).

18   To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must

19   first plead that there was a contract between it and the defendant.  *Smith v. City and Cty. of San*

20   *Francisco*, 225 Cal. App.3d 38, 49 (1990).  Second, the plaintiff must allege that the defendant

21   acted in a way that deprived the plaintiff of benefits conferred by that contract.  *Boland, Inc. v.*

22   *Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1103 (E.D. Cal. 2010).

23        Turning first to his claim against Xpanse, Plaintiff argues in his opposition that Xpanse

24   breached the implied covenant of good faith by converting from a public-facing corporation to a

25   limited liability company.  Opposition at 26.  This action allegedly breached the implied covenant

26   of good faith because it impacted the form, and by extension the value, of Plaintiff's equity in

27   Xpanse.  *Id.*  Though Xpanse was not contractually required to remain a corporation, it was

28   allegedly contractually required to provide Plaintiff with certain forms of equity.  *Id.*  And by

                                               31

United States District Court
Northern District of California

1   changing to an LLC, Xpanse was no longer able to provide Plaintiff with the equity he was

2   promised.  *Id.*  In contrast, Plaintiff alleges that FMC breached the implied covenant of good faith

3   and fair dealing by failing to transfer his employment to Xpanse and failing to issue shares in

4   Xpanse equity.  Complaint ¶¶ 175-86.

5       In opposing the claim against Xpanse, Defendants first argue that Plaintiff has failed to

6   allege the existence of a contract between Plaintiff and Xpanse.  Motion to Dismiss at 29.  As

7   discussed above, Plaintiff has adequately alleged that there was a contract between him and

8   Xpanse.  Defendants do not dispute that there was a contract between FMC and Plaintiff.

9       Defendants also argue that Plaintiff's breach of the implied covenants and good faith

10  claims against Xpanse fails because it is premised on the same breach theory as his breach of

11  contract claim.  *Id.* at 29-30.  A plaintiff, however, can bring a breach of contract claim in tandem

12  with a breach of the implied covenant of good faith claim if the claims are premised on different

13  theories of breach.  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 327 (2000); *cf. Careau & Co. v.*

14  *Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371, 1395 (1990) (If a breach of the implied

15  covenant of good faith claim is premised on the same facts and seeks the same damages as the

16  plaintiff's breach of contract claim, the implied covenant claim may be dismissed as superfluous.).

17  Contrary to Defendants' contention, Plaintiff has alleged a breach theory for his claim against

18  Xpanse that is not necessarily identical to the express breach claim.  This is so because at this

19  juncture, we do not know what the precise terms of the express contract were.  A claim for breach

20  of an implied covenant could fill in the interstices of the express contract.

21      Plaintiff's allegation against Xpanse is sufficient to state claim for breach of the implied

22  covenant of good faith and fair dealing.  The covenant is intended to "prevent a contracting party

23  from engaging in conduct which (while not technically transgressing the [contract's terms])

24  frustrates the other party's rights to the benefits of the contract."  *Racine & Laramie, Ltd. v.*

25  *Department of Parks & Recreation*, 11 Cal.App.4th 1026, 1031 (1992) (internal citations omitted).

26  As a particular example, though Xpanse was not contractually required to remain a corporation, its

27  actions to convert from a corporation to an LLC allegedly frustrated Plaintiff's contractual right to

28  receive Xpanse equity.  Accordingly, the Court **DENIES** Defendants' motion as to the breach of

the covenant of good faith claim against Xpanse.

In contrast, Plaintiff has failed to allege a breach of the implied covenant of good faith claim against FMC.  As pled, Plaintiff's breach of contract claim and breach of the implied covenant of good faith claim against FMC are based on the same theories of breach.  Both claims are premised on the theory that FMC failed to transfer Plaintiff's employment to Xpanse and failed to issue shares of equity in Xpanse.  Complaint ¶¶ 175-86.  In his opposition, Plaintiff does not explain how his breach of the implied covenant claim against FMC is distinct from his breach of contract claim against FMC.  Given that Plaintiff has not pled a distinct theory of breach for his implied covenant of good faith claim against FMC, the Court **GRANTS** Defendants' motion as to the breach of the covenant of good faith claim against FMC.

### 4.      California Labor Code Section 1102.5 (Count 7)

Plaintiff alleges that FMC, Xpanse, and the Middlemans violated California Labor Code Section 1102.5, when they fired him for refusing to participate in the Middlemans' plan to calculate their Xpanse shares differently than shares provided to other employees.  Complaint ¶ 190.  "Labor Code section 1102.5 is a whistleblower statute, the purpose of which is to encourage workplace whistle-blowers to report unlawful acts without fearing retaliation."  *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 287 (2006).  Defendant argues that the statute only applies to employers, not supervisors, and consequently, Stanley Middleman, Michael Middleman, and Gregory Middleman cannot be liable.  Motion to Dismiss at 30.

A California court has not spoken on the express issue of whether a supervisor can be liable under California Labor Code Section 1102.5.  However, most district courts that have addressed the issue have held that section 1102.5 does not impose individual liability on supervisors.  *United States v. CardioDx, Inc.*, No. 15-CV-01339-WHO, 2019 WL 2163002, at *13 (N.D. Cal. May 17, 2019) (collecting cases); *Bales v. County of EL Dorado*, 2:18-CV-01714-JAM-DB, 2018 WL 4558235, at *2 (E.D. Cal. Sept. 20, 2018) ("Cases where district courts considered the amended language under the Rule 12(b)(6) standard have found that section 1102.5 does not impose individual liability on supervisors."); *Broward v. Ericsson Inc.*, 18-CV-02380-EMC, 2018 WL 3646445, at *6 (N.D. Cal. Aug. 1, 2018) ("Plaintiff first two claims [ ] are

1    precluded by law: only employers are liable for tortious wrongful discharge and violations of state

2    law whistleblower protections, not employees or individual supervisors); *see also Jacobs v.*

3    *Universal Development Corp.*, 53 Cal. App. 4th. 692, 697 (1997) (interpreting an earlier version

4    of the statute to imply that "only an employer, and not individual employees, may be liable for

5    tortious discharge").

6          District Courts have reasoned that if the California Supreme Court were to address the

7    issue, it would hold that section 1102.5 does not impose personal liability on employees and

8    supervisors.  *See, e.g., Crone v. Tracy Unified Sch. Dist.*, No. 2:20-CV-01451-JAM-AC, 2020 WL

9    7182345, at *2 (E.D. Cal. Dec. 7, 2020) (collecting cases).  Though section 1102.5 states that

10   "[a]n employer, or any person acting on behalf of the employer" (Cal. Lab. Code § 1102.5(a)) is

11   liable for retaliatory action, courts have noted that "[t]he California Supreme Court has interpreted

12   statutory language similar to. . . [this language] to preclude individual liability."  *Tillery v. Lollis*,

13   1:14-CV-02025-KJM, 2015 WL 4873111, at *9 (E.D. Cal. Aug. 13, 2015); *Rosas v. NFI Indus.*,

14   No. 221CV00046WBSCKD, 2021 WL 1264921, at *5 (E.D. Cal. Apr. 6, 2021).

15         In past cases, the California Supreme Court has rejected the notion that the phrase "[a]n

16   employer, or any person acting on behalf of the employer" creates individual liability because the,

17             "Legislature has adopted other ways to signal individual liability,
              such as the 'clear  language' in Government Code section
18            12940(j)(3) 'imposing personal liability on all  employees for their
              own harassing actions.'  That clear language reads: 'An employee of
19            an entity ... is personally liable for any harassment prohibited by this
              section that is perpetrated by the employee....'"
20

21   *Tillery*, 2015 WL 4873111, at *9 (quoting *Reno v. Baird*, 18 Cal.4th 640, 646-47 (1998)).  If the

22   state legislature had intended section 1102.5 to impose personal liability on supervisors, it would

23   have included similarly clear language.  *Id.*

24         The one case which Plaintiff relies on, *Moren v. Nat'l Express Transit, Inc.*, 2021 WL

25   5602820, (E.D. Cal. Nov. 30, 2021), to support his contention that supervisors can be liable under

26   Labor Code Section 1102.5 does not counter the weight of authority.  In *Moren*, the court reasoned

27   that "as a matter of state law, it is not obvious whether a defendant can or cannot be found

28   personally liable under § 1102.5" because a California appellate court had not spoken on the

United States District Court
Northern District of California

specific issue yet.  *Id.*  Notably, the court did not question the other district court cases which had dismissed section 1102.5 claims against individual defendants, but instead reasoned that those decisions "all resolved merits-related motions that require the court to employ a legal standard that is distinct from the more demanding jurisdictional inquiry it must use to consider the propriety of removal based on fraudulent joinder."  *Id.*

This decision does not hold that section 1102.5 liability can be imposed on individual supervisors as Plaintiff contends.  Rather, it demonstrates that the court was unwilling to dismiss the non-diverse defendant and exercise jurisdiction over a suit without a California appellate having spoken on the specific issue.  Given that most district courts to have ruled on this issue in the context of a 12(b)(6) motion have held that section 1102.5 liability does not apply to individual supervisors, and Plaintiff has not provided any persuasive authority that says otherwise, Defendants' motion as to the Labor Code Section 1102.5 claim against Stanley Middleman, Michael Middleman, and Gregory Middleman is **GRANTED**.

> 5. <u>Intentional Inducement of Breach of Contract, Intentional Interference with Economic Relations, and Negligent Inducement of Breach of Contract (Count 10, Count 11, Count 12)</u>

Plaintiff asserts causes of action for intentional interference with economic relations, intentional inducement of breach of contract, and negligent inducement of breach of contract against Stanley Middleman, Michael Middleman, and Gregory Middleman.  As a preliminary matter, under California law there is "no cause of action for negligent interference with contractual relations."  *Davis v. Nadrich*, 174 Cal.App.4th 1, 9 (2009).  Accordingly, the Court **GRANTS** Defendants' motion as to Plaintiff's negligent inducement of breach of contract claim.

Plaintiff's other two claims, intentional interference with economic relations and intentional inducement of breach of contract, are both premised on the same theory.  Specifically, Plaintiff alleges that the Middlemans "intended to disrupt the contract between [Plaintiff] and Defendants Freedom Mortgage Corporation and Xpanse," and that these disruptions led to damages in the form of lost compensation, damage to his reputation, and emotional distress.  Complaint ¶¶ 221, 228.  The elements which a plaintiff must plead to state a cause of action for

intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) (internal citations omitted).

Plaintiff has failed to state a claim for intentional inducement of breach of contract and intentional interference with economic relations. "[C]orporate agents and employees acting for or on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract," unless the corporate agent was acting for his own benefit, rather than the corporation's benefit. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 512 n.4 (1994); *see 1-800 Contacts, Inc. v. Steinberg*, 107 Cal.App.4th 568, 592 (2003) ("An exception to the agent's immunity, for conduct undertaken for personal advantage, is consistent with the immunity rule, because pursuit of a personal interest renders the actor more than merely the agent of another."); *Mintz v. Blue Cross of California*, 172 Cal. App. 4th 1594, 1605 (2009) (recognizing that "the agent's immunity rule does not apply when the agents are acting as individuals for their individual advantage."). Given that the Middlemans all held director roles at FMC and Xpanse, Plaintiff must allege facts demonstrating that the Middlemans acted for their own benefit, rather than FMC's of Xpanse's, to plead that their actions were intentional and intended to disrupt Plaintiff's employment contracts with FMC and Xpanse—the third element of his claims.

Plaintiff has failed to plead facts suggesting that the Middleman's were acting for their own personal gain. To the contrary, the facts alleged in the complaint suggest that the Middlemans were acting on FMC's and Xpanse's behalf, rather than for their individual benefit, when they allegedly fabricated a reason to fire Plaintiff for cause. Plaintiff states expressly in the complaint that "[d]efendants concealed from [Plaintiff] their plan to turn [Xpanse] into a closely held subsidiary of the [Archwell entities]" in order to "serve the economic needs and self-serving priorities of FMC." Complaint ¶ 128. This statement suggests that the Middlemans fired Plaintiff to further FMC's interests, not their own. Accordingly, the Court **GRANTS** defendants' motion as it pertains to Plaintiff's intentional interference with economic relations and intentional

1    inducement of breach of contract claims.

2          6.     Unfair Competition Law (Count 16)

3          Plaintiff alleges that FMC, Xpanse, Stanley Middleman, Gregory Middleman, and Michael

4    Middleman violated California's Business and Professions Code section 17200, known as the

5    Unfair Competition Law ("UCL").  The UCL prohibits "unlawful, unfair, or fraudulent business

6    act[s] or practice[s]" that cause the plaintiff asserting a claim to have "suffered injury in fact" and

7    "lost money or property."  Cal. Bus. & Prof. Code §§ 17200, 17204; *see South Bay Chevrolet v.*

8    *Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 885 (1999).  "It governs 'anti-competitive

9    business practices' as well as injuries to consumers, and has as a major purpose 'the preservation

10   of fair business competition.'"  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.

11   4th 163, 180 (1999) (quoting *Barquis v. Merchants Collection Assn.,* 7 Cal.3d 95, 110, 101

12   (1972)).  Its "coverage is sweeping, embracing anything that can properly be called a business

13   practice and that at the same time is forbidden by law."  *Rossberg v. Bank of Am., N.A.,* 219 Cal.

14   App. 4th 1481, 1501 (2013) (internal quotations omitted).  "[L]iability can lie against an officer or

15   director who either personally commits a tort or . . . personally commits the alleged UCL act or

16   was sufficiently responsible for the commission of that act through his personal direction or action

17   that he may be held personally liable."  *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab.*

18   *Litig.*, 497 F. Supp. 3d 552, 635 (N.D. Cal. 2020).

19         Plaintiff alleges that defendants FMC, Xpanse, Stanley Middleman, Gregory Middleman,

20   and Michael Middleman violated the UCL by engaging in unlawful practices.  Those practices

21   include: making fraudulent promises, directing the breach of Plaintiff's contracts with Xpanse and

22   FMC, failing to pay Plaintiff certain wages, and violating several California labor codes.

23   Defendants, however, argue that the UCL claims should be dismissed because Plaintiff is not an

24   "average consumer," or "member of the general public."  Motion to Dismiss at 32.  Rather he is an

25   "accomplished business, digital and technology leader with an MBA" and therefore does not have

26   standing to bring a UCL claim.  Motion to Dismiss at 33.

27         Contrary to Defendants' contention, employees *can* bring UCL claims against their

28   employers for restitution of unpaid earned wages.  *See Cortez v. Purolator Air Filtration Prod.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Co*., 23 Cal. 4th 163, 168 (2000) (holding that "[a]n order that earned wages be paid is [] a

2  restitutionary remedy authorized by the UCL"); *Dang v. Sutter's Place, Inc*., No. C-10-02181

3  RMW, 2013 WL 5955561, at *2 (N.D. Cal. Oct. 28, 2013) ("When an employer has violated

4  the UCL by failing to pay wages owed to an employee under the law, the employer may be

5  compelled to restore those wages as a form of restitution.").  Plaintiff may have been an employee

6  in a high-level position, but he was still an employee.  Therefore, he can bring a UCL claim

7  against his former employers and supervisors for their fraudulent, unfair, or unlawful practices—

8  such as violating California labor code or committing fraud—which resulted in lost wages.  *See*

9  *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1564 (2014) (holding that supervisors

10  who promote, participate, and are aware of an employer's fraudulent or unlawful practices are

11  liable under the UCL).

12          Defendants do not cite to any cases which suggest that an employee's professional

13  experience or level of education bars him from bringing a UCL claim against his former employer.

14  Instead, Defendants rely on cases which involve corporate entities.  It is true that a corporate entity

15  may not have standing to bring a UCL claim when it cannot show that any individual consumers

16  were harmed by the defendant's wrongdoing or that the defendant's acts were anticompetitive.

17  *See Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007) (noting that

18  "where a UCL action is based on contracts not involving either the public in general or individual

19  consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the

20  relief it seeks"); *Rosenbluth Internat., Inc. v. Superior Ct*., 101 Cal. App. 4th 1073, 1079 (2002)

21  (holding that a corporate entity may not bring a UCL claim on behalf of other corporations who

22  are not a part of the general public).  However, this case is not a dispute between two corporate

23  entities.  Rather, it is a dispute between an employee and his former employer.

24          Since Plaintiff has alleged (1) that Defendants FMC and Stanley Middleman committed

25  fraud, and that Xpanse, Gregory Middleman, and Michael Middleman violated several California

26  labor codes that were not at issue on this motion, and (2) that these actions resulted in unpaid

27  wages, Plaintiff has sufficiently pled a UCL claim.  Accordingly, Defendants' motion as it pertains

28  to Plaintiff's UCL claim is **DENIED**.

7.      Equitable Claims (Count 17, Count 18, Count 19)

Plaintiff pleads three equitable claims for constructive trust, equitable accounting, and declaratory relief.  Complaint ¶¶ 298, 302, 308.  Plaintiff concedes in his opposition that constructive trust is not a cause of action in California.  Opposition at 30.  Accordingly, the Court **GRANTS** defendants' motion as it pertains to Plaintiff's constructive trust claim.

a.      Equitable Accounting

Plaintiff also asserts a claim for equitable accounting.  "An action for an accounting may be brought to compel the defendant to account to the plaintiff for money or property (1) where a fiduciary relationship exists between the parties, or (2) where, even though no fiduciary relationship exists, the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable."  *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 910 (2013).  Plaintiff alleges that because he is owed a 5% ownership interest in Xpanse per his employment contract with FMC, he is entitled to the value and benefits of that ownership.  Complaint ¶ 303.  He seeks an accounting because Defendants are the only parties with the knowledge of Xpanse's actual value, making an ordinary legal action demanding a fixed sum impractical.  Opposition at 31.

Although neither party points to a case addressing whether an employee may seek an accounting to determine the value of his ownership interest in a company, *Foley v. U. S. Paving Co.*is instructive.  262 Cal. App. 2d 499 (Ct. App. 1968).  The case involved an employment contract under which an employee was to receive a percentage of the company's pre-tax profits in addition to his salary.  *Id.* at 501.  After learning that the company's directors had been increasing their own salaries without the employee's consent, thus decreasing the company's pre-tax profits, and by extension the employee's bonus, the employee brought an action for an accounting to recover the portions of his bonus he believed he was owed.  *Id.* at 504.  The court held that the employee had a right to an accounting under his employment contract.  *Id.* at 505-06.

Similarly, here, Plaintiff seeks an accounting to determine the value of the equity that he was allegedly promised in his employment contract, and which defendants failed to issue him.  Complaint ¶ 303.  Attempting to determine the exact value of Xpanse's equity in order to demand

39

United States District Court
Northern District of California

1  a fixed sum would be nearly impossible without further information about Xpanse's revenue,

2  expenditures, and other assets.  An accounting may therefore be appropriate.  Accordingly, the

3  Court **DENIES** Defendants' motion as it pertains to Plaintiff's equitable accounting claim.

4              b.    Declaratory Relief

5        Finally, Plaintiff asserts a claim for declaratory relief.  Complaint ¶ 308.  Specifically, he

6  "seeks a declaration of his rights under [his employment] contract, including but not limited to his

7  right to severance, benefits, and his ownership interest in Xpanse."  Complaint ¶ 310.  Defendants

8  argue that this claim should be dismissed because it is duplicative of his breach of contract claim.

9  Motion to Dismiss at 34.

10        Under 28 U.S.C. section 2201, "any court of the United States, upon the filing of an

11  appropriate pleading, may declare the rights and other legal relations of any interested party

12  seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C.A. § 2201.

13  "Declaratory relief is not intended to redress past wrongs."  *Vascular Imaging Pros., Inc. v.*

14  *Digirad Corp.*, 401 F. Supp. 3d 1005, 1010 (S.D. Cal. 2019) (citing *U.S. v. Wash.*, 759 F.2d 1353,

15  1357 (9th Cir. 1985)).  Rather, "its purpose is to resolve uncertainties or disputes that may result in

16  future litigation."  *Id.*  It is appropriate to bring a declaratory relief claim in tandem with a breach

17  of contract claim "where [the] breach of contract claim will not settle all of the contractual issues

18  concerning which plaintiff seeks declaratory relief."  *StreamCast Networks, Inc. v. IBIS LLC*, No.

19  CV05-04239MMM(EX), 2006 WL 5720345, at *4 (C.D. Cal. May 2, 2006).

20        Plaintiff has not adequately alleged a claim for declaratory relief because he has not

21  specified how the declaratory relief claim addresses issues that will not be settled by his breach of

22  contract claim.  Notably, Plaintiff alleges that Defendants breached his employment contract by

23  failing to pay the second half of his signing bonus and make 401K matching payments,

24  (Complaint  ¶ 178(E-F)), failing "to provide [him] with the severance benefits he is entitled to

25  receive under the severance agreement provisions," (Complaint ¶ 178(L)), and "failing to adopt

26  and establish an equity incentive plan as required under ¶ 5(g) of [his] contract." Complaint ¶

27  178(b).  Determining whether these actions amounted to a breach of contract will require a finding

28  that Plaintiff had a right to receive certain benefits, severance, and equity under his contract.

Since, Plaintiff's claim for declaratory relief is seeking the same factual findings as his breach of contract claims, it is duplicative.  Accordingly, the Court **GRANTS** Defendants' motion as it pertains to Plaintiff's declaratory relief claim.

## V.  CONCLUSION

For the foregoing reasons the Court **GRANTS in part and DENIES in part** defendants' motions for lack of personal jurisdiction and failure to state a claim as follows.  Defendants' motion for lack of personal jurisdiction is **GRANTED** as to defendants Keystone, the Archwell entities, and Erik Anderson.  Defendants motion for failure to state a claim is **GRANTED** as to (1) all fraud claims against Michael Middleman, Gregory Middleman, and Xpanse, (2) all fraudulent misrepresentation and negligent misrepresentation claims, (3) the breach of the implied covenant of good faith and fair dealing claim against FMC, (4) the California Labor Code section 1102.5 claims against Stanley Middleman, Michael Middleman, and Gregory Middleman, (5) the intentional inducement of breach of contract claim, (6) the intentional interference with economic relations claim, (7) the negligent interference with economic relations claim, (8) the constructive trust claim, and (9) the declaratory relief claim.  Defendants' motion as to all other claims not mentioned above is **DENIED**.

This order disposes of Docket No. 12.


**IT IS SO ORDERED**.


Dated: May 2, 2022

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California