# EXHIBIT A

Ekwan E. Rhow - State Bar No. 174604
erhow@birdmarella.com
Oliver Rocos - State Bar No. 319059
orocos@birdmarella.com
Kate S. Shin - State Bar No. 279867
kshin@birdmarella.com
Barr Benyamin - State Bar No. 318996
bbenyamin@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff and Counter-Defendant Rahul Mewawalla

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| RAHUL MEWAWALLA, an individual;<br><br>Plaintiff,<br><br>vs.<br>STANLEY C. MIDDLEMAN, an individual; MICHAEL B. MIDDLEMAN, an individual; GREGORY E. MIDDLEMAN, an individual; ; FREEDOM MORTGAGE CORPORATION; a New Jersey corporation; XPANSE, LLC, a Delaware limited liability company; ; and DOES 1-50, inclusive<br><br>Defendants. | Case No.: 3:21-cv-09700-EMC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>**1. Fraud-False Promise;**<br>**2. Fraud-Concealment;**<br>**3. Breach of Contract;**<br>**4. Breach of Covenant of Good Faith and Fair Dealing;**<br>**5. Wrongful Discharge in Violation of Public Policy;**<br>**6. Wrongful Withholding of Wages, Including Upon Termination in Violation of RCW 49.48.010;**<br>**7. Intentional Wrongful Withholding of Wages in Violation of RCW 49.52.050 – Rebates of Wages – Penalty;**<br>**8. Equitable Accounting.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually for his complaint against Defendants Stanley Middleman, Michael Middleman, Gregory Middleman, Freedom Mortgage Corporation, Xpanse, LLC, and Does 1-50, inclusive, alleges upon information and belief, as follows:

**JURISDICTION AND VENUE**

1. Plaintiff is a citizen of the State of Washington who was employed in Santa Clara County, California and subsequently in Washington State by Defendant Freedom Mortgage Corporation as Executive Vice President, Platforms and Technology Businesses and Chief Digital Officer between March 30, 2020 and January 22, 2021. Plaintiff was jointly employed by Archwell Technology Corporation, referred to as Freedom Technology Corporation ("FTC") in Plaintiff's employment contract, which was subsequently renamed Xpanse, Inc., and now called Xpanse, LLC, from May 27, 2020 through January 22, 2021 as Chief Executive Officer/President and Co-Founder.

2. Defendant Stanley Middleman is the CEO and principal owner, shareholder and beneficiary of Freedom Mortgage Corporation and is a resident of New Jersey and/or Florida. Stanley Middleman has also been Chairman of a Mortgage Investment Corporation, which is a NYSE listed publicly-traded company, and he also retains control and/or owns interests in several other companies and businesses.

3. Defendant Michael Middleman, son of Defendant Stanley Middleman and brother of Defendant Gregory Middleman, is executive vice president of Freedom Mortgage Corporation and is a principal owner of Archwell Holdings LLC, Archwell Solutions LLC, Archwell Management LLC and Keystone B2B, LLC. Michael Middleman is a resident of Pennsylvania.

4. Defendant Gregory Middleman, son of Defendant Stanley Middleman and brother of Defendant Michael Middleman, is Chief Operating Officer of Xpanse, LLC, vice president at Freedom Mortgage Corporation and a principal owner of Archwell Holdings LLC, Archwell Solutions LLC, Archwell Management, LLC and Keystone B2B, LLC. Gregory Middleman is a resident of Pennsylvania.

5. Defendant Freedom Mortgage Corporation is a corporation formed, organized and existing under the laws of the State of New Jersey, and headquartered in Mount Laurel, New Jersey. It is one of the largest financial services, mortgage and lending companies in the nation and describes itself publicly as "the #1 FHA (government-insured) and VA Lender in the U.S.", "one of the nation's largest full-service mortgage lenders" and "licensed in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands." Freedom Mortgage is a multi-billion-dollar company that has multi-billion-dollar arrangements with numerous publicly-traded banks and has also issued several large bond and other offerings in excess of several hundreds of millions of dollars to investors in recent years subject to securities law, tax law, corporate law, and other applicable laws. According to a 2021 news release from Freedom Mortgage Corporation, the company had a well over $300 billion dollars mortgage portfolio and had annual mortgage origination of $134 billion dollars in 2020. In addition, according to public credit rating agency reports, the company has $9.5 billion of borrowing capacity across committed and uncommitted warehouse facilities.

6. Defendant Xpanse, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It describes itself publicly as a FinTech (financial technology) company "building the modern OS (operating system) for the greater mortgage industry," Xpanse, LLC is a wholly-owned subsidiary of Archwell Holdings, LLC, with Archwell Holdings, LLC as the member and Archwell Management, LLC as the manager. Xpanse, LLC's corporate headquarters and principal place of business is in Bellevue, Washington.

7. Plaintiff lacks sufficient information and belief to allege the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, pursuant to Code of Civil Procedure § 474. For that reason, Plaintiff sues said fictitiously named Defendants by such fictitious names. When the true names, nature and capacity of said fictitiously named Defendants are ascertained, Plaintiff shall amend this Complaint accordingly. At all times herein mentioned, all Defendants herein, whether named or unnamed were and are responsible

and liable to Plaintiff for all of Plaintiff's damages and other relief prayed for herein. Plaintiff alleges on information and belief that at all times herein mentioned, each of the Defendants herein, whether named or unnamed, was the agent, servant, employee, co-conspirator, co-adventurer, and employee of each other Defendant herein, whether named or unnamed. With respect to each action and inaction pled in the following paragraphs, each of the Defendants, whether named or unnamed, was acting within the full course and scope of their agency and employment and was acting with the full knowledge, consent, ratification and approval of each other Defendant herein, whether named or unnamed.

8. The value of the damages, penalties and interest sought in this action exceed the minimum jurisdictional requirements of the Court. Venue in the Court is proper because: (1) Plaintiff entered into and executed the employment contract in Santa Clara County, California (2) Plaintiff lived in and worked for Defendants in Santa Clara County, California; and (3) Plaintiff and Defendants entered into a binding employment contract that selected California law and Santa Clara County Superior Court as the venue for the resolution of all claims arising out of Plaintiff's employment. (Exhibit A).

## BACKGROUND

A. Plaintiff Negotiates an Agreement to Become the Founding President of the Company that is Now Known as Xpanse, LLC

9. Plaintiff is an accomplished business, digital and technology leader. He earned an MBA from the Kellogg School of Management, Northwestern University, and has numerous years of executive management and leadership experience. Plaintiff has held leadership, executive and entrepreneurial roles at a number of major business, digital and technology companies such as Nokia, General Electric/NBCUniversal, Yahoo and has been featured in major publications such as the Wall Street Journal, CNBC, Harvard Business Review and has also been involved with philanthropic organizations such as SOS Children's Villages USA, one of the largest non-profit organizations serving children in need.

10. In 2019, Plaintiff entered into discussions with Defendant Stanley Middleman. Over the course of the following several months, Plaintiff spoke with and met personally with Stanley Middleman numerous times in both New York City, including on November 6, 2019 and November 7, 2019, and at and near Freedom Mortgage's headquarters in Mount Laurel, New Jersey on October 11, 2019 and on December 20, 2019, in addition to more discussions over the phone, including on September 19, 2019 and October 17, 2019 about the Middleman family's desire to create a technology company that would develop and market technologies to revolutionize the tools and processes used by lenders and service providers in the mortgage industry. Stanley Middleman described the technology company as a multi-billion-dollar opportunity, and informed Plaintiff that the goal of the technology company is to take it public through an IPO. Stanley Middleman described to Plaintiff the substantial projected valuation of the technology company and how although he had already amassed substantial wealth, he saw this as an opportunity to further grow his and his family's coffers by several billion dollars. Plaintiff informed Stanley Middleman that for Plaintiff to consider this opportunity and partner with the Defendants, Defendants would have to provide Plaintiff with meaningful equity ownership as a central component of his employment compensation and the Defendants would have to commit that Plaintiff and Xpanse's employees get value and participate through equity ownership in the company.

11. Plaintiff and Stanley Middleman discussed and agreed that the technology company would be incorporated, run and operated as an independent corporation, similar to how the NYSE listed publicly-traded Mortgage Investment Corporation that Stanley Middleman was involved with was operated, and that it would not be like Archwell Holdings or Freedom Mortgage Corporation, which were closely held and operated by the Middleman's. Stanley Middleman said to Plaintiff that he and the Mortgage Investment Corporation CEO would meet occasionally for lunch about once a month and the CEO of the Mortgage Investment Corporation ran the company independently. Stanley Middleman discussed with Plaintiff that

the Middleman's had previously tried to generate substantial gain through technology related ventures. However, they had failed, and that it would key for them have a leader like Plaintiff to partner with to form, launch and lead the technology company, and to attract and recruit the caliber of talent needed.

12. Defendant Stanley Middleman promised Plaintiff that Freedom Mortgage Corporation would contribute about $140-$150 million in annual revenue recurring run rate to the new technology company. Stanley Middleman also promised Plaintiff that Freedom Mortgage Corporation would transfer substantial valuable intellectual property, transfer all the significant technology assets owned by Freedom Mortgage Corporation and Archwell Holdings, and transfer large numbers of valuable technologists from Freedom Mortgage Corporation and Archwell Holdings related to the development of technology (including engineers and developers), to the new company.

13. Defendant Stanley Middleman also promised Plaintiff that he would get other major U.S. mortgage companies, including a specific NASDAQ listed publicly-traded company, to contribute and work with the new technology company. He described how his plans would further enhance the opportunity and value of the technology company, which would have about $200 million in annual recurring revenue. Stanley Middleman informed Plaintiff that in addition to getting the Chairman and CEO of the specific NASDAQ listed publicly-traded major U.S. mortgage company involved, he would get several other major mortgage companies, servicers and others operating in the industry to support the growth and success of the technology company.

14. Defendant Stanley Middleman informed Plaintiff that Freedom Mortgage Corporation and Archwell Holdings had significant existing technology assets and owned substantial valuable intellectual property. He promised those assets would be transferred to the technology company, which would enable the technology company to have a substantial base of assets, revenue, resources and technologists immediately and accelerate its success.

15. Defendant Stanley Middleman informed Plaintiff that he and his team of advisors had projected the technology company's valuation to be in the tens of billions of dollars. Defendant Stanley Middleman also informed Plaintiff that he intended to obtain a number of additional multi-million-dollar recurring revenue contracts from companies, including from the specific NASDAQ listed publicly-traded major U.S. mortgage company and others, to contribute additional revenue to the new technology company in addition to the $140-$150 million recurring annual revenue from Freedom Mortgage Corporation. This revenue would further support the technology company's aggressive growth plans and even further enhance the technology company's valuation and the value of the equity compensation.

16. Defendant Stanley Middleman informed Plaintiff that he planned for Plaintiff to lead the technology company over the next several years, that he viewed Plaintiff as a business partner, in addition to being leader of the technology company, and that Plaintiff would have a long-term employment and business relationship with the company as the company went public through an IPO, and post-IPO as the company continues to operate and expand.

17. On about November 7, 2019, after discussions and meetings between Plaintiff and Defendants Stanley Middleman, Michael Middleman, and others, Defendant Stanley Middleman negotiated terms of employment with Plaintiff and told Plaintiff that he intended to send Plaintiff a formal employment offer. Defendants wanted to hire Plaintiff to form, lead and build a spin-off technology company, which initially was to be called Freedom Technology Corporation ("FTC"), and to serve as its Founding President.

18. Over the course of the following several weeks, Plaintiff engaged in contract negotiations with Robert King, Special Advisor to Defendant Stanley Middleman and Executive Vice President for Freedom Mortgage Corporation, who is a lawyer, and Christopher Staub, friend of Defendant Michael Middleman and Senior Vice President of Finance for Freedom Mortgage Corporation.

19. During this time, Plaintiff was also in discussions with another company in the

European Union to serve as its Managing Director and to take the role of CEO. That company had offered Plaintiff at least $19,200,000.00 cash compensation over 3 years, with at least $7,200,000.00 cash compensation in the first year, for an initial 3-year fixed commitment, with expected 3-year recurring extensions henceforth. That company also offered double-digit percentage equity that based on overall financial projections by the company would equal or exceed $200 million.

20. Based on representations made to him by Defendants about the multi-billion-dollar opportunity for the new technology company, the value of the equity, the specific structure, form, and manner of the equity, their contributions, the independent nature and operation of the technology company, C-Corp structure of the company, and long-term employment and partnership, Plaintiff eventually elected to proceed forward with Freedom Mortgage Corporation's more valuable offer.

21. During a breakfast meeting with Stanley Middleman at 80 Columbus Circle in New York City on about November 7, 2019, as Stanley Middleman and Plaintiff were negotiating Plaintiff's employment terms including equity ownership and signing bonus, Plaintiff disclosed that he was in discussions with another company. In response, Stanley Middleman promised that the value of Plaintiff's ownership interests and the value of the new technology company would be significant. He promised he was committed to a long-term relationship with Plaintiff, who would for several years to come serve as the leader of a multi-billion-dollar technology venture. Stanley Middleman said that he expected Plaintiff to take the company public and lead it through to an IPO in four to five years, and to serve beyond.

22. During this meeting Stanley Middleman described the plan to Plaintiff. Plaintiff would first join Freedom Mortgage Corporation. When the technology company was formed, Plaintiff's employment would be transferred there as its leader. The Middleman's companies, including Freedom Mortgage Corporation, Archwell Holdings, KeystoneB2B and other entities, would transfer and fulfill their technology assets, revenue, technologists, intellectual

property and other contributions to the technology company. Stanley Middleman would work to secure revenue and other contributions from the specific NASDAQ listed publicly-traded major U.S. mortgage company and others, and to obtain other parties to purchase equity stakes in the technology company in order to establish attractive valuation benchmarks so that Plaintiff could take the company public through an IPO. Stanley Middleman assured Plaintiff he would be the leader of the company through the IPO and henceforth. Stanley Middleman discussed the timeline to take the company public within four to five years given his overall projections and plans.

23. Plaintiff discussed all of this with Stanley Middleman who re-emphasized his representations about the multi-billion-dollar opportunity for the new technology company, the magnitude of his revenue run rate, assets, intellectual property, technology, technologists and staff contributions, the value of Plaintiff's equity ownership, IPO plans for the technology company, Plaintiff being the technology company's founding President and leading the company long-term, and the technology company's independence and focus on external customers and markets. Based on Defendant Stanley Middleman's statements and explicit promises, Stanley Middleman suggested he would offer Plaintiff a 5% stake in the new company instead of the double-digit percentage equity stake in the new company that Plaintiff had requested during prior negotiations with Stanley Middleman. Stanley Middleman also negotiated down the terms of Plaintiff's signing bonus so that instead of receiving the signing bonus as a single lumpsum, only half of the signing bonus would be paid on the first company pay date following Plaintiff's start date and the second half of the signing bonus would be paid on the first pay date following Plaintiff's six-month work anniversary.

24. On December 10, 2019, Robert King sent Plaintiff an offer letter for his consideration, copying Stanley Middleman and Christopher Staub. The offer letter contained terms that were inconsistent with terms discussed during direct negotiations with Stanley Middleman, however, and missed terms such as the signing bonus that Stanley Middleman had already agreed to and

negotiated with Plaintiff. Later that same day, Plaintiff returned a redline of the offer letter that reinserted the missing terms and added other customary terms. In response, Robert King agreed to revise and subsequently, the parties agreed to put together a definitive employment agreement and contract.

25. In January 2020, when the Defendants sent the employment agreement to Plaintiff, it contained provisions that are unlawful in California, where Plaintiff resided and was expected to work. Defendants had at least two seasoned lawyers involved in the contract negotiations: Robert King and Freedom Mortgage Corporation's Chief Legal Officer Steven Molitor. As negotiations stalled, Plaintiff retained and involved his personal attorney directly in the contract negotiations. Defendants and their employment attorneys suggested that the employment agreement for Plaintiff's employment with Freedom Mortgage Corporation and the agreement for Plaintiff's employment with the technology company (referred to as "Freedom Technology Corporation" (FTC) in the Agreement) should use the same form of agreement for Plaintiff's employment and both were attached together by the Defendants. During legal negotiations, Defendants and their attorneys were especially focused on certain aspects of the contract, such as the Termination for Cause definition and the Equity Agreement, and pushed hard for acceptance on those terms. Eventually the parties reached agreement on all material terms of Plaintiff's employment and compensation package, and entered into a for-cause executive employment binding contract (Exhibit A).

26. As per the negotiations and discussions, (i) the employment agreement with Freedom Mortgage Corporation, (ii) the employment agreement with the technology company, referred to as Freedom Technology Corporation ("FTC"), now known as Xpanse (See "Employment Agreement between Freedom Technology Corporation" and Plaintiff, (included in Exhibit A attached hereto), and (iii) the equity agreement including as early-exercise stock, form and manner of equity structured as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof (included in Exhibit A, attached hereto), and provisions around equity

acceleration, were all contemporaneously agreed to by all the parties, and incorporated into and combined together in one overall binding employment agreement.

27. The representations and promises made by the Defendants, including the substantial contributions, revenue, assets, intellectual property, technologists transfers to the technology company from the Middleman's and Freedom Mortgage Corporation were material representations and were relied upon by Plaintiff. Both parties agreed that Freedom Mortgage Corporation would be the guarantor of the payments and benefits promised to Plaintiff in the event that the technology company (referred to as Freedom Technology Corporation, thereafter named as Xpanse) does not or is unable to meet its obligations to Plaintiff under Plaintiff's employment agreement (Exhibit A).

28. Plaintiff accepted Defendants' employment offer based on statements and explicit promises made by Defendants Stanley Middleman and Michael Middleman, and their company representatives. In lieu of the double-digit percentage equity stake in the new company Plaintiff had requested during negotiations with Stanley Middleman, he accepted a reduced 5% equity stake in the company as a material and central component of his compensation package. Plaintiff expressed his desire to have key employees participate in the value of the technology company and have ownership, and specifically agreed with the Defendants on the structure, form and manner of equity ownership.

29. Defendant Stanley Middleman, to Plaintiff's knowledge, had not provided nor currently provides equity ownership to employees at Freedom Mortgage Corporation or Archwell Holdings, and was hesitant to share equity with key employees. Stanley Middleman expressed great pride to Plaintiff that he fully controlled and fully owned Freedom Mortgage Corporation and Archwell Holdings and that he and his family had all the equity. However, Plaintiff expressed his preference to having employees participate in equity ownership and negotiated with the Defendants to agree to have an additional 2.5% equity to offer the technology company's key employees.

30. Defendants also agreed with Plaintiff that the technology company's structure would be a C-Corporation ("C-Corp"), which is also known as a Stock Corporation, to enable the technology company to be structured and operated as an independent company, to provide transparent ownership participation for employees, with the shareholder rights and protections provided by a C-Corp, to gain the full value of the equity per a C-Corp entity structure and to ensure the company could provide the form, manner and structure of equity to Plaintiff as negotiated and agreed upon. The technology company was specifically referred to as Freedom Technology Corporation in the executed employment agreement; i.e., it specifically used "Corporation" affirming the agreement between Plaintiff and Defendants regarding the entity being structured and operated as a C-Corp.

31. For equity ownership as negotiated and agreed upon, Defendants agreed for Plaintiff to be granted an early-exercise stock option and specifically, as incentive stock options (ISOs), non-statutory stock options (NSOs) or combination thereof, as determined by Plaintiff. This specific structure, form and manner of the equity was material to Plaintiff's employment terms, and substantially contributed to the value of the equity compensation of Plaintiff, and, therefore, was specified and included in the employment agreement (Exhibit A).

32. Plaintiff's decision to accept the Defendants' employment offer and to not take another employment offer was based on the representations of Defendant Stanley Middleman, and others, that the company would be valued at tens of billions of dollars based on Freedom Mortgage Corporation's immediate contribution of $140-$150M of annual revenue rate, additional contributions secured from others such as the specific NASDAQ listed publicly-traded major U.S. mortgage company for recurring annual revenue to be at least $200 million, substantial valuable intellectual property and significant technology assets contributions, the transfer of Freedom Mortgage's technology divisions and staff, including a large number of technologists, the company structured as a C-Corp, the company operated independently with its own market-facing priorities and roadmaps, the equity as early-exercise, and specifically as

incentive stock options (ISOs), non-statutory stock options (NSOs) or combination thereof as determined by Plaintiff, and the Plaintiff's employment being immediately transferred to the technology company upon its formation and incorporation.

33. Stanley Middleman represented that he would obtain significant contributions and multi-million dollars of annual recurring revenue from other major mortgage industry players such as the specific NASDAQ listed publicly-traded major U.S. mortgage company and others. According to the recurring revenue, assets, intellectual property, staffing, and other contributions' representations made by Defendant Stanley Middleman, and others, Plaintiff's 5% equity interest in the new company would be worth at least $400 million.

34. On February 7, 2020, Freedom Mortgage Corporation informed Plaintiff that they plan to have Plaintiff speak at their upcoming annual leadership conference. On February 18, 2020, Plaintiff signed and returned the employment agreement to Freedom Mortgage Corporation. Defendant Stanley Middleman informed Plaintiff on February 19, 2020 that he was very pleased that Plaintiff had signed the agreement; Stanley Middleman signed the Agreement on behalf of Freedom Mortgage Corporation on February 26, 2020 (Exhibit A).

35. The 2020 employment agreement grew out of extensive negotiations, including numerous in-person meetings, breakfast, lunch and dinner meetings, in both New York City and at and near Freedom Mortgage Corporation's headquarters in Mount Laurel, New Jersey, and phone discussions. During these meetings and discussions, the most senior executives and the owners of Freedom Mortgage Corporation, Archwell Holdings, LLC, Archwell Solutions, LLC, Archwell Management, LLC, and Keystone B2B, LLC, including Defendants Stanley Middleman, Michael Middleman, and others, spelled out their aggressive enterprise value creation plans for the new independent technology company that would be worth tens of billions of dollars. Defendants promised that Plaintiff would play the leading role as the founding president and leader of the independent technology company for many years to come.

B. <u>Summary of Key Terms of the February 2020 Employment Agreement (Exhibit A)</u>

36. Key terms of the employment agreement include:

i. Until the technology company was formed as a C-Corp, Plaintiff would be designated an employee of Freedom Mortgage Corporation as its Executive Vice President, Platforms and Technology Businesses and Chief Digital Officer, but his work would be focused entirely on the technology company.

ii. Immediately after the technology company was created and incorporated, Plaintiff's employment would be transferred to the new company where he would assume the title and position of the company's founding President.

iii. On the date the technology company was formed, Defendants would adopt and establish an equity incentive plan with a share reserve equal to at least 7.5% of the company's total share capital.

iv. As soon as Plaintiff's employment transferred to the technology company, it would grant him an early-exercise stock option to purchase a number of shares of the company equal to at least 5% of the company's share capital on a fully diluted basis as of the date of the adoption of the technology company's stock plan. Options would be early-exercise and incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof. Plaintiff's equity would be immediately vested and accelerated given a number of circumstances.

v. As soon as Plaintiff's employment transferred to the technology company, Plaintiff and that company would execute the included and already agreed to employment agreement with the technology company (referred to as "Freedom Technology Corporation") attached to and incorporated within the parties' original employment agreement. (Exhibit A)

vi. Plaintiff would be paid a signing bonus of $1,000,000.00. Fifty percent of the signing bonus ($500,000.00) would be paid on the first company pay date following Plaintiff's start date (March 30, 2020). The Agreement required Defendant Freedom Mortgage Corporation to pay the second half of the signing bonus ($500,000.00) on the first pay date

following Plaintiff's six-month work anniversary (September 30, 2020).

vii. Plaintiff would be paid a beginning annual base salary of $1,500,000.00.

viii. Plaintiff would receive performance bonuses, including but not limited to, a guaranteed bonus at the end of his first year of employment in an amount equal to his annual salary, at a minimum of $1,500,000.00.

ix. Plaintiff would receive at least 20 calendar days' paid time off each calendar year.

x. Plaintiff's and the technology company's employee bonus plan, as subsequently discussed and agreed upon, was determined to be increased to up to 150% of base salary i.e. $2,250,000.00.

xi. Plaintiff was entitled to the enhanced employment benefits of the technology company, including but not limited to, 100% matching and fully-vested 401K contributions, no-cost health insurance coverage for him and his family, annual inflation (at least 3%) and other base salary increases, annual wellness bonuses, and additional bonuses and benefits.

xii. Plaintiff's employment would be subject to a good-cause termination provision pursuant to 8(f)(i) of Exhibit A, and not to be deemed "at will." If Plaintiff were terminated without "good cause," as defined within the employment agreement, he would be entitled to a number of substantial benefits, including:

a. A single severance lump sum payment in an amount equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus);

b. A single lump sum payment of the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the Executive's

termination calculated at 100% of target.

c. Twelve months equivalent company-paid COBRA benefits for Plaintiff and his family.

d. A pro rata amount (calculated pursuant to the Employment Agreement) of the current year's target Discretionary Performance Bonus amount, irrespective of whether the performance goals applicable have been established or satisfied, which is calculated pro rata of 100% of Base Salary, however as subsequently discussed and agreed upon, the Discretionary Performance bonus plan for the Plaintiff and the technology company was determined to be increased to up to 150% of Base Salary.

C. On May 27, 2020, Xpanse is Established, Formed, Incorporated and Registered as a Delaware C-Corp.

37. Defendants Stanley Middleman, Gregory Middleman and Michael Middleman initially named the technology company, erstwhile referred to as Freedom Technology Corporation ("FTC"), as Archwell Technology Corporation. Approximately two months after Plaintiff began working for Defendants, they incorporated FTC in the State of Delaware on May 27, 2020, as a C-Corp. The Middleman's subsequently renamed the company, Xpanse, Inc. Based on public filings made under penalty of perjury by Gregory Middleman in Arizona on August 17, 2020, Xpanse, Inc. authorized 10,000 shares and issued 1,000 shares. Defendants failed to disclose this activity to Plaintiff.

D. Plaintiff Became a Joint Employee of Freedom Mortgage Corporation and Xpanse.

38. Over the course of the following months, Defendant Gregory Middleman registered Xpanse, Inc. in several states, including California, Washington, Arizona, New Jersey, Florida, Pennsylvania, Michigan, Virginia, Texas among others. In these filings, Defendant Gregory Middleman declared under penalty of perjury that Plaintiff was the Chief Executive Officer of Xpanse, as filed with the Secretary of State of California (See Exhibit B), with similar filings

per declaration by Defendant Gregory Middleman under penalty of perjury across several states that Plaintiff was the Chief Executive Officer/President/Governor of Xpanse.

39. Xpanse's public website also stated that Plaintiff was "CEO & Co-Founder" of the company, and in external and internal meetings, the company referred to Plaintiff as the Chief Executive Officer and Co-Founder of the company. Defendants used Freedom Mortgage Corporation as a temporary platform to house Plaintiff until Xpanse, Inc. was formed and legally capable of hiring employees.

40. From the beginning of his engagement by Defendants, Plaintiff's work was focused on creating and building Xpanse as a technology company. Although Plaintiff reported directly to Defendant Stanley Middleman of Freedom Mortgage Corporation, his role was to lead the independently-formed technology company.

41. Soon after Xpanse's incorporation, the company started bringing onboard and hiring employees of Xpanse, but did not bring onboard and immediately transfer Plaintiff to Xpanse, which was required by Plaintiff's employment contract.

42. Given Defendant Stanley Middleman's promises and commitments around aggressive growth plans, Plaintiff recruited, attracted and brought on leadership, engineering, product, design, technology and other talent into the company with experience from multi-billion dollar and high growth companies such as Amazon, Facebook, Microsoft, Zillow among others. Based on promises Defendants made and upon authority granted to him, Plaintiff offered stock options in Xpanse, Inc. to key employees as an incentive for joining the new technology company.

43. Defendant Gregory Middleman remarked to his father Stanley Middleman and brother Michael Middleman how amazed he was with the caliber, experience and expertise of talent Plaintiff and the company were in discussions with, and with the caliber and level of talent that was coming onboard.

44. Plaintiff kept Defendant Gregory Middleman involved in these discussions and

decisions, and Defendants Stanley Middleman and Michael Middleman were regularly kept abreast and apprised. Defendant Gregory Middleman controlled employment terms offered to employees, including equity ownership and stock options, by keeping himself as the signatory for Xpanse employment letters.

45. The Xpanse leadership and executive team reported to Plaintiff on a daily basis, including the senior most product, engineering, design, technology, business executives, and he was fully focused on leading the company and driving the company's growth in his role as CEO and Co-Founder of Xpanse.

E. <u>In Malicious Breach of Plaintiff's Employment Agreement, Defendants Failed to Transfer Plaintiff's Employment to Xpanse.</u>

46. Soon after the incorporation of Xpanse in May 2020 and for several months following, Plaintiff engaged in multiple discussions with Defendants Gregory Middleman, Michael Middleman and Stanley Middleman, among others, requesting transfer of his employment to Xpanse, Inc as had been promised in the employment agreement. Plaintiff was functioning in all respects as the CEO and Co-Founder of Xpanse and was referred to by the Defendants and others in external and internal meetings as the leader of the technology company and was declared as such by Defendant Gregory Middleman across numerous state filings under penalty of perjury. Yet for undisclosed reasons, Defendants refused to transfer his employment there.

47. Defendant Gregory Middleman, who was an executive and vice president of Freedom Mortgage Corporation, transferred his own employment to Xpanse as the company's chief operating officer, and also promptly availed himself of the company's superior benefits and other employment entitlements, all of which were denied and not made available to Plaintiff.

48. In about September 2020, in a meeting with Plaintiff, Defendant Gregory Middleman, Robert King and Christopher Staub asked Plaintiff if he would consider delaying the transfer of his employment to Xpanse until sometime after the beginning of 2021. In response, Plaintiff reminded them that the transfer had already been delayed well beyond the incorporation of the

technology company, which was completed back in May 2020, and Plaintiff requested to be transferred immediately in compliance with the employment agreement.

49. For reasons that only became clear to Plaintiff later, Defendants continued to promise transferring his employment to Xpanse, yet refused to do so.

F. Defendants Made Material Misrepresentations to Plaintiff Regarding Their Contributions, Structure and Plans for the Technology Company, Concealed Material Information, and Made False and Fraudulent Promises to Plaintiff.

50. Defendants Stanley Middleman, Michael Middleman and others represented to Plaintiff that they and Freedom Mortgage Corporation, Archwell Holdings LLC, Keystone B2B LLC and others would transfer all the significant technology assets, substantial valuable intellectual property, technology related platforms and assets, and large numbers of technologists from Freedom Mortgage Corporation, Archwell Holdings LLC and Keystone B2B LLC to the technology company.

51. However, Freedom Mortgage Corporation did not have full lien-free rights and transfer privileges for all its intellectual property and significant technology assets upon Plaintiff's commencement of employment. Defendants Stanley Middleman and Michael Middleman were fully aware of this during negotiations and discussions with Plaintiff; however, all of them concealed these material facts from Plaintiff.

52. Defendant Stanley Middleman, Michael Middleman and others represented to Plaintiff that Defendants Freedom Technology Corporation, Archwell Holdings and Keystone B2B LLC had existing valuable technology platforms, substantial intellectual property and would transfer a large number of skilled technologists that the technology company would build upon and accelerate its success with customers and with the broader industry. However, much of Freedom Technology Corporation's core code was outdated, legacy and inflexible in nature, and was not particularly useful for external customers. Keystone B2B LLC had no valuable internal technology development talent and it did not have ownership of technology nor intellectual

property nor the data models and architecture. Defendants were fully aware of these facts and concealed all this material information from Plaintiff during negotiations and discussions. The truth of these facts remained concealed from Plaintiff until the true state of affairs was uncovered after having direct discussions with the respective tech and other teams.

53. Furthermore, the technology and platform used by Archwell Holdings and its subsidiary Keystone B2B, LLC was not even owned by the Middleman's but was commercially licensed from a third-party company, and there was no available access to the architecture or data models and no ownership of the intellectual property and technology platform. Defendants were fully aware of the inflexible and outdated nature of the code at Freedom Mortgage Corporation, the third-party licensing arrangement, its restrictions, the absence of owned intellectual property, lack of technology development talent, and/or absence of access to the architecture or data models at Archwell Holding's subsidiary Keystone B2B LLC; however, they had misrepresented and concealed this from Plaintiff.

54. During the course of the entire calendar year 2020, and early 2021, Freedom Mortgage Corporation, Archwell Holdings, Archwell Management, Archwell Solutions, and Keystone B2B did not transfer any significant intellectual property, technology platforms, or substantial assets to the technology company, despite promises and representations that were made to Plaintiff during negotiations and discussions.

55. Defendants Stanley Middleman, Michael Middleman and others represented to Plaintiff that they would transfer a large number of technologists, staff and assets from Freedom Mortgage Corporation to the technology company. Freedom Mortgage Corporation did not transfer a large number of technologists, staff, resources and assets to the technology company. Defendants did not even prepare a transition plan for such transfer to the technology company, again misrepresenting their intentions to Plaintiff. Plaintiff also asked Defendants for approval to prepare such a plan; however, Defendants delayed and evaded having any plans for transferring substantial technologists and assets from Freedom Mortgage Corporation,

Archwell Holdings and its entities to Xpanse upon Plaintiff's commencement of employment and during his employment. Plaintiff also asked Defendants Stanley Middleman and Michael Middleman about resourcing the technology company with the significant revenue, intellectual property and substantial staffing transfers as they had represented to Plaintiff; however, they repeatedly evaded and delayed on their promises and commitments to Plaintiff.

56. Defendants had represented to Plaintiff that Archwell Holding's technology subsidiaries, affiliates and related platforms, staff, and assets would be transferred to the technology company, which also included transferring Defendant Keystone B2B LLC to Xpanse. While Defendants represented this to Plaintiff both before and after his commencement of employment, Defendants, including Defendant Michael Middleman's friend and Freedom Mortgage Corporation's Senior Vice President Christopher Staub, Defendant Erik Anderson, Defendant Gregory Middleman and others, were concurrently providing employees of Keystone B2B LLC with contrary information and representations.

57. Defendant Stanley Middleman represented that Freedom Mortgage Corporation would contribute $140-$150 million of annual recurring revenue run rate. However, Defendants did not contribute the $140-$150 million of annual recurring revenue run rate from Freedom Mortgage Corporation to the technology company that the Defendant Stanley Middleman had promised and misrepresented to Plaintiff.

58. Defendants did not execute any revenue contracts between the technology company and Freedom Mortgage Corporation during the entire calendar year 2020, and through 2021 during Plaintiff's employment, even though several revenue terms sheets and contracts were prepared and discussed by Plaintiff and Timothy M. Beard, Chief Financial Officer (CFO) of Xpanse, with Defendants Michael Middleman, Gregory Middleman and Stanley Middleman. Defendants Michael Middleman, Gregory Middleman and Stanley Middleman made repeated representations to Plaintiff that they would execute independent and market-standard revenue agreements with Xpanse, however, they did not do so through the entire 2020 calendar year and

through 2021 during Plaintiff's employment even though the Defendants had Xpanse develop and build technology and develop intellectual property development for the benefit of Freedom Mortgage Corporation, Keystone B2B LLC, Archwell Holdings LLC, its subsidiaries and affiliates. In addition, revenue and pricing model proposals made by Plaintiff that would significantly increase revenue and value of Xpanse were not made effective by Defendants because they wanted to capture and retain that revenue and value in other Archwell-affiliated entities which were 100% owned by the Middlemans, to the detriment of Xpanse, it's revenue, scale, valuation and economic growth, and damaging Plaintiff and Xpanse's employees.

59. Defendant Stanley Middleman made representations regarding additional multi-millions of annual recurring revenue run rate from the specific NASDAQ listed publicly-traded major U.S. mortgage company and others; however, Defendants did not allow Plaintiff nor CFO Timothy Beard to discuss or even communicate with the specific NASDAQ listed publicly-traded major U.S. mortgage company regarding the additional multi-million annual recurring revenue run rate that the Defendants had represented to Plaintiff.

60. Defendant Stanley Middleman, Michael Middleman and Gregory Middleman made representations to Plaintiff that the technology company would be an independent market-facing company to enable management to be focused on serving the best interests of the technology company, external customers and its employees. However, Defendants refused Plaintiff from having an independent and external market-facing product and market roadmap. Instead, Defendant Michael Middleman coerced Plaintiff to have a roadmap serving the needs and priorities of Freedom Technology Corporation and the Archwell entities. Funding and financing were being conditioned by the Defendants as such and based on the self-serving near-term interests of the Middlemans instead of the technology company advancing its own independent market-facing roadmap and priorities focused on the long-term best interests of the technology company, external customers and its employees. Defendant Gregory Middleman used the payroll of the technology company to hire his own friends, and Defendant Michael

Middleman and his staff hired people on the payroll of the technology company with the intent and with instructions to serve the self-serving interests of Freedom Mortgage Corporation instead of serving the independent technology company, its commercialization activities and external customers. In addition, instead of having the technology company as an independent company, Defendants in December 2020 even referred to the technology company as a member of the "Freedom Family of Companies."

61. Defendant Stanley Middleman and Gregory Middleman represented to Plaintiff that Xpanse would provide employee ownership through grants of employee stock options for Plaintiff's co-workers, staff and employees, but refused Plaintiff to take actions to enable that and Defendants did not provide an equity plan nor equity grant documents to any of the other key employees promised equity, even though Defendants had represented that Plaintiff as the leader of the technology company could make these decisions to serve the best interests of the technology company and its employees.

62. Plaintiff was fraudulently misled to act in reliance on the Middleman's misrepresentations. Based on their representations and promises, Plaintiff made similar representations and promises to executives and employees that were recruited and brought aboard the technology company. These executives and employees relied upon these material representations. Defendants Stanley Middleman, Michael Middleman and Gregory Middleman were aware that their misrepresentations, false promises and concealments would cause both personal and economic harm to Plaintiff and his co-employees at Xpanse.

63. Defendants and Plaintiff negotiated and agreed in the employment contract (pursuant to Exhibit B of the employment contract), and Defendants represented that they would adopt comments provided by Plaintiff to ensure commercially reasonable terms and conditions in the technology company's equity plans upon Plaintiff's commencement (see Exhibit A); however, the Defendants did not intend to and did not do so, and instead, slipped in highly unusual and unreasonable material terms and provisions without advance discussion or agreement with

Plaintiff, such as but not limited to, a vested share repurchase provision and a five-year purchase note provision, and the Defendant's scheme was caught by and objected to by Plaintiff and his counsel.

64. The vested share repurchase provision Defendants slipped into the equity plan, without any advance discussion with Plaintiff, would egregiously enable Defendants to repurchase Plaintiff and his co-employees' vested equity with no increase in price or at unfavorable prices, resulting in no or marginal economic net benefit to Plaintiff and his co-workers. Defendants attempted to deprive Plaintiff and other equity-entitled employees of the most valuable and central part of their compensation and the promised value of their equity ownership. This would severely negate or reduce the value of their equity ownership and the material compensation represented by the Defendants to Plaintiff and his co-employees.

65. Defendants also slipped in a provision to avoid paying Plaintiff and his co-employees upon purchase of their equity, and instead use a five year note which would deprive Plaintiff and his co-employees of due compensation for several years, and with the risk of not receiving any payments if the Defendants did not sustain the company or fulfill their obligations.

66. Plaintiff and his counsel expressed repeated material concerns about these slipped in provisions and the egregious behavior of the Defendants and its legal counsel, Blank Rome, which was contrary to the Defendants obligations and representations to Plaintiff. Even though Defendants specifically represented in the Employment Agreement that they "shall adopt the reasonable comments provided" by Plaintiff "to ensure commercially reasonable terms and conditions" in the technology company's equity plans, the Defendants did not adopt the comments provided by Plaintiff and his counsel and neither addressed nor resolved Plaintiff's and his counsel's concerns and objections about the Defendants having slipped in highly unusual and unreasonable material terms and provisions without advance discussion or agreement with Plaintiff, that the Defendants were aware would deprive Plaintiff of the value, form, manner and structure of equity which was the central component of Plaintiff's

compensation.

67. Defendants Stanley Middleman and Michael Middleman made representations that Plaintiff would be the long-term leader of the technology company and would have a long-term employment relationship over several years. Defendant Stanley Middleman informed Plaintiff that Gregory Middleman would assist him. Stanley Middleman assured Plaintiff that Gregory Middleman's proximity to and relationship with his father Stanley Middleman and brother Michael Middleman, would be beneficial to Plaintiff. In fact, however, Defendants Stanley Middleman and Michael Middleman intended for Defendant Gregory Middleman, who had only recently graduated from business school, to learn from Plaintiff, draw and benefit from his expertise, have Plaintiff attract, recruit and onboard an experienced leadership team, to setup, create and operationalize the company, and instead of Plaintiff, for Gregory Middleman to become leader of and be heir to the technology company, much like Defendant Stanley Middleman was making his other son Michael Middleman heir to Freedom Mortgage Corporation.

68. Defendants misrepresented that Plaintiff and employees would have equity in the technology company and had falsely promised Plaintiff that he and other employees would be provided due and full shareholder rights and protections. After almost a full year of Plaintiff joining, and after Defendants had already authorized 10,000 shares and issued shares 1,000 shares of Xpanse, Inc., they had not provided any equity stock options or equity ownership rights and protections to Plaintiff or any of the other employees as they had repeatedly promised.

69. Defendants misrepresented that the technology company would be a C-Corp, have C-Corp shareholders' rights and protections, be formed to be taken public through an IPO, and that Plaintiff and other key employees would participate through equity ownership in the C-Corp, as early-exercise incentive stock options, non-statutory stock options and/or combination thereof for Plaintiff. Without disclosing their true plans to Plaintiff, however, Defendants

actually intended to develop the technology company into a closely-held, Middleman-family, limited liability company, and be a subsidiary closely controlled by Archwell Holdings LLC, and to serve the self-serving interests of the Middleman's and their other entities.

70. Defendants Stanley Middleman, Michael Middleman, Gregory Middleman and Erik Anderson deliberately concealed structural, legal and other plans and actions from Plaintiff and deliberately excluded Plaintiff from such discussions related to the technology company where it would have been evident to Plaintiff that the Defendants had made misrepresentations to and had concealed information from Plaintiff.

71. In May 2020, around the time the technology company was established and incorporated as a Delaware C-Corp, Defendants Stanley Middleman, Michael Middleman, Gregory Middleman misrepresented to Plaintiff that if the technology company was based in Bellevue, Washington, his employment would continue, along with the terms of and his benefits of that employment, in accordance with his contract and in accordance with the representations made by the Defendants. In June 2020, Defendants confirmed to Plaintiff that Plaintiff's position and base location, pursuant to paragraph 2 of the employment agreement, would be updated to include Greater Seattle area, which includes Bellevue, Washington with Special Advisor to Defendant Stanley Middleman and Executive Vice President for Freedom Mortgage Corporation Robert King, Freedom Mortgage Corporation's Chief Legal Officer Steven Molitor, Defendant Gregory Middleman and others involved. In reliance on those discussions and representations, Plaintiff moved from Santa Clara County, California to Bellevue, Washington along with his family within weeks to establish leadership presence in Bellevue and progress recruiting activities for the company. In reliance on the Defendant's representations, Plaintiff, his family and kids uprooted their life and school in California and moved to Bellevue, Washington believing Defendant's representations that they would transfer Plaintiff's employment to Xpanse and that Plaintiff would continue his career at Xpanse for years to come. Defendants however did not intend to transfer Plaintiff to Xpanse, be in the long-

term employment of either Freedom Mortgage Corporation or Xpanse and/or to pay him compensation, equity, equity as early-exercise incentive stock options, non-statutory stock options and/or combination thereof, and the benefits of Xpanse they had promised to provide to Plaintiff. Defendants did not intend for the technology company to operate as an independent company and as a C-Corp.

G. In Malicious Breach of Plaintiff's Employment Agreement, Defendants Failed to Issue Equity in Xpanse to Plaintiff.

72. Plaintiff's employment agreement required Xpanse to issue its stock option plan on May 27, 2020, when the company was incorporated, and to immediately provide Plaintiff with a stock option agreement pursuant to the employment agreement. (See, Exhibit A.)

73. Now that the technology company, Xpanse, was already incorporated, Defendants were required to immediately adopt the equity plan. Pursuant to the employment agreement (see ¶ Exhibit B of the employment contract), "On the date that Freedom Technology Corporation is incorporated, Freedom Technology Corporation shall adopt and establish an equity incentive plan." Defendants were required to immediately grant Plaintiff his early-exercise stock option. Pursuant to the employment agreement (see ¶ Exhibit B of the employment contract hereto), "In conjunction with the adoption of the FTC Equity Plan, the Executive shall be granted an "early exercise" stock option which is an "incentive stock option", a "non-statutory stock option" or combination thereof at the Executive's election, to purchase a number of shares in Freedom Technology Corporation that is equal to at least 5% of Freedom Technology Corporation's share capital on a fully diluted basis…." Plaintiff engaged in extensive discussions with Defendants Stanley Middleman, Michael Middleman and Gregory Middleman regarding the equity component of his compensation package, which was the most valuable and central component of his compensation as represented by the Defendants. During these discussions, Defendants repeatedly assured Plaintiff that his equity interest would be issued and, in the structure, form and manner consistent with his employment agreement and that

Plaintiff would be transferred over to the technology company, Xpanse, as required by the employment agreement.

74. In June 2020, after the equity plan was already overdue under the employment agreement, Defendants finally engaged the law firm of Blank Rome to work with Robert King, Christopher Staub and Steven Molitor of Freedom Mortgage Corporation to prepare the equity documents for Plaintiff. Plaintiff relied on his own counsel to review and advise him with respect to the equity discussions.

75. In July 2020, during a discussion with Defendant Gregory Middleman, Robert King, Special Advisor to Defendant Stanley Middleman and Executive Vice President of Freedom Mortgage Corporation, and Christopher Staub, friend of Defendant Michael Middleman and Senior Vice President of Freedom Mortgage Corporation, Plaintiff learned the Defendants were planning to change, convert and/or succeed the company from a C-Corp to a Limited Liability Company. This restructuring would willfully and materially breach Plaintiff's employment agreement, and was contrary to the representations and promises Defendants made to Plaintiff. The restructuring would severely and detrimentally impact the value, form, manner and structure of Plaintiff's equity. It would have the same detrimental impact on the equity compensation of other executives and employees Plaintiff was planning to recruit and bring onboard over the coming months. Unlike a C-Corp, limited liability companies (LLCs) cannot and are unable to provide, issue and/or retain the value, form, manner and structure of equity as incentive stock options (ISOs), non-statutory options (NSOs) and early-exercise stock options pursuant to applicable legal and tax regulations and laws. Defendants said that their plan was driven by tax benefits that would benefit the Middlemans. Plaintiff expressed his concern that tax benefits, if any, would accrue to Archwell Holdings and/or Freedom Mortgage Corporation and not Xpanse, and would be self-serving to the Middlemans to the detriment of Xpanse, its value and tax credits, and the value, form and manner of the equity compensation promised to Plaintiff and his coworkers. In addition, it would be in violation of representations

made by the Defendants that Xpanse would be a C-Corp and injure employees whose compensation included stock including Plaintiff. Plaintiff also explained to the Defendants that there were other approaches to have tax benefits if that was their objective, which would not be to the detriment of Plaintiff and future employees, and would not in be violation of the representations made by the Defendants to Plaintiff.

76. During this July 2020 meeting, Plaintiff also expressed his concerns on how this change would severely harm the value, form, manner and structure of the represented equity compensation, and the consequential adverse impact on upcoming recruiting efforts which was considered a priority by the Defendants and the company. Defendant Gregory Middleman reaffirmed to Plaintiff that they had discussed and already agreed to a C-Corp. Defendants assured Plaintiff that they would abide by their agreement with and their representations to him including the C-Corp structure of the company and the structure, form and manner of equity compensation as early exercise and incentive stock options, non-statutory stock options or combination thereof as determined by Plaintiff, and that Plaintiff should continue to attract, recruit and bring employees on board. Defendants assured Plaintiff that they would abide by their promises and told him not to be concerned. Plaintiff relied on the Defendants' representations to his detriment, as he discovered in time to come.

77. In or about August 2020, several months after Xpanse was already incorporated, Freedom Mortgage Corporation finally sent Plaintiff and his counsel the first draft of the proposed equity plan. The proposed plan, however, was incomplete, and still did not include Plaintiff's individual equity award agreement. Plaintiff asked for his individual equity award agreement which had already been delayed and evaded by the Defendants for several months and was long overdue from the Defendants.

78. The proposed equity plan and equity award agreement, prepared for Defendants by their lawyers at Blank Rome did not include terms in accordance with the terms Plaintiff had negotiated with the Middlemans, which had been expressly discussed and/or incorporated into

his employment agreement. It was filled with provisions that appeared to have been intentionally inserted to delay or evade the issuance of the equity plan and option agreement, or to coerce Plaintiff to succumb to a plan that was prepared by the Defendants in bad faith, self-serving to the Defendants, and to the severe detriment of Plaintiff and his co-workers. The draft plan deflated the terms and value of the equity promised to Plaintiff in favor of the Middleman's and included terms that were highly unusual and unreasonable.

79. Over the course of several months, Defendants used their attorneys at Blank Rome to intentionally delay or evade completing the equity plan and to preclude Plaintiff from his early-exercise equity rights and equity terms in the form, manner and structure as provided by his employment agreement and to deprive Plaintiff from realizing the value of his equity.

80. On repeated occasions in or about November 2020, Plaintiff strenuously objected directly to Defendants Stanley Middleman, Michael Middleman and Gregory Middleman about these delay tactics, misrepresentation, bad faith, and violation of his and others' equity rights.

H. Freedom Mortgage Corporation Repeatedly Failed to Pay Plaintiff's Wages Fully and Timely.

81. Defendants Freedom Mortgage Corporation and Xpanse failed to properly credit and compensate Plaintiff with PTO pay between June 2020 and January 2021. On those occasions, Freedom Mortgage Corporation paid PTO based on an incorrect calculation of Plaintiff's regular rate of pay, which resulted in a significant underpayment of Plaintiff's wages that remain unpaid.

82. Defendants also failed to make matching contributions to his 401k plan in July, August, November and December of 2020, and in January of 2021 in accordance with their contractual requirements.

83. In addition, Freedom Mortgage Corporation was required to pay Plaintiff $500,000.00 on October 2, 2020, but it failed to do so until October 30, 2020.

I. Plaintiff Refused to Support a Secret, Illegal Share Valuation Scheme.

84. While engaged in discussions between Blank Rome and Plaintiff's personal counsel, Xpanse and Freedom Mortgage Corporation confirmed to Plaintiff and his personal counsel that all Xpanse shareholders would be issued the same class of stock. The company would not issue any preferred stock.

85. During a meeting in September 2020, however, Defendant Gregory Middleman, Robert King and Christopher Staub explained that the Middleman family wanted to be able to demonstrate externally during future fundraising events, including anticipated investment rounds, strategic partnerships, M&A events and transactions, and future IPO, that the share value for all equity holders was equal.

86. However, Gregory Middleman stated that internally at Xpanse, the Middleman family wanted to calculate share value differently by crediting their own share value with an additional several millions in revenue through and related to affiliated entities, such as Keystone B2B, LLC, which is owned by Archwell Holding LLC and other Archwell Holding LLC's affiliated entities. The Middlemans wanted to create a secret share valuation that benefitted them personally at the expense of Plaintiff, other equity holders, future investors, strategic partners and shareholders.

87. Defendants wanted to have two sets of valuation books and calculations, one to show and use externally and another to use internally. The external calculation would show the same share valuation numbers for the Middlemans, their affiliates, Plaintiff and his co-workers however the internal calculation as proposed by the Middlemans would benefit the Middlemans and deprive Plaintiff and his co-workers of value, even though everyone would own the same class of shares.

88. During this September 2020 meeting and during subsequent meetings with Defendants Gregory Middleman, Michael Middleman and Stanley Middleman, each specifically threatened Plaintiff would suffer adverse consequences if he did not endorse their schemes.

89. In separate meetings, Defendants Stanley Middleman, Michael Middleman and Gregory Middleman specifically informed Plaintiff that they expected him to support their share valuation scheme and to support the scheme over anticipated protests from Xpanse co-workers entitled to equity in Xpanse, Inc.

90. Plaintiff explained to Defendant Gregory Middleman and Michael Middleman in discussions with each of them that the scheme likely violated securities, tax, corporate and other laws. He also explained to Gregory Middleman and Michael Middleman that this plan would inflate the value of Middlemans' ownership interest in Xpanse when compared with the value assigned to shares promised to Xpanse employees as incentive for joining and staying with Xpanse, including Plaintiff, CFO Timothy Beard and his other co-workers.

91. Plaintiff also raised the issue of misrepresentation to future employees, co-workers, investors, and strategic partners and issues regarding legality of having a secret share valuation scheme. Defendant Gregory Middleman said that he will follow up on these concerns with Robert King and Christopher Staub, and also with his brother Michael Middleman and father Stanley Middleman. However, Defendant Stanley Middleman made it evident to Plaintiff in his subsequent discussion with him that refusal to adhere to the Middlemans' scheme would result in adverse consequences to Plaintiff.

92. CFO Timothy Beard, upon learning about the Middlemans' proposed schemes, also expressed his concerns about the Middlemans' share valuation schemes. Mr. Beard was alarmed that the Defendants would attempt to manipulate a company's valuation and by the Defendant's proposed plan to have a differential price for the same class of shares given that would run afoul of and be in violation of federal tax, securities and corporate law, and in addition, the Middlemans' self-dealing act would violate the promised compensation and rights of Plaintiff, CFO Timothy Beard and their co-workers.

J. <u>Defendants Threatened Plaintiff for Refusing to Participate in their Equity Scheme.</u>

93. During discussions with Defendants Stanley Middleman, Gregory Middleman, and

Michael Middleman, Plaintiff was threatened for refusing to participate in their equity scheme.

94. In November and December 2020, Defendant Michael Middleman informed Plaintiff that he did not want the company share valuation issue to be discussed with outside individuals, including with Plaintiff's attorney. Michael Middleman ordered the abrupt cancellation of a call scheduled for December 2, 2020 with Plaintiff's legal counsel and CFO Timothy Beard, which had been called to further discuss Plaintiff's concerns. Michael Middleman refused to permit Plaintiff's legal counsel to join in a call to address Plaintiff's concerns and he told Plaintiff that he did not want Plaintiff to have his counsel involved in these discussions.

95. Plaintiff expected Defendants would abandon their illegal and self-serving schemes as a result of the concerns he and CFO Timothy Beard expressed to them. In addition to his previous efforts to convince Defendants Stanley Middleman and Gregory Middleman to course correct, Plaintiff spoke with Defendant Michael Middleman in November 2020. Instead of working with Plaintiff to create a legal share valuation model, however, Defendant Michael Middleman advanced other schemes that would cause harm to Plaintiff and others who had been promised equity.

96. During his discussion with Defendant Michael Middleman, Plaintiff reminded him that Plaintiff had foregone other opportunities to work for and partner with the Defendants, and had relocated his family to Washington state. He also reminded Michael Middleman that he had made a long-term employment commitment to Defendants based on the representations and promises they each had made to him and to his co-workers.

97. In an effort to help Defendants avoid violations of tax and security laws and to protect his own contractual interests, Plaintiff scheduled a call with the Defendants, together with Plaintiff's legal counsel and Xpanse's CFO Timothy Beard.

98. On or about December 2, 2020, Defendant Michael Middleman canceled this scheduled call. Instead, Defendant Michael Middleman separately spoke with Plaintiff. In response to Plaintiff's expression of concern about the legality of the stock valuation scheme, Michael

Middleman pointedly asked Plaintiff when his own equity interest vests, and if he knew what would happen to his equity interest if Plaintiff were fired "for cause" before the stock options vest.

99. Michael Middleman made it clear to Plaintiff that the Defendants did not want to fulfill Plaintiff's equity compensation pursuant to the terms of the Employment Agreement. Michael Middleman insisted Defendants had the right to determine at their sole discretion if or when Plaintiff received equity, bonuses or other compensation even thought he was fully aware that the Defendants and the Plaintiff had negotiated and executed a binding employment agreement which specified these terms. Michael Middleman also asked Plaintiff about equity promised to his co-workers and what Plaintiff had communicated to them.

100. In response to Plaintiff's request to discuss the Defendant's proposed valuation scheme with members of his leadership team who had been promised equity, Michael Middleman threatened Plaintiff with adverse consequences if he did so. Michael Middleman also told Plaintiff that he had spoken with his father Stanley Middleman, brother Gregory Middleman, Robert King and Christopher Staub. He informed Plaintiff he must support Defendants' proposals and illegal schemes or suffer the adverse consequences. Plaintiff understood the statement to be an explicit ultimatum to support the Middlemans' share value scheme or he would be summarily and pretextually fired "for cause." A manufactured termination for cause would provide Defendants a reason to deny all the benefits and substantial value of Plaintiff's equity agreement, his share of ownership of the company, his guaranteed bonuses, the severance and other benefits incorporated in the employment agreement (Exhibit A), his expected compensation over the next several years, and his role as co-founder and leader of the company.

101. On or about December 14, 2020 Michael Middleman scheduled another telephone call with Plaintiff for the following day. Michael Middleman informed Plaintiff that neither his personal legal counsel nor Xpanse's chief financial officer, Timothy Beard, nor any of his Xpanse co-workers entitled to equity ownership, would be permitted to join the call. Michael

Middleman was joined on the call by his long-time business associate and family friend, Erik Anderson, the recently-hired president and CEO of Archwell Holdings, LLC and Archwell Solutions, LLC. When Plaintiff informed CFO Timothy Beard of this call, CFO Timothy Beard was alarmed that Michael Middleman had abruptly canceled the call with Plaintiff's counsel and had refused to let Plaintiff have his counsel or CFO Timothy Beard join this call.

102. Michael Middleman used the pretext of stating that he would like to have a 1:1 discussion with Plaintiff. Without any notice to Plaintiff, Michael Middleman was joined in this 1:1 call by his close personal friend, former Skadden Arps attorney, Erik Anderson. Defendant Michael Middleman refused to permit Plaintiff's counsel to be present on the call. Despite Plaintiff's request, Defendant Michael Middleman also did not permit Xpanse CFO Timothy Beard to join the call either.

103. During this call on December 15, 2020, Michael Middleman and Erik Anderson were oppressive in their insistence that Plaintiff accept the Middlemans' schemes. Plaintiff again expressed concern for other key employees who, like himself, had been promised equity. When he informed Defendant Michael Middleman and Erik Anderson of his desire to speak with his leadership team about the Middlemans' valuation scheme, Michael Middleman again ordered Plaintiff not to do so.

104. During this conversation, Defendant Michael Middleman and Erik Anderson also informed Plaintiff that the Middlemans have decided to have Xpanse, Inc. succeeded by a limited liability company called Xpanse, LLC.

105. Plaintiff explained that changing Xpanse, Inc. from a C-Corp to a limited liability company would breach material terms of the compensation/equity agreements with himself and other Xpanse employees to whom he had been expressly authorized to offer stock options as part of their compensation packages. Defendants were aware that a limited liability company would violate and be detrimental to the structure, form and manner of equity as had been promised to Plaintiff. Defendants were also aware that they had made multiple representations

to Plaintiff about the company being and remaining a C-Corp, both before his joining the company and again during the discussions back in July 2020 when Defendants had assured Plaintiff that the company would remain and operate as a C-Corp.

106. During this conversation, Defendant Michael Middleman and Erik Anderson issued an ultimatum to Plaintiff to submit to the secret equity scheme and succumb to the succession to a limited liability company immediately, or face serious and adverse consequences.

107. In response to Defendants' aggressive threats, Plaintiff informed Defendant Michael Middleman and Erik Anderson that he would not succumb to their threats on this call. Plaintiff reiterated his concerns around their share valuation scheme and about the changes planned by Freedom Mortgage Corporation and Archwell, including the conversion and succession of Xpanse, Inc. from a C-Corp to an LLC, breached material promises and terms of employee contracts and representations. Defendants were aware that Xpanse, Inc. needed to remain a C-Corp and preserve the structure, form and manner of equity or face exposure to liability for fraud, material breach of contract, and other applicable laws, and at least five individuals had been promised equity in Xpanse, Inc. Plaintiff also reminded them that Plaintiff had previously expressed these concerns around conversion and succession of Xpanse, Inc. from a C-Corp to an LLC back in July 2020 to Gregory Middleman, Robert King and Christopher Staub, and that Plaintiff had been reassured by the Defendants at that time that the company would continue as a C-Corp., and Plaintiff had relied on the Defendants' representations.

108. Plaintiff informed Michael Middleman and Erik Anderson that he would at least like to discuss his concerns and confer with Chief Financial Officer Timothy Beard, given the CFO's financial and securities experience and law degree background. Defendant Michael Middleman and Erik Anderson were displeased that Plaintiff asked again to confer with CFO Timothy Beard. Plaintiff and CFO Timothy Beard further evaluated the differential share value and other elements of the Middlemans' scheme with Plaintiff, and again concluded that the scheme likely ran afoul of tax, securities, corporate, and other laws, and would unquestionably result in the

breach of employment agreements already signed, including their own.

K. Plaintiff and Xpanse CFO Timothy Beard Continue to Object to Defendants' Planned Conversion of Xpanse from a C-Corp to a Limited Liability Company.

109. On December 17, 2020, CFO Timothy Beard sent an email to Michael Middleman's friend Erik Anderson, who was also President and CEO of Archwell Holding and Archwell Solutions, LLC, (one of Archwell Holdings' subsidiaries) and Defendants Michael Middleman and Gregory Middleman, and struck out the change proposed by Freedom Mortgage Corporation and Archwell, for the conversion and succession of Xpanse, Inc. from a C-Corp to an LLC and reiterated that Xpanse has to remain a C-Corp as previously agreed. Plaintiff had previously informed Defendants during their discussions that Xpanse, Inc. needed to remain a C-Corp or face exposure to liability for fraud, material breach of contract and other applicable laws. Defendants were aware that at least five individuals had been promised equity in Xpanse, Inc., a C-Corp.

110. Plaintiff and CFO Timothy Beard were concerned that if the Defendants unilaterally convert and succeed the technology company from a C-Corp to a Limited Liability Company that the Defendants: (1) would egregiously deprive Plaintiff and his co-workers of the form, manner and/or structure of the equity as early-exercise and as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof as promised by the Defendants to Plaintiff. Pursuant to tax laws, unlike a C-Corp, a limited liability company cannot issue early-exercise stock and as ISOs and NSOs and the Defendants were fully aware of this; (2) would deprive Plaintiff and his co-workers of the protections, rights and benefits available with a C-Corp structure; (3) would use the opaqueness of the LLC structure compared to the transparency and well-defined structure of the C-Corp to further deprive Plaintiff and his co-workers of their equity and equity rights and to deprive them of their promised compensation, and for the Defendants to engage in further self-dealing and for their self-interests at the detriment of Plaintiff and his co-workers; (4) would further their egregious schemes such as the share

valuation scheme; (5) would unjustly enrich themselves by availing tax benefits and credits to their self-interests related to Archwell Holdings and/or Freedom Mortgage Corporation, and their subsidiaries and affiliates, and deprive the technology company of its self-held and carry-forward NOL and other tax credits; (6) would continue to further delay and evade their obligations and commitments to Plaintiff and his co-workers; and (7) would use the LLC structure to strip the technology company of its independence and make it a closely-knit and fully controlled and self-serving subsidiary of Archwell Holdings.

111. Plaintiff and CFO Timothy Beard also requested that Xpanse management representatives including Plaintiff join the board of Xpanse based on their growing concerns that Defendants who constituted the board were evading their fiduciary, legal and ethical obligations. Their request received no response from the Defendants.

112. Defendants Stanley Middleman, Michael Middleman, Gregory Middleman and Erik Anderson did not respond to these growing and consequential concerns, at least to Plaintiff.

113. Throughout the rest of December 2020, Plaintiff assumed that Defendants were heeding his advice and the advice of Xpanse's CFO.

114. As of December 2020, Xpanse was making substantial progress toward hitting goals established for Plaintiff and the company. Plaintiff was on track to hit the incentive compensation milestones required to earn a bonus payout of between 100% and 150% of his salary, and he was in the process of onboarding additional staff and further expanding and growing the company.

L. Plaintiff Refused to Engage in Deceptive and Unfair Business Practices.

115. In or about December 2020 and January 2021, Defendant Gregory Middleman instructed Plaintiff to participate with him in what Plaintiff believed to be a fraudulent scheme during an upcoming meeting with representatives of a major mortgage enterprise software company which is owned by a multi-billion-dollar NYSE listed publicly-traded company.

116. Gregory Middleman informed Plaintiff that he intended to tell the major mortgage

enterprise software company that Xpanse would only be used as an internal resource to Freedom Mortgage Corporation and Archwell Holdings, and that Xpanse was not planning to sell its technologies to third parties.

117. This contradicted everything Plaintiff had been told about Xpanse's plans and everything Plaintiff had been working towards as Xpanse's founding president, CEO and co-founder. Gregory Middleman planned to misrepresent the fact that Xpanse was actually building technologies for the broader mortgage industry and, therefore, would be a direct competitor of the major mortgage enterprise software company.

118. Defendant Gregory Middleman directed Plaintiff to engage in this fraudulent subterfuge in order to obtain access to valuable application programming interfaces and other proprietary information and access from the major mortgage enterprise software company, and to do so at favorable economic and commercial terms. Plaintiff refused to do so. Instead, Plaintiff complained to Gregory Middleman that the use of intentional misrepresentations with its competitors would expose Xpanse and all those involved to liability and other legal concerns, including himself.

M. Plaintiff Began to Understand the Scope of Defendants' Misrepresentations and the Motivations Behind Their Misconduct and Misrepresentations.

119. The ownership interest Defendants promised to Plaintiff, 5% of Xpanse's total share value, represents one of the largest, if not the largest, single ownership share the Middlemans have ever offered to an employee who was not a member of the Middleman family.

120. In January 2021 Plaintiff came to the well-founded conclusion that Defendants did not intend to provide him with what they had promised, including a significant ownership interest in Xpanse.

121. In January 2021, Xpanse's leadership team members informed Plaintiff that Defendants Stanley Middleman and Gregory Middleman had privately met with them, without notifying Plaintiff or CFO Timothy Beard. These team members informed Plaintiff that they now

believed the Middlemans did not truly intend to operate Xpanse as an independent technology company, enable its management team to independently run and operate the company, prioritize commercialization of its technologies and/or offer it at true standalone market and economic terms to Freedom Mortgage Corporation and Archwell Holdings, or to take it public with true equity participation and full rights for Xpanse's employees. They expressed their belief that the representations made to them during their own recruitment and promises made to them with respect to equity, its form and manner, and ownership were unlikely to be fulfilled, that the Middlemans instead had intended for Xpanse to become a closely-held subsidiary of Archwell that would serve their own self-interests, and that the Middlemans' true plans were not what had been represented during recruitment to Plaintiff or themselves. CFO Timothy Beard also shared with Plaintiff that he realized from these team members who had discussions with Stanley Middleman and from his own interactions with Stanley Middleman, Michael Middleman, Gregory Middleman and others, that it was clear that the Defendants plans for Xpanse were not as had been represented to him and Plaintiff. Plaintiff and CFO Timothy Beard now realized that the representations and promises made by the Defendants were not going to be fulfilled by the Defendants, and the Defendants had plans for Xpanse that they had concealed from Plaintiff and CFO Timothy Beard.

122. Representations Defendants Stanley Middleman and Michael Middleman made to Plaintiff before he accepted the offer of employment and representations made by Defendants Stanley Middleman, Michael Middleman and Gregory Middleman during his period of employment were false. Plaintiff's equity interest in the new company and its structure, form and manner, a central material term to his employment agreement and the most valuable component of his salary package, was not what the Middlemans claimed it to be. Promises Defendants made about the technology company, including its structure as a C-Corp, its independence, its revenue, intellectual property, assets, transfer of technologists and staff, and/or its priorities and objectives, were never meant to be and were not fulfilled.

123. Defendants concealed from Plaintiff their plan to turn Xpanse, Inc. into a closely-controlled subsidiary of Archwell Holdings, a member of the "Freedom Family of Companies", and have the company serve the economic needs and self-serving priorities of Freedom Mortgage Corporation and Archwell entities. In 2021, Archwell Holdings on its website described Xpanse along with itself and other Defendants as "complementary entities working together" and "Together we are One Archwell."

124. By mid-January 2021, it became clear to Plaintiff why Defendants had intentionally delayed transferring Plaintiff's employment from Freedom Mortgage Corporation to Xpanse. It had also become clear why Defendants Stanley Middleman, Michael Middleman, Gregory Middleman had intentionally delayed and evaded issuing the equity plan promised in Plaintiff's employment agreement. Plaintiff understood that Defendants' hidden plans for Xpanse were inconsistent with material promises they had made to Plaintiff and other employees.

N. <u>Defendants Terminated Both Plaintiff and CFO Timothy Beard on January 21, 2021.</u>

125. On January 21, 2021, without advanced notice or discussion, Special Advisor to Defendant Stanley Middleman and Freedom Mortgage Corporation's Executive Vice President Robert King, informed Plaintiff that he was fired. The notice of his termination said he was terminated for "cause," although Plaintiff's employment agreement requires both notice and an opportunity to cure if there is cause. At no time did Freedom Mortgage Corporation or Xpanse provide any notice to Plaintiff of concerns with his performance, direction or accomplishments.

126. CFO Timothy Beard, who also expressed concerns and challenged Defendants, including their share valuation scheme and planned conversion of Xpanse from a C-Corp to a limited liability company, was summarily fired the same day.

127. Defendants fired Plaintiff because: (1) he refused to participate in activities and schemes that he believed were fraudulent and illegal; (2) he demanded to be paid wages and benefits due and to be issued stock options promised to him by Defendants; (3) he requested to be permitted by Defendants to coordinate with co-workers whose employment rights also were

at stake; (4) he requested an opportunity to consult with his legal counsel regarding his rights and to have his counsel participate in discussions to assess the adverse effects of Defendants' share valuation scheme on his employment and contract rights; (5) Plaintiff refused to engage in deceptive and unfair business practices; (6) despite their contrary representations, Defendants Stanley Middleman, Michael Middleman and Gregory Middleman never intended to permit Plaintiff to hold a 5% ownership stake in Xpanse, a Middleman family company; (7) Defendants Stanley Middleman, Michael Middleman and Gregory Middleman wanted to evade paying Plaintiff his guaranteed bonus, other payments and benefits, and wanted to avoid fulfilling their legal obligations; (8) Defendants wanted Xpanse to facilitate and Plaintiff to succumb to the self-serving interests and self-dealing of the Middlemans, Freedom Technology Corporation and Archwell Holdings over the rights, protections and interests of all others and employees including those had been promised equity ownership; (9) Plaintiff requested to join the board of Xpanse to ensure that the Defendants fulfilled their fiduciary, legal and ethical obligations and his co-workers rights were protected, to ensure that employees would be treated fairly, and that the Defendants were not self-dealing and unjustly benefiting themselves; (10) Defendants realized that Plaintiff had begun to unwind the web of lies Defendants had spun, making it impossible to continue to keep them concealed; and (11) Defendants Stanley Middleman, Michael Middleman and Gregory Middleman wanted to seize full control, ownership, credit and value for Xpanse.

128. Operating according to a common scheme or plan, Defendants intended to interfere with, and deprive Plaintiff of the benefits of his employment agreement. Defendants conspired to fabricate grounds to support "for cause" termination of Plaintiff's employment. They did so to advance their own financial interest and to retaliate against Plaintiff for the concerns and objections that he and CFO Timothy Beard had both raised with them. While Plaintiff certainly had grounds to resign for "good reason" under the employment agreement, Freedom Mortgage did not have good cause to fire him.

129. On January 21, 2021, Defendant Gregory Middleman informed Xpanse's leadership that Plaintiff was terminated and no longer CEO, and that Timothy Beard was no longer CFO. Gregory Middleman indicated to the leadership team that he was now the senior most executive of the company. Immediately seizing management control of the company, Gregory Middleman later that day held a companywide conference with all Xpanse employees to tell them that Plaintiff had been terminated and was no longer the company's CEO. Defendant Freedom Mortgage Corporation paid Plaintiff through January 22, 2021. With both Plaintiff and CFO Timothy Beard simultaneously terminated, the Middlemans had concurrently eliminated the only two individuals who had knowledge of and who had expressed concerns about their illegal, fraudulent and self-serving schemes.

130. In early 2021, Defendants removed Plaintiff and his title as "CEO & Co-Founder" from the company's public website, and changed Gregory Middleman's title on the website to "Founder" of the company, which the Defendants were fully aware was false and fabricated. In doing so Defendants willfully and deliberately robbed Plaintiff of his Co-Founder status.

131. After his termination, Plaintiff discovered that Xpanse, Inc. already had been succeeded by Xpanse, LLC, despite objections from Plaintiff and CFO Timothy Beard. During or around the end of 2020, Defendants Stanley Middleman, Michael Middleman and Gregory Middleman were together in Palm Beach County, Florida. Michael Middleman quietly executed the Delaware succession certificate on December 24, 2020, without informing either Xpanse's Chief Executive Officer or its Chief Financial Officer. Xpanse's succession to a limited liability company was made effective by the Defendants at 11:59 p.m. on December 31, 2020, and the processing of the Delaware succession was completed by early January 2021. Defendants kept this concealed and did not disclose this even after it was completed by them, neither to Plaintiff who was the company's Chief Executive Officer (CEO)/President and Co-Founder, and nor to the Chief Financial Officer of the company.

**FIRST CAUSE OF ACTION**

Fraud: False Promise

(Against Defendants Freedom Mortgage Corporation, Stanley Middleman)

137. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

138. As described herein, Defendants worked in concert to misrepresent material facts and make false promises to Plaintiff to persuade him to become the founding president of a technology company they had planned to form and develop. These misrepresentations involved the most fundamental material terms of Plaintiff's employment, including the revenue, assets, staff transfers, intellectual property and other contributions Defendants planned to make in the new company, the overall independent plans and goals for the company, the structure of the company, the value, form, terms and manner of the equity promised to Plaintiff, the immediate transfer of Plaintiff's employment to the new company, and the early-exercise issuance of ownership interest as incentive stock options, non-statutory options or combination thereof to Plaintiff.

139. These representations, among others described herein, were false.

140. Defendants Stanley Middleman and Michael Middleman made these misrepresentations for their own personal financial interest and on behalf of Freedom Mortgage Corporation, Xpanse, LLC, Archwell Holdings LLC, Archwell Solutions, LLC, Archwell Management LLC and Keystone B2B, LLC. Defendants Stanley Middleman and Michael Middleman knew that the statements described herein were false, or made the misrepresentations recklessly and without regard for the truth.

141. Defendants intended Plaintiff to rely these representations and promises.

142. Plaintiff reasonably relied to his detriment on these representations as statements of fact. Based on these representations, Plaintiff accepted the employment offer made by Defendants Stanley Middleman and Michael Middleman and was precluded from another valuable

employment offer. He spent several months in the negotiation process and then worked for almost a full year in reliance on Defendants' misrepresentations.

143. As a consequence of Defendants' misrepresentations and false promises, Plaintiff has been damaged in several ways:

A. By accepting employment by Defendants, Plaintiff was precluded from pursing an alternative employment offer that was worth in excess of $19,200,000.00 cash compensation, with at least $7,200,000.00 cash compensation in the first year, for an initial 3-year fixed commitment, with expected recurring 3-year renewals at similar or higher compensation. The offer also offered double-digit percentage equity that based on overall financial projections by company would equal or exceed $200 million.

B. Plaintiff has lost the compensation and other benefits of long-term employment promised him by Defendants, including but not limited to, an ownership interest of at least 5% in Xpanse.

C. As a result of his reasonable reliance on Defendants' misrepresentations, which ultimately led to the wrongful termination of his employment "for cause" after less than one year of employment, Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants, and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious misconduct.

D. Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever, given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic losses.

E. Plaintiff incurred substantial expenses and hardship moving himself, his family and children to Washington State based on his reliance on Defendants' misrepresentations.

F. Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

144. In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

145. As a result of Defendants' Conspiracy to Commit Fraud by False Promise, Plaintiff has sustained damages in excess of $100,000,000.00 plus at least a 5% ownership interest in Xpanse, LLC, and is additionally entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

## SECOND CAUSE OF ACTION

Fraud: Concealment

(Against Defendants Freedom Mortgage Corporation, Stanley Middleman)

146. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

147. Plaintiff and Defendants were in a confidential relationship with bilateral fiduciary duties. Defendants had a duty to the founding president and CEO of Xpanse to disclose information to him that was material to the structure, operation and plans of the business- and business-related filings. Defendants also had a fiduciary duty to Plaintiff whose employment contract promised significant ownership interest in Xpanse, making him into a significant owner/investor and substantial shareholder of the company: an employee, co-founder, and business partner.

148. Furthermore, Defendants gave Plaintiff the authority to act on behalf of Xpanse, including the authority to offer stock ownership interests to his leadership team as part of their compensation package, which in several instances Plaintiff did. Defendants had the fiduciary duty to disclose to him material information about their plans and actions, but failed to do so.

Unknown to Plaintiff, Defendants used him to make false promises to several key Xpanse employees.

149. Defendants intentionally concealed from Plaintiff the truth about their plans, actions and activities relating to the Xpanse, LLC, as described herein. Plaintiff did not know of the concealed facts until well after he was hired. He only learned the truth about Defendants' illegal schemes because he observed the inconsistencies between what Defendants represented and promised, versus what they were doing and not doing.

150. Had Plaintiff learned the full extent and truth of the concealed facts and/or plans earlier, he would have behaved differently to protect his interests.

151. As a consequence of Defendants' fraudulent concealment of material facts and/or plans, Plaintiff has been damaged in several ways:

A. By accepting employment by Defendants, Plaintiff was precluded from pursing an alternative employment offer that was worth in excess of $19,200,000.00 cash compensation over the first 3 years, with at least $7,200,000.00 cash compensation in the first year, for an initial 3-year fixed commitment, with expected 3-year renewals. The offer also offered double-digit percentage equity that based on overall financial projections by company would equal or exceed $200 million.

B. Plaintiff has lost the compensation and other benefits of long-term employment promised him by Defendants, including an ownership interest of at least 5% in Xpanse.

C. As a result of his reasonable reliance on Defendants' misrepresentation, which ultimately led to the wrongful termination of his employment "for cause" after less than one year of employment, Plaintiff's accomplished career, professional standing and reputation have been falsely and severely damaged by Defendants and Plaintiff's future employment opportunities are adversely affected by Defendants' tortious misconduct.

D. Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position,

responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and has incurred other significant economic losses.

E. Plaintiff incurred substantial expenses and hardship moving himself, his family and children to Washington State based on his reliance on Defendants' misrepresentations.

F. Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

152. In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants.

153. As a result of Defendants' Conspiracy to Commit Fraud by Concealment Plaintiff has sustained economic and general damages in excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC. Plaintiff is also entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

## THIRD CAUSE OF ACTION

Breach of Contract

(Against Defendants Freedom Mortgage Corporation and Xpanse, LLC )

172. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

173. On or about February 26, 2020, Plaintiff entered into a binding employment contract with Defendant Freedom Mortgage Corporation to serve as the founding president of a technology company it hired Plaintiff to form and lead. At the time he was hired, the technology company did not exist. Once that company was formed by Freedom Mortgage Corporation, Plaintiff became its chief executive officer/president and co-founder. Once formed, the

technology company, referred to as Freedom Technology Corporation in the contract, now known as Xpanse, LLC, assumed the duties and responsibilities as set out in the contract Defendant Stanley Middleman signed on February 26, 2020. (Exhibit A).

174. This contract required Plaintiff to serve as the founding president of Xpanse. Plaintiff fulfilled all of his responsibilities under the contract and/or was excused from performing those duties and obligations that Defendants made impossible to perform as a consequence of their breach and wrongful termination of Plaintiff's employment.

175. Pursuant to section 8(f)(ii)(2) of the employment agreement, Plaintiff's 5% ownership interest in Xpanse accelerated upon the assignment and/or disposition and/or lease and/or sale of substantially all of the talent and intellectual property from Xpanse to Freedom Mortgage Corporation and/or KeystoneB2B LLC and/or Archwell Solutions LLC and/or other entities. In late 2020 and January 2021, Xpanse's talent, technology and intellectual property development was assigned, subjugated and appropriated by the Middleman's to substantially serve the primary needs and priorities of and for the primary benefit of Freedom Mortgage Corporation, and/or KeystoneB2B LLC and/or Archwell Solutions LLC and/or other Middleman's entities, and not as an independent roadmap or market facing priorities or to maximize Xpanse's value and revenue. In breach of their duties under the employment agreement, Defendants failed to accelerate the 5% ownership interest in Xpanse, LLC to Plaintiff upon this occurrence.

176. In addition, and/or in the alternative, when Defendants surreptitiously converted Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January 2021, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately and in its entirety pursuant to Exhibit B of the binding employment contract (see ¶ Exhibit B of the employment contract). The successor and surviving LLC entity did not preserve the value, form, manner and structure of the equity award required by the employment contract. Defendants had agreed with Plaintiff for the technology company's structure to be a C-Corporation ("C-Corp") to enable the full value, form, manner and structure of the equity as

such. The technology company was specifically referred to as Freedom Technology Corporation in the executed employment agreement; i.e., it specifically used "Corporation" affirming the agreement between Plaintiff and Defendants regarding the entity being structured and operated as a C-Corp. However, unlike a C-Corp, limited liability companies (LLCs) cannot and are unable to provide, issue and/or retain the value, form, manner and structure of equity as incentive stock options (ISOs), non-statutory options (NSOs) and early-exercise stock options pursuant to applicable legal and tax regulations. Defendants' failure to accelerate Plaintiff's 5% ownership interest in Xpanse upon this occurrence of this conversion constitutes another breach of the contract.

177. Also, in addition, and/or in the alternative, when Defendants surreptitiously converted and succeeded Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January 2021 and/or made Archwell Management, LLC as the manager of the company, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately and in its entirety pursuant to section 8(f)(ii)(1) of the employment agreement. Defendants' failure to accelerate Plaintiff's 5% ownership interest in Xpanse, LLC upon this occurrence of this conversion constitutes another breach of the employment agreement.

178. Defendants breached the contract in multiple additional ways, as follows:

A. Defendants failed to formally and immediately transfer Plaintiff's employment from Freedom Mortgage Corporation to Xpanse as required under ¶ 3 of the contract;

B. Defendants failed to adopt and establish an equity incentive plan as required under ¶ 5(g) of the contract;

C. Defendants failed to issue equity grants to Plaintiff when and as required under ¶ 5(g) of the contract;

D. Defendants failed to provide or preserve the form, manner and structure of the equity as early-exercise and as incentive stock options (ISO), non-statutory stock

options (NSO) or combination thereof as requited under Exhibit B of the employment contract;

E. Defendants failed to timely pay the second half of his signing bonus ($500,000.00) to Plaintiff;

F. Defendants failed to provide Plaintiff with vested 401k matching benefits in an amount, net of taxes, of at least $39,000.00;

G. Defendants failed to adopt the comments provided by Plaintiff to ensure commercially reasonable terms and conditions for Xpanse's equity plan in violation ¶ Exhibit B of the employment contract;

H. Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of ¶ 8(f) of the employment contract;

I. Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of Exhibit B of the employment contract;

J. Defendants failed to provide Plaintiff with health and other benefits through Xpanse;

K. Defendants failed to fully calculate and pay Plaintiff the value of PTO and holiday pay;

L. Defendants terminated Plaintiff's employment without cause in violation of ¶ 8 of the contract, failed to provide notice or opportunity to cure in violation of the contract, and subsequently failed to provide Plaintiff with the severance benefits he is entitled to receive under the severance agreement provisions set out in the February 26, 2020 contract, including:

   i. A single severance lump sum payment in an amount equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of

the performance metrics for such Performance Discretionary Bonus); which is calculated as at least $3,000,000.00;

ii. A single lump sum payment of the of the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the Executive's termination calculated at 100% of target; which is calculated as at least $1,500,000.00.

iii. Twelve months company-paid COBRA benefits for Plaintiff and his family; which is calculated per numbers provided by UMR on behalf of Freedom Mortgage Corporation as, net of taxes, $43,812.72.

iv. A pro rata amount (calculated pursuant to the Employment Agreement) of the current year's target Discretionary Performance Bonus amount, irrespective of whether the performance goals applicable have been established or satisfied, which is calculated pro rata of 100% of Base Salary as at least $1,375,000.00, however as subsequently discussed and agreed upon, the Discretionary Performance bonus plan for the Plaintiff and the technology company was determined to be increased to up to 150% of Base Salary, which is calculated pro rata as at least $2,062,500.00.

179. As a result of Defendants' breaches of contract, as described herein, Plaintiff has sustained damages in excess of $100,000,000.00, plus at least a 5% ownership interest in Xpanse, LLC, the value of which is known to Defendants and to be proved at trial.

**FOURTH CAUSE OF ACTION**

Breach of the Covenant of Good Faith and Fair Dealing

(Against Defendant Xpanse, LLC)

180. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

181. On or about February 26, 2020, Plaintiff entered into a binding employment contract with Defendant Freedom Mortgage Corporation to serve as the founding president of a technology company it hired Plaintiff to form and lead. At the time he was hired, the technology company did not exist. Once that company was formed by Freedom Mortgage Corporation, Plaintiff became its chief executive officer/president and co-founder. Once formed, the technology company, referred to as Freedom Technology Corporation in the contract, now known as Xpanse, LLC, assumed the duties and responsibilities as set out in the contract Defendant Stanley Middleman signed on February 26, 2020. (Exhibit A)

182. This contract required Plaintiff to serve as the founding president of Xpanse. Plaintiff fulfilled all of his responsibilities under the contract and/or was excused from performing those duties and obligations that Defendants made impossible to perform as a consequence of their breach and wrongful termination of Plaintiff's employment.

183. As Plaintiff's employers, Defendants had substantial and superior power over Plaintiff, and they used their power to prevent Plaintiff from receiving the benefits he had bargained for under the contract. Defendants engaged in conduct specifically meant to mislead and take advantage of Plaintiff in multiple unfair ways. As described herein, Defendants breached the covenant of good faith and fair dealing implied within the employment contract.

184. Pursuant to section 8(f)(ii)(2) of the employment agreement, Plaintiff's 5% ownership interest in Xpanse accelerated upon the assignment and/or disposition and/or lease and/or sale of substantially all of the talent and intellectual property from Xpanse to Freedom Mortgage Corporation and/or KeystoneB2B LLC and/or Archwell Solutions LLC and/or other entities. In late 2020 and January 2021. Xpanse's talent, technology and intellectual property development was assigned, subjugated and appropriated by the Middleman's to substantially serve, not an independent roadmap or market facing priorities or to maximize Xpanse's value and revenue, but instead the primary needs and priorities of and for the primary benefit of Freedom Mortgage Corporation, and/or Keystone B2B LLC and/or Archwell Solutions LLC and/or other

Middlemans' entities. In breach of their duties under the employment agreement and in breach of the covenant of good faith and fair dealing, Defendants failed to accelerate the 5% ownership interest in Xpanse, LLC to Plaintiff upon this occurrence.

185. In addition, and/or in the alternative, when Defendants surreptitiously converted Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January 2021, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately and in its entirety pursuant to Exhibit B of the binding employment contract (see ¶ Exhibit B of the employment contract). The successor and surviving LLC entity did not preserve the value, form, manner and structure of the equity award required by the employment contract. Defendants had agreed with Plaintiff for the technology company's structure to be a C-Corporation ("C-Corp") to enable the full value, form, manner and structure of the equity as such. The technology company was specifically referred to as Freedom Technology Corporation in the executed employment agreement; i.e., it specifically used "Corporation" affirming the agreement between Plaintiff and Defendants regarding the entity being structured and operated as a C-Corp. However, unlike a C-Corp, limited liability companies (LLCs) cannot and are unable to provide, issue and/or retain the value, form, manner and structure of equity as incentive stock options (ISOs), non-statutory options (NSOs) and early-exercise stock options pursuant to applicable legal and tax regulations. Defendants' failure to accelerate Plaintiff's 5% ownership interest in Xpanse upon this occurrence of this conversion constitutes another breach of the contract and constitutes a breach of the covenant of good faith and fair dealing.

185. Also, in addition, and/or in the alternative, when Defendants surreptitiously converted and succeeded Xpanse, Inc., a C-Corp, to Xpanse, LLC, a closely-held limited liability company in January 2021 and/or made Archwell Management, LLC as the manager of the company, they accelerated Plaintiff's five percent (5%) ownership interest in Xpanse immediately and in its entirety pursuant to section 8(f)(ii)(1) of the employment agreement.

Defendants' failure to accelerate Plaintiff's 5% ownership interest in Xpanse, LLC upon this occurrence of this conversion constitutes another breach of the employment agreement and breach of the covenant of good faith and fair dealing.

186. Defendants breached the covenant of good faith and fair dealing in the employment contract in multiple additional ways, as follows:

A. Defendants failed to formally and immediately transfer Plaintiff's employment from Freedom Mortgage Corporation to Xpanse as required under ¶ 3 of the contract;

B. Defendants failed to adopt and establish an equity incentive plan as required under ¶ 5(g) of the contract;

C. Defendants failed to issue equity grants to Plaintiff when and as required under ¶ 5(g) of the contract;

D. Defendants failed to provide or preserve the form, manner and structure of the equity as early-exercise and as incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof as requited under ¶ Exhibit B of the employment contract;

E. Defendants failed to timely pay the second half of his signing bonus ($500,000.00) to Plaintiff;

F. Defendants failed to provide Plaintiff with vested 401k matching benefits in an amount, net of taxes, of at least $39,000.00;

G. Defendants failed to adopt the comments provided by Plaintiff to ensure commercially reasonable terms and conditions for Xpanse's equity plan in violation ¶ Exhibit B of the employment contract;

H. Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of ¶ 8(f) of the contract;

I. Defendants failed to accelerate and transfer ownership interest in Xpanse to Plaintiff in violation of Exhibit B of the employment contract;

J. Defendants failed to provide Plaintiff with health and other benefits through Xpanse;

K. Defendants failed to fully calculate and pay Plaintiff the value of PTO and holiday pay;

L. Defendants terminated Plaintiff's employment without cause in violation of ¶ 8 of the contract, failed to provide notice or opportunity to cure in violation of the contract, and subsequently failed to provide Plaintiff with the severance benefits he is entitled to receive under the severance agreement provisions set out in the February 26, 2020 contract, including:

a. A single severance lump sum payment in an amount equal to one full year of cash compensation, defined as (a) the Executive's Base Salary plus (b) the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary (payable regardless of the Executive's satisfaction of the performance metrics for such Performance Discretionary Bonus); which is calculated as at least $3,000,000.00;

b. A single lump sum payment of the of the Performance Discretionary Bonus to be payable to the Executive for the immediately preceding Performance Year that has not yet been paid to the Executive as of the date of the Executive's termination calculated at 100% of target; which is calculated as at least $1,500,000.00.

c. Twelve months company-paid COBRA benefits for Plaintiff and his family; which is calculated per numbers provided by UMR on behalf of Freedom Mortgage Corporation as, net of taxes, $43,812.72.

d. A pro rata amount (calculated pursuant to the Employment Agreement) of the current year's target Discretionary Performance Bonus amount, irrespective of whether the performance goals applicable have been established or satisfied, which is calculated pro rata of 100% of Base Salary as at least $1,375,000.00, however as subsequently discussed and agreed

upon, the Discretionary Performance for the Plaintiff and the technology company was determined to be increased to up to 150% of Base Salary, which is calculated pro rata as at least $2,062,500.00.

187. All of these actions and deliberate inactions resulted in the breach of the covenant of good faith and fair dealing, as described herein. As a result of Defendants' breaches of the covenant of good faith and fair dealing Plaintiff sustained damages in excess of $100,000,000.00, plus at least a 5% ownership interest in Xpanse, LLC, the value of which is known to Defendants and to be proved at trial.

**FIFTH CAUSE OF ACTION**

Wrongful Discharge in Violation of Washington Public Policy

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, and Does 1-50)

207. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

208. Defendants Freedom Mortgage Corporation and Xpanse jointly employed Plaintiff.

209. While employed by Defendants, Plaintiff refused to engage in conduct that violated the laws and the public policy of Washington and the United States.

A. Plaintiff refused to participate and sign-off on the creation, endorsement and/or implementation of a secret share valuation scheme that would have required him to engage in business practices that he believed would have violated the tax, securities, corporate and other laws of the United States, including but not limited to 18 U.S.C.A. §1348, and that would have violated the employment rights of his co-employees, and his own, and their right to receive the compensation promised to them, including to Plaintiff pursuant to Revised Code of Washington ("RCW") 49.52.050, RCW 49.44.050, and RCW 49.52.070, *et seq.*;

B. Plaintiff refused to participate and agree to the restructuring and reorganization of the company from a C-Corp to a limited liability company (LLC) that would have

required him to engage in business practices he believed would make him party to the intentional and knowing violation of the employment rights of his co-employees, and which also would result in a violation of his own legal rights, including those guaranteed to Plaintiff under RCW 49.44, RCW 49.48 and 49.52 , *et seq*.;

C. Plaintiff refused to participate and engage in anticompetitive conduct and unfair business practices that would have involved him in the violation of RCW 49.44, 49.48 and 49.52, *et. Seq*., as well as state and federal laws, which could have subjected him (and the company) to significant liability.

210. Upon information and belief, Plaintiff and CFO Timothy Beard were the only individuals outside of the Middlemans and the Middlemans' inner circle, who knew about the Middlemans' scheme to restructure and reorganize the company from a C-Corp to a LLC and about the Middlemans' secret valuation scheme. Therefore, Plaintiff and CFO Beard were the only individuals in a position to challenge the Middlemans' illegal scheme and did so in the only path that was available to them to protect Plaintiff's and his co-workers' legal rights to the compensation and equity promised to them as part of their employment. This conduct included challenging these policies in writing and in meetings with the Middlemans.

211. Plaintiff's refusal to engage in this illegal misconduct was a substantial motivating reason for Defendants' termination of Plaintiff's employment.

212. The Washington Legislature, by enacting a "comprehensive legislative system with respect to wages indicates a strong legislative intent to assure payment to employees of wages they have earned." *Schilling v. Radio Holdings, Inc.*, 136 Wash. 2d 152, 158-59 (1998). RCW 49.52.050 and 49.52.070 in particular "express the legislature's strong policy in favor of ensuring the payment of the full amount of wages earned." *Failla v. FixtureOne Corp.*, 181 Wash. 2d 642, 656 (2014).

213. As a result of the wrongful discharge of his employment, Plaintiff has been damaged in numerous ways.

A. Plaintiff has lost the compensation and other benefits of long-term employment promised him by Defendants.

B. Plaintiff has been denied an ownership interest of at least 5% in Xpanse.

C. Plaintiff has been denied equity as early-exercise incentive stock options (ISO), non-statutory stock options (NSO) or combination thereof in Xpanse that he was entitled to receive.

D. Plaintiff has suffered undue hardship given his uprooting his family and children across states from California to Washington state to serve the best interests of the company and its employees.

E. Plaintiff has suffered severe emotional distress, mental anguish and suffering as a result of Defendant's egregious misconduct.

F. As a result of Defendants' wrongful termination of his employment after less than one year of employment, including but not limited to the mischaracterization of the termination as one "for cause," Plaintiff's accomplished career, professional standing and reputation have been falsely portrayed and severely damaged by Defendants. Plaintiff's future employment opportunities are adversely affected by Defendants' tortious termination of his employment by pretextual and fabricated means.

G. Plaintiff has lost significant past income and will lose additional income into the future until he is able to obtain long-term employment with similar position, responsibility, compensation, benefits and equity ownership, promised him by the Defendants, if ever given the fabricated and false "for cause" characterization of his termination, and Plaintiff has incurred other significant economic and non-economic losses.

H. Defendants' discharge of Plaintiff's employment was a substantial factor in causing Plaintiff's harm. Knowing that their actions would cause this, Defendants acted despicably and with malice.

214. In doing the foregoing, Defendants acted with fraud, oppression, malice and despicably, with the intent to cause injury to Plaintiff and with a conscious disregard of the rights of Plaintiff, and subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to an award of exemplary and punitive damages, in addition to compensatory damages for the injuries caused by Defendants. Defendants' decision to terminate Plaintiff's employment was made by Defendants' senior-most executives as described herein above.

215. To date, as a result of Defendants' Wrongful Discharge in Violation of California Public Policy, Plaintiff has sustained economic and general damages in excess of $100,000,000.00, and is owed at least a 5% ownership interest in Xpanse, LLC.

216. Plaintiff also is entitled to sufficient punitive damages to punish Defendants for their outrageous conduct and to set an example to others.

## **SIXTH CAUSE OF ACTION**

Wrongful Withholding of Wages, Including Upon Termination In Violation Of RCW 49.48.010

(Against Defendants Freedom Mortgage Corporation and Xpanse, LLC, Stanley Middleman and Does 1-50)

258. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

259. RCW 49.48.010 makes it unlawful for any employer to withhold or divert any portion of a Washington State employee's wages after the employee ceases to work for an employer.

260. Pursuant to RCW 49.52.050 and .070, it is unlawful for "any employer and any officer, vice principal, or agent of any employer" to "willfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract."

261. Defendants intentionally mischaracterized Plaintiff's termination as "for cause" in order to create pretext to avoid paying Plaintiff the wages and severance benefits owed to him pursuant to his employment agreement for a termination without cause.

262. Pursuant to his employment agreement with Defendants, Plaintiff was entitled to at least 20 calendar days paid time off per calendar year.

263. Pursuant to Defendant Freedom Mortgage Corporation's PTO policy, Plaintiff earned 14 hours of PTO per pay period. At the end of every quarter, Freedom Mortgage Corporation paid out Plaintiff's earned PTO wages. On October 16, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 82 PTO hours at the rate of $721.15 per hour. Subsequently, on December 24, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 42 PTO hours at the rate of $721.15 per hour.

264. Defendant Freedom Mortgage Corporation failed to pay out Plaintiff's PTO at his regular rate of pay for 2020, however, which was $1, 201.92 per hour based on Plaintiff's base salary plus his contractually-guaranteed non-discretionary $1,000,000 signing bonus. For 2020, therefore, Defendant Freedom Mortgage Corporation under paid Plaintiff by a total of at least $59,615.48 in PTO payments, an amount that remained due upon and after the termination of Plaintiff's employment in January 2021.

265. Defendant Freedom Mortgage Corporation failed to pay Plaintiff's PTO at his regular rate of pay for 2021, which was $1,477.16, based on Plaintiff's base salary plus his contractually-guaranteed, 2021 non-discretionary performance bonus of at least $1.5 million, plus Xpanse's 3% annual inflation increase (applied effective March and through the following year, and recurring annual inflation increases thereafter) and the guaranteed $5,000 wellness bonus.

266. During 2021 Plaintiff earned at least 38 hours of PTO. All of these PTO hours were paid at the rate of $721.15 per hour resulting in a failure to pay at least $28,728.24 in PTO wages that were earned and due upon Plaintiff's termination.

267. In total, Defendant Freedom Mortgage Corporation failed to pay Plaintiff at least $88,343.72 in PTO wages upon the date of his termination.

268. In addition, Defendants Freedom Mortgage Corporation and Xpanse, LLC failed to pay severance wages and benefits to Plaintiff on March 22, 2021 as required under the terms of his employment contract.

269. Defendant Xpanse, LLC also failed to make matching contributions to Plaintiff's 401k plan as required under Xpanse's executive compensation plan and 5(e) of Exhibit A to the employment contract between Plaintiff and Defendants.

270. As of the date they paid Plaintiff, January 22, 2021, Defendants also owed Plaintiff a total of $39,000.00, net of taxes, in matching 401k contributions with $19,500.00, net of taxes, during calendar year 2020, and $19,500.00, net of taxes, in January 2021.

271. Defendants failed to provide Plaintiff with his 5% ownership interest in Xpanse.

272. Defendants willfully failed to pay all of these wages due to Plaintiff upon his termination.

273. As a result of Defendant's actions, Plaintiff sustained damages in an amount to be proven at trial, with such amount to be recovered from either the corporate or individual defendants pursuant to RCW 49.48.010, RCW 49.52.050, and RCW 49.52.070.

274. Plaintiff has incurred and will continue to incur attorneys' fees in the prosecution of this action. Plaintiff seeks his attorneys' fees and costs of suit under RCW 49.48.030 .

## SEVENTH CAUSE OF ACTION

Intentional Wrongful Withholding of Wages In Violation Of RCW 49.52.050

(Against Defendants Freedom Mortgage Corporation and Xpanse, LLC, Stanley Middleman and Does 1-50)

275. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

276. Pursuant to RCW 49.52.050 and .070, it is unlawful for "any employer and any officer, vice principal, or agent of any employer" to "willfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract."

277. Defendants intentionally mischaracterized Plaintiff's termination as "for cause" in order to create pretext to avoid paying Plaintiff the wages and severance benefits owed to him pursuant to his employment agreement for a termination without cause, and specifically to deprive Plaintiff of his promised 5% ownership interest in Xpanse.

278. Pursuant to his employment agreement with Defendants, Plaintiff was entitled to at least 20 calendar days paid time off per calendar year.

279. Pursuant to Defendant Freedom Mortgage Corporation's PTO policy, Plaintiff earned 14 hours of PTO per pay period. At the end of every quarter, Freedom Mortgage Corporation paid out Plaintiff's earned PTO wages. On October 16, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 82 PTO hours at the rate of $721.15 per hour. Subsequently, on December 24, 2020, Freedom Mortgage Corporation paid Plaintiff a total of 42 PTO hours at the rate of $721.15 per hour.

280. Defendant Freedom Mortgage Corporation failed to pay out Plaintiff's PTO at his regular rate of pay for 2020, however, which was $1, 201.92 per hour based on Plaintiff's base salary plus his contractually-guaranteed non-discretionary $1,000,000 signing bonus. For 2020, therefore, Defendant Freedom Mortgage Corporation under paid Plaintiff by a total of at least $59,615.48 in PTO payments, an amount that remained due upon and after the termination of Plaintiff's employment in January 2021.

281. Defendant Freedom Mortgage Corporation failed to pay Plaintiff's PTO at his regular rate of pay for 2021, which was $1,477.16, based on Plaintiff's base salary plus his contractually-guaranteed, 2021 non-discretionary performance bonus of at least $1.5 million, plus Xpanse's 3% annual inflation increase (applied effective March and through the following

year, and recurring annual inflation increases thereafter) and the guaranteed $5,000 wellness bonus.

282. During 2021 Plaintiff earned at least 38 hours of PTO. All of these PTO hours were paid at the rate of $721.15 per hour resulting in a failure to pay at least $28,728.24 in PTO wages that were earned and due upon Plaintiff's termination.

283. In total, Defendant Freedom Mortgage Corporation failed to pay Plaintiff at least $88,343.72 in PTO wages upon the date of his termination.

284. In addition, Defendants Freedom Mortgage Corporation and Xpanse, LLC failed to pay severance wages and benefits to Plaintiff on March 22, 2021 as required under the terms of his employment contract. The payments due to Plaintiff under the Severance Agreement constitute wages within the meaning RCW 49.52.050.

285. Defendant Xpanse, LLC also failed to make matching contributions to Plaintiff's 401k plan as required under Xpanse's executive compensation plan and 5(e) of Exhibit A to the employment contract between Plaintiff and Defendants.

286. As of the date they paid Plaintiff, January 22, 2021, Defendants also owed Plaintiff a total of $39,000.00, net of taxes, in matching 401k contributions with $19,500.00, net of taxes, during calendar year 2020, and $19,500.00, net of taxes, in January 2021.

287. Defendants failed to provide Plaintiff with his 5% ownership interest in Xpanse.

288. Defendants willfully failed to pay all of these wages due to Plaintiff upon his termination.

289. Violations of RCW 49.48.010, as discussed above, constitute violations of RCW 49.52.050.

290. RCW 49.52.070 provides that any employer who violates the provisions of RCW 49.52.050 shall be liable in a civil action for twice the amount of wages withheld, attorneys' fees, and costs.

291. As a result of Defendant's actions, Plaintiff sustained damages in an amount to be proven at trial, with such amount to be recovered from either the corporate or individual defendants pursuant to RCW 49.48.010, RCW 49.52.050, and RCW 49.52.070.

292. Plaintiff has incurred and will continue to incur attorneys' fees in the prosecution of this action. Plaintiff seeks his attorneys' fees and costs of suit under RCW 49.48.030.

## EIGHTH CAUSE OF ACTION

Equitable Accounting

(Against Defendants Freedom Mortgage Corporation, Xpanse, LLC, and Does 1-50)

296. Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, with the exception of allegations that are inconsistent with this cause of action.

297. In or around December 2020 or earlier, Plaintiff became entitled to an accelerated 5% ownership interest in the company now known as Xpanse, LLC.

298. Plaintiff's ownership interest in Xpanse entitles Plaintiff to benefits of that ownership and the value of that ownership, including but not limited to intellectual property, revenues, profits, retained earnings, and accrued tax benefits/credits, and other owner benefits and distributions.

299. Defendants have appropriated and assigned Xpanse's intellectual property, development, technologists, staff, other resources, R&D and tax credits and benefits to enrich Defendants Freedom Mortgage Corporation, Keystone B2B, LLC, Archwell Solutions, LLC, Archwell Management, LLC, Archwell Holdings, LLC and its several other subsidiaries and affiliated entities, at the expense of Xpanse and causing economic harm to Plaintiff and his ownership interest.

300. Information memorializing these monetary values and the transfer of intellectual property is in the exclusive control of Defendants. Consequently, the amount of money due Plaintiff now and into the future cannot be ascertained without an accounting.

301. Plaintiff therefore seeks an equitable accounting so he can ascertain the value of his rights.

302.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1) For past and future general and special damages according to proof;

2) For punitive and exemplary damages;

3) For statutory penalties;

4) For double the value of all damages awarded pursuant to RCW 49.52.070.;

5) For attorneys' fees pursuant to RCW 49.48.030 and RCW 49.52.070

6) For specific performance;

7) For an equitable accounting;

8) For prejudgment and postjudgment interest, at the legal rate;

9) For increased payment to offset any additional income or other taxes;

10) For costs of suit incurred herein, including reasonable attorney's fees and costs including pursuant to RCW 49.48.030 and 49.52.070; and

11) For such other and further relief as the court may deem just and proper.

DATED: November 3, 2023

Ekwan E. Rhow
Oliver Rocos
Kate S. Shin
Barr Benyamin
Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: ______________________________
Ekwan E. Rhow
Attorneys for Plaintiff and Counter-Defendant Rahul Mewawalla

## DEMAND FOR TRIAL BY JURY

To the fullest extent permitted by law, Plaintiff demands a trial by jury.

DATED: November 3, 2023

Ekwan E. Rhow
Oliver Rocos
Kate S. Shin
Barr Benyamin
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: ______________________________
Ekwan E. Rhow
Attorneys for Plaintiff and Counter-Defendant
Rahul Mewawalla