Ekwan E. Rhow - State Bar No. 174604
  erhow@birdmarella.com
Oliver Rocos - State Bar No. 319059
  orocos@birdmarella.com
Brandon R. Teachout - State Bar No. 321672
  bteachout@birdmarella.com
BIRD, MARELLA, RHOW, LINCENBERG,
DROOKS, & NESSIM LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff and Counter-Defendant
Rahul Mewawalla

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| RAHUL MEWAWALLA, an individual,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>STANLEY C. MIDDLEMAN, et al.,<br><br>　　　　　Defendant. | CASE NO. 3:21-cv-09700-EMC<br><br>**PLAINTIFF RAHUL MEWAWALLA'S TRIAL BRIEF**<br><br>Date:　January 7, 2025<br>Time:　2:30 p.m.<br>Crtrm:　5<br><br>Assigned to Hon. Edward M. Chen<br><br>Trial Date:　　　February 5, 2025 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  INTRODUCTION

This is an inherently simple case that presents a straightforward scenario.

In late 2019 and early 2020, a series of promises were made to Plaintiff Rahul Mewawalla ("Mewawalla") by Freedom Mortgage Corporation ("FMC") and its CEO and controlling owner, Stanley Middleman ("Middleman"). The core of those promises were that FMC and Middleman would establish a new, independent technology company (ultimately named "Xpanse") that Mewawalla would use his silicon valley experience to run, overseen only by Middleman, which would be infused with intellectual property assets and cash from FMC so that it could develop technology products that would streamline mortgage originations and servicing—industries worth many billions of dollars a year—before going through an IPO. The independence was critical to Mewawalla—FMC is a family company run by billionaire Middleman with his children, and Mewawalla wanted to ensure that he would have the ability to operate the company as he saw fit and without having to satisfy anyone but Middleman himself. Based upon those promises, Mewawalla ceased pursuing alternative employment opportunities and committed himself to Defendants, signing an employment agreement in January 2020 that said his employment would be transferred to the new company as soon as it was incorporated. The reality was more than a disappointment.

Within just weeks of his starting work, it became clear that Defendants' promises had been false. When Xpanse eventually was formed in May 2020, it was not owned by Middleman or FMC, but was instead owned by Archwell Holdings LLC—a company owned and controlled by Middleman's sons, Michael and Gregory. Just weeks later, he learned that although Xpanse was meant to be a C-corporation—the corporate form used in silicon valley—individuals began to suggest that it should be converted to an LLC. When Mewawalla enquired as to the transfer of intellectual property assets, he learned that no such assets existed that even could be transferred. Finally, rather than being overseen by Middleman and given the independence he needed to build Xpanse, Mewawalla instead was micromanaged by the ultimate owner Michael Middleman, as well as other executives Christopher Staub and (later) Erik Anderson. His position was fatally

undermined by the appointment of Gregory Middleman as Chief Operating Officer.

By Fall 2020, Mewawalla's position was becoming increasingly challenging as he fought various individuals to maintain Xpanse's independence and manage it as befitted his role as President and Chief Executive Officer. Rather than listening to his concerns, he was instead berated and criticized for not sacrificing Xpanse for the good of the Middleman family. Ultimately, Mewawalla was terminated in January 2021—just nine months after he began. Defendants' pretextually claimed his termination was for "Cause," such that they did not need to pay him any severance payments. Xpanse's Chief Financial Officer Timothy Beard, who had stood alongside Mewawalla during his fight to maintain Xpanse's independence, was fired the same day.

Mewawalla brings four claims in this action: (1) False Promise against Middleman and FMC, asserting that they lied to him about the Xpanse opportunity; (2) Fraudulent Concealment against Middleman and FMC, asserting that they hid from him the truth about the Xpanse opportunity; (3) Breach of Contract against FMC and Xpanse, asserting that they failed to pay him severance and other sums due under his contracts with him; and (4) Breach of the Covenant of Good Faith and Fair Dealing against Xpanse, asserting that it wrongfully concluded there were grounds to terminate him for "Cause".

## II.   FACTUAL BACKGROUND

### A.   The Parties

*Plaintiff.* Rahul Mewawalla is a veteran Silicon Valley executive whose experience dates back nearly two decades, to 2005. He earned an MBA from the Kellogg School at Northwestern and has served as an executive at major technology companies including Nokia, Yahoo!, and General Electric/NBCUniversal. Mewawalla was employed by FMC from March 30, 2020, through January 21, 2021.

*Defendants.* FMC is one of the country's largest mortgage and lending companies, originating hundreds of billions of dollars of mortgages per year. The company is privately held; Middleman is its CEO and principal owner. His sons, Michael and Gregory Middleman, are among its top executives. Xpanse was intended to be a financial technology company building software for FMC, and eventually, for the broader mortgage industry.

### B. Mewawalla's Negotiations with FMC and FMC's Employment Offer

Mewawalla first contacted Middleman in 2019. Over the course of the following months, Middleman and Mewawalla negotiated the terms by which Mewawalla would lead a standalone technology company Middleman said he wanted to form, that would have the goal of revolutionizing the mortgage lending industry. Middleman promised Mewawalla that unlike FMC, which was and remains privately held by Middleman, this company would be operated and managed like a silicon valley technology company—totally apart from FMC with an eye toward creating a multibillion dollar business that could go public via an IPO. This was critically important to Mewawalla, both because he wanted to avoid interference from senior FMC executives and other Middleman family members and because he wanted to ensure that both he and other future employees would be able to realize the value of their equity stakes through the IPO.

To address these concerns, Middleman promised that he was the ultimate decisionmaker at FMC and that Mewawalla would report to him *directly*—not to anyone else at FMC. Middleman also assured Mewawalla that FMC would give the new company a head start by transferring valuable intellectual property and employees to the new company and contributing hundreds of millions of guaranteed revenue every year. Middleman and other representatives of Defendants also said that the company would be formed as a C-Corp to gain the full value of equity grants to Mewawalla and other future employees.

Many of these promises were documented in a November 22, 2019 email from Robert E. King, Jr., FMC's Executive Vice President and a Senior Advisor to Middleman. King wrote to Mewawalla that FMC would form the new entity that would become Xpanse, which "would be spun out as an independent entity suitable to go public." King wrote that "'Newco' will purchase all the significant technology assets owned by Freedom which would be needed to create a robust mortgage technology platform for origination and servicing."

Less than a month later, on December 10, 2019, King emailed Mewawalla to offer him "the position of President of a newly created affiliate of Freedom, to be known as Freedom Technology Corp. ("FTC")." King wrote that Mewawalla would directly "report to Stanley Middleman, CEO of Freedom and Chairman and CEO of FTC," and that Mewawalla "will receive a grant of 5% of FTC

equity." *Id.* King's offer email also reiterated that "Freedom will sell all of its owned technology assets to FTC which are necessary to design, build and operate a robust mortgage technology platform." *Id.*

Recognizing the risks inherent in working with a family like the Middlemans, Mewawalla carefully negotiated many aspects of his employment agreement, including both what constituted "cause" for termination and what sums he would be paid in severance if he was terminated other than for "cause."

### C. Mewawalla's Negotiations with EV and EV's Employment Offer

Around the same time that Mewawalla was negotiating the terms of his potential employment with FTC, Mewawalla was also negotiating the terms of a potential job opportunity with EV, a real estate company in Germany. Those communications began in September 2019 when an executive headhunter from EV's recruiting firm, Korn Ferry, informed Mewawalla that EV's then-CEO Christian Völkers wanted to meet with Mewawalla to discuss a potential role at EV.

Korn Ferry representatives met with Mewawalla in November 2019 and Völkers met with him shortly thereafter. Mewawalla and Völkers exchanged a series of emails following that meeting in which Völkers stated, "we def should go ahead with our venture" and that his partners "also think its great and we should proceed." In a subsequent email, Mewawalla set forth the general terms that would govern the parties' employment agreement.

Roughly a month later, Völkers sent Mewawalla a draft service agreement that set forth the terms of EV's offer for Mewawalla to join the company as a Managing Director (the "EV Agreement"). Mewawalla and his German lawyer subsequently offered comments on the offer to Korn Ferry, but never rejected the offer as drafted. The negotiations reached a stage where Mewawalla and his counsel believed the EV Agreement was "ready to go," *i.e.*, an operative offer.

### D. Mewawalla Accepted the FMC Offer

Having weighed the competing offers from FMC and EV, including Defendants' promises, Mewawalla decided to proceed with the EV opportunity and executed an employment agreement with FMC (the "FMC Agreement"), effective as of March 30, 2020. Pursuant to that agreement, Mewawalla was hired at FMC, and his employment was to be transferred to the technology company

once it was incorporated. The FTC Agreement expressly provided that Mewawalla would "report to the CEO of the Company," *i.e.*, Middleman. Further, the FMC Agreement reflected the parties' understanding that after Xpanse was formed, Mewawalla would be employed by Xpanse under the same terms and conditions as the FMC Agreement.

Notwithstanding that Mewawalla had chosen FMC over EV, EV remained in pursuit of Mewawalla. Ultimately, however, Mewawalla's role at FMC and the COVID-19 pandemic prevented those discussions from reading an agreement.

### E. Mewawalla Upholds His End of the Bargain, While FMC Does Not

Immediately upon joining FMC in March 2020, Mewawalla went to work formulating Xpanse's business plans and strategy and recruiting executive and technology talent. He was determined and used his knowledge of the technology industry to hire key individuals with management and technical expertise in the fields necessary to develop the envisaged technology products.

Unfortunately, while Mewawalla was doing this work on behalf of Xpanse, he was dismayed to find that the promises Defendants had made to entice him to sign the FMC Agreement were turning out to be a mirage.

When Mewawalla commenced work, he set about seeking to identify what technology assets and staff FMC would be able to transfer to Xpanse as had been promised. Upon investigation, however, he learned that FMC *did not have any valuable IP to speak of in the first place* and that he had been lied to. The absence of any such intellectual property and technologists naturally had a substantial impact on Mewawalla's ability to deliver on the plans for Xpanse.

Further, although Xpanse's independence had been at the heart of the parties' discussions and representations, at its creation Xpanse was simply one more subsidiary of a holding company owned by Middleman's sons, Michael and Greg Middleman, and run primarily by Michael. Immediately therefore, and contrary to what he had been promised, Mewawalla was obligated to report to Michael Middleman in addition to Stanley Middleman.

But the oversight did not end there. In addition to reporting to Michael Middleman, Mewawalla was required to report to Christopher Staub, a senior FMC executive with no formal

role at Xpanse at all. Further, Gregory Middleman was appointed at Xpanse's Chief Operating Officer, an appointment that immediately undermined Mewawalla because Gregory was part owner of the company and had a direct line to Middleman, Mewawalla's ultimate superior. By December 2020, Mewawalla also had to report to Erik Anderson—the Chief Executive Officer of the company that directly owned Archwell.

Moreover, Xpanse's independence was further undermined when, within weeks of its incorporation, Michael Middleman informed Mewawalla that FMC planned to convert Xpanse from a C-corporation to a limited liability company so that the Middlemans could enjoy certain tax benefits. Mewawalla recognized that such a conversion would further undermine Xpanse's independence and pushed back against the plan, but he was berated for it. When he still would not agree, Defendants converted Xpanse anyway and simply chose not to tell Mewawalla it had happened.

Likewise, Mewawalla repeatedly pushed for Xpanse to adopt an equity plan—as he had been promised it would at its formation—that could be used to promise equity to potential employees and entice them to join Xpanse with the potential for a big payout when the company went through the anticipated IPO. But the Middlemans sabotaged the plans by demanding that they retain the right to buy back employee shares at a strike price, rather than the market price, which would give *them* (instead of Xpanse's employees) all of the upside of an increase in Xpanse's value. Mewawalla fought for Xpanse and its employees, but lacked the power he was promised to do as he thought was best for Xpanse. Instead, he was again simply attacked by senior executives who thought he should simply support the Middleman family.

Finally, Mewawalla opposed a plan that would have valued Xpanse equity held by the Middleman family more highly than that held by anyone else—a proposal he considered to be unlawful. Yet again, however, he was denigrated for not supporting what the Middleman family wanted and considered an outsider.

### F. Mewawalla's Termination

Ultimately, Mewawalla paid the price for having fought for Xpanse's independence. On January 21, 2021, Mewawalla was terminated out of the blue and purportedly for "Cause," such that

he would not be paid any severance. His ally in his push to keep Xpanse independent—Timothy Beard, Xpanse's Chief Financial Officer—was terminated the same day.

In hindsight, Mewawalla never stood a chance. The evidence shows that from the moment he began working at FMC there were those plotting his downfall. Internal conversations disclosed that he was nothing more than a "social experiment" that Middleman was "going to crush," and that he was constantly being undermined by those around him who had better access to Middleman.

Mewawalla's personnel file tells the ultimate story of why he was fired. Other than his pay stubs and contract, the only document it contains is an email chain dated just days before his termination in which Michael Middleman, Gregory Middleman, Christopher Staub, and Erik Anderson each make the case as to why Mewawalla should be terminated.

## III. PLAINTIFF'S CLAIMS

### A. Fraud Claims

Mewawalla's false promise claim is based upon his contention that Mr. Middleman and/or Freedom made the following promises to him: (a) Xpanse would be operated and managed completely separate from Freedom; (b) Xpanse would be operated and managed in such a way that it could proceed through an initial public offering in 4-to-5 years; (c) Mr. Mewawalla would report only to Stanley Middleman; (d) Freedom would contribute revenue to Xpanse; (e) Freedom would transfer significant intellectual property and technology assets to Xpanse; (f) Freedom would transfer technologists to Xpanse; (g) Mr. Middleman would use his relationships with other mortgage companies to attempt to convince them to use Xpanse's products; and/or (h) Mr. Mewawalla would be employed at least through Xpanse's initial public offering. Mewawalla's fraudulent concealment claim is based on his contention that Middleman and FMC concealed from him the falsity of those representations.

Mewawlla will offer testimony as to these matters, and will support that testimony with contemporaneous documents from Defendants containing those promises and demonstrating that the truth was concealed. *See, e.g.*, Trial Exhibits 3 (communication from FMC setting forth certain representations about Mewawalla's role); 7–10 (correspondence between Mewawalla and FMC regarding an offer letter for Mewawalla's role). Mewawalla further will testify that he relied on

those promises when making his decision to pursue employment at FMC.

Additionally, Mewawalla will offer both his testimony, the testimony of Timothy Beard, Daniel Oh, and Ganesh Baskaran, as well as substantial documentary evidence produced by Defendants in this action, to show that he worked hard at Xpanse but that he was thwarted at every stage by the total absence of the independence he had been promised. Rather than being able to focus his efforts on developing Xpanse, he instead was compelled to spend his time managing and combatting those who were trying to see it converted into another family run company.

Finally, Mewawalla will offer testimony regarding the opportunity he lost as a result of having relied on Defendants' deception to work at FMC rather than EV or elsewhere, and introduce documentary evidence of that very lucrative lost opportunity. *See, e.g.*, Trial Exhibits 204–205 (communications between Mewawalla and EV's Chief Executive Officer regarding a position), 219 (an employment offer from EV). Evidence of his damages will further be supported by his damages expert Dominic Persechini that show with sufficient confidence that he would have earned many millions of dollars more working at EV than he did working at FMC.

In total, Mewawalla seeks in his fraud claims damages of $36,110,725, plus prejudgment interest.

**B.    Breach of Contract Claims**

It is undisputed that Mewawalla had a contract with FMC. Mewawalla further contends, however, that his appointment as Xpanse's President and CEO as well as his work for Xpanse and the fact that his employment was meant to be transferred to it at its formation means that he also has an agreement with Xpanse. The terms of his employment with Xpanse are those set forth in the draft agreement with Xpanse that is Exhibit A to his agreement with FMC. Trial Ex. 1.

Mewawalla's breach of contract claim is that he was terminated *other than* for "Cause," as that term is defined in his agreements with FMC and Xpanse. *See* Trial Ex. 1 at § 8(f)(i). In support of that claim, Mewawalla will introduce testimony from himself and others showing that Defendants had to meet a very exacting standard before they could terminate him for "cause," supporting that he performed his work more than adequately, and showing that the reason he was terminated was because he was disliked by certain senior executives who were determined to get rid of him no

matter his performance. Such evidence will include the absence of *any* negative performance reviews in his personnel file or elsewhere (Trial Exhibit 345) and the absence of any communication in which he was given an opportunity to cure any shortfall in his work as he was entitled to under the terms of his employment agreements.

Ultimately, Mewawalla will show that Defendants lacked "cause" to terminate him, and that he is entitled to severance damages in accordance with his employment agreements. Trial Ex. 1 at § 8(d). Mewawalla further contends, and will show, that Xpanse owe him hundreds of thousands of dollars for unpaid benefits that he was denied during his employment and at severance.

Finally, Mewawalla pursues against Xpanse only a claim for breach of the covenant of good faith and fair dealing. The basis of this claim is that Xpanse breached this obligation when it determined that it had "cause" to terminate his employment.

In total, Mewawalla seeks in his breach of contract claims damages of $8,132,044 for unpaid severance, $68,862 for unpaid benefits, $114,460 for unpaid moving expenses, and $228,476 for underpayment of paid time of and holiday leave, plus with prejudgment interest.

DATED: December 11, 2024

Ekwan E. Rhow
Oliver Rocos
Brandon R. Teachout
Bird, Marella, Rhow, Lincenberg,
Drooks & Nessim LLP

By:    */s/ Oliver Rocos*
Oliver Rocos
Attorneys for Plaintiff and Counter-Defendant
Rahul Mewawalla