UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAHUL MEWAWALLA,

Plaintiff,

v.

STANLEY C. MIDDLEMAN, et al.,

Defendants.

Case No.  21-cv-09700-EMC

**AMENDED PRETRIAL CONFERENCE ORDER**

(**Slight modifications of Docket No. 264 on page 18.)

## I.       TRIAL DATES AND LENGTH OF TRIAL

Jury Selection is set for 2/5/2025, at 8:30 AM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.  Screening on the basis of questionnaires of prospective jurors who obviously cannot serve shall be held via virtual hearing on 1/24/2025 at 1:30 p.m.

Trial will last five court days. The Court will meet with Parties each morning at 8:00AM to discuss any matters outside the presence of the jury. Trial Dates and Hours are: 2/5/2025 (8:30 AM-4:00 PM), 2/6/2025 (8:30AM-**12:30 PM**), 2/7/2025 (8:30 AM-4:00 PM), 2/10/2025 (8:30 AM-4:00 PM), 2/11/2025 (8:30 AM-4:00 PM) in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. The Court expects the **jury to receive the case by noon of 2/11/2025**. Parties are each allotted **10 hours** of trial time, inclusive of opening statements and closing arguments.

## II.       TRIAL PROCEDURES

### A.       Evidence and Objections

The Court imposes the following trial procedures regarding evidence and objections.  A party must give the opposing party at least forty-eight (48) hours' (excluding weekends and

holidays) notice of witnesses it intends to call, exhibits it intends to use, and/or demonstratives it intends to use. Saturdays and Sundays do not count. Thus, *e.g*., for a Monday trial day that starts at 8:00 a.m., a party must give the opposing party notice by 8:00 a.m. on Thursday.

If the opposing party has an objection, then it must notify the party by 4:00 p.m. the same day of notice.

The parties shall meet and confer immediately that day to see if they can resolve objections to exhibits and demonstratives. If they cannot, then they shall file with the Court a joint statement twenty-four (24) hours (excluding weekends and holidays) in advance of the relevant trial day identifying their respective positions on unresolved issues. In short, the Court requires a full day to resolve any objections. Parties are to follow the instructions/format below for any remaining objections to exhibits, filing a joint statement on the Docket, **as well as submitting Word documents of Proposed Orders to both the CAND EMCpo emcpo@cand.uscourts.gov as well as the EMCCRD@cand.uscourts.gov email addresses**.

The Court emphasizes that a party that makes unreasonable objections may be subject to sanction, including deductions from trial time.

Defendant's Exhibits:

| Exhibit No. | Sponsoring Witness | Description | Plaintiff's Remaining Objections | Defendants' Response | Court's Ruling |
|---|---|---|---|---|---|
| TX- | | | | | |
| TX- | | | | | |

2

Plaintiff's Exhibits:

| Exhibit No. | Sponsoring Witness | Description | Defendants' Remaining Objections | Plaintiff's Response | Court's Ruling |
|---|---|---|---|---|---|
| TX- | | | | | |
| TX- | | | | | |

**B.    Witnesses**

The Parties agreed at the pretrial conference to call each witness only once. Thus, for witnesses Defendants plans to affirmatively call in their defense, Defendants' cross-examination during the Plaintiff's case-in-chief will not be limited to the scope of Plaintiff's direct. The Court will not allow deposition testimony for witnesses who are being called live, except for impeachment or refreshing recollection.

### III.    PLAINTIFF'S MILS

**A.    P's MIL #1: To Exclude the Testimony of Defendants' Expert Richard Harroch (Docket No. 217)**

Defendants' designated Richard Harroch ("Harroch"), a venture capital investor, as their rebuttal expert.  Harroch will testify about the custom and practice of integration clauses in corporate agreements; that the process used to terminate Plaintiff for Cause was within the custom and practice of privately held companies; that the misconduct Plaintiff alleges, including the "Secret Valuation Scheme," was within the custom and practice of similar companies; and that the service amounts Plaintiff claims are not within the custom and practice of startup companies.

Plaintiff moved to exclude Harroch's testimony because they believe Harroch's expertise is irrelevant to the issue of industry "custom and practice." Plaintiff also contends that specific opinions of Harroch's testimony should be excluded because they believe some of his opinions

United States District Court
Northern District of California

United States District Court
Northern District of California

are: (1) outside the scope of rebuttal; (2) improperly state the ultimate conclusions of law; (3) improperly state ultimate determinations of fact; and (4) irrelevant and unduly prejudicial.

### 1.   Whether Harroch's Testimony Should Be Excluded Altogether Because FMC is not a Start Up

Plaintiff argues that Harroch's testimony is irrelevant because while he may be qualified to opine on the customs and practices of the startup industry, FMC is not a startup. Plaintiff notes that Harroch repeatedly refers to "Xpanse" – a company Defendants created and hired Plaintiff to lead – as a startup technology company. However, Plaintiff refutes this because Xpanse is a "wholly owned subsidiary" of FMC, which is a multibillion-dollar company. Additionally, Plaintiff was employed by FMC and not Xpanse.[1] But, Plaintiff asserts he had an employment contract and opportunity with Xpanse, and it is debatable whether Xpanse should be considered a startup since despite its relationship with FMC, it was a new company. Harroch thus had a basis for treating Xpanse as a startup.

This motion to exclude Harroch's testimony on this ground is **DENIED**.

### 2.   Whether Harroch's testimony is a timely rebuttal

In the case at bar, the normal allocation between and timing of opening expert reports and rebuttal reports set for the in Rule 26(a)(2)(D) does not apply. The Court signed a stipulated order wherein the "deadline to exchange expert opening reports for subject matters on which a party bears the burden of proof" followed by the "deadline to exchange expert rebuttal reports". *See* Docket No. 103. Hence, rebuttal includes any matters on which the propounding party did not have the burden of proof. *See Hynix Semiconductor v. Rambus*, 2008 WL 350647, at *5 (N.D. Cal. 2008). Harroch's report is rebuttal as contemplated in the stipulated order. It was **not** untimely disclosed. And its scope properly responded to Plaintiff's evidence of matters on which the Plaintiff had the burden of proof (liability and damages). Plaintiff's reliance on *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384 (N.D. Cal. 2015) is thus off point. *See Blue Bottle*

---

[1] In Harroch's Expert Report, Harroch states "I understand that [Plaintiff] never signed an employment agreement with Xpanse but that he nevertheless contends that he was an employee of that company pursuant to . . . his Freedom Employment Agreement."

1    *Coffee, Llc. V. Chuan Liao*, 2023 U.S. Dist. LEXIS 237823 (observing that *Clear-View* is not

2    binding on N.D. California Court while stating "the report at issue there was clearly not rebuttal; it

3    was not on the same subject as the report it was supposedly rebutting, and it should have been part

4    of defendant's case in chief.")

5        This motion to exclude Harroch's testimony on this ground is **DENIED**.

6        **3.    Whether Harrcoh's testimony improperly states the ultimate conclusions of**

7        **law**

8        Plaintiff contends that Harroch stated a legal conclusion which is impermissible according

9    to Fed. R. Evid. 702.  Experts can embrace the ultimate issue without necessarily usurping the

10    court's role related to matters of the law.  *See* Fed. R. Evid. 704(a).  However, an expert witness

11    cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law.

12    *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053 (9th Cir. 2002).  To the extent the expert makes

13    reasonable assumptions in applying the expert's methodology, that is proper even if the

14    assumption makes certain legal assumptions, such as the meaning of a contract.  So long as any

15    legal interpretation is clearly made as an assumption, and Harroch does not opine directly on a

16    matter of law, it is not excludable.

17        This motion to exclude Harroch's testimony on this ground is **DENIED** so long as he does

18    not purport to provide an opinion on matters of law and confines his opinion as being based on

19    certain assumptions about legal matters.

20        **4.    Whether Harroch's testimony improperly state ultimate determinations of**

21        **fact**

22        When an expert tells the jury what result to reach, this does not aid the jury in making a

23    decision but attempts to substitute the expert's judgment for the jury's.  *United States v. Duncan*,

24    42 F.3d 97, 101 (2nd Cir. 1994) (holding that the testimony of an expert is admissible when it was

25    based on personal knowledge and did not use legally specialized terms or judicially defined terms

26    related to the case.)  However, an expert can provide an opinion about whether a party's conduct

27    acted in conformance with applicable standards or "outside of the course of professional practice,"

28    *Navarro v. Hamilton*, 2019 WL 351873 at *8-9 (C.D. Cal. 2019), if those standards are relevant.

United States District Court
Northern District of California

5

1    This is what Harroch does.

2        This motion to exclude Harroch's testimony on this ground is **DENIED**.

3        **5.    Whether Harroch's testimony is irrelevant and unduly prejudicial**

4        Harroch's testimony is relevant and the probative value of his testimony is substantially

5    outweighed by any FRE 403 concern.

6        Therefore, this motion on this ground should be **DENIED**.

7

8    **B.    P's MIL #2: To Limit the Testimony of Defendants' Expert Wayne Guay (Docket No.**

9        **218)**

10        Pursuant to the July 21, 2023 scheduling deadline to exchange expert rebuttal reports,

11   Defendants declared Wayne Guay ("Guay") as their expert on damages suffered by Plaintiff.   On

12   September 20, 2023, the Court granted summary judgment to Defendants on their argument that

13   Plaintiff was not entitled to equity in Xpanse, rending moot Guay's rebuttal opinions regarding

14   such.  On Defendants' trial witness list, Defendats list Guay as someone who will respond to

15   testimony from Plaintiff's damages expert, Dominic Persechini, and will opine about the damages

16   on Freedom's counterclaim.

17        Plaintiff seeks to exclude certain testimony of Defendants' damage expert Wayne Guay on

18   the basis that (1) his testimony regarding Plaintiff's equity damages are irrelevant given this

19   Court's summary judgment motion; (2) certain opinions improperly state ultimate conclusions of

20   law; and (3) certain opinions improperly state ultimate determinations that should be left for the

21   factfinder.  Wayne Guay is a professor of accounting at the Wharton School of the University of

22   Pennsylvania and has been an expert on executive compensation and incentives, corporate

23   governance, employee stock option valuation, insider trading, firm valuation and financial

24   statement analysis.  He is not a lawyer.

25        Defendants agree with Plaintiff on mootness of the equity damages item (1).  However,

26   Defendants argue that Guay's expert opinions concerning the remaining contract and fraud claims

27   are admissible and relevant.  Specifically, Defendants contend their expert should be able to

28   respond to the underlying assumptions regarding severance-payment calculations made by expert

United States District Court
Northern District of California

Dominic Persechini and by challenging expert Persechini assessment of Plaintiff's financial losses stemming from the alleged fraud which allegedly cost him a job with E&V.

### 1. Whether Many of Guay's Opinions are Relevant Following the Court's Summary Judgment Order

Because the Court previously ruled that Plaintiff was not entitled to equity in Xpanse and not permitted to bring claims under California Labor Code, See ECF 160 at 20-28, Guay need not and may not testify on the equity issue.

Motion to exclude this part of Guay's testimony is **GRANTED**.

### 2. Whether Some of Guay's Opinions Should be Excluded because they are Legal Opinions

Defendants argue challenging another expert's assumptions is a permissible topic of rebuttal testimony. *Pinterest, Inc. v. Pintrips, Inc.*, 2015 WL 2268498, at *1 (N.D. Cal. 2015). Defendants claim the gist of Guay's opinion is that Persechini's fraud damages calculation is based on Plaintiff's alleged employment opportunity at E&V, which is a speculative assumption. Specifically, Defendants argue that Guay is entitled to tell the jury that Persechini deviated from accepted economic principles by assuming that Plaintiff would have been employed at E&V if he had not joined FMC. Defendants argue there are many other broad and unsupported assumptions that Pereschini opines to that Guay should have the ability to rebut. Defendants contend that these assumptions balloon the supposed damages for the alleged loss of the E&V opportunity.

Plaintiff takes issue with the below opinions provided by Guay Regarding the E&V opportunity:

> As I explain below, I find Mr. Persechini's damages arising from the purportedly lost E&V opportunity speculative. They are based on speculative assumptions and inconsistent with the specific terms of the Draft E&V Service Agreement that he relied on, which I understand was never agreed upon by the parties.

Rocos Decl., Ex. A, ¶ 14.

> Mr. Persechini Relies on Terms that Were Never Agreed to . . . As an initial matter, contrary to Mr. Mewawalla's claim that the agreement was "pretty much final,"[31] information in the record indicates that Plaintiff and E&V had not yet reached an agreement regarding the terms.

United States District Court
Northern District of California

Rocos Decl., Ex. A, ¶ 15-16.

> This list calls into question Mr. Mewawalla's characterization that an agreement was "pretty much final." Other than Mr. Mewawalla's testimony, there is no evidence a deal would have been struck given the changes Mr. Mewawalla was requesting. Mr. Persechini provides no evidence E&V would accept the changes Mr. Mewawalla requested, and no contemporaneous evidence that Mr. Mewawalla would have accepted the E&V draft agreement had E&V not agreed to his changes.

Rocos Decl., Ex. A, ¶ 16 & n.37.

> Mr. Mewawalla appears to have recognized potential risks associated with being employed under a Service Agreement, as he indicated the following suggestion to the contract from E&V: "Should this be an Employment Agreement and not a Service Agreement (to ensure employee protection/safeguards)?

Rocos Decl., Ex. A, ¶ 17-21.

> The Persechini Report states that Mr. Mewawalla was to receive a fixed annual salary of €3,000,000 from E&V as per the Draft E&V Service Agreement.50 The Draft E&V Service Agreement identifies this sum as being "fixed" and contains no provision that the company will consider annual escalation.

Rocos Decl., Ex. A, ¶ 22.

> As noted above, Mr. Persechini provides no basis for the assumption of receiving the full bonus except his conversation with Mr. Mewawalla. In fact, as described above, rather than "target," the draft agreement uses the term "up to" which suggests E&V viewed the €2,000,000 bonus as a maximum and not a number that could be reached with certainty. This is another example where Mr. Persechini has simply relied upon Mr. Mewawalla's expectations rather than performing any independent analysis. Absent any additional support, the Persechini Report's assumption regarding Plaintiff's annual bonuses at E&V is speculative.

Rocos Decl., Ex. A, ¶ 25.

The Court holds that neither expert, Guay or Persechini, can give a legal opinion about the strength of the evidence on whether the E&V Agreement could have led to actual employment, and how well Plaintiff would have performed at E&V. Each expert can simply state their assumptions in rendering their financial calculations and leave it to the evidence developed at trial and attorney argument to determine whether the asserted fraud-based damages are based on facts or speculation . Accordingly, many of Guay's opinions as as to the strength of the evidence

underlying the assumptions is not a matter within his expertise and are thus stricken.  If there are terms in the draft Agreement which are ambiguous, he can explain his opinions are based on certain assumptions about the meaning of those terms, so long as he does not purport to give a legal opinion as to their meaning.

Guay also challenges Persechini's calculation of breach of contract damages stemming from Plaintiff's termination from FMC/Xpanse.  In response to Plaintiff's *Daubert* challenge to Guy, Defendants contend that expert testimony is admissible to help the trier of fact on meaning of terms with specialized meaning, *Corbus, LLC v. 8th Bridge Capital, Inc.*, 2021 WL 4439220, at *4 (C.D. Cal. 202), and the severance provisions in Plaintiff's Employment Agreement includes specialized language.   Guay's rebuttal testimony highlights section 8(d)(ii) of the severance section of the employment agreement with FMC to show that Persechini engaged in double counting in erroneously inflating Plaintiff's damages claim.  He states:

> I find Mr. Persechini's assumptions speculative, conceptually flawed, and inconsistent with the specific terms of the FMC Employment Agreement that he relied on.  Below I explain the shortcomings of the Persechini Report's terms and unsupported assumptions.

Rocos Decl., Ex. A, ¶ 32.

> In short, Mr. Persechini's damages calculation assumes with certainty that Mr. Mewawalla would be employed for six years when the contract provides no such guarantee and, in fact, contemplated the ability of Freedom to dismiss Mr. Mewawalla. Therefore, Mr. Persechini's assumption is highly speculative and unreliable. Indeed, I understand from counsel given Mr. Mewawalla's performance, Xpanse would have terminated Mr. Mewawalla regardless of whether or not the firing was classified as being with cause.

Rocos Decl., Ex. A, ¶ 34-35.

> The employee contract signed by Mr. Mewawalla does not include any guarantee of salary increases, but rather states that it "may be increased periodically (but shall not be subject to decrease below $1,500,000), as determined by the CEO of [Freedom Mortgage] at his sole discretion."

Rocos Decl., Ex. A, ¶ 37.

> The signed FMC Employment Agreement makes clear that, after the first year, the performance bonus was subject to an annual performance evaluation[.]

Rocos Decl., Ex. A, ¶ 40.

> The Persechini Report calculates the damages from alleged unpaid severance based on the assumption that the court finds the Defendants liable for Mr. Mewawalla's unpaid severance.  I understand that, according to the FMC Employment Agreement, Mr. Mewawalla would not be eligible for such payments if he were terminated for cause. However, if he were terminated without cause, according to the contract, he would be eligible for severance, including base salary, performance discretionary bonuses, and twelve months of group medical benefits. Mr. Persechini was asked to assume the discretionary bonus would be calculated using 100 percent and 150 percent of base salary.

Rocos Decl., Ex. A, ¶ 60.

> Mr. Persechini reports that Mr. Mewawalla's severance pay should be $3 million or $3.75 million under section 8(d)(i) (one-year base plus one-year bonus at either 100 percent target or 150 percent target), $1.5 million or $2.25 million under 8(d)(ii) (full-year preceding year bonus at either 100 percent target or 150 percent), plus $1.375 million or $2.0625 million (his prorated share of his prior-year bonus at 100 percent or 150 percent). Mr. Persechini has provided no basis for including damages associated with Section 8(d)(ii) of the Employment Agreement given Plaintiff was terminated before the end of his first Performance Year. Moreover, if Mr. Mewawalla were entitled to a full year of Discretionary Bonus, it would render 8(d)(iv) meaningless. I have been asked to recalculate Mr. Persechini's damages assuming his severance payment equals one year salary plus the prorated portion of Discretionary Bonus (at 100 percent of target) in the year in which he was terminated. This equals $2,918,713 before prejudgment interest and $3,680,252 after considering prejudgment interest.

Rocos Decl., Ex. A, ¶ 62.

The interpretation of the Severance Provision, including that of Section 8(d)(ii) is a matter upon which the Court has ruled, as noted below and at the pretrial conference.  This obviates the need for Guay's testimony on the problem with Persechini's assumption about the meaning of the Severance Provision.  Because Persechini's testimony will be limited by this Court's ruling, this obviates this aspect of Guay's testimony.

This motion to exclude Harroch's testimony on the ground is **DENIED** as moot.

**3.      <u>Whether Guay's Opinions should be excluded because they improperly state ultimate decisions that should be left to the factfinder.</u>**

Guay's proposed testimony contains additional comments on the strength of the factual evidence regarding Mr. Mewawalla's performance.  For instance, he states:

> Moreover, the Company had concerns about Mr. Mewawalla's performance, and he was ultimately terminated in January 2021 for poor performance, a fact that suggests Mr. Mewawalla may well have received less than his expected salary increases had he remained employed.

Rocos Decl., Ex. A, ¶ 38.

> Given the growing dissatisfaction with Mr. Mewawalla's performance within Xpanse and Freedom in November 2020 and the performance of the company, it is not credible that the Board or CEO would have approved substantial increase in his target bonus compensation.

Rocos Decl., Ex. A, ¶ 41.

> Moreover, as noted above, the Company had concerns about Mr. Mewawalla's performance, and he was ultimately terminated in January 2021 for poor performance, a fact that suggests Mr. Mewawalla may well have received less than the target bonus had he remained employed.

Rocos Decl., Ex. A, ¶ 42.

> There is no suggestion in the presentation that the potential for a 150 percent bonus was available to Mr. Mewawalla nor has Mr. Persechini cited any evidence in the record that the Freedom Mortgage CEO or Board of the company had approved it, as required by his contract. Given the growing dissatisfaction with Mr. Mewawalla's performance within Xpanse and Freedom in November 2020 and the performance of the company, it is not credible that the Board or CEO would have approved a substantial increase in his target bonus compensation.

Rocos Decl., Ex. A, ¶ 41.

This kind of commentary on the strength of the evidence to show the likely short length of Plaintiff's employment with FMC/Xpanse given his performance issues are matters squarely within the province of the jury and not something within his expertise.  Although Guay may be qualified to talk about normal industry practices which the jury may consider in determining, *e.g.*, how long Plaintiff would have been employed by FMC/Xpanse, he may not opine on the facts and

United States District Court
Northern District of California

1 | ultimate question of whether Plaintiff was terminated for Cause or would likely have been

2 | terminated sooner rather than later.

3 |     This motion to exclude Harroch's testimony on this ground is **GRANTED.**

4

5 | **C.**      **P's MIL #3: To Exclude the Testimony of Defendants' Expert Matthew Finkin**

6 |          **(Docket No. 219)**

7 |     Defendants have agreed that Finkin will not testify, thus, the Court does not need to rule on

8 | this motion.

9

10 | D.      **P's MIL #4: To Exclude the Testimony of Defendants' Witness Robert King (Docket**

11 |          **No. 220)**

12

13 |     Plaintiff has moved to exclude testimony of Defendant's witness Robert King. Following

14 | the Court's Order at Docket No. 241 allowing the deposition of King prior to trial, Parties

15 | confirmed at the pretrial conference that the deposition of Mr. King will take place on January 15,

16 | 2025. Accordingly, Plaintiff's motion is **DENIED**.

17

18 | E.      **P's MIL #5: To Exclude the Testimony of Defendants' Witnesses Gina Morselli and**

19 |          **Kiran Sahota (Docket No. 221)**

20

21 |     Plaintiff has moved to exclude the testimony of two of Defendant's fact witnesses—Gina

22 | Morselli and Kiran Sahota on the grounds that they were not included in Defendant's 26(e)

23 | disclosures. Plaintiff's motion is **DENIED**.

24 |     Defendants' trial witness list states that Ms. Sahota will "testify about Xpanse's business,"

25 | and Ms. Morselli "will testify about the representations Mr. Mewawalla made about his

26 | credentials and compensation."  Plaintiff, himself, disclosed Kiran Sahota, and Defendants then

27 | incorporated the fact witness on to their list. *Hauschild v. City of Richmond & Christopher*

28 | *Magnus*, 2015 WL 7351384, at *3 (N.D. Cal. Nov. 20, 2015) ("[P]laintiff included Dickerson as a

1    potential witness in his own Rule 26 disclosures. Thus, any assertion that plaintiff has been

2    harmed by defendants' failure to include Dickerson in their own Rule 26 disclosures is baseless.")

3         Defendants state Gina Morselli is merely a potential impeachment witness. Rule 26(a) does

4    not require the disclosure of witnesses who would be called "solely for impeachment," so there is

5    not any failure-to-disclose for the Court to remedy. Ms. Morselli was a talent recruitment

6    executive at Freedom in July 2019, she interviewed Mr. Mewawalla after he applied for a job,

7    took notes of what he told her, and then sent them to Stanley Middleman. Defendant argues if Mr.

8    Mewawalla confirms the accuracy of his statements as she recorded them, there will be no need

9    for Defendants to call Ms. Morselli. If he denies telling her those things, Defendants will call her

10   to impeach him.

11        Accordingly, there has been no disclosure violation, so exclusion is not appropriate.

12   Plaintiff's motion is **DENIED**.

13

14                          **IV.    DEFENDANTS' MILS**

15

16   A.   **D's MIL #1: To Exclude the Testimony of Rahul Mewawalla Regarding a German**

17        **Employment Opportunity (Docket No. 223)**

18        Defendant has moved to exclude all evidence Mr. Mewawalla will likely rely on for his

19   claims in Counts 1 and 2, that but for misstatements and omissions from Freedom inducing him to

20   work there, he would have accepted a job offer from a German firm, Engel & Volkers ("E&V"),

21   that allegedly guaranteed him $38 million. Compl. ¶¶ 142-43, 149-51. Plaintiff alleges that his

22   decision to proceed with FMC instead of with E&V—and thus not to actually enter into an

23   agreement with EV— was the product of Defendants' false promises and fraudulent concealment;

24   that his ultimate gains from FMC were substantially less than the benefits he would have received

25   if he had worked at E&V instead; and that he is entitled to damages for those lost benefits. *See id.*

26   ¶¶ 143, 151, 161, 170, 267. Defendants dispute, *inter alia*, whether this opportunity with E&V

27   would have materialized.

28

United States District Court
Northern District of California

1    As proof of these alleged fraud damages, Mr. Mewawalla relies on (i) a draft agreement he

2    says E&V prepared for him to sign (that Plaintiff initially states was the final version, but later

3    discovery showed Plaintiff had sent many emails to his lawyer seeking to change terms); (ii)

4    statements he attributes to E&V's CEO and others that the draft was signature-ready; and (iii)

5    statements he attributes to a German lawyer that German law guaranteed him three years of

6    compensation regardless of his performance. Defendant claims all of these statements and

7    documents are hearsay, and that Plaintiff has failed to identify any German lawyer or E&V

8    witness who can corroborate Mr. Mewawalla's claims. *See* Fed. R. Evid. 801, 802.

9    Plaintiff counters that the items are not hearsay under the "verbal acts" doctrine because

10    the E&V agreement is merely being offered to establish that Plaintiff had another job offer, not for

11    the truth of the matter asserted. *N.L.R.B. v. H. Koch & Sons*, 578 F.2d 1287, 1291 (9th Cir. 1978).

12    Plaintiff also argues, if the agreement is found to be hearsay, the E&V statement should be subject

13    to a hearsay exception of a business record under Fed. R. Evid. 803(6), or the residual exception

14    under Fed. R. Evid. 807. FRE 803(6) business exception states:

15

16    "A record of an act, event, condition, opinion, or diagnosis if:
    (A) the record was made at or near the time by — or from
    information transmitted by — someone with knowledge;

17    (B) the record was kept in the course of a regularly conducted
    activity of a business, organization, occupation, or calling, whether

18    or not for profit;
    (C) making the record was a regular practice of that activity;

19    (D) all these conditions are shown by the testimony of the custodian
    or another qualified witness, or by a certification that complies with

20    Rule 902(11) or (12) or with a statute permitting certification; and
    (E) the opponent does not show that the source of information or the

21    method or circumstances of preparation indicate a lack of
    trustworthiness."

22
    FRE 807 residual exception states:

23

24    "(a) Under the following conditions, a hearsay statement is not
    excluded by the rule against hearsay even if the statement is not

25    admissible under a hearsay exception in Rule 803 or 804:
    (1) the statement is supported by sufficient guarantees of

26    trustworthiness—after considering the totality of circumstances
    under which it was made and evidence, if any, corroborating the

27    statement; and
    (2) it is more probative on the point for which it is offered than any

28    other evidence that the proponent can obtain through reasonable

United States District Court
Northern District of California

14

efforts.

(b) Notice. The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name— so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing—or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice."

Plaintiff claims that, notwithstanding efforts to secure oral testimony in Germany concerning these documents directly from EV using the Hague Convention, the parties were ultimately unable to do so because of procedural barriers. Defendants agreed to abandon their efforts to secure that testimony.

Thus, the Court must determine if the agreement and third-party statements are "verbal acts" or subject to a hearsay exception.

**(i) a draft agreement Plaintiff says E&V prepared for him to sign;**

Defendants agree that "[a]bundant admissible evidence in the form of [Plaintiff's] own emails and subsequent drafts" exists. Motion at 5. There is therefore no dispute that subsequent correspondence arising from the draft agreement is admissible. Under the rule of completeness, the initial draft of the E&V Agreement is admissible. FRE 106. It is needed to explain the iterative correspondence which ensued.

The E&V Agreement is also admissible under the "verbal act" doctrine. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801 (Advisory Cmte. Notes to Subdivision (c)). "The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." *Id.*

The case law is clear, and the parties do not dispute, that a *completed* contract is subjected to the "verbal act" doctrine. *See Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) ("A contract is a verbal act. It has legal reality independent of the truth of any statement contained in it."). Additionally, case law and respected commentators, have concluded that "legally significant steps in the contractual chain, such as offers, acceptances, and rejections" can also be considered "verbal acts," because "these out-of-court statements can be shown in evidence not as proof of

15

what they assert ("I will (or won't) buy your house for $90,000"), but rather for the independent, legally-determined effect such statements generate." *Wright & Miller*, 30B Fed. Prac. & Proc. Evid. § 6722 (2024 ed.). Verbal acts include "the documents and oral exchanges that surround contract formation." *Id.*; *see Mueller*, at 937 ("[V]arious communications—*e.g.*, conversations, letters, and telegrams—relevant to the making of the contract are also not hearsay.") Thus, to the extent Plaintiff is offering the E&V Agreement to show an offer was made that contained specific terms and that the parties were heading towards an agreement,[2] this is a "verbal act." *See United States v. Arteaga*, 117 F.3d 388, 397 n.16 (9th Cir. 1997) ("[T]he statement of a merchant that he is willing to sell 100 pounds of coffee for $300 may be legally operative as an offer; in an action on the contract, the 'truth' of the statement is not at issue. This type of statement is sometimes called a 'verbal act.'").

Defendants asserted at the hearing that because the offer was not in a final "accepted" or "acceptable" format, it effectively was not "legally operative" and cannot constitute a "verbal act." This is because certain terms were missing, including: the start date, Plaintiff's reimbursement for travel and hotel accommodations, a relocation allowance, and secondary activities that E&V

---

[2] In Defendants' further briefing on the "verbal act" doctrine as ordered by the Court, Docket No. 260, Defendants argue that the "verbal act" doctrine cannot apply here because Plaintiff's rely on the *terms* of the agreement, not just the *fact* that an offer was made. But an offer is legally significant not just because it was made, but also because of what it contains. *See Shimer v. Foley, Hoag & Eliot LLP*, 795 N.E.2d 599, 602-04 & n.11 (Mass. App. Ct. 2003) (case cited by Plaintiff, Docket No. 260) (noting Massachusetts applies the "same doctrine" as federal law, and that "proof of the [rejected] offer, even as evidence of damages, was not dependent on the truthfulness, honesty or sincerity" of the offeror, but rather "the significance of the words used by [the company] in making the offer was in the fact that they were communicated to [plaintiff] and that he would have accepted; their import, that that point, was unrelated to whether [the offeror] truly meant to pay the amounts it proposed."). A contract which clearly constitutes a verbal act may establish not only the fact of an agreement but also the terms of that agreement. Inherently there is some assertion of the "truth" of the matter asserted – *i.e.* what the terms of the agreement were. That fact does not defeat the verbal acts doctrine.

Defendants offer some non-binding case law support that "offers" that are not accepted fail to have legal significance for a non-hearsay purpose. *See* Docket No. 260, page 1; *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1087-88 (10th Cir. 2001) ("Only 'utterances by the parties ... constituting the offer and acceptance which brought the contract into being' qualify as verbal acts.") (citing McCormick on Evidence § 249 (5th ed.1999)) The Court does not subscribe to that narrow application of the verbal acts doctrine. In any event, to the extent it could be argued the E&V Agreement is also being offered for the truth of the matter and not for its legal effect, the evidence is admissible under FRE 807 as noted below.

1   would allow him to continue. Defendants also argue that in discovery, Plaintiff produced emails

2   showing "much different versions of the draft E&V agreement, along with emails he authored and

3   sent to both his German lawyer and E&V's recruiter, requesting significant changes. Motion at 3-

4   4.[3] Plaintiff's counsel then sent a revised agreement to E&V, reflecting these requested changes.

5   *Id*. It appears there was no further follow-up between E&V and Plaintiff.

6       There is little case law detailing the bounds of *when* an offer becomes a verbal act. After

7   reviewing the Parties' cited case law, Docket Nos. 259, 260, the Court finds Defendants'

8   arguments that the draft agreement was not in a sufficiently "acceptable" form so as to fall under

9   the verbal act rubric unpersuasive.[4] First, as noted above, there is persuasive support for the

10

11  [3] Some of the changes Plaintiff asked for via email include:
        • "STI should say' [sic] target of 2M EUR' not 'up to'"

12      • "For initial signing bonus, this following line needs to be removed – 'on the condition

13  that until then no party has given notice for termination to the other party and this Service
    Agreement has not been terminated otherwise'"

14      • "Please change employment contract duration to 4 years (not 3 years) as agreed"

15      • "Has to include executive can serve on up to 3 outside supervisory boards or equivalent
    boards of companies or charities and receive compensation from these companies"

16      • "Vacation at 20 days seems low"
        • "Equity Agreement needs to be specified in and be part of this agreement"

17      • "Has to include Severance/termination i.e. payout to executive of (a) base salary (b) plus
    STI at 100% of target (c) in addition to STI at 100% for current year on pro-rate basis and (d)

18  benefits for standard 18 months-2 years if termination/severance happens; or if the company does
    not meet or fulfill its contract obligations to executive, executive is entitled to receive full

19  severance compensation"
        • "Need to remove 'Publications and speeches etc. which may affect the interests of the

20  Company, require prior written consent of the Company' and 'Any consent granted may be

21  revoked by the Company at any time' – why do I need prior written consent?"
        • "Employer to indemnify executive from any liability; also provide executive with

22  directors & officers insurance"
        "Please add clause that whether or not the executive accepts the offer, the company will

23  pay any fees or expenses to executive's counsel to review and assist with the employment

24  contract"

25  [4] *See e.g.*, *Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1182–83 (7th Cir. 1994)
    (insurer's offer to settle was a verbal act and thus admissible non-hearsay even though the offer

26  was not accepted because the counterparty could accept it "within some reasonable time after" the
    offer, and thus become a binding contract); *Cloverland-Green Spring Dairies, Inc. v.*

27  *Pennsylvania Milk Mktg. Bd.*, 298 F.3d 201, 218 (3d Cir. 2002) ("[A] statement offering to sell a
    product at a particular price is a 'verbal act,' not hearsay, because the statement itself has legal

28  effect.")

17

proposition that not only offers but other "communications" "relevant to the making of a contract" or surrounding the negotiations of the contract can be verbal acts. *See* Wright and Miller, *supra*, and *Mueller* at 937. It is not only a finalized contract that has or could have legal effect— statements and circumstances leading up to a contract also bear legal significance. *See e.g.* Restatement (Second) of Contracts § 26 Preliminary Negotiations (1981) ("Even though a communication is not an offer, it may contain promises or representations which are incorporated in a subsequent offer and hence become part of the contract made when the offer is accepted."); **[5]1 Witkin, *Summary of California Law*, Contracts, § 771 Surrounding Circumstances (11th ed. 2024) ("A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."); *Hinesley v. Oakshade Town Center,* 135 Cal.App.4th 289, 301 (2005) (statement preceding contract may be admitted to prove fraudulent inducement; *Consortium Info. Servs., Inc. v. Credit Data Servs., Inc*., 149 F. App'x 575, 576–77 (9th Cir. 2005) (statement used to make estoppel argument).** Moreover, as a factual matter, it is noteworthy that the E&V Agreement was a thoroughly written draft contract containing nearly all material terms. And Plaintiff will testify to the statements the CEO told him in conjunction with sending this offer that it was "ready to go." Thus, there appears to be evidence that will be presented at trial that the offer could have been accepted or was close to a format that could have been accepted.  A jury could so find.  *Cf. Huddleston v. United States*, 485 U.S. 681, 690 (1988).  This, of course, does not prevent Defendants from offering at trial  Plaintiff's follow-up emails regarding suggested change to terms of the E&V draft agreement, as well as Plaintiff's later versions of the draft (admissible as party opponent admissions, FRE 801(d)(2)), to cast doubt on how final the offer may have been and to prove that the parties in fact were not close to an agreement; Defendants have plenty of room to prove that Plaintiff's claim of lost opportunities with E&V was speculative.

Plaintiff also argues the E&V Agreement is subject to the business record exception. Opp. at 3-4. The initial draft was produced to Defendants by Korn Ferry, who was hired by E&V for

---

[5] ** Denotes amended section.

1    recruitment in connection with E&V's discussions with Plaintiff. Korn Ferry has authenticated the

2    documents in their records.  Declaration of Oliver Rocos ("Rocos Decl.") ¶ 2, Ex. A (Affidavit of

3    Custodian of Records of Korn Ferry) ¶ 3 ("In 2019-2020, Korn Ferry assisted its client Engel &

4    Volkers AG with the recruitment of a candidate named Rahul Mewawalla."); Rocos Decl. ¶ 3, Ex.

5    B (KF_0103, *et seq.*). For the reasons discussed below, Korn Ferry's possession of the draft

6    agreement is a business record, but the content of the draft presents another layer of potential

7    hearsay not encompassed by the business record exception. Thus, though the content of the draft

8    agreement is not admissible as a business record pursuant to FRE 803(6), the draft being kept and

9    produced by Korn Ferry corroborates the authenticity of the Agreement.

10          And finally, Plaintiff seeks an exception for the E&V Agreement under the "residual

11   exception," FRE 807, arguing that notwithstanding tremendous effort to secure oral testimony

12   concerning these documents directly from E&V using the Hague Convention, the Parties were

13   ultimately unable to do so. This exception admits hearsay statements not otherwise admissible

14   where "(1) the statement is supported by sufficient guarantees of trustworthiness—after

15   considering the totality of circumstances under which it was made and evidence, if any,

16   corroborating the statement; and (2) it is more probative on the point for which it is offered than

17   any other evidence that the proponent can obtain through reasonable efforts." The E&V

18   Agreement is a written contract, authenticated by the recruiting firm Korn Ferry that E&V hired to

19   recruit Plaintiff.  There appears to be no reason, and Defendants have not offered any reason, to

20   distrust the E&V Agreement or Korn Ferry. Though it was Defendants who initially sought

21   testimony through the Hague Convention in Germany, the Parties told the Court E&V would not

22   agree to waive any confidentiality, and thus the efforts to secure any testimony about these

23   documents ultimately failed. Given this circumstance, it would not have been "reasonable" for

24   Plaintiff to then attempt to secure testimony on their own. Accordingly, Plaintiff is also able to

25   rely on the residual exception, FRE 807, to offer the E&V Agreement, and accompanying

26   elements of this alleged offer.[6]

27

28   ───────────────────
     [6] In Plaintiff's additional briefing as ordered by the Court, Docket No. 260, Plaintiffs cite, and the
     Court finds persuasive, *Virola v. XO Communications Inc.*, 2008 WL 1766601, at *16 (E.D.N.Y.

United States District Court
Northern District of California

1

**(ii) statements Plaintiff attributes to E&V's CEO and others that the draft, despite**

2

**terms left blank, was signature-ready; and**

3

Defendants seek to exclude alleged statements by the E&V CEO made to Plaintiff

4

including that "they were looking for me to come in as the managing director, and bring in both

5

technology mindset, and a Silicon Valley mindset, for them to continue advance and accomplish

6

their plans," that "they are looking for a managing director, and I would be a very good fit," the

7

parties' discussions about "their plans," "their financials," and "compensation," and Plaintiff's

8

understanding that the draft EV Agreement was "ready to go" based on his conversations with the

9

CEO. Mot. at 1–3 (citing Declaration of Robert J. Nolan ("Nolan Decl."), Ex. A at 85, 88, 89, 92).

10

To the extent Plaintiff attempts to get in any "communications" E&V's CEO made in

11

connection with E&V's initial offer, those are admissible as verbal acts as discussed above. *See*

12

*Mueller*, at 937. Moreover, Plaintiff confirmed at the pretrial conference he will not assert at trial

13

that there were additional terms discussed orally which are not referenced in a written document.

14

The Court will hold Plaintiff's to this representation. This will cabin Plaintiff's testimony and

15

mitigate the prejudice Defendants contend will obtain if what they consider hearsay is admitted.

16

Additionally, as noted above, Plaintiff may also rely on the residual exception, FRE 807, to offer

17

statements the CEO made in connection with his initial offer to Plaintiff.

18

Additionally, to the extent E&V's CEO made statements to Korn Ferry as part of their

19

recruitment process, there are two potential layers of hearsay. First, the documents Korn Ferry

20

drafted, and then the statements made by the CEO. These documents are admissible pursuant to

21

the business record exception. Opp. at 3-4.[7] Korn Ferry was hired by E&V for recruitment in

22

connection with E&V's discussions with Plaintiff. Korn Ferry's custodian of records has certified

23

_____

24

Apr. 15, 2008) (finding that where "offers were not accepted," they "might arguably constitute
hearsay," but "if the plaintiffs cannot produce any alternative nonhearsay evidence," testimony

25

and the terms of an offer fall into the residual exception of FRE 807 because "[t]he trustworthiness
of an offer of employment and a salary quote, at least when given to an experienced professional,

26

is circumstantially guaranteed by the powerful reputational pressures that a competitive labore
market exerts on corporations.")

27

[7] Plaintiff has also produced "other documents produced by Korn Ferry in connection with its
work on behalf of EV, including a document confirming the EV CEO's positive reaction

28

following a meeting with Plaintiff, resulting in a "Verbal offer made" on December 12, 2019." *See*
Rocos Decl. Ex. C (KF_0012).

under oath that the records produced "(i) were prepared or maintained by Korn Ferry personnel at or near the times of the acts, conditions, and events described in the records; (ii) were kept in the course of Korn Ferry's regularly conducted business activity; and (iii) were made by Korn Ferry's regularly conducted business activity as a regular practice." Declaration of Oliver Rocos ("Rocos Decl.") ¶ 2, Ex. A (Affidavit of Custodian of Records of Korn Ferry) ¶ 6. The CEO statements, as noted above, can be offered either through the verbal act doctrine—as "communications" surrounding the offer, *Mueller* at 937, or through the residual exception, FRE 807. Accordingly, the Korn Ferry documents are admissible.

      **(iii) statements Plaintiff attributes to a German lawyer that German law guaranteed him three years of compensation regardless of his performance.**

      Statements made by Plaintiff's German lawyer are hearsay without an exception—they are offered for the truth of the matter asserted by a non-declarant. FRE 801. Plaintiff should have secured testimony by Plaintiff's German lawyer to corroborate Plaintiff's version of events. The lawyer's statement of Plaintiff is not a verbal act since it had no legally operative effect such as an offer.  Plaintiff seeks an exception under the "residual exception." FRE 807. Plaintiff has not offered evidence that supports trustworthiness of Plaintiff's telling of events; and though Plaintiff's German lawyer may be outside the subpoena power of this Court, Plaintiff did not attempt to use the Hague Convention and the power of this Court to secure testimony. Plaintiff has also failed to establish with any specificity or proof of "reasonable efforts" Plaintiff underwent to secure testimony.

      Accordingly, Defendants' motion is **DENIED** as to the E&V Agreement and surrounding communications from the E&V CEO and is **GRANTED** as to Plaintiff's German lawyer's statements.

B.    **D's MIL #2: To Exclude Portions of the Expert Opinion of Dominic Persechini (Docket No. 224)**

      Defendants argue that the Plaintiff's damages expert, Dominic Persechini offers three inadmissible opinions that should be excluded, including: (1) his opinion on Plaintiff's fraud

damages which are highly speculative; (2) his calculation of Plaintiff's severance benefits conflict with the clear terms of the Employment Agreement; and (3) his calculation of the "Xpanse opportunity" which were precluded by my previous summary judgment order.

As the Court held above, neither expert, Guay or Persechini, can give a legal opinion about the strength of the evidence—whether the E&V Agreement could have led to actual employment, and how well Plaintiff could have performed at E&V. Each expert can simply state their assumptions in rendering their financial calculations and leave it to the evidence developed at trial and attorney argument to determine whether the asserted fraud-based damages are based on speculation and not recoverable.

### 1. Whether Persechini's opinion on fraud damages should be excluded on the basis of speculation and unreliability

Defendants argue that the E&V Opportunity damages are speculative because they are predicated on the assumption that had Plaintiff been provided with a firm offer from E&V, he could have taken instead of accepting employment at FMC.

This Court may exclude expert opinion testimony as speculative that lacks a reliable basis. *See* Fed. R. Evid. 702; *Elosu v. Middlefork Ranch Inc*, 26 F.4th, 1020 (9th Cir. 2022). 2023 amendments to Rule 702 make clear that the four factors of admissibility under FRE 702 must be found by a preponderance of the evidence. *See* 2023 Advis. Comm. Note. This includes a sufficient factual basis for an opinion— a basis must be something that a reasonable jury could find.

In his expert report, Persechini calculates the Plaintiff's total E&V damages to be $38,489,806—this number is obtained by subtracting Plaintiff's mitigating compensation of $8,478,215 from Plaintiff's lost non-equity compensation from March 30, 2020 through March 29, 2026 which equals $44,834,986 he would have earned with E&V. These estimations are based on the analysis of the draft service agreement between E&V and Plaintiff. Persechini outlined how the service agreement identified a fixed annual salary, an annual bonus, and two one-time initial bonuses.

Defendants rely on *Payan v. L.A. Com. Coll. Distr.*, 2019 WL 8163479, at *3 (S.D. Cal.

United States District Court
Northern District of California

2019).  In *Payan*, the court excluded the testimony of a damage export who relied on accounts of the plaintiffs which were "wholly unsupported by the record or by anything in [the expert's] report."  *Id.*  Additionally, the expert in that case made several unfounded assumptions, like assuming the plaintiffs would have been immediately hired had they graduated on time without providing any analysis to show the impacts of delayed graduation and hiring timing.

Unlike the expert in *Payan*, Persechini's assumption, while certainly debatable and perhaps questionable, are not so unreasonable such that no reasonable juror could find in Plaintiff's favor.  He relies in large part on the draft employment contract between Plaintiff and E&V which delineate the substantial compensation that Plaintiff would have received thereunder.  While subsequent communications cast doubt on whether that agreement would have been consummated had Plaintiff not been induced to go with FMC, that is a matter of debate on which a reasonable juror might decide in Plaintiff's favor.  Thus, Persechini's assumptions about the E&V agreement were not so unreasonable as to render that assumed fact insufficient under FRE 702.

Defendants argue that Persechini failed to account for Plaintiff's mitigating compensation by not including equity damages from Plaintiff's current employer in his calculation.  But this court already excluded Plaintiff's claim for equity.  Thus, Persechini's omission of that element of mitigation was not unreasonable.  In any event, even if there were an omission of one element, that would not warrant exclusion of the entire testimony.  As the Ninth Circuit has observed, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility."  *Hemmings v. Tidyman's Inc.,* 285 F.3d at 1188.

Motion to exclude Persechini's testimony on Plaintiff's fraud damages on these grounds is **DENIED**.

2. <u>Whether Persechini's severance calculations should be excluded because they conflict with the employment agreement</u>

Defendants argue that Persechini's breach-of-contract severance calculation per Section 8(d)(ii) of the FMC employment agreement should be excluded because it ignores terms of the contract agreement; specifically, they allege that severance clearly applies only when an employee worked an entire year and was entitled to a bonus for that year but had not yet received that bonus

1   when they were terminated.  Equally inadmissible, they claim, Mr. Persechini's alterative damage

2   figure assumes performance-based bonuses at 150% of base salary, which is inconsistent with

3   provisions of the Employment Agreement setting bonuses at 100% of base salary.

4           As noted below and at the pretrial conference, this Court has construed the agreement.

5   Section 8(d)(ii) is clear—Plaintiff would only be entitled to the performance bonus described

6   therein only if he worked for a full year and was entitled to that bonus.  Plaintiff worked less than

7   a year.

8           Regarding the 150% (versus 100%) bonus rate, Plaintiff claims that subsequent discussions

9   and agreements regarding the discretionary performance bonus plan was determined to be

10  increased up to 150%.  Plaintiff offers an Xpanse presentation slide on annual performance and

11  bonuses which demonstrated targets and goals for employees to receive 70%, 100%, 125%, or

12  150% payouts as extrinsic evidence to support this argument.  This is a matter the Court reserves

13  for trial.

14          The motion to exclude Persechini's severance calculations because they conflict with the

15  employment agreement is **GRANTED IN PART.**

16          **3.      Whether Persechini's calculation of the Xpanse opportunity should be**

17                  **excluded**

18          The Court previously dismissed the claim that Plaintiff was wrongfully terminated in

19  violation of public policy in summary judgment order.  *See* ECF No. 160, at 28-29.  Therefore,

20  Plaintiff cannot claim any amounts on that theory and Persechini cannot provide testimony on the

21  Xpanse opportunity.  Following dismissal of Plaintiff's labor code claims, he no longer seeks such

22  damages.

23

24  C.      **D's MIL #3: To Exclude References to Or Evidence of Issues Disposed of At**
        **Summary Judgment (Docket No. 225)**

25

26          Defendant moves for a broad order restricting the evidence Plaintiff can offer at trial,

27  barring any evidence that touched on an issue that was disposed of at the summary judgment

28  stage. Order on Summary Judgment at Docket 160. To begin, the Court notes this is an overly

broad request. Just because evidence may not related to claims and theories that were disposed of at the summary judgment stage, this does not then preclude Plaintiff from offering the same evidence if it is relevant to another claim that remains. The Court will not revisit its prior rulings.

### 1.    **Oral Promises and the Integration Clause**

Defendants ask for an order excluding "Oral Promises Within the Ambit of the Integration Clause." Defendants argue "Because the Court already determined that Plaintiff's alleged reliance on oral promises allegedly made to him relating to the terms of the FMC Agreement was unreasonable, evidence of and reference to such promises should be excluded at trial." Motion at 1-2; Docket 160. at 10:22-11:1 ("These facts indicate that his reliance was unjustified and unreasonable."). The Court previously found that the integration clause could be a factor the jury could consider in determine justifiable reliance. The Court did **not** hold, as Defendants argue, that because of the Integration Clause, Plaintiff's reliance on any unwritten promises was unjustified and unreasonable.

> To the extent the parties intended the representations at issue to constitute terms of employment, the "integration clause is certainly relevant to the Court's justifiable reliance analysis and militates in favor of finding that [Plaintiff] did not justifiably rely on [Defendants'] alleged misrepresentations." *Hon Hai Precision Indus. Co.*, *2020 WL 5128629, at *13. This is particularly true here, where Plaintiff is a sophisticated businessman, *see* Def. Ex. R; Pl. Decl. ¶ 4, and was represented by experienced counsel throughout negotiations of the FMC Agreement. *See* Def. Ex. O ("Palao-Ricketts Dep.") at 14:22–15:7, 19:18–20:24, 57:24–58:14, 77:20–77:25. These facts indicate that his reliance was unjustified and unreasonable.

> Nevertheless, a plain reading of the integration clause suggests the misrepresentations on which Plaintiff allegedly relied may not fall within its scope. To be sure, the integration clause is broad and provides that it "supersedes all prior agreements . . . *related to* the subject matter of this agreement." FMC Agreement § 12 (emphasis added). But the clause still only supersedes prior agreements related to the "subject matter of *this* agreement," *i.e.*, the FMC Agreement. The FMC Agreement is an employment agreement, and therefore, its subject matter relates to terms of *employment*, such as Plaintiff's responsibilities, compensation, and rights upon separation. In contrast, Plaintiff's false promise claim focuses on alleged misrepresentations that *induced* Plaintiff to negotiate the FMC Agreement in the first place, misrepresentations that technically do not involve terms of employment, but such matters as the funding and strategy of Xpanse. Such matters arguably do not relate to the

United States District Court
Northern District of California

1    subject matter of the FMC Agreement (*i.e.*, the terms of the FMC
     employment).

2    [. . .]

3    In this case, ascertaining whether the parties intended the alleged
     representations to be within the scope of the integration clause at the

4    time the contract was executed depends on the credibility and
     interpretations of extrinsic evidence. Thus, whether the alleged

5    misrepresentations fall within the scope of the integration clause is
     fairly a jury question. In any event, even if every representation

6    constituted a term of employment subject to the integration clause,
     an integration clause is just one factor in the determination of

7    justifiable reliance, and viewing the evidence in the light most
     favorable to Plaintiff, a jury could still find that Plaintiff justifiably

8    relied on those representations. *See McColgan*, 4 F. Supp. 3d at
     1233–34 ("Justifiable reliance in a fraud action is ordinarily a

9    question of fact, '[e]xcept in the rare case where the undisputed facts
     leave no room for a reasonable difference of opinion.'" (citation

10   omitted)).

11   Docket 160 at 10-12.

12        Accordingly, Plaintiff is not barred from introducing evidence of alleged

13   misrepresentations, and it is a question for the jury whether notwithstanding the integration clause,

14   Plaintiff's reliance on the promises was reasonable. Defendants' motion as to this point is

15   **DENIED**.

16

17        2.    **Promises relating to the funding and strategy of Xpanse**

18        Defendants also attempt to exclude Plaintiff from arguing he relied on alleged oral

19   promises relating to the funding and strategy of Xpanse. As the Court noted in the Summary

20   Judgment Order, "Justifiable reliance in a fraud action is ordinarily a question of fact, '[e]xcept in

21   the rare case where the undisputed facts leave no room for a reasonable difference of opinion.'"

22   *McColgan v. Mut. of Omaha Ins. Co.*, 4 F. Supp. 3d 1228, 1233–34 (E.D. Cal. 2014) (quoting

23   *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1475 (1990)). Order on Summary

24   Judgment at 10. Defendants present no case law to support the Court barring Plaintiff from

25   presenting evidence of oral promises just because emails were sent following the alleged oral

26   promises that did not include them in writing. Accordingly, the Court finds no basis to bar

27   Plaintiff from offering the relevant promises he allegedly relied upon. It is a question for the jury

28   whether Plaintiff's reliance was reasonable, and Defendants' motion as to this point is **DENIED**.

United States District Court
Northern District of California

1

2      3.      **Evidence Re Right to Equity**

3          In the Order on Summary Judgment, the Court held Plaintiff is not entitled to any equity in

4  Xpanse "because his promised Option never vested," and dismissed Plaintiff's Count 18. Order on

5  Summary Judgment at 16, 20. Defendants again seek an overly broad evidence exclusion of any

6  promises that were made to Plaintiff regarding his entitlement to equity because Defendants claim

7  the promises are not probative. Plaintiff confirms he "does not intend to introduce at trial, or to

8  argue, that he is in fact entitled to any equity in Xpanse or any damages relating to such equity."

9  Opp. at 3-4. Plaintiff argues, and the Court agrees, evidence around the equity promises remains

10  probative and potentially relevant to Plaintiff's claims regarding retaliation and firing without

11  cause. Plaintiff points to the following examples of the relevance of the promises around equity:

12      (1) "Defendants sought to value Xpanse shares differently depending on whether the

13          shareholder was a member of the Middleman family or someone else. Compl. ¶¶ 89-

14          97. Specifically, Defendants wished to value shares held by members of the

15          Middleman family by including all of Xpanse's revenue, while valuing shares held by

16          others on only a limited portion of Xpanse's revenue. Id. ¶¶ 91-92. Plaintiff, and others,

17          opposed that scheme. Id. ¶¶ 93-97."

18      (2) "Plaintiff has alleged in support of his breach of contract claim that one of the reasons

19          he (and Timothy Beard) was terminated was because he pushed back against

20          Defendants' conversion plans, rather than going along with them. *Id.* ¶¶ 132"

21      (3) "Two of the core false promises on which Plaintiff's fraud claims are based are

22          Defendants' promises that (1) Xpanse would be incorporated and managed

23          independently, and (2) that Xpanse would be operated in a manner that allowed it to go

24          through an Initial Public Offering. Plaintiff contends that those statements were false

25          because, among other things, Defendants changed Xpanse's corporate form from a C

26          corporation to an LLC at the first opportunity, which eliminated its independence in

27          favor of being controlled by its members (namely, the Middleman family) and ensured

28          it could not go through an IPO. Compl. ¶¶ 115."

(4) "Plaintiff contends that he was promised equity in Xpanse in such a manner that he could enjoy the upside in the event it went through an IPO. Compl. ¶¶ 138, 143."

(5) "Plaintiff contends that he was strongly opposed to that scheme on the basis that it was (1) harmful to employees who had not agreed to that provision when accepting employment that provided equity, and (2) would harm Xpanse's ability to attract additional talent who disliked such provisions. *Id.* ¶ 132."

Accordingly, Plaintiff has pointed to probative value of the alleged promises involving equity (apart from his unsuccessful attempt recover as a remedy the purportedly lost equity), and Defendants' motion as to this point it **DENIED.**

### 4.    Retaliation Evidence

Defendants argue that because the Court dismissed Plaintiff's claims under the Labor Code of California or Washington law, Plaintiff should be barred from offering evidence of wrongful termination, retaliation, or whistleblowing. This request is beyond what the Court held. Plaintiff confirms he is not pursuing damages under California or Washington law for these claims, but instead that evidence about retaliation or whistleblowing is relevant because "Plaintiff contends that Defendants terminated him at least in part because he refused to accede to Defendants' demands with respect to an unlawful secret valuation scheme, Xpanse's change in corporate form, and its harmful buy-back scheme. Compl. ¶ 132. The Court agrees this evidence may be relevant to support Plaintiff's claim that was terminated reasons other than for "cause" as Defendants contend. Accordingly, Defendants' motion as to this point is **DENIED**.

### 5.    Evidence of Relocation

Defendants also ask to exclude evidence of Plaintiff's relocation. As the Court has already ruled that Plaintiff moved on his own accord, this evidence is not relevant to any remaining dispute, and Defendants' motion as to this point is **GRANTED**. Order on Summary Judgment at 27 ("Rather, the evidence establishes that the move was Plaintiff's own prerogative. In fact, FMC's general counsel sent an email to Plaintiff expressing skepticism about his move to

United States District Court
Northern District of California

Washington. In that email FMC's general counsel deferred to Plaintiff, stating: "I obviously give you very broad deference with respect to your plans for this company[,]" and that he was "[n]ot looking to unduly restrict you in any way[.]" *See* Def. Ex. T.").

D.    **D's MIL #4: Exclude Testimony of Ganesh Baskaran (Docket No. 226)**

Defendants move to exclude the testimony of Plaintiff's fact witness Mr. Baskaran. Mr. Baskaran is listed as a possible trial witness to testify to, among other things, "Xpanse's operations, business decisions, and employee compensation." Mr. Baskaran started at Xpanse in mid-November 2020, two months before Freedom terminated Mr. Mewawalla. Defendants argue he had no involvement in Plaintiff's pre-employment negotiations with Freedom, or his hiring, or Stanley Middleman's determination that there was "Cause" under Mr. Mewawalla's employment agreement to fire him without severance. Defendants state that any testimony from Mr. Baskaran about his own employment post-dating Mr. Mewawalla's tenure, or about his own departure from Xpanse, is irrelevant to any issue in the case and should be precluded.

Central to Defendants' concerns is that Mr. Baskaran had his own grievance in connection with his experience/departure at Xpanse, and Defendants do not want his own grievances, lawsuit, and settlement to be brought into the case, and that it should be excluded under Rule 403.

Plaintiff argues they do not seek to relitigate Mr. Baskaran's grievances. Instead, Plaintiff argues Mr. Baskaran's testimony is relevant to: "Xpanse's plans and operations; Plaintiff's competency and reputation, the nature of Xpanse's work environment; the management styles of Stanley Middleman, Gregory Middleman, Michael Middleman, Christopher Staub, and Erik Anderson; and changes to Xpanse following Plaintiff's departure. All of those topics are material to the issues in dispute, and such testimony is relevant and admissible. Accordingly, Mr. Baskaran should be permitted to testify about those topics." "By way of just one example, Defendants' witnesses have testified that one reason for Plaintiff's termination was that he was spending too much money on staffing without obtaining results. To the extent that Mr. Baskaran testifies that Xpanse's headcount grew even more rapidly yet still failed to deploy a product in the 12+ months following Plaintiff's termination "for cause," that would tend to disprove Defendants' assertion in

this regard."

The Court narrowly **GRANTS** Defendants' motion, under Rule 403, insofar as Defendants seek to exclude any testimony on Mr. Basakran's exit from the company, though Plaintiff argues that will not be brought up. At the pretrial conference, Plaintiff further confirmed Mr. Baskaran's testimony would focus on systemic problems and issues as he saw while employed at Xpanse and not grievance personal and peculiar to him. The Court warned Plaintiff that if Plaintiff or Ms. Baskaran starts to stray, the Court will cut it off under Rule 403.

The Court **DENIES** Defendants' remaining aspects of their motion as to the relevance of Mr. Baskaran's testimony. Plaintiff has offered possible relevance of Mr. Baskaran's testimony,

### E.    D's MIL #5: Exclude Evidence of Stanley Middleman's Political Views (Docket No. 227)

Defendants have moved under FRE 401, 402, and 403 to exclude a videotape of a speech Stanley Middleman made in 2018 and any evidence, comment, or argument about Mr. Middleman's speech or other expressions of his political or public-policy opinions. The videotape is of a luncheon speech Stanley Middleman gave to a Jewish business group in 2018. In the speech, Mr. Middleman mentioned that he considers California law to be "not very friendly" to business and that he had discussed with his lawyers some "pitfalls" of doing business in "the Republic of California." Plaintiff argues that this request is premature as there is not enough information to determine the video's relevance, and that Defendants' request is overbroad in attempting to exclude not just the videotape but also any political opinions, or "public policy opinions." Plaintiff argues "Middleman's 'public policy opinions' may well ultimately be germane to the extent that he believed that the law should be changed in a manner that would have made Defendants' actions non-violative of the law. And if, for example, Mr. Middleman offered testimony that directly contradicts the referenced videotape, Plaintiff certainly would be entitled to introduce it." Plaintiff's Opp. at 5.

Plaintiff agrees it will not seek to introduce any such statement unless to directly impeach Mr. Middleman if he testifies to the contrary.  The Court **DEFERS** this motion until trial.

F.    **D's MIL #6: To Exclude Evidence of Other Lawsuits Involving Defendants (Docket No. 228)**

Defendants have moved to preclude "any evidence, testimony, or argument concerning other lawsuits or investigations involving any of the Defendants," stating that courts tend to exclude other evidence of litigation under Rule 403, as it can create mini-trials within the main trial.  *See, e.g.*, *In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, 2019 WL 7185548, at *3 (C.D. Cal. Dec. 9, 2019) (evidence of other litigation "invites a trial-within-a trial, and would likely cause confusion and waste time—concerns that run afoul of Fed. R. Evid. 403"); *W. Air Charter, Inc. v. Schembari*, 2019 WL 6998769, at *5 (C.D. Cal. Jan. 11, 2019) ("The Court finds that evidence of the Sojitz Lawsuit has no likelihood of proving any material facts relevant to Plaintiff's claims and would be highly prejudicial, as it could mislead the jury, confuse the legal issues relevant to the dispute before them, and cause undue delay.")

Plaintiff argues, and this Court agrees, that this request is premature. Plaintiff states they do not presently seek to introduce such evidence at trial but should not be precluded from doing so should Defendants open the door to such evidence.

Accordingly, the Court **DEFERS** this motion, pending trial.

G.    **D's MIL #7: Exclude References to Or Evidence of Plaintiff's Alleged Mental Distress and Emotional Anguish (Docket No. 229)**

Defendants move to exclude any of Plaintiff's testimony regarding his mental distress and emotional anguish because Plaintiff told Defendants in discovery responses he was not formally diagnosed.  A plaintiff is not permitted to "self-diagnose himself with—or testify as to the symptoms of—depression, anxiety, [. . .]. Such testimony would stray too far into matters of 'scientific, technical, or other specialized knowledge' prohibited by Rule 701." *Sanchez v. Master Prot., LP*, 2022 WL 2092995, at *2 (C.D. Cal. May 4, 2022).

Plaintiff agrees to not attempt to self-diagnose with depression or anxiety, and states that he is not asserting any damages resulting from any "mental and emotional injuries." Plaintiff

31

argues, and the Court agrees, however, that Defendants' request is overly broad, as Defendants are asking for an exclusion that is beyond Plaintiff attempting to improperly self-diagnose. *Sanchez v. Master Prot., LP*, 2022 WL 2092995, at *2 (C.D. Cal. May 4, 2022) (granting motion in limine "to the extent it seeks to prevent Plaintiff from medically diagnosing himself" but denying it "to the extent it seeks to prevent Plaintiff from testifying that he generally felt depressed, anxious, or sleep deprived"). Plaintiff states "testimony concerning, for example, his shock, surprise, and/or upset resulting from Defendants' actions may also be probative of other issues, including whether Plaintiff's reliance on Defendants' promises was reasonable and real; Plaintiff's actions in relation to Defendants' plans to restructure Xpanse; and whether Defendants properly provided notice and an opportunity to cure any issues with Plaintiff's performance" is all relevant and probative. Therefore, to the extent Defendants' motion seeks to prevent Plaintiff from self-diagnosis, the motion is **GRANTED**. To the extend Defendants' attempt generally to bar Plaintiff from providing testimony on his feelings and emotional state, the motion is **DENIED**. *Sanchez v. Master Prot., LP*, 2022 WL 2092995, at *2 (C.D. Cal. May 4, 2022). The Court notes that Defendants' designation of Plaintiff's Interrogatory responses to Nos. 1, 2, and 5 are fair to impeach Plaintiff's claims of mental and emotional health.

## V.     MOTION TO BIFURCATE (DOCKET NO. 214)

Defendants move under Fed. R. Civ. P. 42(b) for an order bifurcating the trial into two phases—liability and compensatory separate from and punitive damages— to prevent Mr. Mewawalla under Federal Rules of Evidence 401–403 from presenting any evidence or argument about Defendants' wealth in Phase I of the trial.

As this Court has previously found, the financial information of FMC is relevant to damages, as well as punitive damages:

> "In contrast, the financial status of Defendant Freedom Mortgage Corporation is relevant to the claim for damages because Plaintiff was allegedly promised compensation in the form of a 5% equity interest in Defendant Xpanse, after Defendant Freedom Mortgage Corporation transferred assets to it. The only way that Plaintiff can assess the value is to obtain information regarding the assets of Defendant Freedom Mortgage Corporation. The financial

United States District Court
Northern District of California

information is also relevant to punitive damages."

Docket No. 117 at 2-3 (Order on Discovery Letters). The financial information of Xpanse is similarly relevant. However, the individual wealth of Stanley Middlemen or the Middlemen family is irrelevant to damages and to punitive damages and is thus excluded. "The Complaint does not allege and Plaintiff does not point to any pleading in which Plaintiff claims that the promises were false because Defendants lacked the resources to carry them out. Therefore, the information Plaintiff seeks is not relevant to the theories of fraud." *Id*.

Therefore, Defendants' motion regarding excluding Defendants' financial status is **GRANTED** as to Middleman's individual personal wealth but is **DENIED** as to FMC's and Xpanse's financial status. Accordingly, the Court finds no reason to bifurcate the trial. Defendants' motion to bifurcate is **DENIED**.

## VI.     PRETRIAL STATEMENT ISSUES (DOCKET NO. 230)

In the Parties' Joint Pretrial Statements, Defendants raise a number of additional issues. PTC Statement at pages 8-15. Defendants also raised an issue regarding a late-noticed witness. PTC Statement at page 16. The Court rules as follows:

### A.     "Xpanse-Opportunity" Damages

Defendants state Plaintiff's expert includes $32.2 million for the "Xpanse opportunity," based on Mr. Mewawalla's assertion that, had he not been terminated, he would have remained employed by Xpanse through 2026 and received large bonuses and raises. These damages were connected to Count 9 that Plaintiff was terminated in violation of public policy, which this Court dismissed at summary judgment. Docket No. 160 at 28-89.  Plaintiff confirmed at the pretrial conference he does not seek these damages anymore following the Court's Order on Summary Judgment. Thus, there appears to be no dispute, and both Parties should follow the Court's prior rulings regarding summary judgment.

B.    **Promises Related to the Funding and Strategy of Xpanse**

Defendants re-stated issues briefed in Defendants' MIL #3 regarding promises Plaintiff claims to have relied on. The Court ruled above in Section IV.C.

C.    **Interpretation of Section 8(d) of the Agreement**

The Court held at the pretrial conference that as a matter of law, Section 8(d) of the Agreement regarding severance owed if a party is fired without cause is clear. The Court's following construction of the section is binding on the parties:

If the Executive is fired without cause:

- o  8(d)(i): The Executive is entitled to a lump sum of an entire year's worth of salary plus 100% of the current year's bonus.

- o  8(d)(ii): If the Executive had been at the company for a year, the Executive would ALSO get 100% of the prior year's bonus[8] that was earned by which had not been paid already. <u>This does not apply to Mr. Mewawalla, as he was not at FMC or Xpanse for a full year.</u>

- o   8(d)(iii): The Executive ALSO gets COBRA benefits paid for 12 months.

- o  8(d)(iv): The Executive ALSO gets a prorated portion of the ***current*** year's bonus "irrespective of whether the performance goals applicable to such Discretionary Bonus have been established or satisfied."

The Court renders this interpretation because the provision on its face is not ambiguous and at the hearing Plaintiff conceded he had no extrinsic evidence which would suggest the provision is ambiguous.  Moreover, Plaintiff's construction makes no sense; it would permit double recovery under Section 8(d)(ii) and (iv).  At the pretrial conference, the Court left the door open for Plaintiff to prove at trial with extrinsic evidence that the agreement was modified to increase the bonus to 150%.

---

[8] "Performance Discretionary Bonus" is defined as a bonus based on achievement of performance goals, to be paid "following the anniversary of the Executive's Start Date each year ('Performance Year')". *See* Employment Agreement, Section 5(c).

1

2

D.      **Xpanse's Dismissal from the Case**

Defendants argue Xpanse should be dismissed from the case because the Court previously dismissed a portion of Plaintiff's basis under Count 5 (breach of contract) and Count 18 (claim for an equitable accounting of said equity) against Xpanse for equity on the ground that no options had vested. But the Court did not dismiss Xpanse from the other counts in which it was named as a defendant. Xpanse remains a defendant in the case.

As Plaintiff argues, Plaintiffs bring other claims under Counts 5 (breach of contract) and 6 (breach of the covenant of good faith and fair dealing) against Xpanse including: "(1) failing to timely pay a portion of his signing bonus, (2) failing to provide Plaintiff with Xpanse's employee benefits, (3) failing to calculate and pay him PTO, (4) terminating his employment without cause, without providing notice or an opportunity to cure, and (5) failing to pay him the severance benefits to which he was entitled. ECF 1 at ¶ 178." PTC Statement at 13.

E.      **Interpretation of Freedom's California Employee Handbook**

Defendants argue that Plaintiff's calculation of his alleged PTO benefits he was owed upon termination should be calculated based on a pro-rated rate determined from his base salary, non-inclusive of any bonuses.  Defendants point to the company's California Supplemental Employee Handbook (which governs California-based employees) which states: "Upon termination of employment with Freedom Mortgage, you will receive payment for any unused, accrued paid time off at your base rate of pay time of termination (meaning your base hourly rate, exclusive of any variable income such as commissions and/or bonuses), including a pro rata portion of your final month of accrual" (emphasis in original). Defendants argue this would reduce Plaintiff's PTO by $228,475.97.  Plaintiff counters that Defendants previously argued, and the Court found, that Plaintiff was a resident of Washington at the time of his termination. ECF NO. 160 at 23-24 (noting Plaintiff's "termination occurred on January 21, 2021, when Plaintiff lived in Washington).  Thus, Plaintiff argues there is no factual basis to claim the California handbook's calculations apply to him.

1    Defendants do not offer another basis for their interpretation at how PTO should be

2    calculated, thus the Court holds— at this juncture—that the California Handbook's calculation

3    does not apply to Plaintiff since he was not a California-based employee.

4

5    F.    **Exclusion of Daniel Oh**

6    At the pretrial conference, the Court allowed Defendants to take the deposition of Mr. Oh

7    prior to trial, as he was disclosed late by Plaintiff.

8

9    **VII.    OBJECTIONS TO BELLWETHER EXHIBITS**

10   A.    **Recurring Issues**

11   This Order addresses the parties' exhibit list objections regarding representative exhibits,

12   suitable for resolution before trial ("Bellwethers").  Docket No. 230-3.  Before turning to the

13   objections, the Court first addresses two recurring issues.

14   Exhibits containing comments on Plaintiff's performance are relevant and the state of mind

15   of Defendants – whether they terminated Plaintiff for "Cause."  Upon request, the Court will give

16   a limiting instruction.  The Court notes, however, that the volume of such exhibits viewed

17   cumulatively may implicate FRE 403 at some point.  Defendants are thus forewarned they should

18   proffer only their best evidence or risk exclusion under FRE403.

19   To the extent Defendants seek to admit such documents for the truth of the matter asserted

20   therein, the Court notes they are hearsay and most contain multiple levels of hearsay, and thus

21   even if one level meets an exception (e.g. as a business record), other hearsay problems still

22   obtain.

23   The below admissibility determinations are rendered with these principles in mind.

24   B.    **Bellwethers**

25   1.    **Mewawalla Challenges to Stanley C. Middleman, et al., Exhibits**

| Exhibit No. | Description | Objections | Outcome |
|---|---|---|---|

36

United States District Court
Northern District of California

| 553 | This is an email from Jennifer Sanchez, director of human services at Archwell Solutions, containing summaries of anonymous employee survey data, sent to the Plaintiff and Gregory Middleman on October 26, 2020.<br><br>Some of the survey data from the new hire check in, which was compiled in a survey deck on PowerPoint, include statements about Plaintiff (then CEO of XPanse). | FRE 403, 602, and 802 | Objection overruled.<br><br>Statements of survey respondents expressing their views of management are admissible to show those employees' state of mind, a fact relevant to Defendants' assessment of Plaintiff's performance and whether there was Cause to terminate him. *See e.g.* "[n]ervous that leadership does not have a lot of knowledge" (553-013), "[f]eel good about the people" (553-008), "[f]eel stuck and very frustrated" (553-008). "[f]eel like I am in a holding pattern" (553-010), "[f]eel ignored" (553-014), and "feel like I need to lead since there is not a leader present" (553-015).<br><br>As to the survey itself, it reports on these employees' views and constitutes a business record under FRE 803(6).  The accompanying email is likewise a business record. |
| 567 | This is an email from Christopher Staub to Jordan Glick (both employees of FMC) on November 19, 2020, indicating that an Xpanse employee named "Don" resigned because of Plaintiff, stating that Plaintiff berated a recruiter Xpanse employee, and that other Xpanse employees were threatening to leave.<br><br>The email states, "don | FRE 403, 602, and 802 | Objection overruled.<br><br>Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |

| | | | |
|---|---|---|---|
| | was one, but it's alot of stuff.  recruiter called greg crying that Rahul was berating her, engineers are threatening to leave, he sent stan his weekly update and it was only about his equity[.]" | | |
| 578 | This is an email from Christopher Staub to Adam Cohen (an employee of Archwell Holdings LLC) on December 21, 2020, forwarding an email from Michael Middleman (an employee from FMC) that includes: an alleged excerpt from a blog that refers to Plaintiff as "mysterious;" discusses the motivation for certain alleged actions by Plaintiff and calls it "strange;" and then states that Plaintiff's alleged acts were "considered strange in a Finnish company." | FRE 403, 602, and 802 | Objection sustained.  FRE 403. |
| 597 | This is an email chain from January 21, 2021, between Christopher Staub and Gregory Middleman (an employee of Xpanse) that reports the content of an alleged conversation between two individuals about Plaintiff. | FRE 403, 602, and 802 | Objection sustained.<br><br>Exhibit does not go to relevant state of mind relevant to Plaintiff's termination because Defendants had already decided to terminate Plaintiff.<br><br>To the extent Defendants seek to use it to prove truth of the matters asserted (after-acquired evidence of wrongful conduct), it is hearsay on multiple levels. |
| 533 | This is a three-page email chain from April 30, 2020, beginning with an email from Robert D'Urbano (who reported to Michael Middleman) that provides | FRE 403, 602, and 802 | Objection overruled.<br><br>Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |

| | | | |
|---|---|---|---|
| | his personal thoughts and negative evaluation of Plaintiff. | | |
| 536 | This is four-page May 20, 2020, email chain that contains emails from James Luisi to Christopher Staub providing his personal thoughts and evaluation of Plaintiff. Mr. Luisi worked a Keystone, a company that Xpanse was seeking to replace. | FRE 403, 602, and 802 | Objection overruled.<br><br>Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 538 | This is a July 21, 2020, instant message chain between Gregory Middleman (employed by Xpanse) and Christopher Staub in which they both criticize Plaintiff and repeat criticisms allegedly made by others ("michael, robert and others have questioned whether [Plaintiff] is good or not a lot. . . . the rest of our team is noticing it too and talking about it"). | FRE 403, 602, and 802 | Objection overruled.<br><br>Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 543 | This is an undated text message chain between a Ms. Sanchez (an Archwell Solutions employee) and Michael Middleman (employed by Freedom Mortgage Corporation) in which they both criticize Plaintiff (e.g. calling him "a con artist" (FM_00060482)) and repeating criticisms of him made by others that had been communicated to them. | FRE 403, 602, and 802 | Objection overruled.<br><br>Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 566 | This is a November 19, 2020, email chain between Christopher Staub and Michael Middleman in | FRE 403, 602, and 802 | Objection overruled.<br><br>Admissible for the non-hearsay use to show Defendants' state |

| | | | |
|---|---|---|---|
| | which they quote Greggory Middleman as having "reached the end of the rope with [Plaintiff]" and criticize Plaintiff. | | of mind relative to termination. |
| 569 | This is a December 3, 2020, email from Christopher Staub to Adam Cohen. | FRE 403, 602, and 802 | Objection overruled. Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 572 | This is a December 10, 2020, email chain between Christopher Staub, Michael Middleman, and Adam Cohen in which Michael Middleman criticizes Plaintiff's work. | FRE 403, 602, and 802 | Objection overruled. Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 573 | This is a December 14, 2020, email exchange between Christopher Staub and Michael Middleman in which they each criticize business projections Plaintiff was allegedly involved in preparing. | FRE 403, 602, and 802 | Objection overruled. Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 579 | This is December 21, 2020, email from James Luisi to Christopher Staub, Adam Cohen, and Erik Anderson providing his personal thoughts and evaluation of certain aspects of Xpanse's operations and employees. | FRE 403, 602, and 802 | Objection overruled. Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |
| 594 | This is one of several iterations of the same email chain, which comprises emails sent on January 14-15, 2021, between Christopher Staub, Michael Middleman, Gregory Middleman, Erik Anderson (employed by Archwell Solutions), and | FRE 403, 602, and 802 | Objection overruled. Admissible for the non-hearsay use to show Defendants' state of mind relative to termination. |

| | Stanley Middleman. The email chain contains a broad range of criticisms of Plaintiff, and it relays, in many places, alleged criticisms of Plaintiff by others. | | |
|---|---|---|---|

2.      **Stanley C. Middleman, et al., Challenges to Rahul Mewawalla Exhibits**

| Exhibit No. | Description | Objections | Outcome |
|---|---|---|---|
| 215 | This is the service draft agreement with a German real estate company, Engel & Volkers ("E&V"). | FRE 403 and 802 | Objection overruled.<br><br>Admissible under the "verbal acts" doctrine because the EV agreement is being offered to establish that Plaintiff had another job offer, not for the truth of the matter asserted. |
| 206 | This exhibit displays a chart regarding a timeline of communication between Plaintiff and E&V. | FRE 403 and 802 | Reserved.  Foundation needed to determine whether this qualifies as an exception to hearsay (such as a business record).  There may be multiple levels of hearsay that need to be addressed. |
| 250 | This is a chat exchange between Christopher Staub and Jordan Glick (Senior executive at Freedom Mortgage Company) regarding Plaintiff being used as a Pawn at Xpanse. | FRE 403 and 802 | Objection overruled.<br><br>Admissible as party-opponent statements. See FRE 801(d)(2).<br><br>Statements' probative value is not substantially outweighed by unfair prejudice. |
| 258 | This is a chat exchange between Christopher Staub and Jordan Glick regarding their irritation of Plaintiff. | FRE 403 and 802 | Objection overruled.<br><br>Admissible as party-opponent statements. See FRE 801(d)(2).<br><br>Statements' probative value is not substantially outweighed by unfair prejudice. |

United States District Court
Northern District of California

42

1

**VIII.    OBJECTIONS TO DEPOSITION DESIGNATIONS (DOCKET NO. 230-4)**

By **Wednesday, January 15th, 2025**, Parties are to further meet and confer to resolve objections to deposition designations and file an updated JOINT statement regarding any remaining objections that the Court will resolve in advance of trial. Parties are forewarned that the time this Court takes to resolve unreasonable objections will come off the respective Parties' trial time.  Parties confirmed only one witness will be called by deposition. Docket No. 261.

**IX.    OBJECTIONS TO DISCOVERY RESPONSES (DOCKET NO. 230-5)**

By **Wednesday, January 15th, 2025**, Parties are to further meet and confer to resolve objections to discovery responses and file an updated JOINT statement regarding any remaining objections that the Court will resolve in advance of trial. Parties should work to stipulate to authenticity. Parties are forewarned that the time this Court takes to resolve unreasonable objections will come off the respective Parties' trial time.

**X.    JURY INSTRUCTIONS (DOCKET NO. 233)**

By **Wednesday, January 15th, 2025**, Parties are to meet and confer and file a JOINT statement regarding stipulated, updated jury instructions, including a single updated, stipulated "Unclean Hands" jury instruction No. 30/39 as instructed by the Court, and an updated stipulated Breach of Contract instruction No. 33 and No. 34 with a cite to the section of the Employment Agreement with the definition of "Cause." **The Court notes Parties should follow the model jury instructions, give case law to support any deviation from the model, and refrain from including attorney argument within jury instructions.** The Court will file a final proposed set of jury instructions following review of Parties upcoming filing.

//

//

//

//

//

United States District Court
Northern District of California

1

## XI.    VERDICT FORM (DOCKET NOS. 216, 231)

By **Wednesday, January 15th, 2025**, Parties are to refile a JOINT updated, stipulated verdict form. The Court will then file a final proposed verdict form.

**IT IS SO ORDERED**.

Dated: January 15, 2025

_____
EDWARD M. CHEN
United States District Judge