**WILLIAMS & CONNOLLY LLP**
Paul B. Gaffney (SBN 345431)
pgaffney@wc.com
George A. Borden (admitted *pro hac vice*)
gborden@wc.com
Ricardo Leyva (admitted *pro hac vice*)
rleyva@wc.com
Ikenna Ugboaja (admitted *pro hac vice*)
iugboaja@wc.com
680 Maine Avenue SW
Washington, DC  20024
Telephone:    (202) 434-5000
Facsimile:    (202) 434-5029

**DUANE MORRIS LLP**
Stephen H. Sutro (SBN 172168)
shsutro@duanemorris.com
Robert J. Nolan (SBN 235738)
rjnolan@duanemorris.com
David A. Goldstein (SBN 319394)
DAGoldstein@duanemorris.com
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105
Telephone:    415.957.3000
Facsimile:    415.957.3001

Attorneys for Defendants FREEDOM
MORTGAGE CORPORATION, XPANSE,
LLC, and STANLEY C. MIDDLEMAN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RAHUL MEWAWALLA, an individual,<br><br>                        Plaintiff,<br><br>        vs.<br><br>STANLEY C. MIDDLEMAN, an individual, et al.,<br><br>                        Defendants. | Case No. 3:21-cv-09700-EMC<br><br>**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Trial Date:            February 5, 2025 |

1

## TABLE OF CONTENTS

2   **ISSUES TO BE DECIDED** ......................................................................................... 1

3   **INTRODUCTION**..................................................................................................... 1

    **ARGUMENT** .............................................................................................................. 1
4
    I.     MR. MEWAWALLA'S FRAUD CLAIMS (COUNTS 1 AND 2) FAIL
5        AS A MATTER OF LAW.............................................................................. 1

6        A.   The Evidence Does Not Permit a Jury Finding that Defendants
         Made Any False Promises (Count 1)...................................................... 2
7
             1.   Alleged Promise (a): Independent Management and
8            Operation. ............................................................................ 2

9            2.   Alleged Promise (b): IPO in 4 to 5 Years............................... 3

10           3.   Alleged Promise (c): Reporting Only to Stan Middleman. ................ 3

             4.   Alleged Promise (d): Contributing Revenue to Xpanse. ................... 4
11
             5.   Alleged Promises (e) and (f): Transfer of Technology
12           Assets, and Technologists to Xpanse.................................... 5

13           6.   Alleged Promise (g): Leveraging Mr. Middleman's
             Relationships with Other Mortgage Companies. ................ 5
14
             7.   Alleged Promise (h): Employment through Xpanse's IPO. ................ 6
15
         B.   The Evidence Does Not Permit a Jury Finding that Defendants
16       Concealed Any Material Information. .................................................. 6

17       C.   The Evidence Does Not Permit a Jury Finding that Defendants
         Intended to Deceive Mr. Mewawalla................................................... 7
18
         D.   The Evidence Does Not Permit a Jury Finding of Reasonable
19       Reliance. ............................................................................................. 8

20           1.   The Integration Clause Bars Any Finding of Reasonable
             Reliance. ............................................................................ 8
21
             2.   Mr. Mewawalla Could Not Reasonably Rely on the
22           Alleged Promises About Xpanse's Strategy and
             Operations. ........................................................................ 10
23
             3.   Mr. Mewawalla Could Not Reasonably Rely on Promises
24           that Xpanse Would Be Operated in Such a Way That It
             Could Proceed to an IPO in 4-5 Years................................ 10
25
             4.   Mr. Mewawalla's Circumstances in 2020 Do Not Permit a
             Finding of Reasonable Reliance. ....................................... 11
26
         E.   Mr. Mewawalla's Alleged Fraud Damages from the E&V
         Opportunity Are Too Speculative To Be Recoverable. ................................ 11
27
         F.   Mr. Mewawalla Is Not Entitled to Prejudgment Interest on Fraud
28       Damages................................................................................................. 13

         G.   The Economic Loss Doctrine Bars Mr. Mewawalla's Fraud

-i-

Claims. ...................................................................................................... 15

II.   MR. MEWAWALLA'S CONTRACT CLAIMS (COUNTS 5 AND 6)
      FAIL AS A MATTER OF LAW. ................................................................ 15

      A.    Mr. Mewawalla's Contract Was Induced by Fraud ........................ 15

      B.    Mr. Mewawalla Had No Contract with Xpanse. ............................ 15

      C.    The Claim Against Xpanse for Breach of the Covenant of Good
            Faith and Fair Dealing (Count 6) Fails as a Matter of Law. .......... 17

      D.    The Evidence Does Not Permit a Jury Finding that Defendants
            Lacked "Cause." ............................................................................. 17

      E.    The Evidence Does Not Permit a Jury Finding of a 150% Bonus
            Target for Severance. ..................................................................... 20

      F.    Mr. Mewawalla Is Not Entitled to Additional PTO/FHL Benefits ............... 20

      G.    Mr. Mewawalla Is Only Entitled to a Prorated Portion of His
            Discretionary Bonus under Sections 8(d)(i) and 8(d)(iv) of the
            Employment Agreement. ................................................................. 21

III.  THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF
      LAW ON ALL CLAIMS BASED ON UNCLEAN HANDS. .................................. 21

IV.   MR. MEWAWALLA'S DAMAGES ARE LIMITED TO THE
      SEVERANCE BENEFITS. ......................................................................... 23

V.    MR. MEWAWALLA IS NOT ENTITLED TO PUNITIVE DAMAGES ................ 24

CONCLUSION .......................................................................................... 24

1

2

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................1, 20

*Barry v. Raskov*, 232 Cal. App. 3d 447 (1991) ...................................................................14

*Bishop v. Hyundai Motor Am.*, 44 Cal.App.4th 750 (1996) ...........................................................14

*Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640 (2005) .........................................................8

*Brandt v. Verizon Comms., Inc.*, 2019 WL 4082562 (N.D. Cal. Aug. 29, 2019) .........................24

*Brentsun Realty Corp. v. D'Urso Supermarkets, Inc.*, 582 N.Y.S. 2d 216 (1992) .......................16

*Bullis v. Sec. Pac. Nat'l Bank*, 21 Cal. 3d 801 (1978) ...................................................................14

*Burton v. Sosinsky*, 203 Cal. App. 3d 562 (1988) .........................................................................23

*Camp v. Jeffer, Mangels, Butler & Marmaro*,
    35 Cal. App. 4th 620 (1995), *as modified on denial of reh'g* (June 29, 1995) .................22, 23

*Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462 (2014) ...................................................................3

*Careau & Co. v. Security Pacific Bus. Credit, Inc.*,
    222 Cal. App. 3d 1371 (Cal. Ct. App. 1990) ...................................................................17

*Carrau v. Marvin Lumber & Cedar Co.*, 93 Cal.App.4th 281 (2001) ...........................................14

*Crowley v. EpiCept Corp.*, 2015 WL 13827908 (S.D. Cal. Mar. 11, 2015) ..................................13

*Currieri v. City of Roseville*, 50 Cal. App. 3d 499 (1975) ...........................................................13

*E. W. Bank v. Rio Sch. Dist.*, 235 Cal. App. 4th 742 (2012) ..........................................................22

*Farahani v. San Diego Cmty. Coll. Dist.*, 175 Cal. App. 4th 1486 (2009) ...................................22

*FiTeq INC v. Venture Corp.*, 2016 WL 693256 (N.D. Cal. Feb. 22, 2016) ..................................12

*F.T.C. v. Publ'g Clearing House, Inc.*,
    104 F.3d 1168 (9th Cir. 1997), *as amended* (Apr. 11, 1997) .........................................20

*Grady v. Easley*, 45 Cal. App. 2d 632 (1941) ...........................................................................15

*Grupe v. Glick*, 26 Cal.2d 680 (1945) ...................................................................................12

*In re Vertis Holdings, Inc.*, 2011 WL 6739518 (Bankr. S.D.N.Y. Dec. 21, 2011) .......................24

*Int'l Union of Operating Eng'rs, Local 3 v. Zurich N. Am.*,
    2006 WL 2791156 (E.D. Cal. Sept. 27, 2006) ...................................................................16

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-iii-

*Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970 (1999).............................22

*Lantz Ret. Invs., LLC v. Glover*, 2021 WL 6118182 (E.D. Cal. Dec. 27, 2021) .............................3

*Mann v. Jackson*, 141 Cal. App. 2d 6 (1956) .................................................................12

*Microsoft Corp. v. Hon Hai Precision Indus. Co.*,
    2020 WL 5128629 (N.D. Cal. Aug. 31, 2020) .............................................................8

*Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833 (1998) ........................................23

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
    157 Cal. App. 4th 835 (2007) ..............................................................................8

*Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997)...................................1

*Oracle USA, Inc. v. XL Global Servs., Inc.*, 2009 WL 2084154 (N.D. Cal. 2009) .....................15

*Rossberg v. Bank of America, N.A.*, 219 Cal. App. 4th 1481 (2013).......................................11, 12

*S. Union Co. v. Sw. Gas. Corp.*, 180 F. Supp. 2d 1021 (D. Ariz. 2002)...................................12

*Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 55 Cal. App. 4th 747 (2012)................................12

*ShopKo Stores Oper. Co., LLC v. Balboa Cap. Corp.*,
    2017 WL 3579879 (C.D. Cal. July 13, 2017) ..........................................................17

*Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799 (1990) .......................................9

*Smith v. City & Ct. of San Francisco*, 225 Cal. App. 3d 38 (1990).....................................17

*Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701 (C.D. Cal. Feb. 7, 2023) ....................14

*Stein v. S. Cal. Edison Co.*, 7 Cal. App. 4th 565 (1992) ..............................................14

*UMG Recordings Inc. v. Global Eagle Entertainment, Inc.*,
    117 F. Supp. 3d 1090 (C.D. Cal. June 22, 2015) .....................................................15

*W. Air Charter, Inc. v. Schembari*, 2019 WL 6998789 (C.D. Cal. Mar. 7, 2019).....................14

**STATUTES AND RULES**

California Civil Code § 3288 ............................................................................14

Fed. R. Civ. P. 50(a)(1)..................................................................................1

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO THE COURT, AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 11, 2025, at 8:30 A.M., or as soon thereafter as this matter may be heard, remotely via Zoom or in Courtroom 5, 17th Floor, of the Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, all Defendants will and hereby do move the Court for an order granting judgment as a matter of law in their favor.

Defendants move for judgment as a matter of law on all causes of action remaining in the case.

<u>**ISSUES TO BE DECIDED**</u>

Whether the Court should grant judgment as a matter of law on all remaining Counts of the Complaint.

<u>**INTRODUCTION**</u>

At the close of the evidence, the record reveals that Mr. Mewawalla's remaining claims either suffer from fatal legal flaws or simply have insufficient evidentiary support to go to the jury. Under Federal Rule of Civil Procedure 50, the Court may resolve an issue against a party when, after the party "has been fully heard on [the] issue," "the jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The Court then may grant judgment as a matter of law against the party on a claim "that, under controlling law, can be maintained or defeated only with a favorable finding on that issue." *Id.* "Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion . . . ." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Mr. Mewawalla has been "fully heard." The evidence does not provide a basis for the jury to find for him on any of his claims.

<u>**ARGUMENT**</u>

I.    <u>**MR. MEWAWALLA'S FRAUD CLAIMS (COUNTS 1 AND 2) FAIL AS A**</u>

**MATTER OF LAW.**

**A.      The Evidence Does Not Permit a Jury Finding that Defendants Made Any False Promises (Count 1).**

Mr. Mewawalla alleges that Defendants made eight false promises:

(a) Xpanse would be operated and managed completely separate from Freedom;

(b) Xpanse would be operated and managed in such a way that it could proceed through an initial public offering in 4-to-5 years;

(c) Mr. Mewawalla would report only to Stanley Middleman;

(d) Freedom would contribute revenue to Xpanse;

(e) Freedom would transfer significant intellectual property and technology assets to Xpanse;

(f) Freedom would transfer technologists to Xpanse;

(g) Mr. Middleman would use his relationships with other mortgage companies to attempt to convince them to use Xpanse's products; and

(h) Mr. Mewawalla would be employed at least through Xpanse's initial public offering. Each of these allegations fails.

**1.      Alleged Promise (a): Independent Management and Operation.**

After Mr. Mewawalla had conversations with Stan Middleman and Bob King about the strategy and funding of Xpanse, Mr. King set forth the terms for Xpanse's operation in an email on November 22, 2019.  Ex. 3.  That email made clear that "[o]wnership of [Xpanse] will be either initially as a subsidiary of Freedom, or a separate entity owned by the Middleman family depending on tax and other considerations," and observed, "We will also need to make sure that all staff at either Freedom or [Xpanse] feel like *one 'Freedom team.'*"  Ex. 3 (emphasis added). That alone demonstrates that Mr. Mewawalla understood Xpanse would not be operated and managed completely separate of Freedom, undermining alleged promise (a).  Mr. Mewawalla also testified that he understood that Mr. Middleman's family would own 92.5 percent of the equity and was fine with that.  Trial Tr. 589-23-24.  If Mr. Mewawalla expected Xpanse to be operated and managed completely separately from Freedom, then providing the Middlemans

with a controlling stake in the company would have directly undermined that expectation.

The evidence also demonstrates that Xpanse's relationship with Freedom Mortgage was a key factor motivating Mr. Mewawalla's decision to accept employment with Freedom, because it provided the business with a competitive advantage.  Trial Tr. 577:13-18 ("You could either do it from the ground up . . . or a much better way would be to *partner with somebody who's already an incumbent player* where they bring in scale, they bring in resources, they bring in an understanding of some of the intricacies of the market.") (emphasis added).  If Defendants had promised that Xpanse would operate completely independently from Freedom, Mr. Mewawalla would not have been able to count on partnership or support from Freedom.  Thus, his own admissions demonstrate that alleged promise (a) was never made.

### 2.    Alleged Promise (b): IPO in 4 to 5 Years.

"The law is well established that actionable misrepresentations must pertain to past or existing material facts. [Citation.]  Statements or predictions regarding future events are deemed to be mere opinions which are not actionable. [Citations.]"  *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469-70 (2014) (holding that "a prediction about future market conditions" is not actionable in fraud); *Lantz Ret. Invs., LLC v. Glover*, 2021 WL 6118182, at *9-10 (E.D. Cal. Dec. 27, 2021) (representation that "[t]he exit strategy would be to hold the property approximately 2 to 3 years with the focus on reducing operating expenses and increasing rental values" "clearly regards future events" and was not actionable in fraud).  Very few startups ever make it to an IPO, and Stan Middleman could not have made an enforceable promise that Xpanse would do so.  To the extent the alleged promise relates to how Xpanse would be "operated and managed," Mr. Mewawalla has adduced no evidence that if he had been competent, Xpanse could not have achieved an IPO. As Xpanse's CEO, he was responsible for operating and managing Xpanse. That Xpanse did not succeed under his leadership is on him, not Mr. Middleman or Freedom.

### 3.    Alleged Promise (c): Reporting Only to Stan Middleman.

This alleged promise cannot support a fraud claim for a fundamental reason: it was kept. Mr. Mewawalla complains that he was expected to speak with Chris Staub, Erik Anderson, and

Greg Middleman, but he fails to show any evidence that he was placed into a formal reporting relationship with any of these individuals.  Instead, the evidence shows that the only formal reporting relationship he had was with Stan.  *See, e.g.*, Trial Tr. 463:23-25 (Erik Anderson: "Rahul did not have a formal reporting relationship with me.").  The evidence that was proffered on this alleged promise only proves that Mr. Mewawalla was expected to maintain communication with key stakeholders in Xpanse.  Mr. Mewawalla was not placed in a formal reporting relationship when he was asked to work with the COO of his company (Greg Middleman), the CEO of the controlling shareholder in Xpanse (Erik Anderson), or an executive for his company's only customer (Chris Staub).  Trial Tr. 334:24-25 (Stan: "He did report to me. I didn't say anything about nobody else. We're a team.").  Any executive in his position would have been expected to maintain open lines of communication with colleagues, shareholders, and customers, and none of those common-sense expectations prove that the alleged promise was broken.  Stan Middleman was the ultimate judge of Mr. Mewawalla's performance, and the evidence proved that it was Stan Middleman who made the decision to terminate him. Trial Tr. 349:16-17.

### 4.    Alleged Promise (d): Contributing Revenue to Xpanse.

Mr. Mewawalla also fails to provide evidence sufficient to support a conclusion that Mr. Middleman promised to "contribute revenue" from Freedom to Xpanse.  The testimony and the evidence of his contemporaneous discussions with Mr. Middleman only proves that Mr. Middleman hoped to turn one of Freedom's expenses—IT costs—into a service that Xpanse could provide.  *See, e.g.*, Trial Tr. 608:6-10 (Mr. Mewawalla: "Stan also talked about, you know, he has this concept that he really likes around turning expenses into revenue. And what he said was that currently at Freedom Mortgage, they spend about 140 to 150 million dollars in expenses around technology, and he would move that to Xpanse.").  That is *not* a representation that Freedom would give Xpanse millions of dollars in exchange for zero consideration.  Nor would any such promise to pay Xpanse for products or services make sense before Xpanse had developed any such products or services, which it had not during Mr. Mewawalla's tenure.  The evidence establishes that there was no promise to "contribute revenue" in the sense that Mr.

Mewawalla contends.

5.   **Alleged Promises (e) and (f): Transfer of Technology Assets, and Technologists to Xpanse.**

The evidence does not show that Mr. Mewawalla was promised that Freedom would freely transfer its intellectual property, technology assets, and technologists to Xpanse immediately.  Mr. King's email specifically refutes alleged promise (e).  The email states that "'Newco' will *purchase* all the significant technology assets owned by Freedom which would be needed to create a robust mortgage technology platform."  Ex. 3 (emphasis added).  That belies any claim that Xpanse would receive significant technology assets without first coming to an agreement with Freedom on what it would offer in return.

The other evidence also undermines his claim.  Greg Middleman testified that Mr. Mewawalla, along with everyone else at Xpanse, agreed that moving parts of Freedom IT to Xpanse was a long-term goal.  Trial Tr. 989:12-19.  And as the evidence of Xpanse's business plan shows, Mr. Mewawalla always understood that this was the *long-term* plan, not something that would be immediately executed at the start of his employment.  See Ex. 249 (Xpanse high-level roadmap shows "Freedom IT *partially* moves to Newco" occurring sometime between 2021 and 2023; Mewawalla responds saying "Nice work!") (emphasis added). This evidence refutes any notion that Freedom would transfer assets and employees to Xpanse immediately upon Xpanse's formation, when it had no capability to manage or use those assets.

These alleged promises also fail for a separate reason: the "promises" were not broken, and were therefore not false.  As Stan Middleman, Kiran Sahota, and Greg Middleman testified, Freedom *has* transferred its resources to Xpanse, including IP, technology assets, and employees.  Trial Tr. 336:18-23 (Stan: IP, technology, employees); Trial Tr. 962:2-8 (Kiran), 985:24-986:2 (Greg).  This bears out that Mr. Middleman and Freedom always intended to make these transfers, but did not do so during Mr. Mewawalla's tenure because he was not competent to manage those assets.

6.   **Alleged Promise (g): Leveraging Mr. Middleman's Relationships with Other Mortgage Companies.**

Alleged promise (g) fails for similar reasons:  Mr. Mewawalla offers no evidence that it was broken.  The evidence establishes that Xpanse had no product to sell during Mr. Mewawalla's tenure, so there was no opportunity to do business with other mortgage companies. Trial Tr. 338:6-8 (Stan: "There was nothing to bring them in to do. They – you have to have a good or service to provide. He had yet to develop a good or service that was marketable to society."). Moreover, as Ms. Sahota testified, Xpanse's Podium B2B product was defectively designed, such that it could not be sold to parties other than Freedom.  *See* Trial Tr. 963:8-25. Only recently, under Ms. Sahota's leadership, has Xpanse succeeded in getting customers beyond Freedom.

### 7.    Alleged Promise (h): Employment through Xpanse's IPO.

Mr. Mewawalla's allegation that he was promised long-term employment flies in the face of his Employment Agreement, which indisputably made him an at-will employee.  Stip. Fact No. 12.  Mr. Mewawalla represented that he read and understood that Agreement.  Ex. 1, § 16. There is, therefore, no sufficient evidence that he was ever promised long-term employment.

### B.    The Evidence Does Not Permit a Jury Finding that Defendants Concealed Any Material Information.

Mr. Mewawalla also fails to show that Defendants concealed any relevant information in order to induce him to accept the employment offer.  Mr. Mewawalla's main theory on this point appears to be that Mr. Middleman always intended for Xpanse to be an LLC, and that Mr. Middleman withheld that information from Mr. Mewawalla to induce him to accept the position. But that is not what any of the evidence shows.  Mr. Middleman and Mr. King were transparent with Mr. Mewawalla in stating that the business structure of Xpanse was an open question.  *See* Ex. 3 (Xpanse structure will "depend[] on tax and other considerations").  Xpanse was initially created as a corporation, but when the tax considerations clearly weighed in favor of conversion to an LLC, Mr. Mewawalla was brought into the discussion.  *See, e.g.*, Ex. 28 (Mewawalla: "feedback was to remain with the Delaware C-Corp structure"; Staub: "Our tax advisors are giving different feedback"); Ex. 320 (12/15/2020 meeting agenda with Mewawalla to discuss "convert[ing] to LLC").

Mr. Mewawalla's attempt to turn Mr. Middleman's expressed preference for LLCs into a conspiracy to deceive him also fails for a different reason: he cannot show that the "concealment" was material.  The LLC structure for an early-stage company with one funder created significant *benefits*.  Because losses on an LLC can offset other taxable income, Archwell (Xpanse's owner) could effectively use pre-tax dollars to fund Xpanse's operations. By stretching the money further, Xpanse had a longer runway, which benefitted both the owners and the employees.  Trial Tr. 511:25-512:13 (Chris Staub).  Although Mr. Mewawalla contended that the conversion would impede recruiting, the former Xpanse employees called by both sides testified that the corporate form did not matter to them.  Trial Tr. 654:20-24 (Daniel Oh); 446:12-21 (Joshua Walker); *see also id.* at 990:2-23 (Greg: "I also later found that there was no harm to our ability to recruit"); 953:24-954:2 (Sahota: no harm to recruiting when Rocket Mortgage was LLC); 974:1-10 (Harroch: LLCs "tremendously beneficial" to employees).  Nor has Mr. Mewawalla offered any evidence that Xpanse's conversion to an LLC prevented employees from obtaining equity in the business, or that the conversion posed any obstacle to converting back to a C-corp in the future for an IPO.  The evidence demonstrates that Mr. Mewawalla was benefitted, not harmed, by Xpanse's conversion to an LLC, *id.*, which provides an independent basis for the Court to enter judgment as a matter of law on his fraudulent concealment claim.

There is no evidence of any other material concealment that could support a jury verdict on Count 2.

C.    **The Evidence Does Not Permit a Jury Finding that Defendants Intended to Deceive Mr. Mewawalla.**

To prove his fraud claims, Mr. Mewawalla must not only prove that the Defendants made "false promises" or concealed material information, but also that those promises or concealments were made with the intent to deceive him.  Mr. Mewawalla has adduced no evidence on the intent element.  Stan Middleman testified that he was hopeful for Xpanse and wanted it to experience the same kind of success as other tech companies.  Trial Tr. 348:22-25.  That is corroborated by the ownership structure, which gave Mr. Middleman every reason to root for Mr. Mewawalla's success and no reason for sabotage.  Since the agreed-upon equity plan was for

-7-

1   Mr. Mewawalla to receive options in 5% of the company and for Mr. Middleman's family trusts

2   to own nearly the entirety of the remainder, Mr. Middleman knew that every $1 that Mr.

3   Mewawalla generated in value for himself would have resulted in more than $18 for Archwell.

4   Mr. Mewawalla offers no plausible reason why Mr. Middleman would not have intended to

5   honor any promises to support Xpanse and Mr. Mewawalla given his family's substantial

6   financial stake in the matter.  This failure is another, independent basis for granting judgment as

7   a matter of law for Defendants on the false promises claim.

8           D.      **The Evidence Does Not Permit a Jury Finding of Reasonable Reliance.**

9           "A plaintiff asserting fraud by misrepresentation is required to plead and prove actual

10  reliance, that is, to establish a *complete causal relationship* between the alleged

11  misrepresentations and the harm claimed to have resulted therefrom. [Citations.]  Actual reliance

12  is also an element of fraud claims based on omission."  *OCM Principal Opportunities Fund, L.P.*

13  *v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 864 (2007).  For multiple reasons, Mr.

14  Mewawalla has not proved this essential element.

15          1.      **The Integration Clause Bars Any Finding of Reasonable Reliance.**

16          "Under California law . . . whether reliance was reasonable . . . may be decided as a

17  matter of law . . . if the facts permit reasonable minds to come to just one conclusion."  *Boeken v.*

18  *Philip Morris, Inc.*, 127 Cal. App. 4th 1640, 1666 (2005).  An "integration clause is certainly

19  relevant to the Court's justifiable reliance analysis and militates in favor of finding that

20  [Plaintiff] did not justifiably rely on [Defendants'] alleged misrepresentations."  *Microsoft Corp.*

21  *v. Hon Hai Precision Indus. Co.*, 2020 WL 5128629, at *13 (N.D. Cal. Aug. 31, 2020).  As the

22  Court observed, "This is particularly true here, where Plaintiff is a sophisticated businessman,

23  [citation], and was represented by experienced counsel throughout negotiations of the FMC

24  Agreement."  ECF No. 160, at 10-11.  The integration clause in the Employment Agreement is

25  phrased broadly, "supersed[ing] *all* prior agreement and understandings . . . relating to the

26  subject matter of this Agreement."  Ex. 1, § 22 (emphasis added).  Mr. Mewawalla "state[d] and

27  represent[ed] that [he] . . . has carefully read this Agreement, [and] understands the contents

28  herein."  Ex. 1, § 16.  Mr. Mewawalla admitted that all the alleged promises related to the subject

1   matter of the Agreement: his employment at Xpanse.  *See* Compl., ¶ 138 ("These

2   misrepresentations involved the most fundamental material terms of Plaintiff's employment

3   …..").  Therefore, the integration clause bars the false-promises claim as a matter of law.

4            To the extent that there is any ambiguity about the integration clause's scope, the

5   evidence demonstrates that Mr. Mewawalla understood the clause to cover issues relating to the

6   funding and operation of Xpanse.  If Mr. Mewawalla interpreted the agreement to apply

7   narrowly to his terms of employment, then he would not have sought promises in the agreement

8   that Xpanse would be "adequately resourced and capitalized."  Ex. 514-003.  Thus, Mr.

9   Mewawalla cannot show reasonable reliance on *any* of the alleged promises not contained within

10   the Employment Agreement.

11            Even if the integration clause were interpreted to cover only matters relating to terms of

12   employment, it proves that Mr. Mewawalla could not reasonably rely on several of the alleged

13   promises he recounts.  Mr. Mewawalla's allegation that he would report *only* to Stan Middleman

14   is nowhere to be found in the Employment Agreement.  To be sure, the Employment Agreement

15   provides that "The Executive shall report to the CEO of the Company."  Ex. 1-002.  But that is

16   meaningfully different from a claim that Stan Middleman would be the *sole individual* reviewing

17   Mr. Mewawalla's work.  As Mr. Middleman testified at trial, such a promise would not have

18   made practical sense given the scale of Defendants' businesses.  Trial Tr. 334:22–335:17.

19            Mr. Mewawalla's claim that he was promised employment at least through Xpanse's

20   initial public offering also fails as a matter of law.  That alleged promise contradicts the express

21   terms of the negotiated employment agreement, which states that he would be an at-will

22   employee.  Stip. Fact No. 12; Trial Tr. 334:17-21; *see Slivinsky v. Watkins-Johnson Co.*, 221 Cal.

23   App. 3d 799, 807 (1990) (Plaintiff's reliance on defendant's "oral promises of continuing

24   employment" was "simply not justifiable because the representations contradict the parties'

25   integrated employment agreement which provided that the employment was at will").  It is also

26   covered by any interpretation of the integration clause because it relates to the terms of his

27   employment.  Even if Defendants expressed a hope that Mr. Mewawalla would stay with Xpanse

28   until an IPO occurred, the statement would make no sense as a guarantee, since there is no

certainty that any start-up in its infancy will succeed in going public.  A reasonable listener with Mr. Mewawalla's experience would understand such a statement to be an aspiration, not an enforceable promise.  *See infra*, Part I.C.

        **2.**      **<u>Mr. Mewawalla Could Not Reasonably Rely on the Alleged Promises About Xpanse's Strategy and Operations.</u>**

      After Mr. Mewawalla had conversations with Stan Middleman and Bob King about the strategy and funding of Xpanse, Mr. King set forth the terms for Xpanse's operation in an email on November 22, 2019.  Ex. 3.  Subsequently, FMC sent Mr. Mewawalla an offer letter that was largely consistent with King's email, Ex. 7, to which Mr. Mewawalla responded by attaching an edited version at the bottom of the email chain, Ex. 8.  Mr. Mewawalla made some substantial redline edits to the offer letter, but did not propose any of the promises that he now contends were made.  *Id.*  To the extent any pre-employment promises about the strategy and funding of Xpanse were made, they were memorialized in writing by the parties.

      In light of Mr. Mewawalla's representations, his experience as a corporate executive, and his care in editing the offer letter to encapsulate the elements of his conversations, Ex. 8, Mr. Mewawalla could not reasonably rely on any alleged promises about Freedom's support of Xpanse that were not set forth in Ex. 8.

        **3.**      **<u>Mr. Mewawalla Could Not Reasonably Rely on Promises that Xpanse Would Be Operated in Such a Way That It Could Proceed to an IPO in 4-5 Years.</u>**

      Any statement that Xpanse would go public in 4-5 years could not have given rise to reasonable reliance.  A reasonable listener would understand such a statement as describing the Defendants' goals or hopes for Xpanse, not a guarantee.  *See supra* Section A.2.  That is especially true here, where Xpanse's suitability to go public was dependent most of all on Mr. Mewawalla's performance as the CEO.  To be suitable to go public, Xpanse would have to develop a product that would be salable to third parties – a goal *Mr. Mewawalla* was tasked with implementing.  Ex. 8.  Mr. Mewawalla cannot sue Defendants for fraud on a theory that their hopes for *his* leadership were shown to be unfounded.

4.      **Mr. Mewawalla's Circumstances in 2020 Do Not Permit a Finding of Reasonable Reliance.**

As Defendants have shown at trial, Mr. Mewawalla's employment opportunities at the time of his hiring were dim.  He was at a failing start-up, he had indiscriminately applied to hundreds of companies, and he had been rejected from all but two.  His only other prospect – Engel & Volkers – had provided him with a draft employment agreement riddled with missing terms, Ex. 215, and containing others that he was prepared to reject, Ex. 14.  His continued negotiations with that company were indefinitely suspended at the outset of the COVID-19 pandemic.  Ex. 17.  In short, Mr. Mewawalla fails to prove that he had comparable employment options, and he therefore cannot show that he relied on the alleged promises when he accepted employment with Freedom Mortgage.  Instead, all of the evidence proves that Mr. Mewawalla was in dire straits in March 2020.  The opportunity to increase his salary more than fifteen-fold at Freedom Mortgage was far better than any other lifeline available.  Because Mr. Mewawalla has not shown that he had the leverage to walk away, he cannot show that the alleged promises were the reason he accepted employment with Freedom.

E.      **Mr. Mewawalla's Alleged Fraud Damages from the E&V Opportunity Are Too Speculative To Be Recoverable.**

Mr. Mewawalla's alleged damages from the E&V opportunity are entirely speculative as to both occurrence and extent.  "Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages. . . . [N]o liability attaches if the damages sustained were otherwise inevitable or due to *unrelated causes*. [Citations.] If the defrauded plaintiff would have suffered the alleged damage even in the absence of the fraudulent inducement, causation *cannot* be alleged and a fraud cause of action cannot be sustained."  *Rossberg v. Bank of America, N.A.*, 219 Cal. App. 4th 1481, 1499 (2013) (cleaned up, emphasis in original).  Mr. Mewawalla fails to offer evidence proving that he would have obtained the E&V opportunity if he had not accepted employment with Freedom.

The evidence Mr. Mewawalla proffers in support of his damages theory shows that he and E&V were still in negotiations about material terms of the contract, including the start date,

-11-

1    the bonus target, the contract duration, the secondary activities E&V would permit, and the

2    equity Mr. Mewawalla would receive.  *See* Exs. 14, 215.  Mr. Mewawalla cannot show with

3    certainty that those disputed terms would have been resolved.

4          The indefinite suspension of employment negotiations at E&V also undermines Mr.

5    Mewawalla's allegation of harm.  Ex. 17.  The evidence shows that if Mr. Mewawalla had

6    declined the Freedom offer in late February 2020 and continued negotiating the many open items

7    with E&V, the pandemic would ultimately have prevented the job from materializing.  Thus, the

8    evidence demonstrates that his alleged "damages sustained were otherwise inevitable or due to

9    *unrelated causes*."  *Rossberg*, 219 Cal. App. 4th at 1499.

10         Moreover, California law requires damages to be proven with reasonable certainty in

11   fraud actions.  *Mann v. Jackson*, 141 Cal. App. 2d 6, 12 (1956); *S. Union Co. v. Sw. Gas. Corp.*,

12   180 F. Supp. 2d 1021, 1035 (D. Ariz. 2002).  Thus, damages for "loss of prospective profits"

13   must be "proven to be certain both as to their occurrence and their extent."  *Sargon Enterprises,*

14   *Inc. v. Univ. of S. Cal.*, 55 Cal. App. 4th 747, 774 (2012); *see also Grupe v. Glick*, 26 Cal.2d 680,

15   693 (1945).  Even if Mr. Mewawalla could somehow prove that he would have been employed

16   by E&V, the extent of his prospective compensation is also unduly speculative.  *See FiTeq INC*

17   *v. Venture Corp.*, 2016 WL 693256, at *9 (N.D. Cal. Feb. 22, 2016) ("Even if Plaintiff could

18   establish the fact of lost profits, it nevertheless fails to offer evidence that could meet the

19   reasonable certainty standard for amount.").

20         Mr. Mewawalla's damages estimate hinges on the duration of his employment at E&V,

21   but he offers no evidence that establishes with any reasonable certainty how long he would have

22   worked there.  His damages expert, Mr. Persechini, offers a six-year employment scenario,

23   which results in a damages estimate of $35,093,259, and a three-year employment scenario,

24   which results in a damages estimate of $17,754,250.  *See* Trial Tr. 872:11-12, 873:17-18.  There

25   was no guarantee that Mr. Mewawalla's E&V agreement would have been renewed for another

26   three-year term, nor any certainty that he would have served the full three years of his initial

27   term.  After all, Mr. Mewawalla could have been terminated at E&V after ten months for

28   substandard performance, as was the case here.  *See* Updated Expert Rebuttal Report of Wayne

1    Guay, Ph.D. at 6-10.  He could have been terminated after even a shorter time based on the

2    COVID pandemic, or if E&V discovered, like Defendants now have, that Mr. Mewawalla

3    misrepresented his qualifications for the job.  *See* Ex. 5-005 (repeating misleading assertions

4    concerning Zenplace contained in his resume).

5         Finally, Mr. Persechini assumes that Mr. Mewawalla would have earned the maximum

6    annual bonus of two million Euros in his second and third years of employment, based on Mr.

7    Mewawalla's self-serving statement that "he expected to meet his targets for receiving the full

8    amount of his annual bonus each year."  Am. Report of Dominic M. Persechini, ¶ 79; *see also*

9    Trial Tr. 907:6-7.  But it is just as plausible, if not likely, that E&V would have been as

10   unsatisfied with Mr. Mewawalla's performance as Defendants were.  Nonetheless, even if Mr.

11   Persechini's estimates were taken at face value, the more than $17 million difference between his

12   own two estimates demonstrates the profound uncertainty inherent in Mr. Mewawalla's damages

13   theory.

14        Finally, Mr. Persechini's opinion constitutes no evidence of damages because he

15   uncritically accepted Mr. Mewawalla's assertions about the E&V opportunity and failed to

16   account for mitigating compensation by excluding the equity Mr. Mewawalla received from his

17   current employer.  He also failed to estimate and account for the probability that Mr. Mewawalla

18   ultimately would not have reached any agreement with E&V.  *See, e.g.*, *Crowley v. EpiCept*

19   *Corp.*, 2015 WL 13827908, at *4 (S.D. Cal. Mar. 11, 2015) (faulting expert for "failing to assign

20   any risk to FDA approval" of the plaintiff's product).  These errors contravene established

21   economic methodology and the legal requirement that Plaintiff's actual mitigating compensation

22   must be considered.  *See Currieri v. City of Roseville*, 50 Cal. App. 3d 499, 504, 506 (1975).

23   The jury could not permissibly rely on his opinion, which does not reliably establish that there

24   were any damages at all.

25        **F.    <u>Mr. Mewawalla Is Not Entitled to Prejudgment Interest on Fraud Damages.</u>**

26        If the Court does not grant judgment as a matter of law for Defendants on Mr.

27   Mewawalla's fraud claims, *see infra* at Parts I.A–D, it should nonetheless hold that Mr.

28   Mewawalla cannot recover prejudgment interest on his fraud damages.

1    California Civil Code § 3288 provides that "in every case of . . . fraud . . . interest may be

2    given, *in the discretion of the jury*" (emphasis added). Courts may not grant PJI if the jury is the

3    finder of fact. *Bullis v. Sec. Pac. Nat'l Bank*, 21 Cal. 3d 801, 814 n. 16 (1978); *Barry v. Raskov*,

4    232 Cal. App. 3d 447, 457 (1991). Thus, in cases where the question of prejudgment interest

5    was not submitted to the jury, courts have concluded that no interest could be awarded on fraud

6    damages. *Stein v. S. Cal. Edison Co.*, 7 Cal. App. 4th 565, 572 (1992). For example, in

7    *Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701, *3 & n. 21, *5 (C.D. Cal. Feb. 7, 2023),

8    the trial court held "that it lacks the authority to award prejudgment interest" even though the

9    parties had agreed in a pretrial conference that any prejudgment interest issues would be handled

10   by the court. And in *W. Air Charter, Inc. v. Schembari*, 2019 WL 6998789, *4 (C.D. Cal. Mar.

11   7, 2019), the "Court agree[d]" with "Defendants' . . . argument . . . that prejudgment interest on

12   tort claims may not be awarded after the verdict when the question was not submitted to the

13   jury."

14       Mr. Mewawalla has waived the argument that he is owed prejudgment interest on his

15   fraud damages because he has not included a jury instruction on that issue. Case law is clear that

16   "a jury instruction which is incomplete or too general must be accompanied by an objection or

17   qualifying instruction to avoid the doctrine of waiver." *Bishop v. Hyundai Motor Am.*, 44

18   Cal.App.4th 750, 760 (1996); *see also Carrau v. Marvin Lumber & Cedar Co.*, 93 Cal.App.4th

19   281, 298-97 (2001) (same). Because Mr. Mewawalla did not submit any objection or qualifying

20   instruction before the jury instructions were finalized in the Court's January 24 Order, *see* ECF

21   No. 281, he has waived any argument that the jury should consider prejudgment interest on his

22   claim for fraud damages. Indeed, the Court denied his untimely request for such an instruction in

23   its February 10 Order. *See* ECF No. 299. The Court should hold as a matter of law that Mr.

24   Mewawalla cannot recover prejudgment interest on his fraud claims.

25       Even if Mr. Mewawalla did not waive his entitlement to prejudgment interest, the

26   evidence fails to support that claim. The evidence established that any judgment that approaches

27   the sums he is seeking on his fraud claims would be more than sufficient to compensate him,

28   without the need to add prejudgment interest.

1

### G.    The Economic Loss Doctrine Bars Mr. Mewawalla's Fraud Claims.

2         Mr. Mewawalla's fraud claims are based entirely on promises Mr. Mewawalla believed

3    would be conditions of his employment at Freedom and, allegedly, Xpanse.  "[T]he fundamental

4    rule in California is that no tort cause of action will lie where the breach of duty is nothing more

5    than a violation of a promise which undermines the expectations of the parties to an agreement."

6    *Oracle USA, Inc. v. XL Global Servs., Inc.*, 2009 WL 2084154, *4 (N.D. Cal. 2009) (addressing

7    whether a promissory fraud claim is subject to the economic loss rule). *See also UMG*

8    *Recordings Inc. v. Global Eagle Entertainment, Inc.*, 117 F. Supp. 3d 1090, 1105-1106 (C.D.

9    Cal. June 22, 2015) (applying economic loss rule even though plaintiffs accused defendant of

10   making oral promise it did not intend to keep).

11   ## II.    MR. MEWAWALLA'S CONTRACT CLAIMS (COUNTS 5 AND 6) FAIL AS A

12   MATTER OF LAW.

13   ### A.    Mr. Mewawalla's Contract Was Induced by Fraud

14        "One who has been induced to enter into a contract by false and fraudulent

15   representations . . .  may set up such damages as a complete or partial defense if sued on the

16   contract by the other party."  *Grady v. Easley*, 45 Cal. App. 2d 632, 642 (1941).  The elements of

17   that defense are set forth in Judicial Council of California Civil Jury Instruction No. 335, and all

18   are easily satisfied here.  The evidence shows that Mr. Mewawalla knowingly misrepresented

19   key details of his prior employment at Zenplace when he was seeking employment with

20   Freedom.  *See* Ex. 504.  This included (among other things) its revenue growth, *id.* at -004, its

21   number of employees, *id.* at -001, and his salary, *id.* at -001.  Stanley Middleman testified at trial

22   that he never would have hired Mr. Mewawalla had he known those representations were false.

23   *E.g.*, Trial Tr. 365:17-25 (salary under $95,000); 366:21-367:10 (25 employees); 368:4-13 (30x

24   revenue growth).  The Court should therefore hold as a matter of law that his contract with

25   Freedom and any implied contract with Xpanse is void.

26   ### B.    Mr. Mewawalla Had No Contract with Xpanse.

27        The Employment Agreement provided that Freedom would employ and pay Mr.

28   Mewawalla "until terminated or until such time as [he] enters" a written contract with Xpanse

1   "in a form that is mutually agreeable to the Parties."  Ex. 1 § 1; see also *id.*, § 10 (amendments to

2   Agreement must be in writing).  Once Xpanse (i) was "created and operational," *and* (ii)

3   "following mutual agreement between [Mr. Mewawalla] and [Xpanse] on a new agreement in

4   the form attached as Exhibit A," his employment with Freedom would end and he would be

5   employed by Xpanse as its "President."  *Id.* ¶ 3 (referring to the "[t]ermination of the Executive's

6   employment with [Freedom] in order for the Executive to begin employment with [Xpanse]").

7   Indeed, the Agreement specifically contemplated that the transfer might not occur, and gave Mr.

8   Mewawalla a remedy if a year passed and he were still employed with Freedom—he would have

9   "Good Reason" to terminate the Agreement and collect the lucrative severance he negotiated.

10  Ex. 1, ¶ 8.f.(iv)(8).  The contract's structure makes clear that Mr. Mewawalla would never be

11  simultaneously contracted with both companies.  Nor was he.  Freedom alone at all times paid

12  his salary and benefits.

13          The Court should therefore hold as a matter of law that Mr. Mewawalla had no

14  employment contract with Xpanse.  It is undisputed that there was no "mutual agreement"

15  between Mr. Mewawalla and Xpanse on a contract for his employment.  *See* Stipulated Fact No.

16  14 ("The parties did not sign any version of the draft employment agreement with . . . Xpanse.").

17  Negotiations over his employment with Xpanse were ongoing in the fall and winter of 2020, and

18  multiple drafts were exchanged.  *See, e.g.*, Exs. 556, 557.  Indeed, the first allegation in Count 5

19  of Mr. Mewawalla's complaint agrees that Freedom never transferred his employment "to

20  Xpanse" as he says it was supposed to.  Compl. ¶ 178(A), *see also* ¶¶ 51-54.  If, as he

21  acknowledges, his employment was never transferred to Xpanse, he plainly cannot sue it for

22  breaching an employment contract that did not yet exist.  Mr. Mewawalla's breach claim lies

23  against Freedom alone.  Xpanse, a "non-party[] or nonsignatory[] to a contract, is not liable for a

24  breach of that contract."  *Int'l Union of Operating Eng'rs, Local 3 v. Zurich N. Am.*, 2006 WL

25  2791156, at *3 (E.D. Cal. Sept. 27, 2006).[1]

26

27  [1] To the extent that Mr. Mewawalla is arguing that Xpanse's conversion from a C corporation to
    an LLC was in and of itself a breach of his contract, that argument also must fail.  In addition to
28  the fact that Mr. Mewawalla had no contract with Xpanse, a renaming or reorganization of a
    party to a contract does not result in a breach of that contract.  *See, e.g.*, *Brentsun Realty Corp. v.*

-16-

C.    **The Claim Against Xpanse for Breach of the Covenant of Good Faith and Fair Dealing (Count 6) Fails as a Matter of Law.**

It is settled that there can be no covenant of good faith and fair dealing absent a contract. "The prerequisite" for such a claim "is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." *Smith v. City & Ct. of San Francisco*, 225 Cal. App. 3d 38, 49 (1990). Because the evidence established that Mr. Mewawalla did not have a contract with Xpanse, he has no valid claim against Xpanse for breach of the covenant.

Moreover, even if he had a contract with Xpanse, Mr. Mewawalla has presented no evidence of any breach other than a breach of the contract itself. "For a breach of the covenant of good faith and fair dealing to be a freestanding cause of action, the plaintiff must identify how the defendant breached the covenant other than through violating an express term in the agreement." *ShopKo Stores Oper. Co., LLC v. Balboa Cap. Corp.*, 2017 WL 3579879, at *9 (C.D. Cal. July 13, 2017). Mr. Mewawalla's claim boils down to the assertion that there was no "Cause" to terminate him and therefore he is owed severance payments, which is the substance of the contract he alleges. That is insufficient to support a claim for breach of the covenant. *See Careau & Co. v. Security Pacific Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (Cal. Ct. App. 1990) (applying California law) (affirming court's sustaining demurrer on count because party "alleged nothing more than a duplicative claim for contract damages").

D.    **The Evidence Does Not Permit a Jury Finding that Defendants Lacked "Cause."**

The Employment Agreement's definition of "Cause" was bespoke and robustly negotiated. *See* Exs. 11, 12, 220, 514, 516, 521, 524, 528, 529, 1 (chronological list of contract redlines exchanged between Mr. Mewawalla and Freedom's attorneys, including three rounds of negotiation over the definition of "Cause"). Under the contract, Mr. Mewawalla had no right to severance payments if there was "a *finding by the CEO* [Mr. Middleman]" that Mr. Mewawalla:

---

*D'Urso Supermarkets, Inc.*, 582 N.Y.S. 2d 216, 217 (1992) (no breach where "[o]nly [the] corporate form was affected, not the corporate property").

engaged in any conduct that is, or is *reasonably likely to be*, materially harmful to the business, interests *or reputation of the Company*, provided that, if such conduct is, in the reasonable judgment of the Company, curable, [Mr. Mewawalla] was given prior written notice of such conduct and was granted a reasonable opportunity of not less than fifteen (15) days to cure any such conduct.

Ex. 1, § 8(f)(i) (emphasis added).

Mr. Mewawalla and his employment counsel fought against defining "Cause" in this way precisely because it was a subjective standard that turned on Mr. Middleman's state of mind. Trial Tr. 404:2–405:24 (testimony of Mr. Palao-Ricketts).  Defendants would not budge, and Mr. Mewawalla relented.

The burden of proving breach falls entirely on Mr. Mewawalla.  Freedom is not required to prove that it had "Cause" to terminate him:  Mr. Mewawalla must prove that it did not.  In other words, Mr. Mewawalla must prove that Stan Middleman *never* concluded that Mr. Mewawalla had engaged in conduct that was reasonably likely to be materially harmful to the business, interests, or reputation of the Company, and that he *never* concluded that Mr. Mewawalla's conduct was incurable.

The evidence establishes that such a determination was made, *see* Trial Tr. 360:9-21, 339:7-10, and that it was amply supported by the record.  *See* Ex. 61 ("The performance and leadership are abysmal, and now we're getting serious complaints about his conduct at work which is exposing the company to legal liability.  [¶]  Regarding feedback from the team, when asked about challenges in the workplace, <u>88%</u> of those surveyed responded negatively."); Trial Tr. 315:4-13 (Stan Middleman: "Freedom is very much a business-to-business entity . . . that's why these relationships that are so valuable were really important to me.  And I had a trust that those relationships would not be hurt or tarnished in any way.  And the reputational part of this was critical in my decision-making."); 360:18-21 (Stan: "[T]o have the reputation of a brand-new company tarnished and the reputation of Freedom tarnished by an inability to work cooperatively with one another was completely unacceptable."); 525:18–527:23 (Erik Anderson: "[Y]ou only get one chance to make a first impression; and if that first impression is a catastrophic failure that disappoints customers and loses a bunch of money and ends up with, you know, frustrated or disillusioned employees and tarnished reputations, customers aren't going to

-18-

1    give you a second chance."); 925:12-15 (Bob King: "[I]t was very important to Freedom, as a . . .

2    successful company, that its reputation be maintained, and so things that caused harm to the

3    reputation of the company were of significant importance to Freedom.").  Mr. Mewawalla has

4    not offered any evidence, let alone evidence that a reasonable jury could rely on, that supports a

5    contrary conclusion about Stan Middleman's state of mind.

6        The contract provides, alternatively, that "Cause" may refer to a finding by Mr.

7    Middleman that Mr. Mewawalla "materially breached [the] Agreement," provided that the

8    breach was not curable.  Ex. 1, § 8(f)(i)(1).  Mr. Mewawalla has admitted that if he "didn't show

9    up" that would "effectively breach[] the agreement."  Trial Tr. 617:9-12.  The evidence shows

10   that Mr. Mewawalla refused to meet with colleagues and Xpanse customers.  *E.g.*, Ex. 61-004-

11   05; Ex. 62 (missed meeting with Ellie Mae).  Plaintiff's tacit concession that he breached the

12   agreement in this manner merits judgment as a matter of law on his contract claims.

13       Mr. Mewawalla's argument that his termination was motivated by jealousy among a

14   group of "Freedom insiders" is factually specious, but it is also legally irrelevant.  His sole

15   evidence that Mr. Staub and Mr. Anderson were envious of him is the fact that he received a

16   generous compensation package, but it is undisputed that Mr. Staub and Mr. Anderson were also

17   well-compensated.  Mr. Mewawalla's explanation is a transparent attempt to avoid the only

18   explanation that is supported by contemporaneous, corroborating evidence from Mr.

19   Mewawalla's supervisors and employees:  Mr. Mewawalla was a disastrous failure at the job of

20   running Xpanse.  Moreover, the testimony of Kiran Sahota established beyond doubt that there is

21   no "insider" bias against "outsiders" at Freedom.  Trial Tr. 964:1-9.  Regardless, the

22   determinative question at the heart of the Cause inquiry was whether "*the CEO*"— i.e., Stan

23   Middleman— determined that Mr. Mewawalla was reasonably likely to harm the interests and

24   reputation of the company, and whether the problems were curable.

25       Mr. Mewawalla has argued that his termination was pretextual and that he was actually

26   terminated because he objected to certain actions by Defendants.  The ev` `idence does not

27   support these allegations.  There is no evidence that Stan Middleman considered any of these

28   factors in reaching his decision to terminate Mr. Mewawalla.  On the contrary, the evidence has

refuted them.  His contention that there was a "double valuation scheme" was eviscerated by multiple witnesses, including Robert King and Richard Harroch.  *See* Trial Tr. 940:2-10 (King); 977:1-6 (Harroch).  His allegation that Xpanse's desire to negotiate a repurchase provision in his proposed equity agreement was unusual in Silicon Valley was fatally undermined by the testimony of Michael Kadlec.  *Id.* at 460:1-6.  Finally, his contention that the conversion of Xpanse to an LLC was harmful to his or any other employee's interests was rebuffed, also by Harroch.  *Id.* at 974:11-25.

    E.    **The Evidence Does Not Permit a Jury Finding of a 150% Bonus Target for Severance.**

        The Employment Agreement provides that if Mr. Mewawalla were terminated without cause, he would be due one year of base salary plus "the Executive's annual Performance Discretionary Bonus calculated at 100% of Base Salary."  Ex. 1, § 8(d)(i).  The Agreement also states that "Any amendment to this Agreement shall be made in writing and signed by the Parties hereto."  Ex. 1, § 10.  The parties have stipulated to the fact that the Agreement was never amended in writing.  *See* Stipulated Fact No. 15.

        Under these facts, the bonus target is clear, but in an attempt to inflate his damages, Mr. Mewawalla alleges without any corroboration that this bonus target had been moved upwards to 150% after the contract was executed.  Ex. 372 at 60.  Mr. Mewawalla points to a proposal that he drafted, Ex. 41, but that document fails to support his claim.  Even a cursory review shows that the bonus structure contemplated there did not apply to Mr. Mewawalla, who was not even mentioned in the document.  The bonus structure was for engineers, not Mr. Mewawalla.  *See id.* (bonus timeline requires "Employee" to "Complete Self Review," followed by "Manager" and "Executive Review and Approval").  That is not enough to create a triable issue of fact.  *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997); *Anderson*, 477 U.S. at 252.  Therefore, the court should hold as a matter of law that Mr. Mewawalla's severance damages cannot be calculated based on a 150% bonus target.

    F.    **Mr. Mewawalla Is Not Entitled to Additional PTO/FHL Benefits.**

        Mr. Mewawalla's claim for unused paid time off and floating holiday leave (PTO/FHL)

1   contradicts the relevant provision of the Freedom Mortgage Employee Handbook, which states:

2   "If an employee separates from the Company (regardless of reason) accrued, unused PTO or

3   unused Floating Holiday *will not be eligible for cash payout; it will be forfeited*."  Ex. 607-107

4   (emphasis added).  Although Freedom's California Supplemental Employee Handbook provides

5   that California employees "will receive payment for any unused, accrued paid time off," Ex.

6   605-011, that provision does not apply to Mr. Mewawalla.  The Court has already held at

7   summary judgment that Mr. Mewawalla was a resident of Washington at the time of his

8   termination, ECF No. 160 at 23-24, and its Pretrial Order held that "the California Handbook's

9   calculation does not apply to Plaintiff since he was not a California-based employee," ECF No.

10  265 at 36.  Mr. Mewawalla has offered no alternative basis for his PTO/FHL claims.  Therefore,

11  the Court should hold as a matter of law that he cannot recover damages related to the

12  "underpayment" of PTO or FHL.  *See* Ex. 416 at 10.

13      **G.    Mr. Mewawalla Is Only Entitled to a Prorated Portion of His Discretionary**

14              **Bonus under Sections 8(d)(i) and 8(d)(iv) of the Employment Agreement.**

15          Notwithstanding the Court's January 15, 2025 Amended Pretrial Conference Order, ECF

16  No. 265 at 34, Defendants submit that Mr. Mewawalla is only entitled to a prorated portion of

17  the Performance Discretionary Bonus if he were found to be terminated without cause.  Although

18  section 8(d)(i) of the Employment Agreement provides that the Discretionary Bonus is to be

19  calculated at 100% of the target (i.e., $1.5 million for an entire year), it should be read in

20  conjunction with section 8(d)(iv), which provides that only a prorated portion of the

21  Discretionary Bonus is due to the Executive "for the Performance Year in which the separation

22  occurs."  Ex. 1, § 8(d)(iv).  In other words, when the Executive is terminated before the end of

23  the first Performance Year, section 8(d)(i) defines the benchmark "Performance Discretionary

24  Bonus" value that should be prorated pursuant to section 8(d)(iv).  Therefore, Mr. Mewawalla is

25  only entitled to a prorated portion of his $1.5 million bonus under sections 8(d)(i) and 8(d)(iv).

26  **III.    The Court Should Grant Judgment as a Matter of Law on All Claims Based on**

27          **Unclean Hands.**

28          The evidence presented at trial establishes that Mr. Mewawalla used highly misleading

and deceptive representations to obtain his position at Freedom Mortgage.  There was no basis for Mr. Mewawalla's claim that ZenPlace "had as many as 4200 employees globally."  Ex. 504. The deposition testimony of Eric Holly, which Mr. Mewawalla corroborated at trial, demonstrated that ZenPlace never had more than 25 employees.  Trial Tr. 751:15-18 (Rahul Mewawalla: 25 employees "sounds about right").  Nor was he "use[d] to $750k plus bonus and incentive- all in 1-2 Million."  Ex. 504.  Instead, the undisputed evidence demonstrates that he earned an average salary considerably lower than that.  *Id.* at 750:6-8 ("Q. Now, your Zenplace salary was much lower than that correct? A: I think it was close to zero.").  When Mr. Mewawalla claimed that he led "30x revenue growth," he omitted the fact that the revenue had fallen precipitously at the time he sought employment with Freedom.  *Id.* at 569:1-22; 753:15- 754:2.

Those intentional misrepresentations went to the heart of Mr. Mewawalla's employment dispute.  His lies about his success as a manager were the reason he received an offer to work with Defendants.  *Id.* at 365:13–367:11 (Q: "What if the truth were that Zenplace never had more than 25 employees?  Would that have made a difference in your decision to hire him?"  Stan Middleman: "He doesn't get the job.").

"Although the application of the unclean hands defense is usually a question of fact, under appropriate circumstances it may be determined as a matter of law."  *E. W. Bank v. Rio Sch. Dist.*, 235 Cal. App. 4th 742, 752 (2012); *Farahani v. San Diego Cmty. Coll. Dist.*, 175 Cal. App. 4th 1486, 1496 (2009) ("The decision to apply the unclean hands defense is a matter within the trial court's discretion.").  In determining whether a particular misconduct constitutes unclean hands, California courts consider "(1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries."  *Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 979 (1999).

All three factors favor Defendants.  California courts have applied the unclean hands defense to dismiss employment cases when a plaintiff misrepresented their background to obtain their position with a defendant.  *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620 (1995), *as modified on denial of reh'g* (June 29, 1995) (affirming summary judgment

dismissal of wrongful termination action where plaintiffs omitted information about their criminal convictions to obtain positions with defendant); *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833 (1998) (affirming summary judgment dismissal of wrongful discharge and breach of contract claims where plaintiff misrepresented her immigration status in her application).  The nature of his misconduct—dishonesty that created a substantial risk of harm to a company's reputation—is the type of bad faith action California courts regard with "great seriousness"; *see Murillo*, 65 Cal. App. 4th at 844-45.  And most importantly, Mr. Mewawalla's "misrepresentation went to the heart of the employment relationship and related directly to [his] . . . claims." *Id.*, at 845.  As in *Camp* and *Murillo*, Mr. Mewawalla's inequitable conduct was the but-for cause of his employment, and therefore bore a direct relationship to his alleged injuries.  This case presents a direct application of the principle at the heart of the unclean hands doctrine: the courthouse doors are "close[d] . . . to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Burton v. Sosinsky*, 203 Cal. App. 3d 562, 573 (1988).  Mr. Mewawalla cannot show any bad faith on the part of the Defendants, let alone bad faith that compares to his own.  Accordingly, the Court should rule as a matter of law that the unclean hands doctrine bars his claims.

Finally, notwithstanding the Court's January 24, 2025 Order, ECF No. 281 (Final Jury Instructions), Defendants also submit that the evidence of Mr. Mewawalla's misconduct operates as a complete bar to recovering any damages under the after-acquired evidence defense.  *See* ECF No. 279 at 2-3.

## IV.    Mr. Mewawalla's Damages Are Limited to the Severance Benefits.

Mr. Mewawalla agreed that "as a condition to [his] receipt of the [severance] benefits" he has to execute "a severance agreement and general release of claims substantially in the form" set forth in Exhibit D attached to the Agreement, under which he "UNCONDITIONALLY" releases "ALL CLAIMS, LIABILITIES, DEMANDS AND CAUSES OF ACTION … as well as all contractual obligations not expressly set forth in [the Severance] Agreement," including "all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing, including claims arising out of an … incentive compensation plan

-23-

applicable to Executive's employment with the Company." Ex. 1, at Ex. C § 4(a). After his alleged claims accrued, Mr. Mewawalla actually provided Freedom with the required executed release within a month of his termination. Accordingly, in pursuing the Severance Benefits, Mr. Mewawalla agreed to release all claims, and he is thus barred from seeking relief beyond that. *See, e.g.*, *Brandt v. Verizon Comms., Inc.*, 2019 WL 4082562, at *3-*7 (N.D. Cal. Aug. 29, 2019).  At summary judgment, the Court found the release unenforceable.  If that is true, however, Mr. Mewawalla failed to satisfy a condition precedent to receiving severance benefits, thereby barring his claim to those benefits. *See In re Vertis Holdings, Inc.*, 2011 WL 6739518, at *2 (Bankr. S.D.N.Y. Dec. 21, 2011).

## V.    <u>Mr. Mewawalla Is Not Entitled to Punitive Damages</u>

Punitive damages are only appropriate where a plaintiff can prove by clear and convincing evidence that the defendant acted with malice, oppression, or fraud.  Cal. Civ. Code § 3294.  There is no evidence—let alone *clear and convincing* evidence—that Defendants acted in that manner.  The evidence shows that Stanley Middleman and other key figures involved in Mr. Mewawalla's termination acted in good faith and wanted him, and by extension Xpanse, to be successful.  *E.g.*, Trial Tr. 338: ("I wanted to be successful. . . . I didn't know [Mr. Mewawalla]. I had no grudge against him. I didn't have a preconceived notion that he was some character I had to get even with."); 557:25 (Anderson: "I wanted it to work"); TX 538 (Greg: "I really want to see things succeed").

**CONCLUSION**

For the reasons stated above, the Court should grant judgment as a matter of law for the Defendants on all of Mr. Mewawalla's remaining claims.

DATED: February 11, 2025                    Respectfully submitted,

                                      By:   */s/* Paul B. Gaffney
                                            _____

**DUANE MORRIS LLP**                  **WILLIAMS & CONNOLLY LLP**
Stephen H. Sutro                      Paul B. Gaffney
Robert J. Nolan                       George A. Borden (admitted *pro hac vice*)
David A. Goldstein                    Ricardo Leyva (admitted *pro hac vice*)
                                      Ikenna Ugboaja (admitted *pro hac vice*)

                                      Attorneys for Defendants