**Volume 5**

**Pages 1001 - 1183**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| RAHUL MEWAWALLA, an individual,<br><br>Plaintiff,<br><br>VS.<br><br>STANLEY C. MIDDLEMAN, et al.,<br><br>Defendants. | **NO. 3:21-CV-09700-EMC** |

San Francisco, California
Tuesday, February 11, 2025

# TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES**:

For Plaintiff:

BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067

**BY: EKWAN E. RHOW, ATTORNEY AT LAW**
**OLIVER ROCOS, ATTORNEY AT LAW**
**BRANDON R. TEACHOUT, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**: (CONTINUED)

For Defendants:

WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
BY: **PAUL B. GAFFNEY, ATTORNEY AT LAW**
**RICARDO LEYVA, ATTORNEY AT LAW**
**IKENNA N. UGBOAJA, ATTORNEY AT LAW**

DUANE MORRIS LLP
One Market Plaza
Spear Street Tower, Suite 2000
San Francisco, California 94105
BY: **ROBERT J. NOLAN, ATTORNEY AT LAW**
**STEPHEN H. SUTRO, ATTORNEY AT LAW**

Also Present: **Rahul Mewawalla**
**Gregory Middleman**
**Candi Hauff, Trial Technician**
**Ryan Knecht, Trial Technician**

# I N D E X

Tuesday, February 11, 2025 - Volume 5


| | PAGE | VOL. |
|---|---|---|
| Defense Rests | 1067 | 5 |
| Jury Instructions | 1070 | 5 |
| Closing Argument by Mr. Rhow | 1087 | 5 |
| Closing Argument by Mr. Gaffney | 1110 | 5 |
| Rebuttal Argument by Mr. Rhow | 1143 | 5 |
| Final Jury Instructions | 1172 | 5 |
| Jury Question | 1180 | 5 |

| **DEFENDANTS' WITNESSES** | PAGE | VOL. |
|---|---|---|
| **G. MIDDLEMAN, GREGORY (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1007 | 5 |
| Direct Examination resumed by Mr. Gaffney | 1007 | 5 |
| Cross-Examination by Mr. Rhow | 1032 | 5 |
| Redirect Examination by Mr. Gaffney | 1037 | 5 |
| **MORSELLI, GINA** | | |
| (SWORN) | 1039 | 5 |
| Direct Examination by Mr. Gaffney | 1039 | 5 |
| Cross-Examination by Mr. Rocos | 1051 | 5 |
| **GUAY, WAYNE** | | |
| (SWORN) | 1055 | 5 |
| Direct Examination by Mr. Leyva | 1056 | 5 |
| Cross-Examination by Mr. Rocos | 1062 | 5 |


## E X H I B I T S


| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 68 | | 1017 | 5 |
| 537 | | 1009 | 5 |
| 538 | | 1014 | 5 |
| 587 | | 1035 | 5 |

**Tuesday - February 11, 2025** **8:26 a.m.**

**P R O C E E D I N G S**

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** All right. Have a seat, everyone. Good morning.

**THE COURTROOM DEPUTY:** The court is calling the case Mewawalla vs. Middleman, et al., Case Number 21-9700.

Counsel, please state your appearance for the record, beginning with the plaintiff.

**MR. RHOW:** Good morning, Your Honor. Ekwan Rhow and team for plaintiff.

**THE COURT:** All right. Good morning.

**MR. GAFFNEY:** Good morning, Your Honor. Paul Gaffney and my team on behalf of the defense.

**THE COURT:** All right. Good morning, everyone.

So we have our finalized instructions here, and you've all reviewed, so we made the various changes.

I know there were two other additional requests, which I have denied as either unnecessary and/or untimely. So we're going to go with what we had and what was settled upon except for the deletion of the counterclaim in light of the defendants' position to withdraw the counterclaim and the one clarification about the duplicate damages matter.

**MR. GAFFNEY:** May I be heard, Your Honor?

**THE COURT:** Yeah.

**MR. GAFFNEY:** We will be filing -- making another JMOL motion at the close of the evidence, and we'll be filing that with the Court.

**THE COURT:** Okay.

**MR. GAFFNEY:** And I know you'll consider it in due course.

**THE COURT:** Yes.

**MR. GAFFNEY:** I do think -- I would like to raise orally the question of punitive damages. I just don't -- they've got to show, by clear and convincing evidence, malice, oppression for activity that occurred -- had to have occurred sometime before the contract was signed; and there's just insufficient evidence to put that question to the jury.

And I'd ask you, for that reason, to remove the punitive damages instruction and take that part of the verdict form out.

**THE COURT:** All right. I take it that's opposed?

**MR. ROCOS:** Yes, Your Honor.

**THE COURT:** Okay. Well, I'll take that under submission as well. I don't think it's appropriate at this point to -- necessary to remove it from the jury's consideration. There's not any new evidence that's coming in at this point. The evidence that's come in has already come in. So there's no prejudice in terms of additional evidence that might be admitted solely for purposes of punitive damages.

So there's no reason for me to necessarily rule on that now, but I will take that motion under submission.

**MR. GAFFNEY:** Thank you, Your Honor.

None of the remaining witnesses have any bearing on the punitive damages question.

**THE COURT:** Yeah. Yeah, that's what I thought.

Okay. So remind me. We were in the process of direct -- were we direct or cross yesterday?

**MR. GAFFNEY:** The direct examination of Greg Middleman.

**THE COURT:** Yeah, we're still on direct. Okay.

And you have one more -- two more witnesses after this?

**MR. GAFFNEY:** Yes, and they're brief.

**THE COURT:** Okay.

All right. Well, I think the jury, hopefully, is here and we can get started on time.

I take it there's been no further settlement discussions in the interim.

**MR. GAFFNEY:** My phone has been silent.

**THE COURT:** Okay. Well...

**MR. RHOW:** As has mine.

**MR. GAFFNEY:** Would you like Mr. Middleman --

**THE COURT:** We can talk about that after.

Are they here?

**THE COURTROOM DEPUTY:** They're ready to go.

**THE COURT:** They're ready to go.

**MR. GAFFNEY:** Would you like Mr. Middleman to --

**THE COURT:** Yeah, why don't you have him come on up and take the stand.

(Witness resumes the stand.)

**THE COURTROOM DEPUTY:** All rise for the jury.

(Proceedings were heard in the presence of the jury.)

**GREGORY G. MIDDLEMAN,**

called as a witness for the Defendants, having been previously duly sworn, testified further as follows:

**THE COURT:** Okay. Have a seat. Good morning.

Welcome back, members of the jury, and thank you again for being so prompt and timely. I really appreciate that. It's helped us stay on schedule, and we are on schedule.

And as you'll recall, Mr. Greg Middleman was testifying on direct, and we're going to pick up where we left off yesterday.

So you have the floor, Mr. Gaffney.

**MR. GAFFNEY:** Thank you, Your Honor.

**DIRECT EXAMINATION (resumed)**

**BY MR. GAFFNEY:**

**Q.** Good morning, Mr. Middleman.

**A.** Good morning.

**Q.** Rahul's lawyer has argued in this case that Xpanse was supposed to be an independent company. You heard that -- those statements?

**A.** Yes, I heard that.

**Q.** Okay. Is it an independent company?

**A.** Yes.

**Q.** What's your basis for saying that?

**A.** It's part of Archwell, which is completely separate from Freedom Mortgage.

**Q.** Is there a close connection between the two companies, between Xpanse and Freedom?

**A.** There is some kind of ownership between the families, but they're unrelated. They're not the same business.

**Q.** How about -- aside from ownership, how about just the relationship? Is there a commercial relationship between them?

**A.** There is.

**Q.** And what's that relationship?

**A.** Mostly a customer, Freedom being the customer of the Archwell businesses, including Xpanse.

**Q.** And where does -- during Rahul's time at the company, where did Xpanse get its funding?

**A.** Mostly through Freedom, and some additional funding from Archwell.

**Q.** Okay. Did Rahul ever complain about the close connection funding the relationship with your dad with Freedom as a customer, did he ever complain about that to you?

**A.** No. He viewed that as a positive. He pitched it to all of the recruits that that was a positive. That was one of our

biggest selling points: We had this large first customer that could provide this funding for a long period of time.

**MR. GAFFNEY:** I'd like to admit and publish Exhibit 537.

**THE COURT:** Okay. Any objection?

**MR. RHOW:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 537 received in evidence.)

**BY MR. GAFFNEY:**

**Q.** Could you tell the jury what this document is?

**A.** It looks like it is a PowerPoint presentation for recruits.

**MR. GAFFNEY:** Okay. And could you turn to the first page of the PowerPoint, Ryan, please.

**MR. KNECHT:** The first page?

**MR. GAFFNEY:** The first page.

**BY MR. GAFFNEY:**

**Q.** What was the purpose of this presentation, Mr. Middleman?

**A.** The purpose was to bring transparency to our new hires and explain to them: Here is what Xpanse does; here is how Xpanse is funded; here's the relationship with Freedom Mortgage, et cetera, so that they would have that clarity.

**Q.** Okay. If you could talk more slowly and a little bit louder and maybe slower. Sorry.

**A.** Sorry.

The goal of this was to bring transparency to our new hires so that when they started at Xpanse, they could understand here's what Xpanse is, what Xpanse does, how it fits into Archwell, and the relationship with Freedom as the first customer.

**Q.** By the way, have you ever testified in court before at a trial?

**A.** I have not.

**Q.** Nerve-racking sometimes?

**A.** A little bit.

**Q.** Yeah. Did Rahul have any input into this presentation?

**A.** Yes. We worked on it together.

**MR. GAFFNEY:** Okay. Could you turn to page 6, please, Ryan.

**BY MR. GAFFNEY:**

**Q.** Could you tell the jury what Xpanse was trying to communicate with this slide?

**A.** So with this, we were trying to explain how this is the perfect mixture of a start-up culture, while also having advantages that start-ups typically don't have by having a built-in first customer in Freedom Mortgage and also having the funding that would come from those revenues of Freedom Mortgage, along with the backing of the funding that we would get from Archwell.

**Q.** When you testified earlier that Rahul used the lack of

independence from Freedom as a selling point, is this what you're referring to?

**A.** Yes. He -- it was -- the lack of independence?

**Q.** Well, the close ties between the two companies.

**A.** Yes. He looked at that as a positive, and that's what we talked about every week that we brought in new hires, when we explained to them how the business worked.

**Q.** So was Rahul aware of Archwell's ownership of Xpanse?

**A.** Yes.

**Q.** He testified yesterday on cross-examination that he was not aware that you and your brother were the owners of Archwell. Is that accurate?

**A.** That's completely inaccurate. I explained to him the structure on many occasions. We even had town halls with all of our employees, that he was a part of, where I explained what Archwell is, what the ownership is in Archwell, the relationship with Freedom. We had my brother attend those too, and he clarified and answered questions. So it would be impossible for him not to know that.

**Q.** Now, Rahul, was he involved in making pitches to recruits?

**A.** Yes.

**Q.** Okay. When he was doing this, was he himself an Xpanse employee?

**A.** No.

**Q.** Why wasn't he?

**A.** He refused to move over.
**Q.** What do you mean by that?
**A.** I had asked him on several occasions to become an Xpanse employee. We had set up the entity. We had started hiring employees. And for whatever reason, he would not make the move over. And I thought it was very harmful to the business.
And employees had continuously asked me, "Why won't he move over? It's not on his LinkedIn. It makes it harder to recruit."
And he wouldn't do it.
**Q.** How many occasions would you estimate that you brought this issue up with him?
**A.** I'd say between five and ten.
**Q.** Okay. In any of those conversations, did he ever say, "I'm already an Xpanse employee"?
**A.** No.
**Q.** Did he ever explain why he refused to move over?
**A.** No.
**Q.** Okay. Now, you mentioned that your first impression of Rahul was positive; is that right?
**A.** That's right.
**Q.** You were enthusiastic about working for him?
**A.** Yes.
**Q.** Hoping he would be a mentor?
**A.** Absolutely.

**Q.** Okay. Did your impression of him change over time?
**A.** Yes. It changed quite a bit.
**Q.** How did it change?
**A.** I started to see things and get feedback from employees that worked at Xpanse and from stakeholders at Freedom Mortgage that were the customer, and I started to see the way that he went about running the business and the different things that he demanded be part of Xpanse.

For example, he said that we needed the best health benefits around; we needed 401(k) matching; we needed to give out health and wellness bonuses. There were a lot of things that were very uncommon. And he needed the best of the best, and he claimed that was for our ability to recruit. And it just proved, over time, that those things weren't actually needed.

The feedback that I was getting from employees at Freedom Mortgage that he was supposed to be working with was consistently negative. The CIO at Freedom at the time told me that he thought Rahul had no understanding of technology whatsoever after an encounter with him.

So there were a lot of these meetings and a lot of this feedback that I was getting, and it was very consistently negative.

**MR. GAFFNEY:** I'd like to admit and publish Exhibit 538.

**MR. RHOW:** No objection.

**THE COURT:** Okay. Admitted.

(Trial Exhibit 538 received in evidence.)

**BY MR. GAFFNEY:**

**Q.** Mr. Middleman, what is this document that the jury is looking at now?

**A.** It's a Microsoft Teams message between Chris Staub and I.

**Q.** So it's like you type something and it pops up on a screen and then he types something back?

**A.** Yes.

**Q.** And it gets captured in a document?

**A.** That's right.

**Q.** Is this a program that Freedom uses?

**A.** Yes.

**Q.** Okay. What's the date of -- when were you messaging back and forth with Mr. Staub?

**A.** Looks like this was July 21st, 2020.

**Q.** So you'd been working with Rahul since about the beginning of April?

**A.** That's right.

**Q.** And he was terminated in January. So this is roughly half -- halfway during his tenure?

**A.** That's right.

**Q.** You see your message from 1:52?

**A.** I do.

**Q.** You say you're getting a little concerned about Rahul. What did you mean by that?

**A.** So at this time, we now had some employees. It wasn't just Rahul and I looking around for opportunities at Freedom Mortgage. So there was finally now the need for leadership and direction to be given to employees, and the plan needed to start to come together, and I saw that that wasn't happening at all.

And I also saw his relationships starting to develop with our employees and with the stakeholders at Freedom Mortgage and Archwell, and I started to get a lot of that negative feedback.

And the combination of all of those things happening at once started to raise a lot of doubts in my mind.

**MR. GAFFNEY:** Could you, Ryan, highlight the comments at 1:54.

**BY MR. GAFFNEY:**

**Q.** Do you see that one?

**A.** I do.

**Q.** What did you mean by the statement that Rahul was "all about the revenues and, like, disregards the expense side"?

**A.** I thought he was spending way too much money, and not only spending too much money, but doing it in a very inappropriate way.

At the same time, he was trying to get revenue from Freedom, whether it made sense or not, just to make Xpanse look

better from a revenue standpoint; but he disregarded the need to try to make Xpanse not profitable, but at least cost-effective in the way that they were investing in the technology they were building.

**Q.** Could you look at the -- it's a longer comment at 1:58. I won't ask you to read it. The jury can see it.

[As read]:

"For sure."

What was your concern here?

**A.** I -- I was in a confusing place at that time because I was still very enthused about the business. I thought it had huge potential. I wanted to see Rahul succeed. He and I had done a lot of work together to get it off the ground. But at the same time, I wanted to make sure that Chris was aware of how I felt and get his thoughts on Rahul and what he thought the right path forward was.

**Q.** What was your brother, Michael's -- what sort of interaction or role did he have with Xpanse at this time?

**A.** He had two roles. He was an owner of Archwell, along with me, so he was there kind of from the investor perspective. He also ran the call center at Freedom Mortgage which we were building a product for, so he also was part of it from a customer perspective.

**Q.** Did you talk to your brother about your concerns about Rahul?

**A.** Yes.

**MR. GAFFNEY:** I'd like to admit and publish Exhibit 68.

**THE COURT:** Any objection?

**MR. RHOW:** Hang on.

I do, Your Honor. This is -- we're now into hearsay, and so there should be, actually for this and the prior document as well, a limiting instruction of some sort, if, and to the extent, it's going to be admitted.

**THE COURT:** All right. This is state of mind?

**MR. GAFFNEY:** State of mind, Your Honor.

**THE COURT:** All right. Just to remind the jury, I've given you a limiting instruction before. So these communications go to what was in the state of mind of the defendants and not necessarily the truth of what's stated in the documents.

On that basis, it's admitted with the instruction.

(Trial Exhibit 68 received in evidence.)

**BY MR. GAFFNEY:**

**Q.** What is this document, Mr. Middleman?

**A.** These are text messages between my brother and I.

**Q.** When were you exchanging these text messages?

**A.** Looks like July 20th, 2020.

**Q.** So around the same time you were having communications with Mr. Staub?

**A.** That's right.
**Q.** So the first message, this is from you; correct?
**A.** That's right.
**Q.** Okay. When you say, "I think your instinct may have been right," you're referring to Michael's instinct?
**A.** His opinion that Rahul was incompetent and not capable of leading Xpanse.
**Q.** What did you mean by "drinking his Kool-Aid"?
**A.** So when I started, like I mentioned, I thought he sounded smart, I thought he had a great vision and high-level plan for what the company could be, and I got really excited about what that future could look like and I was a believer in it.
But as time went on, I started to see the reality of his inability to lead, his inability to develop relationships with customers and key stakeholders, the way that he would treat employees. All of these things just made it very clear, as time went on, that he was not capable of doing this job.
**Q.** So these messages we've looked at in the last two exhibits from July 2020, did things with Rahul get better or worse after that?
**A.** They got worse and worse as time went on.
**Q.** Okay. Now, the jury has seen, so I won't show them again, comments from the survey that was taken. Do you remember that survey?
**A.** I do.

**Q.** Okay. Whose idea was it to conduct?
**A.** I believe it was the HR leader's idea.
**Q.** Who was the HR leader of Xpanse?
**A.** Jen Sanchez.
**Q.** Why did Xpanse decide to conduct a survey?
**A.** I had been getting negative feedback from employees; HR was getting a lot of negative feedback from employees. So we wanted to get a feel, anonymously, for how the entire company was viewing the leadership, and that included Rahul and myself.
**Q.** Some of the comments were pretty negative, huh?
**A.** Yes.
**Q.** And some were directed at either you or you as part of the leadership team; right?
**A.** That's right.
**Q.** So what did you do after receiving the results?
**A.** I immediately got on the phone with Rahul and we talked about how we could start to fix these issues.
**Q.** Was he receptive?
**A.** He was.
**Q.** Did you ever do a follow-up survey?
**A.** I wanted to, but Rahul wanted to have full control of the questions that would be asked, who the surveys would go to. He wanted to know who was answering the questions in what way. And I thought that was completely irresponsible, and I wanted to do another anonymous survey. He continued to push back, and

we never got another survey sent out to all of the employees.

**Q.** So he wanted to know who was -- if someone was making negative comments, he wanted to know who those people were?

**A.** Yes.

**Q.** Why did you feel it was important for the survey to remain anonymous?

**A.** Because I wanted to know exactly how employees truly felt. If it wasn't anonymous, they would likely not give their full, true feelings. So I wanted to know what they were thinking, and I wanted to come up with ways to improve it.

**Q.** Did you ever receive complaints from employees about Rahul?

**A.** Yes, on several occasions.

**Q.** Could you please describe those for the jury?

**MR. RHOW:** Your Honor, we're now cumulative, and it's hearsay for sure.

**MR. GAFFNEY:** Well, it's state of mind and what employees were complaining about.

**THE COURT:** Overruled. Again, this is subject --

**MR. RHOW:** With the limiting instruction, Your Honor?

**THE COURT:** This is subject to a limiting instruction. This goes to the state of mind of this witness and other defend- -- and the defendants and not necessarily to the truth of what is stated.

**THE WITNESS:** So there were several examples.

One that I could think of, it was the head of design. His name was Christer Garbis. He was hired for -- I don't remember what he got paid, but it was a lot of money. He was used to running organizations of hundreds of designers. He came in and found that there were two designers. There wasn't much need for design work really at all in what we were building. And he told me he thought Rahul was totally incompetent and didn't know what he was doing. He quit shortly after that.

Another example was Christen Miller. She was a recruiter with Xpanse. She told me that he was repeatedly very abusive towards her. I witnessed that myself, and that became a very bad situation, and I ultimately had her starting to deal directly with me instead of interfacing with Rahul at all.

Another example was Rob Demick. He was another recruiter. He complained on a regular basis to me about Rahul, how demanding he was, his lack of understanding of how recruiting should work in the technology space.

This was a very common thing, and it happened with more people I could mention.

Rob Demick quit shortly after he made those comments to me, and he posted on his LinkedIn that Rahul was the worst CEO he's ever dealt with or seen.

**BY MR. GAFFNEY:**

**Q.** Did you raise these issues with Rahul?

**A.** Yes.

**Q.** What did you say to him?
**A.** I said, "This" -- so with the recruiters, I told him that "This behavior is not acceptable, and if you can't change it, you can't work with these recruiters anymore, and I will just take that part of what we're doing."
So I pretty much did all of the back-and-forth with the recruiters from that point on.
**Q.** Did he have any response to this?
**A.** Not that I recall. I think he denied that he was as harsh as they said in their one-on-ones, but I would have no way of knowing what those, you know, one-on-one conversations were.
**Q.** Did -- as far as you could tell from your position, did employee attitudes toward Rahul change after you talked to him?
**A.** No.
**Q.** Now, one issue that has come up in this case -- I think you heard a bit about it when you were attending the trial last week -- is that Rahul claims that Xpanse -- that he's entitled to a 150 percent bonus; he was entitled to a 150 percent bonus at Xpanse. You've heard that?
**A.** I have.
**Q.** Are you aware that in his written agreement that he didn't sign, it says 100 percent?
**A.** I'm aware, yes.
**Q.** And you understand his basis for claiming it's 150 percent is a PowerPoint?

**A.** That's right.

**Q.** Are you familiar with that PowerPoint presentation?

**A.** I am. It was a proposal that he made. I believe he wanted that to be what was -- you know, what was part of the bonus structure for all Xpanse employees before he would actually move over so that he could take advantage of that as well.

**Q.** So he was proposing to raise his own bonus?

**A.** It seemed like that's what he was trying to do. That would have never been allowed to happen. And I believe that's why he never formally joined Xpanse. He wanted to get that into his contract before he would ever move over and, hopefully -- I assume he tried to do that without my father being aware of it.

**Q.** Well, who was on the board of Xpanse at this period of time?

**A.** We referred to it as a steering committee, and it was my brother and I, along with Chris Staub and, later, Erik Anderson.

**Q.** So -- but at this point in time, Xpanse was a corporation; correct?

**A.** That's right.

**Q.** And it had two directors; right?

**A.** Yep.

**Q.** And who were the two directors?

**A.** Myself and my brother, Mike Middleman.
**Q.** Did you and Michael approve a proposal to raise Mr. Mewawalla's target bonus to 150 percent?
**A.** Absolutely not.
**Q.** Did you sign any document --
**A.** No.
**Q.** I wasn't quite finished with my question.
**A.** Go ahead.
**Q.** Did you sign any document memorializing an intent to change the target bonus of Mr. Mewawalla to 150 percent?
**A.** No.
**Q.** So this 150 percent proposal was never adopted formally by Xpanse; correct?
**A.** No.
**Q.** Was there any likelihood in November of 2020 that you and Michael would have agreed to raise Rahul's bonus to a 150 percent target?
**A.** No.
**Q.** Now, Mr. Middleman, eventually your father made a decision to terminate Rahul; correct?
**A.** Yes.
**Q.** Was it his decision to make the termination?
**A.** It was.
**Q.** Did you provide input to him?
**A.** I did.

**Q.** Did he ask for it?
**A.** I believe he did.
**Q.** Describe for the jury what you remember about the process that preceded your father's termination of Rahul.
**A.** There had been several conversations regarding his performance, and he asked that my brother and I, along with Erik Anderson, Chris Staub, and possibly others I don't recall, write him an email describing Rahul's performance and what we had observed.
**Q.** Did you -- did you write that for him?
**A.** I did.
**MR. GAFFNEY:** I would like to admit and publish Exhibit 62.
**THE COURT:** Any objection?
**MR. RHOW:** I think it's already in, but no objection.
**THE COURT:** Okay. It's admitted if it's not already admitted.
**BY MR. GAFFNEY:**
**Q.** Mr. Middleman, do you recognize this document?
**A.** Yes.
**Q.** What is it?
**A.** It's the email I wrote to my father explaining my analysis of how I thought Rahul was performing.
**Q.** So I'd like to draw your attention to something you wrote in here in the --

**MR. RHOW:** Your Honor, sorry. This is subject to the limiting instruction. I think you did say that before. I'm just confirming.

**MR. GAFFNEY:** Well...

**THE COURT:** Well, yes. Like the others, this goes to the state of mind, and that's the purpose of this document.

**MR. GAFFNEY:** Well, it also goes to the issue of notice to Mr. Middleman, that he recorded this at the time, his views at the time. This is not conveying -- only parts of this convey statements from other people.

**MR. RHOW:** Your Honor, that's not the ruling. It is state of mind. We've had this discussion.

**THE COURT:** Even if it's a business record, the contents of it is still subject to a hearsay level, so it still goes to state of mind.

**BY MR. GAFFNEY:**

**Q.** You wrote in the second sentence [as read]:

"When the responsibility falls on Rahul or if he needs to produce something, he always assigns the task to something else."

**A.** That's right.

**Q.** Do you stand by that statement?

**A.** I do.

**Q.** What was your factual basis for it?

**A.** Good leaders do delegate. So early on, I was fine with

that. But over time, it became clear that all he was doing was delegating and was not taking any responsibility himself to drive the company forward. That's mainly what I meant.

**Q.** Could you look at the beginning of the second paragraph. You mention meetings with Ellie Mae. What's Ellie Mae?

**A.** They were a potential partner of ours. They were a company that had the largest loan origination system in the mortgage industry, so it was going to be very critical that we integrate with them in order to get -- in order to do business with other mortgage companies outside of Freedom.

**Q.** So you reference two meetings. Were you at those?

**A.** Yes.

**Q.** What about those meetings caused you to bring it to your father's attention?

**A.** I believe the first one, Rahul just didn't show up, and I was shocked that he would miss that meeting. It was probably the most important meeting that we had at Xpanse to that point, and he wasn't there.

On the second meeting, he did show up, but he didn't speak at all during the meeting. He left that all to me and pretty much just said "Hi" and "Bye." And I couldn't believe that he didn't drive the meeting and he didn't add any value to the conversation whatsoever.

**Q.** Now, when you -- well, it's fair to say that you recommended to your father that Rahul be terminated?

**A.** Yes.

**Q.** Were you recommending that he be terminated for cause under his contract? Was that something you were thinking about?

**A.** I didn't get into that part of it.

**Q.** Why not?

**A.** It didn't come up. I just gave my reasons for why I thought Rahul was not doing a good job, and I left everything else to his decision.

**MR. GAFFNEY:** I would like to admit and publish Exhibit 340.

**THE COURT:** Any objection?

**MR. RHOW:** I think it's in. No objection, Your Honor.

**MR. GAFFNEY:** I think it's in already, Your Honor.

**THE COURT:** All right. Go ahead.

**BY MR. GAFFNEY:**

**Q.** Can you identify this document for the jury?

**A.** Yes. This is an email I sent to the Xpanse employees after Rahul had been fired.

**Q.** It says here in your first line that [as read]:

"I made the difficult decision to part ways with Rahul . . . ."

Was that true?

**A.** I worded it poorly. If I could go back, I would have changed the way I said it. I was trying to take responsibility

for the decision. The employees did not know my father at all, and they had all worked very closely with me, so I wanted to take the accountability. But the reality of it was that it was my father's decision, and I gave him input and agreed with the decision.

**MR. GAFFNEY:** You can take that down, Ryan.

**BY MR. GAFFNEY:**

**Q.** So what happened to Xpanse after Rahul was terminated?

**A.** We continued to operate. We added several more employees over the next few months.

The mortgage industry then took a big downturn. Interest rates rose. They had been at historic lows when Rahul started. So our revenues were very high; we had a lot of opportunity; and that changed very much when interest rates rose and our revenues declined; and we ended up shrinking the business pretty significantly.

Since then, the industry has become a little bit more stable, and we've been able to bring on some customers. We've been able to build more products for Freedom and have been pretty successful in doing so.

**Q.** Who runs Xpanse now?

**A.** Kiran Sahota.

**Q.** Do you know her?

**A.** Yes.

**Q.** She testified yesterday?

**A.** That's right.
**Q.** You were here for that?
**A.** I was.
**Q.** It's fair to say that she is not a longtime Freedom insider?
**A.** No. She started just a few months after Rahul did.
**Q.** Was she close personal friends with you or your brother or your dad before she was hired?
**A.** Not at all. We were introduced to her through a recruiting firm.
**Q.** In your opinion, has she positioned Xpanse for success?
**A.** Yes. She's done a great job.
**Q.** What has she done that makes you think that?
**A.** She's built confidence with her employees. They understand the direction the company is going in. She does a great job of working back with the Freedom team to make sure everybody's aligned on the plan. She makes sure that the technology products that are being built are delivered on time and in a completed way. And she's just a very organized and determined person and has built -- and has gained a lot of credibility with her employees and with all of the other stakeholders at Freedom and Archwell.
**Q.** Now, Mr. Middleman, you were here during Mr. Rhow's opening statement; right?
**A.** Yes.

**Q.** You heard him say over and over again that Rahul was an outsider who some sort of, like, cabal of insiders targeted, your brother and Chris Staub, Erik Anderson, you, I guess. You heard all that?

**A.** I did.

**Q.** Is there any truth to that?

**A.** No. He -- there were stakeholders at Archwell that were responsible for working with him. The idea was for it to be very collaborative. Like any successful business, you don't run it yourself and not talk to anybody else. He would have to collaborate with leaders at Freedom Mortgage, with investors at Archwell, with others in the industry. We would have all had to work together for it to be successful.

And everybody that was involved had no problem with that. Everybody went out of their way to meet with him on a regular basis. It was just that the conversations themselves never went well due to a lack of understanding of mortgage or technology on his part. And that's ultimately what it came down to, and that's what the feedback I got consistently was.

**MR. GAFFNEY:** Thank you, Mr. Middleman.

I have no further questions.

**THE COURT:** All right. Thank you.

Cross?

\\\

\\\

**CROSS-EXAMINATION**

**BY MR. RHOW:**

**Q.** Mr. Middleman, nice to meet you. My name is Ekwan Rhow. I don't believe we've met before.

**A.** Nice to meet you.

**Q.** Nice to meet you.

The decision to fire Rahul was a group decision; right?

**A.** No. It was my father's decision. He got input from others.

**MR. RHOW:** Your Honor, I'd like to read from Mr. Middleman's deposition.

Hand this up.

**THE COURT:** Okay.

**THE COURTROOM DEPUTY:** Thank you.

**MR. RHOW:** 89, lines 2 through 6.

(Document handed up to the Court.)

**THE COURT:** 89, 2 through 6.

**MR. GAFFNEY:** Just one moment, Your Honor.

(Pause in proceedings.)

**MR. GAFFNEY:** No objection.

**THE COURT:** Go ahead and read it.

**BY MR. RHOW:**

**Q.** You recall your deposition you took under oath before?

**A.** Yes.

**Q.** [As read]:

**"QUESTION:** You fired Rahul; correct?

**"ANSWER:** You mean -- but how do you define 'firing'? I had a conversation.

**"QUESTION:** You made the decision?

**"ANSWER:** No. It was a group decision."

Now, you mentioned the steering committee before. The steering committee was actually overseeing the company; right?

**A.** No. Rahul was supposed to be overseeing the company. The steering committee gave input and had oversight from an investor standpoint. Rahul was the CEO of the company, or was supposed to be had he ever officially moved over.

**Q.** So just tell me if this sentence is true or not: There was a steering committee overseeing the company.

**A.** From an investor's perspective, yes.

**Q.** Okay. And so -- and, by the way, that steering committee, to be perfectly clear, included yourself, Chris Staub, Michael Middleman, and perhaps Adam Cohen?

**A.** That's right.

**Q.** And, in fact, that steering committee had the authority to fire Rahul; right?

**A.** I'm not sure. That was -- ultimately, it would have been my father's decision because he was a Freedom Mortgage employee. Had he moved over to Xpanse, theoretically, that group would have had that authority.

**Q.** You did have the authority or not? The steering committee

did or did not have the authority?

**A.** He was a Freedom Mortgage employee, so it was my father's decision.

**MR. RHOW:** Your Honor, I'd like to read again 89, line 16 through 23.

**THE COURT:** Okay. Go ahead.

**MR. RHOW:** [As read]:

"**QUESTION:** Okay. And did you have authority to fire anyone from Xpanse?

"**ANSWER:** Yes.

"**QUESTION:** Okay. You had the authority to fire Rahul; is that correct?

"**ANSWER:** I don't really -- there was a group -- there was a steering committee, and the steering committee together had the authority, and that steering committee, I was part of that. I had the most knowledge of the situation and his performance, or lack thereof, and that's what led to the decision."

**BY MR. RHOW:**

**Q.** Beth Cole, do you know who she is?

**A.** Yes.

**Q.** She's an employment attorney in-house at Freedom; right?

**A.** That's right.

**MR. RHOW:** Exhibit 587, I'd like to move to publish and admit.

**THE COURT:** Any objection?

**MR. GAFFNEY:** I haven't seen it yet, Your Honor.

(Pause in proceedings.)

**MR. GAFFNEY:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 587 received in evidence.)

**BY MR. RHOW:**

**Q.** You are not on this email, Mr. Middleman, but I want to show you one line.

This is an Erik Anderson email to Christopher Staub. Those are two members of the steering committee; right?

**A.** Yes.

**Q.** And this is January 12th, 2021. And if you look at that first line, it says [as read]:

"Basically, I wanted to simulate a version of the model that eliminates most leadership (other than a couple currently there on product and development and of course Greg)."

Do you see that?

**A.** Yes.

**Q.** And you are Greg, of course?

**A.** Yes.

**Q.** And you understood that during this time frame, the steering committee was putting together a model to save costs that would remove leadership like Rahul; fair?

**A.** It appears they were building a scenario.

**Q.** So what I'm saying is true?

**A.** It looks like they're building one of possibly many scenarios of what the company could look like with reduced costs.

**Q.** Moving on to a different subject, I think what you said before is Freedom and Xpanse had close ties but they're independent and separate; right?

**A.** Yes.

**Q.** All right. Let's go to 538. This is the text chain.

Why is your email -- why is -- are you -- why do you have a gregory.middleman@freedommortgage.com email on this text chain instead of an Xpanse one?

**A.** Because I was using it -- I have roles at Freedom Mortgage as an employee, and I'm also an investor in Archwell. So I have responsibilities for both. I use both systems.

**Q.** Okay. So while you're sitting on this steering committee, you have roles at Freedom; right?

**A.** Uh-huh.

**Q.** Yes?

**A.** Yes.

**Q.** Okay. And so while Freedom is supposed to be independent, you, sitting on the steering committee, have roles at Freedom; right?

**A.** Yes.

**Q.** Mr. Middleman, you are the COO of Xpanse during this time frame?

**A.** Yes.

**Q.** And you were involved in hirings too; right?

**A.** Yes.

**Q.** And, in fact, the recruiters that you said started working with you, they ended up leaving; right?

**A.** That's right.

**MR. RHOW:** Nothing further, Your Honor.

**THE COURT:** Okay. Anything further?

**MR. GAFFNEY:** Briefly.

Would you mind putting up that same exhibit we looked at?

(Pause in proceedings.)

**MR. GAFFNEY:** It's all right. We don't need to see it. The jury will remember it.

**REDIRECT EXAMINATION**

**BY MR. GAFFNEY:**

**Q.** You saw the email -- you remember the email that he showed you between Erik Anderson and Chris Staub?

**A.** Yes.

**Q.** And there was a discussion about cutting costs at Xpanse out of leadership; right?

**A.** That's right, yes.

**Q.** Okay. And there was other leadership at the company -- little L -- besides Rahul; correct?

**A.** Yes.

**Q.** Okay. Was there a view that there was too much leadership expense at Xpanse at the time?

**A.** Yes, there was.

**Q.** Why was that?

**A.** Because he had hired very expensive leaders that didn't necessarily need to be at a start-up. They were leaders that would be great, potentially, for a larger company of hundreds; but to manage 30 to 50 people, they were not necessary.

Rahul also wasn't part of that leadership analysis. Again, he was a Freedom Mortgage employee. So it would be irrelevant. Any cost-cutting would be of the other leaders. He wasn't part of the financial model because he was not an employee of Xpanse.

**Q.** If Rahul had come to your steering committee and said, "You know what? I know you want to cut costs, and I'll work for what I made last year at Zenplace, $95,000, if you keep me on and don't terminate me," would your recommendation to your father have been any different?

**A.** Absolutely not.

**MR. GAFFNEY:** Thank you, Your Honor.

**THE COURT:** Anything further?

**MR. RHOW:** Nothing further, Your Honor.

**THE COURT:** All right. Thank you, Mr. Middleman. You may step down.

**THE WITNESS:** Thank you.

(Witness excused.)

**THE COURT:** Counsel, I have your binder.

Vicky, can you give this back to him.

**THE COURTROOM DEPUTY:** Thank you.

**THE COURT:** And defense may call their next witness.

**MR. GAFFNEY:** Your Honor, the defense calls Gina Morselli.

**THE COURT:** Okay.

(Witness steps forward to be sworn.)

**THE COURTROOM DEPUTY:** Please raise your right hand.

**GINA MORSELLI**,

called as a witness for the Defendants, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE COURTROOM DEPUTY:** Thank you. Please have a seat.

Please speak clearly into the microphone, state and spell your first and last name for the record.

**THE WITNESS:** Gina Morselli, G-i-n-a, M-o-r-s-e-l-l-i.

**THE COURT:** All right. Thank you, Ms. Morselli.

You may proceed.

**THE WITNESS:** Thank you.

**DIRECT EXAMINATION**

**BY MR. GAFFNEY:**

**Q.** Ms. Morselli, do you work at Freedom Mortgage?

**A.** No, I do not.
**Q.** Do you work for any affiliated company or company owned by the Middleman family?
**A.** I do not.
**Q.** Have you worked for Freedom in the past?
**A.** I have.
**Q.** What -- what's the duration of your employment with them? What years did you work there?
**A.** I started with Freedom in 1990, and it was till 2022, is when I ended with Freedom.
**Q.** Did you work continuously for them during that period? Did you ever leave?
**A.** No. From 2000 to 2003, mutually separated, and I worked for a staffing agency for three years.
**Q.** Then you came back to Freedom?
**A.** Yes.
**Q.** What did you do in 2022?
**A.** In 2022, I ran HNE, which is Harrison National Employment, a staffing agency, for an affiliate of Freedom Mortgage.
**Q.** What was the affiliate of Freedom Mortgage?
**A.** Archwell.
**Q.** Now, you say you started in 1990?
**A.** Yes.
**Q.** The jury has heard testimony that that's when Mr. Middleman started the company. Were you an original

employee?
**A.** Yes.
**Q.** And you lasted, for the most part, continuously through 2022 with just that little break?
**A.** Yes, correct.
**Q.** Did Freedom have a lot of long-term employees like you?
**A.** Yes, there were. There were.
**Q.** Why did you stay so long?
**A.** It was a great place to work, actually. It was...
**Q.** What do you currently do for a living?
**A.** I have investment properties.
**Q.** In what part of the country?
**A.** New Jersey.
**Q.** Okay. Do you live in New Jersey now?
**A.** No, I do not.
**Q.** Where do you live?
**A.** Florida.
**Q.** Is Freedom, or any company owned or affiliated with the Middlemans, a client of your --
**A.** No.
**Q.** -- rental property business?
**A.** No. No.
**Q.** I want to turn your attention to the year 2019. Okay? What was your job for Freedom in 2019?
**A.** I was vice president of talent acquisition.

**Q.** What did that job involve?
**A.** I oversaw the hiring for Freedom Mortgage everywhere, from clerical support to the C suite, which is executive level.
**Q.** How long had you been in that role?
**A.** Approximately six or seven years.
**Q.** Okay. Did you interact with Stan Middleman as part of your job?
**A.** Oh, yes. Mm-hmm.
**Q.** On what sort of matters would you interact with Stan?
**A.** Well, overall reporting on the hiring, the open positions, the time to fill, and on any positions that he would need filled for his area within the organization.
**Q.** Would he ever ask you to look at folks for potential jobs?
**A.** Oh, yes.
**Q.** How would that process work?
**A.** Well, if it was somebody he was asking me to look at, he would present me with a résumé and say, "Give them a call and see what you find out and let me know."
**MR. GAFFNEY:** I'd like to publish Exhibit 504 to the jury. It's previously been admitted.
**THE COURT:** Okay.
**BY MR. GAFFNEY:**
**Q.** Ms. Morselli, is this up on your screen?
**A.** Yes, it is. Thank you.
**Q.** Do you recognize this document?

**A.** I do.
**Q.** What is it?
**A.** This is a write-up of an interview that I had with a potential applicant, Mr. Mewawalla.
**Q.** Is this the sort of document you would create in the ordinary scope of your duties?
**A.** Yes.
**Q.** And you would create it around the time of the conversation with the employee?
**A.** Oh, yes.
**Q.** And it would be saved somewhere within the system --
**A.** Mm-hmm.
**Q.** -- at Freedom?
**A.** Yes. Correct.
**Q.** Do you recall conducting this interview with Mr. Mewawalla?
**A.** I do when I look at the notes, to that extent.
**MR. GAFFNEY:** Now, Ryan, could you highlight the sentence that says [as read]:
His company has as many as 4200 employees globally."
**BY MR. GAFFNEY:**
**Q.** Mr. Mewawalla testified that he never told you that he had managed 4200 employees. Is that true he never told you that?
**A.** No. He told me he did manage 4200 employees.

**Q.** Are you a good notetaker?

**A.** Very much so. I've been doing it for years for Mr. Middleman. I don't think he would have...

**Q.** Are you -- what sort of care do you put into your note-taking when you're doing something for Mr. Middleman around this time?

**A.** You have to be a very good listener, and I usually follow up with repeating what they said to confirm that I understood what they said properly.

**Q.** Okay. Mr. Mewawalla testified that what he actually said to you was there were 1200 employees at Nokia globally, Nokia being one of the companies on his résumé.

Is there any chance you mistranscribed that statement into what you have here in the notes?

**A.** No. I specifically referenced Zenplace.

**MR. ROCOS:** Objection, Your Honor.

**THE COURT:** Overruled.

**BY MR. GAFFNEY:**

**Q.** When you say "specifically referenced Zenplace," what do you mean by that?

**A.** His most recent position.

**Q.** You've got Zenplace there in the prior sentence; right?

**A.** Yes.

**Q.** So you were asking him about Zenplace?

**A.** Yes.

**Q.** Okay. And when you said "his company," were you referring to Zenplace?
**A.** His company, yes.
**Q.** What did you understand his relationship with Zenplace was?
**A.** Owner.
**Q.** I'm sorry?
**A.** Owner.
**Q.** Owner. Okay.
Did you have an interest in jobs he had held -- well, let me strike that.
Could you, Ryan, turn to the résumé that is attached at the end of the exhibit. Go down to the Nokia entry.
So you see the Nokia entry is two years, from 2010 to 2012?
**A.** I see that.
**Q.** So that was seven years before the interview?
**A.** I see that, yes.
**Q.** And he had worked, in the interim, for five years at Zenplace; right? I'll withdraw the question.
So given what you were doing for Mr. Middleman, taking -- having an intake interview, did you have much interest in jobs that Mr. Mewawalla had held seven years earlier?
**A.** No, not at all.
**Q.** Why not?

**A.** It's not relevant. It's too far out. It's not relevant.

**Q.** Why does that make it not relevant?

**A.** It's not something that he's been doing the last few years. It's -- that far out would not be something that would be of interest for me to document.

**MR. GAFFNEY:** Could you go back to the first page, Ryan, and could you highlight the line about his salary.

**BY MR. GAFFNEY:**

**Q.** Did you ask Mr. Mewawalla what he was making at Zenplace?

**A.** No.

**Q.** Why not?

**A.** You can't. It's not legal.

**Q.** Would you ask -- well, do you know why that reference to salary is in there?

**A.** I do.

**Q.** How did it get there?

**A.** So I posed a question of, "Can you give me an idea as to what you're looking to make your first year in a new position" --

**Q.** Okay. Why would you --

**A.** -- "with a new company?"

**Q.** And why would you ask that?

**A.** To get an idea if it was worth pursuing a conversation based upon someone's expectations.

**Q.** Can you give me an example of what someone could say that

would end the interview?

**A.** So if they said $5 million the first year, I wouldn't move forward with that.

**Q.** How common is it, when you have these -- when you pose these questions, for the interviewee to tell you what they're currently making?

**A.** I would say, since we were a nationwide company, different states and different regulations, probably 40 percent would tell me.

**Q.** And that's useful information to you when people tell you what they're currently making?

**A.** Useful in a sense of if the expectations match the potential job.

**Q.** What did you mean when you wrote in this highlighted sentence, "He is used to making 750,000 plus bonus and incentive, all in, 1 to 2 million dollars"?

**A.** I mean what I wrote, that he specifically said that he's used to making the 750,000 and, all in, 1 to 2 million dollars. However, that is built up in bonus and incentives.

**Q.** Now, he testified that what he actually told you was, "The last time I was at a large company, I was making a couple million dollars." Is that possible?

**A.** I wouldn't have written that down. My question is, is: What are you used to making currently?

(Stenographer interrupts for clarification of the record.)

**THE WITNESS:** I would not have written that down.

**BY MR. GAFFNEY:**

**Q.** Well, if he had told you that he was making a couple million dollars the last time he was at a large company, you knew, from the résumé, when the last time he was working at a large company was; right?

**A.** Correct.

**Q.** Okay. And so was it relevant to your work for Mr. Middleman here to report what Mr. Mewawalla was making at a prior job seven years earlier?

**A.** No, it's not relevant.

**Q.** Why not?

**A.** Because that's many years in the past and we're looking for present, and that's why I put down he's used to making 750,000 plus bonus and incentives, 1 to 2 million currently -- or at the time, should I say.

**Q.** Is there any chance, if he had told you he was making a couple million dollars the last time he was at a large company, that you would have written down $750,000?

**A.** Oh, no. No. It's not relevant, no.

**Q.** I'm going to show you a chart that's been used in this case.

Could you put that up?

Do you see the salary numbers down there?

**A.** Yes.

**Q.** Is this consistent with what Mr. Mewawalla told you?
**A.** No.
**Q.** If he had told you that for the last five years, this is how much he was making, that he never had more than 25 employees at Zenplace, would you have recommended to Stan that Rahul be invited back for an interview?
**A.** I would not have.
**Q.** Now, let me turn to a different subject.
You can take that down, Ryan.
Exhibit 8, which is, I believe, in evidence from last week. You're not on this, and I don't expect you to be on this, but if you could turn to page 3.
I think it's one more page, Ryan. Back one. Highlight this first bolded section, "This offer is contingent."
Do you see that?
**A.** Yes.
**Q.** Okay. And this -- well, this is a draft of an offer letter that was testified to earlier in the case.
My question is this: You see that -- the language about the background check. Was it customary to do a background check on folks who Freedom was planning to hire?
**A.** Yes, very much so.
**Q.** For what purpose?
**A.** We had to make sure, being in the finance business, that their background was clear, without any criminal background.

**Q.** Okay. Would Freedom do the actual check?
**A.** No. We would hire a third party.
**Q.** Have you ever heard of HireRight?
**A.** Yes, mm-hmm.
**Q.** Is that a background check company?
**A.** Yes. That's who we worked with at the time.
**Q.** Would the background checks contain or report information about prior employment?
**A.** It would confirm the years that they were employed from and to.
**Q.** Would it contain salary information?
**A.** Oh, no.
**Q.** Would HireRight, or whatever service you used, check the accuracy of statements made on an applicant's résumé?
**A.** No, they would not.
**Q.** Statements like "I have 4200 employees at my company"?
**A.** No. That is not customary at all.
**Q.** How about salary information?
**A.** No.
**Q.** There's been a suggestion in the case that Freedom didn't do its own due diligence on Mr. Mewawalla.
If you were to have checked up on what Freedom's actual employee count was or how much money Mr. Mewawalla was making -- I'm sorry. Strike the question.
If you wanted to check up on how many employees that

Zenplace had, how much money it was paying, assuming you could answer that -- you could ask that question, who at Zenplace would you have asked?

**A.** I guess I would have to call Mr. Mewawalla. He was the owner.

**MR. GAFFNEY:** No further questions, Your Honor.

**THE COURT:** Cross?

**CROSS-EXAMINATION**

**BY MR. ROCOS:**

**Q.** Good morning, Ms. Morselli.

Could we put up and publish Exhibit 504 that was up a moment ago.

I believe you testified a moment ago that you didn't recall the conversation until you looked at the email; is that right?

**A.** That's correct.

**Q.** So when you testified a moment ago, you were testifying based upon your reading of this email?

**A.** Correct.

**Q.** And your assumptions of what you must have done six years ago, when you were making the notes that are referred to in this email?

**A.** Can you rephrase the question, please?

**Q.** I said, your testimony was based off the assumptions of what you think you did five and a half years ago, when you

prepared this email?

**A.** No. I recall it, seeing the email.

**Q.** I want to focus on the line towards the end of your email [as read]:

"He is used to 750K plus bonus and incentive, all in, 1 to 2 million."

You testified that he provided that information in response to your question as to what it is that he expected or would like to make while working at Freedom?

**A.** Yes, that's correct.

**Q.** And do you know that Mr. Mewawalla made actually 1 to 2 million dollars a year while he was working at Nokia?

**A.** No, I don't recall that. I only recall what he said that he was used to making, and that's why I wrote it down.

I would never write something down that was that far in the past.

**Q.** Do you know how much it was that Mr. Mewawalla was paid by defendants on a yearly basis?

**A.** I do not.

**Q.** Would it surprise you to know that, although you wrote down he's used to 750K for a salary, they actually paid him a salary of $1.5 million?

**A.** Would I be -- did you say "surprised"?

**Q.** Would you be surprised?

**A.** No. I don't get involved at that point, at that level,

for the negotiation.

**Q.** Looking up to the line here that Mr. Gaffney highlighted, first, where you say [as read]:

"His company has had as many as 4200 employees globally."

Do you see that?

**A.** I do see that.

**Q.** Do you know that Mr. Mewawalla has worked at companies that have had over a thousand employees, certainly, globally? You know that; right?

**A.** I can't say that I know that from these notes here.

**Q.** Why don't we -- can we go down to the Nokia entry that we looked at a moment ago. Actually, sorry, let's go to Zenplace first, just above.

Did you look at this résumé when you were talking with Mr. Mewawalla?

**A.** Yes. I typically have the résumés right in front of me, yes.

**Q.** Would you have used it in connection with asking Mr. Mewawalla questions about his background?

**A.** Yes. I ask about the background, yes.

**Q.** And do you see this entry on Zenplace? Would you have read the details within it?

**A.** I would have read the whole résumé, yes.

**Q.** And you see there that nowhere in connection with Zenplace

does it reference any global enterprise; right?

**A.** It doesn't.

**Q.** And can we go down to the Nokia entry.

Do you see here, highlighted on the screen, in connection with Nokia, there are -- one, two, three, four, five -- six times it says "global"? Right?

**A.** I do.

**Q.** That's the same word that you used in your email?

**A.** I did.

**Q.** You can see on the second bullet point there on the left-hand side, it says led a 1200-person division spanning various business units, and it ends [as read]:

". . . across the Americas, Europe, and Asia-Pacific."

Do you see that?

**A.** I do.

**Q.** Now, it's certainly at least possible that Mr. Mewawalla was referring -- when he was talking about the number of employees he's managed globally, he was actually referring to Nokia; right?

**A.** No, because the number 1200 is not what I wrote down. It was 4200. And it would have been irrelevant to me to put in notes.

**Q.** So your testimony is that Mr. Mewawalla lied about the number of employees that he had at Zenplace, lied about his

salary at Zenplace, just to try and pretend that he was worthwhile being interviewed at Freedom?

**A.** I'm saying the notes that I took were accurate in what he told me as to his current situation.

**MR. ROCOS:** Thank you.

No further questions.

**THE COURT:** Anything further?

**MR. GAFFNEY:** Nothing, Your Honor.

**THE COURT:** All right. Thank you. You may step down. You're excused as a witness.

**THE WITNESS:** Thank you.

(Witness excused.)

**THE COURT:** Further witness?

**MR. LEYVA:** Your Honor, the defense calls Professor Wayne Guay.

(Witness steps forward to be sworn.)

**THE COURTROOM DEPUTY:** Please raise your right hand.

**WAYNE GUAY**,

called as a witness for the Defendants, having been duly sworn, testified as follows:

**THE WITNESS:** Yes.

**THE COURTROOM DEPUTY:** Thank you. Please have a seat.

Please speak clearly into the microphone, state and spell your first and last name for the record.

**THE WITNESS:** Wayne Guay, W-a-y-n-e, G-u-a-y.

**THE COURT:** All right. Thank you, Mr. Guay.

You may proceed, Mr. Leyva.

**DIRECT EXAMINATION**

**BY MR. LEYVA:**

**Q.** Professor, what do you do for a living?

**A.** I'm a professor at the University of Pennsylvania, at the business school there.

**Q.** How long have you been a professor?

**A.** Since 1997, so almost 30 years.

**Q.** What's your area of expertise?

**A.** My areas of expertise, there's a number of them, but the ones that are most relevant here would be executive compensation and firm valuation damages.

**Q.** Do you have any advanced degrees?

**A.** I do. I have two master's degrees, one in business administration and one in applied economics, as well as a Ph.D. in accounting from the University of Rochester.

**Q.** What does your job entail besides teaching?

**A.** So in addition to teaching, I also do a fair bit of research.

**Q.** What do you do research on?

**A.** I do research on executive compensation, corporate governance, firm valuation.

**Q.** Have you published any work in your field?

**A.** Yes. I've published many papers on executive

compensation.
**Q.** Have you worked on cases involving executive compensation?
**A.** Yes, I have.
**Q.** You were here yesterday. Did you hear Mr. Persechini say that he had been involved in three or four contract cases involving C-suite-level executives?
**A.** I was here and I did hear him say that, yes.
**Q.** How many executive compensation cases have you worked on?
**A.** I've worked on more than 50.
**Q.** In the past, have you worked for both plaintiffs and defendants?
**A.** Yes, I have.

**MR. LEYVA:** Your Honor, we move to qualify Professor Guay as an expert in the field of executive compensation, firm valuation, and damages.

**THE COURT:** Any objection?

**MR. ROCOS:** No objection, Your Honor.

**THE COURT:** He is so certified. Thank you.

And just a reminder, what I said about expert witnesses yesterday applies to this witness as well. Thank you.

**BY MR. LEYVA:**
**Q.** Professor, what was your assignment in this case?
**A.** So I was asked to analyze Mr. Persechini's report, and I was also asked to perform some alternative calculations.
**Q.** What did you do to prepare your opinions?

**A.** So I read through the case file, a lot of the case documents. I read some deposition testimony. I read Mr. Persechini's report and some of his citations, some emails and other documents.
**Q.** In preparing your opinions, was there anything you wanted to see or read that you weren't provided?
**A.** No.
**Q.** Did you reach any conclusions?
**A.** I did, yes.
**MR. LEYVA:** Mr. Knecht, could you please pull up Professor Guay's demonstrative.
And I'd like to publish this demonstrative to the jury.
Can you see that?
**BY MR. LEYVA:**
**Q.** Did you prepare this, Professor Guay?
**A.** Yes, I did.
**Q.** So let's take your opinions one at a time.
What is your first opinion?
**A.** So the first opinion -- just to set sort of a base here, so what an expert is trying to do in terms of damages in a case like this is they're looking at jobs that Mr. Mewawalla, the executive, actually did in the real world -- and in the real word, he worked for Freedom Mortgage; he currently works for Mawson -- and compare that, the compensation he received at those jobs, with the compensation that he might have received

in an alternative opportunity. And here, we've been talking about the E&V opportunity.

So comparing those two sets of scenarios and if the opportunity that he might have taken if things had gone a different way, if that may pay more than what he actually did, then there might be damag- -- there would be damages; and if what he actually did earned him more than the alternative opportunity, then there wouldn't be damages.

So that's typically what an executive is doing -- or an expert is doing in a case like this.

And what Mr. Persechini did, one of the -- one of my critiques of his analysis is that he took a number of key assumptions that he used to compute damages and key assumptions he used to estimate the E&V opportunity compensation, he took those estimates -- or those assumptions directly from Mr. Mewawalla at face value.

**Q.** In your opinion, Professor Guay, is it concerning that Mr. Persechini took these assumptions at face value?

**A.** Yes, it's concerning that he took them, in part because academic evidence, literature has shown that executives tend to be overconfident about their own performance and they tend to underestimate some of the risks associated with that performance.

**Q.** Have you ever seen an expert on either side ever prepare a damages -- a damages calculation the way in which

Mr. Persechini has done in this case?

**A.** No, I haven't. And I'll highlight that in a minute.

**Q.** So let's turn to your next point. What is your second opinion, Professor Guay?

**A.** So the second opinion is that when comparing those two scenarios, what Mr. Mewawalla actually earned in his jobs versus what he might have earned if he had taken this other opportunity at E&V, it's important to consider all of the sources of compensation that he received in both of those scenarios. And if you omit a component of that compensation, then it's not possible to say definitively whether there are any damages or not.

**Q.** So your next slide states [as read]:

"Excluding Sources of Compensation May Erroneously Show Damages."

Could you explain to the jury what this is conveying?

**A.** Yes. So these are two different -- two different job opportunities -- two different jobs. The first -- the first row is a job that the employee or the executive says they might have taken if things had gone in a different way. The second row is what the employee or the executive actually made at their jobs.

And we know that different jobs have different components of compensation. Some might pay more salary; some might pay more benefits; some might pay more stock-based compensation.

And so this Job A pays $60,000 in salary; Job B pays $25,000 in salary. And if you were to just compare the salary between the two jobs, it looks like Job A is a better job than Job B, and it would look -- appear that there may be some damages. In fact, Job B has more equity compensation than Job A; and so when you compare total compensation across those jobs, there are no damages because the greater equity at one job offsets the greater salary at the other.

**Q.** And in Mr. Persechini's calculation in our case, Mr. Persechini failed to consider a component of compensation; is that right?

**A.** Yes.

**MR. ROCOS:** Objection, Your Honor. Leading.

**THE COURT:** Overruled. But watch your leading.

**MR. LEYVA:** Understood, Your Honor.

**THE WITNESS:** Yes. Mr. Persechini excluded all of the stock-based compensation from his analysis. And so we've been hearing a lot about stock-based compensation in the case. Mr. Persechini ignores it in computing damages.

**BY MR. LEYVA:**

**Q.** Finally, Professor, I understand you prepared an alternate estimate; is that right?

**A.** I did, yes.

**Q.** What does this alternative estimate show?

**A.** So this is an alternative estimate. It's using

Mr. Persechini's approach, which I argue is flawed, and I'm not adopting his -- endorsing his approach, but I've been asked to use his approach to compute damages under the assumption that Mr. Mewawalla would have worked at E&V for the same amount of time he worked at Freedom Mortgage, which was ten months.

**MR. LEYVA:** Thank you, Professor Guay.

No further questions.

**THE COURT:** All right. Thank you.

Cross?

**CROSS-EXAMINATION**

**BY MR. ROCOS:**

**Q.** Thank you, Professor Guay. Good to see you again.

**A.** You as well.

**Q.** You testified a moment ago that one of your criticisms of Mr. Persechini's analysis is that he accepted some of the representations made by Mr. Mewawalla; correct?

**A.** That is -- yes, that is one of my -- one of my critiques.

**Q.** One of the issues was the duration that Mr. Mewawalla expected that he might be employed at E&V; right?

**A.** Yes. There were a number of things. That's one of them.

**Q.** Do you recall that the E&V agreement did say, though, that it was for a fixed term of three years?

**A.** The -- the draft agreement I saw was for a term of three years, yes.

**Q.** And that there was a provision within it to agree to

extend it for a further three years; right?

**A.** There was a provision in it to do that as well, yes.

**Q.** You also testified a moment ago -- you had that chart that sort of looked like a traffic light where you say you need to take the full compensation from one opportunity and deduct from it the full compensation from another opportunity to determine how much was lost; right?

**A.** To determine damages, you do need to do that, yes.

**Q.** Yeah. So we need to work out what Mr. Mewawalla might have made in that alternative scenario, deduct what he actually made, and the figure that comes out at the end, that's what the damages would be?

**A.** Well, yes. In simplistic terms, but yes.

**Q.** Understood.

**A.** Total compensation across those two opportunities, yes.

**Q.** And one of your opinions is that what you need to do is deduct from Mr. Mewawalla's damages figure the equity that he earned at his later position at Mawson; correct?

**A.** You need to include equity compensation on both sides of the equation; otherwise, it's not an apples-to-apples comparison.

**Q.** So when the jury is determining the damages figure, it needs to include the potential equity that Mr. Mewawalla could have made at E&V; correct?

**A.** Mr. Persechini should have included equity in his analysis

on both sides. The failure to do so doesn't allow him to say anything about damages.

**Q.** Were you here for Mr. Mewawalla's testimony, that it was expected that his equity at E&V could have been worth as much as $200 million?

**A.** I heard -- I heard the testimony on that yesterday. I heard Mr. Persechini mention it as well, yes, but -- yes.

**Q.** So Mr. Persechini, in your analysis, should have added that $200 million on one side and taken off the equity portion on the other side to arrive at the proper damages figure; correct?

**A.** No. What I heard Mr. Persechini say was that -- that the E&V opportunity or the E&V business may have been worth some large sum of money many years down the road.

The value of an equity position in a company today is not based on what that company might be worth five or ten years down the road. It's based on what that company is worth today. And this is a company that hadn't even been started at E&V, so what Mr. Persechini said made no sense.

**Q.** But we're agreed that you need to add the equity from the lost opportunity and deduct from that any equity that was made from what actually happened; correct?

**A.** Mr. Persechini should have included equity. That's what all experts discussing or doing damages on executive compensation do. I've never seen a damages expert that's

excluded a key component of executive compensation when computing damages. So by failing to put the equity in his analysis, he can't say anything definitive about whether there even are damages in this case.

**Q.** Your opinion was that if you assume that Rahul had been employed at Engel & Völkers for the same amount of time that he was employed at Freedom Mortgage, his losses are $4.25 million, something like that?

**A.** I was asked to do a calculation using Mr. Persechini's methodology -- which, again, I don't endorse but -- using his methodology and assuming that Mr. Mewawalla worked at E&V for the same amount of time he worked at Freedom Mortgage. I was asked to do that calculation, and I did it.

**Q.** And do you have an estimate of what his three-year damages would have been? Did you do any analysis there?

**A.** I was not asked to do that, no.

**Q.** Do you think it would have been less than Mr. Persechini's $21 million but more than the $4.25 million? Right?

**A.** I'm not sure what you're asking.

**Q.** Well, can you estimate for me now how much it would have been at three years?

**A.** No. I haven't done those calculations.

**Q.** Do you agree with me that over a six-year time frame, it's likely that a CEO will receive an increase in compensation?

**A.** Well, over a six-year period of time, again, there's

typically a probability that an executive can be terminated at points in time. Mr. Persechini didn't take that into consideration.

It's standard to look at survey evidence or academic literature or do peer benchmarking. Mr. Persechini didn't do any of that for termination probabilities. He didn't do any of that for expected salary increases. He didn't do any of that with respect to whether the bonuses would be hit.

Mr. Mewawalla said, "My salary would go up by this." Mr. Persechini used that in his analysis. I've never seen anybody do that.

**Q.** That's not quite what I asked. What I asked is: Would you expect that over a six-year period you assume that a CEO stayed in place, would you agree with me that you'd expect their salary to increase? Right?

**A.** Depending on whether they stayed in that job, the salary can go up. What it would go up by would depend upon performance and it would depend upon industry norms.

**MR. ROCOS:** Thank you.

No further questions.

**THE COURT:** All right. Thank you.

Redirect?

**MR. LEYVA:** No further questions, Your Honor.

**THE COURT:** All right. Thank you.

That will conclude your testimony, Professor. Thank you.

You may step down.

(Witness excused.)

**THE COURT:** Any further witnesses?

**MR. GAFFNEY:** No, Your Honor. The defense rests.

**THE COURT:** All right. Any rebuttal witnesses by the plaintiff?

**MR. RHOW:** No, Your Honor.

**THE COURT:** So both sides rest --

**MR. RHOW:** That is correct.

**THE COURT:** -- correct?

All right. That will conclude the presentation of evidence in this case. What we're going to do, since we're almost at the 10 o'clock hour, is go ahead and take our morning break.

When we return, I am going to give you the instructions on the law on this case. I will read those. They'll also be up on the screen so you can read along with me, and you will get a copy of the instructions when you deliberate.

After I complete the set of instructions on the law, each of the parties -- the parties may then deliver their closing arguments, and then I will give you some final-final instructions, and then you will be charged with deliberations. So we are on course.

So we'll see you in about 15 minutes.

**THE COURTROOM DEPUTY:** All rise for the jury.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Okay. So do we have the instructions that -- who's going to display them, Vicky?

**THE COURTROOM DEPUTY:** Yes. I already gave them to the defense trial tech.

**THE COURT:** All right. And so what I intend to do is to give the closing instructions, starting with Number 24, and then I will save the last -- from 44 on, I will save for after you've delivered your closings.

**THE COURTROOM DEPUTY:** So 24 to 43 to display?

**THE COURT:** Yes. And then after that, again, 44 through 49.

And what I intend to give to the jury -- unless there is a request, I don't see a need to give the front-loaded instructions I give at the outset. I could. I could give them the complete set. I don't know if you have any -- I guess it has some procedural things. I don't know. Sort of "What is evidence?" and that sort of stuff but --

**MR. ROCOS:** We don't think they're necessary.

**THE COURT:** Yeah.

**MR. ROCOS:** They've got plenty to read.

**THE COURT:** I think so.

**MR. GAFFNEY:** Nor do we.

**THE COURT:** Okay. So we will give them 24 through 49 physically, and I will read those. Okay?

**MR. ROCOS:** I think that's right, Your Honor. Thank you.

**THE COURT:** All right. Good. Thank you.

So we'll see you in a bit.

**THE COURTROOM DEPUTY:** Court is in recess.

(Recess taken at 9:54 a.m.)

(Proceedings resumed at 10:12 a.m.)

**THE COURTROOM DEPUTY:** Please remain seated and come to order. Court is back in session.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Okay. Are we all set? If so, let's bring the jury in.

(Pause in proceedings.)

**THE COURTROOM DEPUTY:** All rise for the jury.

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Okay. Please be seated.

Welcome back, members of the jury. Thank you.

So I will now give you the instructions on the law, and to help you, we're going to try and put it up on the screen so you can read along with me.

And you can ignore the numberings here because there were some earlier things that I'd already read to you, and there may be a number missing. But don't be concerned with the number of the instruction. It's the title of the instruction that's important.

**JURY INSTRUCTIONS**

**THE COURT:** All right. First, "Duty of the Jury."

Members of the Jury, now that you have heard all the evidence and the argu- -- well, and will hear the arguments of the attorneys, it is my duty to instruct you on the law that applies to this case.

Each of you will receive a copy of the instructions that you will take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, or irrelevant biases, whether conscious or unconscious. That means you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything I may have said or done that I have an opinion regarding the evidence or what your verdict should be.

"Fraud: False Promise (Count 1)."

Mr. Mewawalla claims Freedom Mortgage and Stanley Middleman made false promises about their plans for Xpanse that Mr. Mewawalla relied on in deciding to accept employment there.

To establish this claim, Mr. Mewawalla must prove all of

the following:

Number 1, that Mr. Middleman and/or Freedom made at least one of the following promises:

(a) Xpanse would be operated and managed completely separate from Freedom;

(b) Xpanse would be operated and managed in such a way that it could proceed through an initial public offering in four to five years;

(c) Mr. Mewawalla would report only to Stanley Middleman;

(d) Freedom would contribute revenue to Xpanse;

(e) Freedom would transfer significant intellectual property and technology assets to Xpanse;

(f) Freedom would transfer technologists to Xpanse;

(g) Mr. Middleman would use his relationship with other mortgage companies to attempt to convince them to use Xpanse's products; and/or

(h) Mr. Mewawalla would be employed at least through Xpanse's initial public offering.

2, that Mr. Middleman and/or Freedom did not honor that promise made and had no intention of doing so at the time they were made;

3, that Mr. Middleman and/or Freedom intended Mr. Mewawalla to rely on that made promise;

4, that Mr. Mewawalla reasonably relied on that made promise;

5, that Mr. Middleman was harmed -- Mr. Mewawalla was harmed; and

6, that Mr. Mewawalla's reliance on that promise was a substantial factor in causing his harm.

"Fraud: Concealment (Count 2)."

Mr. Mewawalla claims that he was harmed because Freedom Mortgage and Stanley Middleman concealed certain information. To establish this claim, Mr. Mewawalla must prove each and all of the following:

Number 1, that Freedom and/or Mr. Middleman intentionally failed to disclose certain facts that were known only to them and that Mr. Mewawalla could not have discovered;

2, that Mr. Mewawalla did not know of the concealed facts;

3, that Freedom and/or Mr. Middleman intended to deceive Mr. Mewawalla by concealing the facts;

4, that had the omitted information been disclosed, Mr. Mewawalla reasonably relied on that concealment - i.e., he would have behaved differently, as described in instructions that I will give you, Number 27 and 28;

5, that Mr. Mewawalla was harmed; and

6, that Freedom and/or Mr. Middleman's concealment was a substantial factor in causing Mr. Mewawalla's harm.

"Reliance."

Mr. Mewawalla relied on false promises or concealments of information if he proves that:

1, the false promise or concealment substantially influenced him to work for FMC and/or Xpanse and forego other employment opportunities; and

2, he probably would not have worked for FMC and/or Xpanse and given up other opportunities without the concealment or false promise.

It is not necessary for a concealment or false promise to be the only reason for Mr. Mewawalla's decision.

"Reasonable Reliance."

In determining whether Mr. Mewawalla's reliance on the false promise or concealment was reasonable, Mr. Mewawalla must first prove that the matter was material. A matter is material if a reasonable person would find it important in deciding what to do.

If you decide that the matter is material, you must then decide whether it was reasonable for Mr. Mewawalla to rely on the false promise or concealment. In making this decision, take into consideration Mr. Mewawalla's intelligence, knowledge, education, experience, as well as the terms of the written contract.

However, it is not reasonable for anyone to rely on a false promise or concealment that is preposterous. It also is not reasonable for anyone to rely on a false promise or concealment if the facts are within his observation -- if facts that are within his observation show that it was obviously

false.

"Damages for Fraud and Concealment."

If you decide Mr. Mewawalla has proved either his false promise or concealment claims, you also must decide how much money will reasonably compensate Mr. Mewawalla for the harm. This compensation is called "damages."

The amount of damages must include an award for all harm that Defendants was a -- all that Defendants was a substantial factor in causing, even if the particular harm could not -- could not have been anticipated.

Mr. Mewawalla must prove the amount of his damages. However, Mr. Mewawalla does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

In this case, Mr. Mewawalla is seeking damages in the form of lost income and other benefits from an employment opportunity with a German firm, Engel & Völkers, that Mr. Mewawalla claims he forewent to accept his employment offer with Freedom. If you find for Mr. Mewawalla on his fraud claim, you may award Mr. Mewawalla the difference between, on the one hand, the value he would have received from the Engel & Völkers opportunity; and, on the other hand, (i) the value he actually received from Freedom, (ii) the value he actually received from any other employer during the relevant time period, (iii) and any damages for breach of contract,

should you so award.

Mr. Mewawalla may also recover amounts that he reasonably spent out of pocket in reliance on Defendants' false promise or concealment if those amounts would not otherwise have been spent.

"Breach of Contract - Introduction."

As you have heard, Mr. Mewawalla asserts a claim of breach of contract against both Freedom and Xpanse.

Freedom does not dispute it had a contract with Mr. Mewawalla under the terms of the Employment Agreement, referred to as "Agreement," that was admitted as evidence at trial.  Xpanse, however, maintains that it never had an employment contract with Mr. Mewawalla.

Mr. Mewawalla alleges that Freedom and Xpanse owe him severance benefits under Section 8(d) of the Agreement because, he contends, Defendants did not have "Cause" -- that's quote around the term "Cause" -- to fire him as the Agreement defines that term.  Defendants contend that Mr. Mewawalla had "Cause" -- Mr. Middleman had "Cause" to terminate Mr. Mewawalla under the Agreement and therefore owed him no severance benefits.

Mr. Mewawalla also alleges that Freedom and Xpanse breached the contract with him by failing to pay him certain benefits he believes he earned during his employment.  Freedom and Xpanse deny that these amounts are owed.

"Contract Formation - Essential Factual Elements."

As noted, Mr. Mewawalla and Xpanse disagree over whether he had an employment contract with Xpanse in addition to his employment contract with Freedom. Mr. Mewawalla bears the burden of proving that a contract with Xpanse existed. To prove this, Mr. Mewawalla must prove all of the following:

Number 1, that the contract terms were clear enough that the parties could understand what each was required to do;

Number 2, that the parties agreed to give each other something of value [a promise to do something or not to do something may have value]; and

3, that the parties agreed to the terms of the contract.

When you examine whether the parties agreed to the terms of the contract, ask yourself if, under the circumstances, a reasonable person would conclude, from the words and conduct of each party, that there was an agreement. You may not consider the parties' hidden intentions, only their words and conduct.

If Mr. Mewawalla did not prove all three of the above, then a contract was not created between him and Xpanse, in which case Xpanse cannot be held liable for breach of contract or for breach of the implied covenant of good faith and fair dealing.

"Breach of Contract: Freedom (Count 5)."

To recover damages for breach of contract, Mr. Mewawalla must prove, by a preponderance of the evidence, that (a)

Mr. Mewawalla was terminated without "Cause," as that term is defined in Section 8(f)(i) of the Employment Agreement, and Freedom failed to pay severance benefits; or (b) Freedom failed to pay other benefits to which Mr. Mewawalla was entitled under the contract.

"Breach of Contract - Xpanse."

To recover damages from Xpanse for breach of contract, Mr. Mewawalla must prove by a preponderance of the evidence that:

1, Mr. Mewawalla and Xpanse entered into an employment agreement containing the same termination provisions and benefits as those in the Employment Agreement with Freedom Mortgage Corporation; and.

2(a), Mr. Mewawalla was terminated without "Cause" as that term is defined in Section 8(f)(i), and Xpanse failed to pay severance benefits pursuant to Section 8(d); and/or (b) Xpanse failed to pay Mr. Mewawalla benefits to which he was entitled under the contract.

"At-Will Employment."

The parties agree that Mr. Mewawalla was what the law calls -- was what the law calls an at-will employee. That means Defendants were legally entitled to fire Mr. Mewawalla for any lawful reason or for no reason at all. Defendants did not need "Cause" to terminate Mr. Mewawalla's employment. Whether there was "Cause" or not only affects whether he is

entitled to severance benefits.

"Breach of the Covenant (Count 6)."

In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of another -- of any other party to receive the benefits of the contract. Good faith means honesty of purpose without an intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract. Mr. Mewawalla claims that Xpanse violated the duty to act fairly and in good faith. To establish this claim, Mr. Mewawalla must prove all of the following:

1, that Mr. Mewawalla and Xpanse entered into a contract;

2, that Mr. Mewawalla did all, or substantially all of the significant things that the contract required him to do or that he was excused from having to do these things;

3, that all conditions required for Xpanse's performance had occurred and -- or were excused;

4, that Xpanse failed to act in good faith when determining that it had the right to terminate Mr. Mewawalla for "Cause"; and

5, that Mr. Mewawalla was harmed by Xpanse's conduct.

If you decide that Xpanse was contractually obligated to pay the above-mentioned benefits and that Xpanse's failure to make such payments was a breach of contract under Count 5, then Xpanse is not also liable for breach of the implied covenant of good faith and fair dealing under Count 6.

"Introduction to Contract Damages."

If you decide that Mr. Mewawalla has proved his claim against Defendants for breach of contract, you also must decide how much money will reasonably compensate him for the harm caused by the breach. This compensation is called "damages." The purpose of such damages is to put Mr. Mewawalla in as good a position as he would have been if Defendants had performed as promised.

To recover damages for any harm, Mr. Mewawalla must prove that when the contract was made, both parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as a result of the breach of the contract.

Mr. Mewawalla must also prove the amount of his damages according to the following instructions. He does not have to prove the exact amount of damages. You must not speculate or guess in awarding damages.

Mr. Mewawalla claims damages for: One, unpaid severance; two, unpaid benefits; and, three, unpaid paid time off.

"Affirmative Defense: Fraud."

Defendants claim that no contract was created because their consent was obtained by fraud. This is an affirmative defense to Counts 5 and 6, and to succeed, Defendants must prove all of the following:

1, that Mr. Mewawalla made representations to Freedom about his prior employment;

2, that Mr. Mewawalla knew that the representations were not true;

3, that Mr. Mewawalla made the representations to persuade Defendants to agree to the contract;

4, that Defendants Stanley Middleman, Freedom, and/or Xpanse reasonably relied on these representations; and

5, that Defendants Stanley Middleman, Freedom, and/or Xpanse would not have entered into the contract if they had known that the representations were not true.

If you decide that either or both Defendant Freedom or Xpanse has proven all of the above, then no contract was created with that Defendant.

"Affirmative Defense - Unclean Hands."

Defendants contend Mr. Mewawalla may not recover damages on any of his claims because, during the hiring process, he misrepresented material facts about his prior employment. This allegation that Mr. Mewawalla acted with what the law calls, quote, "unclean hands," close quote, is an affirmative defense that Defendants bear the burden of proving. If they do so in

connection with one or more of Mr. Mewawalla's claims, then he may not recover on such claims even if he has otherwise proved all of the elements of such claims.

The doctrine of unclean hands bars a plaintiff from obtaining damages when he has violated a duty of good faith or has acted unconscionably in connection with the same subject matter out of which he seeks a remedy. The misconduct alleged to constitute "unclean hands" need not constitute a crime or an actionable tort, but not every wrongful act constitutes unclean hands. There must be a direct relationship between the claimed misconduct by a plaintiff and the claimed harm by the defendants so that it would be unfair to allow the plaintiff to recover on her [sic] claim.

Although Defendants' "unclean hands" defense applies to all of Mr. Mewawalla's claims, you must weigh whether his alleged misconduct should bar him from recovering damages on a claim-by-claim, and Defendant-by-Defendant, basis. That is, you must decide whether Mr. Mewawalla's conduct constituted "unclean hands" and whether it had a direct relationship to each of the false promise claim, the concealment claim, the breach of contract claim, and the breach of covenant of good faith claim.

"Limitation on Remedies - After-Acquired Evidence."

Defendants Freedom Mortgage Company and Xpanse contend that the doctrine of after-acquired evidence applies to

Mr. Mewawalla's claims for breach of contract (Count 5). Freedom Mortgage Corporation and Xpanse contend that after they discharged Mr. Mewawalla, they discovered that Mr. Mewawalla misrepresented facts about his prior employment. Freedom Mortgage Corporation and Xpanse contend that they would have discharged Mr. Mewawalla anyway if they had known this. You must decide whether Freedom Mortgage Corporation and Xpanse have proved all of the following:

1, that Mr. Mewawalla misrepresented facts about his prior employment;

2, that Mr. Mewawalla's misrepresentations were sufficiently severe that Freedom Mortgage Corporation and Xpanse would have discharged him for that reason alone had Freedom Mortgage Corporation and Xpanse known of them; and

3, that Freedom Mortgage Corporation and Xpanse would have discharged Mr. Mewawalla for the misrepresentations as a matter of settled company policy.

If you find that Freedom Mortgage Corporation and Xpanse have proved that Mr. Mewawalla misrepresented facts about his prior employment and that had Freedom Mortgage Corporation and Xpanse known of this misrepresentation earlier, they would have discharged Mr. Mewawalla for that reason alone as required by the elements above, then Mr. Mewawalla may recover damages only -- only for any time before the date on which Freedom Mortgage Corporation and Xpanse discovered the

misrepresentations.

Freedom Mortgage Corporation and Xpanse must prove the date of discovery if it is contested.

"Obligation to Pay Money Only."

To recover damages for the breach of contract to pay money, Mr. Mewawalla must prove the amount due under the contract.

"Punitive Damages."

If you decide that Stanley Middleman's or Freedom Mortgage's conduct caused Mr. Mewawalla harm, you must decide whether that conduct justifies an award of punitive damages. The purpose of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

You may award punitive damages against Stanley Middleman only if Mr. Mewawalla proves by clear and convincing evidence that Stanley Middleman engaged in that conduct with malice, oppression, or fraud.

To obtain punitive damages against Stanley Middleman, Mr. Mewawalla must prove one of the following by clear and convincing evidence:

1, that the malice, oppression, or fraud was the conduct of Stanley Middleman; or

2, that the conduct constituting malice, oppression, or fraud was authorized by Stanley Middleman; or

3, Stanley Middleman knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

You may award punitive damages against Freedom Mortgage Corporation only if Mr. Mewawalla proves by clear and convincing evidence that Freedom Mortgage Corporation acted with malice, oppression, or fraud.

To obtain punitive damages against Freedom Mortgage Corporation, Mr. Mewawalla must prove one of the following by clear and convincing evidence:

1, that the malice, oppression, or fraud was the conduct of one or more officers, directors, or managing agents of Freedom Mortgage Corporation, who acted on behalf of Freedom Mortgage Corporation; or

2, that the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of Freedom Mortgage Corporation; or

3, that one or more officers, directors, or managing agents of Freedom Mortgage Corporation knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means that a defendant acted with intent to cause injury or that a defendant's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A defendant acts with knowing disregard

when the defendant is aware of the probable dangerous consequences of the defendant's conduct and deliberately fails to avoid those consequences.

"Oppression" means that a defendant's conduct was despicable and subjected Mr. Mewawalla to cruel and unjust hardship in knowing disregard of his rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that a defendant intentionally misrepresented or concealed a material fact and did so intending to harm Mr. Mewawalla.

An employee is a "managing agent" if the employee exercises substantial independent authority and judgment in corporate decision-making such that the employee's decisions ultimately determine corporate policy.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award punitive damages. If you decide to award punitive damages, you should consider all of the following factors separately for each defendant in determining the amount:

(a) How reprehensible was that defendant's conduct? In deciding how reprehensible a defendant's conduct was, you may consider, among other factors:

1, whether the conduct caused physical harm;

2, whether the defendant disregarded the health or safety of others;

3, whether Mr. Mewawalla was financially weak or vulnerable and the defendant knew Mr. Mewawalla was financially weak or vulnerable and took advantage of him;

4, whether the defendant's conduct involved a pattern or practice; and

5, whether the defendant acted with trickery or deceit.

And (b) Is there a reasonable relationship between the amount of punitive damages and Mr. Mewawalla's harm?

And (c) In view of the defendant's financial condition, what amount is necessary to punish the defendant and discourage future wrongful conduct? You may not increase the punitive damages award above an amount that is otherwise appropriate merely because a defendant has substantial financial resources.

Punitive damages may not be used to punish a defendant for the impact of his alleged misconduct on persons other than Mr. Mewawalla.

"Clear and Convincing Evidence."

As I mentioned, Mr. Mewawalla must persuade you that he is entitled to punitive damages by clear and convincing evidence, which is a higher burden of proof. You will recall that I gave you at the outset the standard of proof which we call preponderance of the evidence, which means something is more likely than not. Clear and convincing is a higher burden of

proof. This means he must persuade you that it's highly probable that Defendants Stanley Middleman or Freedom Mortgage Corporation acted with malice, oppression, or fraud as I have defined those terms.

All right. So those are the instructions on the law. Again, you will get a copy of these instructions when you deliberate.

But at this juncture, it is now the opportunity for each side to present their closing arguments, and we start with the plaintiff.

**MR. RHOW:** Thank you, Your Honor.

**CLOSING ARGUMENT**

**MR. RHOW:** Ladies and gentlemen, it is good to see you again. I told you in opening this would be another chance for me to speak to you directly.

I do want to thank you for your service again, your patience and your attention in this very cold courtroom. By the way, I didn't mean the judge; I meant the temperature. The judge has been very warm and inviting.

Now, I went a bit fast during the trial because we were on a clock. And my goal here is to kind of put the pieces together for you. But I'm still on a clock, so I'm going to have to move briskly, so I apologize for that.

At the beginning of this case, I told you that this case is about, and the story I would tell to you is the story of an

outsider. And we believe we have told that story, and we've told you the ramifications of an outsider like Rahul trying to set up a separate and independent venture within the Freedom universe.

The first two counts in this case are for fraud and fraudulent concealment, so I'm going to walk you through the law on fraud.

You saw the jury instruction. When you go back in the jury room, I'm sure you'll read it. But one thing to keep in mind is, for all of the representations on Count 1 that we've been talking about, we have to prove -- and we believe we proved almost all of them, but we really only have to prove one.

And if you look at these representations, they're all fairly related. They all occur in the same conversations. And so while we broke them out, the reality is we only have to prove one of them.

Now, it is clear that Stanley Middleman and Freedom made these representations. He said, point-blank --

"Did you tell him, Rahul, that Xpanse would be operated and managed completely separate, completely separate from Freedom?"

He said, "I did."

Now, he denied that it's not being operated in this fashion, but we'll show you that that representation, which he

admits he made, was not honored.

Now, he also -- if you listened to the testimony that Mr. Gaffney elicited from him, he actually confirmed that he made all of these representations; but his position is: I made it, but I honored it. Again, the evidence will show that he did not.

Bottom line is -- and it is undisputed from Mr. Middleman's own testimony -- that Rahul was promised, as it relates to Count Number 1, the fraud claim, that Xpanse would be managed and operated completely separate from Freedom. That's not disputed.

The reason that was an important representation for Rahul, as he confirmed, is his concern -- it's not personal -- his concern is, when you have a family business with a family culture, that can get in the way of operating a start-up that is separate.

So when Mr. Middleman testified, "Hey, this is a family business; this is a family culture," that's him not honoring the representation he had made.

But it goes further than that because what we learned from the evidence is Mr. Middleman concealed that Xpanse would be essentially part of the Freedom kingdom, where he could do whatever he wanted. He has that right if it is, in fact, part of Freedom, but he promised it would not.

He confirmed that, in fact, Xpanse would be part of the

Middlemans' tax shelter goals -- you heard about that -- and essentially a personal piggy bank. Again, that's not a problem. He's allowed to do that, but he made the representation to Rahul to the contrary.

Finally, what you heard -- and you heard this from Greg Middleman just now, point-blank -- Xpanse is managed by a steering committee. He denied it. Then I read him the testimony, and he confirmed that that was the case.

That fact alone proves that it was not separate and independent because the steering committee was a Freedom steering committee.

Greg Middleman has two positions. He's part of Freedom; he's part of Xpanse. Chris Staub is only part of Freedom. Michael Middleman is only part of Freedom. But they were the secret steering committee that Greg Middleman admitted to just now.

Other witnesses -- Josh Walker, remember him? He came in. I don't think he knew what was going on here.

I asked him, "Was Freedom Mortgage involved in the operations of Xpanse?"

"Yes."

"All of those gentlemen, that I mentioned, were involved in the management of Xpanse?"

Answer, "Correct."

I don't think he realized what he was testifying to. But

he knew what was going on. Everyone knew what was going on. Contrary to what Stan Middleman said would not occur, it was occurring right in front of everyone's eyes.

Josh Walker went a step further. And I was shocked by this. He said -- "Who was your boss?"

It was Adam Cohen. It wasn't even Tim Beard, the CFO. And Adam Cohen isn't an Xpanse employee. Adam Cohen has two email addresses, Archwell and Freedom.

Again, you see that, in fact, Freedom is not being kept separate, is not being operated separately at all. And this is from testimony of non-parties in this case.

Mr. Erik Anderson, you heard him testify. He told you that, in fact, based on the fact that Archwell and Freedom should be completely unrelated -- he admitted to that -- Freedom should not be making the decision to terminate Xpanse. That should either come from Xpanse or, what he said, the parent company.

Who made the decision? Stan Middleman, who has no role at Archwell; the steering committee, which includes Freedom folks. All undisputed in this case.

Second representation, Rahul was promised that he would report directly to Stan Middleman, not to Freedom insiders. Now, this really goes hand in hand with the concept of separation and independence. It goes hand in hand with that. Because he didn't want to report to a steering committee. He

didn't want a secret steering committee to be overruling what he was doing or directing Xpanse's operations, but that's what happened, and he didn't know about it.

In the corporate world, who you report to is a big deal. It's a big deal. It's not just something you put on a piece of paper; you're going to report to XYZ.

This was Rahul saying: I have a direct line of communication, not to Chris Staub, not to Michael Middleman, not to Greg Middleman, not to Adam Cohen, not to the army of folks you even saw during the course of this trial, all of these folks who surround Mr. Stan Middleman. I want one person who's going to be overseeing what I'm doing. I want one person who I have to answer to. I want one person who's going to see what I'm doing face to face and can give me a fair assessment. That was a big deal.

And it's in the employment agreement. He's reporting to one person, not a steering committee, no interference from Freedom. True independence is what he wanted but he did not get.

In fact, Erik Anderson confirmed that Rahul reported to him. That's, right there, a breach of the employment agreement. That's, right there, a breach of that representation that Stan Middleman admitted he made.

Bottom line -- and Greg Middleman confirmed this -- Xpanse was overseen not by Rahul, not by the officers of Xpanse, but

by the steering committee. That is not just a breach of contract, that is a fraud.

Chris Staub is interesting. You didn't see him during the course of this trial. I'm going to talk about that later. But he clearly is involved in the steering committee, in the decision to terminate. And he's a Freedom executive, exactly what Rahul wanted to avoid.

He testified, through the depositions, he has no tech experience at all; yet he's overseeing Rahul. You saw he is copied on all of the critical emails. Trial Exhibit 3, from November 2019, the offer letter. You also see the text chains where he's clearly talking behind Rahul's back.

This is the person Rahul's -- who's secretly overseeing Rahul? A Freedom employee who does not have his back? And, of course, he is one of the co-conspirators on the January 16th, 2021, email chain.

Bottom line is Chris Staub was never committed to helping Rahul. This is exactly why those representations were important to Rahul.

The text chain's never explained. You saw Mr. Gaffney in opening say, "We're going to explain these things. You're going to hear the context."

Chris Staub never showed up. Don't think he could get on a plane? Don't think if Stan Middleman said, "Get on a plane and get out here and testify," he would have? Never came

before you guys and explained why he wrote these things.

These are for the truth of the matter asserted. This is direct evidence of what Rahul was dealing with. You'll get a chance to read them when you go back there.

Chris Staub, part of the steering committee, makes the observation that, in fact, Rahul does not have direct access to Stan. That's what Rahul had been promised. It's a big deal. If you don't have direct access and have to go through a steering committee, it is suboptimal. Undisputed testimony for the truth of the matter asserted.

He goes on [as read]:

"This guy Rahul is driving me nuts," June 27th, 2020.

I showed this to you during opening. What I didn't show to you is what Jordan Glick calls Rahul [as read]:

"But Abdul will make some serious dollars."

Hardly a term of endearment.

Chris Staub, in June of 2020, says [as read]:

"Just worried about potential legal action."

Guess why? He knew he was going to drive him out. He knew he was going to get him fired. He knew they'd have to face the music on this, which they are doing today. This is two months after Rahul started from the guy who's supposed to be helping him.

The bait and switch, ladies and gentlemen, was the fraud,

telling him, "Hey, it's going to be this way," but, in fact, it's a different way. And the problem is that, in part, from the get-go, Stan Middleman said, "I'll be involved," but he couldn't.

There was an issue that we never really got explained during this trial, where folks at Freedom were expressing concerns about this family business. Chris Staub mentions there is this related-party transactions issue. Erik Anderson, in email, says: Hey, we've got to keep arm's length. We can't show Stan Middleman too involved.

He's going to be non-disclosed, but actually he is going to be involved? What is going on here? Why is this occurring? Why isn't Rahul being told about these related-parties issues and this conflict of interest that has nothing to do with it? It's never told to him, but it is affecting and causing Stan to insert this layer of management between him and Rahul. He has to do it because investors and customers are concerned about related-party transactions.

That's part of the fraud, ladies and gentlemen. That's part of what was never disclosed to Rahul. The bottom line is, Rahul could not report directly to Stan because Stan had all these other competing related-party issues; he needed to insert this secret layer of Freedom folks to control Xpanse, all of this directly contrary to what had been promised.

The bait and switch, you saw it live. They come in; they

take over Xpanse; they overrule Rahul; they change its incorporation, equity, and direction; and they fire him. That's not separate. That's not independent. That's the exact opposite.

And for Rahul, for all the complaints you hear about him, it is rather shocking because he really never had a chance. How can a CEO succeed when he's not a CEO, when there's a secret group overseeing him, overruling him, talking behind his back, poisoning the well?

The challenges Rahul faced are myriad. I won't go through all of them. It is clear the Middleman family -- and they deserve this. I have no issue with this -- but they're used to yes-men, and he was not.

We also know he was dealing with COVID. He was dealing with an inexperienced COO. And now we know, just today, he's dealing with a steering committee.

The other challenge Rahul faced was conflicts of interest. He needed to keep the non-Xpanse folks at bay and ensure that Xpanse's interests were being protected above Freedom's interest. That was one of the issues he had.

Erik Anderson confirmed, though, that there were no protocols in place to ensure that the conflicts between Freedom, Archwell, and Xpanse were handled. No wonder Rahul had a hard time. No wonder Rahul failed. Because in this massive competing and conflicting interest, Stan Middleman and

Freedom had no intention of honoring the promises that had been made to Rahul.

It culminates, ladies and gentlemen, in a plot to terminate him, and I want to focus on this for a second. We spent so much time on the three issues. Remember the LLC conversion, the equity buyback, and the double valuations? We spent so much time on whether Rahul was right or wrong. That's not the point. I'm going to assume, for the purpose of this closing, he was wrong. He wasn't right in all of his perceptions and opinions. But that is a red herring. Whether Rahul is right or wrong is irrelevant.

The fact that he was fired for having a good faith disagreement is the problem. He could have been a hundred percent wrong; but since he objected in good faith, that doesn't mean you get fired.

That's the true issue here. That's what I presented in opening. Yet we spent all this time with Professor Harroch saying, you know, all of the observations Rahul made about LLCs is wrong. I don't care. It is undisputed he made the objection, he believed the objection, and that's why they fired him. Firing someone for not being a yes-man is not a basis for cause.

Issue one -- we talked about it -- was the LLC conversion. I'm not going to go through the documents. It is pretty clear that in late 2020, Freedom told Rahul, despite the fact that

Xpanse had been incorporated as a C corporation, they told Rahul, "Sorry. We're converting to an LLC." That's undisputed.

It is also undisputed that in late December 2020, Rahul and Tim Beard say: You know what? That's not right. It's contrary to what's been promised. It's going to hurt recruiting. It's going to -- it's not customary to Silicon Valley folks. And, again, even assuming Rahul's 100 percent wrong, he has the right to make the objection, and he should not get fired for making the objection. That's the problem.

But you did hear, by the way, even Mr. Harroch saying, "Yes, it is customary." And you heard Tim Beard say, "Yes, it is preferred." And Rahul made clear, for him, he wanted it that way. The fact that he objected is not a basis for cause, even if he was not right.

Tim Beard made clear, the C corporation was critical. In response to Rahul raising it, their response wasn't, "Hey, let's get some lawyers in a room. Let's talk about this." They said privately -- this is the steering committee -- privately behind Rahul's back, saying December 17th, sarcastically [as read]:

"Didn't realize it's up for such heavy negotiation."

Why should the CEO even have a say in this? He's just the CEO, trying to protect Xpanse, but he should shut his mouth.

When he raises further objections, they don't try to talk with him. He's not rejecting meeting invites. They're saying secretly: The plan is to go dark. He's objecting too much. You know what? Let's just ignore him and go dark and do what we want anyways, which is what they did. I showed all of this to you in opening.

December 24th, behind his back, they convert. Certainly, they've raised the issue. They haven't kept that secret from him. But the fact that they go forward with a conversion behind his back tells you who is running the show here. The steering committee, which is supposed to be separate and independent, they're the ones making the decisions.

Behind his back, Chris Staub, who didn't show up at trial, Adam Cohen, who didn't show up at trial, he says: Hey, you just got the best Christmas present you could ever imagine, the conversion.

If you go into the email -- I am paraphrasing these emails -- you'll see; it's all right there.

In fact, Chris Staub even sarcastically says, "Hey, I'll send to these guys projections on the C corp.," a C corp. that no longer existed. Again, all being done behind Rahul's back.

Second issue was the double valuations. Remember what we talked about? Valuation of the employee's stock at this price; valuation of other stock at that price. Again, whether Rahul is right or wrong, he objected to it because he thought it

wasn't in the interest of Xpanse.

Tim Beard writes, "To be clear, this valuation scheme would blatantly manipulate the valuation which investors and the IRS might not be thrilled with. It would expose the company to liability."

Again, whether Rahul's right or wrong, that seems like a good faith objection. And Rahul is trying to have a good faith discussion about this issue, and they go dark on him.

Bottom line is, rather than talk about this issue -- and you will see in Trial Exhibit 305, Chris Staub, when Rahul raises it, privately he writes, "What nonsense. How can the CEO even raise an objection on this issue? He just should follow whatever the steering committee wants them to do."

The third issue is the equity clawback. I'll go through that really quickly. Clearly, this was a problem. It was non-standard. It was a non-starter for Rahul.

This is why he wasn't transferred over to Xpanse, because they were trying to insert this provision in there. He's ready to go. He's CEO of Xpanse. This paperwork issue is the reason that happened, because he objected to that.

And what Rahul did, to be clear, on November 16th, he tried to get other folks involved. "Tim Beard, let's hear his views. Bob King, I want to hear your views. Let's see if we can get to consensus on this," but they go dark on him.

Here's the "What nonsense" email, Chris Staub. Never

showed up at trial. He's not happy that Rahul is even talking. "You're CEO. You should not even be objecting or saying anything about this. It is nonsense for you to talk."

December 17th, 2020, it is absolutely undisputed that on these three issues, Rahul objects in late December 2020. It is absolutely undisputed that a month later, he's fired.

Common sense, ladies and gentlemen, tells you this is why he was fired. Everything you've seen at this trial is the cover-up for this. No one explains or disputes anything I just told you. That is the cover-up. That is despicable. That is inappropriate. That's why we're here at this trial.

Why else was Rahul terminated? I'll go through this quickly. There are a lot of other reasons that had nothing to do with for cause. Clearly, costs were at issue.
Erik Anderson thought Rahul's position was duplicative of Archwell. Rahul had a high salary.

This came in today, Exhibit 587. Erik Anderson's modeling a cost structure where you eliminate all leadership. That's what's going on. It's cost. The cover-up is what you saw during this trial. Real issues, they didn't like that Rahul objected. Cost issue was an icing on the cake.

The decision to terminate. I wasn't going to say this at the beginning of trial. I didn't know how the evidence would come in. This thing was orchestrated. This was manufactured. We now know -- you heard it from Mr. Anderson -- that that

email, the only email in his entire personnel file -- you'll see it -- that January 16th email is manufactured and put together seven days after the decision to terminate has already been made.

That's not how it should work. You should do a full HR investigation. You should interview employees. You should make sure you have the facts, put it all in the personnel file, and then fire him. You don't put emails into his personnel file criticizing his performance seven days after you have made the decision to terminate him already. That's bad faith. That's despicable. That's not how any company should work.

We know from Exhibit 334, "Let's let the noise of Rahul pass." What does that mean? The decision had been made long before then.

We also know from all the witnesses on the stand, they never reviewed anything beyond the January 16th email chain, never viewed actual evidence, never talked with Rahul.

Bob King calls him that day, not to talk to him about performance, to tell him, "You're being terminated for cause." No one bothered to pick up the phone and get a complete picture.

Mr. Middleman, Stan Middleman, confirms that here's the problem for them, and I'll explain it later. They know he does not have full discretion. They know and he admits, this decision must be made in good faith. This decision must be

made with as complete of information as possible. Stan Middleman, as difficult as he was as a witness, and I respect that, he admitted to this, "I can't make it based on whims. I can't make it based on hearsay or being subjective or just because I feel like it."

The real reason Rahul was terminated, he said no on the three issues. He wasn't a yes-man. The for-cause termination presentation you've seen during the course of this trial is a cover-up for the real reasons he was terminated.

The termination letter itself is part of the cover-up, and I'm going to talk about this later too. Rahul could not have been working for Freedom. He could not be terminated from Freedom. There's no evidence he was serving as EVP and chief digital officer of Freedom. The cover letter doesn't say, "You're being terminated as CEO of Xpanse." And it doesn't mention any basis for cause. It doesn't explain it at all.

This was Rahul's first and last notice. You will see from the agreement, that is a violation of the agreement. This was part of the cover-up that is now continuing in this trial.

The other things we know in terms of seeing a complete picture, Stan Middleman never considered Greg Middleman's role in leadership. A lot of complaints in those surveys were directed to him. The allegation was that Rahul spent too much money. That's how start-ups work. You spend money on the front-end; you make money on the back end.

Stan Middleman never considered that, in fact, losses were increasing, the number of employees were increasing even after Rahul left because that's the reality of start-ups.

Gina Colucci testified that in terms of these operating losses, what was happening, "Well, we're hiring a lot of people at high salaries." That's after Rahul has left.

This is interesting. Adam Cohen, Exhibit 338, January 20th, he says, "The fact that we're firing Rahul but literally doing nothing else is insane." You know what that is an admission of? That's an admission that the firing Rahul based on cost was a pretext. It was a pretext. "We fired him because he said, 'No' on the three issues. We actually don't care about costs. We're going to increase costs. We're going to do the same thing Rahul's business plan has laid out for us, but we're going to make it look like he was fired because of bad leadership, overspending, not moving fast enough."

The other part of the complete picture that's missing that Stan Middleman never considered: Did Freedom actually provide the support that it promised? We now know that the two representations here were made. Stan Middleman confirmed he did make these representations. This is in Trial Exhibit 3. He also confirmed that Rahul was there. Didn't meet him.

Three years later, they're saying -- four years later, with Kiran Sahota, it's like, "Oh, we did get it done four years later." The representation was that this would happen

quickly based on a plan, not four years later and certainly not in an effort to prevent Rahul from succeeding.

Breach of contract. You've seen the instruction. This is a single-issue claim on breach of contract. If you believe there was not cause, Rahul wins on that claim.

"For Cause," of course, is defined in the agreement. It's defined in Section 8. You'll read it when you -- if you need to read it, of course it's in Trial Exhibit 1. Opportunity to cure, advance notice, got to be in writing. Basic provisions.

Now, they make termination cause out to be something quite small, like if you disagree on a business decision, if you are too demanding on your employees. I tried to give you examples, just off the top of my head, of what I consider material. "Material" is the keyword there. It's stealing trade secrets, giving kickbacks, laundering money, embezzling money. Those are clearly material.

If you look at the entirety of that section, you'll know that simply pushing employees too hard is not material, especially when not one of those employees ever submitted a complaint to Rahul's HR file, personnel file, not once. You don't see it anywhere in the file at all.

If a CEO were fired based on what the defendant is arguing, no CEO would survive. Every CEO will have disagreements with employees. Every CEO will disagree with other members of management. It happens every day in every

company in the United States.

And if reputation is so important to Stan Middleman and Freedom, they should have considered this case because, based on the allegations, based on the evidence, how they're treating Rahul, their former CEO, is much more damaging to their reputation than Rahul's private relationships with employees at Xpanse back in the day.

Bottom line is the contract requires a finding by the CEO, advance notice, and an opportunity to cure, and those were not followed.

We know that there was no finding by the CEO. Greg Middleman testified. You saw me. I asked him, "Was this a group decision?" He said "No." But then I read his deposition testimony. It was a group decision.

I asked him, "The steering committee, they made that decision, they have the authority?" He said "No." I read the testimony. It was the steering committee.

That's a violation of the agreement. That's a violation of the representations. That's both a fraud and a breach of contract.

We also know the only document in the entire personnel file is the January 16th, 2021, email. We know it's sent five days -- seven days after the decision is made and only five days before he's terminated. In the personnel file, where's the pattern of misconduct? Where's the evidence of an

HR investigation? Where's the evidence that Stan Middleman looked at the full picture?

Exhibit 63 is the first and last notice prepared by Bob King, who really had no personal knowledge as to what was going on. The only thing he knew is he was late for meetings. We know that's not a basis for cause.

And this is critical. This part of the testimony was critical. First, Stan Middleman confirmed he had not given a prior notice for cause, never gave a chance to cure. He confirmed he did not believe Rahul had done any misconduct.

This is the critical testimony, ladies and gentlemen. He testifies that at the time he makes his finding, he was not thinking about the difference between a cause and a for-cause.

Section 8 requires him, when he terminates, to make a finding of cause, but his testimony confirms he was just terminating him. By virtue of that testimony, we know as a matter of law, Trial Exhibit 1, the employment agreement, Section 8, was violated. His own testimony. I don't need anything more than that. I don't need steering committee. I don't need Chris Staub. I don't need all the other testimony. That testimony alone tells you he never made the finding.

And, in fact, even as we sit here today, no one has made the finding.

Erik Anderson said: When did you get the evidence compiled for a for-cause termination? No idea.

That wasn't back then. That was a couple days ago. He said: Are you aware of any process that was put together to support a for-cause termination? Nope. Not a way.

Violation of the agreement, violation of good faith. This is the conduct that Rahul has been dealing with to get to this trial.

It gets worse. Exhibit 345, Rahul's lawyer writes to Freedom's lawyer and says, "Hey, listen, I know he got fired back on January 21st, but can you please tell me the substantiation? We've requested it many, many times. What is the substantiation for the for-cause termination? And, by the way, I want to see a copy of the personnel file."

Her response -- the lawyer's response, here's the basis for cause, she says, "I'm just not going to talk about it anymore."

Here's the personnel file with one email. This is February 28th. You know why she couldn't engage? She still didn't have a basis for cause.

It gets worse. Remember that email, the February -- the January 16th email? Greg Middleman confirmed Beth Cole is Freedom's employment lawyer. She doesn't get that email until a month later. How can anyone be making a for-cause determination as of January 21st when the employment lawyers don't even have the basis till a month later?

We know, from this evidence, Freedom is making it up.

They made it up in this trial, and you'll hear it in closing. They're going to keep doing that.

Look at the emails from back then. Look at the timeline from back then. Use your common sense. And look at Stan Middleman's testimony, which they cannot run from. He never made the finding. If you believe that to be true -- of course he said it -- they lose on that fact alone.

Bottom line is: This is why he was fired. Rahul was fired because he could not adopt the Middleman culture. He was fired because he was not a cultural fit. He was fired because he was a social experiment. He was fired because he was an outsider.

Does any of your common sense tell you that is, in this day and age, a proper basis for cause? Because we are not cultural fits? Because we are social experiments?

After four long years, we are here at trial. Why has Rahul been forced to take this to trial? Based on the fraud, because he was promised but never given true independence, true separation from Freedom, as he requested, and an actual opportunity to succeed on the breach of contract because he was not a yes-man to Freedom and the Middleman family and because they manufactured a for-cause termination.

Thank you so much. I will have one last chance to talk to you in rebuttal, but I appreciate you listening to me for now.

**THE COURT:** All right. Mr. Gaffney?

**A JUROR:** Can I take one minute?

**THE COURT:** Yeah, go ahead.

(Juror leaves the courtroom and returns shortly.)

**THE COURT:** Okay. Mr. Gaffney, you have the floor.

**CLOSING ARGUMENT**

**MR. GAFFNEY:** I join in Mr. Rhow's thanks for your time and attention to this case. I don't know how many of you wanted to be on jury duty. Often it's not a choice; it's a requirement. But if that's you, thank you again for showing up every day and listening attentively. We're grateful for that.

Now, at its core, this is a pretty simple case. Stan Middleman had an idea for a new company, and he hired Rahul to bring it to life. Ten months later, Stan learned what you now know, that Rahul was unqualified for the job and he got it only because, well, he finessed his way into it with what we could charitably call embellishments and, perhaps more honestly, ought to call lies.

Rahul was not only incompetent for the job, but he was a bad boss and an abusive manager. And so Stan did what anyone would expect him to do. He fired him. And he made a determination -- you heard him say this -- that Rahul was harming his business, harming the reputation of his life's work, Freedom, and that's why he was terminated for cause.

Now, that should have been the end of it. Rahul had made $2 1/2 million for ten months' work, ten times what he had made

in the prior five years at Zenplace. So for someone who had not earned more than $95,000 a year for the last five years, you'd think that would be a good deal; and for someone who conned his way into the job in the first place, you'd think he'd be grateful that Stan didn't come back after him for the money.

But, you know, that didn't happen, and Rahul is here asking you to give him more of Stan's money, $5 million plus in his contract claim and nearly $40 million for this alleged fraud. Okay? And I'm here to tell you -- ask -- tell you all the reasons why you shouldn't do that and ask you not to.

Now, a lot of this case is a credibility contest. You have -- you have Rahul saying he did this, he did that, he said this, he said that to various people; and you have all those people lined up on the Freedom side who he's called liars: Erik Anderson, Stan, Greg Middleman, Bob King, all of them.

He brought one witness to court to tell you how he did at Xpanse. You might remember him. Friday morning, Daniel -- Friday afternoon, Daniel Oh, the gentleman who came in from Seattle. He didn't know Rahul. The only thing memorable he said, from our perspective, is that he didn't care whether Xpanse was an LLC or a C corp.

So think about that when you go through the evidence. Think about the fact that Rahul doesn't have any corroboration for him telling Stan, "I need all this stuff," or complaining,

after the fact, when he said Stan didn't follow up on his promises.

So a teacher once told me that you can get away with calling one person a liar, calling two people liars is kind of iffy, and calling three people liars probably means you're the liar. We have a lot of people he's calling liars in this case, and you ought not stand for it.

Now, his résumé fraud speaks for itself, and it's important here, not just because it goes to his credibility, but it goes to one of our affirmative defenses. That's the unclean hands defense and the fraud defense that Judge Chen told you about. But even if you put those aside, it bears on his willingness to tell the truth and his uncomfortable relationship to it.

Now, let me talk about the claims and the evidence. Claim 1 is his false promise claim, fraud claim. So the elements of this, super important. Okay?

You have to find that Stan and/or Freedom made a promise they didn't honor and had no intention of honoring; that they intended him to rely on it; and that he reasonably relied on that promise.

Now, you remember this slide from the beginning of the case, all these things? They're just going to -- they just talked about one of them. Okay? The one about independence. And there's a reason for that. Okay?

You saw this one. He said, "Stan promised me I'd be employed through the IPO." His contract said he would be -- he was an employee at will. He said, "Well, that's really not one of my more important lies. It's my least important lie."

You saw these. He had made -- he has sued Stan Middleman for defrauding him for saying these things, all of which came true, all of which Stan -- Stan said, "Yes, I did -- I did tell him this, and I honored everything I did. I've contributed revenue. I've contributed intellectual property. I've contributed technologists. And I've used my efforts to try to get Xpanse customers."

In response to all that, Rahul came up the other day and said, "Well, he told me that would be on day one. He would transfer the entire IT department -- he told me he'd transfer the entire IT department of Freedom into this new company he just started," headed by a gentleman he'd only met a few times.

Seriously? Come on. You heard Greg, who was his number two. I said, "Greg, could you -- how would Xpanse have handled that?" He said, "We couldn't handle that. It would have been chaos. We didn't know what we were doing. We'd just started. We had two people."

Come on, you know that Stan is telling the truth when he's told you, "We are happy to give Xpanse everything it needs to succeed. He's just got to build something to deserve it, to make it work. I am -- I am rooting for his success."

Of course he was rooting for his success. He owned -- he and his family owned a hundred percent of Xpanse. He spent a lot of money to bring Mr. Mewawalla in. Of course he wanted him to succeed.

And you heard him say, when he didn't work out ten months later, he was saddened. He made a mistake. It was his mistake. He made the choice to hire him. He put him in there; and for all the reasons we'll get into, he made the choice to terminate his employment.

Now, I'm going to focus on this independence point, which is the only -- which is the entire basis -- according to the closing argument, the entire basis for the fraud claim is that Stan told Rahul that Xpanse was going to be independent. He quoted part of that. He quoted part of that.

[As read]:

**"QUESTION:** Did you tell him that Xpanse would be operated and managed separately from Freedom?

**"ANSWER:** I did, and it is.

**"QUESTION:** Okay. Did you tell him that Xpanse or that Freedom or the Middlemans, the owners of Freedom, wouldn't have any say?

**"ANSWER:** No.

**"QUESTION:** So you -- when you told him it would be separate and independent, you didn't mean that he was going to have -- not going to have to answer to the

owners?

**"ANSWER:** Yeah, I didn't think I was going to die and leave it to him."

Okay? So Rahul was expressing surprise that he was going to have to respond to the people who owned the company. He knew it was a family company. It was owned by the family.

He complains about having to deal with Erik Anderson. Well, Erik Anderson's job was to supervise the company's investments through Archwell, which includes owning Xpanse. He was the representative of the owners of Xpanse.

Rahul complains about having to take input from Mike Middleman. Well, Mike Middleman was an owner of Xpanse, a director of Xpanse, and the customer of Xpanse. He had no business getting involved in looking at things? Of course he did.

Chris Staub, another one of his villains, who is Chris Staub? Well, he was an executive at Freedom who Stan said, "I asked him to watch over this." Okay? "The company -- the family's investing a lot of money. I want you to pay attention."

And he told that to Rahul on his first week of work. In that April 4th email, he said, "You're going to -- Chris Staub is going to work with you. You're going to be owned by Archwell. Talk to Bob King. He's going to be involved. Greg is coming to be your number two." He told him all those

things.

Has Stan -- I'm sorry -- has Rahul -- did he ever object at the time? He did not. Have you seen a single writing anywhere that Rahul has written, an email, a note, even a witness other than himself who would say, "Boy, this is not what I signed up for"? Right? "This is not what I signed up for. I thought I wasn't going to have to report to the owners of the company." Right? "I thought that I could disregard -- I didn't have to listen to Chris Staub, even though you told me I should do that."

You don't see that. And that's telling in this case because there's a lot of documentation of things, but there aren't -- there's nothing that's corroborating his lies. And the truth of that is: Where's the evidence of him -- of him complaining? He complained to Stan that things were not as promised.

Now, I want to go through these quickly. I've gone through the promises.

Now, then the question you saw in the instruction was that Rahul would have to reasonably rely on promises. Right? So Stan made a promise of independence, whatever that means. Right? You can't -- there's no basis to say it means he was not going to have to answer to people, and answer to people besides Stan, because Stan had people working for him. His company was owned by Archwell. Of course he was going to

answer for them.

So reasonable reliance, what does that mean? Well, I want you to think about this because this came up a bit, and it went unmentioned by Mr. Rhow in his opening. Okay?

You saw the agreement, and the agreement had this Provision 22. This is super important. Okay? It's called the integration clause. And this is one of the rare cases where the witnesses on both sides of this case agree.

What is the purpose of this? It's to prevent disputes regarding whether parties made promises to one another that weren't included in the written agreement. Right? That's Rahul's own lawyer.

You remember he said, "I walked him through it to make sure there were not any promises that you had received that weren't in the agreement." Okay?

Bob King said the same thing. You know what it's designed to prevent? It's designed to prevent lawsuits like this, where someone says, "You induced me to sign this contract, even though the promises that I'm saying you made to me, I didn't bother to put into the agreement."

We went over this. You may have seen it. You may not remember it. We went kind of quickly. All the promises, every single one of those promises that he's suing over, he said in his complaint, the thing he filed to start the case, that the most fundamental material terms of his employment were these

promises.

And you saw what the integration clause said. It said: If we've made a promise and it's not in the agreement, you can't complain about it later. Or another way to look at it, if you've been made a promise by us, please ask us to put it in the agreement so we don't have any confusion about what you were promised, what you're relying on, and what you're not.

And you saw the drafting documents and you heard Mr. King, who drafted that agreement for Freedom. And I asked him -- I went through every one of those promises, and I said, "Did Rahul or his lawyer ever ask you for this? Did he ever ask you for this? Did he ever ask you for this? Transferring assets or long-term employment or report only to Stan?"

And he said, "Rahul never asked for any of that to be part of the agreement." Okay?

The instruction you're going to get on reasonable reliance is going to say you should consider the terms of the written agreement that he was a party to.

Now, the evidence on the integration clause issue is going to show two things: that he was never asked to -- he never asked to include these promises, which means he doesn't think they were made. He wasn't relying on them when he signed this agreement.

Now, there's a fraudulent concealment claim, which I think is based mainly, if I understand it correctly, about the LLC

issue; that Stan said that "I always wanted it initially. I always thought this thing should be an LLC."

And you'll explain -- you've heard from multiple witnesses who explained why that was, why the LLC structure made sense. You might remember -- I'm sorry. You might remember Erik Anderson explained it this way. I thought it was a very helpful way to illustrate it. The LLC structure made it possible for the company to finance this business for a longer period of time. Okay?

They explained -- they suggested this is all kind of some tax scheme for the Middlemans. If you're an employee and you join a start-up and you want to make sure that your salary is going to continue to be paid, you want an LLC because you can build more runway, more time to get off the ground.

Well, what about the effect on recruiting? Okay. You heard that was Rahul's objection to this. It makes it harder to recruit people. Well, that's not true. That's not true. Erik Anderson had personal experience with it. The expert you saw, Richard Harroch, had personal experience with it. No problem recruiting people. Erik Anderson himself was recruited, got interest in an LLC, talked about how nice that was, how effectively he recruited other people using the same thing.

Here's another thing. Look at the facts. Look at what happens, not just what he says. The evidence is uncontradicted

that no employee of Xpanse who was promised or told they would get stock options and ended up getting options in the LLC ever complained about that. No evidence to the contrary on that.

So let's talk about the elements of this fraudulent concealment claim.

I'm sorry. Looks like -- I was up very late last night making some slides. I wish I had -- looks like I've omitted the instruction.

So the instruction -- I'll paraphrase it -- requires three things. It requires that Stan or Bob intentionally -- Stan or Bob King intentionally failed to disclose -- Ryan, could you take that down -- that Stan and Bob intentionally failed to disclose their plans for the structure. Okay?

That's not true. You know it's not true because the email that Bob King sent in November to Rahul to talk about the summary of their discussions. It would likely be an LLC -- I'm sorry. It would likely be a C corp., but we needed the flexibility because we needed to take care of tax and other considerations.

He testified yesterday at length about that and that Rahul never asked him what he meant by that. What did you mean by the tax and other considerations? Why does -- what does that have to do with the corporate form? Why can't you commit that this would be an LLC? Okay?

You saw no evidence, zero evidence, that Rahul ever asked

anyone at Freedom to include a provision of the employment agreement that said, "This company would be formed and remain an LLC." Okay?

Remember, right around the same time when he's talking to the folks in Germany, he sends them a two-page email with 26 different points on changes he wants made to that EV agreement. Okay? So we knew he was paying close attention, asking for changes to the most minor aspects of that agreement; and he never once said, "Hey, you promised me this was going to be a C corp. Let's have that in the agreement."

Better yet, you heard uncontradicted evidence from both Greg Middleman and Bob King yesterday that when they were having this discussion with Rahul in the fall about whether their conversion should take place, Rahul never once said to either one of them, "Hey, you're not allowed to do this. I have a contract that says you need my consent."

He never said that. And the reason for that is his consent wasn't required. They took his input. Right? You heard Greg and Bob say yesterday, "Yeah, we listened to what he said. We considered it. Maybe he had a point." But they ultimately looked at how much money was being spent at this company, how long it was going to take to get off the ground, and that the LLC structure was the right way to go.

Perfectly reasonable decisions that the company was entitled to make. They took his input. They disagreed with

it. It turns out the evidence shows that they were right and he was wrong. It didn't affect any recruiting at that place. People with the expertise say no impact.

You heard -- you saw our expert witness, Mr. Harroch, came in yesterday, the older gentleman, expert in start-up structure and financing. He started lots of start-ups, lots of LLCs. LLCs are common. Okay? They are a commonsense way to structure a start-up. And he thought, if he were an employee of Xpanse, that's how he would want the company structured. Okay?

The only guy who you heard the opposite of -- opposite from, other than Rahul, is this guy Tim Beard, the guy with no face on the screen. Rahul did not bring him to trial. You couldn't see him in person and judge his credibility, but this is the evidence you heard about him.

He was fired the same day as Rahul. Erik Anderson explained this. He would have been brought in as a CEO that was -- a CFO. It was a totally unnecessary expense. $500,000 a year he was being paid to be a CFO at a company that didn't need a CFO. If you need proof of that, they didn't hire a replacement. Okay?

This was part of -- and we'll get into this and the cause and the mismanagement that led Stan to make the decision he made. That's a -- that's a reason for that, because he had people making half a million dollars who were unnecessary, and

that was all money that was coming out of the Middlemans' pocket, which they had asked Erik Anderson to supervise.

But suppose, suppose they didn't disclose this plan for the conversion. Okay? Stan says he knew about it. Stan says Rahul knew about it and he told him about it. But let's assume that that's not true.

They have to show that the non-disclosure, the concealment, was intentional. Of course it wasn't. Why would Stan Middleman have any desire to hide how he wants to structure his company? They're common. And Rahul was a -- represented himself to be a savvy businessperson. How could he not know? Okay?

And if he really was curious about it -- because you have to show that he didn't know; he has to show that he didn't know -- why didn't he ever ask when Bob King sent him an email and said, "Hey, we're going to have tax considerations go into the structure of this company"?

Okay. Now, this is -- this is the best part of the concealment claim. They've got to show that the concealment was intended to get Rahul to sign. That is, this is how it goes. They didn't disclose Stan's point about thinking that initially, before -- as it was getting up to speed, that Xpanse should be an LLC; and then when it was successful, they would convert it. That's their -- I think the guts of their concealment claim. Okay?

And then they have to show that he -- that Rahul didn't know that, that this was a good way to structure the company. Then they have to show that the concealment was intended to get Rahul to sign the agreement. Okay?

So let's think about this. Stan purposely didn't disclose his structuring goals in order to convince Rahul to sign an agreement he would otherwise not sign. That's crazy. Stan Middleman was starting up a new company. He thought Rahul would be good to do this, but he had other, as you saw, bigger -- bigger fish to fry.

Just a word about Stan. He's, obviously, a wealthy man, and we all saw the jury selection where there's some strong feelings about wealthy people in this country. And I guess I'd say this: If your kid grows up to be rich, at least if my kid grows up to be rich, I'd kind of like him to be like Stan. He's regularly recognized for having one of the best workplaces in his community. He's generous to his employees.

You saw Gina Morselli came up here today. She'd been there 30 years. Lots of other people have been there 30 years. People don't stay around at companies for 30 years if your employees are -- if your boss is a jerk. You heard Stan say that he would give gold watches out to people who made it to 25 years, and his jeweler called him up and said, "We're out of gold watches," and he had to come up with some other gift to give.

He builds a Children's Hospital. He invests in his community, buys a share of a baseball team that he's been rooting at as a kid.

And the idea is that this man so badly wanted Rahul to work there that he concealed whatever facts they say he concealed in order to induce that? I'd say it requires some monumental arrogance, monumental arrogance for Rahul, who for the prior five years was the proprietor of a failing Internet start-up, software start-up, to think that he was so uniquely and perfectly situated for this job and that Stan knew that, that he would lie to get him to take it.

If they were trying to lie about the corporate structure to get him to take it, why would Bob King, in his first email to him, say, "Hey, structure's up in the air. We have tax issues to consider"?

Okay. And then -- then Rahul's got to show that he reasonably relied on some non-disclosure. Okay? This -- of all the whoppers you've been told in this case, this may be the biggest one.

He takes the position that if Stan had told him, "Hey, let's start this thing as an LLC. It'll be more tax efficient, which means I'll have more money available to fund it; we can build more runway," if he gave that explanation, Rahul says, "I would have turned the job down. I would have turned down the million-dollar signing bonus, the million-and-a-half-dollar

salary, all the other things, the stock options. I would have turned it all down and I would have pursued that job in Germany."

You saw that. We'll get to the German job in a minute. The draft -- everything that says "Draft" all over it.

So the entire LLC issue -- I'll use a word that Mr. Rhow used -- it is a red herring. Okay? It is an argument meant to distract. They didn't hide it. They didn't hide the reasons for it. They talked to Rahul about it. He never claimed to anyone, when they were doing it, that they were breaching a promise to him. It's a distraction. It wasn't the reason they fired him. We'll get to that in a minute.

Now, let's talk about our unclean hands defense because we've spent a lot of time on that in the case. I'll zip through the verdict form here, where we're -- you're checking "no," ideally, through all of this.

So here's the instruction on unclean hands, that it bars a plaintiff from collecting damages when he has violated a duty of good faith or has acted unconsciously [sic]. All right? There must be a direct relationship between the misconduct so that it's unfair to allow him to collect. Okay?

So this is -- this is what the affirmative defense means, and it's important, that even if they proved fraud and even if they proved a breach of contract, if you find unclean hands, he loses both of those claims. Okay?

So we were -- this is the Gina Morselli email. We saw Gina today. This is what Rahul said about the things in there: She's a bad stenographer. I mentioned 1200 employees at Nokia. I said I didn't -- I never said I was making -- I was used to making that. I told her that I was making that kind of money seven years ago.

And you heard her response. You heard her response: I took that -- I took that down correctly. I took the salary information down correctly. If you had told me that he was talking about a job from seven years ago, I wouldn't have cared. That's not what we look for. We look for what they're doing now. And you can see that when she talks about Zenplace all over that. Okay?

Not the only person he was telling fibs to or lies to at that time. Right? Remember this? Same time, he's interviewing with Korn Ferry. This is their document recording the interview. He tells them: Not looking for money. Seems improbable. Does not expect to have a compensation as he has today. His current package, his current package is a million dollars -- million and a half dollars, plus a million and a half dollar bonus, plus long-term incentives of a million dollars and equity. Okay? False. That was not his current package. Okay?

He's telling Korn Ferry the same lies that he told Gina Morselli. Either that or he's ended up with the bad luck of

getting the two worst stenographers, the two worst notetakers in human resources in Germany and the United States. Okay?

This is another evidence of his lies -- okay? -- of his misleading his way, lying his way into this job. Okay? You remember this? This is his résumé. Okay? He touts this. He talked about: Everything on my résumé is accurate. I'm really proud of that.

By 2023, he is taking it off. He doesn't even include it anymore. He said, "Well, I didn't have enough space on my résumé." Right? Remember that testimony? Well, that's obviously not true. It's the same number of lines.

He's like, "Well, Microsoft Word, when you put in bullets, makes it hard, so..."

Come on. Take off -- the very first thing that used to be on your résumé that you take off after you've been -- after the defendants in this case have accused him of unclean hands? Seriously.

Now, this may be the worst of it. Okay? This is 2022. This is his résumé he was sending out after he was terminated. Okay? He sounds like he's Stan Middleman's right-hand man at Freedom Mortgage. Okay?

What did he actually say? He said, "I've never managed an employee at Freedom Mortgage. I never did any work for Freedom Mortgage." And, yet, look at what he says. He led this business. He grew the business, a 50 percent increase.

He obviously has a willingness to tell potential employers whatever he thinks they might want to hear, whether it is accurate or not.

Again, if you decide the -- if you decide he has acted with unclean hands, the case is over. No fraud, no breach of contract, no nothing.

I just wanted to show these one more time. We showed this to Gina and some of the other witnesses. If Stan -- we asked Stan Middleman this [as read]:

"If you knew these facts, if you knew these facts about his income, would you ever have hired him at Freedom?"

And Stan said "No," obviously.

Gina said she wouldn't even have recommended him for an interview. So he got in the door with these misrepresentations about his work at Zenplace. That's Stan's testimony. You remember that.

Now, on the contract claim, you remember this. There were contract claims he has asserted against Xpanse and against Freedom.

The Xpanse claim, I'd like to dispense with quickly. Right? You remember this? He had a written employment draft with Xpanse and never signed it -- okay? -- even though his contract said you're going to execute this agreement if you want to become an employee of Xpanse.

He said, "Well" -- I forget exactly his reasoning. "I was -- because I was already acting as the CEO, then I didn't think I needed to sign this. But my deal with Xpanse is the same thing that's in this agreement, even though I didn't sign it."

Come on. Come on. You heard Greg Middleman say this morning -- Stan called him a liar for saying this when I asked him about it on -- I'm sorry. Rahul called Greg a liar for saying this because I asked him about it when I was cross-examining him. I asked Greg.

**"QUESTION:** Did you ever -- was Rahul an employee of Xpanse?

**"ANSWER:** No.

**"QUESTION:** How do you know?

**"ANSWER:** Because I asked him to become an employee of Xpanse because it was important for our other employees to know that the guy running the company was not a Freedom guy."

Okay? He said he wouldn't do it. He speculated that was because he wanted to wait until these better financial deals came in. But it doesn't matter. He wasn't -- he wasn't an Xpanse employee.

And you'll notice -- this is some important testimony from Greg. In these conversations, he estimated five or ten of them that he had with Rahul on this subject, Rahul never once said,

never, "I'm already an Xpanse employee." Okay?

I don't know why he's suing Xpanse. I suppose it's to try to claim the 150 percent bonus. Maybe there's something else. The damages he seeks against Xpanse are the same he's apparently seeking against Freedom, but there's no claim against Xpanse, and you ought to decide that issue in Xpanse's favor. Okay?

Now, on the breach of contract, this is super important. The burden is on Rahul to prove that Stan did not have cause. The burden is not on Freedom or Stan to prove that it did. Okay?

So he has to prove that Stan did not make a finding that Rahul was engaged in conduct that is or reasonably likely -- or is reasonably likely to be materially harmful to the business, interests, or reputation of the company.

Stan, you heard him. He said, "I looked at this, and I concluded that all of these things were true."

You saw Stan say and describe at length how important the reputation of this company was to him. He started it from scratch. He has his family working there. He gets awards for being a great employer, people there for 30 years. And when he hears stories about Rahul berating employees, having them leaving in tears, about not showing up to meetings, about terrible relations with the customer, Freedom, Stan made his finding. And Rahul's got to show that Stan didn't make a

finding, Stan didn't have a reason to make a finding. I don't know how he's going to do that.

Now, we had this thing about the steering committee. Well, Stan didn't really fire him. They had an excerpt from Erik Anderson's deposition where he said, "Was the decision made to terminate him on January 6 or something?" They left out the part where I followed up with him, and I said [as read]:

**"QUESTION:** Well, who made the decision to fire Rahul?

**"ANSWER:** Stan did.

**"QUESTION:** What decision did you make on January 6th?

**"ANSWER:** We had concluded that we would recommend to Stan that he be fired."

But it was up to Stan. Right? No question that there was a group of people who provided input into the termination, all of which was appropriate. Greg Middleman, he worked there and owned half the company. Mike Middleman, he worked there. He was the customer that Freedom was supposed to be building a product for. Erik Anderson, president of the majority owner -- not majority owner, the 100 percent owner. His responsibility was to make sure this didn't fail. He said it was going to be a spectacular failure, economic catastrophe. Okay?

You've got to understand, from his position, if that happens to Xpanse, a company he's ultimately responsible for, that's not just Rahul's problem; it's Erik's problem. Okay?

Chris Staub, same thing. Assigned by Stan to make sure the family's company -- money was being spent prudently. That was his job. He looked into it and concluded that it wasn't.

And none of these people made the decision to fire Rahul. That's -- they've got snippets about: I was involved. Did you make -- you saw the letter from Greg. I made the decision to terminate. He explained that. My dad made the decision. He was the CEO of Freedom. He had hired this guy. It was up to him, and he decided to do it.

You heard Bob King's testimony yesterday. He wrote the termination letter. Okay? He talked to counsel before he did that. He himself is a lawyer. He assured himself, talking to all the people involved, that Stan had a basis to fire Rahul for cause. Okay?

So you've got to find -- you've got to find that all of that is phony, that it was all a pretext of some sort. Right? This was all -- this had nothing to do with Rahul's performance. It had everything to do with the LLC issue that he objected to, this 409A issue, whatever that is -- something about the stock option plan. He didn't like a term that they were negotiating, and that's why they got rid of him. And it had nothing to do with the fact that people were leaving in tears, that the financial picture was awful -- right? -- or that he would never show up to meetings. You heard that from Erik Anderson. He'd ask for meetings. He is -- he's got a lot

to say in Rahul's operation of Xpanse because he represents the owners, and he would like a meeting once a week, and Rahul said "No." Okay?

Now, you've heard about this: One more piece of proof here that will show you, that will show you that Rahul's firing was justified, was not a pretext, and that the determination that he was bad at it, that he was hurting the reputation of the company, he was hurting the business.

The proof of that is -- you saw it yesterday when Ms. Sahota got up on the stand. She was a Freedom employee, not an insider, not a friend of the Middlemans, didn't know them before she interviewed, had only been at the company two years, had worked at a competitor. She comes in and they say, "You need to take a look at Xpanse."

And she comes in, and you heard her, it was a mess. Products were behind schedule. One product, she was spending $800 a month putting -- paying the bills at Xpanse. A product that Rahul started, they had to pull the plug on. The B2B product, you hear, they needed it in the door to replace the other thing, way behind schedule and it was terrible. It did not have the functionality it needed. Okay?

By the time she actually took over Xpanse, it was down to six employees. It's now up to, I think she said 350. Okay? It's got new products. It actually has customers. It is fulfilling the vision that Stan had for this, or at least it's

on its way. Okay?

There was cause to terminate Rahul. Stan had cause, and he did it.

One last thing about the -- on the termination. The accusation is that he didn't have to -- he didn't give him cause. He said cause was required. Well, cause -- I mean, I'm sorry. Notice was required. Remember that? He said you had to give him notice, didn't give him notice, that's the end of it. That's not what it says. Okay?

Notice is given [as read]:

"Provided that if such conduct is, in the reasonable judgment of the company, curable. The executive was given notice.

So it's up to Stan to decide whether the conduct he saw was curable. Right? And he's like, "This is my company." This is his reputation. Okay? He had been warned. And you saw the evidence corroborating that. Okay?

Erik Anderson said he sat down with him and talked to him. Greg said, this morning, he said, "I would meet with him and tell him these are problems. We need to fix them, and nothing happened." Okay?

So you have to give the CEO of the company notice to say you need to do all the things we asked you to do the last three months and you didn't do? No.

The reasonable judgment, that's up to Stan. Did he have a

reasonable basis to conclude that this stuff was not going to be fixed, that the reputation of the company that had been hurt by the -- by chasing recruiters out onto the street and having them bad-mouthing Xpanse and Freedom in the recruiting community, that that stuff was somehow curable? They've got to prove that it was curable, and Stan had no reasonable basis to conclude otherwise.

Now, let's talk briefly about the termination procedure that they followed. The suggestion is, from Mr. Rhow, that either Stan wasn't involved -- false. Stan said he did it. Okay? -- or that he somehow acted impulsively, that this was a rush job, a rush decision. Okay? That's clearly not true.

How do you know it's not true? Because his oldest son, Michael -- okay? -- sent Stan an email mid-December and said, "I think Rahul's got to go." Okay?

What did Stan do? Did he turn around and fire Rahul? No. He said, "I want to talk to Greg." And then he got the input of Erik Anderson; he got the input of Chris Staub; he consulted counsel; and he made his finding. Okay?

He wasn't fired because he was an outsider. They replaced him with an outsider. He wasn't fired because he didn't want the conversion to occur, because they considered his arguments and they rejected it. Okay?

The issues about 409A valuation or what exactly was going to be in the repurchase stock documents or stock plan, Stan

didn't even know about that stuff. Okay? He testified that way, and it was uncontradicted. Okay?

Bob King sent the letter. You heard from him. He tried to call. You know, they had this thing about, "Well, they never even called him." He tried to call him. He said he couldn't reach him, and he decided to send it out. You know why that is? Word gets out. You don't want the employee to hear from someone else. You want them to hear it from you. Okay?

Now, one last thing on the contract claim. There are affirmative defenses to the contract claim that are only to the contract claim. You may remember this, that he -- that Judge Chen read to you. Okay? One is fraud.

If you find that Rahul made a false statement that they intend- -- that he knew was false and he intended them to rely on it and they did rely on it, he can't bring his contract claim. And every one of those elements is satisfied by the résumé fraud.

The statement where he made a false statement to Gina Morselli, abundant evidence of that. Obviously knew it was false when he made it. Obviously done to induce Freedom to bring him in and interview him, give him a job. And they did, and they relied on it.

And you saw the testimony from Stan saying, "You know what? If I had known the truth, not a chance I'd have hired

him." Okay? "Not a chance I'd hire him."

Remember what he said. You know, failure -- no shame in failure. Lying is something different. Okay? You've got to have honesty.

Could you bring up the damages slide, Ryan?

So you have contract damages and you have fraud damages. Let me talk about the contract damages briefly.

He wasn't entitled to a 150 percent bonus from Xpanse. Remember, that only is available at all if you decide that Xpanse is in the case, if you decide he had a contract with Xpanse, which he didn't for all the reasons I said.

But even if it's in the case, then he's got to prove that the provision in the unsigned Xpanse agreement that limited his bonus to 100 percent doesn't apply, even though there's a provision in this agreement that said nothing changes unless there's something signed, in writing -- made in writing, signed by both of the parties. Well, there was nothing. The contract itself wasn't even signed, much less any agreement to make a change about it.

So that is a -- there's no basis for the 150 percent. And then you -- that's just on the documents.

You heard Greg this morning. He said, "150 percent?" That was in a -- that was in a PowerPoint that was -- it was Rahul's idea. He wanted to give himself a raise. Okay? Never approved by the board, never agreed to in writing.

So whatever you think about the contract claim -- and I think the answer to the contract claim is there is no contract claim because they can't prove that he was fired for cause and they have a problem with unclean hands and the other affirmative defenses. But even if you get there, this idea of a bonus of 150 percent is crazy. No evidence to support it at all.

Now, what about the fraud damages? Well, you remember Mr. Persechini? He was up there yesterday, and he told you $39 million or something. And he made all these assumptions.

And Mr. Guay, this morning -- Mr. Guay, this morning, went through them all and said no responsible expert would decide -- would have held those assumptions. Okay?

And Mr. Guay, by the way, is actually an expert in executive compensation, unlike Mr. Persechini. He's an Ivy League professor. He publishes a lot on these issues, and he's testified a whole bunch of times.

Here's what he said about the baseless assumptions. Remember? They said there was a deal that was going to happen. That's what Mr. Persechini said. Well, there would have been a deal on that first draft, the one that Rahul had 26 problems with. Okay?

The assumption would be that the negotiations, which were obviously ongoing -- they hadn't responded to his email at the end of January -- that they would be finished before the COVID

pandemic hit six weeks later -- okay? -- that this would get done in six weeks, because we know what would happen if the COVID pandemic hit. You saw the email. They said, "We're not bringing people in from the U.S." Understandably, they're not the only company that did that.

They assume he's going to get a 7 to 10 percent raise every year? That would be nice. And then an additional step up 25 to 30 percent because he would get a new contract with another big raise. Okay? You heard Mr. Guay say, you know, CEOs don't last that long. There's no study in the literature predicting that he would have somehow been up there for another three years.

Max bonuses every year. So a guy, who you saw his performance here at Freedom -- they gave him a chance and it didn't work out and it went badly. But they're saying the same guy would earn max bonuses every year at Engel & Völkers, keep his job through COVID, get a new contract after three years, not get terminated.

It's utter speculation. That $40 million is just made up. This little thread here, little thread there, they try to pull it together and say, "I think" -- this is what his opinion was: "My opinion is that if he had taken that job or that if he hadn't been lied to -- okay? -- if he hadn't been lied to and taken that job, this is how much money he would have made," and it's nonsense. Okay?

I'm going to say the last thing about punitive damages. He didn't say anything about it. You heard the instruction. This is important.

The punitive damage issues relates only to the fraud claim. That is, the only conduct that could give rise to punitive damages is conduct that occurred between July of 2019, when he applied, and February -- February 15th of 2020, when he signed his agreement. That's where the alleged fraud occurred. To have punitive damages, there would have to be conduct occurring in that period. Okay?

It's got to be malicious, nasty stuff by Mr. King -- I'm sorry -- by Mr. Middleman -- okay? -- or Mr. King. You have to find some serious intent to injure him. Okay? Come on.

But he's got to prove it by clear and convincing evidence that leaves no doubt in your -- very little doubt in your mind that that's what happened. Whatever else he might say about being disappointed of how things worked out and that "I wish" -- "Stan made me promises that I know I didn't get in the agreement, but I wish he had honored them. I don't like the way I was treated," fine. Punitive damages, willful, malicious, conduct? Not a chance.

Thank you for your time. I really appreciate it. 52 minutes doesn't seem like a lot to me. Maybe it seems like a lot to you. But, again, your attention that you've given the case here, and I know the attention that you're going to give

it in the jury room, greatly appreciated.

I urge you to find that the 2 1/2 -- $2.3 million that Stan paid him is enough; that you shouldn't give him more money. You shouldn't take more of that money away and give it to him. He's been treated fairly enough.

Thank you.

**THE COURT:** The plaintiff has an opportunity to give one final rebuttal argument, but we've been going at it for almost two hours. But I don't want to have take the full lunch break yet because we're almost there.

You have about --

**MR. RHOW:** I have about 40 minutes.

**THE COURT:** How long?

**MR. RHOW:** 40.

**THE COURT:** Oh, okay. Well, then maybe we should take -- that means you won't get your lunch till about 1 o'clock at this rate.

All right. Well, I guess we'll have to take a lunch break at this point, then.

All right. So, again, we will take a break for 45 minutes, after which we'll hear final rebuttal argument from the plaintiff, and I'll give you a few final instructions, and the case will go to you for deliberation.

My admonition is still, do not talk about this case yet amongst yourselves or with anybody else until the case is fully

submitted to you.

So we'll see you in about 45 minutes.

**THE COURTROOM DEPUTY:** All rise for the jury.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** All right. So they'll probably get the case around 2 o'clock, is my guess at this point. Thank you.

**THE COURTROOM DEPUTY:** Court is in recess.

(Luncheon recess taken at 12:10 p.m.)

**Afternoon Session** **12:58 p.m.**

**THE COURTROOM DEPUTY:** All rise for the jury.

(Proceedings were heard in the presence of the jury.)

**THE COURT:** Okay. Please be seated, everyone.

Thank you and welcome, members of the jury.

Plaintiffs now have an opportunity to deliver what's called their rebuttal closing argument.

And, Mr. Rhow, you have the floor.

**MR. RHOW:** Thank you, Your Honor.

**REBUTTAL ARGUMENT**

**MR. RHOW:** Thank you, ladies and gentlemen.

So I'm going to try to finish up here and cover some of the points and then conclude. I'm going to kind of move around a little bit, though.

The first point I want to talk about is this point: not for the truth. It's very important because when you hear a lot of the evidence that came in during closing, you have to

analyze what is its purpose, what is its utility. And this instruction, as you recall, tells you that when Your Honor told you that evidence is coming in for a limited purpose, it's only for that purpose.

And a lot of the evidence you heard during the closing just now did not come in for the truth of the matter, for the truth of what was said. Very important.

The January 16th, '21, email chain talking about difficult relationships, talking about abusive relationships, that's the first time I heard that. Not truthful. Not a fact on which you can rely on. No evidence actually supporting that because the judge's instruction was it's not coming in for the truth.

In fact, a lot of the evidence you heard, the survey evidence did not come in for the truth. Hearsay, what other people said, did not come in for the truth. The notion of an abusive relationship did not come in for the truth.

And what's really concerning about that is, when you throw that word out, it actually makes defense case less credible because if there truly was an abusive relationship, it should be in the personnel file. There should have been an HR investigation. People should be interviewed. There should be verification.

And the reason this instruction exists is so that people can't just come up and talk negatively about someone and get away with it, because it's not for the truth.

And I submit to you, if you look at the evidence that's presented, much of the evidence supporting for cause did not come in for the truth. That's the instruction, and it makes sense. It's fair so that you can't attack someone based on gossip, based on hearsay, based on what they heard from someone else when your HR department has made no attempt to verify that.

Remember those recruiters, the recruiters who said these things about Rahul? They never showed up at trial. Not for the truth.

And that's why we're here, is because Freedom decided to attack Rahul's reputation, dared him to come to trial, dared him to take on an army of lawyers, and said, "We're going to attack you not with the truth, but with gossip, things I heard from other folks, and we're going to smear your reputation forever."

Exhibit 62, not for the truth.

And so the bottom line is, there is no truthful or actual evidence supporting Rahul's purported termination for cause.

One thing I heard Mr. Gaffney say is: How come you didn't see other ex-Xpanse employees? You really think an ex-Xpanse employee wants to deal with this army of lawyers hired by a billion-dollar company to tarnish their reputation, to tarnish their ability to get other jobs?

Daniel Oh came in, and he was really truthful. He even

said during his interview with Xpanse, he may have not told them about the Amazon issues. And what did he say at the end? I did this because it was the right thing to do.

Kiran Sahota, she has to come. She has to get on the private jet and come because her job depends on it.

All these other folks, why are they here?

**MR. GAFFNEY:** Objection, Your Honor.

**THE COURT:** That's --

**MR. GAFFNEY:** There's no evidence --

**THE COURT:** Well, there's no evidence of that.

And remember that the attorney's statements is not evidence, and I would like you to stick to the evidence.

**MR. RHOW:** Understood.

**MR. GAFFNEY:** She flew commercial, for what it's worth, to correct the record.

**MR. RHOW:** However they got here, whether it's Kiran Sahota, she's currently at Freedom. Why do you think she's here? Her job depends on it.

Why do you think these other folks are here? They're either friends with Greg Middleman or the Middlemans.

Not Daniel Oh, who came because he said it was the right thing to do.

Tim Beard testified through deposition. This did not come in through objection. This came in without objection. And he made clear Rahul was demanding; but as CFO of the company, he

was not aware of any conflict. It's just normally what happens in a start-up when you're trying to push people to meet deadlines and trying to meet budgets. You're pushing folks to work harder. And it was even more hard during COVID.

And remember, Mr. Middleman said that in his email. He said, "This is the most challenging managerial situation I've ever been involved in." Rahul had to face that too.

The distraction, Rahul's résumé. We spent so much time on this. Let's look at the jury instruction on this.

If, and to the extent, Rahul misrepresented material facts about his employment, material facts, there must be a direct relationship between the claimed misconduct and the claimed harm. There has to be a relationship.

What does the evidence show? Stan never cared about Zenplace. He didn't care. He didn't ask a single question about it. What he cared about is his work at Yahoo!, big companies, like Stan's company, like Nokia, like GE. That's what he was focused on, not a start-up called Zenplace.

The evidence will show -- or, sorry. The evidence already shows that Rahul did take a minimal salary as a founder, but that's normal. The founders of a lot of tech companies, they don't take any salary because they're focused on building the company. They're focused on stock and building the value of the company. They're focused on an IPO. They're not trying to take a salary from a start-up.

And the bottom line is this was part of his career arc. He put it on his résumé, as he should; but if you look at his résumé, what stands out is his positions at Yahoo! and Nokia, at GE, and that's why he got hired.

It is true -- it is true, actually, that Rahul was not motivated by cash, by dollars. He was motivated by stock options. He testified to that. The true attraction of Xpanse was getting a piece of the company. He had done the salary thing, and now he wanted to go for the ideal thing.

The evidence was clear that Freedom did not rely on his résumé. That is a red herring. Exhibit 228, they did their own background check. They verified Zenplace. They verified the data related to Zenplace. No response to this Exhibit 228.

Exhibit 8, the offer letter, makes clear, "We will do a full background check on you," and they did it. Stan Middleman confirmed that.

And, remember, this is Freedom's HR department that deals with 7,000 employees, that knows how to put together a personnel file. You think they didn't do a background check here? You think they didn't call references? They did. Rahul testified about that.

So everything they're saying now that they didn't know, they certainly called references; and if they cared to know, they would have asked.

They knew Zenplace was a start-up. They knew it had

minimal revenues. Not every start-up makes it. Rahul apologizes for that, but he put it on his résumé to show his overall career.

We know from the meetings that Stan Middleman -- and there were four or five face-to-face meetings, remember that, with a bunch of other folks from Freedom. Gina Morselli is not part of any of those meetings. These are Stan, Chris Staub, Bob King, Robert D'Urbano. You heard about these folks. No one asked a single thing about Zenplace because they didn't care. They knew it was a start-up that had not yet succeeded, and so they focused the discussion -- and Rahul testified about this -- on the large companies, Yahoo! and Nokia.

And what I put at the top of this slide is Stan's statement. Remember this statement? "People Get Paid What They Are Worth."

Now, I don't agree with that at all. I think people have value beyond that. But if that is true, what Stan said, then he would have asked about Yahoo! and Nokia. He would have asked, "Hey, at big companies, what are you getting paid or what did you get paid?" That's what he would have focused on.

Now, Gina Morselli's email, we spent a lot of time on this during this trial. The jury instruction says there has to be a link between the claimed false information and the hiring decision. Gina Morselli's email is the initial discussion. What that email allows Rahul to do is get an interview. It

doesn't get him the job. It doesn't get him anywhere close to the job. He has not met the head honcho yet. He has not met Stan Middleman.

And so she is the gatekeeper to him getting an interview and a meeting with Stan, where Stan is going to ask whatever he wants to ask, whatever he thinks is important, because the person who's making the decision here is Stan, not Gina Morselli, and the material facts are facts that Stan cares about.

And the evidence shows, as I mentioned, he had three or four meetings, Rahul did, with not just Stan, but all these other folks; and after doing all of that, to the extent they cared about Zenplace, they would have raised it, including background checks, including the HireRight document, including calling references. They were satisfied and hired him.

If Mr. Mewawalla's résumé was actually a factor -- and you'll see in the evidence they were aware of issues with his résumé. In fact, in the plot to terminate Rahul, you'll see in Exhibit 62, Chris Staub is saying, "Hey, I found some inaccuracies in his résumé." They knew about it back then. They never put it into Exhibit 63, the termination letter, because they didn't think it was material. They didn't think it was relevant. The only people who think it was relevant are the lawyers who brought it to your attention during this trial because that's the first time, the first time anyone has raised

it as something being material.

Greg Middleman -- sorry. Michael Middleman testified that prior to Rahul filing his lawsuit, he had never heard anyone make these allegations. Why do you think they're making the allegations now? The billion-dollar company has hired its army of lawyers, "Let's take Rahul down. Let's find any inaccuracy and let's blow it up."

I actually think the reference to the 2023 résumé really shows you how inward looking defense thinks about Rahul, how little they think of Rahul, how conspiratorially they think of him. They look at that 2023 résumé and they go, "Wait a minute. He has both Xpanse and Freedom there, the exact same dates and years."

Why do you think that's the case? Why do you think Rahul had to do that? Him putting that out there, anyone interviewing him is going to say, "Hey, how come you have two different companies for the same years?" Why do you think he needs to do that? If he had not put Freedom on his résumé, Mr. Gaffney would have come up here and said, "Aha, he didn't put Freedom on his résumé. He has no breach of contract claim against Freedom." If he had not put Xpanse on his résumé, then he'd come up and say, "He didn't put Xpanse on this résumé. He has no claim against Xpanse."

Why do you think Rahul put both on? He had to because his termination notice listed an EVP platforms and tech business

and chief digital officer. That's the exact title he puts in his résumé. He has to. Until this case is resolved, he is in limbo because if he interviews with anyone, they are going to ask him about this. They're going to ask him about Xpanse, and he needs to be as truthful as he can because of this lawsuit, because of this very lawsuit. He has no choice but to do that.

And the irony is, by putting it on his résumé, it makes it worse for Rahul. Rahul has to then say, "Here's why it's on the résumé. I got terminated for cause. I'm in a lawsuit." No-win situation.

And yet they flip that on Rahul and say, "Aha, even more evidence of fraud." That's just not right. That's how lawyers -- I'm a lawyer too, I apologize but -- think: "Well, I'll come up with this conspiracy and show he's been lying the whole time," when the reason he is doing this is because we're here today.

This whole résumé issue was fabricated for you guys. This is truly a litigation tactic put together by this army of lawyers. If they really cared about this, when they did their background check, when they called those references, you would have heard about this a long time ago, but you never did.

All right. Next issue, discretion versus good faith. I heard Mr. Gaffney in closing saying it's up to Stan. Not true. Not true. Not true based on his own testimony. Not true based on the law.

First of all, in terms of analyzing cure, if you read the agreement, it's up to the company, not Stan. But more importantly, there's something called good faith that overrides subjectivity, that prevents Stan from just acting based on however he wants to act. He can't just say, "You know what? I feel like it, so I'm going to do it." The law and his testimony tells you good faith must be a factor here. That is --

**MR. GAFFNEY:** Objection, Your Honor. That's not in the instruction.

**MR. RHOW:** Well, I'm going show it in a second.

**THE COURT:** Overruled.

**MR. RHOW:** This is Mr. Middleman's testimony. It's not a jury instruction. I don't need an instruction. Mr. Middleman testifies, "The decision to terminate, you agree you need to make that decision in good faith?" He agreed to that.

Their lawyer, not Mr. Paolo, Cisco, their lawyer said there's an implied covenant of good faith and fair dealing. Their lawyer said that.

This instruction relates to Xpanse, I want to be very clear, but read it. In every contract, there is an implied promise of good faith and fair dealing. Every contract. Just like Mr. Kadlec said, just like Stan Middleman said. And it requires honesty and being straight, not subjectivity, not

orchestrating a for cause, not doing something behind someone's back.

"Good faith" means the finding by the CEO, based on what Stan Middleman's own testimony and the testimony of his lawyer, Mr. Kadlec. It's got to be a good faith finding, not subjective, not discretionary, a good faith finding.

Advance notice, got to do that in good faith. If there's any doubt, give him notice. First, written notice. I'd even put that in there. You've got to give him opportunity to cure in good faith. None of that occurred.

In fact, we know the good faith finding never occurred at all because he didn't even make it, but we know it should be made in good faith. It certainly needs to be made at the time of the termination, not afterwards, and it should be based on personal interactions.

Remember what Rahul said? The reason he put that finding in there, it's unusual, the finding by the CEO, is so that based on a good faith finding, he would know this is based on something Stan and I -- Stan observed me doing based on a personal interaction, not based on a January 16th, 2021, email, not based on gossip, hearsay, speculation. Based on Stan Middleman's own words. He cannot act subjectively or based on incomplete impressions.

They didn't have good faith back then -- I'm sorry. They didn't have a good faith substantiation of for cause back then.

They don't even have it now.

And if it is true that for cause is as subjective as the defense is arguing to you, then what is the difference between for cause and at will? If it's, "I'll fire you for whatever reason I want based on my own subjective decision-making," that's what at will is. Why did we even negotiate for cause if Stan can just do whatever he wants?

Just think about the logic or illogic of that and how they're presenting it to you. It needs to be reasonable. It needs to be in good faith. It needs to be based on a complete picture based on what Stan Middleman told you. None of that happened, and so you know both fraud and breach of contract should be applied here.

The integration clause, we spent a lot of time on this -- or, I'm sorry -- Mr. Gaffney did. He didn't focus on this part of the agreement. This is a contractual issue. The integration clause does not prevent you from raising any frauds. That makes no sense at all. Otherwise, people will just stick this in, defraud anyone, and say, "Look, sorry, can't get me because of this."

This is the most important part. It says "relating to the subject matter of the agreement." And so I agree, all the drafts that they showed you, not us, they showed you all these redlines, et cetera, those clearly relate to the subject matter of the agreement. Those are redlines of the subject matter of

the agreement. You can disregard all of those. All of that testimony related to redlines, irrelevant, I agree.

What's not irrelevant are frauds that are made outside the four corners of the agreement, and Mr. Rahul testified about this. This is called an employment agreement. Things like salary, for cause, stock options, those are the subject matter of the employment agreement.

So if Rahul says, "I am owed a $5 million salary," but the agreement says 1.5, I agree, you can't make that argument. That's not the argument he's making.

In terms of the operation of Xpanse, Xpanse will be a C corp., Freedom will transfer IP to Xpanse, that's not part of the employment arrangement. Freedom transferring IP to Xpanse is an agreement between Freedom and Xpanse. You don't put that in an employment agreement.

And so if you understand that these representations that were not in the employment agreement were made to Rahul about the operation of Xpanse, you can understand now how integration clauses work. Simple as that. Simple as that.

And just logically, it doesn't make sense that you can just stick this in there and say, "You know what? I lied day and night to you about material things but, sorry, you signed this." That's not how business works. That's not how agreements work.

In fact, the jury instructions tell you very clearly that

in terms of analyzing reliance, the terms of the written agreement are just one factor. Of course, it's not the only factor; it's one factor. And I've explained to you why it's an irrelevant factor; but if it were otherwise, the jury instructions would say, "Integration clause equals no fraud." It doesn't say that.

The other thing that's important, if you look at the jury instructions, it says [as read]:

> "It is not necessary for a concealment or false promise to be the only reason for Rahul's decision."

And so what that means is the frauds that we've talked about do not have to be the only reason he went forward. It could be that he relied on the agreement too, as well as relying on the promises made by Mr. Middleman, and that's the instruction.

And to be clear, the agreement does have promises that are consistent with the representations about operations. For example, you saw the agreement talks about stock in a technology corporation; i.e., a C corporation. That is an employment term, but also gives you confirmation that the promise about C corporation that is an operational promise was made. It's very consistent. In fact, it corroborates the fraud, this agreement.

The agreement also says, as you recall, that Rahul report to Stan. That's in the agreement directly, because that's both

an operational promise and an employment promise, and the fact that it's in the employment agreement gives you confirmation. It's corroboration that the fraudulent statement was also made. They work hand in hand.

And so the bottom line is, the integration clause was not designed to and does not somehow magically insulate defendants from fraud.

In fact, it's ironic the argument is somewhat like, "How come you didn't include this in the agreement?" And I would say only a lawyer could argue that Rahul should be negotiating agreements -- sorry -- Rahul should have negotiated on issues that were being kept concealed from him that he had no idea about. He's supposed to read the other side's mind and think, "All the secret things you're thinking, I need to negotiate in here. I don't know that you're defrauding me. I can't insulate or negotiate issues I don't know about"?

What really happened here, the consequences of saying "no" -- I'm going to go through this quickly. But I think if you look at the timeline in December, it really will crystallize what happened here. Michael Middleman never came to this trial to deny this very critical testimony.

Rahul says in early December, December 2nd, Michael Middleman told him, "If you don't agree with me on LLC, you're going to get fired and you will take nothing." That's a very important statement. Michael Middleman should have come here

to rebut that. Chose not to come before you, and you are allowed to wonder why. Would he have been able to really rebut that, or does he know he actually made it?

December 14th, on this issue of equity and the LLCs, Rahul actually confirms a meeting with Middleman, Michael Middleman, and he says, "I'm happy to chat." He says, "Hey, let's get Cisco involved. He may be able to give some insights into this issue and his input would be helpful." He's just trying to get a complete picture. Give him some more data points. That's all he's trying to do, so he can have a good faith discussion on this.

He tells Tim Beard, "Hey, why don't you get involved too? Because you have some background on equity at your prior company. You're Stanford Law School. You're a start-up guy."

Christopher Staub tells Michael Middleman, "What a joke. This is so infuriating. Why is Rahul doing all this? He is just CEO of the company. It's not his business." That's December 14th.

December 15th, this meeting where Erik Anderson says, "Oh, I was Kumbaya, welcoming Rahul to this meeting"? Give me a break. This meeting was a setup to talk about these four things.

December 15th email, Erik says, "Conversion to LLC." He knows Rahul is not cool with that. "409 approach and vesting," that's the double valuation issue. Rahul is not cool with

that. According to Erik, that's a violation of his employment agreement. This is not an open forum to discuss these things. This is a setup.

Rahul testifies he gets ambushed at the meeting. He was going to bring Tim. They said, "Come alone," and suddenly Erik shows up.

The next morning -- this is important. This timeline is important here because it shows you what's going down. The next morning, after Rahul's objected at the December 15th meeting, these guys are not happy. Michael Middleman is furious this guy is saying no to him. He goes straight to his father [as read]:

"Free at 9:00? Bottom line, I don't see him as a CEO or cultural fit."

He doesn't explain that Rahul is objecting on a variety of issues. He says, "This guy is not part of our culture. He said no to me three times. Time for him to go." What do you think is really going on here?

Put the timeline together. Common sense now tells you exactly what went down. I put it together. I just put the emails together instead of it getting presented scattered. Partly my fault. You can see what happens.

Then what happens next? They go dark. "Sick and tired of hearing the CEO complain. Time to go dark."

What happens a month later? Fired. They don't talk to

him at all. Fired. And that's what's infuriating about this trial, that they come to this trial, hit him on his résumé, say it's a for-cause, talk about abusive relationships, talk about all these things when this timeline, it's not hearsay; it's direct evidence from their own mouths confirming what common sense should tell us went down. That's why it took us four years to get here. They don't want you to see this timeline.

They put out Erik Anderson as a witness, Kiran Sahota as a witness, Josh Walker as a witness. You think any of them said no? That's why they're here. They don't say no. They said, "Yes. No problem. Whatever you need. We'll come for trial. Whatever you need to say, we'll come to trial." That's why they're here.

Who didn't show up at trial? Chris Staub. How can you not come to trial and explain those text messages? You need to own up to those. You need to face the music on those. How can you not come to trial while concurrently accusing Rahul of abusive relationships when you aren't even explaining your own words?

How can you come to trial or do a trial and not have Michael Middleman explain, "Did you threaten him or not? Because if you didn't, you should come to trial, tell this jury under penalty of perjury I didn't do it."

Xpanse. This relates to that 2023 résumé and why,

frankly, Rahul's résumé is a landmine for him. It's complicated because of this lawsuit and the positions they've taken.

But here's the bottom line. If Rahul was employed by Xpanse, his terminations by Freedom and Xpanse are both improper. I'll explain it to you.

The law, to be clear, does not require a written or executed employment agreement. It just doesn't. Chris Staub, you heard the testimony, he doesn't have a written employment agreement but he's an employee.

The jury instruction says [as read]:

> "You can infer an agreement from the words and conduct of each party."

There is no requirement it be in writing. The conduct here is attaching that draft agreement to Exhibit 1. They knew exactly what the terms were going to be. It's going to be the same terms.

Here's a stipulated fact, stipulated by both sides: Mr. Mewawalla was Xpanse's president and CEO. That's an admission that he is an employee of Xpanse. How can you be CEO and president of Xpanse if you're not working for Xpanse?

Words and conduct, their own words, they stipulated to this. Their own conduct, they stipulated to this. It is stipulated to that this guy is an employee of Xpanse.

And let me be clear. He never refused to move to Xpanse.

What happened? Let's look at the testimony and evidence again. They tried to insert the clawback provision. He said, "Wait a minute. That wasn't part of the employment agreement. I'm ready to go to Xpanse, but that part, I don't like." That's all that happened.

Erik Anderson confirms he's acting as Xpanse CEO. Look at that second: Was he acting as an Xpanse employee? Yes.

If he is an Xpanse employee, the Freedom termination was improper, the Xpanse termination was improper.

Part of it is because of this. The Xpanse employment agreement requires a finding by the CEO of Xpanse. That's Rahul.

Now, I'm not trying to be cute here because the reason this is in here, it goes to intent. Why was this in here? It was meant to ensure that Freedom could not fire Rahul when he was an Xpanse CEO. That's the intent of it.

And these guys put themselves in this position with all the funny games they're playing, all the conflicts of interest, Stan Middleman, with all of his conflicts who could not become CEO. They put themselves in a position where their own agreements don't allow them to do what they're claiming they can do. They negotiated themselves into this conundrum for them.

Look at the notice of termination, Exhibit 63. He is never terminated as the CEO of Xpanse. They stipulated he's

the CEO of Xpanse and the president of Xpanse. The termination doesn't give him notice he's being terminated from those positions. You will not see a single termination notice in this entire trial where he's terminated from the position that they stipulate he held.

Why do you think his 2023 résumé is such a mess? This is the conundrum we're dealing with that we need to resolve first before he can get on with his life.

Bottom line is both Xpanse and Freedom breached their agreements. He was, at this point, based on their shenanigans, an employee of both companies, and they breached -- both of them breached the agreements by not following the terms of the agreements, by not having for cause to terminate him from any positions.

Fraudulent concealment. All right, I want to talk about this because fraudulent concealment is the second claim in this case. It's Count 2. Count 1 is fraud. Count 2 is fraudulent concealment. Count 1 is what you say. Count 2 is what you don't say and hide. Totally different frauds.

And so when you hear all of Stan's explanations, "Here's what I meant. Here's what I meant to do"; Bob King saying, "Here's what I meant to do. Here's what I would have said," those tell you that they have violated Count 2 because them explaining on the stand only confirms they should have explained it back then, but they concealed it. They didn't

give these full explanations they're giving now to Rahul back then. They should have done that. That's Count 2.

Now, what is a fraud? I'm going to give you levels of a fraud here because the notion that, "Oh, my gosh, how can this be a fraud?" There's different levels of fraud, all consistent with the jury instructions.

There's lies. I'm going to sell you the Brooklyn Bridge. That's a lie. But when you also conceal your intentions, when you also misrepresent your commitment, when you also don't tell the whole story, when you stay silent in the face of someone saying something to the contrary, that is no less a fraud under the instructions. That's Count 2.

If you stay silent, that is no better, no worse a fraud than an outright lie. It's the exact same thing. So for billion-dollar companies, they're like, "Maybe I will; maybe I won't." That's a fraud. "Promises are not really promises," that's a fraud. "I may change my mind later," that's a fraud. That mindset is no different than an outright lie. The mindset of "I will do whatever I want" is just like an outright lie under these instructions.

And mind you, it is very difficult to prove fraud. Fraudsters don't send text messages to other people saying, "Hey, by the way, I'm about to defraud you." It really is based on what we call circumstantial evidence, which, under the law, has no less weight than direct evidence. And the bottom

line is, the concealment under Count 2 is that they concealed that Xpanse was going to be an LLC.

Let's walk through that. I think we covered a lot of it, but this was the critical testimony during this case. Mr. Middleman said [as read]:

**"QUESTION:** You had intended Xpanse to be an LLC all along?

**"ANSWER:** Yes, initially.

**"QUESTION:** You never told him about this intention?

**"ANSWER:** We didn't discuss it."

That is a fraudulent concealment. He didn't want to convert. If his money was at risk, he didn't want to lose -- he didn't want to lose that tax break, and he had never been a fan of C corps. Again, if he had told this to Rahul in November 2019, that's not a fraudulent concealment; but when you stay silent and you don't explain what you're really thinking, that's Count 2.

Now, the agreement, when you think about it, actually is part of the fraud because Stan has testified, "I was going to make this an LLC initially." That was his secret intention. But, instead, if you look at the agreement, Rahul is being told, "No, it's a C corp." He thinks everything is cool.

Part of the lie's right here. Next step, Xpanse is actually incorporated as a C corp. That's part of the cover-up, ladies and gentlemen. Stan has said, "This is going

on an LLC, but I'll make Rahul think I'm cool on C corps. I'll incorporate as a C corp."

Bob King stays silent. He goes along with this ruse. Bob King incorporates as a C corp. All of them are going along with this ruse, knowing darn well this is not going to be a C corp.

Why did he do it? It's his money. And, by the way, I have no problem with that. It's his money but, remember, this comes at the expense of Xpanse, and he didn't tell him. That's Count 2. That's the concealment.

Stan Middleman's tax issues and money outweighed Xpanse's interest. Never told to Rahul. And this is what Rahul is trying to avoid, this situation.

If Bob King had told him -- remember that November 9th -- sorry. It's not on the screen -- the November 9th, 2019, email where Bob King is telling him and writing that it's a C corp. and that's the preferred structure, et cetera, et cetera? That's when he should have been saying, "Oh, by the way, as it relates to tax issues, we're going to be an LLC." That would have been the perfect time to raise it, but it's not raised.

And if you look at that email, that Exhibit 3, this is what it says in the email. It says that as to ownership of the entity, for tax or other considerations, they may make it Archwell; they make it owned in a different way. That's ownership.

For your tax reasons, maybe Archwell has once -- maybe Stan wants a structured ownership through his sons, through siblings, through trusts. That's not what we're talking about here. Ownership is different from structure. Who owns it? Disclosed in Exhibit 3.

The structure of Xpanse side, not the owner, the structure is what's not disclosed. And that's why it's so clear this is a fraud and concealment because that would have been a perfect time for Bob King to write not "C corp. is preferred"; he should have said, "We're going to be an LLC initially," as they all knew.

That's Count 2, ladies and gentlemen. That's the concealment. That's leading him down the wrong way because for Rahul, if he had known of this intention -- it's not unreasonable, by the way. Everything Mr. Harroch said is true. It's not unreasonable to do this. But for Rahul, if he had known this, he could have walked away and gone to Engel & Völkers. That's the concealment. That's the fraud. That's the reliance.

Now, quickly, I'm going to go through the rest of this. Fraud by Freedom. Remember, it's not just fraud by Mr. Middleman. Mr. Gaffney spent a lot of time about Stan. It's fraud by anyone: Mr. Staub, Mr. King. Any person who concealed what should have been disclosed triggers Count 2. So you've got to look at the activity of everyone.

Motive for fraud, very quickly. Freedom was aware of Rahul's competing offer. And really what happened here, when you put the pieces together, this is really: What Stan wants Stan gets. Stan wanted a tech company. There's no question about that. And Freedom, the folks at Freedom have been told, "We need to get this thing going." And what they did collectively is say, "We'll say what is necessary to get Rahul in the door and get this thing moving."

It is agnostic to Rahul in a sense. Whether it's Rahul or some other tech person, it wasn't directed at him. But the point is, at that point, once Stan has said, "We're doing a tech company, get him in and we'll figure out later if everything we said is true or not," but Stan has said, "I need this tech company. You got to set it up." That's why this all went down.

As to why he's terminated, one obvious reason, 5 percent equity. If the company's worth billions, that's $50 million or more they gave to Rahul. If he's terminated, they get that back.

As you see what happens in 2020, Rahul's putting together business plans. They realize they don't need him anymore. He's given the plan that they follow and continue to follow. That's the exact plan. Don't need him anymore. Time to fire him. Simple as that.

All right. Damages. I'm not going to go through these

instructions. I think they're relatively clear. If there is liability, there should be damages. If you believe Count 1, Count 2, 5, or 6, you award damages.

Now, but I do want to be clear about one thing. We gave very clearly data points. We're giving you data points. It is completely up to you where to go with this, what is the proper analysis. All we tried to give you is alternative calculations.

The only part I found interesting is when Mr. Persechini was up there, they hammered him. They said, "How come you don't have -- all you have is an offer? It's not signed? It's not dated? It never matured into a final agreement?"

Why do you think that is? The fraud made it impossible for Don Persechini or anyone else to have additional evidence because what happened is Rahul took the offer; and because he took the offer, we'll never know. We'll never know what could have happened with Engel & Völkers. Because that's what happens in a fraud. The fraud prevents you from having evidence.

And so that notion, again, only a lawyer can make that argument, "Aha, you have no evidence." Oh, wait a minute. It's because of my fraud.

The data points I gave you, you take what is reasonable and you come up with the conclusion.

Punitive damages. I want to be really clear on this, it

doesn't have to be Stan. Stan doesn't have to have the same intent. If he knew of the conduct and approved it, there's punitives. Look at Chris Staub. Look at his text chain. Look at Michael Middleman. Look at all of them. Working collectively, all of those can tag Freedom.

Verdict form. Again, my suggestion, your common sense will override, is to check "Plaintiff" on Counts 1, 2. I do think punitive damages are awardable here. And certainly on 5 and 6 as well.

In closing, ladies and gentlemen, Mr. Gaffney, Mr. Middleman talked so much about reputation. What about Rahul's reputation? What about Rahul having to deal with a termination for cause that the world knows about?

If he sues, even if he wins, it's still a scarlet letter. He's known as the guy who sues. And for that reason, reputation -- I agree, this case is all about reputation because even if Rahul wins this case, he will never be able to recover what he has truly lost.

Ladies and gentlemen, thank you so much. It's been an honor to represent Rahul. It's been an honor to present the case to you guys. I do hope that you consider the evidence, and appreciate it.

**THE COURT:** All right. Thank you, Mr. Rhow.

Let me give the jury some final instructions.

\\\

**FINAL JURY INSTRUCTIONS**

**THE COURT:** First on the Duty to Deliberate.

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to their views.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think that it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases, to influence you. You should also not be influenced by any person's race,

color, religion, national ancestry, or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

Do not be afraid to examine any assumptions you or other jurors have made which are not based on the evidence presented at trial. Please do not take anything I may say or do or have said or done during the trial as indicating what I think of the evidence or what your verdict should be. That is entirely up to you.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

"Consideration of Evidence - Conduct of the Jury."

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.

Except for discussing the case with your fellow jurors during deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or other means, via email, via text

messaging, or any Internet chat room, blog, website, or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it, although I have no information that there will be news reports about this case; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. And also, do not do any research about the case, the law, or the people involved, including the parties, the witnesses, or the lawyers, until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case

decided only on the evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow these rules and it is very important you that follow these rules.

A juror who violates these restrictions jeopardizes the fairness of the proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

"Wealth of the Parties."

In reaching a verdict, you may not consider the wealth or poverty of any party as the parties' wealth or poverty is not relevant to any issues -- any of the issues that you must decide, except as I have otherwise instructed.

"Evidence in Electronic Format."

Those exhibits received in evidence that are capable of

being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer, projector, printer, and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment, how to locate and view the exhibits on the computer, and how to print the exhibits. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note to the clerk. If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the clerk, signed by your foreperson or by one or more members of the jury. Do not refer to or discuss any exhibit you are attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with a clerk present for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the Court technician or any non-juror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any non-juror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any outside website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the Court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data from the jury room and do not copy any such data.

"Communications with the Court."

If it is necessary -- if it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk or bailiff, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until after you

have reached a unanimous verdict or have been discharged.

"Return of the Verdict."

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the Courtroom Deputy that you are ready to return to the courtroom.

So with that, I'm going to direct the jury to commence deliberations.

And as mentioned, Ms. Ayala will make sure that you have access to the exhibits. You will have multiple copies of these instructions, written instructions, as well as the verdict form.

And with that, I will hand the case over to the jury at this point. So, thank you.

**THE COURTROOM DEPUTY:** All rise for the jury.

(At 2:07 p.m., the jury retired to commence deliberations.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** All right. So I want to make sure that all of you have left Vicky with a cell phone, and you should stay within a five-minute radius in case we get notes or something from the jury; and then we can -- if we need to gather, we can do so quickly.

I have indicated to them that we expect them, if necessary, to deliberate during the full days that have been

allocated, 8:30 to 4:00. I believe they've been so informed.

Right, Vicky?

**THE COURTROOM DEPUTY:** Yes, Your Honor.

**THE COURT:** And I expect -- I assume they will stay, if necessary, at least till 4 o'clock today. We should probably let them know if they want to stay later, we're here if they want to go past that time.

**THE COURTROOM DEPUTY:** I informed them.

**THE COURT:** Okay. So they're aware that if they want to go on, that's in their discretion.

So let me commend counsel for getting this case done in a relatively efficient way. You did comply amazingly close to the time frame, and you were able to adjust your pace accordingly.

Obviously, this case has been vigorously presented on both sides and well presented. So -- and it's never too late to talk settlement, even as we wait here. So keep that in mind.

**MR. GAFFNEY:** Thank you.

**THE COURT:** Otherwise, we'll wait to hear.

**MR. RHOW:** Thank you, Your Honor.

**ALL:** Thank you, Your Honor.

**THE COURTROOM DEPUTY:** Court is in recess.

(Recess taken at 1:54 p.m.)

(Proceedings resumed at 3:41 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Have a seat, everyone.

**THE COURTROOM DEPUTY:** Court is calling the case Mewawalla vs. Middleman, et al., Case Number 21-9700.

Counsel, please state your appearance for the record, beginning with the plaintiff.

**MR. RHOW:** Good afternoon, Your Honor. Ekwan Rhow, Ollie Rocos, Brendan Teachout on behalf of plaintiff.

**THE COURT:** All right. Thank you.

**MR. GAFFNEY:** Good afternoon, Your Honor. Paul Gaffney with our team for the defense.

**THE COURT:** All right. Just a reminder, I do want you all to stay within a short radius of the Court so we don't keep the jury waiting, especially now it's almost 4 o'clock.

So we have Question Number 1 from the jury, which I think you all have received. If I'm reading this properly, it says [as read]:

"Count 2: What are the facts that are allegedly" --

I think the word is "conceded"? "Consented"?

**MR. RHOW:** I think it's "concealed."

**THE COURT:** Concealed? Oh, concealed.

**MR. RHOW:** Yes.

**THE COURT:** Okay.

[As read]:

"What are the facts that are allegedly

concealed?"

I thought that was discussed in the closing, but I don't know what to say. What do you --

**MR. GAFFNEY:** Your Honor, we would propose reading back the instruction, if you're going to do anything. Otherwise, you're invading the province of the jury.

**THE COURT:** And that would be?

**MR. GAFFNEY:** Instruction 26.

**THE COURT:** 26.

(Pause in proceedings.)

**THE COURT:** Well, that doesn't really answer anything. It just --

**MR. GAFFNEY:** That --

**THE COURT:** Right.

**MR. GAFFNEY:** Just because they asked does not mean --

**THE COURT:** I agree.

**MR. GAFFNEY:** -- we have to --

**THE COURT:** I'm not about to make anybody's case here or there, one way or the other.

But what is your response?

**MR. RHOW:** I don't disagree with that. I don't know if the further -- I'm loath to add something beyond the instruction, other than to emphasize it's up to them to come up with those certain facts.

**MR. SUTRO:** Or not.

**MR. RHOW:** Or not. Certainly. I don't mean to imply otherwise.

But the instruction does not say "or not." It just says what it says. So I don't mind if it's reread in that fashion.

**THE COURT:** Do you want me to reread it or send a note back, just say, "Reread Instruction 26"?

**MR. RHOW:** Yeah, I think that's fine.

**MR. GAFFNEY:** That would be fine.

**THE COURT:** Yeah, I don't see any -- because -- yeah, I think it's probably not appropriate to comment on the evidence at this point.

So if there's no objection, I will just simply say, "Reread Instruction Number 26," period. Okay?

Okay. See if they can read my writing as well as I could read their writing.

**MR. GAFFNEY:** And can we get a copy of the note?

**THE COURT:** Oh, you don't have it?

**MR. GAFFNEY:** No, no. I have it, but not with your --

**THE COURT:** Oh, okay. Yeah, we'll --

**THE COURTROOM DEPUTY:** You mean a copy of the response?

**MR. GAFFNEY:** Yes, please.

**THE COURTROOM DEPUTY:** I have to scan it.

**THE COURT:** Is that clear enough, Vicky? Can you read it?

**THE COURTROOM DEPUTY:** Oh, I can read it good.

**THE COURT:** Okay. If she can read it, that's the test.

Okay. Well, I don't know how much longer they'll stay, but I think we should be available until we find out.

And Vicky will let you know when they leave. Okay?

**ALL:** Thank you.

**THE COURT:** All right. Thanks.

**THE COURTROOM DEPUTY:** Court is in recess.

(Proceedings adjourned at 3:45 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, February 13, 2025



Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter