UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAHUL MEWAWALLA,

Plaintiff,

v.

STANLEY C. MIDDLEMAN, et al.,

Defendants.

Case No.  21-cv-09700-EMC

**ORDER RE: POST-TRIAL MOTIONS**

Docket Nos. 323, 324, 325, 326, 340

## I.      INTRODUCTION

Before the Court are the following four post-trial motions:

(1) Defendant's Renewed Motion as a Judgment Matter of Law or New Trial (Docket No. 323);

(2) Defendant's Motion to Compel Plaintiff to Elect a Remedy (Docket No. 324);

(3) Plaintiff's Motion for Award of Prejudgment Interest Pursuant to Cal. Civil Code § 3287 (Docket No. 325);

(4) Plaintiff's Motion for Attorney Fees and Bill of Costs Pursuant to Fed. R. Civ. P 54(d) and Cal. Labor Code § 218.5 (Docket No. 326).

For the reasons stated herein, the Court **GRANTS** Plaintiff's Motion for Prejudgment Interest; **DENIES** Defendant's Renewed Motion as a Judgment Matter of Law or New Trial; **DENIES** Defendant's Motion to Compel Plaintiff to Elect a Remedy; and **DENIES** Plaintiff's Motion for Attorney Fees and Bill of Costs.  To the extent Plaintiff seeks costs under Rule 54(d), Plaintiff must follow Local Rule 54-1 and file a Bill of Costs with the Court.

## II.    FACTS AND BACKGROUND

On February 12, 2025, the jury returned a verdict in favor of Plaintiff on his claims for False Promise and Fraudulent Concealment and for Breach of Contract against Freedom Mortgage Corporation ("FMC"), and in favor of Xpanse on Plaintiff's claims for Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing. *See* Docket No. 310 (Jury Verdict). The jury awarded Mr. Mewawalla $3,750,000 for his false promise and fraudulent concealment claims and $4,293,813 for his breach-of contract claim against Freedom. *Id.*

## III.    DISCUSSION

A.    Defendant's Renewed Motion as a Judgment Matter of Law or New Trial (Docket No. 323)

1.    Judgment as a Matter of Law

Judgment as a matter of law requires the moving party to show "that a reasonable jury would not have a legally sufficient evidentiary basis to find" for the other party. Fed. R. Civ. P. 50(a)(1). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Id.* The Court must "view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

Defendant brings many arguments as a basis for their judgment as a matter of law. The Court has already ruled on many of the arguments before, and Defendant fails to justify the Court departing from its previous rulings. Defendant's remaining arguments are merely asking the Court to refute the jury's verdict based on Defendant's perspective. Plaintiff proffered sufficient evidence to support the jury's conclusions. Accordingly, the Court **DENIES** Defendants' motion. The Court takes each argument in turn.

a.     Evidence supports the jury's findings on Fraud Claims: Counts 1 and 2

Plaintiff had the burden of persuading the jury that Defendants defrauded him into consummating the Employment Agreement with FMC—whether through making one of eight enumerated false promises, *see* Docket No. 299 at 30 (Jury Instruction No. 25 re. Count 1), by concealing certain facts, *see id.* at 31 (Jury Instruction No. 26 re. Count 2), or both.

As set forth in the parties' stipulated Jury Instruction No. 25, Plaintiff alleged Defendants made eight specific false promises to him, namely, that (a) Xpanse would be operated and managed completely separate from Freedom; (b) Xpanse would be operated and managed in such a way that it could proceed through an initial public offering in 4-to-5 years; (c) Mewawalla would report only to Stanley Middleman; (d) Freedom would contribute revenue to Xpanse; (e) Freedom would transfer significant intellectual property and technology assets to Xpanse; (f) Freedom would transfer technologists to Xpanse; (g) Middleman would use his relationships with other mortgage companies to attempt to convince them to use Xpanse's products; and (h) Mewawalla would be employed at least through Xpanse's initial public offering.  Docket No. 299 at 30.

For each count, Plaintiff was required to prove Defendants made a false promise and/or concealed a fact with an intent to deceive him and that he reasonably relied on the promise or concealment to his detriment.  *Id.* at 30–31.  At trial, Plaintiff presented extensive evidence to prove these claims and the jury was persuaded—it found for him on both fraud counts and awarded $3,750,000 in damages.  Docket No. 310 (Jury Verdict) at 2.  Defendants argue there was no legally sufficient basis for the jury's verdict in Plaintiff's favor, and merely recite the evidence in their favor.  However, viewing all the evidence in favor of the nonmoving party, there is substantial evidence to support the jury's verdict—that Defendants lied or concealed at least **one** of the alleged promises.

The Court also notes that Plaintiff asked the jury to award him $35 million in fraud damages, as "lost opportunity damages," and asked for punitive damages.  The jury awarded Plaintiff $3.75 million and rejected Plaintiff's claim for punitive damages.  Though the Court cannot fully articulate the underlying rationale for the precise dollar amount awarded by the jury,

1  it is evident that the jury was not fully convinced of Plaintiff's position and was at least persuaded

2  in some regard by Defendant's counter-evidence.  In short, the jury was mindful of the competing

3  evidence.

4      Below is a review of the trial evidence supporting each alleged false promise.

6           i.     <u>Promise re: Xpanse would be operated and managed completely</u>

7                 <u>separate from Freedom</u>

8      **Promise**: Defendants' counsel asked Stan Middleman at trial: "Did you tell [Plaintiff] that

9  Xpanse would be operated and managed completely separate from Freedom?" He answered: "I

10  did, and it is." Tr. 334:4-6.

11      **Reliance**: Plaintiff explained that the precise reason he sought Middleman's reassurance

12  that Xpanse "would be run independently [and] managed independently" was because of his

13  concerns that "Freedom Mortgage is a family enterprise [and] would put family first over the

14  company." Tr. 670:25-671:17, 810:14-25; *see also* Tr. 384:9-386:16 (testimony of Plaintiff's

15  attorney, Cisco Palao-Ricketts, that "decision-making" in family businesses "can be emotional"

16  and "clouded by [the family's] personal interests").

17      **Evidence of Falsity/Concealment**: Middleman testified that it was always his intention to

18  run both FMC and Xpanse as part of "a family business," that in doing so he was necessarily

19  going to impose "family culture" on both FMC and Xpanse, that he wanted Plaintiff "to adopt

20  [the] family's culture at Xpanse," Tr. 287:25-288:12 ("Q: And so what you wanted Rahul to do is

21  to adopt your family's culture at Xpanse; fair? A: Yes."), and that he wanted his son Michael to

22  manage Xpanse—even though he was a FMC executive with no formal role at Xpanse—simply

23  because Michael is "my son and it's a family business, and he's got the best interest and a vested

24  interest in the outcome," Tr. 350:24-351:8.

25      Greg Middleman testified that Xpanse was overseen not by Plaintiff, but by a group that

26  included Greg Middleman, Chris Staub, Michael Middleman, and possibly Adam Cohen. Tr.

27  1033:6-18.  Likewise, former Xpanse employee Josh Walker confirmed that Michael Middleman

28  was "involved in the management of Xpanse," along with various other employees of FMC or the

United States District Court<br/>Northern District of California

1    Middleman family trust, Archwell—namely Erik Anderson, Chris Staub, and Adam Cohen.  Tr.

2    451:3-20.  Walker also admitted that "Freedom Mortgage was involved in the operations of

3    Xpanse," Tr. 450:14-16, 451:3-20.

4         Defendants argue (for the first time, not in their initial JMOL and after stipulating to this

5    instruction), that this promise was too vague to be relied upon.  Defendant also argues that the

6    promise actually had different meanings: Stan Middleman meant it in the literal sense, that Xpanse

7    was a separate subsidiary from FMC, but would still be a part of the family.  Whereas Mewawalla

8    "misinterpreted" the promise to mean he would have complete separate ownership from the family

9    business.  Aside from the fact that Defendants likely waived their vagueness argument by failing

10   to include it in their initial motion at the close of evidence, *Freund v. Nycomed Amersham*, 347

11   F.3d 752, 761 (9th Cir. 2003) ("A party cannot raise arguments in its post-trial motion for

12   judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a)

13   motion."), the factual determination of the meaning of the promise and the credibility of the

14   witnesses is precisely the domain of the jury.

15        The Court's task is not to reexamine the evidence and come to its own conclusions.

16   Rather, the Court must "view all evidence in the light most favorable to the nonmoving party,

17   draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable

18   to the moving party that the jury is not required to believe."  *Harper v. City of Los Angeles*, 533

19   F.3d 1010, 1021 (9th Cir. 2008).  Plaintiff presented ample evidence that a promise was made;

20   Plaintiff had reason to reasonably rely on the promise; and that the actual facts ended up

21   differently from the promise.

22

23            ii.    Promise re: Xpanse would be operated and managed in such a way

24                   that it could proceed through an initial public offering in 4-to-5

25                   years

26        **Promise**: Plaintiff testified that to address his concern that FMC was a closely held family

27   company and show investors "that this was truly an independent company," from "the very

28   beginning, I made very clear to Stan that [Xpanse] has to be a C corp."  Tr. 671:7-9, 673:2-19.

1    Former CFO Tim Beard likewise testified that the C corporation structure was critical to his

2    decision to work for Xpanse. Tr. 830:21-831:5 ("It was represented to me that [Xpanse] was a C-

3    Corporation" and "[h]ad the equity been granted in anything other than C-Corp, it would

4    fundamentally change how I viewed the offer and the opportunity at Xpanse").

5        **Reliance**: Plaintiff and Beard repeatedly explained to Defendants that the C Corporation

6    structure is preferred by potential hires in the technology industry, and it is the structure used for

7    companies that will go through an IPO. TX 57 at 4 ("Having Xpanse as an LLC creates both

8    recruiting and retention issues."). And Plaintiff's attorney, Cisco Palao Ricketts, testified at trial

9    that it was "[a]bsolutely" his understanding when negotiating the Employment Agreement that

10    Xpanse would be formed as a C corporation rather than as a pass-through LLC. Tr. 388:10-23

11    (noting that he would have given different legal advice to Plaintiff if he had known that Xpanse

12    might be an LLC).

13        **Evidence of Falsity/Concealment**: Stan Middleman testified that Xpanse was never

14    meant to be a C corporation because from the very outset, "I had intended [Xpanse] to be an LLC

15    or an S" Corporation. Tr. 205:3-8 (Q. "You had intended it to be an LLC all along? A. Initially.").

16    And Stan Middleman further admitted that he "did not discuss" his views with Plaintiff. Tr.

17    205:14-206:1 ("Q: [Y]ou never told him, when you were signing, 'By the way, my secret

18    intention, this should be an LLC?'" . . . A. I was never asked the question."); Tr. 370:19-371:1

19    ("Q: "[Y]ou never told that to Rahul because you assumed he should just know that? A:

20    Correct.").

21        Though Defendants argue it was an "open question" whether Xpanse would be a C

22    corporation or an LLC and point to counter evidence to dispute the meaning of Mr. Middleman's

23    promise or the reasonableness of Plaintiff's reliance, the Court's job is not to weigh the evidence.

24    Viewing the evidence in the light most favorable to Plaintiff, evidence at trial supports a jury's

25    finding that this promise was made, relied upon, and never kept.

26

27        iii.    Promise re: Mewawalla would report only to Stanley Middleman

28        **Promise**: Stan Middleman admitted at trial that he promised Plaintiff that Plaintiff would

United States District Court
Northern District of California

1    report to him.  Tr. 334:24-25.

2        **Reliance**: Plaintiff testified that it was specifically discussed during the parties'

3    negotiations that he would report solely to Stan Middleman—no one else.  Tr. 592:8-13, 612:11-

4    613:7 ("This was reflecting a discussion that Stan and I had that I would report to him."), 656:25-

5    658:2 ("The agreement between Stan and I was that Stan and I would work directly; I would

6    report directly to him. . . . we had reached an agreement that it would just be me reporting to

7    Stan.").

8        **Evidence of Falsity/Concealment**: Stan Middleman argued that statement was not to be

9    taken literally because he did not promise that Plaintiff would report "only" to him: "He did report

10   to me. I didn't say anything about nobody else."  Mot. at 9 (citing Tr. 334:24-25).

11       And when asked on cross about Stan Middleman's contrary testimony, Plaintiff responded:

12   "I wish I didn't have to say this, but that was an inaccurate statement."  Tr. 730:20-731:6.  The

13   jury, after hearing two different versions of an event, came to their own conclusion: this is

14   precisely the jury's task.

15       Plaintiff also presented a December 15, 2020 email from Anderson to Michael Middleman

16   listing as an item for discussion for a call they had scheduled with Plaintiff: "Report to Erik," TX

17   320, and a December 16, 2020 email from Michael Middleman to his father stating that "I've

18   positioned him to work with Erik directly," TX 56.

19       Evidence of the circumstances surrounding Plaintiff's termination soon thereafter could

20   also support that Defendants representation was false.  At trial, counsel read into the record Greg

21   Middleman's sworn deposition testimony that "the steering committee" for Xpanse "had the

22   authority" to fire Plaintiff, and "I was part of that."  Tr. 1034:4-18.  Also read was Greg

23   Middleman's sworn deposition testimony that firing Rahul "was a group decision," not a decision

24   Stan Middleman made alone.  Tr. 1033:1-5. Erik Anderson confirmed "the decision to terminate []

25   an Xpanse officer employed by Xpanse would have to come from Xpanse or a parent company,"

26   namely Archwell—an entity in which Stan Middleman had no role. Tr. 467:4-14, 470:1-7.

27   Anderson also testified that the decision to terminate Plaintiff was made by January 9, 2021, Tr.

28   479:1-3, seven days before FMC put together their email chain to justify the decision they claimed

7

at trial was Stan Middleman's alone, TX 62.  This testimony was corroborated by a January 9 email from Staub to Anderson, in which Staub stated that they "should probably let the noise of Rahul pass" before making employment offers to potential new hires. TX 334.  It is further corroborated by the fact that Anderson was contemporaneously preparing revised financial modeling for Xpanse that "eliminates most leadership (other than a couple . . . and of course Greg)," including Plaintiff. TX 587.

Viewing the evidence in the light most favorable to Plaintiff, evidence at trial supports a jury's finding that this promise was made, relied upon, and never kept.

iv.    <u>Promises re: Freedom would transfer intellectual property,</u>

<u>technology assets, technologists to Xpanse</u>

**Promise**: Plaintiff testified that "Stan had promised" him that FMC would contribute revenue and transfer intellectual property assets and employees known as technologists to Xpanse "within weeks" of Xpanse's creation.  Tr. 782:6-9.

**Reliance**: Plaintiff explained that the reason Defendants made these promises in the first place, and the reason he relied upon those promises in accepting the FMC opportunity in lieu of pursuing another opportunity, was because the transfers would help Xpanse get out of the starting blocks more quickly:

> Stan talked about all of this valuable intellectual property and software . . . that would give us a real head start. . . . He talked about Freedom having several hundreds of technologists . . . that would give us, you know, a head start around -- around talent. . . . And Stan also talked about . . . that currently at Freedom Mortgage, they spend about 140 to 150 million dollars in expenses around technology, and he would move that to Xpanse . . . and that would give us, you know, real material revenue pretty early on that we could then build upon.

Tr. 607:12-608:17 (emphases added); *see also id*. 628:11-24 ("I was excited to [] see what Freedom and some of the affiliated companies had built so that we could then build upon that and get a running start."); 633:12-20 ("Stan and I talked about [] that we would transfer all of these technologists from Freedom into Xpanse but then also bring in new recruits[.]").

**Evidence of Falsity/Concealment**: The evidence in the record demonstrates that these

United States District Court
Northern District of California

1    transfers did not take place during Plaintiff's tenure.  *See, e.g.*, Mot. at 4; Tr. 629:20-24; ("Q: Was

2    there any valuable intellectual property . . . that could be transferred into Xpanse? A:

3    Unfortunately not."); 633:21-23 ("Freedom didn't allow me to transfer the technologists that we

4    had talked about from Freedom to Xpanse.").

5    　　　　Defendants acknowledge that these promises were made but contend that they were kept

6    because those things eventually happened at some point long after Plaintiff was terminated.  Mot.

7    at 4; Tr. 336:19-23; TX 3.  Defendants argue the promise was never to transfer the assets

8    *immediately*, and that it was unreasonable to assume this transfer would happen quickly.

9    Defendants also argue the alleged promise that "Mr. Middleman would use his relationships with

10    other mortgage companies to attempt to convince them to use Xpanse's products," Docket No.

11    299 at 30, could not have been broken because the trial record is undisputed that there were no

12    "Xpanse products" for third parties to purchase until long after Mr. Mewawalla left.  Tr. 338:6-8

13    (S. Middleman); *see also id.* 963:8-25 (Sahota).

14    　　　　Though Defendants point to counter evidence to dispute the meaning of Mr. Middleman's

15    promise or the reasonableness of Plaintiff's reliance, the Court's job is not to weigh the evidence.

16    Viewing the evidence in the light most favorable to Plaintiff, evidence at trial supports a jury's

17    finding that this promise was made, relied upon, and never kept.

18

19    　　　　　　　　　　v.　　Promise re: Term Employment

20    　　　　Plaintiff's least convincing promise was that Mr. Middleman promised him he would be

21    employed on a long-term basis.  At trial, Plaintiff conceded that, under the clear and plain terms of

22    his Employment Agreement, he was employed at will and could be fired at any time for any

23    reason.  Stip. Fact No. 12; Tr. 615:15-18; 745:19; 746:4-5.  Mr. Mewawalla testified that he

24    carefully read the agreement before signing it, and it is undisputed that the document included an

25    integration clause that extinguished any prior inconsistent promises he believed he had received.

26    *See* Ex. 1-009-10 (§§ 16, 22)2; Tr. 697:21-698:14; 695:16-18.  *See* Tr. 696:2-5 ("This one [*i.e.*,

27    promise] was least important to me.").

28    　　　　Though the Court finds there is not substantial evidence to support a claim for fraud on this

United States District Court
Northern District of California

1    promise, this does not overturn the jury's verdict.  The jury only needed to find for Plaintiff on

2    **one** of the eight alleged promises, and as the Court noted above, substantial evidence supported a

3    finding on all but this one promise.

4

5                        vi.    Reconsideration of Reliance Rulings

6              Defendants renew their argument from summary judgment and pre-trial proceedings that

7    the Integration Clause of the Employment Agreement bars Plaintiff's false promises claim.

8    Defendants contend that Plaintiff's testimony that he "saw the words" and "saw [] paragraph"

9    ¶ 138 of his Complaint somehow "conceded" that all of the promises at issue were "squarely

10   within the integration clause." Mot. at 10-11 (citing Tr. 744:11-17).  This is exactly the same

11   paragraph of the Complaint that Defendants relied on when making this identical argument before.

12   *See* Docket No. 143 at 2, 5.

13             The Court will not depart from its previous rulings.  The Court previously held Plaintiff's

14   contention that "Defendants misrepresented matters related to FMC's and Xpanse's *operations*"

15   and ruled that "the allegation in the complaint which references terms of *employment* is not

16   necessarily synonymous with the 'subject matter' of the employment *agreement*" covered by the

17   integration clause.  Docket No. 160 at 9.  The Court ruled that the promises were operational in

18   nature, noting that "not one of the promises that relate to the funding and strategy of Xpanse were

19   included in the FMC Agreement," and concluded that "whether the alleged misrepresentations fall

20   within the scope of the integration clause is fairly a jury question."  *Id.* at 11–12.  The Court

21   reaffirmed that ruling when Defendants re-raised the same arguments in pre-trial proceedings.

22   Docket No. 265 at 25–26 ("The Court previously found that the integration clause could be a

23   factor the jury could consider in determine justifiable reliance. The Court did not hold, as

24   Defendants argue, that because of the Integration Clause, Plaintiff's reliance on any unwritten

25   promises was unjustified and unreasonable.").  Defendants do not identify any new law suggesting

26   the Court's ruling was wrong, they just ask this Court to substitute their view of the evidence for

27   that of the jury's.  There is no basis to revisit the Court's prior rulings.

28             Second, Defendants submit that Plaintiff "could not have reasonably relied on any

United States District Court
Northern District of California

10

promises about FMC's support of Xpanse" (or, alternatively, "the strategy and funding of Xpanse") other than to the extent Plaintiff referenced those promises in the edits he proposed to his offer letter on December 12, 2019.  Mot. at 11-12 (claiming that any such promises "were memorialized in writing by the parties" in TX 8).  Defendants made the same argument in pre-trial briefing, and the Court rejected it.  Docket No. 265 at 26 ("It is a question for the jury whether Plaintiff's reliance was reasonable."); *id.* at 34 (rejecting the same argument in another context).

Third, Defendants contend Plaintiff could not have relied on their false promises and the concealed facts in accepting employment at FMC because he "did not show that he had the leverage to walk away."  Mot. at 12.  Defendants do not cite any authority for the proposition that Plaintiff is required to "prove that he had comparable employment options" to show reasonable reliance on an employer's promises or concealment when accepting employment and none exists. As the parties' joint stipulated Jury Instruction on reliance indicated, a defendant must merely show that the false promise or concealment "substantially influenced" him to do what he did and that he "would probably not have" done that thing but for the false promise or concealment; it is not necessary for the fraud "to be the only reason for" the victim's decision.  *See* Docket No. 233 at 30; Docket No. 299 at 32; CACI Instruction No. 1907 (citing, *inter alia*, *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 976–77 (1997)).  The Court stands by the accuracy of that instruction.

vii.    Reconsideration of Economic Loss Rule, Release of Claims

Defendants re-raise arguments the Court already rejected and fail to offer any basis for reconsideration of the Court's prior rulings.

Defendants again contend that Count 1 is barred by the economic loss rule because it is "based entirely on promises Mr. Mewawalla believed would be conditions of his employment." Mot. at 13.  The Court denied summary judgment on this ground, citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 649 (1996) for the proposition that a plaintiff may bring both a breach of contract claim and a fraud claim where, as here, the contract was fraudulently induced.  Docket No. 160 at 12–14.  Further, and as discussed above, the Court noted that promises at issue in Count 1 are not

11

1    merely related to the "conditions of his employment," but also include promises relating to

2    (among other things) plans for Xpanse's corporate structure. The Court's prior ruling was correct

3    and Defendants state no ground to revisit it.

4         Defendants also again contend that Plaintiff's fraud claims are barred because he signed a

5    release of claims in connection with the Employment Agreement—or, in the alternative, if the

6    release is unenforceable, then Plaintiff "failed to satisfy a condition precedent to receiving

7    severance benefits." Mot. at 22-23. The Court rejected both halves of this argument on summary

8    judgment. With respect to the first half, the Court held that "Defendants did not perform" their

9    obligation to pay the severance benefits due under the agreement "and thus, cannot enforce the

10   contract against Plaintiff." Docket No. 160 at 33. And with respect to the second, the Court (1)

11   distinguished Defendants' case holding that a plaintiff who had *not* signed a general release was

12   not entitled to severance benefits from this case, where Plaintiff did sign and return the release but

13   Defendants refused to sign; and (2) held that "if Plaintiff prevails in this litigation on his claim that

14   Defendants inappropriately determined that his termination was for cause, he will have established

15   his entitlement to the Severance Benefits by virtue of a judgment of the court, not by virtue of the

16   Severance Agreement. The contractual release does not apply." Docket No. 160 at 34-35 (citing

17   *Beverly Way Assocs. v. Barham*, 226 Cal. App. 3d 49, 55 (1990) ("It is hornbook that an

18   unequivocal rejection by an offeree, communicated to the offeror, terminates the offer; even if the

19   offeror does no further act, the offeree cannot later purport to accept the offer and thereby create

20   enforceable contractual rights against the offeror."). Defendants offer no legitimate reason to

21   revisit that ruling now.

22

23              b.    Evidence supports the jury's findings on Breach of Contract: Count 5

24         Plaintiff had the burden of persuading the jury that he "was terminated without 'Cause,' as

25   that term is defined in Section 8(f)(i) of the Employment Agreement, and Freedom failed to pay

26   severance benefits." Docket No. 299 at 37 (Instruction No. 32). The jury found for Plaintiff on

27   Count 5 for FMC's breach of contract and awarded $4,293,813 in damages. Docket No. 310 (Jury

28   Verdict) at 3.

Under the contract, cause was defined as follows:

> "a finding by the CEO that the Executive . . .engaged in any conduct that is, or is reasonably likely to be, materially harmful to the business, interests or reputation of the Company, provided that, if such conduct is, in the reasonable judgment of the Company, curable, [Mr. Mewawalla] was given prior written notice of such conduct and was granted a reasonable opportunity of not less than fifteen (15) days to cure any such conduct."

Ex. 1, § 8(f)(i).

Plaintiffs presented substantial evidence to support the jury's finding that Plaintiff was not fired for cause. Stan Middleman testified that he was not aware of Plaintiff ever being put on notice that his potential termination could be a for-cause termination and was not aware of any process put together to support a for-cause termination. Tr. 373:11-16; 481:20-482:7. He testified that he hadn't even thought about whether it was appropriate to terminate Plaintiff for "Cause" at the time he signed off on the termination decision and was "not making a decision between a for-cause termination and a not-for-cause termination." Tr. 285:8-17. He testified that he had "no idea" whether any demands for performance improvement were ever communicated to Plaintiff in writing by other FMC executives. Tr. 297:3-12. Mr. Middleman testified that he had not given any prior notice to Plaintiff. Tr. 362:17-18. And he testified that, "at the time [he] decided to fire Mr. Mewawalla, [he] didn't believe [Plaintiff] had engaged in any misconduct." Tr. 284:17-19.

Plaintiff's termination letter stated that he was being terminated for "Cause;" it did not contain any examples of his purported "materially harmful" conduct. TX 63. When Plaintiff's attorney contacted FMC's outside counsel to ask for documentation concerning the purported "Cause," she did not provide any. TX 345. Further, one month after Plaintiff's termination, all that Defendants' counsel had provided was a "personnel file" that contained nothing about Plaintiff's performance except the email thread drafted one week after the date Erik Anderson testified that the decision to fire Plaintiff had already been made. *Id.* Chris Staub's deposition testimony, read into the record, was also consistent with this: Staub was not aware of any "notice or meeting with Mr. Mewawalla to discuss all together the[] incredibly broad criticisms of his performance and behavior" set forth in the email thread purportedly documenting his performance issues. Tr. 850:19-23. Staub likewise testified that he was not aware of there ever being a

meeting between anyone at FMC and Plaintiff "where he was presented specifically with his shortcomings and [] informed that if he didn't improve, he would be terminated." Tr. 849:10-14. Plaintiff also testified that he was not told these issues existed, let alone in writing, and was not given an opportunity to cure them. Tr. 689:23-690:21.

Defendants contend that the testimony of Greg Middleman and current employee Kiran Sahota "established beyond doubt" that "there is no 'insider' bias against 'outsiders' at Freedom" and that "Mr. Mewawalla was a disastrous failure at the job of running Xpanse." Mot. at 21. But the jury could have credited the conflicting testimony of former Chief Financial Officer Tim Beard, who testified that Plaintiff "was clearly running" frequent Xpanse executive meetings, "always showed well," and "always participated" or "delegated" as appropriate. Tr. 833:9-24. Beard also testified that he didn't know of any kind of conflict or other personnel disputes involving Plaintiff. Tr. 833:25-834:7. The jury could also have credited the testimony of former Xpanse engineer Daniel Oh, who said that his "views of Xpanse and its culture" were "[b]ad," and "[a] lot of it was centered around Greg." Tr. at 652:13-15, 649:23-650:1, 651:13-16.

The jury could reasonably have credited the ample evidence that FMC's contentions that Plaintiff was terminated due to his inability to control costs at Xpanse were pretextual. For example, Adam Cohen wrote to Chris Staub on January 20, 2021—the day before Plaintiff was fired: "The fact that we're firing Rahul but literally doing nothing else different in the company Rahul 'built' other than throwing more money and bodies into it is beyond insane." TX 338. Gina Colucci testified at her deposition, which was played to the jury, that Xpanse "continued to hire a large number of individuals who were well-compensated" throughout 2021, after Plaintiff was terminated. Colucci Dep. Tr. 265:7-18 (video played at trial but not transcribed); *see also id*. 132:03-132:10 (testifying that headcount grew from 48 employees at the end of 2020 to 70 or 80 by the end of 2021). Likewise, Erik Anderson testified to the difficulty of achieving success at Xpanse even given substantially more time than Plaintiff was allowed to succeed, admitting that Xpanse is "still trying to make it work" even now, some four years later. Tr. 559:9-11.

c.    Rejection of Affirmative Defenses

1    Defendants argued that Plaintiff acted with unclean hands due to his supposed

2    misrepresentations about his prior work at a start-up he founded, Zenplace.  Defendants evidence

3    consisted of an HR recruiter's notes and testimony about what Plaintiff allegedly told her in a

4    recruiting call.  Plaintiff presented testimony that he had not said what the HR recruiter wrote

5    down, and that she must have misheard or mistyped what Plaintiff stated on the call. Defendants

6    told the jury that "if you decide he has acted with unclean hands, the case is over. No fraud, no

7    breach of contract, no nothing." Tr. 1129:1-6.

8    The jury rejected this defense, and likely credited the substantial evidence Plaintiff

9    presented to the contrary, including that Plaintiff's employment was "contingent upon Freedom's

10   receipt of a favorable employment, criminal and credit background check," TX 8 at 5 (emphasis in

11   original), that it was FMC's policy to conduct such background checks, Tr. 302:7-11, that

12   Defendants did conduct a background check which involved calling Plaintiff's references at

13   Zenplace, Tr. 593:6-594:13, and reached an "Adjudication Result" of "Meets Company

14   Standards," TX 228 at 3; *see also* Tr. 851:25-852:5 (Michael Middleman "[n]ever hear[d] from

15   anyone that Rahul had fabricated or exaggerated his employment background" until this lawsuit

16   was filed); Tr. 374:11-23 (Stan Middleman "didn't know much about Zenplace" and didn't ask

17   about it).  The evidence supports the jury's rejections of Defendant's affirmative defense.

18

19        2.    Motion for a New Trial

20            a.    Defendants are not entitled to a new trial for the fraud claims

21    Rule 59(a) allows the court to grant "a new trial on all or some of the issues" "after a jury

22   trial, for any reason for which a new trial has heretofore been granted in an action at law in federal

23   court." Fed. R. Civ. P. 59(a). "[J]ury instructions must fairly and adequately cover the issues

24   presented, must correctly state the law, and must not be misleading." *Dang v. Cross*, 422 F.3d

25   800, 804 (9th Cir. 2005).  A court does not err when it rejects proposed jury instructions that are

26   not "properly supported by the law and the evidence." *See Clem v. Lomeli*, 566 F.3d 1177, 1181

27   (9th Cir. 2009).  If an "error in the jury instruction is harmless, it does not warrant" a new trial.

28   *Dang*, 422 F.3d at 805. "In evaluating jury instructions, prejudicial error results when, looking to

United States District Court
Northern District of California

1    the instructions as a whole, the substance of the applicable law was [not] fairly and correctly

2    covered."  *Id*. (quoting *Swinton v. Potomac Corp.,* 270 F.3d 794, 802 (9th Cir. 2001)).

3

4                         i.        Reconsideration of Reliance Instruction

5             Defendants seek a new trial on the ground that the Court's instruction on reasonable

6    reliance, Docket No. 299 at 33 (Instruction No. 28, adopting CACI No. 1908 with one

7    modification to reference consideration of "the terms of the written contract") was inadequate

8    because it did not specifically instruct the jury that "reliance on promises that contradict the terms

9    of an integrated agreement is unreasonable."  Mot. at 13.  This argument was already rejected in

10   the Court's Order regarding Jury Instructions: "Which provisions are within the scope of the

11   Integration Clause, and which are not is a matter for Defendants to prove—this argument should

12   not be included in jury instructions."  Docket No. 272 at 3 (Order re: Jury Instructions).

13   Defendants re-raise the issue.

14            The Court held closely to the model California jury instruction, and Defendants present no

15   basis to support this jury instruction was inadequate, incorrectly stated the law, or caused them

16   prejudice warranting a new trial.

17

18                        ii.        Reconsideration of Rulings re: Fraud Damages

19            In the alternative, Defendants seek a new trial or remittitur on fraud damages on the ground

20   that the damages are impermissibly speculative, excessive, and not supported by the evidence.

21   These arguments again reiterate Defendants' prior failed arguments during pre-trial proceedings,

22   and Defendants have not offered any valid basis to reconsider the Court's rejection of them.

23            The parties' joint stipulated jury instruction accurately reflected the law.  Docket No. 233

24   at 35 ("Mr. Mewawalla must prove the amount of his damages.  However, Mr. Mewawalla does

25   not have to prove the exact amount of damages that will provide reasonable compensation for the

26   harm. You must not speculate or guess in awarding damages."); Docket No. 299 at 34.

27            At trial, Plaintiff alleged and proved that but for Defendants' fraud, it is reasonably certain

28   that he would have successfully pursued an opportunity to work elsewhere by demonstrating that

United States District Court
Northern District of California

1    he had a viable opportunity with Engel & Völkers ("E&V").  Plaintiff did so by offering a draft

2    employment contract prepared by E&V and transmitted to him via its Chief Executive Christian

3    Völkers and his own testimony regarding statements made to him by Völkers offering a position.

4    TX 219; Tr. 599:10-602:23.  Plaintiff also presented evidence of proposed revisions and his own

5    opinion that the draft offer was far enough along that he could have and would have simply

6    accepted it in lieu of negotiating revisions were also in evidence.  *E.g.*, TX 204; TX 512; Tr.

7    602:11-23, 773:2-13. And he testified that he had received dozens of responses to his outreach to

8    other potential employers and had many conversations with other employers.  Tr. 578:11-16.  This

9    evidence, construed in the light most favorable to Plaintiff, adequately supports the jury's verdict.

10       It is notable that Plaintiff's expert testified that the fraud damages would amount to $38

11   million.  The jury only granted Plaintiff an award of $3.75 million.  At the hearing on these

12   motions, Defendants further argued that this $3.75 million actually becomes closer to $8-10

13   million after accounting for the fact that the jury was instructed to remove any awards for contract

14   damages from the fraud damages.  In asking for fraud damages, Plaintiff's expert, Dr. Persechini,

15   projected out an employment for Plaintiff for 3 years and for 6 years, with ample yearly bonuses to

16   arrive at the $35 million in lost profits damages.  *See* Tr. 870:10-16 (Plaintiff's expert, Persechini

17   Testimony), 873:18.  In view of what the jury actually awarded, the jury appears to have awarded

18   only about two years of salary and bonuses.  *See id.* at 870:10-16 ("So when you look at the

19   agreement itself, it spelled out an annual salary of 3 million euros, an annual bonus of 2 million

20   euros, an initial bonus of 1 million euros. So if you do the math, that's 6 million euros just for the

21   first year. We have to talk in dollars here, so I have to convert that. So for the first year, that's

22   about $7 million.")  As the Court has held, the further out damages are projected, the more

23   speculative they may become.  The Court need not discern the exact calculation of the jury, but it

24   appears the jury was conscientious and mindful of the trial evidence in awarding the damages.

25   Thus, insofar as Defendant presented arguments at trial that Plaintiff's expert's damages number

26   was not reliable (that the E&V Agreement was too speculative or not likely to come to fruition) or

27   needed to be reduced (for example, because of the equity package at Plaintiff's current job of

28   Mawson mitigating a substantial part of Plaintiff's requested damages) it is fair to assume that

United States District Court
Northern District of California

17

Defendants were at least partially successful in convincing the jury to award Plaintiff only a fraction of the damages he sought.  There is substantial evidence to support the jury's award.

### iii.    Reconsideration of Motions in Limine Rulings on Experts

Defendants seek reconsideration of the Court's prior rulings (namely, the Court's ruling to permit the testimony of Plaintiff's damages expert Dominic Persechini concerning the calculation of fraud damages and to exclude certain opinions of Defendants' damages expert Wayne Guay) and attempt to replace the jury's verdict with their own based on their view of the evidence. Defendants' arguments that Persechini's testimony should have been excluded and that Guay's should have been permitted fail.

With respect to Persechini, Defendants simply repeat the same arguments and cite the same cases as they did in their motions *in limine*.  The Court concluded there was sufficient record evidence to support Persechini's opinions: "While subsequent communications cast doubt on whether that agreement would have been consummated had Plaintiff not been induced to go with FMC, that is a matter of debate on which a reasonable juror might decide in Plaintiff's favor." Docket No. 265 at 23 (noting also that even if it was error to exclude equity, that "would not warrant exclusion of the entire testimony").

With respect to Guay, Defendants previously argued:

> Defendants argue challenging another expert's assumptions is a permissible topic of rebuttal testimony. *Pinterest, Inc. v. Pintrips, Inc.*, 2015 WL 2268498, at *1 (N.D. Cal. 2015). Defendants claim the gist of Guay's opinion is that Persechini's fraud damages calculation is based on Plaintiff's alleged employment opportunity at E&V, which is a speculative assumption. Specifically, Defendants argue that Guay is entitled to tell the jury that Persechini deviated from accepted economic principles by assuming that Plaintiff would have been employed at E&V if he had not joined FMC. Defendants argue there are many other broad and unsupported assumptions that Pereschini opines to that Guay should have the ability to rebut. Defendants contend that these assumptions balloon the supposed damages for the alleged loss of the E&V opportunity.

Docket No. 265 at 7 (Pretrial Order).  The excluded opinions constituted Mr. Guay's personal opinions on the relative strength of the evidence, which this Court found improper, for any experts, to opine on because this is the precise domain of the jury:

The Court holds that neither expert, Guay or Persechini, can give a legal opinion about the strength of the evidence on whether the E&V Agreement could have led to actual employment, and how well Plaintiff would have performed at E&V. Each expert can simply state their assumptions in rendering their financial calculations and leave it to the evidence developed at trial and attorney argument to determine whether the asserted fraud-based damages are based on facts or speculation . Accordingly, many of Guay's opinions as as to the strength of the evidence underlying the assumptions is not a matter within his expertise and are thus stricken. If there are terms in the draft Agreement which are ambiguous, he can explain his opinions are based on certain assumptions about the meaning of those terms, so long as he does not purport to give a legal opinion as to their meaning.

Docket No. 265 at 8–9 (Pretrial Order).

Defendants fail to cite any new information or law to justify the Court departing from its previous ruling.

### iv.    Reconsideration of Evidentiary Rulings on E&V Agreement

In the Amended Pretrial Conference Order, Docket No. 265 13–21, the Court ruled that the draft E&V Agreement and Völkers's statements were admissible for three reasons, all of which remain valid now. First, under the rule of completeness, Plaintiff and/or Defendants were going to admit Plaintiff's subsequent drafts, emails, and edits to the original offer letter. The Court ruled that the first draft of the agreement was thus admissible under the Rule of Completeness, FRE 106. *See* Docket No. 265 at 15. Second, pursuant to the "verbal acts" doctrine, the Court ruled the evidence is not hearsay because it was not admitted for the truth of the matter asserted. *See* Docket No. 265 at 16, 20 (citing *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992)). Third, the evidence was deemed separately admissible under the residual exception because there was "no reason . . . to distrust the E&V Agreement or Korn Ferry" and it was impossible to secure testimony concerning the documents from E&V using the Hague Convention. Docket No. 265 at 19, 21 & n.6. Defendant largely restated their rejected arguments, which the Court is not persuaded by.

At the hearing, Defendants argued some of the bases on which the Court relied in applying the residual exception were incorrect. First, Defendant raises a belated attempt to object to the admission of the subsequent E&V drafts which served as a predicate for the Completeness

Doctrine invoked by the Court to admit the earlier drafts. However, Defendants did not object to the admission of the subsequent drafts at the Pretrial Conference, nor at trial. As the Court noted in its Pretrial Conference Order, "Defendants agree that '[a]bundant admissible evidence in the form of [Plaintiff's] own emails and subsequent drafts' exists. Motion at 5. There is therefore no dispute that subsequent correspondence arising from the draft agreement is admissible. Under the rule of completeness, the initial draft of the E&V Agreement is admissible. FRE 106. It is needed to explain the iterative correspondence which ensued." Docket No. 265 at 15. Defendants waived any objection to admission of the later drafts and its belated attempt to now revisit that ruling is rejected. Thus, Defendant's belated objection is denied.

Defendants also argued, again, that it was Defendants who sought to depose E&V through the Hague convention, and not Plaintiffs, so the residual exception cannot apply because Plaintiff did not exhaust all his options to obtain more direct evidence from E&V – *i.e.* the deposition testimony of Mr. Volkers. However, as both Parties agreed at the hearing, in the Germany proceedings, E&V raised a confidentiality privilege to Plaintiff's negotiations with E&V and E&V's CEO. When Plaintiff agreed to waive his own confidentiality privilege so that Mr. Volkers could be deposed, E&V did not withdraw its privilege objection (or so it appears from the record). As this Court previously held, Plaintiff could have seen the writing on the wall, and it would have thus been futile for Plaintiff to attempt to depose Mr. Volkers in the face of E&V's continued objection. Docket No. 265 at 19.

And finally, Defendant re-raised their arguments regarding what constitutes an "offer" to satisfy the verbal offer exception. The Court relies on its prior order, which thoroughly addresses this argument. *See id*. at 13-18. The verbal acts doctrine applies.

       b.    <u>Defendants are not entitled to a new trial for the breach of contract claim</u>

In pre-trial proceedings the Court held "Section 8(d) of the Agreement regarding severance owed if a party is fired without cause is clear" and "[t]he Court's following construction of the section is binding on the parties:

> 8(d)(i): The Executive is entitled to a lump sum of an entire year's worth of salary plus 100% of the current year's bonus. . . .
> 8(d)(iii): The Executive ALSO gets COBRA benefits paid for 12 months.
> 8(d)(iv): The Executive ALSO gets a prorated portion of the current year's bonus "irrespective of whether the performance goals applicable to such Discretionary Bonus have been established or satisfied."

Docket No. 265 at 34 ("The Court renders this interpretation because the provision on its face is not ambiguous"). As to whether the bonus was 100% or 150%, the Court left the door open for Plaintiff to prove at trial with extrinsic evidence that the agreement was modified via an oral modification to increase the bonus to 150%.

Defendant argues that the jury awarded a 150% bonus, and additional COBRA/PTO benefits to which Plaintiff was not entitled. However, that is not what the jury did. Looking to the math of Plaintiff's damages expert Dominic Persechini, he calculated Plaintiff's unpaid severance wages as totaling $4,418,813, based on the Court's interpretation of Section 8(d), as follows: (A) $3 million of annual cash compensation, pursuant to section 8(d)(i); plus (B) $43,813 in COBRA premiums, pursuant to section 8(d)(iii); plus (C) $1,375,000 for a pro-rated bonus, pursuant to section 8(d)(iv). Tr. 874:19–21, 876:8–25.[1] With respect to the pro-rated bonus, Persechini reached the $1,375,000 figure by dividing Plaintiff's $1,500,000 maximum annual bonus by 12 months, for a monthly figure of $125,000 per month, and then multiplying that by the 11 calendar months during which Plaintiff was employed by FMC for at least one day. *Id.* Defendants' damages expert Wayne Guay notably did not challenge those calculations. *See* Tr. 1055:5–1062:7.

Persechini separately provided an alternative damages calculation based on an assumed entitlement to 150% bonus based on the contents of TX 41, which totaled $5,856,313 as opposed to $4,418,813. Persechini also provided calculations for unpaid PTO/FHL benefits ($228,476), Xpanse benefits ($45,233), and an adjustment for taxes ($49,360).

---

[1] Defendant argues the calculation should have been: $2,918.813 "the sum of his $1,500,000 base salary (§ 8(d)(i)) + $1,375,000 in prorated bonus (§ 8(d)(i), (iv)) + $43,813 in COBRA benefits (§ 8(d)(iii))." Mot. at 28. It appears Defendants are arguing that 8(d)(i) would amount to $1,500,000 as opposed to the proper calculation of $1,500,000 + 100% of the current year's bonus, which was another full years' worth of salary.

The jury's damages award on count 5 for FMC's breach of contract was $4,293,813, *i.e.*, precisely $125,000 less than the $4,418,813 figure Persechini calculated for severance wages under the 100% bonus scenario.  Docket No. 310 (Jury Verdict) at 3.  Accordingly, the jury's verdict of $4,293,813 tracked closely to Persechini's 100% bonus methodology, not the calculation of a 150% bonus.

Defendant also re-raises their flawed interpretation of Section 8(d) that this Court already rejected, again contending that section 8(d)(i) "should be read in conjunction with section 8(d)(iv)" and construed to provide for solely payment of the base salary and not payment of the base salary of the bonus.  Mot. at 30.  This argument is identical to Defendants' argument in the Joint Pretrial Conference Statement.  Docket No. 230 at 10–11 ("Section 8(d)(i) must be read in conjunction with Section 8(d)(iv) of the Agreement.").  The Court rejected this argument, holding that under 8(d)(i), "regardless if there is satisfactory performance," the Plaintiff is entitled to receive "double the base salary."  Docket No. 263 (Hrg. Tr.) at 26:25–27:7 ("I don't see any other way of reading that").  There is no reason to revisit this argument here.

### 3.    Conclusion

Defendant's motion for judgment as a matter of law, for a new trial, and for remittitur of damages is **DENIED**.

B.     Defendant's Motion to Compel Plaintiff to Elect a Remedy (Docket No. 324)

Plaintiff sought two categories of damages: (1) unpaid wages and benefits he was due under his Employment Agreement with FMC; and (2) the value of the lost opportunity damages arising from Defendants' fraudulent promises and concealment.  *See generally* Compl.

Defendants bring a motion to compel Plaintiff to elect either his damages from his fraud claims, or his damages from his contract claim, arguing that he cannot succeed on both because the remedies are "mutually exclusive."  Mot. at 1.  Defendant argues that the damages exist in "two inconsistent universes"—one where Plaintiff did not take the job and went to E&V, and another where he did take the job and got severance for being fired without cause.

Defendants rely heavily on *Banks v. General Atomics*. 2015 WL 1524383 (Cal. Ct. App. Apr. 2, 2015), *as modified on denial of reh'g* (Apr. 22, 2015) (unpublished).  However, this case is inapposite.  Banks was a scientist who was recruited to start a new business division focused on laser technology.  *Id*. at *1-2.  Enticed by promises of equity ownership, Banks left his employer and accepted employment with GA. *Id*. at *2-3.  Despite oral commitments by GA executives reaffirming Banks' entitlement to equity, he never received a written equity agreement and was eventually informed that none was forthcoming.  *Id*.  Banks sued for both breach of contract and fraudulent inducement, **stemming from the same obligation: that GA did not pay him equity**. The jury entered verdicts for Banks on both.  *Id*. at *5.  The trial court required Banks to elect between them.  *Id*. at *1, 15.  The Court of Appeal affirmed the ruling: "Banks's alternative damages theories contemplate two inconsistent universes that cannot coexist: one in which Banks never left Lawrence Livermore, and one in which he did."  *Id*. at *14.  The Court of Appeal noted, however, that breach of contract and fraudulent inducement are not always incompatible, when the two claims "arose out of different obligations and different operative facts."  *Id*. at *15 (collecting cases).

Here, Plaintiff's claims for fraud and breach of contract "arose out of different obligations and different operative facts," *id*. at *15, and thus Plaintiff is not required to elect a remedy.  *See, e.g*., *Schnabel v. Lui*, 302 F.3d 1023, 1038 (9th Cir. 2002) (collecting California cases) ("'[F]raud in the inducement and breach of contract causes of action' can support separate damage awards,

United States District Court
Northern District of California

provided the actions 'arise out of different obligations and different operative facts.'"); *Gen. Ins. Co. v. Mammoth Vista Owners' Assn.*, 174 Cal. App. 3d 810, 828 (1985) (doctrine does not "preclude a plaintiff from pursuing two causes of action, as breach of contract and fraud, where each action arose out of different obligations and different operative facts"); *Symcox v. Zuk*, 221 Cal. App. 2d 383, 391 (1963) (Where "the operative facts giving rise to each cause of action are different, and in each instance a different primary right had been violated," there is no basis to "force[] plaintiff an election of remedies[.]"). More specifically, the doctrine of election of remedies does not apply where the second claim is "based on related but different or additional facts." *See Greenwood & Co. Real Est. v. C-D Inv. Co.*, 18 Cal. Rptr. 2d 144, 167 (1993).

Plaintiff's breach-of-contract claim arose solely out of FMC's refusal to pay severance benefits under the Employment Agreement upon his termination and seeks only those amounts as damages. On the other hand, Plaintiff's fraud claim arose from Stan Middleman's various additional false promises (made *before* the Employment Agreement was consummated) and concealment about how FMC and Xpanse would operate. That pre-employment misconduct caused damages different from failure to pay under the FMC contract; the fraud damages center on the lost employment opportunities outside of FMC.

Thus, the Court **DENIES** Defendants' motion to compel Plaintiff to elect a remedy, as the fraud claim, and the contract claim arises out of "different obligations" and "different operative facts." *Gen. Ins. Co. v. Mammoth Vista Owners' Assn.*, 174 Cal. App. 3d 810, 828 (1985). To be sure, there is some overlap between the fraud damages (lost opportunity) and the breach of contract damages. In awarding damages, the jury had to offset the compensation Plaintiff would have obtained but for the fraud by the amount he received from Defendants for his employment with them, including amounts he was paid as well as amounts he was awarded as contract damages (*i.e.* the amount he should have been paid).[2]

---

[2] The jury was specifically instructed to deduct any contract damages from its award of fraud damages. *See* the relevant portion of the stipulated Instruction No. 29:

> If you find for Mr. Mewawalla on his fraud claim, you may award Mr. Mewawalla the difference between, on the one hand, the value he would have received from the Engel & Volkers opportunity; and, on the other

C.    Plaintiff's Motion for Award of Prejudgment Interest Pursuant to Cal. Civil Code § 3287

(Docket No. 325)

Under California Civil Code § 3287(a), Plaintiff is entitled to prejudgment interest on his

breach of contract award because damages were certain under the severance agreement Section

8(d).  California Civil Code § 3287(a) reads as follows:

> a) A person who is entitled to recover damages certain, or capable of
> being made certain by calculation, and the right to recover which is
> vested in the person upon a particular day, is entitled also to recover
> interest thereon from that day, except when the debtor is prevented
> by law, or by the act of the creditor from paying the debt. This
> section is applicable to recovery of damages and interest from
> any debtor, including the state or any county, city, city and county,
> municipal corporation, public district, public agency, or any political
> subdivision of the state.

In California, prejudgment interest on damages that are "certain" is mandatory under Cal.

Civ. Code § 3287(a).  "Courts generally apply a liberal construction in determining whether a

claim is certain or liquidated."  *Howard v. Am. Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498, 535

(2010).  A claim is certain when "the defendant knew the amount of damages owed to the claimant

or could have computed that amount from reasonably available information," and certainty is lost

"only when the amount of damages turns on disputed facts."  *Id.*

Here, the Court held that the severance provisions constitute the relevant "fixed standard"

when it held "as a matter of law, Section 8(d) of the Agreement" is "quite clear" and "not

ambiguous."  Mot. at 3–4; Docket No. 265 at 34 (Amended Pretrial Conference Order setting forth

a "binding" construction of the provisions); (Pretrial Hrg) Tr. 26:25–27:20, Docket No. 263.

Plaintiff adopted that "fixed standard" when calculating severance damages, and Defendants did

not challenge that standard at trial despite having disputed that interpretation pretrial.

Defendants counter that Plaintiff argued for a different meaning of Section 8(d), and for a

150% bonus instead of 100%.  Neither of these instances transforms the fact that the meaning

_____

> hand, (i) the value he actually received from Freedom, (ii) the value he
> actually received from any other employer during the relevant time period,
> (iii) and any damages for breach of contract, should you so award.

Docket No. 299 (Revised Final Jury Instructions) at 34 (Instruction No. 29).

United States District Court
Northern District of California

Section 8(d) was ruled as clear and unambiguous at least as to the base amount sought and thus was sufficiently definite for purposes of determining entitlement to prejudgment interest.  Where a party proposes two damages models, one that merely would have "augmented" the amount of the first, in an amount "*over and above*" the other, California courts have found the damages to still be certain, at least as to the amount which was certain.  *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 774 (2002) (emphasis in original).  The key question is whether the *defendant* actually knew or could have computed the amount that was owed.  *Id*.  Here, Defendants were on notice of the possible amounts that were owed to Plaintiff under Section 8(d), and certainly so with respect to the bonus at 100% - which the jury ultimately awarded.

California employs a prejudgment interest rate calculated at 10% per annum as the default rate for breach of contract claims if not specified in the contract. Cal. Civ. Code § 3287(c). Plaintiff's expert calculated prejudgment interest at a 10% simple interest rate for $1,790,411 in prejudgment interest through May 22, 2025, and an additional $1,176.39 for each day thereafter through entry of judgment, pursuant to Civil Code § 3287(a).  Rocos Decl., Ex. A, Docket No. 336-1.

The Court **GRANTS** Plaintiff's Motion for Prejudgment Interest under Cal. Civ. Code § 3287(a).[3]

---

[3] In the alternative, Plaintiff argues for prejudgment interest under 3287(b) for unliquidated damages, but because the Court finds prejudgment interest due under 3287(a), the Court need not address this argument.

United States District Court
Northern District of California

D.    Plaintiff's Motion for Attorney Fees and Bill of Costs Pursuant to Fed. R. Civ. P 54(d) and

Cal. Labor Code § 218.5 (Docket No. 326)

1.    Application of Section 218.5

Plaintiff brings a motion for attorneys' fees and costs.  Plaintiff cites to California Labor

Code § 218.5 for his assertion of attorneys' fees, and to Rule 54(d) for an award of costs.  Section

218.5 reads as follows:

> (a) In any action brought for the nonpayment of wages, fringe
> benefits, or pension fund contributions, the
> court shall award reasonable attorney's fees and costs to the
> prevailing party if any party to the action requests attorney's fees and
> costs upon the initiation of the action. However, if the prevailing
> party in the court action is not an employee, attorney's fees and costs
> shall be awarded pursuant to this section only if the court finds that
> the employee brought the court action in bad faith. This section shall
> not apply to an action brought by the Labor Commissioner. This
> section shall not apply to a surety issuing a bond pursuant to Chapter
> 9 (commencing with Section 7000) of Division 3 of the Business
> and Professions Code or to an action to enforce a mechanics lien
> brought under Chapter 4 (commencing with Section 8400) of Title 2
> of Part 6 of Division 4 of the Civil Code.
>
> (b) This section does not apply to any cause of action for which
> attorney's fees are recoverable under Section 1194.

Plaintiff is seeking attorney's fees under California Labor Code Section 218.5 based on his

breach of contract claim that was governed by California law.  The choice-of-law provision in the

Employment Agreement reads as follows:

> 12. **Applicable Law**. This Agreement shall be governed by and
> construed in accordance with the laws of the State of California
> (without reference to the conflict of laws provisions thereof). Any
> action, suit or other legal proceeding arising under or relating to any
> provisions of this Agreement shall be commenced in the Santa Clara
> County Superior Court or in the State of California (or, if
> appropriate, a federal court located within the Northern District of
> the State of California), and the Company and the Executive each
> consents to the jurisdiction of such a court.

Trial Ex. 1 ¶ 12 (Employment Agreement).

However, California statutes such as the Labor Code apply "a presumption against

extraterritoriality—that is, a presumption that state law is intended to apply only within state

borders."  *Ward v. United Airlines, Inc.*, 466 P.3d 309, 317 (Cal. 2020).  "To evaluate whether a

claim seeks to apply the force of a state statute beyond the state's boundaries, courts consider

27

United States District Court
Northern District of California

where the conduct that 'creates liability' under the statute occurs." *See Oman v. Delta Air Lines, Inc*., 889 F.3d 1075, 1079 (9th Cir. 2018).  As Defendants note, the conduct that gave rise to this breach of contract claim all occurred outside of the state of California: Plaintiff "was terminated by Freedom's founder and CEO, Stanley Middleman, who lived and worked in Florida, on the recommendation of Freedom and Archwell employees who lived in Pennsylvania, New Jersey, and Georgia." Docket No. 160 (MSJ Op.) (citations omitted); *see* Docket Nos. 12-2 (Stanley Middleman Decl.) ¶¶ 2–5, 12-3 (Gregory Middleman Decl.) ¶¶ 2–5, 12-4 (Michael Middleman Decl.) ¶¶ 2–5, 12-5 (Erik Anderson Decl.) ¶¶ 2–4; *see* Docket No. 1-1 ¶¶ 2, 6, 7, 10.  The termination and failure to pay severance took place in January 2021, and the conduct regarding denial of benefits occurred, "at the earliest, on July 10, 2020, when Plaintiff alleges Defendants failed to match his 401K contributions"—both of which occurred "*after* Plaintiff moved to Washington in May 2020 . . . and *after* Defendants began withholding Washington taxes rather than California taxes for Plaintiff in June 2020."  Docket No. 160 at 25 (citing Compl. ¶¶ 76, 243; Docket No. 130-3 (Staub Decl.) ¶ 2).  There is thus no statutory basis for applying Section 218.5 here.

A choice-of-law clause in a contract cannot simply incorporate the California Labor Code which otherwise cannot apply because of extra-territoriality.  *See Cotter v. Lyft, Inc*., 60 F. Supp. 3d 1065 (N.D. Cal. 2014) ("Even if the choice of law provision were intended to confer upon out-of-state drivers a cause of action for violation of California's wage and hour laws, it could not do so.  An employee cannot create by contract a cause of action that California law does not provide.").  As the Court held at summary judgment, because Plaintiff's California Labor Code claims do not apply extraterritorially, Plaintiff could not not bring any California Labor Code claims as direct causes of action herein even under the umbrella of a choice of law clause.  Docket No. 160.

Plaintiff's attempt to separate out Section 218.5 from this rule is without merit.  Section 218.5 is found within the Labor Code under "Division 2: Employment Regulation and Supervision" > "Part 1: Compensation" > "Chapter 1: Payment of Wages" > "Article 1: General Occupations."  This is the same Article of the Labor Code that contains the substantive rights that

cannot be incorporated by reference into a contract. *See Cotter* 60 F. Supp. 3d 1065. Section 218.5 is not a stand-alone attorneys' fees provision—it is within the "matrix of laws" that California uses to regulate work within the state, and fee awards are tied inextricably to the substantive labor right created by Division 2. *Ward v. United Airlines, Inc.*, 466 P.3d 309, 319 (2020). It is therefore an integral part of the California Labor Code that cannot be made to apply simply by virtue of a contractual choice of law clause.

Furthermore, the choice-of-law provision also incorporates California's presumption against its labor laws applying extraterritorially. *See Wilson v. Wavestream Corp.*, No. 2:24-CV-00061 (MCS) (BFM), 2024 WL 3914475, at *2 n.2 (C.D. Cal. May 13, 2024) (collecting cases and noting that "a California choice-of-law clause incorporates California's presumption against extraterritoriality and its geographical limitation unless there is an indication otherwise"). The presumption against extraterritorial application still obtains even under the choice of law contract clause.

Accordingly, Plaintiffs' Motion for Attorneys' Fees is **DENIED**. To the extent Plaintiff seeks costs under Rule 54(d), Plaintiff must follow Local Rule 54-1 and file a Bill of Costs with the Court.[4]

2.   Defendants' Objection to Reply Evidence

On April 29, 2025, Plaintiffs filed an Objection to Reply Evidence, arguing that the

---

[4] Filing of Bill of Costs

    (a) Time for Filing and Content. No later than 14 days after entry of judgment or order under which costs may be claimed, a prevailing party claiming taxable costs must serve and file a bill of costs. The bill must state separately and specifically each item of taxable costs claimed. It must be supported by an affidavit, pursuant to 28 U.S.C. §1924, that the costs are correctly stated, were necessarily incurred, and are allowable by law. Appropriate documentation to support each item claimed must be attached to the bill of costs.

    (b) Effect of Service. Service of bill of costs shall constitute notice pursuant to Fed. R. Civ. P. 54(d), of a request for taxation of costs by the Clerk.

    (c) Waiver of Costs. Any party who fails to file a bill of costs within the time period provided by this rule will be deemed to have waived costs.

United States District Court
Northern District of California

1    Plaintiff improperly submitted new argument and evidence in their Reply in support of their

2    motion for attorneys' fees.  Docket No. 339.  The Court does not rely on this evidence in its ruling

3    herein, thus Defendants' objections are moot. Accordingly, the Court **DENIES** Defendant's

4    request for leave to file a sur-reply brief.  Docket No. 340.

5

6    E.    Sealing Motions

7         Defendants' Sealing Motion at Docket No. 222 is **GRANTED IN PART AND DENIED**

8    **IN PART**, as modified by Plaintiff's opposition withdrawing their confidentiality designations to

9    the mentioned documents.  *See* Docket No. 244.

10        The Parties Joint Sealing Motion at Docket No. 236 is **GRANTED**.

11        Parties Joint-Motion to Seal at Docket No. 276 is **GRANTED**. The Court directs the Clerk

12   of Court to seal the document at Docket No. 197-1.

13        The Parties have 14 days from the date of this Order to file the respective (sealed,

14   unsealed, redacted or unredacted documents) adjustments to the Docket.

15

16                    **IV.    CONCLUSION**

17        This Order disposes of the motions at Docket Nos. 222, 236, 276, 323, 324, 325, 326, 340.

18

19

20        **IT IS SO ORDERED**.

21

22   Dated:  July 11, 2025

23

24                                        _____

25                                        EDWARD M. CHEN
                                          United States District Judge

26

27

28

United States District Court
Northern District of California

30